ORAL ARGUMENT SCHEDULED FOR JANUARY 12, 2015

No. 14-1068

## IN THE
## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT
_____

INTERCOLLEGIATE BROADCASTING SYSTEM, INC.,
*Petitioner*,

v.

COPYRIGHT ROYALTY BOARD and
LIBRARY OF CONGRESS,

*Respondents*.
_____

On Petition for Review of a Determination of the
Copyright Royalty Board

## JOINT APPENDIX

Joyce R. Branda
*Acting Assistant Attorney General*
Mark R. Freeman
Sonia K. McNeil
(202) 616-8209
U.S. DEPARTMENT OF JUSTICE
950 Pennsylvania Ave., N.W.
Washington, D.C. 20530

Christopher J. Wright
Timothy J. Simeone
John R. Grimm
HARRIS, WILTSHIRE & GRANNIS, LLP
1919 M Street NW, 8th Floor
Washington, DC 20036
(202) 730-1300
cwright@hwglaw.com

November 19, 2014                    *Counsel for Petitioner*

# TABLE OF CONTENTS

| Date | Document | Page |
|------|----------|------|
| Sept. 29, 2009 | Written Direct Testimony of Barrie Kessler, Determination of Royalty Rates for Digital Performance Right in Sound Recordings and Ephemeral Recordings No. 2009-1 CRB Webcasting III..........................................................................JA 1 | |
| Sept. 29, 2009 | Written Testimony of Frederick Kass, Determination of Royalty Rates for Digital Performance Right in Sound Recordings and Ephemeral Recordings No. 2009-1 CRB Webcasting III......................................................................JA 32 | |
| Oct. 13, 2009 | Notice and Recordkeeping for Use of Sound Recordings Under Statutory License, 74 Fed. Reg. 52,418......................JA 92 | |
| Feb. 22, 2010 | Register of Copyright's Memorandum Opinion on Material Questions of Substantive Law, Determination of Royalty Rates for Digital Performance Right in Sound Recordings and   Ephemeral Recordings, No. 2009-1 CRB Webcasting III...................................................................JA 102 | |
| Apr. 1, 2010 | Order Granting in Part and Denying in Part IBS's Motion to Compel CBI to Answer Interrogatory and Produce Documents, Determination of Royalty Rates for Digital Performance Right in Sound Recordings and Ephemeral Recordings, No. 2009-1 CRB Webcasting III...........................................................JA 110 | |
| June 7, 2010 | Written Rebuttal Testimony of Frederick Kass, Determination of Royalty Rates for Digital Performance Right in Sound Recordings and Ephemeral Recordings, No. 2009-1 CRB Webcasting III...................................................................JA 112 | |
| Sept. 17, 2010 | Digital Performance Right in Sound Recording and Ephemeral Recordings, 75 Fed. Reg. 56,873........................................JA 137 | |
| Mar. 9, 2011 | Digital Performance Right in Sound Recordings and Ephemeral Recordings; Final Rule, 76 Fed. Reg. 13,026......................JA 140 | |
| Oct. 22, 2012 | SoundExchange Motion Concerning the Conduct of Proceedings on Remand, Determination of Royalty Rates for Digital | |

Performance Right in Sound Recordings and Ephemeral Recordings, No. 2009-1 CRB Webcasting III.....................JA 173

Aug. 26, 2013    College Broadcasters, Inc.'s Response to July 26, 2013 Order for Further Briefing, Determination of Royalty Rates for Digital Performance Right in Sound Recordings and Ephemeral Recordings, No. 2009-1 CRB Webcasting III.....................JA 183

Aug. 26, 2013    IBS's Proposal for the Conduct of Remand and Supporting Memorandum of Law, Determination of Royalty Rates for Digital Performance Right in Sound Recordings and Ephemeral Recordings, No. 2009-1 CRB Webcasting III....................JA 194

Aug. 26, 2013    SoundExchange Response to July 26, 2013 Order for Further Briefing, Determination of Royalty Rates for Digital Performance Right in Sound Recordings and Ephemeral Recordings, No. 2009-1 CRB Webcasting III....................JA  205

Sept. 17, 2013   Notice of Intention To Conduct Paper Proceeding on Remand And Solicitation of Comments from the Parties, Determination of Royalty Rates for Digital Performance Right in Sound Recordings and Ephemeral Recordings, No. 2009-1 CRB Webcasting III.....................................................JA 218

Sept. 27, 2013   IBS's Comments Regarding Judges' Notice of Intention to Conduct Paper Hearings, Determination of Royalty Rates for Digital Performance Right in Sound Recordings and Ephemeral Recordings, No. 2009-1 CRB Webcasting III.....................JA 227

Oct. 22, 2013    Order Following Notice of Intention to Conduct Paper Proceeding on Remand, Determination of Royalty Rates for Digital Performance Right in Sound Recordings and Ephemeral Recordings, No. 2009-1 CRB Webcasting III.....................JA 233

Feb. 4, 2014     Order Denying Motion for Rehearing, Determination of Royalty Rates for Digital Performance Right in Sound Recordings and Ephemeral Recordings, No. 2009-1 CRB Webcasting III.....................................................JA 234

*Mar. 11, 2014     Initial Determination After Second Remand (Web II), Digital
                   Performance Right in Sound Recording and Ephemeral
                   Recordings, No. 2005-1 CRB DTRA (Webcasting II)........JA 240

Apr. 25, 2014      Determination of Royalty Rates for Digital Performance Right
                   in Sound Recordings and Ephemeral Recordings; Final Rule,
                   79 Fed. Reg. 23,102 ...........................................................JA 256

*Although this document is not a part of the record in this proceeding, it is being
included in the Joint Appendix for the convenience of the Court.

Before the
## UNITED STATES COPYRIGHT ROYALTY JUDGES
### Washington, D.C.

In the Matter of:

Digital Performance Right in Sound
Recordings and Ephemeral Recordings

Docket No. 2009-1
CRB Webcasting III

### TESTIMONY OF

# BARRIE KESSLER

### Chief Operating Officer, SoundExchange, Inc.

**September 2009**

## Written Direct Testimony of Barrie Kessler

### I.    Background and Qualifications

I am the Chief Operating Officer of SoundExchange, Inc. ("SoundExchange"). I have

held this position since July 2001. Before I became Chief Operating Officer, I served as

SoundExchange's Senior Director of Data Administration, beginning in November 1999. Prior

to that, I worked as a database and technology consultant for the Recording Industry Association

of America, Inc. ("RIAA") for seven years. There, I developed the software for the certification

system for Gold, Platinum and Multi-platinum record sales, and created the royalty distribution

system for the Alliance of Artists and Recording Companies ("AARC"). I also previously

served as Director of Systems for RSA, Inc., where I directed project teams that provided

analytical and application design systems to corporate clients, and was responsible for the

company's network administration. I also previously worked as a database consultant for Price

Waterhouse and DOC Computer Center.

My responsibilities as SoundExchange's Chief Operating Officer include overseeing the

collection and distribution of royalty payments for the performance of sound recordings through

the various types of services eligible for statutory licensing, including the services at issue in this

proceeding. In this capacity, I supervise SoundExchange staff who receive royalty payments

from licensees, determine the amounts owed copyright owners and performers, and distribute the

royalties to those individuals and entities. Additionally, I oversee SoundExchange's technical

involvement with licensees, manage its budget, and coordinate its systems requirements,

development, and testing.

## II.     Overview

I am submitting this testimony to provide background information about SoundExchange and its operations; to describe SoundExchange's collection and distribution of royalties; to address several challenges that SoundExchange faces; to explain why SoundExchange should be the sole Collective for collecting and distributing royalties under the Section 112 and 114 licenses; to provide information related to the proposed minimum fee; and to support SoundExchange's proposal that the Judges continue the same terms for the statutory licenses as they adopted in the Webcasting II proceeding, with certain modifications.

## III.    SoundExchange's Collection and Distribution of Royalties

### A.     Overview of SoundExchange

SoundExchange is a 501(c)(6) nonprofit performance rights organization established to ensure the prompt, fair and efficient collection and distribution of royalties payable to performers and sound recording copyright owners for the use of sound recordings over, among other things, the Internet, wireless networks, cable and satellite television networks, and satellite radio services (hereinafter collectively "services" or "licensees") via digital audio transmissions. SoundExchange is governed by an 18-member Board of Directors that is made up of equal numbers of artist representatives and sound recording copyright owner representatives. Copyright owners are represented by board members associated with the major record companies (four), independent record companies (two), the Recording Industry Association of America (two), and the American Association of Independent Music (one). Artists are represented by one representative each from the American Federation of Musicians ("AFM") and the American Federation of Television and Radio Artists ("AFTRA"). There are also seven at-large artist seats, which are currently held by artists' lawyers and managers (four), an individual artist

JA3

(Martha Reeves), and individuals who are affiliated with the Future of Music Coalition and the Rhythm & Blues Foundation.

In Webcasting II, Docket No. 2005-1 CRB DTRA, the Judges designated SoundExchange "as the Collective to receive statements of account and royalty payments from Licensees due under § 380.3 and to distribute such royalty payments to each Copyright Owner and Performer, or their designated agents, entitled to receive royalties under 17 U.S.C. 112(e) or 114(g)." 37 C.F.R. § 380.4(b).

SoundExchange has represented artists and record labels on a vast array of issues, including notice and recordkeeping and rate-setting through the Copyright Royalty Judges' proceedings, as well as the prior CARP processes. In addition, SoundExchange undertakes a number of measures to protect the interests of artists and copyright owners under the statutory licenses, including by conducting audits of licensees, seeking and obtaining compliance by noncompliant licensees, and engaging in other enforcement and compliance measures. Since its founding, SoundExchange has, on behalf of all artists and record labels, sought the establishment of fair royalties and regulations that enable the prompt, fair and efficient distribution of royalties to all those artists and copyright owners entitled to such royalties.

SoundExchange frequently refers to those record labels and artists who have specifically authorized us to collect royalties on their behalf as "members." We have approximately 9,700 record label members and 29,000 artist members. We also pay statutory royalties to non-members – copyright owners and artists alike – as if they were also members. In total, we maintain accounts for approximately 11,500 record labels and 41,000 artists, including members and non-members.

SoundExchange has distributed royalties based on billions of webcasting performances. To date, SoundExchange has conducted a total of 33 royalty distributions and has made nearly 150,000 individual payments totaling more than $250 million. SoundExchange collected approximately $19 million in statutory webcasting royalties for 2006, $40 million for 2007 and $50 million for 2008.

SoundExchange strives to minimize the administrative costs associated with royalty collection and distribution. SoundExchange has 40 full-time staff members. In 2007, based on our audited expenses, our administrative rate was 4.3% of total revenue. In 2008, based on our (as of yet unaudited) expenses, our administrative rate was 5.1% of total revenue. This is a remarkable accomplishment, given the short time that SoundExchange has been in existence and the lower revenue base against which this number is calculated (compared with other U.S. collection societies, which often have overall royalties approaching or exceeding $1 billion). For comparison purposes, I believe reported administrative costs for the American Society of Composers, Authors and Publishers ("ASCAP") and BMI are typically higher.

### B.    Webcasting Licensees

The number of webcasters paying royalties to SoundExchange remains robust – 610 webcasting services paid SoundExchange statutory royalties in 2008. In fact, this number under-counts the total number of webcasters that paid royalties in 2008. Some corporate enterprises (*e.g.*, radio station groups) pay and report in a consolidated manner on behalf of all of their affiliates, while other affiliates of other enterprises pay and report separately for each station or for distinct subsets of stations (for example, on a regional basis). Taking these differences into account, SoundExchange actually receives separate reporting, and in some cases separate

4

payment, from over 1,400 different webcasting services, accounting for thousands of channels and stations.

The commercial webcasters participating in this proceeding – Live365 and RealNetworks – account for a relatively small portion of the total webcasting royalties paid to SoundExchange. In 2008, the royalties paid by these two parties' webcasting services represented less than 2.5% of the total webcasting royalties paid to SoundExchange. In 2009, they represent less than 2% of the webcasting royalties paid to date.

By contrast, the royalties paid by the webcasters that have opted into one of the three Webcaster Settlement Act agreements that SoundExchange is submitting as exhibits in this proceeding – the Broadcasters agreement with the National Association of Broadcasters ("NAB"), the Noncommercial Educational Webcasters agreement with College Broadcasters, Inc. ("CBI"), and the Commercial Webcasters agreement with Sirius XM Radio – represent over 50% of the total webcasting royalties paid to SoundExchange in 2008.

### C.    Royalty Collection and Distribution

SoundExchange's core mission is to collect and distribute statutory royalties as efficiently and accurately as possible. We have worked hard for nearly ten years to develop sophisticated systems, business processes and extensive databases uniquely suited to the challenging task of distributing statutory royalties. For managing royalty collection and distribution, SoundExchange employs the following operational procedures.

Receipt of Payment. SoundExchange's Royalty Administration and Distribution Services Departments receive from statutory licensees royalty payments and, ideally, two reports: (1) statements of account that reflect the licensee's calculation of the payments for the reporting period; and (2) reports of use that log performances of sound recordings. (We also receive

notices of election that indicate whether the licensee has utilized any optional rates and terms.) When SoundExchange receives payment from a licensee, that payment is logged into SoundExchange's licensee database.  If this is the first payment from a licensee, a new profile is created for the licensee.  If the licensee has previously paid royalties, then the payment is entered under the existing profile.  If the licensee operates services in multiple rate categories, the royalty payments are allocated among the applicable rate categories based on the statements of account. Similarly, block payments by a parent corporation covering corporate subsidiaries (*e.g.* by a radio station group covering individual radio stations) may be allocated among the subsidiaries if the parent provides separate statements of account for each of the covered subsidiaries.

Loading of Reports of Use.  Reports of use are associated with a service's payments and statements of account for a particular period and loaded into SoundExchange's system.  The reports are supposed to provide information about the sound recording title, album, artist, marketing label, International Standard Recording Code and other information, as well as information about the number of listeners.  If a report does not conform to the required format and delivery specifications, it may not load without substantial manual intervention.  Instead, SoundExchange staff must review the reports, identify the kinds of corrections that need to be made, work with the service to obtain a corrected report from the service, and then attempt again to load the report into the system.  In some instances, services fail to accurately report identifying data for sound recordings by, for example, identifying an artist as "Various," reporting a performer as "Beethoven" or "Mozart," or simply not providing required information.  In each of these instances my staff has to research the partially identified sound recording in order to identify accurately the sound recording copyright owners and performers entitled to royalties.

6

Matching.  SoundExchange's systems seek to match the recordings reported in licensee reports of use with information in SoundExchange's database concerning known recordings and their copyright owners and performers.  Our complex log loading algorithm attempts to match identical and similar data elements and combinations of data elements from the incoming log against performance information previously received from the services.  If there is a match for a particular sound recording, then the program identifies the corresponding copyright owner and performer information.  However, a reported recording might not match a known recording if, for example, the service has performed a recording by an unsigned band, or a very new, old, foreign or other obscure recording that has not previously been reported to SoundExchange, or if the service has provided incomplete or incorrect identifying information.

Research.  SoundExchange has built its database of sound recordings from scratch, based on information reported to it by the services.  To the extent a reported recording does not sufficiently match a known recording, SoundExchange personnel will research the recording in an effort to determine whether it should be added to SoundExchange's database or whether it is in the database under different identifying information.  This research requires a significant amount of staff time.  Such research is often required for new releases, works reported for the first time, works from small labels, compilation albums and foreign repertoire.  In the case of compilation albums, for example, finding copyright ownership information is particularly time-consuming because, although the album is issued by one label, each of the sound recordings on it could be owned by a different label.

SoundExchange conducts extensive data quality assurance work to ensure the correct association of copyright owners and performers, on the one hand, and particular performances, on the other.  For example, the SoundExchange system detects what we call "performances in

conflict," a situation in which performances of the same sound recording are reported as being on more than one label. In such cases, we conduct research to determine the correct label for the sound recording. We also review situations in which an artist has performances of different sound recordings with different labels or with "unassociated labels," which may indicate that the label information provided to us was incorrect.

Account Assignment. SoundExchange then assigns reported sound recording performances to accounts belonging to copyright owners and performers. Performances for which a copyright owner or artist account is not identifiable (e.g., because the recording reported has not yet been matched to a recording known to SoundExchange) are assigned to a "suspense" account for later review and research. This is often the result of poor quality data provided by licensees. Performances assigned to suspense accounts are processed through the steps that follow as soon as identification is made, with the associated royalties being released in the next scheduled distribution.

Royalty Allocation. Once account assignment has occurred, a service's royalty payments for a given distribution period are allocated to sound recordings used by that service during that period and to SoundExchange's costs deductible under Section 114(g)(3) (sometimes referred to as SoundExchange's "administrative fee"). Before distribution of allocated funds, SoundExchange takes several quality assurance steps to ensure accounts are payable, address and tax identification information is complete, performances in conflict are resolved and copyright owner conflicts are resolved (to the extent practicable).

Adjustment. Once allocations are completed, it is sometimes necessary to adjust particular accounts to rectify reporting and other errors that occurred in prior distributions. For example, if Copyright Owner A was incorrectly reported as the copyright owner of Song X and

8

received royalties for Song X, but the actual owner of that song was Copyright Owner B, then SoundExchange would need to credit Copyright Owner B in a future distribution and debit Copyright Owner A's account for the improper distribution. Adjustments typically take the form of an additional payment or a reduced payment to an existing account in the next scheduled distribution. For copyright owners and artists who are newly identified and for whom royalties have been accruing, a new account is created and royalties attributed to the suspense account are transferred to the new account. Adjustments are also made from suspense accounts to copyright owner and artist accounts based on registrations received during the period between distributions.

Distribution. This process begins with consolidating allocations across licensees' performance logs within a license category according to earning entity,[1] which are then assigned to copyright owners, artists, or certain other payees (such as a producer who an artist directs SoundExchange to pay) based on the payment instructions for each. Next, the system generates a payment file, which we transmit to our banking partner. SoundExchange generally provides each royalty-earning entity with an electronic or hard copy statement reflecting the performances – and the licenses under which the sound recordings were performed – for which the royalty payment is made. When there is a payable balance in a payee's account above the distribution threshold, a check is mailed or funds are electronically transferred.

SoundExchange's database containing payee information is derived from account information received from record labels and artists, and includes such payees as the copyright owners and artists themselves, management companies, production companies, estates and heirs. We must, however, verify address and other information and secure appropriate tax forms

---

[1] An "earning entity" is the person or entity who has earned the royalties from a tax standpoint and does not have to be the person who receives royalties.

directly from each artist and label. If an earning entity fails to provide SoundExchange with tax information, then we can still distribute royalties but must withhold a portion of the royalties pursuant to applicable Internal Revenue Service ("IRS") guidelines.

SoundExchange presently conducts distributions at least four times a year for statutorily licensed uses (*i.e.*, performances pursuant to 17 U.S.C. §§ 112(e) and 114) and, at times, for non-statutorily licensed performances for which SoundExchange has collected royalties, typically from non-U.S. performing rights organizations who have money for U.S. performers or copyright owners. The threshold for distributing royalties to a payee is $10. Distributing smaller amounts would incur significant additional transaction costs. Every payee with a balance greater than $10 receives at least an annual distribution. Payees with balances less than $100 receive more frequent distributions only if they have opted to be paid by electronic funds transfer rather than by check.

Payments for which SoundExchange lacks sufficient information to distribute to the appropriate copyright owner or performer are allocated to separate accounts in accordance with 37 C.F.R. § 380.8. When SoundExchange subsequently obtains the information necessary to distribute royalties to a particular copyright owner or performer, it will do so in a future distribution.

### D.    Challenges That SoundExchange Faces

#### 1.    The Complexities of Royalty Collection and Distribution

While SoundExchange has gained tremendous efficiencies through its custom software system, the massive scope of the undertaking and the frequency with which novel circumstances arise make the actual task of collecting and distributing royalty payments extremely complex.

Collecting royalties from hundreds of services and distributing the royalties to thousands of payees is an enormous undertaking. Working together with statutory licensees, artists, unions and record labels, we endeavor every year to streamline our processes and ensure that the maximum amount of royalties we collect are paid out to those entitled to receive them. SoundExchange has automated many of its functions (and such automation is critical to ensuring efficient distribution of royalties). About a year ago, we deployed a new royalty distribution platform that has improved SoundExchange's ability to manage royalty recipient accounts, match performances to repertoire, and manage our research work flow. This new platform automates more functions, enables us to process large volume logs more easily, and permits greater flexibility in how artist and copyright owner accounts are paid, among other things. I am very pleased with these improvements and greater automation, though SoundExchange staff still must undertake the laborious process of tracking down individuals entitled to royalties and correcting or completing misreported performance data.

The process of matching performances of specific sound recordings to individual copyright owners and performers is often difficult because many business arrangements in the recording industry are intricate and continually evolving. For a given sound recording, there may be multiple artists as well as multiple payees entitled to receive a portion of the royalties, as well as the IRS. Further, members of a band often change over the course of the band's

11

existence. When a band that has undergone changes in membership releases multiple versions of the same song, each release may involve payments to different people. Matching the performing band members to a particular sound recording of such a song can be complicated. For example, Fleetwood Mac has undergone multiple changes in membership since it originally formed in 1968, making the task of determining which royalties belong to which members difficult. Indeed, fourteen different individuals may claim to have been a part of the "featured artist" Fleetwood Mac at one time or another, and SoundExchange must determine which individuals are entitled to payment for which sound recording. And Sade is the name of both the individual artist Sade Adu and the band with which she has sung. When SoundExchange receives reports from licensees that list only "Sade" as the performing artist, it can be difficult to determine whether Sade Adu or Sade the band (which includes other members in addition to Sade Adu) is the proper recipient of royalties for a sound recording performance.

Band members may also share royalties on an unequal basis. In the easy case, bands or artists have a corporation that receives the royalties and the corporation assumes responsibility for dividing and distributing royalties among the band members. In some cases, however, SoundExchange itself has to locate the information regarding shares, divide the royalties, and make the payments to each band member. The general rule we have created is to distribute royalties on a pro rata basis among the members of a band when there is no indication to the contrary from band members.

Furthermore distributions can be especially complicated if an artist is deceased and there are multiple heirs (each of whom may have a different share) entitled to the royalties from the performance of a single sound recording; this is particularly true where the artist is a group and more than one group member is deceased.

## 2.    Problems Caused by Poor Licensee Compliance

SoundExchange works diligently to pay through as high a percentage of its receipts as possible, as fast as possible. SoundExchange's royalty distributions are impeded by many licensees' submitting reports of use that are inaccurate, incomplete, improperly formatted or delinquent, or by their failure to provide reports of use altogether. SoundExchange understands that the CRJs are considering issues related to reports of use, including census reporting, in a separate proceeding, Docket No. RM 2008-7, and that proposals for regulations related to reports of use properly belong in that proceeding. To that end, SoundExchange has submitted three sets of comments in Docket No. RM 2008-7. However, I mention the problems SoundExchange faces in connection with licensees' widespread noncompliance with the reporting regulations and poor quality reports of use because it has a direct impact on SoundExchange's distribution of royalties.

SoundExchange's ability to allocate and distribute royalties depends to a large degree upon the cooperation of licensees in complying with their payment and reporting obligations on a timely basis, and among services there is widespread noncompliance with the Judges' regulations. Unfortunately, many services have not historically and still do not regularly provide reports of use or have submitted defective reports of use.

For example, in past years, RealNetworks failed to provide reports of use. This failure to comply with basic reporting requirements has caused SoundExchange to expend time and money to get RealNetworks to fulfill its obligations and prevents the prompt distribution of royalties.

In addition to missing or defective reports of use, many services fail to provide the required statement of account or other necessary documentation with their payments, or are paying at an improper rate. All of this has the effect of delaying distribution. For example, since

the Judges set the webcasting royalty rates for 2006 - 2010 in Webcasting II, Live365 has not

paid SoundExchange at those new rates. Live365's recent litigation efforts suggest that it is

unsatisfied by the rates set in Webcasting II. It certainly has every right to seek whatever legal

remedies may be available to it, and to participate in this rate-setting proceeding to advocate in

favor of different rates. But a service's unhappiness with the rates set by the Judges should not

excuse the service from paying those rates.

Poor compliance by licensees impedes SoundExchange's efforts to administer the license

efficiently. SoundExchange has taken a number of steps to address these problems. We have

applied increased pressure on services to supply missing reports of use and to provide more

compliant reports of use. We work with licensees to improve their reporting compliance. We

have also assigned more SoundExchange staff to focus their attention on resolving problems

with logs, and we have reallocated members of our software development team to data and

distribution activities. However, all such efforts require SoundExchange's attention, time and

money – all of which could have been devoted to its core mission of collecting and distributing

royalties.

### 3.    Identifying and Locating Royalty Recipients

In an effort to maintain accurate information on artists' arrangements for division of

royalties as well as basic contact and tax information, SoundExchange actively engages in artist

outreach. SoundExchange attends about 50 music industry conferences, meetings, festivals and

events a year, and speaks to artist management firms, record labels, performing rights

organizations and law firms that represent artists. SoundExchange also works with music

associations to spread awareness of its services, and it advertises in a variety of media outlets.

14

SoundExchange personnel are available to artists (as well as to copyright owners and licensees) to provide information and answer questions, and we do so on a regular basis.

For undistributed royalties, six SoundExchange staff members' and three consultants' responsibilities include conducting research to locate artists and obtain their payee information. Even where SoundExchange is able to determine the identity of the artist and record label, that does not mean that SoundExchange knows where to locate them. Locating accurate payee information for a sound recording can be very difficult, especially if the recording is listed in a non-active, deep "catalog" or involves an artist who does not have a U.S. corporate entity designated to receive royalties on his or her behalf. Moreover, even when we locate artists or their managers, we still need them to return payee information so that we can send their royalties to them. All of these steps mean that tracking down and paying the enormous number of artists and record companies entitled to statutory royalties is a daunting task.

Through niche programming, services perform many sound recordings of smaller, less well-known labels and performers who are hard to find (and the problem is magnified if the labels are no longer in existence). SoundExchange spends a significant amount of time addressing this problem in two ways. First, SoundExchange personnel publicize the organization, its mission and its functions in order to ensure that artists and copyright owners are aware that they may have royalties owed to them. We hope that individuals who learn about us will contact us to provide us with the information we need to pay them. Second, SoundExchange performs extensive research to locate and contact individuals who may be entitled to royalties. For example, we rely on databases such as Celebrity Access and All Music Guide as well as information provided by other organizations within the music industry, both domestic and

15

foreign, to locate artists. SoundExchange also utilizes temporary employees, interns, and independent contractors to assist in locating individuals and entities entitled to royalty payments.

SoundExchange's ability to distribute royalties depends upon the cooperation of copyright owners and performers in providing necessary payment and tax information. SoundExchange cannot distribute allocated royalties when the artist or the rights owner or both have failed to register with SoundExchange. Inexplicably, even when SoundExchange contacts artists about unpayable royalties, some of them fail to submit the proper registration information to enable payment. In addition, many artists change address frequently, and it is not uncommon that an artist SoundExchange has previously paid will move but fail to inform SoundExchange of his or her new address. SoundExchange is then unable to distribute royalties to that artist until he or she can be located again. If artist group members cannot agree to the splits among them for their repertoire or if there are multiple claims against the same repertoire (as with two foreign collecting societies claiming the same sound recording), those payments will be placed on hold, pending resolution of the dispute.

SoundExchange is working to address these challenges in several ways in addition to the outreach measures discussed above. For example, instead of issuing checks, we offer royalty recipients the option of receiving their royalties through automated check clearinghouses that essentially offer direct deposit into bank accounts. Even when artists tour frequently and change their addresses, their bank accounts generally remain the same. Under this system, when an artist moves or is touring, he or she will continue to receive payments directly into his or her bank account. In addition, we continue to pursue initiatives with foreign collectives to locate artists. SoundExchange has developed relationships and negotiated agreements with sister royalty societies around the world, including SOMEXFON in Mexico, PPL in the United

Kingdom, ABRAMUS and UBC in Brazil, AIE in Spain, RAAP in Ireland, and SENA in the Netherlands. Under these agreements, SoundExchange remits royalty payments due to copyright owners or performers represented by those societies. In some agreements, SoundExchange receives royalty payments for performances of U.S. sound recordings that these analogous societies have collected.

We also work with other organizations with connections to the artist community to compare our unmatched lists to data they maintain about artists. When those organizations have contact information for artists for whom we lack information, they contact the artists and encourage them to register with SoundExchange and collect their royalties. Furthermore, we have launched on-line registration, so that artists and copyright owners can register with SoundExchange without having to use conventional mail. Finally, we continue to appreciate the efforts of our record label members who encourage their artists to collect their SoundExchange royalties.

## IV.    SoundExchange Should Be Designated the Sole Collective to Collect and Distribute Webcasting Royalties.

In Webcasting II, the Judges found "that selection of a single Collective represents the most economically and administratively efficient system for collecting royalties under the blanket license framework created by the statutory licenses." Faced with testimony and evidence submitted by SoundExchange and RLI, the Judges concluded that "SoundExchange is the superior organization to serve as the Collective for the 2006-2010 royalty period." 72 Fed. Reg. at 24105 (May 1, 2007).

I agree with the CRJs' conclusions, and request that the Judges again designate SoundExchange as the sole Collective to collect and distribute royalties for the 2011-2015 statutory period. SoundExchange now has considerable experience and expertise in

17

administering the statutory licenses.  Whereas at the time I submitted my written direct testimony in Webcasting II, SoundExchange had processed over 650 million sound recording performances, 72 Fed. Reg. at 24104, SoundExchange has now processed billions of sound recording performances.  SoundExchange has continued to increase the size of its membership and the number of record label and artist accounts it maintains.  Whereas at the time the Webcasting II direct testimony was submitted, SoundExchange had approximately 3,000 record label members and 12,000 artist members, 72 Fed. Reg. at 24104, today SoundExchange has approximately 9,700 record label members and 29,000 artist members.  And while SoundExchange had over 700,000 sound recordings in its database when I submitted my written direct testimony in Webcasting II, today that number has grown to nearly 2 million.

I am aware that RLI has filed a petition to participate in Webcasting III.  I oppose any effort by RLI to be designated as the sole Collective or as an alternative collective to collect and distribute statutory webcasting royalties.  In selecting SoundExchange over RLI as the sole Collective in the Webcasting II proceeding, the Judges expressed "serious reservations about the bona fides of Royalty Logic to act as the Collective under the statutory licenses."  Webcasting II, 72 Fed. Reg. at 24105.  The Judges noted that RLI is a for-profit organization that wants to enter the royalty collection and distribution business to make money; that the testimony of Mr. Gertz raised concerns "as to whether Royalty Logic will act in the best interest of all copyright owners and performers covered by the statutory licenses"; that RLI's relationship with copyright users and services "elevated" these concerns; and that RLI's arguments about the potential effects of competition between collectives were not relevant.  Webcasting II, Fed. Reg. at 24105.

In my testimony in Docket No. 2005-1 CRB DTRA, I discussed the problems associated with a system that includes more than one collection and distribution agent.  Those problems

18

remain true today. SoundExchange's system presently contains entries for tens of thousands of copyright owners and performers and nearly 2 million sound recordings. For the system to recognize multiple agents, SoundExchange would have to expend significant resources, both human and monetary, to create the accounting platform necessary to track numerous distributing agent relationships, keep accounts current when entitled parties change affiliation with multiple agents, and still ensure timely distributions. Adding multiple agents would not only create administrative costs and burdens, but would also result in substantial delay in distributing royalties owed. The resulting complexity and administrative burden would serve no one and would lead only to a large number of disputes between collectives – disputes that might end up back before the Judges.

In my view, a multi-agent system is anathema to the concept of an efficient statutory licensing system. Although proponents of a multi-collective system often point to ASCAP, BMI, and SESAC – the musical works performing rights organizations – it is important to understand that administering a statutory license is fundamentally different from what those organizations do. Those organizations all engage in <u>direct</u>, <u>voluntary</u> licensing. They represent their members (and only their members) and are able to compete for members by negotiating different rates and terms for collection and distribution of royalties. They only collect and distribute monies for their own members, and have no responsibility to anyone other than their members.

Under the Copyright Act, SoundExchange is in the position of administering a statutory license whose rates and terms are set by the Judges. There cannot be "competition" between collectives on rates and terms; the only "competition" would be created by one collective trying to free-ride off the efforts of another, as RLI has done in the past and may want to do in the future. Moreover, because many copyright owners and performers will be members of no

19

organization, there must be an entity that has the responsibility of researching and identifying their recordings, locating them and ensuring that they too receive the royalties to which they are entitled. SoundExchange (or its predecessor) has undertaken that responsibility since royalties began being paid under Section 112(e) and Section 114 of the Copyright Act.

Where a statutory license has specified rates and terms, it only makes sense for a single entity to provide administration. As I discussed in my prior testimony, if multiple collectives were to administer the same license, the collection and distribution process would grind to a halt.

Moreover, designating a second Collective would create greater overall costs because copyright owners and performers would have to pay for duplicative systems for license administration. Similarly, designating a new Collective to replace SoundExchange would be inefficient. SoundExchange has invested substantial time, effort and money into developing its collection and distribution systems, and has developed great expertise in administering the statutory license. The benefits to copyright owners and artists of that experience and expertise would be lost if a different entity were designated as the Collective. Copyright owners and artists would also be harmed because they would subsidize the costs of transitioning to a new Collective.

## V.    The Minimum Fee

SoundExchange proposes setting the statutorily-required minimum fee at $500 per channel or station, subject to a $50,000 annual cap for commercial webcasters. This proposal is supported by agreements that SoundExchange is submitting as evidence, and would ensure that every licensee makes some contribution to the costs of administering the statutory license.

A.    Agreements

SoundExchange's agreements under the Webcaster Settlement Act establish that services are willing to pay the minimum fee that SoundExchange is seeking in this proceeding. SoundExchange has submitted two settlements to the CRJs for publication and adoption – a Broadcasters agreement with the National Association of Broadcasters ("NAB") and a Noncommercial Educational Webcasters agreement with College Broadcasters, Inc. ("CBI"). The parties entered into the Broadcasters agreement pursuant to the Webcaster Settlement Act of 2008, and the Noncommercial Educational Webcasters agreement pursuant to the Webcaster Settlement Act of 2009. In addition, SoundExchange has entered into a Commercial Webcaster settlement with Sirius XM pursuant to the Webcaster Settlement Act of 2009. The agreements provided eligible services an opportunity to opt into the agreements and accept the rates and terms established by them.

The NAB agreement covers the time period 2006 through 2015, and includes an annual minimum fee of $500 per station or channel, subject to a $50,000 cap. According to SoundExchange's records, 404 entities have opted into the NAB agreement on behalf of several thousand individual stations.

The Commercial Webcaster Agreement covers the time period 2009 through 2015, and likewise includes an annual minimum fee of $500 per station or channel, subject to a $50,000 cap. Sirius XM has opted into the agreement for its webcasting service.

The CBI agreement covers the time period 2011 through 2015 (with special reporting provisions for 2009-2010), and includes an annual minimum fee of $500 per station or channel. The opt-ins for the CBI agreement are not due until January 2010. The minimum fee in the CBI agreement has no cap but, in our experience, the huge majority of noncommercial services never

21

pay more than $500, and no individual noncommercial licensee that pays SoundExchange reports more than ten stations on its statements of account, let alone the 100 that would reach the cap in the commercial webcaster context. In addition, for noncommercial services, $500 covers the first 159,140 ATH per channel or station as well, meaning that a cap would be inappropriate. For example, if a noncommercial webcaster offered 150 channels, but was subject to a cap of $50,000 at a minimum fee rate of $500 per channel, that noncommercial webcaster should not get 159,140 aggregate tuning hours of usage on 50 channels for free.

These agreements show that both commercial and noncommercial stations are willing and able to pay a $500 minimum fee.

### B.    Contribution Toward Administrative Costs

One rationale for the minimum fee that has been raised in past proceedings is that it should cover SoundExchange's administrative expenses even in the absence of royalties. 72 Fed. Reg. at 24096 (May 1, 2007). I agree that the minimum fee should ensure that every licensee makes an appropriate contribution to the costs of administering the statutory license, as well as a reasonable payment for usage of sound recordings. After all, if the minimum fee covered only administrative expenses, then copyright owners and performers collectively would receive no payment for the use of their sound recordings by services paying only the minimum fee. Those payments would in effect be completely consumed by costs of administration.

That said, SoundExchange has never sought to collect all of its costs from minimum fee payments. Payments from services that pay larger amounts of royalties in effect subsidize the costs associated with processing payments and information from smaller services that typically pay only the minimum fee.

SoundExchange's per service or per station or channel administrative costs are difficult to quantify. The expenses that SoundExchange incurs in relation to particular services vary widely depending on the quality of data that a service provides to SoundExchange and on the additional work that SoundExchange may need to do when it receives poor quality data. In addition, some large station groups submit separate statements of account and reports of use for each of their individual stations. This means that we need to process each such station individually, rather than as a group, which necessarily adds time to our efforts. Our costs also vary depending on the breadth and obscurity of a service's repertoire, with services that play a great deal of repertoire that is relatively unique imposing greater research costs. In addition, many of our costs are effectively shared across services – including things like research of repertoire used by multiple services, costs of artist outreach and distributing royalties once individual services' allocations are loaded, information technology and corporate overhead. SoundExchange does not track its administrative costs on a licensee-by-licensee, station-by-station or channel-by-channel basis and, as a result, there is no precise way to determine exactly what we must spend on such a basis.

As a check on whether the minimum fees agreed upon in SoundExchange's Webcaster Settlement Act agreements and proposed in this proceeding are reasonable in light of our administrative costs, SoundExchange nonetheless estimated our administrative costs per service. Based on current (and as of this point unaudited) records, SoundExchange's expenses for 2008 were approximately $8.4 million. This amount includes SoundExchange staff, facilities, amortized and depreciated equipment, operating expenses, and other costs. This amount excludes the amortization of costs of rate-setting proceedings. In 2008, SoundExchange had 1,440 licensees (at the statement of account level) of all license types. When SoundExchange's

23

operating costs are divided by the number of licensees, the result is a per licensee cost of approximately $5,833.

While the overwhelming majority of these licensees (about 1,371) operated only one station or channel, some operated multiple stations or channels. The number of individual channels or stations on a licensee's service is often an indicator of greater complexity required to handle such payments and reporting. However, it is unclear how many "stations" there actually are in the case of a handful of internet-only services that allow users to create channels, and handling payments and reporting by those services is probably not hundreds or thousands of times more expensive or complex than handling payments and reporting by a service with only one channel. That is why we have been willing to agree to a cap on the minimum fee corresponding to 100 channels or stations per licensee, and propose such a cap for commercial webcasters in this proceeding.

As a further check on our proposed per channel or per station minimum fee, we tried to determine the average number of channels or stations per webcaster licensee. Calculating the average number of channels or stations per webcaster is necessarily an inexact exercise. Services do not always report the total number of channels or stations, and as noted above, for services that allow users to create channels, it is unclear how many "stations" there actually are. In estimating the average number of stations or channels per webcaster, we used actual numbers where that information is reported to us. Where that information is not reported to us, but where a service provides information about the number of its stations or channels on a publicly available website, we used that information. For the small number of services for which we lack information about their total number of stations or channels, but for which we are generally aware that they have a large number of stations or channels, we assumed 100 stations or

channels. The assumption of 100 stations or channels is consistent with SoundExchange's proposal of a $50,000 cap on minimum fees for commercial services with 100 or more stations or channels where the minimum fee is $500.

Based on the foregoing information, we determined that there are an average of about seven channels or stations per webcaster licensee at the statement of account level. As a matter of arithmetic, SoundExchange's average per channel or station cost for webcasters in 2008 was approximately $833 ($5,833 divided by 7). One could do this analysis differently. For example, if one capped at 100 the number of channels on services known to have a much larger number of channels, one would get a lower average number of channels or stations per webcaster licensee at the statement of account level and a correspondingly higher average per channel or station cost.

The exact cost imposed by any particular licensee varies widely. Every single statement of account and every single report of use must go through the entire process described above – the payments and statements of account must be reviewed, verified, and recorded; and the reports of use must likewise be reviewed, tested, logged, and loaded into the distribution engine. Any problems with paperwork or logs can introduce problems and cause delay.

Nonetheless, the estimates described above demonstrate that SoundExchange's proposed minimum fee of $500 per station or channel is below our estimated per station or channel costs. As indicated above, SoundExchange has never sought to collect all of its costs from minimum fee payments. Payments from services that pay larger amounts of royalties in effect subsidize the costs associated with processing payments and information from smaller services that typically pay only the minimum fee. However, because $500 per station or channel does not recover all of our administrative costs, particularly if the minimum fee is understood to include

25

some payment for usage of sound recordings, that level of payment represents a reasonable and justified contribution to the costs of administering the statutory license.

## VI.    License Terms

SoundExchange generally proposes continuing the same terms in this proceeding as the Judges adopted in the Webcasting II proceeding, Docket No. 2005-1, subject to the revisions described below with regard to (i) server log retention, (ii) late fees for reports of use, (iii) identification of licensees, and (iv) certain technical and conforming changes.

Although the Judges did not rule in SoundExchange's favor on all of the terms issues raised in the Webcasting II proceeding, the Judges clearly recognized many of SoundExchange's concerns, and the terms adopted in that proceeding represented an important step forward. In the SDARS proceeding, Docket No. 2006-1, the Judges adopted terms that were largely similar to the terms adopted in the Webcasting II proceeding, except to the extent dictated by differences in the rate structure and for certain technical changes. I believe there is value in having consistency of terms across licenses, and in allowing time to fully assess the effectiveness of those terms based on experience working under those terms. Consistency among the terms regulations for the various types of services and over time aids SoundExchange's administration of the licenses and makes licensees' compliance with the terms more efficient.

For all of these reasons, SoundExchange proposes that the Judges adopt the same terms regulations as it adopted in Docket No. 2005-1, as codified at 37 C.F.R. Part 380, except as discussed below.

### A.    Server Log Retention

SoundExchange proposes that the statutory license terms expressly confirm that the records a licensee is required to retain pursuant to 37 C.F.R. § 380.4(h) and that are subject to

audit under 37 C.F.R. § 380.6 include server logs sufficient to substantiate rate calculation and reporting. Licensees often do not retain the actual server logs showing which transmissions were made when. This data is critical for verifying that licensees have made the proper payments.

The current royalty rate structure is based on the actual performances transmitted, and SoundExchange proposes continuing that rate structure in the next rate period. Every webcaster's transmissions are made by computer servers that typically generate original records of what recordings they transmitted to how many users and when. Those logs should become the basis for a licensee's statements of account and reports of use. However, if SoundExchange cannot compare those logs to the statements of account, reports of use and other records maintained by the licensee that purportedly were derived from the server logs, we are missing the first – and perhaps most important – link in the chain of records that establish actual usage.

While I believe the current regulations already require licensees to maintain their server logs for at least a three year period, because they are "records of a Licensee . . . relating to payments of . . . royalties." 37 C.F.R. § 380.4(h), some licensees apparently take a different view and do not retain their server logs. Accordingly, SoundExchange proposes that the Judges make this requirement more explicit.

### B.     Late Fees for Reports of Use

SoundExchange proposes that reports of use be added to the list in 37 C.F.R. § 380.4(e) of items that, if provided late, would trigger liability for late fees. SoundExchange made a similar proposal in the pending notice and recordkeeping proceeding, Docket No. RM 2008-7. The implementation of that concept could be included in either the notice and recordkeeping regulations or the license terms. Implementing the concept in the license terms would be appropriate because late fees are otherwise provided for in the license terms, and timely

provision of reports of use is essential to the distribution of statutory royalties as contemplated

by the license terms.  Indeed, reports of use are at least as important to timely distribution as

statements of account, which are subject to late fees.  SoundExchange is raising the issue here in

case the Judges would prefer to consider the issue in the context of this proceeding, rather than in

the recordkeeping proceeding.

As SoundExchange explained in Docket No. RM 2008-7, widespread noncompliance

with reporting requirements demonstrates that it is important to provide greater incentives to

compliance than in the past.  We receive no reports of use from many webcasters, and the reports

we received were often late or grossly inadequate.  This is a significant impediment to our timely

payment of copyright owners and performers.  Other than the threat of litigation, there is no

commercial incentive for a service to comply with the regulations governing reports of use.  The

possibility of late fees would provide an additional, immediate incentive to comply with the

applicable reporting requirements and would greatly facilitate operation of the statutory licenses.

### C.    Identification of Licensees

SoundExchange proposes that statements of account correspond to reports of use by

identifying the licensee in exactly the way it is identified on the corresponding notice of use and

report of use, and by covering the same scope of activity (e.g., the same channels or stations).  In

addition, the regulations should be clarified to explain that the "Licensee" is *the entity* identified

on the notice of use, statement of account, and report of use, and that each Licensee must submit

its own notice of use, statement of account, and report of use.  Under this proposal, a station

group could choose to submit separate statements of account for each of its stations, but if it did,

it would also have to have filed a corresponding notice of use for each station and would have to

submit separate reports of use for each station.  Likewise, a station group could choose instead to

28

file a single statement of account covering all of its stations, but in that instance, it would need to supply a single notice of use and a single report of use covering all of its stations. We would prefer that station groups consolidate their reporting to the extent possible.

Because SoundExchange receives reports from hundreds of webcasting payors covering thousands of channels and stations, we devote considerable effort to reconciling changes and variations in licensee names and matching statements of account to reports of use covering different combinations of channels and stations. Those aspects of our work would be greatly simplified at little or no evident cost to licensees if licensees were required to provide notices of use, statements of account and reports of use on a consistent basis, and to use consistent names to refer to themselves in such documents.

In addition, we would like a regulation requiring licensees to use an account number, that is assigned to them by SoundExchange, on their statements of account and reports of use. This unique identifier would make it easier for SoundExchange to identify each licensee in our system, and to distinguish between services with similar names. This proposal would not burden licensees, and indeed might simplify their reporting and accounting efforts, as well.

### D.    Technical and Conforming Changes

Finally, SoundExchange is proposing a few technical and conforming changes to the regulations, including changes that would be helpful to make for the sake of clarity or consistency across licenses. These proposed changes are reflected in the redlined proposed regulations that SoundExchange is submitting as an attachment to its rate proposal.

I declare under penalty of perjury that the foregoing testimony is true and correct.

Executed on September 29, 2009

Barrie Kessler

30

JA31

# MILLER & VAN EATON

## P. L. L. C.

MATTHEW C. AMES
KENNETH A. BRUNETTI*
MARCI L. FRISCHKORN
GAIL A. KARISH*
NICHOLAS P. MILLER
MATTHEW K. SCHETTENHELM
JOSEPH VAN EATON

*Admitted to Practice in
California Only

**1155 CONNECTICUT AVENUE, N.W.
SUITE 1000
WASHINGTON, D.C. 20036-4320
TELEPHONE (202) 785-0600
FAX (202) 785-1234**

MILLER & VAN EATON, L.L.P.
580 CALIFORNIA STREET
SUITE 1600
SAN FRANCISCO, CALIFORNIA 94104
TELEPHONE (415) 477-3650
FAX (415) 738-2466

WWW.MILLERVANEATON.COM

OF COUNSEL:
JAMES R. HOBSON
GERARD L. LEDERER
WILLIAM R. MALONE

September 29, 2009

To the Honorable Copyright Royalty Judges

Re:  Webcasting III

Accompanying this cover sheet are written testimony and exhibits for Intercollegiate

Broadcasting System and Harvard Radio Broadcasting Co., Inc.

Respectfully submitted,

William Malone

Their Attorney

JA32

Before the
COPYRIGHT ROYALTY BOARD
in the Library of Congress
Washington, D.C.

)
In the Matter of )
) Docket No. 2009-1
Digital Performance in Sound Recordings ) CRB Webcasting III
and Ephemeral Recordings )
)

## TESTIMONY
### of
### FREDERICK J. KASS, JR.

on behalf of
INTERCOLLEGIATE BROADCASTING SYSTEM, INC.

#### Curriculum vitae

1.    Frederick J. Kass, Jr. ("Fritz") is treasurer, director of operations (chief operating

officer), and a director of the Intercollegiate Broadcasting System, Inc. In 1982 he purchased

three acres in New Windsor New York and built and became an owner and the operator of a

retail shopping center in New York, as a result of owning an electronics supply house in the '70s.

Fritz is the former Director of Aviation for Orange County Airport, Montgomery, New York

(1995 – 2006). He holds the rank of Captain (Ret) in the United States Navy (Reserve). Captain

Kass receives monthly retirement pay from the United States Navy, and the State of New York,

JA33

for his past service. He served on the active duty in Vietnam combat zone at times during 1965, 1966, and 1967. Captain Kass volunteered for and was recalled to active duty in 1990 to serve the United States as the Assistant Chief of Staff for Operations and Plans for COMUSNAVCENT, the Navy Component Command for the United States Central Command. He served at United States Navy Central Command Headquarters in Bahrain, and in combat zones, and throughout the Persian Gulf Region through the middle of 1991. Captain Kass has received various medals, ribbons, and awards for his service.

2.    Mr. Kass first became active in college radio in 1960 while an undergraduate at Lehigh University, where he served as Station Manager of campus stations WLVR and WRLN. He graduated from Lehigh in 1964 with a B.S. degree in Business. Mr. Kass received his Masters Degree in Business from the State University of New York at Albany in 1970, under a Department of Defense education program. He has been an unpaid volunteer officer and director of the Intercollegiate Broadcasting System, Inc., since 1961.

3.    Since shortly after his graduation and service in the U.S. Navy, Mr. Kass has been involved as an unpaid volunteer in activities supporting the education and character development of America's youth, ranging from managing the day-to-day operations of IBS to advising the Hudson Valley Boy Scout Council (15,000 scouts) as their Vice President of Exploring to serving on the board of directors of the Eastern Orange County Chamber of Commerce for over a decade. In 2001, the Orange County Chamber of Commerce, an association of over 2,000 businesses, awarded Mr. Kass "Volunteer of the Year." Mr. Kass further educated America's sons and daughters as an adjunct faculty member for the College of Aeronautics, a four-year accredited college in New York State. At the college, he taught management and various

2

JA34

aviation subjects. Mr. Kass is a founder (1970), past president and Paul Harris Fellow of the New Windsor Cornwall Rotary Club. He currently continues his worldwide community service through Rotary International and annual contributions to the Rotary Foundation. In 2009 Fritz received the Rotary Benefactor Award from the New Windsor – Cornwall Rotary Club and Rotary District 7210. Fritz also sponsors many annual youth education projects and scholarships. These include an annual college scholarship for the most outstanding Air Force JROTC Cadet at Newburgh Free Academy, the local public high school and a scholarship for lesson to become a FAA licensed pilot for a local teenager. Facilitator of free flights for Young Eagles, youth ages 8 – 17, and many other multi-year opportunities to help area youth obtain critical life skills. Captain Kass, US Navy retired, is an U S Naval Academy designated information officer, a Blue and Gold Officer. Fritz interviews local youth who have applied to the USNA for admissions. At IBS he has been involved in negotiations with the performing rights organizations and SoundExchange née RIAA on behalf of IBS' member stations.

4.    Through his work with the IBS board, managing IBS' national and coast to coast regional meetings of member-stations, manning IBS' central office, and visiting stations in the field since 1961, Mr. Kass has become familiar with the wide range of campus broadcast stations operating in North America, Asia, Australia and Europe.

### Description of IBS

5.    The Intercollegiate Broadcasting System was founded in the early '40s, when there were just a handful of unlicensed carrier current radio stations on American campuses, and was incorporated as a non-profit corporation in Rhode Island in 1944. As radio broadcasting has evolved over the decades, the functions of IBS have changed correspondingly. IBS has (i)

3

JA35

actively supported the interests of college radio at the Federal Communications Commission, (ii) distributed programming, (iii) provided technical and other guidance to member stations, (iv) had assisted the stations in selling national advertising 1950s until that market dried up, (v) has assisted member stations in obtaining copyright licenses from the performing rights organizations since 1970s, (vi) has conducted national and regional meetings for the education of, and exchange of experience among, its members, and (vii) has published newsletters and magazines (Journal of College Radio and College Radio) to keep member stations' staffs informed, etc. As student listenership shifted to FM radio from AM radio, IBS assisted many member stations in converting from unlicensed AM operation to licensed FM operation; and when campuses were wired for the Internet, IBS assisted many member stations in streaming. IBS has member stations in high schools as well as colleges, and IBS has sought to aid them in their particular problems.

6.    Currently there are estimated to be 1,500 student-staffed stations and webcasting operations affiliated with domestic academic institutions. IBS is the largest organization representing such stations, and its membership includes over 1,000 such stations.

7.    IBS' membership encompasses a wide variety of student-staffed operations, from in-building PA systems to high-power FM broadcast stations. The hours of operation vary widely, from a few hours per week to around-the-clock and from term-time to 365 days per year. FCC rules do not require even the licensed Educational FM stations to operate in vacation periods. The number of undergraduate staff members at each station ranges from a handful to over a hundred. Some stations are operated by academic departments as curricular activities or as laboratories, to provide practical experience for undergraduates; others are encouraged or

tolerated by college administrations as extra-curricular student activities. Funding sources vary from academic budgets to student activity funds to advertising to dues paid by staff members. Few salaries are paid; academic instructors are usually paid out of departmental budgets; occasional student managers are given stipends; and a few student staff members receive financial aid of one sort or another, tied to participation in the station's operations.

      8.     IBS' member stations are not in the business of selling music or anything else. They are interested in educating America's sons and daughters. The use of digital recordings, though essential as a practical matter, is merely incidental to their primary educational purpose. Operating a radio station offers opportunities to learn by doing. It gives the next generation many of the skills and abilities essential to success in our society, including personal responsibility and initiative, management skills, business skills, marketing, music, writing and journalism, engineering, digital communications, digital networking – streaming audio, and a lot of other extra-curricular knowledge. A generation or so ago a fair percentage of students matriculated with some of this knowledge already, it having rubbed off from voluntary or involuntary participation in small family businesses. Today the employment of the parents of a majority of students -- and those students who are themselves employed -- is as "salary men," to appropriate the Japanese term, and the students have no firsthand experience or perspective on standalone enterprises -- what makes them operationally successful and how one conducts himself or herself to succeed in such a modern society. These are abilities and skills that are not listed in the course syllabi. USA students and worldwide students are in a critical competition for world economic productivity.

5

9.     From time-to-time IBS has surveyed its member stations to obtain information about operating budgets. The most recent survey showed that the average annual operating budget for campus stations to be about nine thousand dollars per year, but some having annual operating budgets of only $250.00 or less. All member stations are, as far as IBS is aware, themselves non-profit and/or parts of non-profit institutions. Most IBS Member academic institutions are part of local, state, and even federal (e.g., military service academies) government.

10.    Student staffs are typically characterized by relatively short tenure and high turnover, reflecting the academic environment from which they are drawn. This means in practice that operational procedures and the like are constantly being relearned by each successive college generation of students. These factors also place a practical limit on the complexity of procedures and practices that can be passed from one student generation to the next. A few stations even experience discontinuities in operation from one generation of staffers to the next.

11.    As previously intimated, solely student volunteers staff most stations; some volunteers' participation tends to be somewhat "laid back." In most stations the depth of staffing is variable from semester to semester and even within a given semester as examination periods come and go. The volunteer nature of the staffing means that operations in these stations tend to be somewhat informal, and it places a practical limit on the number and intensity of formal duties that can be imposed on day-to-day operations.

12.    Performance of digital recordings by college webcasters benefits the composer and artists of new music. Most college stations do not program music under rigidly

6

JA38

circumscribed formats dictated from above. A far wider variety of music is played by them than by their commercial broadcast counterparts. The academically affiliated stations, having young staffs, naturally present more new music by emerging artists. As emerging artists these musicians need and desire public exposure. They see presentation by these college stations as ways to build a following, and they promote themselves by distributing copies of their recordings and allied promotional materials to such stations. This is a mutually beneficial relationship. Many college stations, having restricted programming budgets, take advantage of such promotional disks and other materials, thereby assuring new works and artists of prompt exposure.

13.     There is a technical aspect of defining "performance" that has a disproportionate impact on college and high school webcasters. Much of the listening to these stations is typically to programming not subject to compulsory license. The most listened-to programs of these stations are generally varsity sports broadcasts. Many of these stations carry recorded programs that are cleared-at-the-source. Many stations carry live and delayed broadcasts of lectures, public forums, concerts, and interviews with artists and public figures on campus. Various recorded digital performances are directly licensed by a direct "Creative Commons"-type license from the artists. In fact, as a result of the payola investigations by the New York State attorney general, money was made available by grants from the resulting New York State Music Fund to foster such direct licensing. As a consequence, educational webcasters owe nothing to SoundExchange under a statutory license for their use of such recordings.

## IBS Relations with the Performing Rights Organizations

7

JA39

14.    As alluded to earlier in my testimony, IBS has negotiated licensing agreements over the past three decades with the performing rights organizations, viz., ASCAP, BMI, and SESAC. A few member stations report operating under campus-wide licenses negotiated by the parent academic institutions. The IBS-negotiated licenses are tailored to the distinctive characteristics of campus stations. The stations' licenses with ASCAP provide for an annual fee of under $300.00 and for reporting music played on a sampling basis, i.e., during a calendar week and a further sampling of a few stations designated annually by ASCAP; the licenses with BMI provide for an annual fee of under $300.00 and for reporting music played on a sampling basis, i.e., 72 hours once a year, and the licenses with SESAC contain no reporting requirement.

15.    Under the terms of the Small Webcaster Settlement Act of 2002, P.L. 107-321, IBS and other small webcasters negotiated a nonprecedential rate agreement for October 28, 1998 - December 31, 2004. Those rates and terms were published in the Federal Register, 68 Fed. Reg. 35,008 (June 11, 2003). Subsequently, RIAA, IBS, and Harvard Radio Broadcasting Co., Inc., negotiated a nonprecedential extension of those rates for 2005. The agreement had special provisions concerning recordkeeping and reporting, tailored the academically affiliated noncommercial webcasters' uses and capabilities.

16.    The three signatories filed a "Joint Petition for Adjustment of Rates and Terms for Statutory Licenses Applicable to Noncommercial Webcasters Making Eligible Nonsubscription Transmissions" with the Office on August 26, 2004. A copy of that petition is attached as an exhibit hereto. The Office declined to publish the agreement in the Federal Register, and at that point the legal situation became contentious among the Office and the parties. Nevertheless, rates and terms were continued in effect in 2005 by intervening statutory enactment.

8

JA40

17.    It remains IBS' basic position that such rates and terms are appropriate for its stations, subject to any need for clarification that has emerged since, and should be extended to the 2006-10 period for IBS member stations. IBS Members should only pay for their direct use of the statutory license by the IBS Member. There should be no minimum fee greater than that which would reasonably approximate the annual direct use of the statutory license, not to exceed $25.00 annually.

18.    In the course of Webcasting II IBS introduced the contemporary agreement between SoundEx and NPR/CPB for CPB-qualified webcasters. It provided that in 2004 CPB would make a single payment of $80,000.00 to cover use of the statutory license for 798 CPB/NPR entities. It was determined that the average continuous annual listenership, continuous performances exceeded 200. Therefore the value of a single continuous use of the statutory license for a continuous CPB/NPR web stream was less than $0.50 (50 cents) per continuous performance per year. Computation: $80,000.00 divided by 798 equals $100.25 per webcaster per year of 2004. $100.25 per NPR/CPB webcaster divided by 200 equals value of a continuous statutory license performance per year, 50 cents. There was no reporting/recordkeeping provided for in the agreement.

19.    Shortly after the commencement of Webcasting III CPB signed a licensing agreement with SoundEx covering webcasting by CPB-qualified stations. It provided for CPB to make a payment of $1,850,000.00 to cover six copyright years, 2005 – 2010, for at least 450 NPR, NFCB, and CPB qualified stations/webcasters. (Note: the exact number is unknown. The 450 are the number given in the Federal Register. In 2004 there were 798 CPB/NPR entities plus approximately 150 NFCB additional Webcast II entities. Therefore the value of a continuous

9

JA41

annual performance under this CPB/NPR/NFCB/PRX/PRI/APM is expected to be no more than $1.54 per continuous performance per year. The computations before adjustment are: $1,850,000.00 divided by six years is $308,333.33 per statutory performance year. Divided by 450 that is $685.19 per web stream per year. Divided by 200 continuous listeners/performances that is $3.43 per continuous performance use of the statutory license per year.)

20    Terms: IBS Member webcasts will be paying for their direct use of the SoundExchange collective statutory/compulsory performance music license. IBS Members also use, but should not pay SoundExchange for three other copyright performance licenses, the direct license between the webcaster, or their member organizations, like IBS, and the performance copyright holder artist/label, webcaster owned performance license, an example is a State College where the campus curricular band, vocal group, or music group, plays on campus and is broadcast over the radio station, and lastly where the performance copyright has been prepaid by another organization, an example being music programming performances re-broadcast from NPR, PRX, PRI, and APM, were CPB has prepaid SoundExchange for the performances over these networks, used by many IBS Members.

### Certification

20.    The foregoing facts and conclusions are true and correct to the best of my knowledge and belief.

Subscribed and sworn to under the penalties of perjury, 28 U.S.C. § 17465.

Frederick J. Kass, Jr.

New Windsor, New York
September 28, 2009

Exhibit (8/26/04 Joint Petition)

11

**Before the**
**COPYRIGHT OFFICE**
**LIBRARY OF CONGRESS**
**Washington, D.C.**



**RECEIVED**
**.2 6 2004**
**COPYRIGHT OFFICE**
**PUBLIC OFFICE**

| | |
|---|---|
| In the Matter of ) | |
| ) | |
| Digital Performance Right in Sound ) | |
| Recordings and Ephemeral Recordings ) | Docket No. 2004-1 (CARP DTRA4) |
| for Noncommercial Webcasters ) | |
| for 2005 and 2006 pursuant to Sections 112 ) | |
| and 114 of the Copyright Act. ) | |

### JOINT PETITION FOR ADJUSTMENT OF RATES AND TERMS FOR STATUTORY LICENSES APPLICABLE TO NONCOMMERCIAL WEBCASTERS MAKING ELIGIBLE NONSUBSCRIPTION TRANSMISSIONS

Pursuant to 17 U.S.C. §§ 112(e), 114 & 803 and 37 C.F.R. § 251.63(b),

SoundExchange, Inc., the nonprofit collective jointly controlled by representatives of

recording artists and sound recording copyright owners, previously designated by the

Librarian of Congress as the sole receiving agent for the collection of royalty payments

made by eligible nonsubscription transmission services pursuant to Sections 112 and 114

of the Copyright Act, and Intercollegiate Broadcasting System, Inc., whose members

include Noncommercial Webcasters[1] and Harvard Radio Broadcasting Co., Inc. (licensee

of WHRB (FM)), (collectively referred to as the "Petitioners"), hereby submit this Joint

---

[1] A "Noncommercial Webcaster" means a Webcaster that:

(1) is exempt from taxation under section 501 of the Internal Revenue Code of 1986 (26 U.S.C. § 501);

(2) has applied in good faith to the Internal Revenue Service for exemption from taxation under section 501 of the Internal Revenue Code and has a commercially reasonable expectation that such exemption shall be granted; or

(3) is operated by a State or possession or any governmental entity or subordinate thereof, or by the United States or District of Columbia, for exclusively public purposes.

Petition to advise the Copyright Office of their settlement of the controversy over the rates and terms to be established in this proceeding for noncommercial entities making eligible nonsubscription transmissions and ephemeral phonorecords under statutory license. Specifically, the Petitioners have reached agreement on proposed rates and terms for the use of sound recordings in eligible nonsubscription transmissions together with related ephemeral recordings (collectively "Covered Activities") for the 2005 through 2006 statutory license period. Petitioners hereby request that the Office publish the attached proposed rates and terms set forth in Exhibit A for public comment pursuant to 37 C.F.R. § 251.63(b) in lieu of convening a Copyright Arbitration Royalty Panel ("CARP") to determine rates and terms for the Covered Activities for the years 2005 through 2006.

## I.   BACKGROUND

The Digital Performance Right in Sound Recordings Act of 1995 ("DPRA") created a new exclusive right "to perform sound recordings publicly by means of a digital audio transmission." 17 U.S.C. § 106(6). The DPRA limited this right in several respects, including by the creation of a statutory license for performances by certain subscription services. 17 U.S.C. § 114(f). In 1998, the Digital Millennium Copyright Act ("DMCA") amended the statutory license in Section 114 to clarify coverage of certain categories of transmission services, including services making eligible nonsubscription transmissions and new subscription services. *See* 17 U.S.C. § 114(d)(2). It also amended Section 112 to address ephemeral reproductions that facilitate the making of certain digital audio transmissions, including those pursuant to the statutory license in Section 114. *See* 17 U.S.C. §§ 112(a) & (e).

2

The Copyright Office conducted a CARP proceeding that established royalty rates and terms for these statutory licenses applicable to eligible nonsubscription services for the period from October 28, 1998, to December 31, 2002. *See* Final Rule and Order in Determination of Reasonable Rates and Terms for the Digital Performance of Sound Recordings and Ephemeral Recordings, Docket No. 2000-9 CARP DTRA 1&2, 67 Fed. Reg. 45,239 (July 8, 2002) (the "Final Order"). With the enactment of the Small Webcaster Settlement Act of 2002, Pub. L. No. 107-321, 116 Stat. 2780 (2002), Congress authorized SoundExchange to negotiate rates and terms binding on all copyright owners and performers and available to noncommercial licensees as an alternative to the statutory rates and terms established in the Final Order. Such rates and terms, however, were not binding on Noncommercial Webcasters, which were permitted to elect to pay royalties under the Final Order or the rates and terms adopted pursuant to SWSA.

SoundExchange and the noncommercial entities signatory hereto agreed to alternative rates to those established under the Final Order pursuant to authority granted under SWSA, and the parties submitted those rates and terms to the Copyright Office on May 31, 2003. Those rates and terms were published in the Federal Register on June 11, 2003, and established alternative rates and terms for the period October 28, 1998 through December 31, 2004. *See* 68 Fed. Reg. 35,008.

On January 6, 2004, the Copyright Office published a notification of the initiation of the voluntary negotiation period to establish rates and terms for eligible nonsubscription transmissions and related ephemeral phonorecords for the period 2005 through 2006. 69 Fed. Reg. 689. Pursuant to that notification, parties may submit a voluntary settlement of rates and terms to the Copyright Office and request that the

3

Office publish the proposed rates and terms in the Federal Register for public comment. *Id.* at 690. "If no party with a substantial interest and an intent to participate in an arbitration proceeding files a comment opposing the negotiated rates and terms, the Librarian may adopt the proposed terms and rates without convening a [CARP]". *Id.*

## II.   THE PETITIONERS AND THEIR AGREEMENT

The Petitioners have reached agreement on proposed rates and terms governing the use of sound recordings in Covered Activities for the 2005 through 2006 statutory license period. Exhibit A to this Joint Petition contains proposed regulations that implement the agreement. The Petitioners hereby request that the Copyright Office promulgate the proposed regulations in Exhibit A.

Each of the Petitioners has a "significant interest" in the rates and terms that are the subject of the two relevant CARP proceedings within the meaning of Section 803(a) of the Copyright Act. 17 U.S.C. § 803(a).

SoundExchange represents as follows: It is a nonprofit organization jointly controlled by representatives of sound recording copyright owners and performing artists and was established to administer the Section 112 and Section 114 statutory licenses on behalf of the vast majority of sound recording copyright owners and performers in the United States. SoundExchange was the sole collective designated to receive and distribute royalties paid by statutory licensees for the 2003-2004 rate period and one of two collectives designated to receive and distribute royalties paid by statutory licensees during the 1998 through 2002 rate period. SoundExchange's member record companies create, manufacture and/or distribute approximately 90% of all legitimate sound recordings produced and sold in the United States.

4

The Intercollegiate Broadcasting System, Inc., is a Rhode Island not-for-profit corporation with over nine hundred non-profit member radio stations and webcasters throughout the United States, representing the bulk of the not-for-profit educationally affiliated radio stations/webcasters.

Harvard Radio Broadcasting Co., Inc., is a Massachusetts eleemosynary corporation, licensee of Station WHRB (FM), Cambridge, Massachusetts.

## III. NONPRECEDENTIAL NATURE OF NEGOTIATED RATES AND TERMS

SWSA provided that neither the legislation nor any agreement negotiated pursuant thereto shall "be admissible as evidence or otherwise taken into account in any administrative, judicial, or other government proceeding involving" the establishment of royalties or notice and recordkeeping provisions under Sections 112 and 114. That is, the rates and terms negotiated pursuant to SWSA were to be considered non-precedential. Because Petitioners are essentially seeking to have the rates and terms that are in effect for 2004 and which were negotiated pursuant to SWSA pushed forward for an additional two-year statutory period, they believe the non-precedential effect of those rates should apply for the 2005-06 rate period and request that the Federal Register notice announcing the settlement set forth that it is non-precedential. The rates and terms negotiated by the Petitioners represent a compromise motivated by extraordinary and unique circumstances and should not be given any precedential effect whatsoever.

5

## IV.   CONCLUSION

Pursuant to 17 U.S.C. §§ 112(e), 114 and 803 and 37 C.F.R. § 251.63(b), the

Petitioners respectfully request that the Copyright Office publish the rates and terms set

forth in Exhibit A for public comment and thereafter adopt such rates and terms for the

years 2005 and 2006.

Respectfully submitted,

By _William Malone/mjw_       By _Michele J. Woods_

William Malone                        Michele J. Woods
James R. Hobson                       ARNOLD & PORTER LLP
MILLER AND VAN EATON, P.L.L.C.        555 Twelfth St., N.W.
1155 Connecticut Avenue, N.W.         Washington, D.C.  20004
Suite 1000                            (202) 942-5719
Washington, D.C.  20036-4320          (202) 942-5999 (facsimile)
(202) 785-0600
(202) 785-1234 (facsimile)            *Counsel for SoundExchange, Inc.*

*Counsel for Intercollegiate Broadcasting*
*System, Inc. and Harvard Radio*
*Broadcasting Co., Inc. (licensee of WHRB*
*(FM))*

August 26, 2004

## Exhibit A

**37 CFR Part 263**

**Rates and Terms for Certain Transmissions and the Making of Ephemeral Reproductions by Noncommercial Licensees**

**263.1  General.**

(a)    *Scope.* This part 263 establishes rates and terms of royalty payments for the public performance of sound recordings in certain digital transmissions by Noncommercial Webcasters in accordance with the provisions of 17 U.S.C. 114, and the making of certain ephemeral recordings by Noncommercial Webcasters in accordance with the provisions of 17 U.S.C. 112(e), during the License Period.

(b)    *Legal compliance.* Noncommercial Webcasters relying upon the statutory licenses set forth in 17 U.S.C. 112 and 114 shall comply with the requirements of those sections, the rates and terms of this part and any other applicable regulations.

(c)    *Relationship to voluntary agreements.* Notwithstanding the royalty rates and terms established in this part, the rates and terms of any license agreements entered into by sound recording copyright owners and Noncommercial Webcasters making digital audio transmissions of sound recordings or ephemeral recordings shall apply in lieu of the rates and terms of this part to transmissions or recordings within the scope of such agreements.

**263.2  Definitions.**

For purposes of this part, the following definitions shall apply:

(a)    *Aggregate Tuning Hours* means the total hours of programming that a Noncommercial Webcaster has transmitted during the relevant period to all listeners within the United States over the relevant channels and stations, and from any archived programs, that provide audio programming consisting, in whole or in part, of eligible nonsubscription transmissions, less the actual running time of any sound recordings for which the Noncommercial Webcaster has obtained direct licenses apart from 17 U.S.C. 114(d)(2) or which do not require a license under United States copyright law. By way of example, if a Noncommercial Webcaster transmitted 1 hour of programming to 10 simultaneous listeners, the Noncommercial Webcaster's Aggregate Tuning Hours would equal 10. If three minutes of that hour consisted of transmission of a directly licensed recording, the Noncommercial Webcaster's Aggregate Tuning Hours would equal 9 hours and 30 minutes. As an additional example, if one listener listened to a Noncommercial Webcaster for 10 hours (and none of the recordings transmitted during that time was directly licensed), the Noncommercial Webcaster's Aggregate Tuning Hours would equal 10.

(b)    *Broadcaster Simulcast* means a simultaneous Internet transmission or retransmission of an over-the-air terrestrial AM or FM radio broadcast, including one with previously broadcast programming substituted for programming for which requisite licenses or clearances to transmit over the Internet have not been obtained and one with substitute advertisements, where such Internet transmission or retransmission is made by a Noncommercial Webcaster that owns or operates the over-the-air radio station making the AM or FM broadcast.

(c)    *Copyright Owner* is a sound recording copyright owner who is entitled to receive royalty payments made under this part pursuant to the statutory licenses under 17 U.S.C. 112(e) or 114.

(d)    *Ephemeral Recording* is a phonorecord created for the purpose of facilitating a transmission of a public performance of a sound recording for the purpose of facilitating a transmission of a public performance of a sound recording under a statutory license in accordance with 17 U.S.C. 114(f), and subject to the limitations specified in 17 U.S.C. 112(e).

(e)    *Incidental Performance* is a Performance that both:

(1)    makes no more than incidental use of sound recordings including, but not limited to, brief musical transitions in and out of commercials or program segments, brief performances during news, talk, sports and business programming, brief background performances during disk jockey announcements, brief performances during commercials of 60 seconds or less in duration, or brief performances during sporting or other public events; and

(2)    other than ambient music that is background at a public event, does not contain an entire sound recording and does not feature a particular sound recording of more than 30 seconds (as a sound recording used as a theme song is featured).

(f)    *License Period* means the period commencing on January 1, 2005 and ending on December 31, 2006.

(g)    *Listener* is a player, receiving device or other point receiving and rendering a transmission of a public performance of a sound recordings made by a Licensee, irrespective of the number of individuals present to hear the transmission.

(h)    *Noncommercial Educational Entity* or *NEE* is a Noncommercial Webcaster that is directly operated by, or is affiliated with and officially sanctioned by, and the digital audio transmission operations of which are, during the course of the year, staffed substantially by students enrolled at, a domestically accredited primary or secondary school, college, university or other post-secondary degree-granting educational institution, but that is not a "public broadcasting entity" (as defined in 17 U.S.C. 118(g))

2

JA51

qualified to receive funding from the Corporation for Public Broadcasting pursuant to the criteria set forth in 47 U.S.C. 396.

    (i)    *Noncommercial Webcaster* means a Webcaster that –

    (1)    is exempt from taxation under section 501 of the Internal Revenue Code of 1986 (26 U.S.C. 501);

    (2)    has applied in good faith to the Internal Revenue Service for exemption from taxation under section 501 of the Internal Revenue Code and has a commercially reasonable expectation that such exemption shall be granted; or

    (3)    is operated by a State or possession or any governmental entity or subordinate thereof, or by the United States or District of Columbia, for exclusively public purposes.

    (j)    *Performance* is each instance in which any portion of a sound recording is publicly performed to a listener by means of a digital audio transmission or retransmission (e.g., the delivery of any portion of a single track from a compact disc to one listener) but excluding the following:

    (1)    a performance of a sound recording that does not require a license (e.g., the sound recording is not copyrighted);

    (2)    a performance of a sound recording for which the Noncommercial Webcaster has previously obtained a license from the copyright owner of such sound recording; and

    (3)    an Incidental Performance.

    (k)    *Performers* means the independent administrators identified in 17 U.S.C. 114(g)(2)(B) and (C) and the parties identified in 17 U.S.C. 114(g)(2)(D).

    (l)    *Webcaster* means a person or entity that has obtained a compulsory license under section 112 or 114 and the implementing regulations therefore to make eligible nonsubscription transmissions and ephemeral recordings.

**263.3 Election for payment of royalty rates available to Noncommercial Webcasters under section 263.4.**

    (a)    *General.* A Noncommercial Webcaster may elect to be subject to the rates and terms set forth in section 263.4 by complying with the procedures set forth in 263.3(b).

    (b)    *Election process.* A Noncommercial Webcaster making digital audio transmissions of sound recordings that wishes to elect for the first time to be subject to

3

the rates and terms set forth in section 263.4 in lieu of the rates and terms set forth in section 263.5 for the License Period shall submit to SoundExchange, Inc. a completed and signed election form (available on the SoundExchange web site at http://www.soundexchange.com) by no later than _____ [Copyright Office to insert the date that would be 30 days after publication of these Rates and Terms in the Federal Register]; provided, however, that any Noncommercial Webcaster that has previously elected to pay royalties under the rates and terms published in the Federal Register on June 11, 2003, 68 Fed. Reg. 35008, need not file a new election with SoundExchange. Notwithstanding the preceding sentence—

(1)     if a Noncommercial Webcaster has not previously made digital audio transmissions of sound recordings under the section 114 statutory license or ephemeral phonorecords under the section 112 statutory license, then the Noncommercial Webcaster may make its election by no later than the first date on which it would be obligated under these Rates and Terms to make a royalty payment for the use of sound recordings under the section 112 or 114 statutory license; and

(2)     a NEE may make its election by the later of (i) 45 days after the month in which the Noncommercial Webcaster first made a digital audio transmission of a sound recording under statutory license or (ii) the first day of the calendar quarter following the quarter in which the NEE commenced digital audio transmissions of sound recordings under statutory license.

(c)     *Effect of election or nonelection.*

(1)     *Election.* If a Noncommercial Webcaster timely elects under section 263.3(b) to be covered by the rates and terms set forth in section 263.4, then the Noncommercial Webcaster shall thereafter be obligated to pay royalties under and comply with the provisions of section 263.4 through the remainder of the License Period, provided that such Noncommercial Webcaster continues to meet the conditions for eligibility as a Noncommercial Webcaster.

(2)     *Nonelection.* A Noncommercial Webcaster that does not make a timely election under section 263.3(b) shall pay royalties as otherwise provided under section 263.5 for the License Period.

(d)     *Proof of eligibility.* A Noncommercial Webcaster that makes an election pursuant to section 263.3(b) shall make available to SoundExchange, within 30 days after SoundExchange's written request at any time during the 3 years following such election, sufficient evidence to support its eligibility as a Noncommercial Webcaster and, if applicable, as an NEE. Any proof of eligibility provided hereunder shall be provided with a certification signed by the chief executive officer of the Noncommercial Webcaster, or other person with similar management authority over the Noncommercial Webcaster, certifying that the information provided is accurate and the person signing is authorized to act on behalf of the Noncommercial Webcaster.

4

(e)    *Limitation on participation in certain CARP proceedings.* A Noncommercial Webcaster that elects to be subject to the rates and terms in section 263.4 agrees that it has elected those rates and terms in lieu of participating in a copyright arbitration royalty panel ("CARP") proceeding to set rates and terms for the License Period and in lieu of any different rates and terms that may be determined through such a CARP proceeding. Once a Noncommercial Webcaster has elected the rates and terms in section 263.4, it shall be prohibited from participating in any such CARP proceeding for the License Period.

**263.4 Royalty fees for public performances of sound recordings and for ephemeral recordings for Noncommercial Webcasters electing under section 263.3(b).**

(a)    *Minimum annual fees for Noncommercial Webcasters electing under 263.3(b).*

(1)    *NEEs transmitting a single channel.* Except as provided in section 263.4(a)(3) and subject to section 263.4(b), each NEE shall pay a nonrefundable minimum annual fee of $500 for each year of the License Period, except in the case of an NEE (i) that is, or is affiliated with, an educational institution with fewer than 10,000 enrolled students or (ii) where substantially all of the programming transmitted by such NEE is reasonably classified as news, talk, sports or business programming, in which case the minimum annual fee shall be $250. The minimum annual fee is not proratable and shall be due in its entirety for all or any portion of a year in which the NEE makes a Performance of a sound recording under the section 114 statutory license.

(2)    *Other Noncommercial Webcasters transmitting a single channel.* Except as provided in section 263.4(a)(3) and subject to section 263.4(b), each Noncommercial Webcaster that is not an NEE shall pay a nonrefundable minimum annual fee of $500 for each year of the License Period, except in the case of a Noncommercial Webcaster where substantially all of the programming transmitted by such Noncommercial Webcaster is reasonably classified as news, talk, sports or business programming, in which case the minimum annual fee shall be $250. The minimum annual fee is not proratable and shall be due in its entirety for all or any portion of a year in which the Noncommercial Webcaster makes a Performance of a sound recording under the section 114 statutory license.

(3)    *Noncommercial Webcasters transmitting multiple channels.* Notwithstanding Sections 263.4(a)(1) or (2), the nonrefundable minimum annual fee shall be $500 for each year of the License Period for any Noncommercial Webcaster that makes a Performance of a sound recording on more than one channel or station of programming; provided that–

(i)    if the Performances of sound recordings over any channels or stations in excess of one consist only of Incidental Performances, then

5

JA54

the nonrefundable minimum annual fee shall be as provided in Sections 263.4(a)(1) or (2) as applicable;

(ii)    if substantially all of the programming on all of a Noncommercial Webcaster's channels and stations is reasonably classified as news, talk, sports or business programming, then the minimum annual fee for such Noncommercial Webcaster shall be $250;

(iii)    if a Noncommercial Webcaster that owns or operates multiple over-the-air terrestrial AM or FM radio stations offers more than one Internet channel or station on which substantially all of the programming consists of Broadcaster Simulcasts, then—

(A)    a nonrefundable minimum annual fee otherwise determined in accordance with this section 263.4(a)(3) shall extend to only three such Internet channels or stations offering Broadcaster Simulcasts, as well as associated Internet-only channels (subject to section 263.4(c));

(B)    additional nonrefundable minimum annual fees shall be payable under this Section 263.4(a)(3) for additional groups of up to three Internet channels or stations offering Broadcaster Simulcasts, as well as associated Internet-only channels (subject to section 263.4(c));

(C)    each such group of up to three such Internet channels or stations, as well as associated Internet-only channels (subject to section 263.4(c)), shall be treated as a separate Noncommercial Webcaster for purposes of sections 263.4(a)(3)(ii), (b) and (c);

(D)    all such channels or stations offering Broadcaster Simulcasts in a group shall be treated as a single channel or station for purposes of section 263.4(c);

(E)    any additional channels or stations considered with the group for purposes of section 263.4(c) shall also be considered with the group for purposes of section 263.4(b); and

(F)    accordingly, the Noncommercial Webcaster may offer two additional Internet-only channels or stations with each group of up to three channels or stations offering Broadcaster Simulcasts without triggering payments under section 263.4(c)(2), but all of such channels or stations (up to a total of five) shall be considered together for purposes of determining whether the

6

JA55

Noncommercial Webcaster exceeds the 146,000 Aggregate Tuning Hours threshold in section 263.4(b); and

(iv)    for purposes of determining the number of channels or stations of programming offered by a Noncommercial Webcaster, an "archived program" (as defined in 17 U.S.C. 114(j)(2)) that complies with the conditions in 17 U.S.C. 114(d)(2)(C)(iii)(I) and (II) shall not be considered a separate channel or station of programming except in the case of a Noncommercial Webcaster that exclusively makes digital audio transmissions of archived programming.

(v)    The minimum annual fee is not proratable and shall be due in its entirety for all or any portion of a year in which the Noncommercial Webcaster makes a Performance of a sound recording under the section 114 statutory license.

(b)    *Usage fees for Noncommercial Webcasters making election under 263.3(b).*

(1)    *In General.* Subject to section 263.4(c), the nonrefundable minimum annual fee payable under section 263.4(a) for each year of the License Period shall constitute full payment for digital audio transmissions totaling not more than 146,000 Aggregate Tuning Hours per month. If in any month during the License Period a Noncommercial Webcaster makes digital audio transmissions of sound recordings under statutory license in excess of 146,000 Aggregate Tuning Hours, then the Noncommercial Webcaster shall pay additional usage royalties for those digital audio transmissions in excess of 146,000 Aggregate Tuning Hours at the following rates, subject to the election provided in section 263.4(b)(2):

(i)    $0.0002176 (.02176¢) per Performance; or

(ii)    $.00251 (.251¢) per Aggregate Tuning Hour, except in the case of channels or stations where substantially all of the programming is reasonably classified as news, talk, sports or business programming, in which case the royalty rate shall be $.0002 (.02¢) per Aggregate Tuning Hour.

For the avoidance of doubt, a Noncommercial Webcaster shall calculate its Aggregate Tuning Hours of digital audio transmissions each month and shall pay any additional royalties owed for such month as provided above in this section 263.4(b), but the Noncommercial Webcaster shall not owe any additional royalties for any subsequent months until such time as the Noncommercial Webcaster again exceeds the 146,000 Aggregate Tuning Hour threshold during a given month.

7

(2)    *Election of Per Performance or Aggregate Tuning Hour Rate*. The first time a Noncommercial Webcaster is required to pay usage royalties under section 263.4(b)(1) during the License Period, the Noncommercial Webcaster shall notify SoundExchange in writing on a form to be made available by SoundExchange of the method that it shall use to calculate its liability under section 263.4(b)(1) for the remainder of the License Period, if any. Specifically, the Noncommercial Webcaster shall make an election to calculate royalties on either a Performance basis as set forth in section 263.4(b)(1)(i) or an Aggregate Tuning Hour basis as set forth in section 263.4(b)(1)(ii). Thus, for example, a Noncommercial Webcaster may not in one month when its digital audio transmissions exceed 146,000 Aggregate Tuning Hours calculate its usage additional royalties based on the Performance royalty and in another month when its digital audio transmissions exceed 146,000 Aggregate Tuning Hours calculate its additional royalties based on the Aggregate Tuning Hour royalty.

(c)    *Fees for more than three channels of programming for Noncommercial Webcasters electing under 263.3(b)*. Subject to section 263.4(a)(3)(iii), if in any year of the License Period a Noncommercial Webcaster makes digital audio transmissions of sound recordings on more than three channels or stations of programming, then—

(1)    the Noncommercial Webcaster shall by written notice to SoundExchange at the time of its first payment for each year of the License Period or its inception of its first channel or station in excess of three, whichever is later, designate three channels or stations for which the nonrefundable minimum annual fee payable under section 263.4(a)(3), and any additional usage royalty payments under section 263.4(b), shall constitute full payment; and

(2)    the Noncommercial Webcaster shall pay royalties for all its digital audio transmissions of sound recordings under statutory license over its other channels and stations at the statutory rates for digital audio transmissions made by commercial eligible nonsubscription transmission services at such time (i.e., the successor to the rates set forth for 2003-2004 in section 262.3), provided that—

(i)    the Noncommercial Webcaster shall not be required to make any minimum annual payments that otherwise apply to commercial eligible nonsubscription transmission services;

(ii)    the nonrefundable minimum annual fee payable under section 263.4(a)(3) shall not be creditable toward such payments for its other channels and stations;

(iii)    such payments for its other channels and stations shall be due at the times provided in section 263.6(b) rather than any different times otherwise applicable to commercial eligible nonsubscription transmission services, except that if the statutory rate for digital audio transmissions made by commercial eligible nonsubscription transmission

services has not then been determined, such payments for its other channels and stations shall be due 45 days following the month in which the statutory rate is determined; and

(iv)    the Noncommercial Webcaster shall comply with other terms relating to royalty payments that otherwise apply to commercial eligible nonsubscription transmission services (e.g., terms concerning any election among payment options, as set forth in part 262).

For the avoidance of doubt, by operation of Section 263.4(a)(3), when a Noncommercial Webcaster that owns or operates multiple over-the-air terrestrial AM or FM radio stations offers more than one Internet channel or station on which substantially all of the programming consists of Broadcaster Simulcasts: (i) such Broadcaster Simulcasts shall in no event be subject to the statutory rates for digital audio transmissions made by commercial eligible nonsubscription transmission services, and (ii) only programming offered on Internet-only channels or stations in excess of two that may be associated with a group of up to three channels or stations offering Broadcaster Simulcasts may be subject to that statutory rate as provided in this section.

(d)    *Payment in lieu of providing reports of use for Noncommercial Webcaster electing under 263.3(b).*

(1)    *No obligation to provide reports of use.*  Notwithstanding any other regulations adopted by the Librarian of Congress or the Copyright Office, a Noncommercial Webcaster making an election under section 263.3(b) shall not be required to provide reports of use of sound recordings to SoundExchange for the License Period.  The payment required by section 263.4(d)(2) is intended to facilitate SoundExchange's ability to collect or otherwise acquire substitute data on which to base distributions to Copyright Owners and Performers of payments made by Noncommercial Webcasters, although SoundExchange shall be under no obligation to spend such payments in any particular way or to collect or otherwise acquire any particular data by any particular means.  Subject to section 263.6(h), SoundExchange may base its distributions to Copyright Owners and Performers of payments made by Noncommercial Webcasters on any data or methodology determined by its board of directors.

(2)    *Payment in lieu of reports of use.*  A Noncommercial Webcaster making an election under section 263.3(b) shall, in addition to the nonrefundable minimum annual fees paid for each year of the License Period, pay an additional payment of $25 for each year of the License Period in lieu of the provision of reports of use of sound recordings.  The payment due under this section 263.4(d)(2) shall be due at the time minimum annual fees are paid under section 263.4(a).

9

(3) *Participation in Task Force.* The task force created pursuant to Section 7(b) of the May 31, 2003 noncommercial webcaster agreement, negotiated under the Small Webcaster Settlement Act of 2002 and published in the Federal Register on June 11, 2003 (68 Fed. Reg. 35,008), shall continue to be obligated to use reasonable efforts to work with SoundExchange to determine data fields and report formats and recommend policies, procedures and systems for the delivery of electronic reports of use of sound recordings to SoundExchange sufficient to permit SoundExchange, beginning in 2007, to distribute the royalties paid by Noncommercial Webcasters to those Copyright Owners and Performers whose sound recordings are transmitted by Noncommercial Webcasters based on data reported by or on behalf of Noncommercial Webcasters. In the absence of substantial consensus among the Noncommercial Webcasters concerning the membership of such task force, each Noncommercial Webcaster shall be obligated to use reasonable efforts to do the foregoing.

(e) *Ephemeral Recordings.* The royalty payable under 17 U.S.C. 112(e) for the making of any reproductions of a phonorecord during the License Period, and used solely by a Noncommercial Webcaster making an election under section 263.3(b) to facilitate transmissions for which it pays royalties as and when provided in this section 263.4(a)-(c) shall be deemed to be included within, and to comprise 8.8% percent of, the Noncommercial Webcaster's royalty payments under section 263.4(a)-(c).

(f) *Reporting.* Each Noncommercial Webcaster making digital audio transmissions in excess of 146,000 Aggregate Tuning Hours in any month shall report its Aggregate Tuning Hours of digital audio transmissions to SoundExchange in a monthly statement of account to be filed under section 263.6. Each Noncommercial Webcaster having a statutory license during the License Period and not making digital audio transmissions in excess of 146,000 Aggregate Tuning Hours in any month shall so certify in the statement of account accompanying its first payment following the end of a calendar year within the License Period, including the payment of any minimum annual fees, if any. For the avoidance of doubt, the statements of account filed by a Noncommercial Webcaster for the years 2006 and 2007 (with the payment of each year's minimum annual fee) shall state that the Noncommercial Webcaster did not exceed 146,000 Aggregate Tuning Hours in any month of 2005 or 2006, as the case may be, if true. A Noncommercial Webcaster whose transmissions exceeded 146,000 Aggregate Tuning Hours in some, but not all, months of a given calendar year during the License Period shall not be required to certify its Aggregate Tuning Hours in the statement of account accompanying its first payment following the end of that year but shall only be required to report its Aggregate Tuning Hours in the statement(s) of account submitted for those months in which its Aggregate Tuning Hours exceeded 146,000.

**263.5 Fees for Noncommercial Webcasters not making an election under section 263.3(b).**

(a)    *General.* The following rates and terms shall apply to Noncommercial Webcasters not making an election under 263.3(b).

(b)    *Minimum Annual Fee.* A Noncommercial Webcaster not making an election under section 263.3(b) shall pay a nonrefundable, nonprorated minimum annual fee of $500 for each year of the License Period during which the Noncommercial Webcaster makes digital audio transmissions of sound recordings or ephemeral phonorecords under statutory license.

(c)    *Performance Fees.* A Noncommercial Webcaster not making an election under section 263.3(b) shall pay the following fees for the making of digital audio transmissions of sound recordings:

(1)    for Broadcast Simulcasts, a royalty of $0.0002 (.02¢) per Performance;

(2)    for other Internet transmissions, including up to two side channels of programming consistent with the mission of the station, a royalty of $0.0002 (.02¢) per Performance; and

(3)    for Internet transmissions on other side channels of programming, a royalty of $.0007 (.07¢) per Performance.

(d)    *Ephemeral Fees.* For the making of any number of ephemeral recordings to facilitate the Internet transmission of a sound recording, a Noncommercial Webcaster shall pay an additional section 112(e) royalty equal to 8.8% of the Performance royalty liability calculated under Section 263.5(c).

**263.6 Terms for making payment of royalty fees and statements of account.**

(a)    *Timing of payment of minimum annual fees.* The nonrefundable minimum annual fee for each year of the License Period shall be due by January 31st of such year; provided, however, when a Noncommercial Webcaster has not previously made digital audio transmissions of sound recordings under the section 114 statutory license, the Noncommercial Webcaster may make its first payment of a nonrefundable minimum annual fee within 45 days following the month in which the Noncommercial Webcaster commences digital audio transmissions of sound recordings under the section 114 statutory license, except in the case of a NEE making an election under section 263.3(b), which may pay its minimum annual fee at the time its election is due under 263.3(b)(2).

(b)    *Timing of payment of other fees.* Any payments due under sections 263.4(b) or (c) or 263.5 shall be due 45 days following the month in which the liability accrues.

(c)    *Remittance.* Payments of all amounts due under this Part 263 shall be made to SoundExchange, Inc. and shall under no circumstances be refundable. Payments shall be accompanied by the statement of account required under section 263.6(g).

(d)    *Continuing obligation to pay.* If statutory rates and terms for Noncommercial Webcasters for the period beginning January 1, 2007, have not been established by December 31, 2006, then Noncommercial Webcasters shall continue to make payments at the rates established under this part 263 for the License Period until such successor rates and terms are established. Such interim royalties shall be subject to retroactive adjustment based on the final successor rates. Any overpayment shall be fully creditable to future payments, and any underpayment shall be paid within 45 days after establishment of the successor rates and terms, except as may otherwise be provided in the successor terms.

(e)    *Late payments.* A Noncommercial Webcaster shall pay a late fee of 0.75% per month, or the highest lawful rate, whichever is lower, for any payment received by SoundExchange after the due date. Late fees shall accrue from the due date until payment is received by SoundExchange. Such late fees shall be without prejudice to other remedies of copyright owners.

(f)    *Adjustment of schedule if this part not adopted until after January 1, 2005.* If the rates and terms established in this part 263 are not adopted in a final rule until after January 1, 2005, then any initial payments due hereunder shall be due by the later of the date set forth in this part 263 or 45 days following the publication of this part 263 in the Federal Register.

(g)    *Statements of account.* To the extent a statement of account is required under this part 263, the Noncommercial Webcaster shall complete and submit the statement of account prepared by SoundExchange for Noncommercial Webcasters and made available on its web site located at http://soundexchange.com. A statement of account shall include only the following information:

(1)    Such information as is necessary to calculate the accompanying royalty payment, and, in the case of Noncommercial Webcasters paying royalties under 263.5, if no payment is owed for the month, to calculate any portion of the minimum fee recouped during the month;

(2)    The name, address, business title, telephone number, facsimile number, electronic mail address and other contact information of the individual or individuals to be contacted for information or questions concerning the content of the statement of account;

12

(3)    The handwritten signature of:

(i)    The owner of the Noncommercial Webcaster or a duly authorized agent of the owner, if the Noncommercial Webcaster is not a partnership or a corporation;

(ii)    A partner or delegee, if the Noncommercial Webcaster is a partnership; or

(iii)    An officer of the corporation, if the Noncommercial Webcaster is a corporation,

provided, however, that a student may not sign a statement of account for a NEE.

(4)    The printed or typewritten name of the person signing the statement of account;

(5)    The date of signature;

(6)    If the Noncommercial Webcaster is a partnership or a corporation, the title or official position in the partnership or corporation by the person signing the statement of account;

(7)    A certification of the capacity of the person signing; and

(8)    A statement to the following effect:

"I, the undersigned owner or agent of the Noncommercial Webcaster, or officer or partner, if the Noncommercial Webcaster is a corporation or partnership, have examined this statement of account and hereby state that it is true, accurate and complete to my knowledge after reasonable due diligence."

(h)    *Distribution of Payments.*

(1)    SoundExchange shall distribute royalty payments directly to Copyright Owners and Performers, according to 17 U.S.C. 114(g)(2); provided that SoundExchange shall only be responsible for making distributions to those Copyright Owners and Performers who provide it with such information as is necessary to identify and pay the correct recipient of such payments. SoundExchange shall distribute royalty payments on a basis that values all performances by a Noncommercial Webcaster equally based upon the information obtained by SoundExchange for the distribution of royalty payments; provided, however, Performers and Copyright Owners that authorize SoundExchange may agree with SoundExchange to allocate their shares of the royalty payments made by any Noncommercial Webcaster among themselves on an alternative basis.

13

Parties entitled to receive payments under 17 U.S.C. 114(g)(2) may agree with SoundExchange upon payment protocols to be used by SoundExchange that provide for alternative arrangements for the payment of royalties consistent with the percentages in 17 U.S.C. 114(g)(2).

(2)    SoundExchange shall inform the Register of Copyrights of:

(i)    Its methodology for distributing royalty payments to Copyright Owners and Performers who have not themselves authorized it (hereinafter "nonmembers"), and any amendments thereto, within 60 days of adoption and no later than 30 days prior to the first distribution to Copyright Owners and Performers of any royalties distributed pursuant to that methodology;

(ii)    Any written complaint that SoundExchange receives from a nonmember concerning the distribution of royalty payments, within 60 days of receiving such written complaint; and

(iii)    The final disposition by SoundExchange of any complaint specified by paragraph (h)(2)(ii) of this section, within 60 days of such disposition.

(3)    SoundExchange may request that the Register of Copyrights provide a written opinion stating whether its methodology for distributing royalty payments to nonmembers meets the requirements of this section.

(i)    *Permitted Deductions.* SoundExchange may deduct from the payments made by Noncommercial Webcasters under sections 263.4 and 263.5, prior to the distribution of such payments to any person or entity entitled thereto, all incurred costs permitted to be deducted under 17 U.S.C. 114(g)(3); provided, however, that any party entitled to receive royalty payments under 17 U.S.C. 112(e) or 114(g) may agree to permit SoundExchange to make any other deductions.

(j)    *Retention of Records.* Books and records of a Noncommercial Webcaster and SoundExchange relating to the payment, collection and distribution of royalty payments shall be kept for a period of not less than 3 years.

**263.7 Confidentiality.**

For purposes of this part, "Confidential Information" shall mean nonpublic information contained in a statement of account necessary to calculate liability under the statutory license. SoundExchange shall not disclose Confidential Information in a manner that reveals the identity of the service providing the Confidential Information; provided, however, that SoundExchange may disclose Confidential Information that reveals the identity of the service providing the Confidential Information as part of an audit, CARP or other legal proceeding, to comply with legal obligations generally, and to any sound recording copyright owner or performer entitled to receive statutory royalties.

14

JA63

Sound recording copyright owners and performers shall not publicly disclose such Confidential Information other than for enforcement purposes or sell any Confidential Information to a third party. SoundExchange and sound recording copyright owners and performers shall implement procedures to safeguard all Confidential Information using a reasonable standard of care, but in no event less than the standard of care used to safeguard their own confidential information.

### 263.8 Verification of statements of account.

(a)    *General.* This section prescribes procedures by which SoundExchange may verify the royalty payments made by a Noncommercial Webcaster.

(b)    *Frequency of verification.* SoundExchange may conduct a single audit of a Noncommercial Webcaster, upon reasonable notice and during reasonable business hours, during any given calendar year, for any or all of the prior 3 calendar years, but no calendar year shall be subject to audit more than once.

(c)    *Notice of intent to audit.* SoundExchange must file with the Copyright Office a notice of intent to audit a particular Noncommercial Webcaster, which shall, within 30 days of the filing of the notice, publish in the Federal Register a notice announcing such filing. The notification of intent to audit shall be served at the same time on the Noncommercial Webcaster to be audited. Any such audit shall be conducted by an independent and qualified auditor identified in the notice, and shall be binding on all parties.

(d)    *Acquisition and retention of records.* The Noncommercial Webcaster shall use commercially reasonable efforts to obtain or to provide access to any relevant books and records maintained by third parties for the purpose of the audit and retain such records for a period of not less than 3 years. SoundExchange shall retain the report of the verification for a period of not less than 3 years.

(e)    *Acceptable verification procedure.* An audit, including underlying paperwork, which was performed in the ordinary course of business according to generally accepted auditing standards by an independent and qualified auditor, shall serve as an acceptable verification procedure for all parties with respect to the information that is within the scope of the audit.

(f)    *Consultation.* Before rendering a written report to SoundExchange, except where the auditor has a reasonable basis to suspect fraud and disclosure would, in the reasonable opinion of the auditor, prejudice the investigation of such suspected fraud, the auditor shall review the tentative written findings of the audit with the appropriate agent or employee of the Noncommercial Webcaster being audited in order to remedy any factual errors and clarify any issues relating to the audit; provided that the appropriate agent or employee of the Noncommercial Webcaster reasonably cooperates with the auditor to remedy promptly any factual errors or clarify any issues raised by the audit.

15

(g)    *Costs of the verification procedure.* SoundExchange shall pay the cost of the verification procedure, unless it is finally determined that there was an underpayment of 10% or more, in which case the Noncommercial Webcaster shall, in addition to paying the amount of any underpayment, bear the reasonable costs of the verification procedure.

### 263.9  Verification of royalty payments.

(a)    *General.* This section prescribes procedures by which any Copyright Owner or Performer may verify the royalty payments made by SoundExchange; provided, however, that nothing contained in this section shall apply to situations where a Copyright Owner or a Performer and SoundExchange have agreed as to proper verification methods.

(b)    *Frequency of verification.* A Copyright Owner or a Performer may conduct a single audit of SoundExchange upon reasonable notice and during reasonable business hours, during any given calendar year, for any or all of the prior 3 calendar years, but no calendar year shall be subject to audit more than once.

(c)    *Notice of intent to audit.* A Copyright Owner or Performer must file with the Copyright Office a notice of intent to audit SoundExchange, which shall, within 30 days of the filing of the notice, publish in the Federal Register a notice announcing such filing. The notification of intent to audit shall be served at the same time on SoundExchange. Any such audit shall be conducted by an independent and qualified auditor identified in the notice, and shall be binding on all Copyright Owners and Performers.

(d)    *Acquisition and retention of records.* SoundExchange shall use commercially reasonable efforts to obtain or to provide access to any relevant books and records maintained by third parties for the purpose of the audit and retain such records for a period of not less than 3 years. The Copyright Owner or Performer requesting the verification procedure shall retain the report of the verification for a period of not less than 3 years.

(e)    *Acceptable verification procedure.* An audit, including underlying paperwork, which was performed in the ordinary course of business according to generally accepted auditing standards by an independent and qualified auditor, shall serve as an acceptable verification procedure for all parties with respect to the information that is within the scope of the audit.

(f)    *Consultation.* Before rendering a written report to a Copyright Owner or Performer, except where the auditor has a reasonable basis to suspect fraud and disclosure would, in the reasonable opinion of the auditor, prejudice the investigation of such suspected fraud, the auditor shall review the tentative written findings of the audit with the appropriate agent or employee of SoundExchange in order to remedy any factual errors and clarify any issues relating to the audit; provided that the appropriate agent or employee of SoundExchange reasonably cooperates with the auditor to remedy promptly any factual errors or clarify any issues raised by the audit.

(g)    *Costs of the verification procedure.* The Copyright Owner or Performer requesting the verification procedure shall pay the cost of the procedure, unless it is finally determined that there was an underpayment of 10% or more, in which case SoundExchange shall, in addition to paying the amount of any underpayment, bear the reasonable costs of the verification procedure.

## 263.10  Unclaimed funds.

If SoundExchange is unable to identify or locate a Copyright Owner or Performer who is entitled to receive a royalty payment under this part, SoundExchange shall retain the required payment in a segregated trust account for a period of 3 years from the date of payment. No claim to such payment shall be valid after the expiration of the 3-year period. After the expiration of this period, SoundExchange may apply the unclaimed funds to offset any costs deductible under 17 U.S.C. 114(g)(3). The foregoing shall apply notwithstanding the common law or statutes of any State.

## 263.11  Default.

If a Noncommercial Webcaster fails to comply with the conditions of the statutory licenses set forth in 17 U.S.C. 112 and 114, this part and any other applicable regulations, then a sound recording copyright owner or its agent may give written notice to the Noncommercial Webcaster that, unless the breach is remedied within thirty days from the date of notice and not repeated, the Noncommercial Webcaster's authorization to make public performances and ephemeral reproductions under this part will be automatically terminated. Such termination renders any public performances and ephemeral reproductions as to which the breach relates actionable as acts of infringement under 17 U.S.C. 501 and fully subject to the remedies provided by 17 U.S.C. 502-506 and 509.

17

Before the
COPYRIGHT ROYALTY BOARD
in the Library of Congress
Washington, D.C.

| | |
|---|---|
| In the Matter of ) | |
| ) | Docket No. 2009-1 |
| Digital Performance in Sound Recordings ) | CRB Webcasting III |
| and Ephemeral Recordings ) | |
| ) | |

Testimony of

## JOHN E. MURPHY

on behalf of
INTERCOLLEGIATE BROADCASTING SYSTEM, INC.

### Curriculum vitae

1.    John E. Murphy has been General Manager of WHUS Radio, since 1979. WHUS

an educational FM station in Storrs, Connecticut, is licensed to the University of Connecticut.

Mr. Murphy has more than forty years' experience in the broadcast industry. By the time he had

graduated from high school he had worked on the staff of WRNW (FM), Mt. Kisco, New York,

as a gofer and in addition had produced and announced occasional live, late-night and weekend

shows. He attended Syracuse University on a Regents Scholarship 1970-74, with a dual major in

engineering and liberal arts-communication. While in Syracuse, he worked at Stations WAER

(FM) 1970-74 and WONO (FM) 1973-75 and later WEZG (FM) and WSOQ (AM) 1975-77. He

received a B.A.-level equivalency determination from Connecticut State University in 1983 and

did further work at Goddard College, Plainfield, Vermont, in the Bachelors program in 1985, where he is now completing a Master of Arts program. During 1977-78 he was employed as a recording engineer by All-Platinum Recording Studios and Sugar Hill Records in Englewood, N.J. As a member of the adjunct faculty at Eastern Connecticut State University since 1983 he teaches five different courses in the Communications Department as needed. He has also produced four hundred weekly and monthly live cable programs since 1993 on the Windham, Connecticut, cable systems and produced numerous live programs on the Newtown, Connecticut, cable system during 1997-99.

College Radio Experiences

2.       While WHUS itself is more accurately characterized as a community radio station, it is based at a university and is operated by students working in collaboration with local citizens. Since coming to WHUS I have also consistently worked with students from other, more typical college radio stations. I served as a member of the Board of Directors of the Intercollegiate Broadcasting System from my first election in 1981 until 2004. I served as director of station relations 1988-93, as President 1994-96, and served as Chairman from 1999 to 2004. I have attended IBS' national and regional conferences for over twenty-five years.

3.       IBS sponsors a national and various regional conferences for the staffs of member-stations and prospective members. I served as a worship leader at these conferences for over twenty-five years, and I still do. As a leader of workshops I regularly engage in talking "shop" with the students who attend. At these conferences I am typically engaged in many informal conversations with students outside the formal workshops. In addition, during the school year between conferences I respond to frequent calls seeking advice on topics relating to the operation of student-staffed stations. From these interactions with students from all around

the country I have acquired a broad understanding of the common operational problems and practices of these stations.

4.    Most college stations use music in a manner readily distinguishable from that of most commercial radio stations. Students do not take a "commercial" attitude toward the music that they play; they do not talk of the music they play as a "product" merely to be delivered to listeners. They display very respectful, rather than market-driven or exploitive, attitudes toward the artists whose music they play. They tend to be curators of the genres of music they like. The ethic and culture of college radio has historically provided artists and the music industry with a truly genuine and pure and free media space for reaching the public without commercial limitations or constraints. Artists have recognized college radio for decades as one of the few places where they could receive exposure and support in their early formative stage, before they developed an audience or record company interest.

5.    Most college station managers do not attempt to dictate the music to be played but rather leave that to the diverse interests and knowledge of their programming personalities. Generally there are no "must play" song lists imposed by station management. Some stations do have "push files" in their studios displaying recent recordings by new artists and new types of music by established artists for the information of their programming staffs. There may be percentage-of-airplay requirements, to make sure the radio station continuously supports the exposure of new artists and new recordings, but the focus is on the artist or genre and not the song. A majority of the programs on most college stations utilizing recorded music are programmed "on the fly," that is, in the course of the broadcast itself, influenced by the interests and inspirations of the air personality and by the reactions anticipated and received from listeners in the course of the broadcast.

- 3 -

JA70

6.     One of the fundamental characteristics of college stations displayed at the IBS conferences and in the subsequent telephone calls from students seeking advice is the unceasing turnover in the volunteer staffs and management. The transfer of learning from one staff generation to the next is typically informal and incomplete. So these IBS conferences and consultations perform the role of transferring information and experience from one generation of station staffers to the next. Over the years then the educational process is on-going and repetitive with each new generation of staffers; it is never accomplished once-and-for-all times..

7.     The most common questions on which college stations' staffs seek information and consultation focus on issues of station management, programming, technology and fund-raising. Being a "manager" is quite a new role for most undergraduates; it's something they haven't done yet, and college radio gives them an opportunity to experience the challenges of people-management. Budgeting is a perennial problem. Many of the stations, particularly at smaller institutions, are struggling at the "survival" level. Their options for raising money are quite limited. They are desperate for funds to improve the level and quality of their operations. Some schools even prohibit their radio stations from raising funds from outside sources, for example, from local business program underwriting or grants. Some of the telephone calls I get are from stations that can't even afford to send staffers to an IBS regional conference.

8.     Perhaps surprisingly I am consulted on programming issues less frequently than management and financial problems. This infrequency may be evidence of the stations' being under little pressure to focus on audience size. Also, stations are often limited or distracted from growth and audience development by their continuing struggle to maintain even the most basic level of operations. One area of apparent growth for college radio online listening is college

- 4 -

athletics, with many stations generally experiencing their highest web-based audiences during coverage of varsity sports, rather than during music programming.

9.    In recent years interest in webcasting by high school students has become noticeable among attendees at the IBS conferences. These high school operations have many of the same problems as college stations, but with some additional obstacles thrown-in. Resources and hours of operation are often constrained by such mundane factors as limited building access, content regulation, and limited potential audiences. But I see a great potential for growth of this segment of webcasters. Webcasting is a great opportunity for students to start learning music, announcing, writing, computer, and management skills that will serve them well in their lives and as members of their communities.

10.    Digital literacy is a critical understanding and skill set that students will need in the future. Whatever their field of interest it will be connected in some way to the Internet, and employees with competency in the creation of content for websites will be increasingly in demand.

### Certification

11.    The foregoing facts and conclusions are true and correct to the best of my knowledge and belief.

Subscribed and sworn to under the penalties of perjury, 28 U.S.C. § 17465.

John E. Murphy

Storrs, Connecticut
September 25, 2009

- 5 -

JA72

Before the
COPYRIGHT ROYALTY BOARD
in the Library of Congress
Washington, D.C.

)
In the Matter of )
) Docket No. 2009-1
Digital Performance in Sound Recordings ) CRB Webcasting III
and Ephemeral Recordings )
—————————————————————)

Testimony of

## BENJAMIN SHAIKEN

on behalf of
INTERCOLLEGIATE BROADCASTING SYSTEM, INC.

1.    My name is Ben Shaiken. I am a senior student at the University of Connecticut

in Storrs, majoring in Sociology with a minor in Political Science and Urban and Community

Studies.

2.    I have been involved in college radio for almost five years now. While still in

high school, I took a training class and become certified to broadcast on WHUS Radio. The

University is on the semester system, so consequently WHUS changes its schedule three times

per year, Fall, Spring and Summer. I began my first two regularly scheduled broadcast programs

in the summer semester of 2005. I hosted one freeform radio show, called "The Good Times

Party Brigade," where I played a mixture of blues, classic rock, soul, funk and hip-hop. I also

began hosting a blues-centered show called "Cakewalk Into Town." I continued to host different

shows at WHUS until the end of the summer in 2006, when I moved to Chicago, IL to attend

DePaul University. In addition to the shows mentioned above, that summer I also hosted a hip-

JA74

hop music show called "Oodles of O's," and co-hosted a funk and soul show called "The Piano Has Been Drinking."

    3.    Upon arriving at DePaul University, I promptly sought out their radio station, Radio DePaul, which is a webcasting-only station. I hosted a hip-hop music show there for their three schedules during my freshman year (2006-2007) of college, in the Fall, Winter and Spring quarters. In April 2007, I was elected Fundraising Director at WHUS, and in June of 2007, I officially withdrew from DePaul University and enrolled in the University of Connecticut. I have been continuously broadcasting on WHUS since the summer of 2007, often hosting more than one show. I currently co-host and engineer a hip-hop show called "Boombox from the Boondox" (sic). In my years at WHUS I have attended a half-dozen college radio conferences sponsored by the Intercollegiate Broadcasting System. I have made oral presentations at such conferences and have had an opportunity to learn from other attendees and presenters how college radio stations solve common problems.

    4.    I was elected operations manager of WHUS in April 2008 and again in April 2009. I am, in effect, the student manager of the station, i.e., chairman the general operations board and of the staff. My responsibilities extend broadly across the activities of all the volunteers on the station staff. The student volunteers at WHUS do not get academic credit for their work at the station; they volunteer because they find the activities rewarding and because it gives them real-world experience they wouldn't otherwise be getting in college.

    5.    I'm telling this story to give some feel for life and work inside a noncommercial broadcasting organization and, more particularly why and how noncommercial stations use recorded music. I'll start by describing the role of the Music and Program Directors at the two noncommercial stations that I've worked at. As a manager, I am intimately aware of the work

2

JA75

and the mentality of those two positions. As a broadcaster, I have experienced the end product of their work first hand.

6.    Typically the Program Director is responsible for creating and maintaining a schedule of which DJ is on air at which time. He is responsible for making the quality of the air product as high as possible. In my experience a noncommercial station does not define this quality in monetary terms. Thus, the Program Director is not concerned with arranging the schedule to most optimize the station's financial interests. Since I have been Operations Manager, I have been a member of the scheduling committee, the body that works with the Program Director each semester to compose an air-shift schedule. In the five schedules that I have served on this committee for, I have never seen financial interests being considered when determining what kind of music will be on air. In his role, the Program Director is primarily concerned with making sure the DJ is most comfortable in his or her timeslot and making sure the individual shows flow together in the most seamless way possible.

7.    The Music Director plays a similar role as to content of the station's music programs. He is responsible for managing both an extensive library of existing LPs and CDs and also the continuous flow of new music that arrives at the station in all media -- CDs, vinyl records and digitally. At WHUS he also manages a group of volunteers who direct different genres of music. Like the Program Director, the Music Director is not driven by or focused on any financial gain for the station by his work. In most genres, there is a section of the library called the "Push File." This area is designated for what he, or a genre director, feels is the best of the new music that has come out recently. The Push File is not a dictated playlist of songs that must be played. It is simply a suggestion of music that is new and is good. DJs are selective about what they'll play, and any DJ, should he or she not like any particular recording, does not

3

JA76

have to play it. The Music Director at WHUS is driven primarily by the quality of the music that he is receiving and by whether someone else at the station might be interested in airing all or part of it. Most of the DJs are known to have particular genres of music in which they have acquired a background, or at least have some familiarity and interest, that they can convey to the station's body of listeners in a meaningful way. That certain music might be more profitable financially for the station is not part of that equation.

8.    What these Directors, coupled with the culture and nature of a noncommercial station, foster is a place where DJs can play whatever music they find interesting. As a DJ, myself, I have always programmed my shows to reflect what music I am enjoying at that particular moment, or what music I feel my audience might enjoy.

9.    One of the other factors that I feel it is important to note is that of the flexible format of noncommercial stations such as WHUS and Radio DePaul. During my time broadcasting on these stations, I have hosted or otherwise been a part of a total of at least ten different radio shows, broadcasting genres of music including blues, ska, funk, soul and hip-hop. As a manager, I have seen broadcasters with musical interests far wider and more diverse than mine pass through the station and program their own shows to showcase particular genres in the best way they can. The diversity of the programming and the flexible format make for a diverse and unique listening experience. The stations' programming is not driven by the desire to hype an audience or promote one specific kind or list of music. Instead it is meant to inform the audience and broaden their musical horizons.

### Certification

10.    The foregoing facts and conclusions are true and correct to the best of my knowledge and belief.

4

JA77

Subscribed and sworn to under the penalties of perjury. 28 U.S.C. § 17465.

_____
Benjamin Shaiken

Storrs, Connecticut
September 25, 2009

5

**Press Clippings**

USCA Case #14-1068    Document #1523372    Filed: 11/19/2014    Page 85 of 299

# THE CHRONICLE
of Higher Education

## Administration
Home   News   Administration

January 27, 2009

### Market Collapse Weighs Heavily on Endowments
*By Goldie Blumenstyk*

College endowments earned an average return of minus-3 percent
for the 2008 fiscal year and an estimated minus-22.5 percent in the
five months after that, two new reports out today show.

The declines are already having an impact. More than a quarter of
all institutions said they planned to draw less money from their
endowment this year than they had expected to spend.

After a half-decade of soaring returns, it was the first time
endowment investments lost money since the early 2000s, when, in
the wake of the collapsing technology bubble and the terrorist
attacks of September 11, endowments returned a minus-3.6 percent
in 2001 and minus-6 percent in 2002 (see tables).

The only category of institutions that managed to eke out an average
positive return in the 2008 fiscal year were the 77 with endowments
worth more than $1-billion. Even their return—0.6 percent—was a
far cry from the 21.3 percent return they posted a year earlier.

As in the previous year, the largest endowments at the end of the
fiscal year were those of Harvard ($36.6-billion), Yale ($22.9-
billion), Stanford ($17.2-billion), and Princeton ($16.3-billion)
Universities. All have subsequently dropped in value by about 20
percent.

The investment declines were hardly a surprise. For the last year,
markets have been roiled by a global recession, a credit crisis of
unprecedented proportions, and the collapse and near-collapse of
several major international banks.

"Things went south just as quickly in the endowment world as they
did in the economy," said John Walda, president of the National
Association of College and University Business Officers, the
organization that conducted the annual survey with TIAA-CREF
Asset Management.

For both the fiscal year and the five months that followed, colleges'
returns were better than many of the market-performance indices.
The Standard & Poor's 500 stock index returned a minus-13.1
percent for the fiscal year; from July 1 to November 30, the S&P fell

by 29.9 percent.

### Surprising Results

Despite the troubled economy and volatile markets, the 36th annual
"Nacubo Endowment Study" found that more than half of all
endowments ended their fiscal year in June with larger total values
than they had a year earlier, with an average increase of 0.5 percent.
Fifty-five institutions reported overall endowment growth of greater
than 10 percent.

The biggest endowment to see a sizable percentage gain was that of
Oklahoma State University and its foundation, which grew by nearly
32 percent, bringing the endowment to $617-million at the end of
fiscal year. Foundation officials said the gain was propelled by a
positive investment return of 4.5 percent and the success of an
April-though-June push for endowment gifts to match challenges
from the state and a private donor, which brought in $65-million.

The survey included responses from 796 institutions from the
United States and Canada. (The accompanying database of changes in
endowment value lists 791 institutions because a few university-
related foundations respond separately but report their data with
the institution.)

Because of the abrupt downturn in the markets since the summer,
Nacubo and its new endowment-study partner, the Commonfund
Institute, conducted a follow-up study on endowment performance
in December. That survey, which included responses from 435 of
the survey respondents, found that endowments had fallen in
overall value by an estimated average of 22.9 percent. (At least five
of the largest 10 endowments did not respond.)

In dollars, that translates to an estimated decline of $94.5-billion in
market value for the institutions in the annual survey.

The findings in the follow-up study reflect the two-pronged problem
colleges face. Negative returns are eating into endowment values,
and philanthropy hasn't been adequate to make up for the losses
and endowment spending. After the markets dove, "gifts did not
help to hold those values up," said John S. Griswold Jr. executive
director of the institute.

Large private colleges depend on their endowment income to cover
15 to 20 percent of their operating costs, and at some of the
wealthiest institutions, it provides as much as 45 percent.

(On Tuesday the institute also released its "2009 Commonfund
Benchmarks Study of Educational Endowments," which found that
628 schools and colleges earned minus-2.7 percent on their

endowment investments in the 2008 fiscal year. The study included
results from 470 colleges and universities, but it does not provide
data or analysis separately for each college respondent.)

### Spending Plans

With markets not expected to recover quickly, many colleges are
taking a cautious spending approach. Faced with substantially
smaller endowments, fewer than 4 percent of respondents said they
plan to increase the rate of spending from their endowment next
year. (Among institutions with endowments greater than
$500-million, the proportion was slightly higher, at 7.5 percent.)
More than a third of respondents said they still didn't know what
they would do or did not respond.

In 2008 the average rate of spending from endowments was 4.6
percent, the same as it was in 2007. The rate of spending is
determined by dividing the amount of endowment money spent by
the value of the endowment at the beginning of the year. Over the
past 18 months, several state and Congressional leaders have
criticized wealthy colleges for failing to spend at least 5 percent of
their endowment value each year.

One of the most vocal of those critics, U.S. Sen. Charles E. Grassley,
a Republican from Iowa, reiterated that message with a written
statement timed for release with the reports. "I hope colleges won't
use the recent volatility as an excuse to raise tuition or freeze
student aid," he said. "Colleges' smart saving and investing could
really help students right now. And the right kind of modest payout
requirement for endowments above a certain dollar amount might
do a lot of good for universities and students regardless of economic
conditions."

Kevin P. Hegarty, chief financial officer at the University of Texas at
Austin, said it was disappointing to see some colleges decide to
avoid tapping deeper into their endowments now, as they face
financial squeezes from declines in state financing and private
giving, and increasing demand for student aid.

"Wasn't that the argument for payouts less than the returns" when
the gains were stronger? he asked. Austin, part of the giant
University of Texas system, which has the fifth-largest endowment
in the country ($16.1-billion), plans to increase spending from its
share of the endowment by the rate of inflation next year.

Mr. Walda said he sympathized with college trustees and other
leaders who are now walking the "tightrope" in deciding how to
respond to the severe drop in endowment values. "I'm not surprised
that 35 percent just don't know at this point," he said.

Still, as he noted, endowments are designed to be long-term investments, and if you look back over the past decade, "it's still a very positive picture."

For the 10 years ending June 30, 2008, colleges' overall return was a positive 6.5 percent.

**Investment Strategies**

The diversification that colleges have been pursuing over the past several years has helped them, Mr. Walda and others said.

That trend continued in 2008.

Between the ends of fiscal 2007 and 2008, the proportion of all college endowment assets invested in "alternatives"—private equity, venture capital, hedge funds, real estate, and natural resources—rose from 18.9 percent to 23.5 percent. The proportion of assets invested in stocks fell from 57.6 percent to 51.9 percent.

For some colleges, which have increasingly been shifting assets away from bread-and-butter investments like stock and bonds, and into alternative investments, like hedge funds and natural resources, the worst may yet be to come.

Over the next few months, many credit-squeezed hedge funds and private-equity funds may be calling on investors to fulfill their investment pledges, which could force some colleges into selling other assets at a loss to come up with the money. And colleges that managed to cushion their overall losses in 2008 by investing in oil and natural gas could find themselves with deep losses, if plummeting prices don't recover.

"Everyone is realizing that they need more liquidity than they thought they did," said Kathryn J. Crecelius, chief investment officer at the Johns Hopkins University.

Johns Hopkins had a return of minus-1.3 percent for 2008, and declines in line with its peers in the months that followed. Between 2007 and 2008, the overall endowment sank in value by nearly 10 percent, to $2.5-billion, but Ms. Crecelius said most of that was attributable to a decision to remove funds the university had been counting as endowment that should not have been classified that way.

Despite the negative return, Ms. Crecelius said, Johns Hopkins is in "a very good position compared to many of our peers" because it has the capital it needs to cover its commitments. Also, it relies on its endowment for only about 5 percent of its operating costs.

By contrast, institutions like Dartmouth College and Harvard, which

depend on endowment funds by as much as seven times that, have recently imposed hiring freezes and spending cuts. Dartmouth, which had already announced it won't fill all 70 positions left vacant by its retirement-incentive program, last week said that "some staff layoffs are inevitable" because of the endowment declines. Like many other institutions that pledged last year to increase financial aid, Dartmouth said it planned to maintain that program.

**Beating the Market**

While few institutions have managed to find market-beating investment strategies for the past several months, some who beat the averages in fiscal 2008 credited their contrarian tactics. For Texas Christian University, that meant beefing up holdings in oil and gas and cutting back on investments in stocks, particularly in stocks of companies in emerging markets (which ended up doing badly), even though for years at investment conferences, "everybody's just thumping the table about international equities," said James R. Hille, chief investment officer.

The result: Texas Christian notched a positive return of 5 percent for 2008. With energy investments accounting for 15 percent of the university's portfolio (much above the average allocation of 2.2 percent), the endowment benefited when prices surged, "Although," Mr. Hille noted, "we're going to pay for that this year."

Christopher L. Bittman, chief investment officer at the University of Colorado Foundation, followed a similar strategy, selling emerging-market stocks and loading up on bonds during the past 18 months. For a while, he said, "we looked pretty foolish," especially when international stocks "screamed ahead." But he said the positions, including an allocation to bonds that has gone from about 5 percent to about 13 percent, seems appropriate now.

Lately, he's been eyeing the kinds of investments that have been battered by the markets, including real estate, high-paying debt issued by companies in financial trouble, and shares of private-equity funds that some cash-strapped investors are unloading at bargain-basement prices.

He's even put a portion of the foundation's endowment into a cattle and sheep farm in Australia. Markets are in turmoil and the foundation, which notched a 1 percent return in 2008, is down notably since then. While few investment experts are predicting a market rally any time soon, Mr. Bittman said he sees cause for optimism. "Honestly, I think there are some opportunities in this mess."

Copyright 2009. All Rights reserved

The Chronicle of Higher Education 1255 Twenty-Third St, N.W. Washington, D.C. 20037

# THE CHRONICLE
#### of Higher Education

## Administration
Home   News   Administration

March 5, 2009

### Endowment Declines Continue, Survey Indicates
*By Goldie Blumenstyk*

A new survey from the Commonfund Institute on the investment performance of 235 education endowments found that the funds earned an average return of minus-24.1 percent in the six months ending December 31, 2008.

A report on the findings includes results from 118 private colleges, 67 public colleges, and 50 independent schools. The institutions of higher education fared only marginally better than the schools, with the private colleges reporting a return of minus-23.7 percent and the public colleges a return of minus-23.6 percent. The average return for schools in the survey was minus-25.1 percent.

The data were gathered in an online survey in January and February.

"It's bad news, absolutely," said John S. Griswold, executive director of the institute. "This is creating a lot of pain right now."

With the market plunges of the last few weeks, Mr. Griswold said, the decline since July 1 and the start of the 2009 fiscal year has no doubt grown. By now, "it's probably 30 percent," he said in an interview this week.

The latest report, part of the "2009 Commonfund Benchmarks Study Year-End Update," includes fewer institutions than the one Commonfund and the National Association of College and University Business Officers reported on in January. That report found that 435 colleges had seen an estimated loss of 22.9 percent on their endowments for the first five months of the 2009 fiscal year (*The Chronicle.* February 6).

Copyright 2009. All Rights reserved

The Chronicle of Higher Education   1255 Twenty-Third St, N.W.   Washington, D.C. 20037

USCA Case #14-1068     Document #1523372     Filed: 11/19/2014     Page 92 of 299

 **REUTERS**

LATEST NEWS ◘◘ BRITAIN SEES G20 SUPPORT FOR REBALANCING WORLD ECONOMY          Quotes, News, Pictures & Vi **SEARCH**    Login


**Top News**
Reuters top ten news stories delivered to your inbox each day.
Subscribe


Travel on Acela Express is easy come, easy go.
Book now at Amtrak.com

 €acela

You are here:  Home > News > U.S. > Article                                        DJIA : **9623.67  +44.81 +0.46%** | Nasdaq : **2144.62  +6.58 +0.31%**

| | | |
|---|---|---|
| HOME | | **EDITOR'S CHOICE** |
| BUSINESS & FINANCE | # College endowments lost 24 percent in 6 months | |
| NEWS | | |
| U.S. | | |

Swine Flu

Politics

International

Technology

Entertainment

Sports

Lifestyle

Oddly Enough

Health

Science

Special Coverage

Video

Pictures

Your View

The Great Debate

Blogs

Weather

Reader Feedback

# College endowments lost 24 percent in 6 months

Thu Mar 5, 2009 12:32am EST

Email |  Print |  Share |  Reprints |  Single Page                                    [-] Text [+]



1 of 1                    Full Size

Featured Broker sponsored link

**100 FREE TRADES**
E*TRADE Securities LLC

By Svea Herbst-Bayliss

BOSTON (Reuters) - U.S. colleges and universities lost nearly one-quarter of their endowments' worth in the first half of their fiscal year, forcing them to cut staff and budgets just like corporations hurt by the financial crisis.

From July through December, U.S. schools' endowments dropped an average of 24.1 percent, according to a report released by the Commonfund Institute, a nonprofit group that polled 629 educational endowments on their results.

Illustrating just how severely the financial crisis is affecting higher education, even wealthy colleges like Harvard are freezing salaries, offering early retirement, reassessing construction projects and considering selling off art collections.

Smaller schools, with endowments of $10 million or less, fared even worse with their endowments losing 30.2 percent, according to the study which will be released on Thursday.

"These are the worst-ever half year results that educational endowments have seen," Commonfund Executive Director John Griswold said in an interview. "Even the most diversified endowments suffered serious declines."

Harvard University, the country's richest, reported in December that its endowment had shrunk by $8 billion to $29 billion in four months and that it expects that loss to widen to 30 percent by the end of the fiscal year on June 30, 2009.

Commonfund, which provides nonprofit organizations with investment information and professional development programs, traditionally reports on these numbers only once a year.

However, the group prepared this rare half-year study between January and February 2009 to assist investment committees in making changes to cope with extremely difficult market conditions. "Some people find the comfort of knowing they are not they are not alone," Griswold said.

Endowments have long provided an important lifeline for schools as these often use at least 5 percent a year to pay for salaries, maintain buildings and contribute to financial aid to help offset the considerable cost of attending private high schools and four year colleges.

Last year bets on U.S. equities dealt endowments the biggest blow. "It was the stock market," Griswold said, noting that the Standard & Poor's 500 index lost about 38 percent in 2008. Larger schools were able to navigate the market slightly better, the report said, noting that schools with endowments of $1 billion or more lost 21.7 percent.

Alternative strategies like hedge funds helped larger endowments survive the market decline better as the average hedge fund lost only 19 percent in 2008.

(Reporting by Svea Herbst-Bayliss; editing by Richard Chang)

© Thomson Reuters 2009 All rights reserved



A selection of our best photos from the past 24 hours. Slideshow
Slideshow

**In The Last Bull Market I Turned $33k into $7,000,000**
What Everyone Wants to Know is "So, How Have I Done Lately?"
I tell them this: "Pretty well... in fact from Sept. 2008 - Feb . 2009 I've made $3,895,191"
- Michael Parness
Get my Book, DVD Free (just $7 shipping)

**SEARCH RESULTS**

**Results for "college endowments 2009"**

Harvard and Yale endowments suffer heavy losses
Thursday, 10 Sep 2009 08:00pm EDT

WRAPUP 1-Harvard and Yale endowments suffer heavy losses Wednesday, 9 Sep 2009 08:00pm EDT

UPDATE 1-Yale's endowment slides 30 pct Wednesday, 9 Sep 2009 08:00pm EDT

Yale's endowment slides 30 percent Wednesday, 9 Sep 2009 08:00pm EDT

Yale's endowment slides 30 pct - WSJ Wednesday, 9 Sep 2009 08:00pm EDT

More results for "college endowments 2009".

**MOST POPULAR ON REUTERS**

Articles | Video

1. **U.S. charges Obama fund-raiser in $290 million fraud**



2. U.S. to push for new economic world order at G20 |  Video
3. CBS fails to end Rather suit; Redstone may testify
4. A.D.C. whodunit: Who leaked and why?
5. "Option" mortgages to explode, officials warn
6. Silicon Valley reinvents the lowly brick
7. Sun Micro losing $100 million a month, Ellison says
8. Kremlin says Israel promised not to strike Iran
9. UPDATE 3-CBS fails to end Rather suit; Redstone may testify
10. Ahmadinejad warns against any attack on Iran |  Video

Most Popular Articles RSS Feed

REUTERS VIDEO
**TECHNOLOGY**

Do More With Reuters
RSS
Widgets
Mobile
Podcasts
Newsletters
Your View

Partner Services
CareerBuilder
Affiliate Network

Professional Products
Support (Customer Zone)
Reuters Media
Financial Products

About Thomson Reuters

FOR THE RECORD

**Dim view of media? Try more transparency**
Dean Wright

A new study found the U.S. public more critical than ever of the accuracy and independence of the media. The proper response: more transparency.
Blog

---

**Reuters.com:**  Help and Contact Us  |  Advertise With Us  |  Mobile  |  Newsletters  |  RSS 🔊  |  Labs  |  Journalism Handbook  |  Archive  |  Site Index  |  Video Index

**Thomson Reuters Corporate:**  Copyright  |  Disclaimer  |  Privacy  |  Professional Products  |  Professional Products Support  |  About Thomson Reuters  |  Careers

**International Editions:**  Africa  |  Arabic  |  Argentine  |  Brazil  |  Canada  |  China  |  France  |  Germany  |  India  |  Italy  |  Japan  |  Latin America  |  Mexico  |  Russia  |  Spain  |  United Kingdom  |  United States

Thomson Reuters is the world's largest international multimedia news agency, providing investing news, world news, business news, technology news, headline news, small business news, news alerts, personal finance, stock market, and mutual funds information available on Reuters.com, video, mobile, and interactive television platforms. Thomson Reuters journalists are subject to an Editorial Handbook which requires fair presentation and disclosure of relevant interests.

NYSE and AMEX quotes delayed by at least 20 minutes. Nasdaq delayed by at least 15 minutes. For a complete list of exchanges and delays, please click here.

# THE CHRONICLE
of Higher Education

## Graduate Students
Home   News   Faculty   Graduate Students

June 8, 2009

### Standard & Poor's Report Lays Out Challenge for Coming Years
Standard & Poor's Report Lays Out Challenge for Coming Years

A new report from Standard & Poor's offers a mixed picture for colleges' prospects in the coming years, but one takeaway is clear: Colleges should expect to feel pain through 2012.

"We believe that the cuts that many institutions have made in fiscal 2009 may offset lower revenues this year, but that managing additional cuts in fiscals 2010, 2011, and 2012 could be more difficult," says the plainly titled report, "The Recession Is Testing U.S. Higher Education's Resilience and Credit Quality."

The report says that 2009 enrollment may remain steady, but that trouble in credit markets, investments, retirement plans, and home equity may spell trouble for some colleges, particularly private ones. Although applications are reportedly up, the report says, "many institutions are also citing a lower amount of deposits, compared with last year."

The report issued other warnings for bread-and-butter issues in college management: endowment, fund raising, and state money. Colleges' heavy dependence on endowments — which provide up to 45 percent of operating revenues at some institutions — may mean that they will have to make significant cuts in their operating budgets.

S&P expects fund-raising revenue to be lower in the next two years than it was in the past two, with colleges in the silent phase of fund raising waiting out the recession. And even as states cut their budgets, many public colleges may see increased demand, as they are perceived as a cheaper alternative to private colleges. —*Scott Carlson*

Copyright 2009. All Rights reserved

The Chronicle of Higher Education   1255 Twenty-Third St, N.W.   Washington, D.C. 20037

## Certificate of Service

I hereby certify that I have caused to be e-mailed and overnighted this day copies of the foregoing testimony and exhibits to the following persons:

Michael J. Huppe, General Counsel
SoundExchange
1211 14th Street, NW, Suite 700
Washington, DC 20005

William B. Colitre
Royalty Logic
21122 Ervin Street
Woodland Hills, CA 91367

Collette E. Vogele
Vogele & Associates
12 Geary Street, Suite 701
San Francisco, CA 94108

Thomas G. Connolly, Mark A. Grannis,
Christopher J. Wright, Timothy J. Simeone,
Charles D. Breckinridge, Kelley Shields
Wiltshire & Grannis
1200 18th Street, N.W.
Washington, DC 20036

David A. Handzo
Michael DeSanctis
Jared Freedman
Jenner & Block
1099 New York Avenue, N.W.
Washington, DC 20001

Ara Hovanesian
Hovanesian & Hovanesian
301 E. Colorado Blvd., Suite 514
Pasadena, CA 91101

David Oxenford
Davis Wright Tremaine
1919 Pennsylvania Avenue N.W., Suite 200
Washington, D.C. 20006

William Malone

Washington, D.C.

September 29, 2009

4122\03\00149814.DOC

## List of Subjects

### 33 CFR Part 155

Alaska, Hazardous substances, Oil pollution, Reporting and recordkeeping requirements.

### 33 CFR Part 157

Cargo vessels, Incorporation by reference, Oil pollution, Reporting and recordkeeping requirements.

### 46 CFR Part 162

Fire prevention, Incorporation by reference, Marine safety, Oil pollution, Reporting and recordkeeping requirements.

■ Accordingly, the interim rule amending 33 CFR parts 155 and 157 and 46 CFR part 162, which was published at 74 FR 3377 on January 16, 2009, as amended by the correction published at 74 FR 6358 on February 9, 2009, is adopted as a final rule with the following changes:

## TITLE 33—NAVIGATION AND NAVIGABLE WATERS

## PART 155—OIL OR HAZARDOUS MATERIAL POLLUTION PREVENTION REGULATIONS FOR VESSELS

■ 1. The authority citation for part 155 continues to read as follows:

**Authority:** 33 U.S.C. 1231, 1321(j); 46 U.S.C. 3703; E.O. 12777, 56 FR 54757, 3 CFR, 1991 Comp., p. 351; Department of Homeland Security Delegation No. 0170.1. Sections 155.100 through 155.130, 150.350 through 155.400, 155.430, 155.440, 155.470, 155.1030(j) and (k), and 155.1065(g) are also issued under 33 U.S.C. 1903(b). Section 155.490 also issued under section 4110(b) of Public Law 101–380. Sections 155.1110 through 155.1150 also issued under 33 U.S.C. 2735.

**Note:** Additional requirements for vessels carrying oil or hazardous materials are contained in 46 CFR parts 30 through 40, 150, 151, and 153.

■ 2. In § 155.350, revise paragraph (a)(3) to read as follows:

### § 155.350 Oily mixture (bilge slops)/fuel oil tank ballast water discharges on oceangoing ships of less than 400 gross tons.

(a) * * *

(3) For equipment installed after 2004 to be approved under paragraph (a)(2) of this section, it must meet current standards in 46 CFR part 162, subpart 162.050 by the date set forth in paragraphs (a)(3)(i) and (a)(3)(ii) of this section, unless the equipment is installed on a ship constructed before 2005 and it would be unreasonable or impracticable to meet those current standards.

(i) A ship entering international service for the first time since 2004, must comply with the requirements of paragraph (a)(3) of this section by the date of its initial survey prior to receiving its International Oil Pollution Prevention (IOPP) certificate.

(ii) Any ship, other than a ship described in paragraph (a)(3)(i) of this section, must comply with the requirements of paragraph (a)(3) of this section by the date of the ship's first drydock after October 13, 2009.

* * * * *

■ 3. In § 155.360, revise paragraph (a)(2) to read as follows:

### § 155.360 Oily mixture (bilge slops) discharges on oceangoing ships of 400 gross tons and above but less than 10,000 gross tons, excluding ships that carry ballast water in their fuel oil tanks.

(a) * * *

(2) For equipment installed after 2004 to be approved under paragraph (a)(1) of this section, it must meet current standards in 46 CFR part 162, subpart 162.050 by the date set forth in paragraphs (a)(2)(i) and (a)(2)(ii) of this section, unless the equipment is installed on a ship constructed before 2005 and it would be unreasonable or impracticable to meet those current standards.

(i) A ship entering international service for the first time since 2004, must comply with the requirements of paragraph (a)(2) of this section by the date of its initial survey prior to receiving its International Oil Pollution Prevention (IOPP) certificate.

(ii) Any ship, other than a ship described in paragraph (a)(2)(i) of this section, must comply with the requirements of paragraph (a)(2) of this section by the date of the ship's first drydock after October 13, 2009.

* * * * *

■ 4. In § 155.370, revise paragraph (a)(4) to read as follows:

### § 155.370 Oily mixture (bilge slops)/fuel oil tank ballast water discharges on oceangoing ships of 10,000 gross tons and above and oceangoing ships of 400 gross tons and above that carry ballast water in their fuel oil tanks.

(a) * * *

(4) For equipment installed after 2004 to be approved under paragraph (a) of this section, it must meet current standards in 46 CFR part 162, subpart 162.050 by the date set forth in paragraphs (a)(4)(i) and (a)(4)(ii) of this section, unless the equipment is installed on a ship constructed before 2005 and it would be unreasonable or impracticable to meet those current standards.

(i) A ship entering international service for the first time since 2004, must comply with the requirements of paragraph (a)(4) of this section by the date of its initial survey prior to receiving its International Oil Pollution Prevention (IOPP) certificate.

(ii) Any ship, other than a ship described in paragraph (a)(4)(i) of this section, must comply with the requirements of paragraph (a)(4) of this section by the date of the ship's first drydock after October 13, 2009.

* * * * *

Dated: October 7, 2009.

**J.G. Lantz,**
*Director of Commercial Regulations and Standards, U.S. Coast Guard.*
[FR Doc. E9–24670 Filed 10–9–09; 8:45 am]
**BILLING CODE 4910–15–P**

## LIBRARY OF CONGRESS

### Copyright Royalty Board

### 37 CFR Part 370

**[Docket No. RM 2008–7]**

### Notice and Recordkeeping for Use of Sound Recordings Under Statutory License

**AGENCY:** Copyright Royalty Board, Library of Congress.

**ACTION:** Final rule.

**SUMMARY:** The Copyright Royalty Judges are issuing final regulations for the delivery and format of reports of use of sound recordings for the statutory licenses set forth in sections 112 and 114 of the Copyright Act.

**DATES:** *Effective Date:* November 12, 2009.

**FOR FURTHER INFORMATION CONTACT:** Richard Strasser, Senior Attorney, or Gina Giuffreda, Attorney Advisor, by telephone at (202) 707–7658 or e-mail at *crb@loc.gov.*

**SUPPLEMENTARY INFORMATION:**

### I. Background

On October 6, 2006, the Copyright Royalty Judges ("Judges") issued interim regulations published in the **Federal Register** for the delivery and format of reports of use of sound recordings for the statutory licenses set forth in sections 112 and 114 of the Copyright Act. 71 FR 59010. The goal of those interim regulations was to establish format and delivery requirements for reports of use so that royalty payments to copyright owners pursuant to section 112 and 114 licenses could be made from April 1, 2004,

forward based upon actual data on the sound recordings transmitted by digital audio services. During the interval since the Judges issued the interim regulations, the Judges have monitored the operation of these regulations as well as developments in recordkeeping requirements agreed upon by parties to various settlements relating to the use of section 112 and 114 licenses. Subsequently, on December 30, 2008, the Judges published a notice of proposed rulemaking ("NPRM") setting forth proposed revisions to the interim regulations adopted in October 2006. 73 FR 79727. The most significant revision proposed by the Judges was to expand the reporting period to implement year-round census reporting. Further, on April 8, 2009, the Judges published a notice of inquiry ("NOI") to obtain additional information concerning the likely costs and benefits from the adoption of the proposed census reporting provision as well as information on any alternatives to the proposal that might accomplish the same goals in a less burdensome way, particularly with respect to small entities. 74 FR 15901. With the issuance of today's regulations, the Judges establish requirements for census reporting for all but those broadcasters who pay no more than the minimum fee for their use of the license. The Judges are adopting these regulations substantially as proposed in the NPRM with minor modifications in response to comments received. These final regulations establish requirements by which copyright owners may receive reasonable notice of the use of their sound recordings and under which records of use shall be kept and made available by entities of all sizes performing sound recordings. *See, e.g.,* 17 U.S.C. 114(f)(4)(A). As with the interim regulations adopted in 2006, today's final regulations represent baseline requirements. In other words, digital audio services are free to negotiate other formats and technical standards for data maintenance and delivery and may use those in lieu of regulations adopted by the Judges, upon agreement with the Collective. We have no intention of codifying these negotiated variances in the future unless and until they come into such standardized use as to effectively supersede the existing regulations.

## II. This Proceeding

The Judges' December 30, 2008, NPRM set forth proposed revisions to the regulations governing the format and delivery requirements for reports of use of sound recordings that provided for three potential categories of change.

First, the Judges proposed eliminating obsolete provisions of the interim regulations. Second, the Judges proposed placing definitions that were duplicated in various sections of the interim regulations into a new single definition section applicable throughout Part 370 unless otherwise defined in a specific section. Third, the Judges proposed expanded reporting to implement year-round census reporting. In connection with this expanded census reporting, the Judges proposed eliminating the aggregate tuning hours ("ATH") approach previously available for nonsubscription services and requiring that such services now report actual total performances ("ATP"). However, the Judges proposed allowing pre-existing satellite digital audio radio services, new subscription services and business establishment services to achieve census reporting by continuing their use of the ATH option if technological impediments existed which thwarted the measurement of actual listenership. 73 FR 79727. In addition to these specific proposals, the Judges also solicited comments on technological developments which might warrant additional revisions to rules governing the method of reporting specific data elements and/or the delivery mechanism employed for reporting.

In response to the NPRM, the Judges received 43 comments from various categories of interested parties: (1) Representatives of copyright owners and performers, including SoundExchange, the Collective charged with collecting and distributing royalties; (2) copyright users and/or their representatives, including the National Association of Broadcasters ("NAB"), College Broadcasters Inc. ("CBI"), Intercollegiate Broadcasting System ("IBS"), various radio broadcasters affiliated with educational institutions, a noncommercial religious broadcaster, and an operator of radio and Internet stations featuring Christian programming; an Internet service that simulcasts the over-the-air and Internet-only broadcasts of primarily noncommercial terrestrial radio stations; and (3) several software providers of recordkeeping solutions to radio stations and Webcasters.

Most of the comments received from interested parties centered on the proposed move to full census ATP reporting. Comments focused on the technological reporting capabilities of small entities or less intensive users (particularly, users associated with educational institutions), as well as on various assertions about the costs and benefits of moving to full census ATP

reporting for such users. Consequently, the Judges' April 8, 2009, NOI sought to obtain additional, more concrete information concerning the likely costs and benefits stemming from the adoption of the proposed census reporting provision as well as information on any alternatives to the proposal that might accomplish the same goals as the proposal in a less burdensome way, particularly with respect to small entities. 74 FR 15901.

In response to the NOI, the Judges received 14 comments and 6 reply comments from the following categories of interested parties: (1) Representatives of copyright owners and performers, including SoundExchange; (2) copyright users and/or their representatives and allied interested parties, including the NAB, CBI, IBS, the National Federation of Community Broadcasters ("NFCB"), various radio broadcasters affiliated with educational institutions, the American Council on Education ("ACE"); and (3) a software provider of recordkeeping solutions to radio stations and Webcasters.

## III. Obsolete Provisions and General Definitions

Obsolete provisions proposed for deletion by the Judges in their December 30th NPRM raised no concerns for commenting parties. Similarly, the deletion of duplicative definitions for nine common terms that appeared in various sections of the interim regulation and their replacement by a single definition for each of the nine terms in a new General Definitions section at the head of the proposed regulation [1] proved noncontroversial. Therefore, given the efficiency gains these changes will bring users, the Judges adopt the changes as proposed in the December 30, 2009, NPRM at 73 FR 79728.

## IV. Reports of Use Content and Reporting Period; Census Reporting

Current requirements for the data to be included in reports of use and the frequency of reporting still largely reflect interim regulations adopted on March 11, 2004 (69 FR 11515) by the Copyright Office during an earlier phase of the recordkeeping rulemaking process that predated the transfer of rulemaking

---

[1] These terms include: (1) Notice of Use, (2) Service, (3) Preexisting Subscription Service, (4) New Subscription Service, (5) Nonsubscription Transmission Service, (6) Preexisting Satellite Digital Audio Radio Service, (7) Business Establishment Service, (8) Collective and (9) Report of Use. In the interest of administrative efficiency, the Judges proposed a new § 370.1, General Definitions, to provide definitions for these nine terms that would apply generally throughout Part 370, unless otherwise specifically indicated.

authority to the Judges pursuant to the Copyright Royalty and Distribution Reform Act of 2004. The Copyright Office in its interim regulations determined to phase in the new reporting process by requiring periodic reporting of sound recording performances, although the Copyright Office noted that: "[O]nce final regulations are implemented, year-round census reporting is likely to be the standard measure rather than the periodic reporting that will now be permitted on an interim basis." 69 FR 11526. Such census reporting provides a more complete record on which to base payments for the use of sound recordings compared to periodic reporting.[2] After providing users with ample time—some five years—to familiarize themselves with the methods of acquiring and keeping the necessary data for compliance, the Judges now adopt a final regulation adopting census reporting for all but the lowest intensity users of sound recordings in a single category of users—broadcasters typically engaged in simulcasting their over-the-air broadcasts on the Web. All other nonsubscription services, such as pure play Webcasters, are required to provide full reporting of the actual total performances of the sound recording for each reporting period during the year.[3] To the extent that technological impediments to measuring actual listenership continue to hamper actual listenership measurement with respect to each sound recording for preexisting satellite digital audio radio services, new subscription services or business establishment services, the alternative of census reporting by means of a construct utilizing aggregate tuning hours[4] is maintained for such services.[5]

[2] Currently, services must provide the total number of performances of each sound recording during the relevant reporting period. However, the relevant reporting period is limited to two periods of seven consecutive days for each calendar quarter of the year. This results in an estimate of the use of a sound recording rather than a report of actual use.

[3] The final rule eliminates the aggregate tuning hours approach to reporting previously available to nonsubscription services. It should be noted that the aggregate tuning hours payment alternative to the per performance rate available to certain Webcasters was phased out at the end of the 2007 calendar year. *Digital Performance Right in Sound Recordings and Ephemeral Recordings Final Rule,* 72 FR 24096 n.33.

[4] This alternative requires an estimate of census reporting by means of reporting the following data for each reporting period: Aggregate tuning hours, channel or program name and play frequency.

[5] It should be noted that in the recent preexisting satellite digital audio radio service ("SDARS") ratemaking proceeding, the collective (SoundExchange) requested that the recordkeeping regulations be amended to require census reporting and the services did not object to census reporting in general so long as the reporting exceptions

A number of the most intensive users of the 114 and 112 licenses are already reporting on a census basis according to SoundExchange. *See* Comments of SoundExchange, Docket No. RM 2008–7 at 5–6 (January 29, 2009); Comments of SoundExchange, Docket No. RM 2008–7 at 15–20 (May 26, 2009). Further, the fact that many of the largest commercial Webcasters and other intensive users such as satellite radio have not filed comments in this proceeding clearly indicates an absence of controversy among more intensive users concerning the Judges' proposed census reporting regulations. Rather, many of the comments focused on the impact of the NPRM on less-intensive users such as a number of noncommercial broadcasters affiliated with educational institutions.

Both commercial and noncommercial broadcasters that are low-intensity users who typically simulcast over the Web appear to share a common technological characteristic–anachronistic systems or procedures that are not designed for easily reporting data on sound recordings simultaneously played as a Webcast. *See, e.g.,* Comments of the National Association of Broadcasters, Docket No. RM 2008–7 at 8–9 (January 29, 2009); Comments of the National Association of Broadcasters, Docket No. RM 2008–7 at 5 (May 26, 2009). For example, in some cases, the manual play of music without the aid of a computer hampers the effective collection of information on the usage of sound recordings. *See, e.g.,* Comments of the National Association of Broadcasters, Docket No. RM 2008–7 at 9 (January 29, 2009); Comments from Tom Worster and Spinitron, Docket No. RM 2008–7 at 3–4 (January 29, 2009); Reply Comments of the American Council on Education, Docket No. RM 2008–7 at 2 (June 8, 2009).

While the absence of automated playlists represents one particular approach followed by some broadcasters for a variety of reasons-sometimes creative, sometimes pedagogical, and sometimes financially driven (*See, e.g.,* Comments of the National Association of Broadcasters, Docket No. RM 2008–7 at 8–9 (January 29, 2009); Comments of the National Association of Broadcasters, Docket No. RM 2008–7 at 4–5 (May 26, 2009); Comments of University of California NCE Broadcast Radio Stations and Associated College

currently found in § 370.3(b)(8)(i)–(iii) were retained. *Determination of Rates and Terms for Preexisting Subscription Services and Satellite Digital Audio Radio Services Final Rule and Order,* 73 FR 4101 (January 24, 2008). The Judges' final recordkeeping rule retains those exceptions in the new § 370.4(b)(3)(i)–(iii) adopted today.

and University Broadcasters Who Simulcast, Docket No. RM 2008–7 at 3 (May 26, 2009); Comments of WSOU–FM, Docket No. RM 2008–7 at 3–4 (May 26, 2009))—these reasons do not necessarily overlap. For example, some low-intensity simulcasters who maintain partial or fully manual playlists may well be affiliated with large, financially well-endowed educational institutions and those institutions may claim to be training future broadcasters irrespective of the broadcast industry trend toward the adoption of automated programming; yet, they may choose to continue manual programming to allow their students more room to pursue a more creative approach to playing music either as part of a structured learning experience or as part of a less structured extracurricular experience. Thus, even in those instances where an educational institution's financial resources appear fully capable of providing for more investment in newer technology for proper recordkeeping and reporting under the Copyright Act, the educational institution may have little incentive to make such investments given the relatively unimportant stature of the activity in its overall mission. As a result, from the user's standpoint in such situations, there may appear to be a reasonable relationship between the low intensity use of Webcasting and the amount of resources the noncommercial broadcasting entity is willing to invest in the effort.

Some parallel exists in a commercial setting where small broadcasters with limited resources may engage small numbers of listeners through simulcasts on the Web of their over-the-air programming, but may not find such listenership sufficiently rewarding to make an immediate investment in adapting their old technology to permit easier recordkeeping. Here again, from the user's standpoint, there may be a reasonable relationship between the very low intensity use of Webcasting and the amount of resources the broadcasting entity is willing to invest in the effort. However, in the commercial case, broadcasters who do not adapt in the long run will fail as commercial entities to achieve the critical mass necessary to justify their presence on the Web. Therefore, they ultimately have a strong financial incentive to become more than very low intensity users, adapt their technology, ultimately achieve the same capabilities as their competitors on the Web and, in the process, attain comparable capabilities for full census reporting. Indeed, this process has been

recognized by the NAB and SoundExchange in their recent settlement pursuant to the Webcaster Settlement Act of 2008 (Pub. L. 110–435, 122 Stat. 4974), where they agreed to reporting requirements applicable to commercial broadcasters [6] that require census reporting for all but a small group of low-intensity users that qualify for a "small broadcaster" status.[7] *See* 74 FR 9301 (March 3, 2009). Such "small broadcasters" are not subject to the full census reporting applicable to other broadcasters in recognition of the "unique business and operational circumstances currently existing with respect to these entities" and are granted this exception to the general rule "on a transitional basis for a limited time." 74 FR 9301. Some of the operating circumstances that differentiate low-intensity commercial broadcasters from other low-intensity commercial Webcasters include the former's continued use of disparate systems not designed in the first instance to provide sound recording performance data and their inability as small entities to quickly pay for the costs of renovating such systems.[8] *See* Comments of the National Association of Broadcasters, Docket No. RM 2008–7 at 4–5 (May 26, 2009).

By contrast, many low-intensity noncommercial broadcasters do not have similarly pressing financial incentives or, indeed, may only be secondarily motivated by financial considerations as noted above. Therefore, for low-intensity noncommercial broadcasters, the transition from old technological equipment and approaches may well proceed at a slower pace until such time as the activity in question generates more support in terms of its relative position in the overall mission of the affiliated institution. This is not to say that a permanent exception to the census reporting rule for low-intensity noncommercial broadcasters is in order. Clearly, the failure to report the full

actual number of performances of a sound recording is at odds with the purpose of the recordkeeping requirement to the extent that, as a result, many sound recordings are under-compensated or not compensated at all from the section 114 and 112 royalties. Yet, at the same time, the low-intensity noncommercial broadcaster, by definition, does not enjoy the same pecuniary benefit from the use of the sound recordings at issue in this proceeding as does the low-intensity commercial broadcaster. Aggregate payments owed by low-intensity noncommercial broadcasters are dwarfed by payments by other users. Therefore, the tension between the relative cost of potential undercompensation to copyright owners and the relative cost of replacing outmoded systems employed by the low-intensity noncommercial broadcaster appears best resolved by allowing low-intensity noncommercial broadcasters to continue to report estimated usage on a quarterly basis in the same manner as under previous requirements until such time as either a reasonably priced technological solution is developed to facilitate census reporting under their current operational configurations and practices [9] or where such noncommercial broadcasters finally move to more state-of-the art technology and practices.

Despite recognizing that there may be situations in which some low-intensity noncommercial broadcasters are not in a position to provide census reporting, SoundExchange nonetheless urges the adoption of census reporting as the default rule in this proceeding. The Judges decline to do so for this narrow class of users. While the rate of progress toward achieving census reporting capabilities among low-intensity noncommercial broadcasters is frustratingly slow, it would be unreasonable to adopt a regulation that may well reduce the ability of such users to submit reports beyond even their current level of effort. Such an action may also raise the transactions costs for both users and the Collective. Neither of these two results would inure to the benefit of copyright owners.

Most educationally affiliated noncommercial broadcasters and/or their representatives initially urged the

Judges to allow them to continue to report two weeks out of every quarter and to continue to use ATH as a reporting alternative to ATP. *See, e.g.,* Comments of University of California NCE Broadcast Radio Stations and Associated College and University Broadcasters Who Simulcast, Docket No. RM 2008–7 at 3 (January 28, 2009); Supplemental Comments of Harvard Radio Broadcasting Company, Docket No. RM 2008–7 at 22 (May 26, 2009). In particular, many of these comments urged the continuation of the two-week sampling approach with ATH reporting "for educational stations paying only the minimum fee"—i.e., for the lowest intensity users. *See, e.g.,* Comments of Collegiate Broadcasters, Inc., Docket No. RM 2008–7 at 29 (May 26, 2009). However, some subsequent comments urged the Judges to consider, at least in the alternative, rolling back even the current two-week sampling requirement in favor of a complete reporting exemption for minimum fee users willing to pay an additional $100 "data proxy fee" annually. *See, e.g.,* Reply Comments of Collegiate Broadcasters, Inc., Docket No. RM 2008–7 at 11, 16 (June 8, 2009). Supplemental Reply Comments of Harvard Radio Broadcasting Company, Docket No. RM 2008–7 at 20 (June 8, 2009).

We do not agree that an additional data proxy fee in lieu of *any* reporting obligation represents a reasonable alternative to the continuation of the two-week sampling approach with ATH reporting for educational stations paying only the minimum fee. The data proxy fee alternative as proposed here represents a step backward in achieving better accuracy in reporting. As a result, it makes undercompensation stemming from inaccurate reporting even more problematic, inasmuch as it is the low-intensity educational station user that both such users and the Collective agree plays more diverse sound recordings. *See, e.g.,* Supplemental Reply Comments of Harvard Radio Broadcasting Company, Docket No. RM 2008–7 at 20 (June 8, 2009). Because of such greater diversity, many more sound recording copyright owners may well forfeit a distribution of earned royalties when their use is not reported at all. *See, e.g.,* Reply Comments of SoundExchange, Inc., Docket No. RM 2008–7 at 2 (June 8, 2009) ("These services do not pay very much in royalties, but what they pay may be the only statutory royalties earned by the copyright owners and performers of many obscure recordings."). In short, it is hardly reasonable to propose a complete exemption from even the

---

[6] Broadcasters, as used in the NAB-SoundExchange settlement, do not include noncommercial Webcasters as they are defined in 17 U.S.C. 114(f)(5)(E)(i).

[7] "Small Webcasters" in the NAB-SoundExchange settlement generally refers to those broadcasters who make eligible transmissions of less than 27,777 aggregate tuning hours in a given year. This level of actual transmissions in a given year, under the rate provisions of the settlement, appears likely to be largely covered by the credit obtained by the broadcaster towards usage upon payment of the $500 per channel minimum fee under the settlement. In other words, where usage clearly exceeds the minimum fee credit, census reporting typically applies.

[8] No comments were received from any pure commercial Webcaster claiming to be similarly situated.

[9] The Corporation for Public Broadcasting ("CPB") in its recent settlement with SoundExchange, pursuant to the Webcaster Settlement Act of 2008, has agreed on behalf of its covered entities to "cooperate in good faith with efforts by SoundExchange to develop and test a technological solution that facilitates reporting." *See* 74 FR 9298 (March 3, 2009).

existing sample-based recordkeeping requirements, for even if the current requirements produce results that are less than perfectly accurate as collected, observed and administered, they at least provide some rational basis for royalty distribution to owners and performers who would otherwise be completely shut out of the royalty distribution process notwithstanding the use of their works.

The expanded scope of census reporting adopted in the final regulation also gave rise to two ancillary changes. One is a minor, noncontroversial change to harmonize references to the frequency of report delivery with the reporting period. That is, in those instances where monthly reports of use are required, the corresponding reporting period is defined as one month; and, in those cases where quarterly reports of use are maintained as the requirement, the corresponding reporting period is defined as one quarter. Second, a change to the previously existing rate category codes was required in the new § 370.4(d)(2)(ii) adopted today so as to prevent inconsistencies with different categories used during prior reporting periods. SoundExchange proposed the use of a new list of category codes with the addition of language indicating that the Collective "may from time to time publish an updated list of categories then applicable under the Webcaster Settlement Act or regulations, and Services shall identify the most specific category then applicable to them." *See* Comments of SoundExchange, Docket No. RM 2008–7, Proposed Regulations Exhibit A at 6 (January 29, 2009). On the other hand, another proposal instead recommends obsoleting and reserving the 2006 codes which would be no longer used going forward, while maintaining the same 2006 codes for categories which have not changed. *See* Comments from Tom Worster and Spinitron, Docket No. RM 2008–7 at 7 (January 29, 2009). The Spinitron proposal is supported by the NAB as promoting more clarity for users. *See* Comments of the National Association of Broadcasters, Docket No. RM 2008–7 at 6, (May 26, 2009). Because the Judges agree that this latter approach makes clear that anyone previously reporting under one of the obsolete codes must choose another one, we adopt the proposal put forward by Tom Worster on behalf of Spinitron as part of this final regulation.

**V. Additional Revisions Proposed by the Parties**

In addition to the specific recordkeeping regulatory changes proposed by the Judges in the December 2008 NPRM, the Judges solicited comments on any technological developments that pointed to the need for further adjustment of the rules either in terms of the method of reporting specific data elements or with respect to the delivery mechanism employed for reporting. For example, the Judges specifically inquired as to what further improvements to the reporting regulations could be made in light of recent technological developments since the promulgation of the interim regulation, the new availability of reporting software or the advent of substantially reduced costs for certain delivery mechanism alternatives.

While approximately 18 proposals for additional regulatory changes beyond those proposed in the December 30, 2008 NPRM were submitted by SoundExchange, users and other interested parties, a number of the additional proposals went beyond the scope of the Judges' specific inquiry. That is, such proposals did not reflect technological developments which might warrant additional revisions to rules governing the method of reporting specific data elements and/or the delivery mechanism being employed for reporting. For example, SoundExchange proposed the addition of late fees for incomplete or tardy reports of use; or, as another example, Frederick Wilhelms III proposed the addition of various detail to the Collective's annual report requirements. *See* Comments of SoundExchange, Docket No. RM 2008–7 at 30–32 (January 29, 2009); Comments of Frederick Wilhelms III, Docket No. RM 2008–7 at 8–9 (January 27, 2009).

Other proposals, such as SoundExchange's request for the delineation of a separate certification form provided by SoundExchange to accompany the report of use (*See* Comments of SoundExchange, Docket No. RM 2008–7 at 30–32 (January 29, 2009)) generated significant controversy concerning the design process and/or contents of the proposed new form, indicating that such proposals not only were likely beyond the scope of the Judges' specific technological change inquiry, but also not yet likely ripe for determination. *See, e.g.*, Comments of National Association of Broadcasters, Docket No. RM 2008–7 at 5–6 (May 26, 2009); Reply Comments of SoundExchange, Docket No. RM 2008–7 at 13 (June 8, 2009). Similarly, SoundExchange's proposal to require nonsubscription services to provide copyright owner information in exactly the same form as it appears in the commercially released product met with objections as to practicality for some users that merit more detailed consideration than the focus of this proceeding permits. *See, e.g.*, Comments of National Association of Broadcasters, Docket No. RM 2008–7 at 6–7 (May 26, 2009).

A proposal that syndicated programming that is simulcast by broadcasters should be exempted from recordkeeping requirements (*See* Comments of the National Association of Broadcasters, Docket No. RM 2008–7 at 8 (May 26, 2009)) raises serious issues concerning the recordkeeping obligations of users and, at the same time, offers no solution for improving reports of actual use to facilitate owners receiving more accurate payment distributions. Moreover, inasmuch as the interim reporting regulation in place has functioned for some time without such an exemption, albeit with less frequent quarterly reporting requirements, it is not at all clear that the adoption of the final regulation proposed in the NPRM merits rethinking at this juncture.[10] Indeed, the Collective suggests that any reporting problems for broadcasters associated with syndicated programming have been adequately addressed going forward in their recently completed NAB-SoundExchange Webcaster settlement agreement. *See* Reply Comments of SoundExchange, Docket No. RM 2008–7 at 14 (June 8, 2009). In short, the syndication exemption proposal has not been sufficiently developed for the Judges' consideration in this proceeding.

Similarly, SoundExchange's proposal to authorize the Collective to distribute royalties based on a reasonable proxy when sufficient reports of use have not been filed within one year after receiving payment has been insufficiently developed in this proceeding. *See* Comments of SoundExchange, Docket No. RM 2008–7 at 4–5 (May 26, 2009). It was raised for the first time in this proceeding in response to the April 8, 2009 NOI and even SoundExchange admits to originally contemplating making this request in a subsequent petition. *Id.* at 4 n.7.

Still other proposals, such as the proposal that the Collective be required to provide confirmation of the receipt of reports of use within a time certain (*See, e.g.*, Comments of Tom Worster and Spinitron, Docket No. RM 2008–7 at 7 (January 29, 2009)), might arguably fit

---

[10] For example, there will be no differential impact on low-intensity, minimum fee broadcasters since the interim reporting regulation remains unchanged in the final regulation for such users.

within a very broad view of the Judges' specific technological change inquiry, but were not addressed by the Collective in terms of either technological feasibility or costs of adoption (if any).

In short, some of the proposals included in comments received by the Judges in this proceeding may merit further examination in a future rulemaking. However, they are not ripe for either adoption or rejection at the present time.

As a result, only a small number of proposals put forward in the parties' comments have been adopted in the final regulations. Some of these proposals relate to clarifying the final regulations as a result of changes made to the frequency reporting rule and are described herein above in connection with that rule. Of the remaining three party proposals adopted by the Judges, one adopted proposal reflects recent technological developments, another adopted proposal reflects a physical change of address for the Collective, and the remaining adopted proposal corrects an inconsistency in the delineation of the use of report dates in the NPRM. No controversy was raised by any of the commenting parties concerning these three proposals.

The change in the final regulation adopted from comments received by the Judges that is directly related to technological developments is the elimination of the delivery of reports of use by means of floppy diskette.[11] *See* Comments of SoundExchange, Docket No. RM 2008–7 at 25 (January 29, 2009). We agree with SoundExchange that the use of floppy diskettes has been rendered obsolete by recent technological developments and that it is not technologically efficient for the Collective to maintain old disk drives and equipment applicable only to such physical media. Moreover, delivery by means of CD–ROM is readily available and maintained in the final regulation for any license user needing a physical media delivery alternative.

The remaining two changes adopted by the Judges from comments submitted by the parties are: (1) a correction in the e-mail address for the Collective to *reports@soundexchange.com* and (2) the consistent reference to dates of a reporting period throughout the final regulation in the format ''year, month and day.'' *See* Comments of SoundExchange, Docket No. RM 2008–7 at 29–30 (January 29, 2009). These

changes adopted by the Judges will add clarity and consistency to the final regulation for reporting and delivery.

## List of Subjects in 37 CFR Part 370

Copyright, Sound recordings.

## Final Regulation

■ For the reasons set forth in the preamble, the Copyright Royalty Judges revise 37 CFR part 370 to read as follows:

## PART 370—NOTICE AND RECORDKEEPING REQUIREMENTS FOR STATUTORY LICENSES

Sec.
370.1   General definitions.
370.2   Notice of use of sound recordings under statutory license.
370.3   Reports of use of sound recordings under statutory license for preexisting subscription services.
370.4   Reports of use of sound recordings under statutory license for nonsubscription transmission services, preexisting satellite digital audio radio services, new subscription services and business establishment services.
370.5   Designated collection and distribution organizations for reports of use of sound recordings under statutory license.

**Authority:** 17 U.S.C. 112(e)(4), 114(f)(4)(A).

## § 370.1   General definitions.

For purposes of this part, the following definitions apply:

(a) A *Notice of Use of Sound Recordings Under Statutory License* is a written notice to sound recording copyright owners of the use of their works under section 112(e) or 114(d)(2) of title 17, United States Code, or both, and is required under this part to be filed by a Service in the Copyright Office.

(b) A *Service* is an entity engaged in either the digital transmission of sound recordings pursuant to section 114(d)(2) of title 17 of the United States Code or making ephemeral phonorecords of sound recordings pursuant to section 112(e) of title 17 of the United States Code or both. The definition of a Service includes an entity that transmits an AM/FM broadcast signal over a digital communications network such as the Internet, regardless of whether the transmission is made by the broadcaster that originates the AM/FM signal or by a third party, provided that such transmission meets the applicable requirements of the statutory license set forth in 17 U.S.C. 114(d)(2). A Service may be further characterized as either a preexisting subscription service, preexisting satellite digital audio radio service, nonsubscription transmission service, new subscription service,

business establishment service or a combination of those.

(c) A *Preexisting Subscription Service* is defined in 17 U.S.C. 114(j)(11).

(d) A *New Subscription Service* is defined in 17 U.S.C. 114(j)(8).

(e) A *Nonsubscription Transmission Service* is a service that makes noninteractive nonsubscription digital audio transmissions that are not exempt under section 114(d)(1) of title 17 of the United States Code and are made as part of a service that provides audio programming consisting, in whole or in part, of performances of sound recordings, including transmissions of broadcast transmissions, if the primary purpose of the service is to provide to the public such audio or other entertainment programming, and the primary purpose of the service is not to sell, advertise, or promote particular products or services other than sound recordings, live concerts, or other music-related events.

(f) A *Preexisting Satellite Digital Audio Radio Service* is defined in 17 U.S.C. 114(j)(10).

(g) A *Business Establishment Service* is a service that makes ephemeral phonorecords of sound recordings pursuant to section 112(e) of title 17 of the United States Code and is exempt under section 114(d)(1)(C)(iv) of title 17 of the United States Code.

(h) A *Collective* is a collection and distribution organization that is designated under one or both of the statutory licenses by determination of the Copyright Royalty Judges.

(i) A *Report of Use* is a report required to be provided by a Service that is transmitting sound recordings pursuant to the statutory license set forth in section 114(d)(2) of title 17 of the United States Code or making ephemeral phonorecords of sound recordings pursuant to the statutory license set forth in section 112(e) of title 17 of the United States Code, or both.

## § 370.2   Notice of use of sound recordings under statutory license.

(a) *General.* This section prescribes rules under which copyright owners shall receive notice of use of their sound recordings when used under either section 112(e) or 114(d)(2) of title 17, United States Code, or both.

(b) *Forms and content.* A Notice of Use of Sound Recordings Under Statutory License shall be prepared on a form that may be obtained from the Copyright Office Web site or from the Licensing Division, and shall include the following information:

(1) The full legal name of the Service that is either commencing digital transmissions of sound recordings or

---

[11] Under the interim regulation, SoundExchange supported four methods of delivery for electronic data files: File Transfer Protocol (''FTP''); electronic mail attachment; CD–ROM delivery; and floppy diskette delivery. The final regulation eliminates floppy diskette delivery.

making ephemeral phonorecords of sound recordings under statutory license or doing both.

(2) The full address, including a specific number and street name or rural route, of the place of business of the Service. A post office box or similar designation will not be sufficient except where it is the only address that can be used in that geographic location.

(3) The telephone number and facsimile number of the Service.

(4) Information on how to gain access to the online Web site or homepage of the Service, or where information may be posted under this section concerning the use of sound recordings under statutory license.

(5) Identification of each license under which the Service intends to operate, including identification of each of the following categories under which the Service will be making digital transmissions of sound recordings: Preexisting subscription service, preexisting satellite digital audio radio service, nonsubscription transmission service, new subscription service or business establishment service.

(6) The date or expected date of the initial digital transmission of a sound recording to be made under the section 114 statutory license and/or the date or the expected date of the initial use of the section 112(e) license for the purpose of making ephemeral phonorecords of the sound recordings.

(7) Identification of any amendments required by paragraph (e) of this section.

(c) *Signature.* The Notice shall include the signature of the appropriate officer or representative of the Service that is either transmitting the sound recordings or making ephemeral phonorecords of sound recordings under statutory license or doing both. The signature shall be accompanied by the printed or typewritten name and the title of the person signing the Notice and by the date of the signature.

(d) *Filing notices; fees.* The original and three copies shall be filed with the Licensing Division of the Copyright Office and shall be accompanied by the filing fee set forth in § 201.3(e) of this title. Notices shall be placed in the public records of the Licensing Division. The Notice and filing fee shall be sent to the Licensing Division at either the address listed on the form obtained from the Copyright Office or to: Library of Congress, Copyright Office, Licensing Division, 101 Independence Avenue, SE., Washington, DC 20557–6400. A Service that, on or after July 1, 2004, shall make digital transmissions and/or ephemeral phonorecords of sound recordings under statutory license shall file a Notice of Use of Sound Recordings

under Statutory License with the Licensing Division of the Copyright Office prior to the making of the first ephemeral phonorecord of the sound recording and prior to the first digital transmission of the sound recording.

(e) *Amendment.* A Service shall file a new Notice of Use of Sound Recordings under Statutory License within 45 days after any of the information contained in the Notice on file has changed, and shall indicate in the space provided by the Copyright Office that the Notice is an amended filing. The Licensing Division shall retain copies of all prior Notices filed by the Service.

### § 370.3   Reports of use of sound recordings under statutory license for preexisting subscription services.

(a) *General.* This section prescribes the rules for the maintenance and delivery of reports of use for sound recordings under section 112(e) or section 114(d)(2) of title 17 of the United States Code, or both, by preexisting subscription services.

(b) *Delivery.* Reports of Use shall be delivered to Collectives that are identified in the records of the Licensing Division of the Copyright Office as having been designated by determination of the Copyright Royalty Judges. Reports of Use shall be delivered on or before the forty-fifth day after the close of each month.

(c) *Posting.* In the event that no Collective is designated under the statutory license, or if all designated Collectives have terminated collection and distribution operations, a preexisting subscription service transmitting sound recordings under statutory license shall post and make available online its Reports of Use. Preexisting subscription services shall post their Reports of Use online on or before the forty-fifth day after the close of each month, and continue to make them available thereafter to all sound recording copyright owners for a period of 90 days. Preexisting subscription services may require use of passwords for access to posted Reports of Use, but must make passwords available in a timely manner and free of charge or other restrictions. Preexisting subscription services may predicate provision of a password upon:

(1) Information relating to identity, location and status as a sound recording copyright owner; and

(2) A "click-wrap" agreement not to use information in the Report of Use for purposes other than royalty collection, royalty distribution, and determining compliance with statutory license requirements, without the express

consent of the preexisting subscription service providing the Report of Use.

(d) *Content.* A "Report of Use of Sound Recordings under Statutory License" shall be identified as such by prominent caption or heading, and shall include a preexisting subscription service's "Intended Playlists" for each channel and each day of the reported month. The "Intended Playlists" shall include a consecutive listing of every recording scheduled to be transmitted, and shall contain the following information in the following order:

(1) The name of the preexisting subscription service or entity;

(2) The channel;

(3) The sound recording title;

(4) The featured recording artist, group, or orchestra;

(5) The retail album title (or, in the case of compilation albums created for commercial purposes, the name of the retail album identified by the preexisting subscription service for purchase of the sound recording);

(6) The marketing label of the commercially available album or other product on which the sound recording is found;

(7) The catalog number;

(8) The International Standard Recording Code (ISRC) embedded in the sound recording, where available and feasible;

(9) Where available, the copyright owner information provided in the copyright notice on the retail album or other product (*e.g.,* following the symbol (P), that is the letter P in a circle) or, in the case of compilation albums created for commercial purposes, in the copyright notice for the individual sound recording;

(10) The date of transmission; and

(11) The time of transmission.

(e) *Signature.* Reports of Use shall include a signed statement by the appropriate officer or representative of the preexisting subscription service attesting, under penalty of perjury, that the information contained in the Report is believed to be accurate and is maintained by the preexisting subscription service in its ordinary course of business. The signature shall be accompanied by the printed or typewritten name and title of the person signing the Report, and by the date of signature.

(f) *Format.* Reports of Use should be provided on a standard machine-readable medium, such as diskette, optical disc, or magneto-optical disc, and should conform as closely as possible to the following specifications:

(1) ASCII delimited format, using pipe characters as delimiter, with no headers or footers;

(2) Carats should surround strings;

(3) No carats should surround dates and numbers;

(4) Dates should be indicated by: YYYY/MM/DD;

(5) Times should be based on a 24-hour clock: HH:MM:SS;

(6) A carriage return should be at the end of each line; and

(7) All data for one record should be on a single line.

(g) *Confidentiality.* Copyright owners, their agents and Collectives shall not disseminate information in the Reports of Use to any persons not entitled to it, nor utilize the information for purposes other than royalty collection and distribution, and determining compliance with statutory license requirements, without express consent of the preexisting subscription service providing the Report of Use.

(h) *Documentation.* All compulsory licensees shall, for a period of at least three years from the date of service or posting of the Report of Use, keep and retain a copy of the Report of Use.

**§ 370.4  Reports of use of sound recordings under statutory license for nonsubscription transmission services, preexisting satellite digital audio radio services, new subscription services and business establishment services.**

(a) *General.* This section prescribes rules for the maintenance and delivery of reports of use of sound recordings under section 112(e) or section 114(d)(2) of title 17 of the United States Code, or both, by nonsubscription transmission services, preexisting satellite digital audio radio services, new subscription services, and business establishment services.

(b) *Definitions.* (1) *Aggregate Tuning Hours* are the total hours of programming that a nonsubscription transmission service, preexisting satellite digital audio radio service, new subscription service or business establishment service has transmitted during the reporting period identified in paragraph (d)(3) of this section to all listeners within the United States over the relevant channels or stations, and from any archived programs, that provide audio programming consisting, in whole or in part, of eligible nonsubscription service, preexisting satellite digital audio radio service, new subscription service or business establishment service transmissions, less the actual running time of any sound recordings for which the service has obtained direct licenses apart from 17 U.S.C. 114(d)(2) or which do not require a license under United States copyright law. For example, if a nonsubscription transmission service

transmitted one hour of programming to 10 simultaneous listeners, the nonsubscription transmission service's Aggregate Tuning Hours would equal 10. If 3 minutes of that hour consisted of transmission of a directly licensed recording, the nonsubscription transmission service's Aggregate Tuning Hours would equal 9 hours and 30 minutes. If one listener listened to the transmission of a nonsubscription transmission service for 10 hours (and none of the recordings transmitted during that time was directly licensed), the nonsubscription transmission service's Aggregate Tuning Hours would equal 10.

(2) An *AM/FM Webcast* is a transmission made by an entity that transmits an AM/FM broadcast signal over a digital communications network such as the Internet, regardless of whether the transmission is made by the broadcaster that originates the AM/FM signal or by a third party, provided that such transmission meets the applicable requirements of the statutory license set forth in 17 U.S.C. 114(d)(2).

(3) A *minimum fee broadcaster* is a nonsubscription service that meets the definition of a broadcaster pursuant to § 380.2(b) of this chapter and the service's payments for eligible transmissions do not exceed the annual minimum fee established for licensees relying upon the statutory licenses set forth in 17 U.S.C. 112 and 114.

(4) A *performance* is each instance in which any portion of a sound recording is publicly performed to a Listener by means of a digital audio transmission or retransmission (*e.g.,* the delivery of any portion of a single track from a compact disc to one Listener) but excluding the following:

(i) A performance of a sound recording that does not require a license (*e.g.,* the sound recording is not copyrighted);

(ii) A performance of a sound recording for which the service has previously obtained a license from the Copyright Owner of such sound recording; and

(iii) An incidental performance that both:

(A) Makes no more than incidental use of sound recordings including, but not limited to, brief musical transitions in and out of commercials or program segments, brief performances during news, talk and sports programming, brief background performances during disk jockey announcements, brief performances during commercials of sixty seconds or less in duration, or brief performances during sporting or other public events; and

(B) Other than ambient music that is background at a public event, does not contain an entire sound recording and does not feature a particular sound recording of more than thirty seconds (as in the case of a sound recording used as a theme song).

(5) *Play frequency* is the number of times a sound recording is publicly performed by a Service during the relevant period, without respect to the number of listeners receiving the sound recording. If a particular sound recording is transmitted to listeners on a particular channel or program only once during the reporting period, then the play frequency is one. If the sound recording is transmitted 10 times during the reporting period, then the play frequency is 10.

(c) *Delivery.* Reports of Use shall be delivered to Collectives that are identified in the records of the Licensing Division of the Copyright Office as having been designated by determination of the Copyright Royalty Judges. Reports of Use shall be delivered on or before the forty-fifth day after the close of each reporting period identified in paragraph (d)(3) of this section.

(d) *Report of Use.* (1) *Separate reports not required.* A nonsubscription transmission service, preexisting satellite digital audio radio service or a new subscription service that transmits sound recordings pursuant to the statutory license set forth in section 114(d)(2) of title 17 of the United States Code and makes ephemeral phonorecords of sound recordings pursuant to the statutory license set forth in section 112(e) of title 17 of the United States Code need not maintain a separate Report of Use for each statutory license during the relevant reporting periods.

(2) *Content.* For a nonsubscription transmission service, preexisting satellite digital audio radio service, new subscription service or business establishment service that transmits sound recordings pursuant to the statutory license set forth in section 114(d)(2) of title 17 of the United States Code, or the statutory license set forth in section 112(e) of title 17 of the United States Code, or both, each Report of Use shall contain the following information, in the following order, for each sound recording transmitted during the reporting periods identified in paragraph (d)(3) of this section:

(i) The name of the nonsubscription transmission service, preexisting satellite digital audio radio service, new subscription service or business establishment service making the transmissions, including the name of

the entity filing the Report of Use, if different;

(ii) The category transmission code for the category of transmission operated by the nonsubscription transmission service, preexisting satellite digital audio radio service, new subscription service or business establishment service:

(A) For eligible nonsubscription transmissions other than broadcast simulcasts and transmissions of non-music programming;

(B) For eligible nonsubscription transmissions of broadcast simulcast programming not reasonably classified as news, talk, sports or business programming;

(C) For eligible nonsubscription transmissions of non-music programming reasonably classified as news, talk, sports or business programming;

(D) [Reserved].

(E) [Reserved].

(F) [Reserved].

(G) [Reserved].

(H) For transmissions other than broadcast simulcasts and transmissions of non-music programming made by an eligible new subscription service;

(I) For transmissions of broadcast simulcast programming not reasonably classified as news, talk, sports or business programming made by an eligible new subscription service;

(J) For transmissions of non-music programming reasonably classified as news, talk, sports or business programming made by an eligible new subscription service; and

(K) For eligible transmissions by a business establishment service making ephemeral recordings;

(iii) The featured artist;

(iv) The sound recording title;

(v) The International Standard Recording Code (ISRC) or, alternatively to the ISRC, the:

(A) Album title; and

(B) Marketing label;

(vi) For a nonsubscription transmission service except those qualifying as minimum fee broadcasters: The actual total performances of the sound recording during the reporting period.

(vii) For a preexisting satellite digital audio radio service, a new subscription service, a business establishment service or a nonsubscription service qualifying as a minimum fee broadcaster: The actual total performances of the sound recording during the reporting period or, alternatively, the

(A) Aggregate Tuning Hours;

(B) Channel or program name; and

(C) Play frequency;

(3) *Reporting period.* A Report of Use shall be prepared:

(i) For each calendar month of the year by all services other than a nonsubscription service qualifying as a minimum fee broadcaster; or

(ii) For a two-week period (two periods of 7 consecutive days) for each calendar quarter of the year by a nonsubscription service qualifying as a minimum fee broadcaster and the two-week period need not consist of consecutive weeks, but both weeks must be completely within the calendar quarter.

(4) *Signature.* Reports of Use shall include a signed statement by the appropriate officer or representative of the service attesting, under penalty of perjury, that the information contained in the Report is believed to be accurate and is maintained by the service in its ordinary course of business. The signature shall be accompanied by the printed or typewritten name and the title of the person signing the Report, and by the date of the signature.

(5) *Confidentiality.* Copyright owners, their agents and Collectives shall not disseminate information in the Reports of Use to any persons not entitled to it, nor utilize the information for purposes other than royalty collection and distribution, without consent of the service providing the Report of Use.

(6) *Documentation.* A Service shall, for a period of at least three years from the date of service or posting of a Report of Use, keep and retain a copy of the Report of Use.

(e) *Format and delivery.* (1) *Electronic format only.* Reports of use must be maintained and delivered in electronic format only, as prescribed in paragraphs (e)(2) through (8) of this section. A hard copy report of use is not permissible.

(2) *ASCII text file delivery; facilitation by provision of spreadsheet templates.* All report of use data files must be delivered in ASCII format. However, to facilitate such delivery, SoundExchange shall post and maintain on its Internet Web site a template for creating a report of use using Microsoft's Excel spreadsheet and Corel's Quattro Pro spreadsheet and instruction on how to convert such spreadsheets to ASCII text files that conform to the format specifications set forth below. Further, technical support and cost associated with the use of spreadsheets is the responsibility of the service submitting the report of use.

(3) *Delivery mechanism.* The data contained in a report of use may be delivered by File Transfer Protocol (FTP), e-mail, or CD–ROM according to the following specifications:

(i) A service delivering a report of use via FTP must obtain a username, password and delivery instructions from SoundExchange. SoundExchange shall maintain on a publicly available portion of its Web site instructions for applying for a username, password and delivery instructions. SoundExchange shall have 15 days from date of request to respond with a username, password and delivery instructions.

(ii) A service delivering a report of use via e-mail shall append the report as an attachment to the e-mail. The main body of the e-mail shall identify:

(A) The full name and address of the service;

(B) The contact person's name, telephone number and e-mail address;

(C) The start and end date of the reporting period;

(D) The number of rows in the data file. If the report of use is a file using headers, counting of the rows should begin with row 15. If the report of use is a file without headers, counting of the rows should begin with row 1; and

(E) The name of the file attached.

(iii) A service delivering a report of use via CD–ROM must compress the reporting data to fit onto a single CD–ROM per reporting period. Each CD–ROM shall be submitted with a cover letter identifying:

(A) The full name and address of the service;

(B) The contact person's name, telephone number and e-mail address;

(C) The start and end date of the reporting period;

(D) The number of rows in the data file. If the report of use is a file using headers, counting of the rows should begin with row 15. If the report of use is a file without headers, counting of the rows should begin with row 1; and

(E) The name of the file attached.

(4) *Delivery address.* Reports of use shall be delivered to SoundExchange at the following address: SoundExchange, Inc., 1121 14th Street, NW., Suite 700, Washington, DC 20005; (Phone) (202) 640–5858; (Facsimile) (202) 640–5859; (E-mail) *reports@soundexchange.com.* SoundExchange shall forward electronic copies of these reports of use to all other collectives defined in this section.

(5) *File naming.* Each data file contained in a report of use must be given a name by the service followed by the start and end date of the reporting period. The start and end date must be separated by a dash and in the format of year, month, and day (YYYYMMDD). Each file name must end with the file type extension of ".txt". (*Example:* AcmeMusicCo20050101–20050331.txt).

(6) *File type and compression.* (i) All data files must be in ASCII format.

(ii) A report of use must be compressed in one of the following zipped formats:

(A) .zip—generated using utilities such as WinZip and/or UNIX zip command;

(B) .Z—generated using UNIX compress command; or

(C) .gz—generated using UNIX gzip command.

(iii) Zipped files shall be named in the same fashion as described in paragraph (e)(5) of this section, except that such zipped files shall use the applicable file extension compression name described in this paragraph (e)(6).

(7) *Files with headers.* (i) If a service elects to submit files with headers, the following elements, in order, must occupy the first 14 rows of a report of use:

(A) Name of service;

(B) Name of contact person;

(C) Street address of the service;

(D) City, state and zip code of the service;

(E) Telephone number of the contact person;

(F) E-mail address of the contact person;

(G) Start of the reporting period (YYYYMMDD);

(H) End of the reporting period (YYYYMMDD);

(I) Report generation date (YYYYMMDD);

(J) Number of rows in data file, beginning with 15th row;

(K) Text indicator character;

(L) Field delimiter character;

(M) Blank line; and

(N) Report headers (Featured Artist, Sound Recording Title, etc.).

(ii) Each of the rows described in paragraphs (e)(7)(i)(A) through (F) of this section must not exceed 255 alphanumeric characters. Each of the rows described in paragraphs (e)(7)(i)(G) through (I) of this section should not exceed eight alphanumeric characters.

(iii) Data text fields, as required by paragraph (d) of this section, begin on row 15 of a report of use with headers. A carriage return must be at the end of each row thereafter. Abbreviations within data fields are not permitted.

(iv) The text indicator character must be unique and must never be found in the report's data content.

(v) The field delimiter character must be unique and must never be found in the report's data content. Delimiters must be used even when certain elements are not being reported; in such case, the service must denote the blank data field with a delimiter in the order in which it would have appeared.

(8) *Files without headers.* If a service elects to submit files without headers, the following format requirements must be met:

(i) ASCII delimited format, using pipe (|) characters as delimiters, with no headers or footers;

(ii) Carats (^) should surround strings;

(iii) No carats (^) should surround dates and numbers;

(iv) A carriage return must be at the end of each line;

(v) All data for one record must be on a single line; and

(vi) Abbreviations within data fields are not permitted.

**§ 370.5  Designated collection and distribution organizations for reports of use of sound recordings under statutory license.**

(a) *General.* This section prescribes rules under which reports of use shall be collected and distributed under section 114(f) of title 17 of the United States Code, and under which reports of such use shall be kept and made available.

(b) *Notice of Designation as Collective under Statutory License.* A Collective shall file with the Licensing Division of the Copyright Office and post and make available online a ''Notice of Designation as Collective under Statutory License,'' which shall be identified as such by prominent caption or heading, and shall contain the following information:

(1) The Collective name, address, telephone number and facsimile number;

(2) A statement that the Collective has been designated for collection and distribution of performance royalties under statutory license for digital transmission of sound recordings; and

(3) Information on how to gain access to the online Web site or home page of the Collective, where information may be posted under this part concerning the use of sound recordings under statutory license. The address of the Licensing Division is: Library of Congress, Copyright Office, Licensing Division, 101 Independence Avenue, SE., Washington, DC 20557–6400.

(c) *Annual Report.* The Collective will post and make available online, for the duration of one year, an Annual Report on how the Collective operates, how royalties are collected and distributed, and what the Collective spent that fiscal year on administrative expenses.

(d) *Inspection of Reports of Use by copyright owners.* The Collective shall make copies of the Reports of Use for the preceding three years available for inspection by any sound recording copyright owner, without charge, during normal office hours upon reasonable notice. The Collective shall predicate inspection of Reports of Use upon information relating to identity, location and status as a sound recording copyright owner, and the copyright owner's written agreement not to utilize the information for purposes other than royalty collection and distribution, and determining compliance with statutory license requirements, without express consent of the Service providing the Report of Use. The Collective shall render its best efforts to locate copyright owners in order to make available reports of use, and such efforts shall include searches in Copyright Office public records and published directories of sound recording copyright owners.

(e) *Confidentiality.* Copyright owners, their agents, and Collectives shall not disseminate information in the Reports of Use to any persons not entitled to it, nor utilize the information for purposes other than royalty collection and distribution, and determining compliance with statutory license requirements, without express consent of the Service providing the Report of Use.

(f) *Termination and dissolution.* If a Collective terminates its collection and distribution operations prior to the close of its term of designation, the Collective shall notify the Licensing Division of the Copyright Office, the Copyright Royalty Board and all Services transmitting sound recordings under statutory license, by certified or registered mail. The dissolving Collective shall provide each such Service with information identifying the copyright owners it has served.

Dated: October 7, 2009.

**James Scott Sledge,**
*Chief U.S. Copyright Royalty Judge.*
[FR Doc. E9–24556 Filed 10–9–09; 8:45 am]
**BILLING CODE 1410–72–P**

---

**ENVIRONMENTAL PROTECTION AGENCY**

**40 CFR Part 52**

**[EPA–R09–OAR–2009–0620; FRL–8956–9]**

**Revisions to the California State Implementation Plan, San Diego Air Pollution Control District**

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Direct final rule.

---

**SUMMARY:** EPA is taking direct final action to approve revisions to the San Diego Air Pollution Control District portion of the California State Implementation Plan (SIP). These revisions concern volatile organic compound (VOC) emissions from cold

**Before the**
**U.S. Copyright Office**
**Library of Congress**
**Washington, D.C. 20559**

| | |
|---|---|
| In the Matter of ) | |
| ) | |
| **Digital Performance Right in Sound** ) | **Docket No. 2009-1** |
| **Recordings and Ephemeral Recordings** ) | **CRB Webcasting III** |
| ) | |

## MEMORANDUM OPINION
## ON MATERIAL QUESTIONS OF SUBSTANTIVE LAW

**I.      Procedural Background**

On January 28, 2010, pursuant to 17 U.S.C. 802(f)(1), the Copyright Royalty Judges ("CRJs")
referred to the Register of Copyrights a novel material question of substantive law that has arisen in this
proceeding. The Copyright Royalty Judges included briefs that had been submitted in December 2009 and
January 2010 by the parties to the proceeding and transcripts of a hearing held on January 12, 2010,
relating to the authority of the CRJs to subpoena a nonparticipant in a proceeding.

After recounting the relevant statutory provisions of Chapter 8 of Title 17, the CRJs posed the
following novel material question of substantive law:

> QUESTION: Whether the Copyright Royalty Judges have authority
> under the Copyright Act to subpoena a nonparticipant to appear and give
> testimony or to produce and permit inspection of documents or tangible
> things?

As required by 17 U.S.C. 802(f)(1)(B)(i), the Register hereby provides her response to the CRJs.

**II.     Statutory Authority in Chapter 8 of Title 17**

In 2004, Congress passed the Copyright Royalty and Distribution Reform Act
("CRDRA"). This legislation created the CRJs and provides, in 17 U.S.C. 803(b)(6)(C)(ix), that:

> In proceedings to determine royalty rates, the Copyright Royalty
> Judges may issue a subpoena commanding a participant or witness
> to appear and give testimony, or to produce and permit inspection
> of documents or tangible things, if the Copyright Royalty Judges'
> resolution of the proceeding would be substantially impaired by the
> absence of such testimony or production of documents or tangible

things. Such subpoena shall specify with reasonable particularity the materials to be produced or the scope and nature of the required testimony. Nothing in this clause shall preclude the Copyright Royalty Judges from requesting the production by a nonparticipant of information or materials relevant to the resolution by the Copyright Royalty Judges of a material issue of fact.

## III.    Summary of Parties' Arguments

On December 10, 2009, RealNetworks, Inc. ("RealNetworks") filed a motion for issuance of subpoenas directing Pandora Media, Inc., Slacker, Inc., and CBS Interactive, Inc.("CBSi"), who are not participants in the proceeding, to present corporate representative witnesses competent to present documents and testify at deposition with respect to factual assertions included in the written direct statement of SoundExchange, Inc. ("SoundExchange") as to which SoundExchange has no first hand knowledge. RealNetworks' motion[1] focuses virtually all of its attention on the application of the CRJs' regulations addressing the discovery stages of a determination. In doing so, it does not attempt to analyze *who* may be the proper subject of a subpoena under the statute.

In response to RealNetworks' motion, SoundExchange[2] argues that section 803(b)(6)(C)(ix) treats *subpoenas* to "participants and witnesses" separately from *requests* to "nonparticipants."[3] In SoundExchange's view, "with respect to participants and witnesses, [the statute] states that the CRJs 'may issue a subpoena commanding a participant or witness to appear and give testimony, or to produce and permit inspection of documents or tangible things,' if certain conditions are met."[4] SoundExchange argues that the CRJs could, under certain conditions, issue a subpoena in a given proceeding to either a participant or a witness whose testimony has been previously submitted to the CRJs in the given proceeding.[5] But, under SoundExchange's view, the CRJs may not issue subpoenas to persons who are neither participants

---

[1] Another participant, Live365, Inc. ("Live365") separately filed a brief in which it adopted the relevant arguments in RealNetworks' initial motion.

[2] Pandora Media, Inc., Slacker, Inc., and CBSi adopted the relevant arguments SoundExchange's brief.

[3] In distinguishing between "participants and witnesses" on one hand, and "nonparticipants" on the other, SoundExchange apparently does not recognize that the "witnesses" that it includes within the group of "participants and witnesses" are in fact nonparticipants. In the parlance of CRJ proceedings, a "participant" is a party to the proceeding. See 17 U.S.C. §§ 801(b)(7)(A), 802(f)(1)(A)(ii), 802(f)(1)(B), 802(f)(1)(D), 803(b)(1)(A)(ii), 803(b)(2)(C), 803(b)(3)(A), 803(b)(4), 803(b)(5), 803(b)(6)(C), 803(c)(2), 803(c)(4), 803(d)(1) , 803(d)(2)(B), 805(1).

[4] SoundExchange cites to the full text of section 803(b)(6)(C)(ix), which provides that CRJs may only issue subpoenas where "resolution of the proceeding would be substantially impaired by the absence of such testimony or production of documents or tangible things"

[5] While SoundExchange, in its written brief, initially argued that the CRJs could only subpoena "participants and witnesses" and that they could not subpoena nonparticipants, at the January 12, 2010, hearing, SoundExchange conceded that the statute's grant of authority to subpoena a "witness" includes those who are not necessarily participants, provided they have previously submitted testimony as a witness in the relevant proceeding. Hearing Transcript at 76.

2

JA103

nor witnesses who have previously submitted testimony in the given proceeding. SoundExchange asserts that "with respect to seeking information from *nonparticipants* like Pandora, Slacker and CBS Interactive, § 803(b)(6)(C)(ix) establishes a different standard that limits the CRJs' power. It does not include them among those individuals who may be subpoenaed. Rather, it provides that '[n]othing in this clause shall preclude the Copyright Royalty Judges from *requesting* the production by a nonparticipant of information or materials relevant to the resolution by the Copyright Royalty Judges of a material issue of fact.'" When asked by the Chief Copyright Royalty Judge at the hearing on the motion whether it was aware of any other federal statutes that provide for a power or duty but provide no mechanism for enforcement, SoundExchange stated that it was not aware of any such statute. SoundExchange further opined that the only enforcement mechanism available to the CRJs in the event of noncompliance with a subpoena would be the CRJs' authority to impose sanctions, such as striking testimony, when the subpoena was directed to a participant or a witness whose testimony has been previously submitted by a participant. SoundExchange observed that this "suggests a reason why this statute should be interpreted to mean the Court [sic] can issue subpoenas to parties, participants and witnesses, but not to nonparticipants."[6]

Having put forth an analysis of section 803(b)(6)(C)(ix) that involves a distinction between "participants and witnesses" on the one hand and "nonparticipants" on the other, SoundExchange cites to *Bobreski v. E.P.A*, 284 F. Supp.2d 67,76 (D.D.C. 2003) and *United States v. Iannone*, 610 F.2d 943, 945-47 (D.C. Cir. 1979) for the proposition that subpoena power should not be found to exist absent an express statutory grant. SoundExchange then cites to *Peters v.United States*, 853 F.2d 692, 696 (9th Cir. 1988), asserting that even where an agency has broad subpoena and investigatory authority, courts should be reluctant to assume the existence of authority to issue third party subpoenas where Congress has not specifically provided for them. SoundExchange also argues that if the CRJs were granted the authority to issue subpoenas to nonparticipants, then the last sentence of 803(b)(6)(C)(ix), which authorizes them to *request* information from nonparticipants, would be unnecessary, and that such an interpretation would violate an accepted principle of statutory construction against surplusage.[7]

RealNetworks and Live365 assert that section 803(b)(6)(C)(ix) authorizes the issuance of subpoenas to nonparticipants and that neither the statute nor regulations limit this power only to participants in a proceeding. Unlike the briefs supporting the initial motion, their reply briefs focus directly on whether the CRJs possess authority to issue subpoenas to persons who are neither participants in the proceeding nor persons who the participants have designated to testify.

In its reply brief, and in the January 12 hearing, RealNetworks argues that the plain language of 803(b)(6)(C)(ix) demonstrates that the CRJs have power to subpoena "witnesses." It asserts that SoundExchange's citations to case law assessing agencies' subpoena authority when Congress has not provided for such power through plain language are therefore irrelevant. RealNetworks argues that SoundExchange's analysis of section 803(b)(6)(C)(ix) is unduly cramped and that the plain text of the statute undermines SoundExchange's argument that "witness" should be understood to mean only a witness previously designated by a participant to give evidence in court. RealNetworks asserts that the common meaning of "witness" and "testimony" support its proposed plain language reading of the statute. RealNetworks also asserts that the plain language and the legislative history of section 803(b)(6)(C)(ix) demonstrate that the CRJs have power to subpoena "witnesses," not just a small subset of witnesses as

---

[6]  Transcript at 72-74.

[7]  CBSi, separately filed a brief in which it adopted the relevant arguments in SoundExchange's brief, and it reiterated many of SoundExchange's arguments at the January 12, 2010, hearing.

3

SoundExchange contends. RealNetworks offers that should the CRJs accept SoundExchange's argument that the CRJs may only subpoena a witness previously designated by a participant to give evidence, it would run counter to language in the legislative history of the Copyright Royalty and Distribution Reform Act of 2004 that explains that the subpoena power was intended to prevent a party from circumscribing the type and amount of evidence considered in a proceeding. H.R. Rep. No. 108-408, at 33 (2004).

At the hearing, CBSi pointed out that the legislative history relied on by RealNetworks addresses proposed statutory language that was markedly different, and much broader, than that which was ultimately enacted by Congress.

RealNetworks' reply brief also points out that the last sentence in section 803(b)(6)(C)(ix) does not create surplusage because the authority to subpoena and the authority to request are not redundant, especially when there are distinct threshold requirements for employing the two differing actions. Under RealNetworks' analysis, the threshold test for issuance of a subpoena to participants and witnesses is substantial impairment, whereas the threshold test for a request for information from nonparticipants is relevance.

In its reply brief, Live365 goes on to argue that if the CRJs' subpoena power were limited to participants and witnesses who have already submitted statements to the CRJs, the subpoena power would be effectively meaningless since other provisions allow the CRJs to compel testimony from parties and their witnesses. See 17 U.S.C. 803(b)(6)(C)(v)-(vii). Thus, according to Live 365, Congress must have been contemplating the ability to compel testimony from nonparticipant third parties.

## IV.    Register's Determination

A review of the written submissions and oral arguments offered by the parties and third party witnesses who supported and opposed the motion reveals that the question is not precisely whether the CRJs have the authority to "subpoena a nonparticipant," but rather whether the CRJs have the authority to subpoena a person who is neither a participant in the proceeding nor a witness whose testimony has been submitted as part of a participant's written direct statement. While SoundExchange's initial submission posited a distinction between participants and witnesses on the one hand and nonparticipants on the other hand, at the time of the hearing on the motion SoundExchange refined its position to acknowledge that some nonparticipants may nevertheless be "witnesses" for purposes of 17 U.S.C. 803(b)(6)(C)(ix). Specifically, SoundExchange acknowledged that the CRJs have the authority to subpoena a nonparticipant whose testimony has previously been submitted by a participant in the relevant proceeding.[8]

SoundExchange's refinement of its position is more consistent with the language of section 803(b)(6)(C)(ix), which empowers the CRJs to "issue a subpoena commanding a participant *or witness* to appear." (Emphasis added). The question, then, is: who may be a "witness" for purposes of section 803(b)(6)(C)(ix)?

In answering that question, one must look toward established canons of statutory construction which dictate that "the meaning of a statute must, in the first instance, be sought in the language in which the act is framed, and if that is plain, and if the law is within the constitutional authority of the law–making body which passed it, the sole function of the courts is to enforce it according to its terms." *Caminetti v.*

---

[8]  SoundExchange acknowledges that "there are times when some of the witnesses aren't even under the control of a participant, and so you would have to issue a subpoena." Hearing Transcript at 76.

4

*United States*, 242 U.S. 470, 485 (1917). The plain meaning of the first sentence of this provision clearly authorizes the issuance of subpoenas to participants. The plain meaning of the same sentence also authorizes the CRJs to issue subpoenas to witnesses. Therefore, it is evident that certain persons other than participants (i.e. nonparticipants) may be subpoenaed, provided that they are "witnesses." Unfortunately, this analysis does not answer the critical question currently before the CRJs regarding whether the authority to subpoena "witnesses" is, as SoundExchange and the proposed subjects of subpoenas suggest, limited to witnesses whose testimony has been filed as part of a participant's written direct statement (a limited subset of nonparticipants), or whether the authority to subpoena witnesses includes any prospective witnesses, which would include all nonparticipants – subject to the other criteria regarding the probative value of their evidence.[9]

In determining whether "witness" as used in section 803(b)(6)(C)(ix) is limited to those who have already submitted testimony to the CRJs, one must, as noted above, look to the plain meaning of the statute. An accepted maxim of statutory construction dictates that in the absence of a definition, a statutory term should be construed in accordance with its natural meaning. *FDIC v. Meyer,* 510 U.S. 471 (1994). The question here is, what is the natural meaning of the word "witness"? *Black's Law Dictionary* defines "witness" as *"One who sees, knows, or vouches for something." Black's Law Dictionary* (8th ed. 2004). Additionally, *Corpus Juris Secundum: A Contemporary Statement of American Law as Derived from Reported Cases and Legislation,* states "The term witness, in its strict legal sense, means one who *gives* evidence in a cause before a court; and in its general sense includes all persons from whose lips testimony *is* extracted to be used in any judicial proceeding, and so includes deponents and affiants as well as persons delivering oral testimony before a court or jury." 97 CJS Witnesses §1 West, 1994. Neither of these definitions deems "witness" to be restricted to those whose testimony has been filed with the CRJs as part of a written, direct statement or, more generally, to those who have already given testimony. Therefore, there is no basis to conclude that Congress intended an alternative, more restrictive, meaning. Instead, the Register determines that "witness" as used in section 803(b)(6)(C)(ix) includes anyone *who knows something* that is relevant, or alternatively anyone who has or gives evidence (as opposed to one who *has given* evidence) in a rate determination proceeding. This plain meaning interpretation includes witnesses who are nonparticipants, including those who have not previously been designated by a participant as a witness as well as those whose testimony has not been filed as part of a written direct statement.

The statutory interpretation principle of *in pari materia,* which offers that statutes relating to the same or a closely allied subject or object should be construed together and compared with each other, indicates that it is also useful to look to other federal statutes that authorize the issuance of subpoenas. 73 Am. Jur. 2d Statutes § 103 (2009). The United States Code is replete with provisions that authorize various officers of the United States to issue subpoenas, and it is common for those provisions expressly to provide a power to "subpoena witnesses" or "issue subpoenas for the attendance of witnesses," or contain similar language. *See, e.g.,* 5 U.S.C. § 1305 (Office of Personnel Management & Merit Systems Protection Board may "subpena witnesses and records" in certain matters relating to administrative law judges); 8 U.S.C.A. § 1229a(b)(1) (Immigration judges "may issue subpoenas for the attendance of witnesses and presentation of evidence"); 2 U.S.C. § 437d(a)(3) (Federal Election Commission may "require by subpena, signed by the chairman or the vice chairman, the attendance and testimony of witnesses and the production of all documentary evidence relating to the execution of its duties"). In each

---

[9]  With regard to both participants as well as witnesses, the CRJs may only issue a subpoena if the resolution of the proceeding would be substantially impaired by the absence of such testimony or production of documents or tangible things.

5

of these cases, a plain reading of the statute leads to the conclusion that Congress was empowering the named officers to issue subpoenas to "witnesses" as the term is commonly understood, and not just to persons who were already participating in their proceedings. The same reading is the natural reading of section 803(b)(6)(C)(ix).

In arguing for a more narrow interpretation of "witness," SoundExchange, joined by the proposed subjects of subpoenas, suggests that the final sentence of section 803(b)(6)(C)(ix) limits the CRJs' power with regard to nonparticipants. Under SoundExchange's reading, if section 803(b)(6)(C)(ix) were interpreted to allow the issuance of subpoenas to nonparticipants, the last sentence of the provision would be superfluous, and such a result would violate an accepted principle of statutory construction. However, the final sentence of section 803(b)(6)(C)(ix), which states "[n]othing in this clause shall preclude the Copyright Royalty Judges from requesting the production by a nonparticipant of information or materials relevant to the resolution by the Copyright Royalty Judges of a material issue of fact," does not address the CRJs' power to *subpoena* testimony. Instead, it speaks to the power of the CRJs to *request* testimony. As RealNetworks accurately points out, there may be situations where the CRJs conclude that it might be useful to have a nonparticipant testify, but at the same time conclude that the resolution of the proceeding would *not* be substantially impaired by the absence of such testimony. In such instances, the CRJs would not be able to *subpoena* the nonparticipant. However, in such instances, the CRJs could, under the final sentence of section 803(b)(6)(C)(ix), *request* the relevant testimony. Such a scenario clearly demonstrates that the final sentence is not rendered superfluous by a nonrestrictive interpretation of the subpoena power. The first part of section 803(b)(6)(C)(ix) authorizes the issuance of a subpoena to participants and witnesses, albeit bound by a finding that the absence of testimony would substantially impair the resolution of the proceeding. The second part of section 803(b)(6)(C)(ix), in a non-superfluous manner, preserves the ability to *request* testimony from a nonparticipant, provided that such testimony is relevant to the resolution of a material issue of fact and even if the absence of that testimony would not substantially impair the resolution of the proceeding.

SoundExchange correctly observes that the legislative history cited by RealNetworks was referring to proposed statutory text that was quite different from the statute as passed. However, it is unnecessary to look toward the legislative history for clarification where the plain meaning of the statute is clear. Even if there were ambiguity or lack of specificity in the statute, the legislative history that exists is consistent with the Register's finding that the CRJs' subpoena power is broad and not restricted to witnesses who have already submitted testimony to the CRJs. The legislative history evidences Congress's intent to allow "the CRJs to subpoena additional witnesses." H.R. Rep. No. 108-408, at 33 (2004). This portion of the House Report indicates that Congress intended the word "witness" to include additional persons beyond merely those who have previously been designated by a participant to give evidence. While it is true that the language discussed in the House Report imparted broader authority than the statue as passed, there is no indication that in the legislation as enacted, Congress intended a more restrictive meaning of "witness." Rather, it appears that subsequent to the filing of the House Report, Congress refined the statutory language in a way that required the CRJs to find a much higher degree of relevance and materiality before they would be permitted to issue subpoenas to witnesses, but not in any way that could affect the determination whether a particular person would be considered a "witness."[10]

---

[10] At the time the House Report was filed, the language in the pending legislation permitted the CRJs to issue subpoenas "only if the evidence requested to be produced or that would be proffered by the witness is relevant and material." H.R. Rep. No. 108-408, at 8 (2004). In the enacted legislation, that authority was narrowed to permit the issuance of subpoenas "if the Copyright Royalty Judges' resolution of the proceeding would be substantially impaired by the absence of such testimony or production of documents or tangible things." 17 U.S.C.

The complete legislative history regarding the CRJs' subpoena power indicates that the type of restrictions that SoundExchange currently argues for were largely reflected in statutory language that was reported by the Senate Judiciary Committee but that ultimately was not adopted by Congress. As laid before the Senate, H.R. 1417 provided that the CRJs "may issue a subpoena commanding a participant or witness in *a proceeding to determine royalty rates* to appear and give testimony or to produce and permit inspection of documents or tangible things …" 150 Cong. Rec. S10499 (daily ed. October 6, 2004) (Emphasis added). The final sentence of the relevant subparagraph also stated that "A Copyright Royalty Judge may not issue a subpoena under this clause to any person who was a participant in a proceeding to determine royalty rates and has negotiated a settlement with respect to those rates." *Id.* However, these two limitations on the CRJs' subpoena power were amended on the Senate floor. The floor amendment removed the above-referenced final sentence of the relevant subparagraph, which would have prevented the CRJs from issuing a subpoena to any person who had been a participant in a proceeding to determine royalty rates and had negotiated a settlement. The floor amendment also removed any indication that a "witness" must be one "*in a proceeding to determine royalty rates*." 150 Cong. Rec. S10590 (daily ed. October 6, 2004). The fact that these two restrictions, which are closely analogous to the one SoundExchange currently argues for, were not included in the statute as enacted indicates that Congress did not intend such limitations to be placed on the CRJs' subpoena power.

The cases cited by SoundExchange are also inapplicable to the current inquiry. *Bobreski v. E.P.A*, 284 F. Supp.2d 67 (D.D.C. 2003) addressed a statute that specifically withheld any grant of subpoena authority; *United States v. Iannone,* 610 F.2d 943 (D.C. Cir. 1979) spoke solely to the authority to subpoena the attendance and testimony of a witness, versus the mere authority to subpoena documentary information; and *Peters v. United States*, 853 F.2d 692 (9th Cir. 1988) addressed limitations on an administrative agency's ability to issue a very unique type of subpoena often referred to as "'John Doe' subpoenas" which are directed in a blanket manner at unidentified targets. The court observed that such subpoenas, which are not at issue here, carry heightened privacy concerns and it was therefore "reluctant to assume the existence of the power to issue third-party subpoenas directed at unidentified targets where Congress has not provided for them specifically, nor provided procedural safeguards." 853 F.2d 696.

Additionally, the CRJs' regulations cited by the parties are not instructive in answering the referred question. The question presented to the Register is the breadth of the CRJs' statutory authority to issue subpoenas. In answering that question, the statutory language, as well as the relevant legislative history and case law, provide the appropriate authority. Any limitation adopted through regulation by the CRJs regarding their ability to issue subpoenas during the discovery process prior to the consideration of the underlying statutory question cannot inform the Register's determination as to the scope of the CRJs' subpoena power under the statute.

Finally, Live355 argues in its reply brief that the CRJs would not need the subpoena power provided in the statute if it extended only to participants and witnesses identified in a party's direct case. It maintains that the subpoena power would be effectively meaningless under this interpretation since other statutory provisions allow the CRJs to compel testimony from parties and their witnesses, citing 17 U.S.C. 803(b)(6)(C)(v)-(vii). That observation is persuasive. The CRJs can order a participant to provide additional documentation or testimony under their authority to conduct the rate setting proceeding. They do not need subpoena power to compel compliance from a participant. The participant can comply with the order or, should it or its witnesses fail to do so, the CRJs can strike the affected portion of the participant's testimony. This option is a powerful enforcement mechanism but it only can work with

_____

803(b)(6)(C)(ix).

participants and witnesses that voluntarily appear before the CRJs. Subpoena power, on the other hand, allows the CRJs to reach nonparticipants who are not part of the proceeding and it provides the CRJs with tools to compel compliance from persons who are not initially part of the proceedings. While it is true that, as SoundExchange points out, the statutory authority to issue subpoenas is silent with regard to enforcement, that is irrelevant to the inquiry at hand. It is not uncommon for Congress to grant subpoena authority in a statute that contains no stated enforcement mechanism. Where Congress grants subpoena authority in a statute that contains no stated enforcement mechanism, enforcement is achieved through a U.S. district court, and may be sought through the assistance of the United States Attorney's office. *Office of Legal Policy, U.S. Department of Justice, Report to Congress on the Use of Administrative Subpoena Authorities by Executive Branch Agencies and Entities, Pursuant to Public Law 106-544,* at 9-10 (2002), (available at http://www.usdoj.gov/archive/index-olp.html).

For the above-stated reasons, the Register concludes that the CRJs do have the authority to subpoena a witness to appear and give testimony or to produce and permit inspection of documents or tangible things even when that witness is not a participant in the proceeding and his or her testimony has not yet been submitted in the proceeding. This authority is restricted to instances where the resolution of the proceeding would be substantially impaired by the absence of such testimony or production of documents or tangible things. Additionally, Congress expressly preserved the CRJs' power to request information from nonparticipants in certain cases when the CRJs do not have the power to issue subpoenas. This power to request information may be invoked in those instances where such testimony is relevant to the resolution of a material issue of fact, even when its absence would not substantially impair the resolution of the proceeding (and, therefore, a subpoena could not be issued). The CRJs have not asked for any determination regarding what may constitute either substantial impairment of resolution of the proceeding or relevance to the resolution of a material issue of fact, and therefore no guidance is offered on those questions. It is, however, pertinent to observe that while the statute grants the CRJs the authority to issue subpoenas in certain circumstances, it does not compel them to issue subpoenas in any circumstance. Furthermore, it is noteworthy that even under the broader grant of subpoena power in the provision initially introduced in the House, Congress stated that it "does not anticipate that the use of subpoena power will become a common occurrence" and that "[t]he CRJs are expected to exercise this power judiciously and only in those instances where they believe a subpoena is necessary to obtain information that the parties have not provided and that the judges deem necessary to make their decision." H.R. Rep. No. 108-408, at 33 (2004).

February 22, 2010

Marybeth Peters
Register of Copyrights

## UNITED STATES COPYRIGHT ROYALTY JUDGES

| | |
|---|---|
| **In the Matter of** | |
| | **Docket No. 2009-1** |
| **Digital Performance Right in Sound** | **CRJ Webcasting III** |
| **Recordings and Ephemeral Recordings** | |

### ORDER GRANTING IN PART AND DENYING IN PART
### IBS'S MOTION TO COMPEL CBI TO ANSWER INTERROGATORY
### AND PRODUCE DOCUMENTS

On January 27, 2010, Intercollegiate Broadcasting Systems, Inc., ("IBS") filed a motion to compel College Broadcasters, Inc. ("CBI") to answer an interrogatory ("IBS Interrogatory No.1") and produce certain documents (IBS's Request for Production Nos. 1 and 2). CBI opposes the interrogatory and document requests, arguing, among other things, that discovery may only be compelled of an opposing party and IBS and CBI are not opposing parties in this proceeding. CBI further contends that CBI "necessarily remains in the proceeding in order to seek grant of its Motion to Adopt Partial Settlement submitted to the CRJs, as the rules seem to require." CBI asserts that requiring CBI to comply with discovery would put parties like CBI in an untenable position: "either they would need to withdraw from royalty rate proceedings and leave their settlements vulnerable to not being adopted by the CRJs, or they would make themselves vulnerable to the costs and burdens associated with the adversarial aspects of the proceeding, such as discovery." *CBI's Response to IBS's Motion to Compel* at 8.

IBS's Interrogatory No. 1 relates to an agreement that CBI reached with SoundExchange, which CBI and SoundExchange have requested that the Judges adopt. *Joint Motion to Adopt Partial Settlement, Docket No. 2009-1, CRB Webcasting III* (August 13, 2009).[1] The interrogatory states in relevant part:

> [In his prepared testimony submitted on behalf of CBI, Mr. Will Robedee] refers to negotiations between SoundExchange and CBI leading up to the agreement between CBI and SoundExchange....On behalf of which non-commercial educational and commercial webcasters did CBI (a) seek to negotiate and (b) sign on behalf of, indicating in your answer as to each such entity named

---

[1] The agreement was published in the *Federal Register* at 75 FR 16377 (April 1, 2010).

2

> whether (a) or (b), or both, tabulating entries in categories
> (a) and (b) by their annual budgets or estimates thereof and
> indicating as to each entry the numbers of, or estimates of,
> paid, non-teaching-faculty staff?

The SoundExchange/CBI settlement and Mr. Robedee's testimony about the settlement are essentially CBI's entire direct case. *See Direct Case of College Broadcasters Inc.*, Docket No. 2009-1, CRB Webcasting III (Sept. 29, 2009). IBS's interrogatory relates directly to the settlement and the testimony. CBI contends that the settlement should be binding on all copyright owners and performers. *See* Direct Testimony of Will Robedee at ¶ 14. IBS disagrees and therefore is an opposing party of CBI with respect to this issue, notwithstanding CBI's contentions to the contrary. Therefore, IBS's request to compel with respect to Interrogatory No. 1 is **GRANTED**.

In IBS's Request for Production No. 1, IBS requests "[c]opies of those formal corporate documents, *e.g.*, state certificate of incorporation, by-laws, directors' resolutions, and the like defining (i) CBI's current corporate purposes, (ii) current and past membership categories or classes and the qualifications of each." This request appears to be limited and reasonable and therefore is **GRANTED**.

In IBS's Request for Production No. 2, IBS requests "[c]opies of documents sufficient to show the names of all directors, officers, and employees of CBI in calendar 2008 and in calendar 2009, respectively, with their respective titles, duties, responsibilities, and concurrent affiliations relating to broadcasting and webcasting." This request appears to be limited and reasonable with respect to directors and officers, but the relevance of the names, duties, etc. of all employees, including administrative or clerical staff is unclear. Therefore, the request is **GRANTED** with respect to all CBI directors and officers in 2008 and 2009 but is otherwise **DENIED** as overbroad.

All documents must be provided no later than ten (10) days after the date of this order.

**SO ORDERED.**

**James Scott Sledge**
**Chief U.S. Copyright Royalty Judge**

**DATED: April 1, 2010**

JA111

Before the
COPYRIGHT ROYALTY JUDGES
Library of Congress
Washington, DC 20540

In the Matter of )
)
)
Adjustment of Rates and Terms for )
Digital Performance Right in Sound )
Recordings and Ephemeral Recordings )
)

Docket No. 2009-1 CRB DTRA

Webcasting III

REBUTTAL TESTIMONY
of Frederick J. Kass,
Chief Operating Officer
Intercollegiate Broadcasting System, Inc.


I am Frederick J. Kass, Chief Operating Officer of the Intercollegiate Broadcasting

System, Inc.  I am the same Frederick J. Kass who testified here earlier this year on April 22d

and May 5th.


Alleged Misrepresentations on IBS Website


1.    On April 22nd Mr. Freedman cross-examined me at some length concerning the

accuracy of the representations at various times in the past by IBS on its website and on special

invoices and on the endorsement on membership certificates issued to certain IBS members.

(TR 806-848.)  In particular he led me through the following exhibits, which were admitted over

objection of IBS' trial counsel, *viz.*:

SoundEx Exh. 8    Application for IBS Membership (2/2010) (TR 817)

SoundEx Exh. 9    IBS 2006-07 Special Membership Certificate to Station 88.KUR
                  (TR 817)


JA112

SoundEx Exh. 10    Pages from IBS website  8/25/08 (TR 833-34)

SoundEx Exh. 11    Infringement letter from Jenner & Block to IBS dated April 8, 2008 (TR 833-4)

SoundEx Exh. 12    Ltr from Jenner & Block dated October 7, 2008 (TR 833-4)

2.    Without waiving IBS' objections to their admissibility, SX Exhibits 8 and 9 simply do not reflect what appears more currently on IBS' website and on IBS membership certificates.  IBS Rebuttal Exh. 1 for identification reflects the same membership application form as of April 2010, and IBS Rebuttal Exh. 2 for identification reflects the only form of membership certificate currently being issued by IBS.

3.    IBS Rebuttal Exhibit 3 for identification shows selected comparable pages currently on IBS' website, reflecting various changes in the website since the pages of August 2008 shown in SoundEx Exh. 10.

4.    SoundEx Exhs. 11 and 12 are two letters written in a chain of letters pertaining to SoundEx Exh.'s charge that IBS has exacerbated these foregoing misleading statements by not "correcting them following demands by SoundEx by making changes in IBS' website."  IBS Rebuttal Exhs. for identification 4, 5, 6, and 7 demonstrate IBS' responses to the SoundEx's demands from Jenner & Block.  Without these letters the sequence of correspondence is incomplete and does not give a clear picture of the seriousness of IBS' attempts in good faith to respond to Jenner & Block's position.  Further, the chain of correspondence is full of cross-references that would not be understood without the omitted ones.

5.    The sequence of the correspondence may be set forth in tabular form to aid the bench in better understanding the sequence, *vis.:*

April 8, 2008    Demand letter from Jenner & Block to IBS  (SoundEx Exh 11)

| | |
|---|---|
| April 23, 2008 | IBS' Reply dated April 23d (IBS Rebuttal Exh. 4), seeking clarification of SoundEx's objections in its April 8th |
| June 5, 2008 | SoundEx's letter to IBS  (IBS Rebuttal Exh. 5) |
| June 16, 2008 | IBS' reply dated June 16th to SoundEx's letter of June 5 (IBS Rebuttal Exh. 6),  offering SoundEx equal time) |
| October 7, 2008 | SoundEx's reply (SoundEx Exh. 12) |
| October 14, 2008 | IBS' reply (IBS Reply Exh. 7), reiteration of IBS' offer of "equal time" to SoundEx to post contrasting views or link readers of IBS' website to SoundEx's own. |

From examination of the foregoing chronology, it becomes apparent (i) that the discussion between counsel moved to a conclusion with reasonable expedition, and (ii) that SoundEx did not convey to IBS any dissatisfaction with the state in which the discussion ended on October 14, 2008.

<u>Sound-Ex's Proposal for a Minimum Rate Unrealistic<br>for Small Educational Webcasters</u>

6.    SoundEx, through its witnesses Barrie Kessler and W. Tucker McCrady, advocates a uniform minimum annual license fee of $ 500 for all educational webcasters.  Five hundred dollars is at such a high level that it (i) is disproportionate to their use of digitally recorded music and (ii) is for many smaller webcasters or would-be webcasters a barrier-to-entry.  As such it contravenes what I understand to be the statutory requirement in Section § 114(f)(2) that there be *"a minimum fee for each such type of service,* such differences in minimum fees to be based on criteria including, not limited to, the quantity and nature of the use of sound recordings" made by each type of service.

7.    The instantaneous listening to the small and very small educational webcasters' webcasts of licensable music is so small, that substitutional effect on record sales is *de minimis.*

IBS would argue that the statute does not purport to protect other webcasters as such from substitutional effect but protects only "the purchase of phonorecords by consumers." The term phonorecord, as I understand it, requires fixation of sound in a tangible object, and that seems to be the way Congress defined it in Section 101 of the Copyright Act. It does not seem to extend protection to competing streams.

       8.     The agreement between SoundEx and CBI is not an appropriate benchmark to use in setting a minimum fee for the overwhelming majority of the small and very small educational webcasters.[1] While CBI has not placed its membership rolls on the public record in this proceeding, it is generally understood among those who have been involved in college radio over the years that the CBI is an organization representing primarily campus stations that are large enough to operate in part with paid staffs. So far as I am aware, CBI does not have conventions of its member stations other than in conjunction with conventions of College Media Advisers. College Media Advisers is not an organization devoted just to college broadcasters, but includes college advisers to collegiate journalistic media across the spectrum – print, audio, television, etc.[2] As suggested by its name, Collegiate Broadcasters, Inc., CBI focuses on serving the larger collegiate webcasting operations.

       9.     The SX-CBI agreement is not an agreement signed on behalf of any particular educational webcaster. Technically it may not be an agreement at all within the meaning of

---

[1] Under IBS' restated rate proposals in Web II and Web III, a *small educational webcaster* is defined as a noncommercial webcaster whose performances of digitally recorded music aggregate less than 15,914 ATH per month or the equivalent. A *very small noncommercial webcaster* is a noncommercial webcaster whose performances of digitally recorded music aggregates less than 6,365 ATH per month or the equivalent.

[2] Under Article I (Membership), section 2, of CMA's by-laws, as currently posted on CMA's website, "Active members shall be restricted to individuals who are performing duties as advisers, supervisors or directors of editorial, business or technical phases of student media operations in colleges or universities, or not-for-profit student media corporations."

either Section 114(f)(5) or 801(b)(7)(A), but only an offer by SoundExchange, since only one party, *viz.,* Sound Exchange and those copyright owners it represents, was bound by it at signing. So far as appears of record in this proceeding, CBI as signatory did not represent any particular webcaster using licensable music represented by SX. Indeed, IBS' Interrogatory to CBI in this proceeding seeking to evoke "on behalf of which non-commercial educational and commercial webcasters did CBI (a) seek to negotiate and (b) sign on behalf of," CBI responded[3]

> CBI negotiated and signed the agreement on behalf of its recent, current, and potential future membership in CBI[,] and any Noncommercial Educational Webcaster can elect whether to be covered under its rates and terms or other available rates and terms. Attached to this statement as Attachment A is a list of all currently eligible potential member stations CBI has identified.

10.     The substantive objection to extending the SX-CBI rates and terms to smaller educational webcasters is that CBI represents primarily large educational webcasters having a very different profile from the more numerous small and very small entities. Such small entities do not have a staff that is in part paid by the entity or by the educational institution of which it is a part. In contrast IBS has the larger membership and represents a broader spectrum of users and would-be users in high schools, academies, universities and colleges, etc. The hours-of-operation of individual IBS members likewise covers a wide spectrum, ranging from (i) a college station simulcasting 24/7/365 to (ii) a high school webcasting-only entity that operates one or two hours each weekday during the school year. A back-of-the-envelope calculation would be that such a smaller entity could program at a max no more than 600 works per month.[4]

---

[3]  CBI's response to IBS' sole interrogatory will be offered here as IBS Rebuttal 8 exhibit, except that Attachment A to CBI's interrogatory, which I am informed by counsel seems to be a list of approximately 1225 station names and associated institutions of higher learning, as to which restricted status was claimed by CBI, is omitted.

[4]  This figure is calculated as follows:  2 hours per month times 12 performances per hour (ATH conversion figure) = performances per day. Twenty-four performances times 25 week-days per month equals 600 works per month.

11.    This estimate tends to overstate the amount of licensable listening to these smaller operations.  IBS' experience and the best figures from Webcasting II and III suggest that the average instantaneous listenership is just under four.  Many smaller stations program recorded music directly licensed to them or through a clearinghouse arrangement, which further reduces the instantaneous listenership for performances licensable by SX.  Considering that many educationally affiliated webcasters attract their peak listening audiences with varsity sports coverage and on-campus lectures and instructional programming, the actual number of performances involving digitally recorded music would be proportionately less.  To the extent that the primary purpose of some such webcasting operations is for course credit or as an extra-curricular activity – "learning by doing" – their instantaneous audiences for digitally recorded music is yet smaller.  These are truly "small businesses" as defined by the Small Business Administration and entitled to the protection of the Small Buisness Regulatory Fairness Act, Title II of P.L. 104-121, 110 Stat. 857-62, 5 U.S.C. § 857-62, 5 U.S.C.  601n.

12.    Taking into account the distinctive use of, and audience for, digitally recorded music by the small and very small educational webcasters, SX's proposed $ 500 minimum is disproportionate to the actual usage of licensable music by the small and very small educational webcasters.  Congress in Section 114(f)(2) intended that the minimum rate be tailored to the type of service in accord with the general public policy favoring small businesses.  This disproportion exists not only in rates but in cost-benefit analysis of prescribed recordkeeping and reporting prescribed.[5]

---

[5]  I am informed by counsel that such analysis is required in laws appearing in the U.S. Code, title 5, ch. 6, implementing Congress' legislative intent to protect small businesses from "unnecessary burdens" and that this purpose is made explicit in Section 2 of P.L. 96-354.

13.     Congress, in enacting the DCMA itself, took pains to indicate that "such rates and terms shall distinguish among the different types of eligible nonsubscription transmission services then in operation and shall include a minimum fee for each such type of sound recordings affected by this paragraph" (§ 114[f][2][A, B]), giving due weight to substitution for CD sales.  IBS' position is that SX's proposed minimum is not tied in any meaningful way to substitution for CD sales.

<u>SX's Proposed Rates are not Justified as Cost-Based</u>

14.     Even assuming that a minimum fee could be justified on a cost-basis, SoundEx has made no showing that any rate structure that is cost-effective would be supported by its showing as to costs.  Only by positing a cost-structure for administrative costs that make such a structure that not cost-effective as to the small and very small webcasters could SX generate administrative fees that recovered a minimum rate of $ 500.  SX's own figures show that their administrative costs per reported performance are on the order of $ 0.000001658.[6]  Again assuming that a small educational webcaster would generate no more than 2,291,616 performances per year, that would generate proportional costs of $3.80 --far less than the $ 500 per year minimum rate.  For a very small webcaster the figure is $ 1.52, even more disproportionately falling on the very small webcaster.  Without scaled rates a five hundred-minimum would leave the small educational webcaster paying for a large number of performances he couldn't use.

15.     Anything other than a cost-effective rate structure would run counter to Congress' intention in replicating in Section 114, as amended by DMCA as nearly as possible, the action of a competitive buyer-seller market.  If a supplier could not service the needs of a

_____

small buyer profitably on at least marginal basis, then there would be no sale at that price for want of a willing buyer.  In a perfectly competitive market only as forced by governmental regulation would a seller agree to sell for less than his marginal costs.

16.    Because the deficiencies in SoundEx' proposed rates and terms have become more evident as testimony have piled up in the record, IBS on May 21st submitted a new proposal for rates in Web III pursuant to Section 351.4(c) of the Rules, *viz.:*

> In view of (i) the direct testimony heard so far and (ii) the CRJs' rate determination published in the <u>Federal Register</u> of May 1, 2007, IBS herewith respectfully submits a superseding restated rate proposal in Web III pursuant to Section 351.4 of the Rules.

> The general principle driving IBS' proposal is that small, noncommercial webcasters should pay only for the performances of music subject to statutory license that they actually webcast.   The proposal consists of three parts:

> (i)    Definitions that identify small, noncommercial webcasters as those whose small listening audiences and hours of operation are such as would result in *de minimis* use of music under statutory license;

> (ii)    Flat annual rates;

> (iii)    An exemption from recordkeeping requirements and reporting requirements.

Rate Proposal

> Definition:  A *small, noncommercial  webcaster* is a noncommercial webcaster whose total performances of digitally recorded music is less than 15,914 ATH per month or the equivalent.

> A *very small noncommercial webcaster* is a noncommercial webcaster whose total performance of digitally recorded music is less than 6,365 ATH per month or the equivalent.

> Royalty Fees:  *Small non-commercial webcasters* shall pay $ 50 per annum*;   very small noncommercial webcasters* shall pay $ 20 per annum.

> Reports of use...   *Small noncommercial webcasters* and *very small noncommercial webcasters* are not required to keep records of, or to file reports of, digitally recorded music webcast..

17.    The respective minimum annual rates of $ 50 and $ 20 are derived in the following fashion:  These are based on usage measured in ATH or equivalent performances based on the determination of May 2007 and the record evidence there (and here) of the average number of instantaneous listeners, *vis.,* four.[7]  For the small webcaster I calculated that its usage factor would not exceed about ten percent that of an educational webcaster, *i.e.,* that its usage would not exceed ten percent of the flat-rate limit of 159,140 ATH per month or approximately 21 continuous statutory performances;[8]  for the very small webcaster I calculated that its usage would not exceed four percent that of an educational webcaster, *i.e.,* that its usage would not exceed four percent of the flat-rate limit of 159,140 or 6365 ATH per month or approximately nine instantaneous listeners.[9]  Applying those percentages to the $ 500 minimum yields proportional fees of $ 50 and $ 20.

Frederick J. Kass
Chief Operations Officer

Newburgh, New York
June 7, 2010

I affirm that the facts stated in the foregoing written testimony are true and correct to the best of my knowledge and belief.

Frederick J. Kass

4122\03\00154039.DOC

---

[7]  For various reasons, which are already detailed in the record and briefly alluded to above, these are overstatements due to the webcasters' audiences being higher for non-recorded-music programming, such as varsity athletics, before adjustments for school vacations.

[8]  15,914 ATH x 12 performances per ATH x 12 months = 2,291,616 annual statutory performances.

[9]  6365 x 12 performances per ATH x 12 months = 916,560 annual statutory performances.

USCA Case #14-1068    Document #1523372    Filed: 11/18/2014    Page 125 of 299
IBS Rebuttal Exhibit 1



# IBS

### INTERCOLLEGIATE
### BROADCASTING
### SYSTEM

**YOUR EXPERIENCED RESOURCE**

April 2010

# INVOICE

No. 11-3076    A

**367 Windsor Highway, New Windsor, NY 12553-7900**
**E-mail: ibs@ibsradio.org Ph (845) 565-0003 FAX (845) 565-7446**

*If required by your Business Office:*
Purchase Order # _____

Date of PO _____

Please note any address changes:

Radio Station

,

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

## Join IBS Radio Station - Webcast Membership

Through December 31, 2010,  Payable by check, or credit card - **VISA - MasterCard - Discover**

| Intercollegiate Broadcasting System Membership Dues for One Year | **$125.00** |
|---|---|

Radio Station Membership in IBS includes:

    **IBS 24/365 Radio Information (http://www.collegeradio.tv) (ibs@ibsradio.org)**
    **Save $80 on registration for 71st Annual IBS** NY City Conference: March 4-6, 2011
    **IBS Assistance with YOUR FCC FM license renewal starting soon!**
    **IBS Assistance with YOUR Webcast/Streaming.**

    **Coast to coast IBS Fall Conferences- registration $25/person including lunch**
    IBS Publications, Music service assistance, engineering/ technical assistance
    FCC Info on License Assistance, Public File, Underwriting, Ownership & LPFM

**Annual Subscription to IBS Newsletter printed in color and mailed**

**Includes First (1ˢᵗ) delegate FREE registration.  Save $80 -  IBS International Radio Conference.**
**IBS International Conference** - Friday - Sunday, **March 4 - 6, 2011  - NY City** at Hotel Pennsylvania
70th annual with over 115 seminars by top academic, broadcasting and government professionals!

**Reduced ($25/person registration) IBS Conference- Oct. 9, 2010, Boston/Brookline, MA**
**Reduced ($25/person registration) IBS Conference- Oct. 23, 2010, Chicago. IL**
**Reduced ($25/person registration) IBS Conference- Dec. 4, 2010, Los Angeles/Claremont, CA**

### IBS is a not for profit education corporation, association, and foundation with 70 years of continuous service to the over 1,000 IBS Members Worldwide!

## Intercollegiate Broadcasting System, Inc.  Federal ID is: # 23 705 9805

Please enclose with your check either the top portion of this invoice or IBS invoice number and mail to:

# IBS

367 Windsor Highway
New Windsor, NY 12553-7900



# IBS Intercollegiate Broadcasting System

This is to Certify that

# WHRB - 95.3 FM

**Harvard University
Cambridge
Massachusetts**

is an IBS Member in good standing of the
**Intercollegiate Broadcasting System, Inc.**

Fritz Kass
Treasurer and Chief Operating Officer

## 2009 - 2010

IBS Rebuttal Exhibit 2





**Intercollegiate Broadcasting System (IBS), your trusted experienced resource for 70 years!**

IBS - college radio, TV, webcasting, podcasting, streaming, and high school radio!

IBS - trusted resource for college radio, TV, webcasting, streaming, and podcasting



| Home | Join IBS | Start A Radio Station |
|---|---|---|
| | IBS New York City Conference | IBS Fall Conferences |

# News for YOU, the IBS Member!

**July 10, 2009 - Case 07-1123: IBS v. CRB/SoundExchange (Intervenor) (US Court of Appeals- DC Circuit)**
**$500 Minimum Webcasting Fee (2006 - 2010) is vacated back to January 1, 2006!**

Webcast - IBS - Intercollegiate Broadcasting System, Inc....    file:///C:/Documents%20and%20Settings/whill/Local%20Se...

USCA Case #14-1068    Document #1523372    Filed: 11/19/2014    Page 128 of 299

# The US Court of Appeals (DC Circuit) Case requesting review (Appeal), decides that the
# $500.00 minimum webcast fee to SoundExchange is unjustified!

IBS Position:

1. There is not sufficient basis to support a $500.00 minimum payment for noncommercial webcasters.

2. Smaller, educational, government owned/operated (State Colleges/Public Schools) should be able to pay for only their direct use of the statutory license to stream music, not the often much larger minimum ($500.00).

3. Many PUBLIC Education webcast entities could be forced off the Internet (No Webcast). Other PUBLIC Education entities are being prohibited from using the Internet/Webcasting to teach America's Sons and Daughters about digital communications. Students would not be allowed to learn/practice vital digital communication/Internet SKILL Sets required by them to survive in the Global World Economy!

4. Copyright Holders (SoundExchange/RIAA) have signed agreements in the Webcast II (2006 - 2010) CRB Record for rates of approximately $100 per year per entity covering the most listened too (average of over 200 USA listeners on the Internet)($80,000 Federal Tax Dollars covering 798 NPR/CPB Entities). Clearly the majority of all NPR, and CPB qualified, webcast entities are owned by States (Colleges/Universities)(Public Schools). Very clearly the legal ownership of CPB Qualified and NPR webcasters is often IDENTICAL to the legal ownership of IBS - Intercollegiate Broadcasting System, IBS Members (State and Local Government). The ONLY difference between IBS and NPR webcasts are the staffs. IBS webcasts are student webcasts used to train, learn, and practice digital techniques. IBS Webcast have very low listenership levels. NPR webcasts are professionally produced. They are widely listened to and are audience, not training focused.

5. The Corporation for Public Broadcasting (CPB) receives annually from US Taxpayers, by Congressional Authorization/Appropriation over $400,000,000.00 ($400 Million Dollars). CPB pays, using Federal Taxpayer dollars the SoundExchange copyright royalty fees for all NPR and CPB Qualified, webcasters. State and local taxpayers often pay SoundExchange webcast royalty fees. Federally funded high visibility mass audience (over 200 continuous listeners) are given preferential rates. State and Local Government funded training entities often with very low listenership (5 or less listeners per minute), due to the minimum must pay the $500.00 minimum rate even though their pay per performance rate is less. Often the use of the statutory music license is only 3% of the federal funded NPR webcasts.

7. The US Court of Appeals after review of the CRB Record vacated the minimum ($500.00) for noncommercial webcasters, allowing the CRB record rates for noncommercial IBS Member State and Local Government Webcasters to be the CRB Rate for 2006 - 2010.

Webcast - IBS - Intercollegiate Broadcasting System, Inc....    file:///C:/Documents%20and%20Settings/whill/Local%20Se...

USCA Case #14-1068    Document #1523372    Filed: 11/19/2014    Page 129 of 299

## What is IBS's position on Webcasting?

1. IBS believes there is tremendous educational and operational value for educational stations to stream their audio (and video) signal over the Internet.

2. IBS believes every educational station should continue to stream their audio signal digitally on the Internet (Webcast)!

3. IBS believes the benefits of streaming/webcasting are so great that your radio station should continue to stream on the Internet even with DMCA copyright uncertainties.

4. IBS believes that every station that is not now streaming should start streaming! Learning the techniques and technology of digital communications is vital for today's graduates. Competitive knowledge of Internet/ Webcasting communications is an important skill set in the world of today.

The value of streaming for an IBS Member Radio Station is:

Education-
To learn and practice the techniques and technology of digital communications.
America's Sons and Daughters must compete in a global digital world. Vital
communication skills are being learned by webcasting at USA schools and colleges.

Operations-
To be able to reach out to alumni, parents, friends and other audiences with
information and programming that cannot be provided by other broadcasting technology.

Constitutional FREEDOM-
The right to free speech and expression of views by American Education Entities and
their faculty and students is vital to a FREE United States of America. Our GREAT
NATION cannot long endure if we allow uncertainty to shut down school and college
webcasts due to impossible to meet recordkeeping and unrealistic rates that apply to
music and NON-MUSIC programming.

Keep webcasting, learning and reaching out to a wider audience!

## Go to IBS First Website Page - click here!



**Links and content being added - stop back and visit again.**
**Please send us your comments, suggestions and critiques.**

*Contents of this site copyright 1996 - 2010, all rights reserved by the*

**Intercollegiate Broadcasting System, Inc.,**

**367 Windsor Highway, New Windsor, NY 12553-7900**

**Phone: 845-565-0003**

**Fax: 845-565-7446**

*Web site design and content by*

*Jeff Tellis, September 15, 1941 -- March 14, 2006*

IBS Rebuttal Exhibit 4

# MILLER & VAN EATON
## ──────── P. L. L. C. ────────

MATTHEW C. AMES
KENNETH A. BRUNETTI*
FREDERICK E. ELLROD III
MARCI L. FRISCHKORN
GAIL A. KARISH*
NICHOLAS P. MILLER
MATTHEW K. SCHETTENHELM
JOSEPH VAN EATON

*Admitted to Practice in
California Only

1155 CONNECTICUT AVENUE, N.W.
SUITE 1000
WASHINGTON, D.C. 20036-4320
TELEPHONE (202) 785-0600
FAX (202) 785-1234

MILLER & VAN EATON, L.L.P.
580 CALIFORNIA STREET
SUITE 1600
SAN FRANCISCO, CALIFORNIA 94104
TELEPHONE (415) 477-3650
FAX (415) 477-3652

WWW.MILLERVANEATON.COM

OF COUNSEL:
 JAMES R. HOBSON
 GERARD L. LEDERER
 WILLIAM R. MALONE
 NANNETTE M. WINTER†

†Admitted to Practice in
New Mexico Only

April 23, 2008

Thomas J. Perrelli, Esq.
Jenner & Block
601 Thirteenth Street, N.W., # 1200-S
Washington, D.C. 20005

Re: <u>IBS Website</u>

Dear Tom:

Your letter of April 8th, though "follow[ing]-up on the various conversations you have had with SouthExchange regarding some of the statutory licensing information posted on the IBS website (http://frontiernet.net/~ibs/DCMA.html)" introduces on page 2 in the fourth-from-last paragraph a point that was, to the best of my recollection and Fritz', not discussed in our prior individual or joint conversations with the SoundExchange staff.

So before attempting a comprehensive response to your letter, I thought it advisable to seek clarification of your contentions with respect to the new point. As to the legal basis of your objection, may I take it to be confined to domestic registrations numbers 2913178 for the dotted swoosh design and 2639580 for SOUNDEXCHANGE in typewritten form, both registered to SoundExchange, Inc., at its former Connecticut Avenue address, for collection and distribution of royalties relating to electronic transmission and distribution of copyrighted music and sound recordings? No. 2999089 for PLAYS in typewritten form for financial information, also registered to SoundExchange, I take to be irrelevant.

MILLER & VAN EATON, P.L.L.C.

- 2 -

Inspecting the ten pages or so associated with the web address in your letter, they appear to constitute a newsletter-like item reciting various persons and events concerning "IBS – college radio, TV webcasting, podcasting, streaming, and high school radio." Various individuals involved in each topic are identified graphically in the respective topic headings. The first topic is IBS services, and it is identified by a composite graphic characteristic of IBS. The second topic appears to describe IBS' activities vis-à-vis specific legal players in Washington, D.C. milieu, and those players (IBS, SoundExchange, and the U.S. Copyright Office) are identified by graphics. The next topic appears to be IBS' appeal to the D.C. Circuit, and the graphics identify IBS and, somewhat erroneously, the Federal Circuit, as the players. The next topic appears to involve the proceeding before the Copyright Royalty Judges, and the graphic identifies the CRB as the player. The next topic appears to describe negotiations between IBS and SoundExchange, and graphics identifying IBS and SoundExchange as players. The final topic appears to report decisions by the Copyright Royalty Board, and the graphic identifies the Board as the player.

At the risk of being considered obtuse, I seek clarification of your contention and its basis(es), since the identification of the "players" in the news items is reasonably accurate – certainly within the limits of ordinary editorial license --, and there is no confusing indication of a source of services within the registered use.

Sincerely yours,

William Malone

cc: Mr. Frederick J. Kass

4122\03\00138220.DOC

JA128

# JENNER&BLOCK

Jenner & Block LLP          Chicago
1099 New York Avenue, NW     New York
Suite 900                   Washington, DC
Washington, DC 20001
Tel 202-639-6000
www.jenner.com

June 5, 2008

Thomas J. Perrelli
Tel  202 639-6004
Fax  202 661-4855
tperrelli@jenner.com

Fritz Kass
Chief Operating Officer
Intercollegiate Broadcasting
System, Inc.
367 Windsor Highway
New Windsor, NY 12553-7900

William Malone
Miller & Van Eaton, PLLC
1155 Connecticut Avenue
Suite 1000
Washington, DC  20036

Re:    False Information on IBS Website

Dear Fritz and Bill:

It has been well over a month since I initially sent a cease-and-desist letter to you
regarding the false and misleading information you have posted on your website.  Yet you have
done absolutely nothing to remove the information from the site or to remedy the situation.  Your
April 23, 2008 response avoids SoundExchange's primary contention that IBS has posted -- and
indeed continues to post -- deceptive information that encourages your members to break the
law.

Your letter seeks a "clarification" about SoundExchange's trademarks, but -- as you
appear to concede -- SoundExchange is the lawful owner of the trademarks at issue and you are
using those trademarks in conjunction with the false and deceptive information on your website.
Fundamentally, however, our dispute is not about SoundExchange's logo -- it is about the false
and deceptive information on the IBS website.  In my letter of April 8, I clearly explained this
concern -- "SoundExchange also finds problematic IBS's posting of this inaccurate information
on a website that . . . contains -- without permission -- SoundExchange's trademarked logo.  This
juxtaposition wrongfully gives the impression that the advice you impart -- authorizing your
members to violate their statutory obligations -- is sanctioned by SoundExchange.  Nothing
could be further from the truth, as your numerous discussions with SoundExchange have made
clear."

There is nothing confusing or complicated about this language.  You cannot possibly
contend with any credibility that you need "clarification" to understand what SoundExchange is
demanding.  Your attempt to skirt the issue by asking questions about trademark registration

Fritz Kass
William Malone
Page 2

numbers while you refuse to correct false statements on your website is transparently a delaying tactic.

I once again reiterate SoundExchange's demand that you correct the information on IBS's website. Please do so as soon as possible and inform me when it has been accomplished. Failure to remove this information may leave SoundExchange with no choice but to contact IBS's members directly to inform them that IBS is providing misleading information and advice that, if followed, may expose them to liability for copyright infringement.

Sincerely,

Thomas J. Perrelli

cc:    Michael J. Huppe
       Colin Rushing

IBS Rebuttal Exhibit 6

# MILLER & VAN EATON

### ——P. L. L. C.——

MATTHEW C. AMES
KENNETH A. BRUNETTI*
FREDERICK E. ELLROD III
MARCI L. FRISCHKORN
GAIL A. KARISH*
NICHOLAS P. MILLER
MATTHEW K. SCHETTENHELM
JOSEPH VAN EATON

*Admitted to Practice in
California Only

**1155 CONNECTICUT AVENUE, N.W.**
**SUITE 1000**
**WASHINGTON, D.C.  20036-4320**
**TELEPHONE (202) 785-0600**
**FAX (202) 785-1234**

MILLER & VAN EATON, L.L.P.
580 CALIFORNIA STREET
SUITE 1600
SAN FRANCISCO, CALIFORNIA  94104
TELEPHONE (415) 477-3650
FAX (415) 477-3652

WWW.MILLERVANEATON.COM

OF COUNSEL:
JAMES R. HOBSON
GERARD L. LEDERER
WILLIAM R. MALONE
NANNETTE M. WINTER†

†Admitted to Practice in
New Mexico Only

June 16, 2008

Thomas J. Perrelli, Esq.
Jenner & Block LLP
1099 New York Avenue, N.W.
Washington, DC  20000

Re:  Information on IBS Website

Dear Tom:

If we are not over-reading your letter of June 5th, I find it very clarifying.  IBS still feels that the changes it made in good faith to the news posting in response to your prior letter represent a fair statement of the matter.  The newsletter's readers are, after all, by-and-large college and high school students who grapple with William Shakespeare, so reading the IBS posting for what it says shouldn't be too difficult.

The "news" here, though, is that SoundExchange disagrees with the views expressed in IBS' revised posting.  As you are aware, IBS has regularly invited and welcomed speakers from SoundExchange to bring their views to the station staff members in attendance at its annual radio conference and at an occasional regional conference?  Their views are considered important to station staff members, even if IBS itself may not agree with them one hundred percent.  Exposure to contrasting views is itself an important learning experience, lest our society become a victim of political correctness run amok.

Your letter in effect argues that IBS' editor has not fairly presented SoundExchange's contrasting views.  Indeed, in the last sentence you suggest that SoundExchange's remedy would be to state its position directly in correspondence to IBS members.  IBS respectfully suggests it

JA131

IBS Rebuttal Exhibit 7

# M I L L E R  &  V A N  E A T O N
## ————— P. L. L. C. —————

MATTHEW C. AMES
KENNETH A. BRUNETTI*
FREDERICK E. ELLROD III
MARCI L. FRISCHKORN
GAIL A. KARISH*
NICHOLAS P. MILLER
MATTHEW K. SCHETTENHELM
JOSEPH VAN EATON

*Admitted to Practice in
California Only

1155 CONNECTICUT AVENUE, N.W.
SUITE 1000
WASHINGTON, D.C. 20036-4320
TELEPHONE (202) 785-0600
FAX (202) 785-1234

MILLER & VAN EATON, L.L.P.
580 CALIFORNIA STREET
SUITE 1600
SAN FRANCISCO, CALIFORNIA 94104
TELEPHONE (415) 477-3650
FAX (415) 477-3652

WWW.MILLERVANEATON.COM

OF COUNSEL:
JAMES R. HOBSON
GERARD L. LEDERER
WILLIAM R. MALONE

October 14, 2008

Thomas J. Perrelli, Esq.
Jenner & Block, LLP
1099 New York Avenue, N.W., # 900
Washington, D.C. 20001

Re:  IBS Website

Dear Tom:

Your letter of October 7th reached Fritz in Saturday's delivery, and he has asked me to drop you a note with regard to your client's continuing objections to the series of postings of current information about developments in the webcasting rights controversy on the IBS website.

As you can appreciate the recent passage of the Webcaster Settlement Act of 2008 has resulted in another update of the relevant postings on the IBS website.

I hope that the most-recent revision will have obviated your objections.

IBS' earlier offer to post any relevant views by SoundExchange remains outstanding.

Sincerely yours,

William Malone

Attorney for
Intercollegiate Broadcasting System, Inc.

cc:  Mr. Frederick J. Kass

4122\03\00143077.DOC

JA132

Before the
## COPYRIGHT ROYALTY BOARD
## LIBRARY OF CONGRESS
Washington, DC

|  |  |
|---|---|
| In the Matter of | ) |
|  | ) |
| Digital Performance Right in Sound | ) Docket No. 2009–1 |
| Recordings and Ephemeral Recordings | ) CRB Webcasting III |
|  | ) |

### College Broadcasters, Inc.'s Supplemental
### Response to Intercollegiate Broadcasting Systems, Inc.'s Interrogatory

College Broadcasters, Inc. ("CBI"), by and through its attorneys, hereby

supplements its response, in accordance with 37 C.F.R. § 351.5 and the Judges' Order of

April 1, 2010, to the interrogatory by Intercollegiate Broadcasting Systems, Inc. ("IBS")

as follows:

### GENERAL OBJECTIONS

CBI incorporates the General Objections raised in its response of December 21,

2009 into its response set forth below.  CBI does not waive any of these General

Objections in its response to the specific interrogatory propounded.

### RESPONSE TO INTERROGATORY

### INTERROGATORY NO. 1.

At various points [under the heading "Proposed Settlement" within Mr. Robedee's
prepared testimony filed September 29, 2009] he refers to negotiations between
SoundExchange and CBI leading up to the agreement between CBI and SoundExchange
filed with the Office at the end of July, 2009, published in the Federal Register on or
about August 12, 2009, and filed under your joint petition to the CRJs on August 13,
2009.  On behalf of which non-commercial educational and commercial webcasters did
CBI (a) seek to negotiate and (b) sign on behalf of, indicating in your answer as to each
such entity named whether (a) or (b), or both, tabulating entries in categories (a) and (b)
by their annual budgets or estimates thereof and indicating as to each entry the numbers

140054.1

of, or estimates of, paid, non-teaching-faculty staff? For the purpose of this interrogatory, non-teaching-faculty staff excludes faculty appointees and employees of the parent institutions currently teaching regular in-classroom courses for which academic credit is awarded.

## RESPONSE TO INTERROGATORY NO. 1.

Subject to and without waving the previously raised objections, CBI responds as follows:

CBI negotiated and signed the agreement on behalf of its recent, current and potential future members; however, eligibility under the negotiated agreement is not predicated on a station's membership in CBI and any Noncommercial Educational Webcaster can elect whether to be covered under its rates and terms or other available rates and terms. Attached to this statement as Attachment A is a list of all currently eligible potential member stations CBI has identified.

CBI does not collect or possess information on the annual budgets or staffing levels of its recent, current, or potential members, nor does CBI possess sufficient information to estimate the annual budgets or staffing levels of these entities.

By: _____

Mitchell L. Stoltz (DC 978149)
CONSTANTINE | CANNON LLP
1301 K Street N.W., Ste. 1050 East
Washington, D.C. 20005
Phone: (202) 204-4523
Fax: (202) 204-3501
mstoltz@constantinecannon.com

*Counsel for College Broadcasters, Inc.*

Dated: April 14, 2010

140054.1

JA134

AFFIRMATION

Will Robedee, under penalty of perjury under the laws of the United States of

America, says he is Executive Director of College Broadcasters, Inc., that he has read the

foregoing response to Intercollegiate Broadcasting Systems, Inc.'s Interrogatory, and that

based on information presently available to him, he believes it to be true and correct.

COLLEGE BROADCASTERS, INC.

By:_____
        Will Robedee
        Executive Director

Date:_____

Certificate of Service

I hereby certify that I have caused to be e-mailed and by Overnight Mail this day copies of the foregoing Rebuttal Testimony of Frederick J. Kass to the following persons.

David D. Oxenford
Adam S. Caldwelll
Ronald G. London
Davis Wright Tremaine
1919 Pennsylvania Avenue N.W., Suite 200
Washington, DC 20006
davidoxenford@dwt.com
adamcaldwell@dwt.com
ronnielondon@dwt.com

David A. Handzo
Steven R. Englund
Michael B. DeSanctis
Jared O. Freedman
Jenner & Block LLP
1099 New York Avenue, N.W.
Washington, DC 20001
dhandzo@jenner.com
senglund@jenner.com
mdesanctis@jenner.com
jfreedman@jenner.com

Christopher J. Wright
Wiltshire & Grannis
1200 18th Street N.W., 12th Floor
Washington, DC 20036
cwright@wiltshiregrannis.com

Michael J. Huppe
C. Colin Rushing
SoundExchange
1121 14th Street, N.W., Suite 700
Washington, DC 20005
mhuppe@soundexchange.com
crushing@soundexchange.com

Kenneth D. Freundlich
Freundlich Law
9100 Wilshire Blvd., Suite 615
East Beverly Hills, CA 90212
ken@freundlichlaw.com

Angus M. MacDonald
Ara Hovanesian
Abraham J. Yacobian
Hovanesian & Hovanesian
301 E. Colorado Blvd., Suite 514
Pasadena, CA 91101
angusm@hovlaw.com
hovanesian@earthlink.net
abrahamy@hovlaw.com

Mitchell L. Stoltz
Constantine Cannon
1627 I Street, N.W., 10th Floor
Washington, DC 20006
mstoltz@constantinecannon.com

William Malone

Washington, DC

June 7, 2010

"simulcasts" (i.e., duplicates) a primary stream or another multicast stream of the same station that the cable system is carrying. However, simulcast streams must be reported on the Statement of Accounts.

(4) Multicast streams of digital broadcast programming shall not be subject to the 3.75% fee or the syndicated exclusivity surcharge.

\*     \*     \*     \*     \*

Dated: August 10,2010

**Marybeth Peters,**

*Register of Copyrights.*

Dated: August 10, 2010

**James H. Billington,**

*The Librarian of Congress.*

[FR Doc. 2010–22814 Filed 9–16–10; 8:45 am]

**BILLING CODE 1410–30–S**

## LIBRARY OF CONGRESS

## Copyright Royalty Board

## 37 CFR Part 380

**[Docket No. 2005–1 CRB DTRA]**

## Digital Performance Right in Sound Recordings and Ephemeral Recordings

**AGENCY:** Copyright Royalty Board, Library of Congress.

**ACTION:** Remand order.

**SUMMARY:** The Copyright Royalty Judges are announcing their determination regarding the minimum fee to be paid by Noncommercial Webcasters under two statutory licenses, permitting certain digital performances of sound recordings and the making of ephemeral recordings, in response to an order of remand by the United States Court of Appeals for the District of Columbia Circuit.

**DATES:** Effective September 17, 2010.

**ADDRESSES:** The remand order also is published on the Copyright Royalty Board Web site at *http://www.loc.gov/ crb/orders/2010/amendment-remand-order-6–30–10.pdf.*

**FOR FURTHER INFORMATION CONTACT:** Richard Strasser, Senior Attorney, or Gina Giuffreda, Attorney Advisor, by telephone at (202) 707–7658 or by e-mail at *crb@loc.gov.*

**SUPPLEMENTARY INFORMATION:** On May 1, 2007, the Copyright Royalty Judges ("Judges") published in the **Federal Register** their determination of royalty rates and terms under the statutory licenses under Sections 112(e) and 114 of the Copyright Act, title 17 of the United States Code, for the period 2006 through 2010 for the digital public

performance of sound recordings by means of eligible nonsubscription transmission or a transmission by a new subscription service. 72 FR 24084. In *Intercollegiate Broadcast System, Inc.* v. *Copyright Royalty Board,* 574 F.3d 748 (DC Cir. 2009), the United States Court of Appeals for the District of Columbia Circuit ("DC Circuit") affirmed the Judges' determination in the main but remanded to the Judges the matter of setting the minimum fee to be paid by both Commercial Webcasters and Noncommercial Webcasters under Sections 112(e) and 114 of the Copyright Act. *Id.* at 762, 767. No rules or procedures applied to a proceeding that is remanded, and the Judges adopted an Interim Final Rule to govern. 37 CFR 351.15. Pursuant to this Rule, Intercollegiate Broadcasting System, Inc. ("IBS") and SoundExchange, Inc. ("SoundExchange") presented proposals for the conduct and schedule of the remand proceeding, including settlement negotiations, written direct statements with proposed rates, discovery and an evidentiary hearing. By order dated October 23, 2009, the Judges established a period commencing November 2, 2009, and concluding on December 2, 2009, for the parties to negotiate and submit a settlement of the minimum fee issue that is the subject of the remand. Absent settlement, the parties were directed to file written direct statements by January 11, 2010.

On December 2, 2009, SoundExchange, Inc. and the Digital Media Association ("DiMA") submitted a settlement regarding the statutory minimum fee to be paid by Commercial Webcasters. Subsequently, the Judges published for comment the proposed change in the rule necessary to implement that settlement pursuant to the order of remand from the DC Circuit. 74 FR 68214 (December 23, 2009). The Judges received one comment from IBS. The Final Rule for the minimum fee to be paid by Commercial Webcasters was published. 75 FR 6097 (February 8, 2010).

Following the filing of Written Direct Statements by IBS and SoundExchange, on January 20, 2010, the Judges established the discovery schedule on the remaining issue of the minimum fee for Noncommercial Webcasters. Following discovery, the hearing was held May 18, 2010. SoundExchange presented the testimony of W. Tucker McCrady, associate counsel, digital legal affairs, Warner Music Group ("WMG"), and Barrie Kessler, chief operating officer, SoundExchange. It also offered Webcaster Settlement Acts of 2008 and 2009 agreements between SoundExchange and College

Broadcasters, Inc. ("CBI") for noncommercial educational webcasters, National Association of Broadcasters ("NAB") for broadcasters, Sirius XM Radio, Inc. ("Sirius XM") for satellite services and DiMA for commercial webcasters. 5/18/10 Tr. at 13 (McCrady). IBS presented the testimony of Frederick J. Kass, Jr., John E. Murphy and Benjamin Shaiken. 5/18/10 Tr. at 62 and 67 (Kass). The testimony of Mr. Kass was that IBS supported a different rate proposal than the one filed. When this different rate proposal was not timely filed, the Judges ordered that it be filed by June 1, 2010. 5/18/10 Tr. at 98 (Kass). The IBS' Restated Rate Proposal was filed June 1, 2010.

Mr. McCrady testified that WMG enters voluntary licenses for commercial webcasters. A negotiated license for the full catalogue must generate at least payments of $25,000. 5/18/10 Tr. at 25 (McCrady). The lowest commercial minimum fee is 20% of revenue. A smaller revenue stream would not justify the time and resources WMG would need to devote to evaluating, negotiating, implementing and monitoring an agreement. 5/18/10 Tr. at 20 (McCrady). Noncommercial Webcasters use the statutory license, because they do not generate enough revenue to WMG to support negotiating a license. SX Remand Trial Ex. 1 at 6 (McCrady).

The CBI agreement has the rates and terms for noncommercial educational webcasters, the same group that IBS represents in this proceeding. 5/18/10 Tr. at 71 (Kass). It has a minimum fee of $500 per year per station or channel and a usage rate of $500 per channel for streaming a noncommercial educational service up to 159,400 aggregate tuning hours ("ATH"). 5/18/10 Tr. at 14 (McCrady). The SoundExchange proposed minimum fee is $500 per station or channel. 5/18/10 Tr. at 14 (McCrady). The proposed minimum fee is fully recoupable against royalty fees owed and this feature reduces transaction costs for both parties. 5/18/10 Tr. at 21, 22 (McCrady). IBS says the average annual revenue of its member stations is $9,000. 5/18/10 Tr. at 20 (McCrady) and 5/18/10 Tr. at 71 (Kass). So, the proposed fee is 6% of revenue, a large discount for Noncommercial Webcasters off the negotiated license agreements for commercial webcasters. 5/18/10 Tr. at 20 (McCrady). All users of sound recordings should be licensed and pay something. It is an important educational message for students to learn the value of recorded music and to pay for it. 5/18/10 Tr. at 23 (McCrady). From the first webcasting proceeding, the standard minimum fee

for statutory licenses has been $500, on the theory that the minimum fee should be sufficient to cover at least the costs of administering the license. SX Remand Trial Ex. 1 at 7 (McCrady).

Ms. Kessler testified about administering the royalties paid under the statutory license. Of the approximately 730 webcasting services paying royalties in 2009, 363 are noncommercial. The noncommercial royalties are less than 1% of the total webcasting royalties paid for 2009. 5/18/10 Tr. at 34 (Kessler). Of the noncommercial services, 305 paid only the minimum fee of $500, and the remaining 58 paid more for exceeding the ATH cap or streaming multiple channels or stations. These payments are pursuant to the royalty minimum fee that is the subject of this remand proceeding, 5/18/10 Tr. at 42 (Kessler), and they demonstrate that noncommercial services are able and willing to pay the minimum fee. 5/18/10 Tr. at 33 (Kessler). SoundExchange does not regularly track the administrative costs on a licensee, station or channel basis. Such costs vary widely based on the quality of the data provided by the service. For this proceeding, SoundExchange estimated its administrative costs. The average per channel or station cost for webcasters for 2008 is $803. 5/18/10 Tr. at 36 (Kessler). The cost of administering the statutory license is greater than the revenue from noncommercial webcasters. 5/18/10 Tr. at 34 (Kessler). The CBI agreement for noncommercial educational webcasters, together with the NAB agreement, the Sirius XM agreement and the DiMA agreement all provide a similar minimum fee of $500, as SoundExchange proposes in this proceeding. All of these agreements were filed under the Webcaster Settlement Acts of 2008 and 2009, which permit agreements on the royalty rates under the statutory licenses. 5/18/10 Tr. at 13 (McCrady).

On June 1, 2010, IBS filed the restated rate proposal that Mr. Kass had supported in his testimony. The general principle of the proposal is that small noncommercial webcasters should pay only for the performances of music subject to the statutory license that they actually webcast. This principle is the same as the Judges used in the Final Determination to support the per performance metric for royalty rates, being more directly tied to the nature of the right being licensed. *See Intercollegiate Broadcast System, Inc.* v. *Copyright Royalty Board,* 574 F.3d 748, 760–61 (DC Cir. 2009). But contrary to this principle, the proposal then provides for a flat royalty rate and an exemption from recordkeeping and reporting requirements. Both the flat rate and the exemptions are inconsistent with a per performance royalty, which is based on the number of performances times the rate for each performance. The proposal was for the royalty rates to be paid by Noncommercial Webcasters (set by 37 CFR 380.3(a)(2)(i)) and not for the minimum fee, which is the subject of this remand proceeding. The proposed rate is $20 to $50 per annum, based on the number of aggregate tuning hours. The proposal did not include a minimum fee. 5/18/10 Tr. at 76, 83–85 (Kass). Mr. Kass said no minimum fee should be paid. He said this discount is justified, because the small noncommercial educational webcasters are teaching students. IBS Remand Trial Ex. 1 at 2. The CBI agreement is available for use by IBS members and some of those members have joined the CBI agreement. 5/18/10 Tr. at 104, 105 (Kass). It proposes the $500 minimum fee per channel or station. 5/18/10 Tr. at 14 (McCrady).

**Noncommercial Minimum Fee**

The Final Determination discussed in Section IV.C.2 that most Noncommercial Webcasters qualified for a distinct segment of the marketplace that justified royalties lower than those paid by Commercial Webcasters. However, the Judges found that:

the bare minimum that such services should have to pay is the administrative cost of administering the license. There is no evidence in the record to suggest that the submarket in which a Noncommercial Webcaster may reside would yield a different administrative cost for SoundExchange as compared to the administrative costs associated with Commercial Webcasters and SoundExchange, notably, makes no distinction between webcasters with respect to the $500 minimum fee. *Webcaster I* affirmed the notion that all webcasters–all Noncommercial Webcasters as well as all Commercial Webcasters–should pay the same minimum fee for the same license. 67 FR 45259 (July 8, 2002). We also find no basis in the record for distinguishing between Commercial Webcasters and Noncommercial Webcasters with respect to the administrative cost of administering the license. Therefore, we determine that a minimum fee of an annual non-refundable, but recoupable $500 minimum per channel or station payable in advance is reasonable over the term of this license.

72 FR 24084, 24099 (May 1, 2007) (footnotes omitted).

Ms. Kessler testified that the rough estimate of the average administrative cost for 2008 to SoundExchange per station or channel for webcasters is $803. All of the agreements filed pursuant to the Webcaster Settlement Acts of 2008 and 2009 have similar minimum fees as the proposed rate of $500 per station or channel. One includes the agreement for noncommercial educational webcasters (the CBI agreement), the same type of services as IBS, which seeks to pay no minimum fee. As found in the above quote from the Final Determination, a zero minimum fee is not supported by the evidence. IBS also asserts that administrative costs should be proportionately tied to the number of performances on a channel in a given year, but fails to establish any credible nexus. On the contrary, there are certain basic processes that must be utilized in administering the use of sound recordings by any Commercial or Noncommercial Webcaster of any size. Not surprisingly, at lesser levels of sound recording usage, the establishment and conduct of such administrative processes cannot simply be dispensed with. Indeed, smaller users may even result in larger proportionate administrative processing time than larger users. SoundExchange Remand Trial Ex. 1 at 3–4 (Kessler). See also *Order,* 72 FR 24084, 24096 n.37 (May 1, 2007).

The evidence presented in the remand proceeding supports a minimum fee of at least the same fee as adopted in the Final Determination. SoundExchange has now presented evidence on administrative costs that exceed this minimum. The agreements entered pursuant to the Webcaster Settlement Acts of 2008 and 2009 support that the industry accepts this minimum fee, which has substantially been in place since the first webcasting proceeding. IBS' position seeks to pay no minimum fee and indeed seeks to pay no or an extremely small royalty for use of copyrighted content. The Judges adopt the same minimum fee for Noncommercial Webcasters as stated in the Final Determination of an annual non-refundable, but recoupable $500 minimum per annum per channel or station payable in advance. 37 CFR 380.3(b)(2).

June 30, 2010.

So ordered.

James Scott Sledge,

*Chief United States Copyright Royalty Judge.*

William J. Roberts, Jr.,

*United States Copyright Royalty Judge.*

Stanley C. Wisniewski,

*United States Copyright Royalty Judge.*

Dated: July 21, 2010.

**James Scott Sledge,**

*Chief, U.S. Copyright Royalty Judge.*

**James H. Billington,**

*Librarian of Congress.*

[FR Doc. 2010–23264 Filed 9–16–10; 8:45 am]

**BILLING CODE 1410–72–P**

## DEPARTMENT OF VETERANS AFFAIRS

**38 CFR part 36**

**RIN 2900–AM87**

**Loan Guaranty: Assistance to Eligible Individuals in Acquiring Specially Adapted Housing**

**AGENCY:** Department of Veterans Affairs.

**ACTION:** Final rule.

**SUMMARY:** This document amends the Department of Veterans Affairs' (VA's) Loan Guaranty regulations concerning assistance to eligible individuals in acquiring specially adapted housing. These changes improve the readability of the regulations; provide further detail about longstanding program policies; and address legislation, policy changes, and a VA Office of the General Counsel legal opinion.

**DATES:** *Effective Date:* October 18, 2010.

**FOR FURTHER INFORMATION CONTACT:** William White, Acting Assistant Director for Loan Policy and Valuation, Loan Guaranty Service (262), Veterans Benefits Administration, Department of Veterans Affairs, 810 Vermont Avenue, NW., Washington, DC 20420, (202) 461–9543. (This is not a toll-free telephone number.)

**SUPPLEMENTARY INFORMATION:** Veterans and servicemembers with severe disabilities may be eligible under 38 U.S.C. chapter 21 for specially adapted housing (SAH) grants. In administering the SAH program, VA helps these eligible individuals to purchase, construct, or adapt a home that suits the individual's living needs. In a document published in the **Federal Register** on October 5, 2009 (74 FR 51103), VA proposed to amend regulations in 38 CFR part 36, subpart C, regarding assistance to certain disabled veterans in acquiring SAH, specifically §§ 36.4400 through 36.4410, which implement the SAH grant program.

As explained in the proposed rule, VA is amending these regulations for three reasons. First, VA believes the regulations should be written in a reader-focused style. Second, detailed guidance about program policies and a regulation written with an easy-to-follow organizational structure will help applicants and eligible individuals (and those acting on their behalf) understand program requirements. Third, substantive changes are necessary to implement recent legislation, policy decisions, and a VA General Counsel legal opinion. Pursuant to 38 U.S.C. 2101(d), the Secretary may prescribe regulations applicable to the SAH program. In revising these regulations, VA intends that applicants, eligible individuals, program participants, and other interested parties will be better informed about the legal requirements and Department policies that guide the administration of SAH grants.

The comment period for the proposed rule ended on December 4, 2009, and VA received two comments. The commenters expressed concern regarding VA's proposed use of the terminology "paraplegic housing grant or PH grant" for the grant authorized under 38 U.S.C. 2101(a). The commenters pointed out that the term is reflective of only one of the types of disabilities that make an individual eligible for this grant. Additionally, the commenters suggested that the use of the term "paraplegic" might result in an improper restriction on eligibility for SAH grants. The concern was that the term "paraplegia" or "paraplegic" might not be interpreted to include the functional loss of use of the lower limbs due to psychological disorders or other non-organic impairments. One commenter, citing General Counsel Precedent Opinion 60–90, asserted that such a restriction on eligibility for SAH grants is improper, and both commenters wanted to ensure that the definition for "paraplegic grant" would not exclude individuals who otherwise would have been eligible for assistance under 38 U.S.C. 2101(a).

The General Counsel opinion held that the determination of "loss of use" is made "irrespective of whether such loss is functional or organic in origin." VA did not propose to diverge from this holding. VA agrees with the commenters' concerns and, therefore, has decided to use the applicable statutory citations when referring to the grants authorized under 38 U.S.C. 2101(a) as well as 2101(b), rather than the terms "paraplegic housing grant" or "adaptive housing grant" as proposed.

No other substantive changes are made to the proposed rule. However, VA has made a few technical revisions. First, VA has revised the heading of subpart C to refer to "Eligible Individuals" rather than "Certain Disabled Veterans." Second, VA is amending the language in § 36.4404(a)(1), (2), and (3) to clarify that assistance is based on an individual's rating for entitlement to compensation under 38 U.S.C. chapter 11. These changes are intended to clarify that assistance under 38 U.S.C. chapter 21 is available to veterans and active duty servicemembers. Third, on September 24, 2009, VA published a final rule establishing 38 CFR 36.4412, which implemented provisions of the Housing and Economic Recovery Act of 2008, Public Law 110–289. Those provisions authorize VA to provide automatic annual increases to certain SAH grant recipients. VA sought comments on proposed § 36.4412 in a document published in the **Federal Register** on May 12, 2009 (74 FR 22145). VA inadvertently omitted § 36.4412 in the proposed rule that preceded this final rule. *See* 74 FR 51103. VA is re-inserting this provision, without further change, as § 36.4411. No substantive changes were made to the regulation. Finally, VA has revised §§ 36.4405(a)(iii), 36.4405(b), and 36.4406(b) for grammatical reasons.

### Unfunded Mandates

The Unfunded Mandates Reform Act of 1995 requires, at 2 U.S.C. 1532, that agencies prepare an assessment of anticipated costs and benefits before issuing any rule that may result in expenditure by State, local, and tribal governments, in the aggregate, or by the private sector, of $100 million or more (adjusted annually for inflation) in any given year. This final rule will have no such effect on State, local, and tribal governments, or on the private sector.

### Paperwork Reduction Act of 1995

Although this document contains provisions constituting collections of information, under the provisions of the Paperwork Reduction Act of 1995 (44 U.S.C. 3501–3521), no new or proposed revised collections of information are associated with this final rule. The information collection provisions for subpart C of 38 CFR part 36 are currently approved by the Office of Management and Budget (OMB) and have been assigned OMB control numbers 2900–0031, 2900–0047, 2900–0132, and 2900–0300.

### Executive Order 12866

Executive Order 12866 directs agencies to assess all costs and benefits of available regulatory alternatives and, when regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety, and other advantages; distributive impacts; and equity). The Executive Order classifies a regulatory action as a "significant regulatory

## LIBRARY OF CONGRESS

## Copyright Royalty Board

## 37 CFR Part 380

**[Docket No. 2009–1 CRB Webcasting III]**

## Digital Performance Right in Sound Recordings and Ephemeral Recordings

**AGENCY:** Copyright Royalty Board, Library of Congress.

**ACTION:** Final rule and order.

**SUMMARY:** The Copyright Royalty Judges are announcing their final determination of the rates and terms for two statutory licenses, permitting certain digital performances of sound recordings and the making of ephemeral recordings, for the period beginning January 1, 2011, and ending on December 31, 2015.

**DATES:** *Effective Date:* March 9, 2011.

*Applicability Dates:* These rates and terms are applicable to the period January 1, 2011, through December 31, 2015.

**FOR FURTHER INFORMATION CONTACT:** Richard Strasser, Senior Attorney, or Gina Giuffreda, Attorney Advisor. Telephone: (202) 707–7658. E-mail: *crb@loc.gov.*

**SUPPLEMENTARY INFORMATION:**

### I. Introduction

#### A. Subject of the Proceeding

This is a rate determination proceeding convened under 17 U.S.C. 803(b) *et seq.* and 37 CFR part 351 *et seq.,* in accord with the Copyright Royalty Judges' Notice announcing commencement of proceeding, with a request for Petitions to Participate in a proceeding to determine the rates and terms for the digital public performance of sound recordings by means of an eligible nonsubscription transmission or a transmission made by a new subscription service under section 114 of the Copyright Act, as amended by the Digital Millennium Copyright Act ("DMCA"), and for the making of ephemeral copies in furtherance of these digital public performances under section 112, as created by the DMCA, published at 74 FR 318 (January 5, 2009). The rates and terms set in this proceeding apply to the period of January 1, 2011 through December 31, 2015. 17 U.S.C. 804(b)(3)(A).

#### B. Statutory Background

A lengthy review of the history of the sound recordings compulsory license is contained in the Final Determination for Rates and Terms in Docket No. 2005–1

CRB DTRA, 72 FR 24084 (May 1, 2007) ("*Webcaster II*").[1] This history was summarized by the United States Court of Appeals for the District of Columbia Circuit in *Intercollegiate Broadcast System, Inc.* v. *Copyright Royalty Board,* 574 F.3d 748, 753–54 (DC Cir. 2009), as follows:

[Since the nineteenth century, the Copyright Act protected the performance right of "musical works" (the notes and lyrics of a song), but not the "sound recording." Writers were protected but not performers.]

In 1995, Congress passed the Digital Performance Right in Sound Recordings Act. Pub. L. No. 104–39, granting the owners of sound recordings an exclusive right in performance "by means of a digital transmission." 17 U.S.C. § 106(6); *see Beethoven.com LLC* v. *Librarian of Cong.,* 394 F.3d 939, 942 (D.C. Cir. 2005). The Digital Millennium Copyright Act of 1998, Pub. L. No. 105–304, "created a statutory license in performances by webcast," to serve Internet broadcasters and to provide a means of paying copyright owners. *Beethoven.com,* 394 F.3d at 942; *see* 17 U.S.C. § 114(d)(2), (f)(2). To govern the statutory license of sound recordings, Congress also created a licensing scheme for so-called "ephemeral" recordings, "the temporary copies necessary to facilitate the transmission of sound recordings during internet broadcasting." *Beethoven.com,* 394 F.3d at 942–43; *see* 17 U.S.C. § 112(e)(4).

Congress has delegated authority to set rates for these rights and licenses under several statutory schemes. The most recent, passed in 2005 [sic], directed the Librarian of Congress to appoint three Copyright Royalty Judges who serve staggered, six-year terms. *See* 17 U.S.C. § 801, *et seq.* These Judges conduct complex, adversarial proceedings, described in 17 U.S.C. § 803 and 37 CFR § 351, *et seq.,* and ultimately set "reasonable rates and terms" for royalty payments from digital performances. 17 U.S.C. § 114(f). * * * Rates should "most clearly represent the rates and terms that would have been negotiated in the marketplace between a willing buyer and a willing seller." *Id.* [17 U.S.C. § 114(f)(2)(B)] "In determining such rates and terms," the Judges must "base [their] decision on economic, competitive and programming information presented by the parties." *Id.* Specifically, they must consider whether "the service may substitute for or may promote the sales of phonorecords" or otherwise affect the "copyright owner's other streams of revenue." *Id.* § 114(f)(2)(B)(i). The Judges must also consider "the relative roles of the copyright owner and the transmitting entity" with respect to "relative creative contribution, technological contribution, capital investment, cost, and risk." *Id.* § 114 (f)(2)(B)(ii). Finally, "[i]n establishing such

rates and terms," the Judges "may consider the rates and terms for comparable types of digital audio transmission services and comparable circumstances under voluntary license agreements described in subparagraph (A)." *Id.* § 114(f)(2)(B).

*Intercollegiate Broadcast System, Inc.* v. *Copyright Royalty Board,* 574 F.3d 748, 753–54 (DC Cir. 2009).

Forty petitions to participate were filed in response to the January 5, 2009, notice of commencement of the proceeding. The great majority of the petitioners were webcasters. During the subsequent period of voluntary negotiations, settlements were reached among many of the parties. In addition to the negotiation phase required in this proceeding, 17 U.S.C. 803(b)(3), Congress enacted the Webcaster Settlement Acts of 2008 and 2009, which expanded the opportunities to resolve the issues in this proceeding, as well as the issues in *Webcaster II.* This legislation further impacted *Webcasting III* by permitting the settling parties to determine if the settlements could be considered as evidence before the Copyright Royalty Judges ("Judges").[2] Eight settlements were resolved under the Webcaster Settlement Acts. 74 FR 9293 (March 3, 2009) (three agreements); 74 FR 34796 (July 17, 2009) (one agreement); 74 FR 40614 (August 12, 2009) (four agreements). The rates and terms under these settlements were the basis of approximately 95 percent of webcasting royalties paid to SoundExchange in 2008 and 2009. SX PFF at ¶¶ 50, 51.[3] Evidence was presented in this proceeding by SoundExchange, Inc. ("SX"), representing the owners, and three webcasters, College Broadcasters, Inc. ("CBI"), Live365, Inc. ("Live365"), and Intercollegiate Broadcasting System,

---

[1] The two prior webcasting proceedings often have been referred to informally as "Webcaster I" and "Webcaster II," respectively, as opposed to the formal caption "DTRA" (which stands for "Digital Transmissions Rate Adjustment"). In the current proceeding, we use the caption "Webcasting III" and intend to caption future webcasting proceedings using the term "Webcasting" followed by the appropriate Roman numeral.

[2] In the pleadings filed and during the testimony, Live365 attempted to introduce evidence about agreements that contained provisions that were not to be considered as precedential under the Webcaster Settlement Acts. Following the clear language of the statute that these agreements were not "admissible as evidence or otherwise taken into account," 17 U.S.C. 114(f)(5)(C), these attempts were rejected. *See, e.g.,* 4/19/10 Tr. at 210:9–10 (sustaining objection to Live365's motion to enter into evidence the "Pure Play Agreement").

[3] References to the proposed findings of fact and conclusions of law shall be cited as "PFF" or "PCL," respectively, and reply findings and conclusions of law shall be cited as "RFF" or "RCL," respectively, preceded by the name of the party that submitted same and followed by the paragraph number. Similarly, references to the written direct testimony shall be cited as "WDT" preceded by the last name of the witness and followed by the page number. Likewise, references to the written rebuttal testimony shall be cited as "WRT" preceded by the last name of the witness followed by the page number. References to the transcript shall be cited as "Tr." preceded by the date and followed by the page number and the name of the witness.

Inc. ("IBS").[4] CBI only presented evidence to support adoption of its settlement with SoundExchange for noncommercial educational webcasters. SoundExchange and Live365 presented evidence related to commercial webcasters. The webcasting royalties paid by Live365 to SoundExchange for 2008 and 2009 were less than 3 percent of total webcasting royalties paid to SoundExchange. SX PFF at ¶ 53. SoundExchange presented evidence related to noncommercial webcasters, and IBS presented evidence for small noncommercial webcasters. Written statements, discovery and testimony for both direct case and rebuttal case were filed on these issues.

On December 14, 2010, the Judges issued their Initial Determination of Rates and Terms. Pursuant to 17 U.S.C. 803(c)(2)(B) and 37 CFR 353.4, motions for rehearing were due to be filed no later than December 29, 2010. No motions were received.

## II. Commercial Webcasters

*A. Commercial Webcasters Encompassed by the National Association of Broadcasters-SoundExchange Agreement*

On June 1, 2009, the National Association of Broadcasters ("NAB") and SoundExchange filed a settlement of all issues between them in the proceeding, including the proposed rates and terms. This was one of the Webcaster Settlement Act agreements, published by the Copyright Office in the **Federal Register**, and was filed in this proceeding, pursuant to 17 U.S.C. 801(b)(7)(A), to be adopted as rates and terms for some services of commercial broadcasters for the period 2011 through 2015. It applies to statutory webcasting activities of commercial terrestrial broadcasters, including digital simulcasts of analog broadcasts and separate digital programming. The settlement includes per performance royalty rates, a minimum fee and reporting requirements that are more comprehensive than those in the current regulations. Section 801(b)(7)(A) allows for the adoption of rates and terms negotiated by "some or all of the participants in a proceeding at any time during the proceeding" provided they are submitted to the Copyright Royalty Judges for approval. This section provides that in such event:

(i) The Copyright Royalty Judges shall provide to those that would be bound by the terms, rates, or other determination set by any agreement in a proceeding to determine royalty rates an opportunity to comment on the agreement and shall provide to participants in the proceeding under section 803(b)(2) that would be bound by the terms, rates, or other determination set by the agreement an opportunity to comment on the agreement and object to its adoption as a basis for statutory terms and rates; and

(ii) The Copyright Royalty Judges may decline to adopt the agreement as a basis for statutory terms and rates for participants that are not parties to the agreement, if any participant described in clause (i) objects to the agreement and the Copyright Royalty Judges conclude, based on the record before them if one exists, that the agreement does not provide a reasonable basis for setting statutory terms or rates.

17 U.S.C. 801(b)(7)(A).

The Judges published the settlement (with minor modifications) in the **Federal Register** on April 1, 2010, and provided an opportunity to comment and object by April 22, 2010. 75 FR 16377 (April 1, 2010). No comments or objections were submitted, so the provisions of 17 U.S.C. 801(b)(7)(A)(ii) do not apply. Absent objection from a party that would be bound by the proposed rates and terms and that would be willing to participate in further proceedings, the Copyright Royalty Judges adopt the rates and terms in the settlement for certain digital transmissions of commercial broadcasters for the period of 2011–2015. 17 U.S.C. 801(b)(7)(A). *Cf. Review of the Copyright Royalty Judges Determination, Docket No. 2009–1*, 74 FR 4537, 4540 (January 26, 2009) (review of settlement adoption).

*B. All Other Commercial Webcasters*

1. Stipulation Concerning the Section 112 Minimum Fee and Royalty Rate and Stipulation Concerning the Section 114 Minimum Fee

In between the direct and rebuttal phases, SoundExchange and Live365 presented two settlements of issues for all remaining commercial webcasters not encompassed by the NAB-SoundExchange agreement: (1) The minimum fee and royalty rates for the section 112 license and (2) the minimum fee for the section 114 license. These two settlements were included in one stipulation. The terms of the settlement are the same as the agreement reached and included as a final rule in *Webcaster II*, following remand. *See Digital Performance Right in Sound Recordings and Ephemeral Recordings (Final rule)*, 75 FR 6097 (February 8, 2010). The minimum fee for commercial webcasters is an annual, nonrefundable fee of $500 for each individual channel and each individual station (including any side channel), subject to an annual cap of $50,000. The royalty rate for the section 112 license is bundled with the fee for the section 114 license. There is one additional term in the stipulation that was not included in *Webcaster II*. The royalty rate for the section 112 license is attributed to be 5% of the bundled royalties. There was no objection to the stipulation. There was evidence presented to support the minimum fee for commercial webcasters and the bundled royalty rates. SX PFF at ¶¶ 459–468, 472. No evidence disputed it. These provisions are supported by the parties and the evidence. The Judges accept and adopt these two stipulations as settling these issues.

2. Rate Proposals for the Section 114 License for Commercial Webcasters

The contending parties propose vastly different rate amounts for the use of the section 114 license for commercial webcasters. In its second revised rate proposal, SoundExchange argues in favor of a performance rate beginning at $.0021 per performance in 2011 and increasing annually by .0002 to a level of $.0029 by 2015. SX PFF at ¶ 118.

Live365 also proposes a per performance fee structure. By contrast, under the Live365 proposal, commercial webcasters would pay $.0009 per performance throughout the period 2011–2015. Rate Proposal For Live365, Inc., Appendix A, Proposed Regulations at § 380.3(a)(1).[5]

Notwithstanding the gulf between the SoundExchange and Live365 proposed royalty amounts, there is no difference between the parties with respect to the basic *structure* of their proposed compensation schemes. Both SoundExchange and Live365 propose that per performance rates (typically stated as a fraction of a penny) be applicable in the case of the section 114 license. Furthermore, the per performance usage structure was adopted in *Webcaster II. Webcaster II*, 72 FR 24090 (May 1, 2007). It remains the best structure for the reasons stated therein. *Id.* at 24089–90. Therefore, the only issues we are left to decide are the applicable amount of the webcaster royalty rate and whether any discount to that rate should be made on those occasions when certain types of webcasters are aggregated.

The starting point for our determination is the applicable amount of the section 114 performance rate.

---

[4] After filing Written Direct Statements, RealNetworks, Inc. withdrew from the proceedings, and Royalty Logic, LLC, did not participate further.

[5] In addition, Live365 seeks a 20% discount applicable to this commercial webcasting per performance rate for certain "qualified webcast aggregation services." This proposal is discussed *infra* at Section II.B.5.

## 3. The Parties' Disparate Approaches To Rate Setting for the Section 114 License for Commercial Webcasters

Both Live365 and SoundExchange agree that the willing buyer/willing seller standard should be applied by the Copyright Royalty Judges in determining the rates for the section 114 license. Both recognize that those rates should reflect the rates that would prevail in a hypothetical marketplace that was not constrained by a compulsory license.

However, in contrast to the positions of the copyright owners and commercial services in *Webcaster II,* in the instant case SoundExchange and Live365 do not agree that the best approach to determining rates is to look to comparable marketplace agreements as "benchmarks" indicative of the prices to which willing buyers and willing sellers would agree in the hypothetical marketplace. On the one hand, Live365 primarily seeks to support its rate proposal by means of a modeling analysis that aims to determine the amount of any residue that may remain for compensating the sound recording input a commercial webcaster uses, after reducing webcaster revenues by an amount equal to the cost of all other inputs utilized by the webcaster in providing its service and also by an assumed amount of webcaster profits. By contrast, SoundExchange puts forward a benchmark approach in support of its rate proposal, similar to the primary argument it made in *Webcaster II* and an approach adopted by the Judges therein.

### a. The Live365 Approach

Live365 relies primarily on a modeling analysis provided by Dr. Mark Fratrik that seeks to identify the rate that commercial webcasters "would have been willing to pay in a negotiated settlement between a willing buyer and a willing seller." Fratrik Corrected and Amended WDT at 5. We find that Dr. Fratrik presumes behavioral constraints not found in the statutory standard and, that even if we were to ignore the distortions created by such added constraints, his analysis suffers from so many other unwarranted explicit assumptions and data defects as to make his analysis untenable.

#### i. Dr. Fratrik's Model and the Hypothetical Market

The terms "willing buyer" and "willing seller" in the statutory standard simply refer to buyers and sellers who are unconstrained in their marketplace dealings. In other words, the buyers and sellers operate in a free market unconstrained by government regulation or interference. (*See, for example, Noncommercial Educational Broadcasting Compulsory License (Final rule and order),* 63 FR 49823, 49834 (September 18, 1998). ("[I]t is difficult to understand how a license negotiated under the constraints of a compulsory license, where the licensor has no choice to license, could truly reflect 'fair market value.'"). Moreover, neither the buyers nor the sellers exercise such monopoly power as to establish them as price-makers and, thus, make negotiations between the parties superfluous. *Webcaster II,* 72 FR 24091 (May 1, 2007). ("In other words, neither sellers nor buyers can be said to be 'willing' partners to an agreement if they are coerced to agree to a price through the exercise of overwhelming market power.")

Dr. Fratrik and Live365 either misperceive the plain meaning of the terms of the statute or deliberately seek to expand the meaning of a "willing buyer" as articulated in the willing buyer-willing seller standard that governs this proceeding. For them, a "willing buyer" is viewed through the lens of an additional policy consideration nowhere articulated in the statute—i.e., that a buyer can only be considered "willing" if that buyer is able to obtain the sound recording input at a price that allows the buyer to earn at least a 20 percent operating profit margin from the use of that input. Thus, in Dr. Fratrik's analysis, a "representative" *single* buyer is deemed to be constrained in its behavior from participating in the input market for sound recordings unless its operating profit margin expectations in the output market for webcasting services are guaranteed at a level consistent with an *industry-wide* average profit margin for a purportedly comparable industry such as terrestrial radio. Fratrik Corrected and Amended WDT at 21–22.

Nothing in the statute supports reading such a behavioral constraint into the hypothetical marketplace to be derived by the Judges in this proceeding. Indeed, a similar argument that economic viability based on the sufficiency of revenue streams to cover costs determines any individual buyer's "willingness to pay for an input raised by Live365 in *Webcaster I,* was rejected in that proceeding. *Determination of Reasonable Rates and Terms for the Digital Performance of Sound Recordings and Ephemeral Recordings (Final rule and order)* ("*Webcaster I*"), 67 FR 45240, 45254 (July 8, 2002) ("Thus, the Panel had no obligation to consider the financial health of any particular service when it proposed the rates.").

Dr. Fratrik's notion of a representative entity adds an operating condition that distinguishes his conceptual formulation from that of a statistically average firm in an industry. His representative firm must reach one specified minimum profit margin and, therefore, can only be satisfied with a royalty rate sufficient to allow it to reach that profit margin. Any lower assumed profit margin would, ceterus paribus, necessarily result in a lower recommended royalty rate. Thus, Dr. Fratrik effectively assumes that his representative firm will never have a reason to operate at less than a particular operating profit margin (*i.e.,* 20%).

But there is no a priori reason to believe that a representative webcaster would not accept a lesser profit margin, so long as it earns a profit and/or finds no risk-adjusted rate of return that could be earned by an alternative investment. Indeed, basic microeconomic analysis recognizes that, in the short-run, it is in the interest of a firm to continue to produce *even at an operating loss,* so long as its variable costs are covered and some contribution can be made toward fixed costs—otherwise, the loss incurred by the firm will be even greater (*i.e.,* full fixed costs if no production takes place).[6] In short, Dr. Fratrik's assumption of a 20% profit margin totally ignores the possibility of webcasters with a whole range of potential acceptable operating profit margins—whether lesser or greater— that would be dependent on such things as varying capital investment costs among webcasters, changing market conditions in output markets, and the applicable time horizon.[7]

Still another difficulty with Dr. Fratrik's conceptual framework is that his single "representative" buyer is treated as tantamount to an industry. But no single firm is typically the equivalent of an industry on the demand side of the market, although there is the obvious exception where a single monopsonistic buyer constitutes the entire demand side of the market for a particular input. While Dr. Fratrik does not make the claim that his representative commercial webcaster is a monopsonist, his analysis effectively produces that result.

---

[6] See, for example, Varian, Hal, *Intermediate Microeconomics: A Modern Approach,* (W.W. Norton & Company, 2009) at 350, 401. Mansfield, Edwin and Yohe, Gary Wynn, *Microeconomics: Theory and Applications,* (W.W. Norton & Company, 2004) at 296, 407; see also 7/28/10 Tr. at 54:2–14 (Salinger).

[7] In the long-run, all short-run fixed costs become variable.

For example, Dr. Fratrik explains that he chose to wed a 20% operating profit margin assumption to his cost and revenue estimates to "derive a resulting value for the copyrighted work." Fratrik Corrected and Amended WDT at 15, 23. In other words, Dr. Fratrik and Live365 effectively claim that *no* buyer would ever be a "willing buyer" unless the price of only the one input here analyzed (i.e., the royalty rate for sound recordings) is low enough to provide *all* buyers with sufficient revenue after the royalty payment to cover all other input costs and yield an operating profit margin of 20%. It is a claim that, rather than resulting from any careful analysis of the market demand and supply schedules, blithely ignores such analysis in favor of a single price point wholly determined by a single actor on the demand side of the market without any reference to the supply side of the market.[8]

In other words, Dr. Fratrik's single "representative" buyer's business model is to be treated as if it is the *only* webcasting production model in the whole webcasting industry. Instead of a *market* demand curve, Dr. Fratrik puts forward the implicit assumption that the amount of sound recording performances demanded must be whatever his representative *firm* deems best for its particular technological and organizational structure. But no one *firm's* demand curve is equivalent to the *market's* demand curve, unless that firm is a monopsonist. Rather, as we have noted in *Webcaster II* and the CARP noted in *Webcaster I* before us, in the hypothetical marketplace we attempt to replicate, there would be significant variations, among *both* buyers and sellers, in terms of sophistication, economic resources, business exigencies, and myriad other factors. *Webcaster II,* 72 FR 24087 (May 1, 2007); *In the Matter of Rate Setting for the Digital Performance of Sound Recordings and Ephemeral Recordings, Report of the Copyright Arbitration Panel to the Librarian of Congress,* Docket No. 2000–9 CARP DTRA 1&2 ("*Webcaster I CARP Report*") at 24.

Finally, even assuming the absence of the additional errors catalogued below, Dr. Fratrik's analysis, which focuses on *past* operating income statements to determine a royalty rate for all

commercial webcasters in the future, fails to establish any behavioral information that would help to delineate the hypothetical marketplace we must replicate. Instead, Dr. Fratrik's analysis is largely mechanical and leads to an unsupported conclusion that *past* revenues and non-royalty costs, coupled with a webcaster operating profit margin not demonstrated to be related to past operating revenue and cost considerations (*see infra* at Section II.B.3.a.ii.), will repeatedly recur at the same levels in each year over the five-year period of the license going forward. Having tightly constrained the possibilities of market behavior in this manner, Dr. Fratrik's model then automatically produces an unchanging residue and, hence, an unchanging royalty rate for the whole period.[9] This is a dubious result that flows from the unwarranted assumption of what amounts to a behavioral straitjacket.

Moreover, even if Dr. Fratrik's problematic behavioral constraints and implicit assumptions somehow could be ignored, his analysis suffers from so many other unwarranted explicit assumptions and data defects as to make it untenable.

ii. The Specific Elements of Dr. Fratrik's Model

Dr. Fratrik's assumptions regarding webcasting industry costs, revenues and profit margins are seriously flawed when viewed individually. Moreover, these flaws are compounded by merging revenue, costs and profit margin information gathered from disparate data sources into a single "economic model."[10]

Dr. Fratrik begins by assuming that "Live365's cost structure will serve as a good conservative proxy for the *industry* as it is a mature operator." Fratrik Corrected and Amended WDT at 16 (emphasis added). This assumption is not supported by the record of evidence in this proceeding which points to a wide variety of existing webcasting services and business models. SX PFF at ¶ 323. It defies credulity to claim, as does Live365, that all these disparate business models may be experiencing

essentially the same unit costs. Indeed, Dr. Fratrik makes this assertion while recognizing that, unlike for many other participants in the market, at least two separate lines of business can be distinguished for Live365 (broadcasting services and webcasting) and, further, that Live365 acts as an aggregator with respect to webcasting. Dr. Fratrik offers no example of a comparable analogous participant in the industry who is structured in this manner. Furthermore, when he attempts to adjust Live365's costs to reflect only webcasting operations, he fails to adequately do so and he ignores the synergistic nature of Live365's various lines of business. SX PFF at ¶¶ 355, 357, 358. Finally, even though he argues for an additional aggregator discount to be applied to Live365's webcasting royalty rates based on monitoring and reporting savings purportedly provided to the collective (i.e., SoundExchange), he nowhere appears to adjust Live365's webcasting cost estimates to account for any resulting differences in costs that Live365 may incur as compared to other webcasters who are not aggregators. He makes no such adjustment despite the fact that it is the typical webcaster's unit costs he is seeking to model rather than the typical aggregator's unit costs. While any additional reporting and monitoring costs incurred by aggregators [11] may be offset by fees charged to the aggregated webcasters or by the reduced costs of programming that Live365 would otherwise have to undertake in order to make comparable channel offerings as a multi-channel broadcaster, such salient differences between the typical webcaster's unit costs and the typical aggregator's unit costs are not addressed by Dr. Fratrik's analysis. For all these reasons, the unit cost estimation for webcasting which Dr. Fratrik offers is seriously flawed.

On the revenue side of his analysis, Dr. Fratrik assumes that: (1) Webcaster revenue comes from advertising revenue and subscription revenue; (2) "publicly available industry reports from AccuStream and ZenithOptimedia serve as the lower and upper bounds, respectively, on advertising revenue measurements for the past period;" and (3) Live365's subscription revenue per listening hour can be utilized as a proxy for gauging subscription revenues in the webcasting industry. Fratrik Corrected and Amended WDT at 16–17, 24–25.

---

[8] Dr. Fratrik implies that because the record companies supplying the sound recordings will incur something near zero incremental costs, the supply side of the market may be largely ignored. 4/27/10 Tr. at 1131:12–1133:19 (Fratrik). But Dr. Fratrik offers no empirical support for his assertion as to actual incremental costs. We have clearly rejected a similar contention put forward in *Webcaster II* on both empirical and theoretical grounds. *Webcaster II,* 72 FR 24094 (May 1, 2007).

[9] In addition to the flat royalty rate growth recommended by Dr. Fratrik over the 2011–2015 term, his recommended royalty rate of $0.0009 per performance would return the statutory rate to near its 2006 statutory level.

[10] Dr. Fratrik uses the term "economic model" to broadly describe his analysis. It is more closely akin to a type of *pro forma* income statement that attempts to demonstrate the expected effect of varying royalty rates on a firm's financial viability. In other words, it is an accounting model that, relying on historical cost and revenue data for all but royalty costs, endeavors to demonstrate the anticipated results of alternative royalty rates on projected net revenues.

[11] For example, Dr. Fratrik notes that, in connection with its aggregation services, "Live365 has spent a considerable amount of time and investment establishing its software systems to accurately measure and document listening for each copyrighted work that is streamed." Fratrik Corrected and Amended WDT at 38 n.62.

Live365's rate proposal in this proceeding (i.e., $.0009 per performance throughout the period 2011–2015), however, is apparently based only on Dr. Fratrik's analysis of revenues using the ZenithOptimedia data. Indeed, use of the Accustream revenue data alternative produces the anomalous result that copyright owners would have to pay webcasters each time the owners' sound recordings were performed, no matter how low a profit margin Dr. Fratrik assumed for webcasters in his analysis. Fratrik Corrected and Amended WDT at 26, Table 4; 4/27/10 Tr. at 1157:1–1158:6 (Fratrik).

Undaunted by this anomalous result, Dr. Fratrik simply repeats his analysis, substituting, *in part,* the ZenithOptimedia advertising revenue data for the Accustream advertising revenue data and, in concert with a 20% assumed profit margin, obtains the $.0009 per performance royalty rate that has been proposed by Live365 to be applied without change throughout the period 2011–2015. Yet Dr. Fratrik's alternative ZenithOptimedia-based analysis does not completely divorce itself from the Accustream data; instead, because ZenithOptimedia did not provide the Aggregate Tuning Hours ("ATH") numbers associated with its total advertising revenue estimate, Dr. Fratrik fell back on the Accustream data for a total ATH number and calculated advertising revenue per ATH by dividing the ZenithOptimedia revenue data by the Accustream ATH data. In short, Dr. Fratrik combines advertising revenue data based on two separate data sources without making a determination that the data was capable of being combined in this manner.

Moreover, even Dr. Fratrik admitted that the ZenithOptimedia and Accustream advertising revenue estimates are "challenging" or difficult to produce because a vast number of webcasters do not report their revenues publicly. 4/27/10 Tr. at 1220:1–20 (Fratrik). Thus, these databases have clear limitations and the uncritical manner in which Dr. Fratrik mixes and matches data from these two separate advertising revenue databases and then further combines subscription revenue data from a third separate source (*i.e.,* the Live365 subscription revenue data) plainly suggests a less than rigorous approach to his analysis.

Finally, with respect to revenues, Dr. Fratrik's analysis reports, but neither takes into account nor provides an adequate explanation for, the growth in the ZenithOptimedia advertising revenues forecast from his 2008 base through 2011 (i.e., growth from $200 million to $291 million). Fratrik

Corrected and Amended WDT, Ex. 8 at 187. It may be argued that growth in the *level* of revenues does not necessarily translate into growth in *unit* revenues. However, we find that it is difficult to accept Dr. Fratrik's unsupported assertion that he expects little improvement in such revenues on a unit basis (*see* Fratrik Corrected and Amended WDT at 5). Dr. Fratrik fails to provide any adequate empirical support for the implied assumption necessary to reach this conclusion—an assumption that the growth in performances will take place at precisely the pace necessary to assure that the anticipated growth in revenues over the relevant period will not alter the unit revenue ratio. Moreover, without such an implied assumption, it is difficult to avoid the conclusion that Dr. Fratrik's constant royalty rate should have been adjusted each year based on the implications of growing revenues for his own model. Yet, he offers no such adjusted royalty rate. At the very least, these changing advertising revenue totals call into question the reliability of the unchanging royalty rate derived by Dr. Fratrik from the lowest of the revenue totals available from the same data source (i.e., $200 million instead of $291 million).

Dr. Fratrik's assumption of a 20% operating margin for webcasters in his analysis is not solidly supported. That operating profit margin is not put forward as either a historical profit margin or a forecasted profit margin for webcasters, but rather as a profit margin derived from the over-the-air broadcasting industry. SX PFF at ¶¶ 328, 330. The record of evidence in this proceeding does not support the notion that profit margins for webcasters are likely to be similar to the more capital intensive terrestrial radio industry. SX PFF at ¶¶ 332–5. Furthermore, we find that Dr. Fratrik failed to establish a solid basis for concluding that the *minimum* operating profit margin for his representative webcaster was comparable to the *average* firm experience from firms that operate on a different platform (over-the-air radio).

Live365 argues in its proposed reply findings at ¶ 327 that Dr. Fratrik's 20% profit margin assumption is further corroborated by the recording industry's own expert testimony in *Webcaster I* (offered by Dr. Thomas Nagle, Chairman, Strategic Pricing Group, Inc.) which purportedly "recommended that webcasters should be able to achieve margins between 13.2% and 21.8%." However, although the Nagle exhibit referred to by Live365 was appended to Dr. Salinger's written rebuttal

testimony, the exhibit was only mentioned briefly in a footnote to the Salinger testimony and then only to make a different argument. Dr. Salinger, in fact, made no specific reference to any of the varying operating profit-margin figures utilized in that 2001 Recording Industry Association of America ("RIAA") study. In other words, it can hardly be said that the figures in question were offered as "corroborative" evidence to support Dr. Fratrik's assumptions. Moreover, the point of this 2001 study appears to have been to recommend a royalty rate based on the operating profit margins necessary to generate an *assumed* range of rates of return on investment for webcasters. In fact, the Nagle study utilized an operating profit margin in the range of 8.43% to 17.05% in order to "arrive at the appropriate range for the statutory license royalty fee." *See* Salinger WRT, Exhibit 3 at 16 and Appendix 3 at 1. Dr. Fratrik's 20% assumption for webcaster operating profit margins lies substantially outside this range. Moreover, the CARP rejected Dr. Nagle's analysis as corroborating evidence in *Webcaster I.* ["Dr. Nagle's analysis necessarily relies upon a myriad of highly questionable assumptions that appear inconsistent with foreseeable market conditions."] *Webcaster I CARP Report* at 73; ["We conclude that Dr. Nagle's analysis does not support any particular rate level."] *Id.* at 74. We find it provides no corroborative support for Dr. Fratrik's assumed 20% webcaster operating profit margin in this proceeding.

Thus, we find that Dr. Fratrik's "model" is based upon a series of assumptions and analogies that, taken individually, add such a degree of uncertainty or inexactitude to the resulting model as to make it unsatisfactory for the purpose of portraying the likely outcome of negotiations between willing buyers and willing sellers in the market for sound recording inputs that are used in webcasting services. Indeed, Dr. Fratrik's model does not even adequately address some of the modest considerations in the modeling approach laid out by Live365's rebuttal expert, Dr. Salinger. SX PFF at ¶ 307. Questionable assumptions, reservations about the methodological appropriateness of mixing disparate data sources, and concerns over the resulting reliability of the data used in the Fratrik model lead us to find that this theoretical construct suffers serious deficiencies that do not lend themselves to remediation.

### iii. Other Factors Put forward for Consideration

Live365 offers several other arguments to buttress its request for a royalty rate that would effectively return the statutory rates to near their 2006 statutory level.

First, Dr. Fratrik maintains that "[a]s industry projections for more robust growth in the Internet radio advertising market have clearly not materialized over the past few years," his valuation model must give rise to the conclusion that a "reduction in royalty rates from the prescribed rates covering 2006–2010" is warranted. Fratrik Corrected and Amended WDT at 31. In so doing, he incorrectly attributes the annual increase in rates established in *Webcaster II* to projections of growth primarily provided by Dr. Erik Brynjolfsson and Mr. James Griffin in that proceeding. Fratrik Corrected and Amended WDT at 12–14. Similarly, Live365 argues that "[g]iven that the lofty expectations from the *Webcasting II* proceeding have not been fulfilled, it follows that the rates for the next five years should be set lower than the rates determined by the CRB [Judges] in *Webcasting II*." *See* Live365 PFF at ¶ 38. But, quite to the contrary, the Judges' determination in *Webcaster II* did not rely on those particular projections in setting rates. Indeed, the Judges expressly rejected Dr. Brynjolfsson's modeling attempt and specifically cited the flaws in his effort "to project future growth rates" as a basis for not relying on them. *Webcaster II,* 72 FR 24093. Moreover, the evidence in the record on industry growth over the 2006–2010 period which shows *increased* advertising revenues, *increased* performances, and *increased* listening does not support a rate *reduction*. It more likely would support at least some modest rate increase. *See* SX PFF at ¶¶ 390–395, 398–401. While some Live365 data may show a flattening or decline for a particular pair of years, the overall trend of that same data does not show a decrease. For example, data presented by Live365 shows a year-to-year decline in listenership from 2006 to 2007, but this is followed by substantial increases in 2008 and 2009 and maintenance of 2008 levels in 2010. Overall, the trend in such listenership recorded since 2000 has been decidedly upward, even though the growth has occurred unevenly from year to year. *See* Smallens Corrected WRT at 7, Table 1.

Second, Live365 also contends that a downward adjustment of the current royalty rate is appropriate based on (1) The promotional value of statutory webcasting relative to its non-substitutional effect on other sales of music, including the promotional value to copyright owners stemming from the wide array of music and artists played on statutory webcasting services; (2) the relative creative contributions, technical contributions, investments, costs and risks made or borne by commercial webcasters compared to copyright owners; and (3) the relative disparate impact of certain competitive factors on webcasters as compared to copyright owners. After careful consideration, we find that the evidence submitted by Live365 on each of these claims is weak at best and, most certainly, too weak to establish the basis for a decrease in webcaster royalty rates. SX PFF at ¶¶ 415, 419–21, 426, 431, 446–9; SX RFF at ¶¶ 176, 179–180. Then too, Live365 does not present an acceptable empirical basis for quantifying the individual asserted effects of these various factors and/or for deriving a method for translating such magnitudes into a rate adjustment. Moreover, to the extent that Live365 claims that the Fratrik valuation model makes such a quantifiable translation, we need not further address these issues separate from our examination of that model which we have found seriously flawed and an inadequate representation of the market.

#### b. The SoundExchange Benchmark Approach

##### i. The Interactive Webcasting Market Benchmark

As in *Webcaster II,* SoundExchange maintains that one set of benchmark agreements with clear relevance for this proceeding as shown by an analysis prepared by its expert economist, Dr. Michael Pelcovits, consists of those agreements found in the market for interactive webcasting covering the digital performance of sound recordings. That is because the interactive webcasting market has characteristics reasonably similar to non-interactive webcasting, particularly after Dr. Pelcovits' final adjustment for the difference in interactivity.

Both markets have similar buyers and sellers and a similar set of rights to be licensed (a blanket license in sound recordings). Both markets are input markets and demand for these inputs is driven by or derived from the ultimate consumer markets in which these inputs are put to use. In these ultimate consumer markets, music is delivered to consumers in a similar fashion, except that in the interactive case the choice of music that is delivered is usually influenced by the ultimate consumer, while in the non-interactive case the consumer usually plays a more passive role. This difference is accounted for in the Pelcovits analysis. In order to make the benchmark interactive market more comparable to the non-interactive market, Dr. Pelcovits adjusts the benchmark by the added value associated with the interactivity characteristic. Pelcovits Amended and Corrected WDT at 23. This results in a rate of $0.0036 per play for a statutory non-interactive webcaster as a possible outcome in the target market. Pelcovits Amended and Corrected WDT at 4, 33.

The Judges find the interactive webcasting benchmark to be of the comparable type that the Copyright Act invites us to consider. 17 U.S.C. 114(f)(2)(B). ("In establishing such rates and terms, the Copyright Royalty Judges may consider the rates and terms for comparable types of digital audio transmission services and comparable circumstances under voluntary license agreements negotiated under subparagraph (A).") Nevertheless, as we indicated in *Webcaster II,* this particular Pelcovits benchmark analysis is not without warts. *Webcaster II,* 72 FR 24094 (May 1, 2007).

In *Webcaster II* we recognized the potential implications of a benchmark analysis that focuses on only subscription services as does the interactive benchmark presented by Dr. Pelcovits. That is, ad-supported non-interactive services might pay less than subscription-based interactive services to use the same music if their advertising revenues failed to evolve to the point where ad-supported non-interactive services were just as lucrative as subscription-based interactive services on a per-listener hour basis. In that proceeding the Judges indicated that to the extent that ad-supported revenues did not come to match subscription revenues on a per-listener hour basis during the 2006–2010 term and, absent clear information on the substitutability of the subscription and non-subscription options among consumers, any resulting shortfall related to ad-supported webcasting revenues would likely be adequately mitigated by a phase-in of the per performance rates to the level indicated by the benchmark analysis, such that the benchmark recommended rate for 2006 would not become effective until the last year of the term. *Webcaster II,* 72 FR 24094 (May 1, 2007).

Here, unlike the absence of data supporting this critique which we noted in *Webcaster II,* Dr. Salinger provides some empirical data to support the position that a benchmark which

reflects a weighted average of revenues obtained from *subscribers and non-subscribers* may result in a lower estimated royalty rate than Dr. Pelcovits' benchmark which focuses on only subscription rates. Salinger WRT at 10–11. Therefore, we are not persuaded that Dr. Pelcovits' benchmark estimates are sufficiently reflective of the hypothetical target market as to support the immediate implementation of a royalty rate equivalent to the $0.0036 outcome estimated by Dr. Pelcovits. Some further downward adjustment to his recommendation to adequately address the subscription/non-subscription revenue level differences may well be in order, although the magnitude of such an adjustment is not clear.

While Dr. Salinger shows that there is likely some "upward bias" introduced into the Pelcovits analysis through its focus on only subscription-based services in the benchmark market, the amount of such upward bias is not persuasively determined. Non-interactive webcasters in the market like Live365 often provide both subscription and non-subscription offerings. 7/28/10 Tr. at 40:10–15 (Salinger). Therefore, subscription-based revenues clearly must be considered. Moreover, the data used by Dr. Salinger to support his criticism, as Dr. Salinger admits, is not without its shortcomings. 7/28/10 Tr. at 98:2–104:6 (Salinger). Similarly, Dr. Fratrik admitted that the ZenithOptimedia and Accustream advertising revenue estimates are "challenging" or difficult to produce because a vast number of webcasters do not report their revenues publicly. 4/27/10 Tr. at 1220:1–20 (Fratrik). There is also the difficulty of segmenting intermingled revenues from webcasting business models that may often directly and/or indirectly depend on both subscription and nonsubscription lines of business, as well as potentially on other sources of revenue. 7/28/10 Tr. at 40:10–15, 92:1–19 (Salinger); Ordover WRT at 10–11. Nevertheless, Dr. Salinger's critique is sufficiently supported to raise legitimate concerns about the potential for upward bias in the Pelcovits estimates. It is only the magnitude of the potential upward bias that is not clearly quantified. What is clear from the record of evidence in this proceeding is that $0.0036 can be no more than the upper bounds of the range of possible rates reasonably applicable to the target market and that the most likely prevailing rate in that market is currently lower than $0.0036.

Dr. Salinger also criticizes the Pelcovits interactive webcasting benchmark analysis for: (1) Relying only on contracts with the four major record companies to the exclusion of the independent record labels; (2) ignoring the downward trend in the effective play rates paid by interactive services by utilizing the average rate in his calculations; and (3) inappropriately constructing the hedonic regression model that is used as one alternative measure of interactivity in the analysis. Salinger WRT at 15–21.

The first of these criticisms fails for lack of persuasive evidence in the record that the use of independent record contracts would have made a material difference. SX RFF at ¶¶ 101–103.

Although the second and third criticisms have some merit, the Judges find that these criticisms indicate that the Pelcovits interactive webcasting benchmark may overstate the likely prevailing market rate in the target market without necessarily rendering the Pelcovits analysis fatally flawed. With respect to the second criticism, Dr. Salinger acknowledged that this concern could be addressed by multiplying the recommended rate by 0.8737.[12] SX PFF at ¶ 209. Such an adjustment, of course, would reduce the recommended rate. SoundExchange offers no evidence that such an adjustment is unwarranted and even appears to endorse such an approach by performing this exact calculation with respect to the $0.0036 rate and reducing it to $0.0031. *See* SX PFF at ¶ 210. But SoundExchange's calculation was applied to the highest possible outcome Dr. Pelcovits lists for his benchmark analysis (*i.e.*, $0.0036), when in fact, Dr. Pelcovits indicates that his rate after substitution adjustment would result in a "range of *recommended* rates" with a "simple average of $0.0033." Thus, it appears that this $0.0033 average also requires adjustment to meet Dr. Salinger's criticism (*e.g.*, to approximately $0.0029). This is not a trivial consideration in light of the fact that in *Webcaster II*, it was Dr. Pelcovits' recommended rates *after the substitution adjustment* that formed the basis for SoundExchange's rate proposal and that formed the basis for the determination by the Judges of a royalty rate to be achieved by the end of the term in 2010 (i.e., a per play rate of $0.19). *See Webcaster II*, 72 FR 24096 (May 1, 2007). In any event, the validity of this criticism of the Pelcovits approach regarding the effective per

play rate clearly erodes the weight to be accorded to the $0.0036 figure.

Dr. Salinger also criticizes the Pelcovits hedonic regression analysis that formed the basis for one of the alternative measures of interactivity in the interactive webcasting benchmark approach. Dr. Salinger expressed concerns about the use of certain fixed effects variables (alternatively described as dummy variables) in the specification of the regression model and about the broad confidence interval surrounding the estimated interactivity coefficient in the hedonic regression. Salinger WRT at 20; 21 n.31 and Exhibit 6; 7/28/10 Tr. at 66:4–69:22 (Salinger). These criticisms have some merit, especially in light of Dr. Pelcovits' admitted lack of familiarity with some of the relevant economic literature, including recent literature cautioning against the indiscriminant use of dummy variables in certain hedonic estimations. 4/20/10 Tr. at 373:18–376:15 (Pelcovits). SoundExchange, in response to this criticism, claims that any problem associated with the hedonic regression is negated by Dr. Pelcovits' use of other methods that result in rates almost identical to the $0.0036 average. *See, for example,* SX RFF at ¶ 107. However, this does not wholly obviate the impact of any resulting overstatement. The rate associated with the hedonic regression is the highest of the three values that are used to calculate the $0.0036 average. Removing the rate associated with the hedonic regression from the average would, in this case, reduce the average. Thus, this criticism of the Pelcovits approach additionally erodes the weight that the Judges accord to the $0.0036 figure.

In short, the potential for upward bias or actual demonstrated upward bias in the Pelcovits estimates persuade us that $0.0036 can be no more than the upper bounds of the range of possible rates reasonably applicable to the target market and that the most likely prevailing rate at the present time in that market is significantly lower than $0.0036.

ii. The National Association of Broadcasters and SiriusXM Agreements

In addition to the interactive webcasting benchmark, Dr. Pelcovits offers a second benchmark based on the average of rates established for the 2011–2015 term in precedential Webcaster Settlement Act Agreements ("WSA agreements") between SoundExchange and the National Association of Broadcasters and between SoundExchange and SiriusXM ("SiriusXM agreement" or "Commercial

---

[12] The 0.8737 multiplier represents the value of a ratio where the numerator consists of the effective per play rate for 2009 (*i.e.*, 0.01917) and the denominator consists of the average effective play rate over the three years in question (*i.e.*, 0.02194).

Webcasters agreement"). Pelcovits Amended and Corrected WDT at 22.

While these precedential WSA agreements certainly pertain to rates to be paid by non-interactive webcasters in the commercial webcasting market at issue in this proceeding, the buyers' and sellers' circumstances are not comparable to those that would prevail in the absence of the Webcaster Settlement Act. Rather than a single seller, the sellers in the hypothetical market we are to consider consist of multiple record companies. *Webcaster II,* 72 FR 24087, 24091 (May 1, 2007); *Webcaster I,* 67 FR 45244 (July 8, 2002). Thus, in *Webcaster II* we found that the fact that there were multiple buyers and multiple sellers in the benchmark market as well as in the target market supported a benchmark analysis. *Webcaster II,* 72 FR 24093 (May 1, 2007). While the applicable law does not require a perfectly competitive benchmark market, the market must be at least "competitive" in the sense that buyers and sellers have comparable resources and market power. *Webcaster II,* 72 FR 24093 (May 1, 2007); *Webcaster I,* 67 FR 45245 (July 8, 2002). This would be generally consistent with free market principles. Yet, the buyers' and sellers' circumstances underlying the WSA agreements were not comparable to market conditions that would prevail in the absence of the WSA. That legislation permitted a single seller representative to enter into negotiations with buyers in the market with respect to rates that would be permitted to supplant the statutory rates previously established in the 2006–2010 period, as well as with respect to rates applicable to the 2011–2015 period. Even Dr. Pelcovits admits that "[e]ach of these contracts, of course, was negotiated in the shadow of the regulatory scheme and against the background of statutory rates previously set by this Court. To that extent, they may or may not represent the same outcome that would result in a pure market negotiation with no regulatory overtones." Pelcovits Amended and Corrected WDT at 15. Therefore, we find that these precedential WSA agreements, which may be fairly characterized as single-seller agreements reached under atypical marketplace conditions, cannot satisfy the comparability requirements for an appropriate benchmark.

However, we further find that, because the NAB-SoundExchange and SiriusXM-SoundExchange agreements clearly govern the rates for a substantial number of commercial webcasters over the relevant 2011–2015 period (Pelcovits Amended and Corrected WDT

at 15) and the commercial webcasters covered by these agreements are competitors with the other commercial webcasters who comprise the remainder of the non-interactive webcasting services (Salinger WRT at 24; Smallens Corrected WRT at 21), these agreements are a useful gauge of the weight to be assigned to the rates suggested by the interactive webcasting benchmark discussed *supra* at Section II.B.3.b.i. Moreover, nothing in the Webcaster Settlement Act constrains us from using these agreements for that purpose. *See* 17 U.S.C. 114(f)(5)(C).

The NAB-SoundExchange and SiriusXM agreements provide for royalty rates on a per performance basis. For the five-year period beginning 2011, the NAB-SoundExchange agreement sets the following rates: $0.0017 for 2011, $0.0020 for 2012, $0.0022 for 2013, $0.0023 for 2014 and $0.0025 for 2015. For the same period, the SiriusXM agreement sets the following rates: $0.0018 for 2011, $0.0020 for 2012, $0.0021 for 2013, $0.0022 for 2014 and $0.0024 for 2015. Pelcovits Amended and Corrected WDT at 15. Two characteristics of these rates are noteworthy. First, the 2011 rate is slightly less than the current 2010 statutory rate of $0.0019 and the rates in the precedential WSA agreements covering the years 2009 and 2010 were somewhat lower than the corresponding statutory rate for those years. Pelcovits Amended and Corrected WDT at 15. Second, the rates in the NAB-SoundExchange and SiriusXM agreements over their entire term are substantially lower than the range of annual rate possibilities suggested for implementation pursuant to the proposed interactive benchmark ($0.0036) or the interactive benchmark after Dr. Pelcovits' substitution adjustment ($0.0033) or the interactive benchmark adjusted to give a more likely reading of the impact of downward trend in the effective play rates paid by interactive services ($0.0031).

Thus, we find that these negotiated rates indicate that the interactive benchmark may likely overstate the prevailing market rate in the target market even when subjected to Dr. Pelcovits' substitution adjustment or Dr. Salinger's adjustment to mitigate the impact of downward trend in the effective play rates paid by interactive services. As a consequence, we further find that the interactive benchmark, even when subjected to these alternative adjustments, provides for rates near the upper bounds of the range of possible rates reasonably applicable to the target market, when the most likely prevailing

rate in that market appears to be lower than the interactive benchmark rates. In other words, the NAB-SoundExchange and SiriusXM agreements lend weight to the need for a further downward adjustment in the benchmark rate to reflect a prevailing rate in the target market closer to the current statutory rate.

Dr. Fratrik contends that the royalty rates in the NAB-SoundExchange agreement must overvalue the input in question, because the NAB received a particularly valuable concession with respect to the waiver of performance complement rules as part of the rate agreement. *See* Fratrik Corrected and Amended WDT at 43–44. ["Consequently, these terrestrial broadcasters, already with the programming established to webcast, *should* be willing to pay more than other webcasters in order to relieve themselves of these provisions." (emphasis added)]. This claim of a one-sided benefit to broadcasters is not adequately supported in the record. The testimony of Dr. Pelcovits, Dr. Ordover and Mr. McCrady indicates that the waivers had value to *both* the NAB and to the record companies. Pelcovits Amended and Corrected WDT at 20 n.21; Ordover WRT at 5, 18; McCrady WDT at 5–6. There is no clear evidence in the record to support either the notion that the limited performance complement waiver in the NAB-SoundExchange agreement was a largely one-sided benefit accruing only to the broadcasters or that broadcasters *did,* in fact, pay more than other webcasters to obtain these provisions.

Dr. Fratrik also contends that terrestrial broadcasters were willing to pay more because they have fewer other costs to cover than pure webcasters. But Dr. Fratrik offers less than persuasive evidence of major cost differences between pure webcasters and broadcasters who engage in webcasting generally or between pure webcasters and the more limiting case of those broadcasters who exclusively simulcast. Dr. Fratrik appears to center his analysis on this latter case. Of course, focusing on this latter comparison simplifies from the reality of the market by assuming that all the webcasting performed by broadcasters consists of simulcasting when, in fact, the NAB-SoundExchange agreement provides for other types of webcasting (*e.g.,* through side channels). *See* SX Ex. 102–DP at Article 1.1(d), 4.2. In addition to that analytical shortcoming, Dr. Fratrik's analysis suffers from other unsupported conclusions. Dr. Fratrik's cost-based contention appears to largely rest on the notion that simulcasters, unlike other

commercial webcasters, have no additional programming costs as those costs have already been paid in connection with their over-the-air operations. *See* Fratrik Corrected and Amended WDT at 41. But no specific empirical data in the record unambiguously supports this asserted relative difference. For example, Dr. Fratrik's conclusion ignores the wide range of business models utilized by commercial webcasters, including that of Live365, a webcaster that is apparently paid to put on programming designed by its clients as opposed to incurring a cost for originating such programming itself. Floater Corrected WDT at 4–8; 4/27/10 Tr. at 1274:5–16; 1301:1–4 (Fratrik).

Several other theories are offered by the contending parties to suggest that the precedential WSA agreements are either higher or lower than the likely prevailing rate in the target market.

For example, the possibility is raised that since the rates in the NAB-SoundExchange agreement were negotiated collectively on behalf of the record companies by SoundExchange, the rates might reflect some additional bargaining power exercised by SoundExchange as a single seller, relative to the bargaining power that would have otherwise been exercised by the individual record companies, leading to higher than free market-determined royalty rates. *See* Ordover WRT at 22, Salinger WRT at 27. While, at first blush, this contention appears to be consistent with economic theory, the facts surrounding the SoundExchange-NAB negotiation and the rates resulting from the negotiation cast serious doubt on the operation of normal economic theory in this case.

These negotiations took place in the context of the WSA legislation specifically providing for SoundExchange to engage in such negotiations as a collective in order to reach agreements that would exempt webcasters from the 2006–2010 statutory rates, as well as allow for 2011–2015 negotiated rates in lieu of any statutory rates that might be determined by the Judges for that term of the applicable license pursuant to a statutory proceeding. 17 U.S.C. 114(f)(5)(A). That is, the rates were to be negotiated in response to a specifically legislated, post-determination, second-chance opportunity afforded the parties to voluntarily reshape applicable webcasting rates. Thus, the rates could be said to have been negotiated both in the shadow of a specific regulatory scheme, as well as against the background of previously set statutory rates, which influenced the outcomes

available to the parties and, in particular, constrained the exercise of monopoly power. Failing to reach an agreement for the 2011–2015 period, the buyers could still avail themselves of the statutory rate-setting procedure. That is, the buyers retained their rights to reject a settlement with SoundExchange and resort to the statutory rate-setting procedure for the 2011–2015 term of the license. Pelcovits Amended and Corrected WDT at 17; Ordover WRT at 23; Salinger WRT at 27. In other words, the buyers in this case maintained some leverage that otherwise would be absent if they faced a monopolist seller without any such recourse.

Additionally, here, the NAB, which negotiated on behalf of broadcasters, effectively served as a single buyer and, thus, may be said to have exercised countervailing market power relative to SoundExchange. Ordover WRT at 23. At the same time, the SoundExchange-SiriusXM agreement certainly offers the example of a non-NAB webcasting buyer for whom negotiations produced rates very similar to the NAB-SoundExchange agreement, indicating that the NAB-SoundExchange agreement, on its face, did not result in the price discrimination sometimes associated with monopoly power.

In short, the NAB-SoundExchange negotiated royalty rates do not appear to have been pushed *above* what might prevail in a multi-seller market as a result of SoundExchange's legislatively permitted role as a single seller in these negotiations because, under the circumstances, it was unlikely to have the ability to exercise the equivalent of the unchecked bargaining power of an unregulated monopolist.

On the other hand, Dr. Ordover's attempt to cast the NAB-SoundExchange agreement as producing royalty rates *below* what might prevail in a free market is also not supported by the record of evidence in this proceeding. Dr. Ordover suggests that, *if certain circumstances can be assumed to be present,* the NAB-SoundExchange agreement may represent a situation where SoundExchange, acting as a single seller, nevertheless would agree to lower royalty rates as compared to those that would occur in a free market in which individual record companies function as sellers. But Dr. Ordover's analysis is predicated on, among other assumptions, the key notion that the repertoire of all four major labels is necessary for simulcasters to operate a viable streaming service. That is, the sound recordings of record companies must be perceived as complementary inputs rather than as substitutes. Here,

there is no evidence in the record which establishes that to be the case for any of the particular broadcasters who have opted into the NAB-SoundExchange agreement, let alone that it is the case generally for all broadcasters.[13] For example, Dr. Ordover offers no evidence that these sound recording inputs are complements based on standard measures such as the cross-elasticity of demand. Moreover, the proffered notion that the NAB-SoundExchange agreement for broadcasters represents lower than average webcasting royalty rates based on some assumed *unique* requirement associated with simulcasting, is not borne out by the agreement itself which provides for *no* distinction between the royalty rate applicable to simulcasting and the royalty rate applicable to broadcasters who engage in other types of webcasting (*e.g.,* side channels). *See* SX Ex. 102–DP at Article 1.1(d), 4.2. Nor is there a substantial difference between the royalty rates applicable to simulcasting in the NAB-SoundExchange agreement and the royalty rates applicable to commercial webcasting in the SiriusXM-SoundExchange agreement. In short, while Dr. Ordover's proposed explanation may be a plausible theory under certain circumstances, here it suffers from a lack of sufficient empirical support to demonstrate the presence of those circumstances.

Finally, Dr. Salinger claims that the rates in both the NAB-SoundExchange and SiriusXM agreements are higher than average webcasting royalty rates in the period 2011–2015 based on a theory that the NAB and SiriusXM structured their agreements with SoundExchange to provide for lower-than-statutory-rates for the years 2009–2010, but above-market rates for the 2011–2015 period, in anticipation that such a restructuring would adversely affect their rivals' costs in the latter period.

Yet, this is also a theory without sufficient facts to support it in the instant case. There is no evidence in the record to suggest any coordination between the NAB and SiriusXM to reach their separate agreements with SoundExchange. Indeed, as NAB broadcasters and SiriusXM are competitors not only with respect to webcasting but also for listeners more generally, it would appear such coordination would be unlikely. In addition, for the strategy of raising rivals' costs to work, SoundExchange would have to agree to go along with the NAB and

---

[13] In *Webcaster II,* a similar assumption that a viable streaming service requires the repertoire of all four major labels was rejected by the Judges. See Webcaster II, 72 FR 24091 (May 1, 2007).

SiriusXM. 7/28/10 Tr. at 132:1–10 (Salinger). There is no evidence in the record to support this additional coordination. A further condition necessary to the success of the strategy is that the NAB and SiriusXM would have to feel assured that a rate setting proceeding would not result in a lower rate than those in their agreements with SoundExchange. There is no evidence in the record to suggest that any protection against a lower statutory rate was embodied in their agreements with SoundExchange. SX PFF at ¶ 270.

Dr. Salinger suggests that one of the possible benefits to SoundExchange from cooperating with a NAB-SiriusXM raising rivals' costs strategy is that copyright owners may "get a rate that's so high but then they get to practice price discrimination by negotiating lower." 7/28/10 Tr. at 133:18–22 (Salinger). However, as Dr. Fratrik acknowledged, in order to price discriminate the seller must "be able to segment out customers." 4/27/10 Tr. at 1249:8–13 (Fratrik). No such market segmentation is supported by the record of evidence in this proceeding. On the contrary, simulcasting and other commercial webcasting compete for the same ultimate consumers who may easily substitute one service for the other as their listening choice. SX PFF at ¶¶ 277, 278. In *Webcaster II,* similarly noting that the balance of the evidence in the record did not persuade us that these simulcasters operate in a submarket separate from and noncompetitive with other commercial webcasters, we declined to set a differentiated rate for commercial broadcasters. By contrast, where we did find sufficient evidence in the record that supported a finding that certain noncommercial webcasters constituted a distinct segment of the market, we did set a differentiated rate. *Webcaster II,* 72 FR 24095, 24097 (May 1, 2007). In *Webcaster II* we noted that "[a] segmented marketplace may have multiple equilibrium prices because it has multiple demand curves for the same commodity relative to a single supply curve" and further, that "[t]he multiple demand curves represent distinct classes of buyers and each demand curve exhibits a different price elasticity of demand." *Webcaster II,* 72 FR 24097. Price discrimination is a feature of such markets. *Id.* Dr. Salinger offers no persuasive empirical evidence of price discrimination related to different price elasticities of demand associated with distinct classes of buyers in the market.

Dr. Salinger's analysis also fails to address other important features of the "raising rivals' costs" construct. For example, he does not empirically examine whether it would make economic sense for NAB and SiriusXM in terms of profitability, to effectively shift up their respective average cost curves at the original output's average cost. In other words, by agreeing to a higher price for the sound recording input, NAB and SiriusXM may sacrifice some of their profitability, depending on the demand for their output. Dr. Salinger does not empirically address the extent to which that may or may not occur. Nor does he examine how the results of such a profitability analysis might support or undermine the incentives behind the "raising rivals' costs" strategy that he opines was operative in motivating NAB and SiriusXM negotiating behavior. For all these reasons, we do not find Dr. Salinger's "raising rivals' costs" theory persuasive.

However, it cannot be disputed that the 2009 and 2010 rates negotiated in these settlements were lower than the statutory rates otherwise applicable to commercial webcasters. Dr. Pelcovits offers another possible adjustment to mitigate the effects of the lower 2009–2010 rates enjoyed by the NAB and SiriusXM as compared to those commercial webcasters that remained subject to the statutory rate. The rates resulting from Dr. Pelcovits' calculation "would give webcasters that are not part of the WSA settlements the same effective rate over the eight-year period [2009–2015] as the NAB and SiriusXM, assuming they all experience the same level of growth in performances." Pelcovits Amended and Corrected WDT at Appendix II. This calculation results in rates equal to the current statutory rate for the first year of the 2011–2015 term and only somewhat higher thereafter. For the five-year period beginning 2011, these adjusted NAB/SiriusXM agreement rates are as follows: $0.0019 for 2011, $0.0020 for 2012, $0.0020 for 2013, $0.0020 for 2014 and $0.0021 for 2015. Pelcovits Amended and Corrected WDT at Appendix II.

After a careful consideration of the evidence presented on the various suggested sources of potential overvaluation and undervaluation of the market rates by the NAB-SoundExchange and SiriusXM agreements, we find that the rates in these agreements do not appear to seriously overvalue or undervalue input prices likely to prevail in the market. Therefore, because the NAB-SoundExchange and SiriusXM agreements clearly govern the rates for a substantial number of commercial webcasters over the relevant 2011–2015 period and the commercial webcasters covered by these agreements are competitors with the other commercial webcasters who comprise the remainder of the non-interactive webcasting services, we find these agreements are a useful gauge of the weight to be assigned to the rates suggested by the interactive webcasting benchmark. *See supra* at Section II.B.3.b.ii.

Inasmuch as there are only small differences between the 2011, 2012 and 2013 rates in the NAB and SiriusXM agreements and the 2010 statutory rate, we decline to assign a weight to the interactive webcasting benchmark that results in a rate at great variance with the current statutory rate. In other words, the rates in these negotiated agreements serve as a caution to us not to depart radically from past rates where we cannot be confident, based on the quality of the benchmark evidence in the record, that the magnitude of such a departure is fully supported in the target market. Here, the NAB and SiriusXM agreements serve as a means of roughly correcting the interactive benchmark for any overvaluation not captured by the variables directly considered in the analysis. As a consequence, we find that the current statutory rate ($0.0019) sets the lower bounds for a range of rates reasonably applicable to the target market and that the most likely prevailing rate in that market is closer to this lower boundary than to the upper boundary identified hereinabove.

### 4. The Section 114 Commercial Webcaster Rates Determined by the Judges

As previously indicated, *supra* at Section II.B.3.b.i., the Judges find the interactive webcasting benchmark to be of the comparable type that the Copyright Act invites us to consider. It is a benchmark with characteristics reasonably similar to non-interactive webcasting, particularly after some adjustment to account for the differences attributable to interactivity. *Id.* However, we cannot find sufficient evidence in the record to support an increase that *fully* implements the rates proposed on the basis of the interactive benchmark. Rather, we find that a rate of $0.0036, derived from the interactive market and adjusted for interactivity differences, can be no more than the upper bounds of a range of possible rates reasonably applicable to the target market. That is because: (1) There is likely some "upward bias" introduced into the interactive benchmark analysis through its focus on only subscription-based services in the benchmark market (*see supra* at Section II.B.3.b.i.) and (2) there is some merit to Dr. Salinger's

identification of some additional sources of upward bias in the Pelcovits interactive benchmark analysis. *Id.*

Two measures available to test the magnitude of such upward bias are the NAB-SoundExchange and SiriusXM–SoundExchange agreements. That is, we find that these agreements are a useful gauge of the weights to be assigned to the rates suggested by the interactive webcasting benchmark, because the NAB-SoundExchange and SiriusXM–SoundExchange agreements clearly govern the rates for a substantial number of commercial webcasters over the relevant 2011–2015 period and the commercial webcasters covered by these agreements are competitors with the other commercial webcasters who comprise the remainder of the non-interactive webcasting services (*see supra* at Section II.B.3.b.ii.). These negotiated rates indicate that the interactive benchmark may likely overstate the prevailing market rate in the target market even when subjected to Dr. Pelcovits' substitution adjustment or Dr. Salinger's adjustment to mitigate the impact of downward trend in the effective play rates paid by interactive services. *Id.* Indeed, the NAB-SoundExchange and SiriusXM agreements lend weight to the need for a further downward adjustment in the benchmark rate to reflect a prevailing rate in the target market closer to the current statutory rate. *Id.* In this way, the NAB-SoundExchange and SiriusXM agreements serve as a means of roughly correcting the interactive benchmark for any overvaluation not captured by the variables directly considered in the analysis. Therefore, inasmuch as there appears to be only a small difference between the 2011 rate in the NAB-SoundExchange and SiriusXM agreements and the 2010 statutory rate, we find that the current statutory rate ($0.0019) sets the lower bounds for a range of rates reasonably applicable to the target market and that the most likely prevailing rate in that market is closer to this lower boundary than to the interactive benchmark rates recommended by Dr. Pelcovits.

In other words, while we accept the interactive benchmark as suggesting an increase in royalty rates for non-interactive webcasting over or by the end of the period 2011–2015, we find that the weight of the evidence does not allow us to accept the full amount of the increases suggested by either the unadjusted or the various adjusted versions of the interactive benchmark. Rather having identified the $0.0036 rate as the upper boundary for a zone of reasonableness for potential marketplace benchmarks and the

$0.0019 rate as the lower boundary for a zone of reasonableness for potential marketplace benchmarks, we find that the most likely prevailing rate in the target market is closer to the lower boundary than to the upper boundary of this zone of reasonableness (*see supra* at Section II.B.3.b.ii.).

However, the most likely prevailing rate at the present time is also likely to shift upward over the 2011–2015 term. We recognize that the interactive benchmark derived in this proceeding after adjusting for interactivity and accounting for substitution (i.e., $0.0033) itself indicates an increase when compared to a similarly adjusted interactive benchmark derived in *Webcaster II* (i.e., $0.0019). *See supra* at Section II.B.3.b.i.; *Webcaster II*, 72 FR 24094, 24096. Similarly, the NAB-SoundExchange and SiriusXM-SoundExchange agreements exhibit an increase in rates over the 2011–2015 term for competing webcasters. *See supra* at Section II.B.3.b.ii. Moreover, we also find that the evidence in the record on industry growth in *increased* advertising revenues, *increased* performances, and *increased* listening likely support at least a modest increase over the 2011–2015 term. *See supra* at Section II.B.3.a.iii. However, we recognize that while the trend in industry growth, as captured by some measures such as listenership, has been decidedly upward, that growth has occurred unevenly from year to year, with two-year plateaus succeeded by large jumps in growth. *Id.*

Our findings suggest three criteria for an appropriate rate based on the marketplace evidence we have been presented. These criteria are: (1) A rate structure that reflects our finding that the most likely prevailing rate in the target market is closer to the lower boundary than to the upper boundary of the zone of reasonableness for potential marketplace benchmarks; (2) a rate structure that accommodates some modest growth in rates over the term of the license period; and (3) a rate structure that provides for longer periods of stable rates during the term of the license period. We find that the following rate structure for commercial webcasters, based on our downward adjustment of the interactive benchmark, meets these three criteria: For the five-year period beginning 2011, the per play rate applicable to each year of the license for Commercial Webcasters is: $0.0019 for 2011, $0.0021 for 2012, $0.0021 for 2013, $0.0023 for 2014 and $0.0023 for 2015.

The willing buyer/willing seller standard in the Copyright Act encompasses consideration of

economic, competitive and programming information presented by the parties, including (1) the promotional or substitution effects of the use of webcasting services by the public on the sales of phonorecords or other effects of the use of webcasting that may interfere with or enhance the sound recording copyright owner's other streams of revenue from its sound recordings; and (2) the relative contributions made by the copyright owner and the webcasting service with respect to creativity, technology, capital investment, cost and risk in bringing the copyrighted work and the service to the public. Because we adopt an adjusted benchmark approach to determining the rates, we agree with *Webcaster II* and *Webcaster I* that such considerations would have already been factored into the negotiated price in the benchmark agreements. 72 FR 24095 (May 1, 2007); 67 FR 45244 (July 8, 2002). Therefore, such considerations have been reviewed by the Copyright Royalty Judges in our determination of the most appropriate benchmark from which to set rates. Similar considerations would have been factored into the negotiated price of the NAB-SoundExchange and SiriusXM-SoundExchange agreements which we utilized to roughly gauge the further downward adjustment necessary to assure that the interactive benchmark rates reasonably reflected likely rates in the target market.

Nevertheless, we have also further separately reviewed the evidence bearing on these considerations. We find that no further upward or downward adjustment is indicated. We have previously noted that the evidence submitted by Live365 on each of these considerations is too weak to establish a basis for a decrease in webcaster royalty rates from the current statutory rate (*see supra* at Section II.B.3.a.iii.). Nor does Live365 present an acceptable empirical basis for quantifying the individual asserted effects of these various factors and/or for deriving a method for translating such magnitudes into a rate adjustment. *Id.* Similarly, to the extent that SoundExchange treats each of these factors separate from its proffered benchmark analysis, it also does not present an acceptable empirical basis for quantifying the individual asserted effects of these various factors and/or for deriving a method for translating such magnitudes into a rate adjustment. Moreover, SoundExchange explicitly relies on Dr. Pelcovits' interactive services benchmark analysis to encompass these considerations. SX RCL at ¶ 20. Therefore, our further consideration of

these factors leads us to find no need for any further adjustment to the rates determined hereinabove.

5. The Proposed Aggregator Discount to the Section 114 Commercial Webcaster Rates

Live365 seeks a further 20% discount applicable to the commercial webcasting per performance rate for certain "qualified webcast aggregation services" who operate a network of at least 100 independently operated "aggregated webcasters" that individually "stream less than 100,000 ATH per month of royalty-bearing performances." Rate Proposal For Live365, Inc., Appendix A, Proposed Regulations at § 380.2 and § 380.3(a)(2). This "discount" proposal may be more properly understood as a proposed term rather than an additional rate proposal. It is conditional; that is, it is applicable only to the extent that certain defined conditions are met (*e.g.,* minimum number of 100 aggregated webcasters and each individual aggregated webcaster streaming less than 100,000 ATH per month). It proposes to establish a mechanism whereby a group of commercial webcasters under certain qualifying conditions may utilize a "webcast aggregation service" to aggregate their monitoring and reporting functions. Rate Proposal For Live365, Inc., Appendix A, Proposed Regulations at § 380.2(m). Monitoring and reporting are compliance-related functions that are currently required of all individual webcaster licensees.

We find no persuasive evidence in the record to support the imposition of an aggregator discount that would apply to the statutory rate for commercial webcasters. Live365 submitted testimony from Dr. Fratrik and Mr. Floater to support this request. The testimony of the latter witness does not, in any meaningful way, address the purported rationale behind this request—namely, that an administrative benefit accrues to the collective which, by implication, reduces transactions costs. Rather Mr. Floater's testimony speaks largely about the asserted benefits of using an aggregation service that flow to "individual webcasters" who make use of the service and to copyright owners of having multiple webcaster stations assembled on a single platform. ["\* \* \* a streaming architecture that can aggregate tens of thousands of individual webcasters \* \* \* Live365's broadcast tools and services enable broadcasters to economically and efficiently stream their programming \* \* \* Live365's aggregation helps broadcasters contain their costs \* \* \* Live365 allows small

webcasters to broadcast content \* \* \* while generating increased performances, sales, royalties and promotional benefits for a wide range of artists and copyright holders."] Floater Corrected WDT at 11–14. These asserted benefits to individual webcasters and copyright owners, which are not quantified sufficiently to ascertain their value, are benefits that are largely indistinguishable from those that might be asserted by any multi-channel webcaster. Nor do these benefits address the issues at heart of the proposal; that is, whether an *aggregator* like Live365 provides any administrative benefit that could be shown to reduce transactions costs, whether any administrative benefit provided by the aggregator can be measured and translated into a discount applicable to the commercial webcasting royalty rate, and whether the full amount of the purported administrative benefit should properly flow to the aggregator, to the individual webcasters so aggregated, to the copyright owners or to some combination thereof.[14] We do not find Mr. Floater's testimony helpful in resolving any of these issues.

Live365 also submitted testimony from Dr. Fratrik to support its request for an aggregator discount that attempts, in part, to address the administrative savings issue. Dr. Fratrik opines that aggregators are entitled to this discount because they "collect and compile all of the necessary documentation of the actual copyrighted works that are streamed and the number of total listening levels for each of these copyrighted works" and because "aggregators make royalty payments to the appropriate parties." Fratrik Corrected and Amended WDT at 38. But again these functions are part of the same sort of compliance activities for which any multi-channel webcaster would necessarily be responsible on behalf of the multiplicity of channels it offered. They do not appear to be unique to an "aggregator." Indeed, when questioned about his description of the aggregator discount, Dr. Fratrik offered no practical distinction between an "aggregator" and any commercial webcaster or simulcaster who offered 100 or more channels. 4/27/10 Tr. at 1265:9–1266:22; 1267:7–1270:15 (Fratrik). We find that Dr. Fratrik's claim of administrative cost savings provided

by aggregators describes a benefit that is largely indistinguishable from those that might be asserted by any multi-channel webcaster. Therefore, inasmuch as multi-channel webcasters already receive a benefit under current regulations [15] (37 CFR 380.3(b)(1)) by way of a $50,000 cap on the minimum fee for services with 100 or more stations or channels, the proposed additional discount for indistinguishable administrative services provided by an "aggregator" is unwarrantedly cumulative. SX PFF at ¶ 597.

Furthermore, Dr. Fratrik admitted that the choice of 100 channels or stations as the threshold for triggering the proposed aggregator discount was not supported by any examination of administrative costs to see what relative administrative cost savings specifically demarcated the boundaries of the discount's applicability. 4/27/10 Tr. at 1270:12–1271:3 (Fratrik). In other words, Dr. Fratrik establishes no cost savings basis in the record for a distinction between the administrative cost savings that might accrue from aggregating 100 stations as compared to 50 or 300 stations where each such station meets the additional condition of accounting for streaming of less than 100,000 ATH per month.

At the same time, Dr. Fratrik reaches his estimated 20% discount rate through the offer of a kind of benchmark analysis that uses purported aggregator discounts provided to Live365 in its agreements with the Performance Rights Organizations ("PROs") pertaining to musical works royalties. But Dr. Fratrik indicated in his testimony that the Live365–BMI agreement he utilized to support this benchmark does not provide a discount to Live365 for aggregating webcasters. Instead, the agreement apparently provides a discount more directly to very small webcasters that utilize Live365 for certain administrative functions related to compliance. 4/27/10 Tr. 1261:18–1262:19 (Fratrik). That is *not* comparable to the proposal before us which calls for the aggregator to receive the full benefits of any discount.

In any case, even if Live365 were to receive the full benefits of any aggregator discount in the BMI agreement, such PRO agreements do not constitute a benchmark that inspires sufficient confidence to be useful. Dr. Fratrik asserts that Live365 provides centralized administration for the

---

[14] For example, it is obvious that if the *full* amount of any purported administrative savings were to flow to the aggregator, then no benefit accrues to anyone else. In such a formulation, the aggregator proposal would seem to reduce to a mere stalking horse for obtaining a less than competitive market rate that advantages Live365 as compared to other commercial webcasters and simulcasters.

[15] Under the May 14, 2010 Stipulation executed by SoundExchange and Live365, the $50,000 cap on minimum fees was also agreed to by the parties for the 2011–2015 term. *See supra* at Section II.B.1.

benefit of the PROs, including centralized collection, reporting and compliance. But he offers no evidence to suggest that the types and level of centralized administrative services provided to the PROs are comparable to the administrative services to be provided by the aggregator to SoundExchange. In *Webcaster II,* we found that another benchmark offered in that proceeding based on the musical works market was flawed because the sellers in that market are different and they are selling different rights. 72 FR 24094 (May 1, 2007). Yet, in the instant proceeding, Dr. Fratrik fails to show that these different sellers and different rights give rise to comparably valued "centralized" administrative services provided by a third party in the target sound recordings market. Nor does Dr. Fratrik address the issue of whether any adjustments to the data from the benchmark musical works market are required that could make it more comparable to the target sound recordings market.

In short, we find that Live365 makes no sufficient showing that an aggregator discount can be justified in general, or adequately measured in particular, on the basis of the evidence in the record.

To the extent that Live365's proposed aggregator discount is viewed strictly as a rate proposal rather than a term, Live365 also fails to delineate a basis for a different royalty rate applicable to a distinct submarket of the larger commercial webcasting market. *Webcasting II* determined that a key factor in differentiating between classes of webcasters for rate purposes is whether the webcasters operate in a distinct market segment or submarket that does not directly compete with the remainder of all webcasters. *Webcaster II,* 72 FR 24095, 24097 (May 1, 2007); *see also supra* at Section II.B.3.b.ii. Live365 as the aggregator does not appear to meet this standard. The record clearly establishes that Live365 competes directly with other commercial webcasters. SX PFF at ¶ 280. And, of course, whether considered as a proposed rate for a new category of commercial webcasters or, as noted hereinabove as a proposed term, we are not persuaded by the record of evidence in this proceeding of a particular market value provided by an aggregator in terms of reduced transactions costs that can, or should, be translated into a discount applicable to the commercial webcasting royalty rate.

In addition, some aspects of the Live365 proposal appear likely to engender confusion. For example, Live365 proposes definitions for a "webcast aggregation service,"

"aggregated webcasters," "commercial webcaster," and "licensee." Taken together, these definitions fail to explicitly delineate that Live365 intends the webcast aggregation service to serve as the licensee in its proposed arrangement and that the webcasters whose programming is transmitted are not the licensees. The proposed regulations, by contrast, identify webcasters specifically as licensees and, therefore, suggest that any commercial webcaster, whether aggregated or unaggregated, remains responsible for payment of the applicable statutory license fee. *See* Rate Proposal For Live365, Inc., Appendix A, Proposed Regulations at § 380.2(b), § 380.2(e), § 380.2(h), § 380.2(o); 9/30/10 Tr. at 622:14–22, 669:18–677:12 (Closing Arguments, Oxenford). Such confusion has practical consequences. Given that the aggregator, as the licensee, is not obligated to provide a list of webcasters for whom it purports to pay SoundExchange and the aggregator, as licensee, may not voluntarily provide such a list to SoundExchange, it may result in more time-consuming administrative effort for SoundExchange to determine whether a particular webcaster is subject to or properly complying with the statutory licenses. This burden was pointed out by Mr. Funn in the context of SoundExchange's specific experience with Live365. Funn WRT at 2; 8/2/10 Tr. at 445:13–446:2 (Funn).

For all the above reasons, we decline to adopt Live365's proposal for a 20% aggregator discount, applicable under certain conditions to the commercial webcasting royalty rate.

## III. Noncommercial Webcasters

Having determined the rates for commercial webcasters, the Judges now turn to the noncommercial category. As previously mentioned, certain webcasters argued in *Webcaster II* that they were distinguishable from commercial webcasters and, as a result, deserved a lower royalty rate. We observed:

> Based on the available evidence, we find that, up to a point, certain "noncommercial" webcasters may constitute a distinct segment of the noninteractive webcasting market that in a willing buyer/willing seller hypothetical marketplace would produce different, lower rates than we have determined hereinabove for Commercial Webcasters. A segmented marketplace may have multiple equilibrium prices because it has multiple demand curves for the same commodity relative to a single supply curve. An example of a segmented market is a market for electricity with different prices for commercial users and residential users. In other words, price differentiation or price discrimination is a feature of such markets. The multiple

demand curves represent distinct classes of buyers and each demand curve exhibits a different price elasticity of demand. By definition, if the commodity in question derives its demand from its ultimate use, then the marketplace can remain segmented only if buyers are unable to transfer the commodity easily among ultimate uses. Put another way, each type of ultimate use must be different.

*Webcaster II,* 72 FR 24097 (footnote omitted). We found that the evidence supported a submarket for noncommercial webcasting, but included safeguards to assure that the submarket did not converge or overlap with the submarket for commercial webcasting. A cap of 159,140 ATH per month marked the boundary between noncommercial and commercial webcasting, and we adopted a $500 per station or channel rate which included the annual, non-refundable, but recoupable, $500 minimum fee payable in advance.[16]

In this proceeding, certain participants have once again asked us for adoption of lower rates for noncommercial webcasting. Greater refinements to the category are also sought; namely, separate rates for distinct "types" of services (all still under the general rubric of noncommercial). SoundExchange and CBI have submitted an agreement, pursuant to 17 U.S.C. 801(b)(7)(A), for rates and terms for a type of service that they identify as "noncommercial educational webcasters." SX PFF at ¶ 65; CBI PFF at ¶ 5. IBS urges us to recognize and set rates for two types of services: small noncommercial webcasters, defined as those whose ATH does not exceed 15,914 per month, and very small noncommercial webcasters, defined as those whose ATH does not exceed 6,365 per month. IBS PFF (Reformatted) at ¶ 26. We address these requests beginning with the SoundExchange-CBI agreement.

### A. Noncommercial Educational Webcasters

On August 13, 2009, slightly more than eight months into the cycle of this proceeding, SoundExchange and CBI submitted a joint motion to adopt a partial settlement "for certain internet transmissions by college radio stations and other noncommercial educational webcasters." *Joint Motion to Adopt*

---

[16] The United States Court of Appeals for the District of Columbia Circuit remanded the $500 minimum fee for lack of evidence. *Intercollegiate Broadcast System, Inc.* v. *Copyright Royalty Board,* 574 F.3d 748, 767 (DC Cir. 2009). After taking evidence, we adopted a $500 minimum fee. Digital *Performance Right in Sound Recordings and Ephemeral Recordings (Remand order),* 75 FR 56873, 56784 (September 17, 2010).

*Partial Settlement* at 1. The settlement was achieved under authorization granted by the Webcaster Settlement Act of 2009, Public Law 111–36, discussed *supra* at Section I.B., and was published by the Copyright Office in the **Federal Register**. *See* 74 FR 40616 (August 12, 2009). By virtue of that publication, the SoundExchange-CBI agreement is now "available, as an option, to any * * * noncommercial webcaster meeting the eligibility conditions of such agreement." 17 U.S.C. 114(f)(5)(B). In submitting the agreement to the Judges, SoundExchange and CBI urged us to likewise publish it in the **Federal Register** and adopt it, under 17 U.S.C. 801(b)(7)(A), as *the* rates and terms applicable to noncommercial educational webcasters for the period 2011 through 2015.[17]

On April 1, 2010, the Judges did publish the SoundExchange/CBI agreement under the authority of section 801(b)(7)(A). 75 FR 16377. With respect to rates, the agreement proposes an annual, nonrefundable minimum fee of $500 for each station or individual channel, including each of its individual side channels. *Id.* at 16384 (April 1, 2010). For those noncommercial educational webcasters whose monthly ATH exceed 159,140, additional fees are paid on a per-performance basis. There is also an optional $100 proxy fee that may be paid by noncommercial educational webcasters in lieu of submitting reports

[17] At the hearing to consider the SoundExchange/CBI motion, there was significant discussion as to whether SoundExchange and CBI were asking the Judges to adopt the agreement as an option for noncommercial educational webcasters or whether the agreement would be binding on all noncommercial educational webcasters. *See* 5/5/10 Tr. at 5:8–51:11 (Hearing on Joint Motion To Adopt Partial Settlement). The confusion was created by the last two sentences of proposed § 380.20(b) to the Judges' rules, 37 CFR, which provided:

However, if a Noncommercial Educational Webcaster is also eligible for any other rates and terms for its Eligible Transmissions during the period January 1, 2011, through December 31, 2015, it may by written notice to the Collective in a form to be provided by the Collective, elect to be subject to such other rates and terms rather than the rates and terms specified in this subpart. If a single educational institution has more than one station making Eligible Transmissions, each such station may determine individually whether it elects to be subject to this subpart.

*Digital Performance Right in Sound Recordings and Ephemeral Recordings (Proposed rule),* 75 FR 16377, 16383 (April 1, 2010). After deliberations, counsel for SoundExchange conceded that such language was confusing and unnecessary, since the purpose of the motion was to set the rates and terms for all services that met the definition of a noncommercial educational webcaster, and could be removed. 5/5/10 Tr. at 46:14–47:16, 50:12–51:11 (Hearing on Joint Motion To Adopt Partial Settlement). In adopting The SoundExchange/CBI agreement today, we are accepting SoundExchange's offer and are not adopting this language.

of use of sound recordings. The agreement also contains a number of terms of payment.

Our consideration of the SoundExchange-CBI agreement, as is the case with the NAB-SoundExchange agreement is governed by 17 U.S.C. 801(b)(7)(A). The Judges received 24 comments, from managers and representatives of terrestrial radio stations, favoring adoption of the SoundExchange-CBI agreement. Many of these comments asserted that the rate structure was compatible with their budget restraints, *see,* e.g., Comment of Bill Keith for WSDP Radio, Plymouth-Canton Community Schools ("The monetary amount was reasonable and most college or high school stations can live with the amounts charged for webcasting"), and several expressed satisfaction with the $100 proxy fee in lieu of reports of use. *See, e.g.,* Comments of Christopher Thuringer for WRFL, University of Kentucky; Comments of David Black, General Manager, WSUM–FM. We received one comment objecting to the settlement from IBS.[18] We held a hearing on the motion on May 5, 2010.

During the course of the hearing, it became clear that IBS' arguments centered upon the proposed annual $500 minimum fee for stations with less than 159,140 ATH. Most significantly, IBS contended that if the Judges adopted the proposed minimum fee for noncommercial educational webcasters, it would be precluded from presenting its own minimum fee proposal and, effectively, its participation in this proceeding would be ended. 5/5/10 Tr. at 51:22–52:2 ("I think Mr. DeSanctis' [counsel for SoundExchange] last remarks indicate that this is an attempt to freeze IBS out of statutory rights to a decision from the Board on the record.") (Hearing on Joint Motion to Adopt Partial Settlement). After conclusion of the hearing, the Judges did not render a decision on the adoption of the settlement, preferring instead to let IBS present its case in the main and consider the matter after all testimony had been presented.

It is now evident that IBS' contention of a "freeze out" was erroneous from the start, for IBS never proposed any rates and terms for noncommercial *educational* webcasters. Rather, as noted

[18] IBS has asserted several times throughout the course of this proceeding that it represents more college and high school radio stations than CBI. *See, e.g.* 5/5/10 Tr. at 80:16–81:3 (Hearing on Joint Motion to Adopt Partial Settlement). However, it has never provided any evidence to demonstrate this is true. In fact, IBS has never revealed to the Judges how many members it has, let alone their identities.

above, IBS requested rates and terms only for certain noncommercial webcasters (defined by it as "small" and "very small"). The Judges pressed counsel for IBS at closing argument as to whether he still objected to adoption of the SoundExchange-CBI agreement as the basis for establishing rates and terms for noncommercial educational webcasters. After some dissembling, he concluded that he did to the extent that adoption of the agreement might influence or prejudice his rate proposal.[19] We find that his response does not support a proper objection raised under section 801(b)(7)(A)(ii) which would require us to consider the reasonableness of the SoundExchange/CBI agreement. *Cf.* 37 CFR 351.10 (admissible evidence must be relevant); FRE 401. Even if we were to conclude otherwise, IBS has not presented any credible testimony that the agreement is unreasonable. Twenty-four noncommercial broadcasters that purportedly will operate their webcasting services under the agreement find it to be reasonable and affordable. IBS has not provided documented testimony to the contrary, despite an invitation to do so. 5/5/10 Tr. at 81:7–82:10 (Hearing on Joint Motion to Adopt Partial Settlement). Instead, it has relied upon the bald assertions of its counsel and its witnesses, arguing that some unidentified and unspecified number of its members cannot afford the fees contained in the agreement and will be driven from the webcasting business.

[19] [THE JUDGES]: You're not proposing a rate for noncommercial educational webcasters. Only CBI and SoundExchange are.

MR. MALONE: Right.

[THE JUDGES]: So why are you objecting to the adoption of that if you have a—two separate categories that you want adopted?

MR. MALONE: Well, the judges can certainly say that—I mean, there's nothing incompatible with them. The—

[THE JUDGES]: But I'm asking you why are you still objecting to the adoption of a $500 minimum fee for noncommercial educational webcasters when you have proposed new fees for two new types of services and have not proposed a fee for something called a noncommercial educational webcaster?

MR. MALONE: Well, our—

[THE JUDGES]: Where is your dog in that fight? I don't see it.

MR. MALONE: All right. The dog in that fight is—and, again, excluding indirect effects that I understand to be the context of your question.

We have no objection to the terms that are there as long as they don't apply to our small stations.

[THE JUDGES]: So you're just objecting to it on the theory that you just hope that what's ever in there doesn't somehow get applied to your case, even though you're asking for two completely different services?

MR. MALONE: That's essentially correct, Your Honor.

9/30/10 Tr. at 660:13—661:22 (IBS Closing Argument).

Without proper evidence, we could not find the agreement unreasonable, were we inclined to do so.

Finding neither a proper nor a credible objection to the SoundExchange-CBI agreement, nor other grounds requiring rejection, we adopt the agreement (*see supra* n.17) as the basis for rates and terms for noncommercial educational webcasters for the period 2011–2015. *See supra* Section II.A.

*B. All Other Noncommercial Webcasters*

1. Rate Proposals for the Section 114 License for Noncommercial Webcasters

The Judges' adoption of the SoundExchange-CBI agreement under section 801(b)(7)(A) does not resolve the matter of rates for the broader category of noncommercial webcasters that we recognized in *Webcaster II*. SoundExchange urges adoption of the same rates for noncommercial webcasters as noncommercial educational webcasters. IBS agrees, but proposes that we recognize two new types of services: small and very small noncommercial webcasters. We address these proposals separately.

For noncommercial webcasters operating under the sections 112 and 114 licenses, SoundExchange proposes a royalty of $500 per station or channel per year, subject to the 159,140 ATH limit. The base royalty would be paid in the form of a $500 per station or channel annual minimum fee, with no cap. If a station or channel exceeds the ATH limit, then the noncommercial webcaster would pay at the commercial usage rates for any overage. SX PFF at ¶¶ 489, 471. In support of its proposal, SoundExchange points to the fact that 363 noncommercial webcasters paid royalties in 2009 similar to its current proposal, with 305 of those webcasters paying only the $500 minimum fee. *Id.* at ¶ 493. This, in its view, demonstrates noncommercial webcasters' ability and willingness to pay the requested fees.

SoundExchange also submits that the reasonableness of the $500 minimum fee is confirmed by the testimony of Barrie Kessler, its chief operating officer. While SoundExchange does not track its administrative costs on a service-by-service basis, Ms. Kessler presented a "reasonableness check" by estimating its administrative cost per service and per channel. First, she divided SoundExchange's total expenses for 2008 by the number of licensees, and then divided that number by the average number of stations or channels per licensee (seven). The result was an approximate average administrative cost of $825 per station

or channel. Kessler Corrected WDT at 25.

Finally, SoundExchange offers its agreement with CBI, discussed above, as support for its rate proposal. The fees are the same, along with the 159,140 ATH limitation and no cap on the minimum fee. The agreement, along with the 24 comments received in favor of it, "is strong evidence of the rates and terms that noncommercial webcasters are willing to pay." SX PFF at ¶ 501.

IBS agrees with SoundExchange's proposal for noncommercial webcasters, but asks the Judges to recognize two additional types of noncommercial services that it identifies as "small" and "very small." Its arrival at this request has followed a decidedly convoluted path throughout this proceeding, metamorphosing from the written direct statements through the closing argument. Section 351.4(a)(3) of the Judges' rules, which governs the content of written direct statements, provides that in a rate proceeding, "each party must state its requested rate." IBS did not do this in plain fashion, instead including its request within the body of testimony of one of its three witnesses. Frederick J. Kass, Jr., the "treasurer, director of operation (chief operating officer), and a director of" IBS stated that: "IBS Members should only pay for their direct use of the statutory license by the IBS Member. There should be no minimum fee greater than that which would reasonably approximate the annual direct use of the statutory license, not to exceed $25.00 annually." Kass WDT at 1, 9. However, Mr. Kass attached as an exhibit to his statement a joint petition to adopt an agreement negotiated between the RIAA, IBS, and the Harvard Radio Broadcasting, Co. that was submitted to the Copyright Office on August 26, 2004.[20] That agreement provided for a minimum annual fee of $500 for noncommercial educational webcasters, except that the fee was $250 for any noncommercial educational webcaster that affiliated with an educational institution with fewer than 10,000 enrolled students or where substantially all of the programming transmitted was classified as news, talk, sports or business programming. Kass WDT, Exhibit A at 5. Despite the inclusion of this exhibit, Mr. Kass expressly disavowed endorsement of its rates in the hearing on his written direct statement. Instead, he asserted that "the appropriate rates are what most people were paying in the marketplace

for the direct use of the statutory license," without stating what that fee or amount should be. 4/22/10 Tr. at 779:22–780:2 (Kass). When the Judges questioned Mr. Kass as to exactly what was his rate proposal, he responded that IBS members should pay only for their actual use of sound recordings and that the fee should be 50 cents per continuous listener per year to a station or channel,[21] not to exceed $25 per year. *Id.* at 781:3–792:12 (Kass). He then later characterized the $25 as a "flat fee" and concluded his testimony on this point that each IBS station should pay an annual $25 flat fee. *Id.* at 791:17–792:12 (Kass).

After the close of the direct case hearings and before the submission of written rebuttal cases, IBS filed a "Restatement of IBS' Rate Proposal." This proposal identified two new types of services: a "small noncommercial webcaster," described as a service with total performances of digitally recorded music less than 15,914 ATH per month or the equivalent; and a "very small noncommercial webcaster," described as a service with total performances of less than 6,365 ATH per month or the equivalent. For small noncommercial webcasters, IBS proposed a flat annual fee of $50, and for very small noncommercial webcasters a flat annual fee of $20. No mention was made of the broader category of noncommercial webcaster. On July 29, 2010, after the submission of written rebuttal cases, IBS filed an "Amplification of IBS' Restated Rate Proposal." This filing was far more than an amplification, because for the first time it proposed an annual minimum fee of $500 for noncommercial webcasters per station or channel, along with annual minimum fees of $50 and $20 for small noncommercial webcasters and very small noncommercial webcasters, respectively. IBS also expressly endorsed SoundExchange's per performance rate proposal for the sections 114 and 112 licenses.[22] And, as an alternative to this rate structure, IBS proposed paying an annual lump sum of $10,000 to SoundExchange to cover all performances by IBS members that are not covered by a negotiated agreement.

---

[20] The joint petition was submitted to the Copyright Office as a settlement of rates and terms for the sections 112 and 114 licenses for the period 2005 and 2006. It was not acted upon by the Office.

[21] This fee is very roughly derived from an agreement negotiated between the RIAA and the Corporation for Public Broadcasting under the Small Webcaster Settlement Act of 2002, which was submitted by IBS in the *Webcaster II* proceeding.

[22] IBS does not define "noncommercial webcaster," but the proposal suggests that it is a webcaster with no more than 159,140 ATH per month per station or channel, but no less than 15,915 ATH. The endorsement of the SoundExchange per performance proposal would then apply to the overage of 159,140 ATH. 9/30/10 Tr. at 651:11–652:21 (IBS Closing Argument).

IBS added that "[i]f the amount of IBS members participating exceeds $10,000.00 there will be a true up within 15 days of the end of the year." *Amplification of IBS' Restated Rate Proposal* at 3 (July 29, 2010).[23]

During the hearings on the written rebuttal cases, SoundExchange objected to the testimony of Mr. Kass, IBS' only rebuttal witness, on the grounds that he did not verify his testimony as required by § 350.4(d) of the Judges' rules, and did not appear to know what was in his testimony.[24] The Judges granted the motion and his testimony was not admitted.[25] IBS sought reconsideration of the decision, which was denied. *Order Denying IBS' Motion For Reconsideration of the Rulings Excluding Its Rebuttal Case,* Docket No. 2009–1 CRB Webcasting III (August 18, 2010). Even if his testimony had been admitted, it did not contain support for IBS' new rate proposals, nor could it given that such testimony would be outside the scope of the rebuttal proceedings.

IBS changed its proposed rates one final time with the filing of its proposed findings of fact and conclusions of law. It withdrew its proposal of a $10,000 annual lump sum payment, and proposed regulatory language that permitted SoundExchange to accept unspecified collective payments on behalf of small and very small noncommercial webcasters.[26]

2. The Section 114 Noncommercial Webcaster Rates Determined by the Judges

The statutory standards that apply to the Judges' determination of section 114 rates for commercial webcasters apply with equal force to our consideration of rates for noncommercial webcasters. IBS requests that we distinguish between two different types of noncommercial webcasters—small and very small—within the broader category, thereby invoking the provision of section 114(f)(2)(B) that requires that rates (and terms)

shall distinguish among different types of eligible nonsubscription transmission services then in operation and shall include a minimum fee for each such type of service, such differences to be based on criteria including, but not limited to, the quantity and nature of the use of sound recordings and the degree to which use of the service may substitute for or may promote the purchase of phonorecords by consumers.

17 U.S.C. 114(f)(2)(B). IBS asks that we make such a distinction for small and very small noncommercial webcasters despite the fact that it has not presented one iota of evidence regarding the relative quantities of music used by these services,[27] nor the nature of their use of sound recordings covered by the license.[28] Likewise, it has completely failed to present any evidence that would enable the Judges to determine the degree to which these proposed services promoted or substituted for the purchase of phonorecords by consumers. IBS has done nothing more than create two arbitrary subcategories of noncommercial webcaster, separated by unsupported amounts of monthly aggregated tuning hours, in an effort to obtain lower royalty rates for its members. IBS has failed to satisfy the statutory burden of presenting evidence to enable the Judges to determine if distinctions within the noncommercial webcaster category are required or warranted, and there is nothing in the record of this proceeding that requires the Judges under section 114(f)(2)(B) to establish separate terms and rates for types of services other than noncommercial webcasters.

IBS' failure on this point is endemic to its failure to the even greater task at hand: The rates that would be negotiated in the marketplace between a willing buyer and willing seller. IBS' constantly changing rate proposals were not fashioned with this standard in mind (let alone the evidence to support it), but rather appeared to spring from some undefined meaning of "fairness," or more likely the impressions of Mr. Kass as to what his members would like to pay for statutory royalties. Indeed,

even with respect to Mr. Kass' somewhat consistent mantra, that IBS members should not pay for any more than the music that they used, there was no proffer of evidence to demonstrate the nature or volume of that use, by what stations, or under what circumstances. The aridity of the record necessitates the rejection of IBS' proposal.

There is no dispute between SoundExchange and IBS that noncommercial webcasting is a distinct segment of the noninteractive webcasting market for which a willing buyer/willing seller hypothetical marketplace would produce different, lower rates than we have determined hereinabove for commercial webcasters. SX PFF at ¶¶ 489–90; IBS PFF at ¶¶ 4, 26. There is also no dispute that the boundary of that submarket is marked by 159,140 ATH per month per station or channel and that any noncommercial webcaster exceeding this limitation should pay the commercial rates adopted in this proceeding for the overage. SX PFF at ¶ 489; IBS PFF at ¶ 26. There is a dispute as to the annual $500 minimum, recoupable fee (*i.e.,* the flat fee rate) proposed by SoundExchange and adopted by the Judges in the *Webcaster II* proceeding. *See* 75 FR 56873 (September 17, 2010) (Remand order). IBS contends that many of its members cannot afford the fee and will cease webcasting activities, but it did not provide any financial records, data or other information, beyond bare allegations of its counsel and Mr. Kass, to support its claim. To the contrary, financial data obtained from IBS' witness John E. Murphy, General Manager of WHUS, licensed to the University of Connecticut, revealed that in 2009 WHUS generated total revenues of $527,364.21 and had a profit of $87,041.55. 4/21/10 Tr. at 583:1–586:12 (Murphy).[29] Mr. Murphy was the only witness to present radio station financial data. Even Mr. Kass' statement that the average operating budget of IBS members is $9,000, though wholly unsupported by documentation, does not demonstrate a lack of ability to pay.[30] Three hundred and five noncommercial webcasters paid SoundExchange the $500 minimum fee in 2009 pursuant to the decision in *Webcaster II,* with an additional 58

---

[23] IBS does not explain what is meant by IBS members exceeding $10,000 in participation. However, the pleading does offer a number of annual statutory performances covered by the $50 annual minimum fees for small noncommercial webcasters (2,291,616) and very small noncommercial webcasters (916,646). Presumably, IBS is offering to pay additional unspecified amounts for those members that exceed that number of performances in a given year.

[24] Section 350.4(d) provides that "[t]he testimony of each witness shall be accompanied by an affidavit or a declaration made pursuant to 28 U.S.C. 1746 supporting the testimony."

[25] It was learned after *voir dire* of the witness that not only did he not comply with the verification rule in filing his written rebuttal statement, but that he was not familiar with substantial portions of his testimony, which had been drafted by IBS' counsel. 7/29/10 Tr. at 292:1– 296:15 (Kass).

[26] To further roil the waters, IBS attached to its proposed findings its *Amplification of IBS' Restated Rate Proposal* which does contain the $10,000 lump sum payment language.

[27] IBS distinguishes between the services based upon the number of ATH, but ATH is not a measurement of the quantity of use of sound recordings covered by the section 114 license. It is only a time measurement of reception of a transmission.

[28] Counsel for IBS conceded at closing argument that the record was devoid of evidence on this statutory requirement. 9/30/10 Tr. at 647:12–651:5 (IBS Closing Argument).

[29] It was revealed that WHUS did not pay *any* statutory license fees in 2009 nor did it file required reports of use. 4/21/10 Tr. at 579:21–582:3, 594:5– 600:2 (Murphy).

[30] Interestingly, IBS members pay an annual $125 membership fee to IBS, and pay $85 per person, or $480 per station, to attend IBS' annual conference in New York City, plus the cost of hotel rooms. 4/21/10 Tr. at 593:12–594:3 (Murphy).

services paying more for exceeding the ATH cap or streaming more than one station or channel. 75 FR 56874 (September 17, 2010) (Remand order). Twenty-four noncommercial educational stations endorsed the SoundExchange-CBI agreement which contains the same flat $500 fee. *See supra* at Section III.A. In sum, we reject IBS' contention that the $500 fee is not affordable and cannot represent what a willing buyer would pay in the hypothetical marketplace.

Having rejected *in toto* the contentions and claims of IBS,[31] we are persuaded that the presentation of SoundExchange best represents the rates that would be paid in the willing buyer/willing seller hypothetical marketplace for noncommercial webcasting. The annual minimum fee of $500 per station or channel functions as the royalty payable for usage of sound recordings up to 159,140 ATH per month. This flat fee is the same that we adopted in *Webcaster II* and, as discussed above, is demonstrably affordable to noncommercial webcasters. We find that the SoundExchange-CBI agreement, which contains the very same fee and rate structure, and the 24 comments supporting it are corroborative evidence that our determination satisfies the statutory standard. As a minimum fee, and mindful of the Court of Appeals' admonition regarding evidence of administrative costs administering the

licenses, *Intercollegiate Broadcast System, Inc.* v. *Copyright Royalty Bd.,* 574 F.3d at 761 (DC Cir. 2009), we are persuaded that the testimony of Ms. Kessler as to estimates of average administrative costs per licensee shows that a $500 minimum fee for noncommercial webcasters is more than reasonable. SX PFF at ¶ 484; *see also* 75 FR 56874 (September 17, 2010) (Remand order).

### 3. The Section 112 Noncommercial Webcaster Rates Determined by the Judges

Although there is not a stipulation as to the rates for the section 112 license for noncommercial webcasters as there is for commercial webcasters, *supra* at Section II.B.1, there is no disagreement between SoundExchange and IBS. SoundExchange proposes the same bundled rate approach for both the section 112 and 114 rights, five percent of which is allocated as the section 112 royalty for making ephemeral copies, and IBS endorses the proposal. SX PFF at ¶¶ 671; IBS PFF at ¶ 24. The testimony offered by SoundExchange supports this proposal and we adopt it. SX PFF at ¶¶ 672–688.

### IV. Terms

The standard for setting terms of payment is what the record reflects would have been agreed to by willing buyers and willing sellers in the marketplace. *Webcaster II,* 72 FR 24102 (May 1, 2007); *see also Webcaster I,* 67 FR 45266 (July 8, 2002). In *Webcaster II,* we further established that we are obligated to "adopt royalty payment and distribution terms that are practical and efficient." *Webcaster II,* 72 FR 24102 (May 1, 2007). The parties each submitted proposals of the terms that they believe satisfy both of these requirements.[32] SoundExchange based its proposal generally on the current terms as adopted in *Webcaster II* and the proceeding setting the sections 112 and 114 rates and terms for preexisting satellite digital audio radio services, with certain revisions, and proposed conforming editorial changes to the webcasting terms in light of changes made in that proceeding. SX PFF at ¶ 549. Live365 proposed changes to the definitions of two terms in § 380.2 of the current webcasting regulations.[33]

Live365 PFF at ¶¶ 382–87; Live365 PCL at ¶¶ 77–79. IBS proposed terms for noncommercial webcasters. IBS PFF at ¶ 26.

SoundExchange and Live365 also stipulated to certain terms. *See Stipulation of SoundExchange, Inc. and Live365, Inc. Regarding Certain Proposed Terms,* Docket No. 2009–1 CRB Webcasting III (September 10, 2010) ("*Joint Stipulation*").

When adopting royalty terms, we also strive, where possible, to maintain consistency across the licenses set forth in sections 112 and 114 in order to maximize efficiency in and minimize the overall costs associated with the administration of the license. *Determination of Rates and Terms for Preexisting Subscription Services and Satellite Digital Audio Radio Services (Final rule and order),* 73 FR 4080, 4098 (January 28, 2008) ("*SDARS*"). However, this goal is not overriding. We will vary terms across the licenses where a party can demonstrate the need for and the benefits of such variance. *Id.*

### A. Collective

SoundExchange requests to be named the sole collective for the collection and distribution of royalties paid by commercial and noncommercial webcasters under the sections 112 and 114 licenses for the period 2011–2015. SX PFF at ¶ 602; Second Revised Rates and Terms of SoundExchange, Inc., Docket No. 2009–1 CRB Webcasting III, at Proposed Regulations § 380.4(b) (July 23, 2010). Live365 takes no position regarding SoundExchange's request, Live365 RFF at ¶ 602, and IBS does not appear to object, given its rate proposal refers to SoundExchange as the collective. *See* Amplification of IBS' Restated Rate Proposal, Docket No. 2009–1 CRB Webcasting III, at 2 (July 29, 2010).

We have determined previously that designation of a single Collective "presents the most economically and administratively efficient system for collecting royalties under the blanket license framework created by the statutory licenses." *Webcaster II,* 72 FR 24104 (May 1, 2007); *see also SDARS,* 73 FR 4099 (January 24, 2008). No party has submitted evidence that would compel us to alter that determination here. Indeed, no party requested the designation of multiple collectives, and SoundExchange was the only party requesting to be selected as a collective.[34]

---

[31] In its proposed findings, and for the first time in this proceeding, IBS contends that "Congress in Section 114(f)(2) intended that the minimum rate be tailored to the type of service in accord with the general public policy favoring small businesses," and that as a consequence the Judges are required under the Regulatory Flexibility Act, 5 U.S.C. 601(6), to determine whether the $500 fee unnecessarily burdens IBS' members. IBS PFF (Reformatted) at ¶¶ 10–13. There is no support in the text or legislative history of the Copyright Act for the proposition that section 114(f)(2) favors small businesses and, indeed, IBS does not supply any. To the contrary, section 114(f)(2)(B) is very clear as to our task in this proceeding: To fashion rates (and terms) that "most clearly represent the rates and terms that would have been negotiated in the marketplace between a willing buyer and a willing seller." IBS has also failed to support its contention that the Judges must conduct a Regulatory Flexibility Act assessment of impact of the $500 fee on IBS' members in particular. IBS has not supplied the Judges with any evidence to adduce whether its members are "small entities" within the meaning of 5 U.S.C. 601—IBS has not supplied us with any documentary evidence of its membership, even their names—nor has it demonstrated that the Regulatory Flexibility Act applies to rate proceedings before the Judges. *See* 5 U.S.C. 601(2) (exempting from the definition of a rule of a government agency "a rule of particular applicability relating to rates"); *c.f. American Moving and Storage Assoc.* v. *DOD,* 91 F.Supp.2d 132, 136 (D.D.C. 2000) (exception for "a rule of particular applicability relating to rates" is explicit and broad). In any event, the Judges did consider the circumstances of noncommercial webcasters, discussed above, in establishing the $500 fee.

[32] CBI's proposal consisted of the terms contained in the agreement with SoundExchange submitted for adoption by the Judges. Since we are adopting that agreement, see supra at Section III.A., CBI's proposal will not be discussed here.

[33] Live365's request for an aggregator discount initially was proposed as a term. However, as discussed *supra* at Section II.B.5., the aggregator discount was handled in the section on proposed

rates and thus this will not be discussed here. *See also,* 9/30/10 Tr. at 615:5–22 (Live365 Closing Argument).

[34] As noted *supra* at n.4, RLI filed a written direct statement but did not present oral testimony;

SoundExchange (and its predecessor) has served as the Collective for the collection, processing and distribution of royalty payments made under the sections 112 and 114 statutory licenses since their inception thereby accumulating a wealth of knowledge and expertise in administering these licenses. *See* Kessler Corrected WDT at 4. Moreover, SoundExchange's designation as the sole Collective is supported by artists and copyright owners. *See* Roberts Hedgpeth WDT at 1–2; McCrady WDT at 19. This coupled with the absence of any opposition or record evidence to suggest that SoundExchange should not serve in that capacity here leads us to designate SoundExchange as the Collective for the 2011–2015 license period.

*B. Stipulated Terms and Technical and Conforming Changes*

On September 10, 2010, SoundExchange and Live365 submitted a stipulation regarding certain proposed terms in the Proposed Regulations appearing as an attachment to Second Revised Proposed Rates and Terms of SoundExchange, Inc. filed July 23, 2010. In several instances, they have stipulated that current provisions of the webcasting terms will remain unchanged. For example, SoundExchange and Live365 agree that the current definitions of the following terms in § 380.2 shall remain unchanged: "Commercial Webcaster," "Copyright Owners," "Ephemeral Recording," "Noncommercial Webcaster," "Performers," and "Qualified Auditor." *Joint Stipulation,* Exhibit A at 2–4 (September 10, 2010). Similarly, the current provisions of § 380.5 will remain unchanged. *Id.* at 9–11.

In other instances, stipulated terms consist of eliminating provisions which were solely applicable to the 2006–2010 license period (*see,* e.g., § 380.4(d)) and reflecting changes necessitated by the adoption of the NAB-SoundExchange and SoundExchange-CBI agreements (*see,* e.g., § 380.2 definition of "Licensee"). *Id.* at 3, 8.

We find that the stipulated terms constitute for the most part technical and non-controversial changes that will add to the clarity of the regulations adopted today. Therefore, we are adopting the terms stipulated to by SoundExchange and Live365.

For these same reasons, we are adopting the technical and conforming changes proposed by SoundExchange,

and not opposed by any party, in Section IV of their Second Revised Rates and Terms, filed July 23, 2010.

We now turn to those contested terms proposed for Commercial Webcasters.

*C. Contested Terms for Commercial Webcasters*

1. Terms Proposed by Live365

Live365 proposes changes to the definitions of two terms in § 380.2, namely, "performance" and "aggregate tuning hours." [35] Live365 PFF at ¶ 387 and PCL at ¶ 79. Specifically, Live365 proposes to modify the definition of "performance" to "exclude any performances of sound recording that are not more than thirty (30) consecutive seconds." Live365 PFF at ¶ 387. According to Live365, this proposed modification conforms the definition of "performance" in § 380.2 to that of a "performance" or "play" as defined in the four interactive service agreements reviewed by Dr. Pelcovits. *Id.* Live365 also contends that past precedent has excluded partial performances from "royalty-bearing" performances, citing to the Librarian's adoption of a settlement agreement among SoundExchange, AFTRA, the American Federation of Musicians of the United States and Canada, and Digital Media Association which excluded from payment performances that suffered technical interruptions or the closing down of a media player or channel switching. Live365 PCL at ¶ 78, citing *Digital Performance Right In Sound Recordings And Ephemeral Recordings, Docket Nos. 2002–1 CARP DTRA3 & 2001–2 CARP DTNSRA,* 74 FR 27506, 27509 (May 20, 2003).

Similarly, Live365 seeks to revise the current definition of "aggregate tuning hours" to exclude programming that does not contain sound recordings such as talk, sports, and advertising not containing sound recordings. Live365 PCL at ¶ 79. Live365 justifies its request by asserting that "programming without sound recordings should not be subject to consideration in regulations dealing with a royalty to be paid for the use of sound recordings." *Id.*

SoundExchange vehemently opposes adoption of either proposed modification. First, SoundExchange contends that these proposed

modifications constitute new terms, not a revision to an existing proposal, in violation of § 351.4(b)(3) which allows for revision of a rate proposal at any time up to and including submission of proposed findings of fact. [36] SX RFF at ¶ 223. Next, SoundExchange asserts that Live365's citation to the four interactive service agreements without more does not provide sufficient record support for either the need for or benefit of this request. *Id.* at ¶¶ 226–228. With regard to the request to redefine "aggregate tuning hours," SoundExchange argues that Live365 fails to point to anything in the record explaining, much less supporting, the need for such proposal. *Id.* at ¶¶ 231–232. Finally, SoundExchange points to Live365's failure to consider the potential effect of its definition of "performance" on the per-performance rate as yet another reason not to accept Live365's proposal. *Id.* at ¶ 230. Were Live365's definition adopted, SoundExchange contends that an upward adjustment would be needed to the per-performance rate since neither Drs. Pelcovits nor Fratrik excluded performances of less than 30 seconds in the calculation of their respective per-performance rates. [37] *Id.*

The Judges decline to adopt either of Live365's proposed definitions. Live365 has provided insufficient record support for either of its proposals. This is especially true with regard to its proposed definition of "aggregate tuning hours." It appears for the first time in Live365's proposed conclusions of law without any citation to the record or any substantive explanation as to why such a change is needed or what benefits would result from its adoption. All Live365 has provided is the unsupported assertions of counsel. Thus, Live365 has not met its burden regarding adoption of this term. *See SDARS,* 73 FR 4101 (January 28, 2008) (refusal to adopt bare proposals unsupported by record evidence).

Likewise, Live365 has not met its burden with respect to adoption of its proffered definition of "performance." Neither the mere citation to the four interactive service agreements in the record here without more nor a reference to a settlement agreement adopted by the Librarian in a CARP proceeding demonstrates that a willing buyer and a willing seller would agree to such a term in the non-interactive market. Live365 simply states that its

---

[35] In the proposed regulations attached to its proposed findings of fact, Live365 included an additional term: A proposed deadline for the completion and issuance of a report regarding an audit to verify royalty payments. *See* Attachment to Live365's Proposed Findings of Fact and Conclusions of Law, § 380.6(g). Since this proposal was not discussed in its proposed findings of fact and Live365 presented no evidence to support the need for such a term, we decline to adopt it.

[36] We need not address the validity of this argument since we decline to adopt this term on other grounds.

[37] According to SoundExchange, the upward adjustment would result from a reduction in the number of plays in the calculation of a per-performance rate. SX RFF at ¶ 230.

---

therefore, their written direct statement was not considered. In any event, RLI did not seek designation as a Collective.

requested definition conforms to the definitions of "performance" and "play" in the agreements reviewed by Dr. Pelcovits with no discussion of or cited support for why such conformance is needed or beneficial or even appropriate here.

Live365's reference to adoption by the Librarian of the settlement agreement in a prior CARP proceeding is unpersuasive. As with its proposal regarding aggregate tuning hours, this justification is offered for the first time in Live365's proposed conclusions of law. Thus, like its proposed definition for aggregate tuning hours, the proffered justification amounts to nothing more than an unsupported argument of counsel.

More importantly, as SoundExchange correctly observes, since neither Dr. Pelcovits nor Dr. Fratrik excluded performances from the calculation of their respective per-performance rates, there would be fewer plays in such calculations, thereby necessitating an upward adjustment to the per-performance rates. Live365 never acknowledges this effect much less addresses how to make the adjustment. *See* SX RFF at ¶ 230. The lack of supportive evidence presented by Live365 when combined with the potential problematic effect on the per-performance rates requires rejection of this term.

### 2. Terms Proposed by SoundExchange

SoundExchange proposes several terms. We note at the outset that several of SoundExchange's proposed terms are contained in some or all of the WSA agreements, including the NAB–SoundExchange and SoundExchange-CBI agreements adopted herein. Parties are free to agree to whatever terms they choose. When such agreement is submitted to the Judges for adoption, we are obligated to adopt said agreement in the absence of objections after publication in the **Federal Register**. 17 U.S.C. 801(b)(7)(A); *see supra* at Section II.A. However, when parties litigate over the adoption of a term, even one that is contained in an adopted agreement, the requesting party must meet its burden with respect to the standards set forth *supra*.

Evaluating SoundExchange's proposals in this light, we find that SoundExchange has not met its burden.

### a. Server Log Retention

SoundExchange urges the Judges to clarify that server logs are among the records to be retained for three years pursuant to § 380.4(h) and to be made available during an audit conducted pursuant to § 380.6. *See* Second Revised

Rates and Terms of SoundExchange, Inc., Section III.A., Proposed Regulations, § 380.4(h) (July 23, 2010); Kessler Corrected WDT at 27. Although SoundExchange believes that retention of these records is required under the current regulations, it requests an amendment to include server logs since oftentimes such logs are not retained. SX PFF at ¶¶ 556–57; Kessler Corrected WDT at 27. SoundExchange asserts that "[t]he evidence indicates marketplace acceptance of such a term," citing to the SoundExchange-CBI agreement which contains an equivalent term. SX PFF at ¶ 555.

In its opposition to this term, Live365 notes that neither the NAB-SoundExchange agreement nor the Commercial Webcasters agreement contains this term nor do any of the interactive service agreements submitted in this proceeding. Live365 RFF at ¶ 555. Live365 further argues that SoundExchange failed to establish how the benefits to SoundExchange of the term outweigh the burden on licensees to comply. *Id.* at ¶ 557.

Section 380.4(h), which governs the retention of records, requires licensees to retain "books and records" relating to royalty payments. The language does not include server logs and SoundExchange's assumption that it does is incorrect. The question remains, however, whether server logs should be included, and the Judges answer in the negative because the record evidence does not support such a finding. None of the interactive agreements in evidence here contain such specificity. Live365 Exs. 17 and 18; McCrady WDT, Exs. 104–DR & 106–DR. Rather, the agreements require licensees only to retain records relating to their obligations under the agreement and in terms no more specific than in the current regulation. *See, e.g.*, Live365 Exs. 17 at ¶ 7(h) and Ex. 18 at ¶ 7(h); McCrady WDT, Exs. 104–DR at ¶ 6(j) and 106–DR at ¶ 4(h). Since these agreements were negotiated in a setting free from the constraints of the regulatory scheme, they provide the best evidence of the agreement of a willing buyer and a willing seller in this respect.

We disagree with SoundExchange's assertion that inclusion of this term in the SoundExchange-CBI WSA agreement constitutes "marketplace acceptance." As discussed *supra* and as acknowledged by SoundExchange, such agreements were reached under atypical marketplace conditions, since their negotiations were overshadowed by the possibility of a regulatory proceeding. *See supra* at Section II.B.3.b.ii.; *see also* 9/30/10 Tr. at 547:20–548:5

(SoundExchange Closing Argument). Furthermore, while the SoundExchange-CBI agreement contains the term, the NAB–SoundExchange and Commercial Webcasters agreements do not despite the assertion of Ms. Kessler that server logs contain data that is "critical for verifying that licensees have made the proper payments." Kessler Corrected WDT at 27; *see also* 4/20/10 Tr. at 455:15–17 (Kessler). If such data is "critical," it is difficult to understand why server logs were not included in the NAB–SoundExchange and Commercial Webcasters agreements, particularly where these agreement were negotiated by SoundExchange and cover "webcasters representing a substantial part of [the webcasting] market." 9/30/10 Tr. at 508:3–4 (SoundExchange Closing Argument); *see supra* at Section II.B.3.b.ii.

Finally, retention of server logs for a three-year period may present significant issues to webcasters regarding storage and costs. No evidence was adduced by SoundExchange as to these important considerations, and the Judges are hesitant to adopt a term without such data. In sum, SoundExchange's request for retention of server logs appears to be more of a want than a need, and we decline to amend § 380.4(h) of our rules.

### b. Standardized Forms for Statements of Account

SoundExchange proposes to require licensees to submit statements of account on a standardized form prescribed by SoundExchange in order to simplify licensees' calculations of the royalties owed and to facilitate SoundExchange's ability to efficiently collect information from licensees. SX PFF at ¶¶ 572, 575. SoundExchange currently provides a template statement of account on its Web site. *Id.* at ¶ 574. SoundExchange notes that noncommercial educational webcasters are required pursuant to their WSA agreement to use a form supplied by SoundExchange. McCrady WDT, Ex. 103–DP at section 4.4.1.

Live365 opposes adoption of this term on the grounds that it is addressed more appropriately in a notice and recordkeeping proceeding. Live365 RFF at ¶ 574.

We are not persuaded that a need for mandatory use of a standardized statement of account exists at this time nor do we find support in the record for adoption of this term. As Mr. Funn testified, the majority of webcasters currently use the template form made available on SoundExchange's Web site. Funn WRT at 2; 8/2/10 Tr. at 492:2–3 (Funn) ("much more than half" of

webcasters currently use template). Mr. Funn provided no information quantifying the additional work for SoundExchange to process a statement of account for the few webcasters who choose not to use the template. The only example given in this regard focused on Live365 and its submission of an altered form using incorrect rates, which is irrelevant to SoundExchange's request. *See* Funn WDT at 3–4; 8/2/10 Tr. at 465:19–22 (Funn).

Our skepticism regarding the need to require use of a standardized form also stems from the fact that neither the NAB–SoundExchange WSA agreement nor the Commercial Webcasters WSA agreement contains this term. McCrady WDT, Exs. 101–DP and 102–DP. Moreover, although the SoundExchange-CBI WSA agreement requires use of a SoundExchange-supplied form, *see* McCrady WDT, Ex. 103–DP at section 4.4.1, such language was not included in the SoundExchange-CBI agreement submitted to the Judges and adopted herein. *See Digital Performance Right in Sound Recordings and Ephemeral Recordings (Proposed rule),* 75 FR 16377, 16385 (§ 380.23(f)) (April 1, 2010).

Given the already widespread use of SoundExchange's template form, the lack of quantification in the record of the time savings to SoundExchange by having a standardized form, and SoundExchange's failure to include this term in the NAB-SoundExchange and Commercial Webcasters WSA agreements or the SoundExchange-CBI agreement submitted to the Judges, we find that the record before us does not support the adoption of this term.

c. Electronic Signature on Statement of Account

SoundExchange seeks to eliminate the requirement in the current § 380.4(f)(3) of a handwritten signature on the statement of account. SX PFF at ¶ 576. According to SoundExchange, allowing electronic signatures would make it easier for licensees to submit their statements of account. *Id., citing* Funn WRT at 3 n.1. SoundExchange further asserts that "none [of the WSA agreements in evidence] requires that statements of account bear a handwritten signature." SX PFF at ¶ 577.

Live365 does not oppose this request as its own proposed regulations eliminate the requirement for a handwritten signature on the statement of account. *See* Attachment to PFF, Proposed Regulations, § 380.4(f)(3).

The Judges determine that the record evidence does not support adoption of

this term. The WSA agreements, as submitted as exhibits to Mr. McCrady's written direct testimony do, despite SoundExchange's assertions to the contrary, require a handwritten signature on a statement of account. SoundExchange is correct that each agreement requires statements of account to be provided each month, although neither agreement sets forth the specific information to be included. *See* McCrady WDT, Ex. 101–DP at section 4.6 (NAB), Ex. 102–DP at section 4.5 (Commercial Webcasters), and Ex. 103–DP at section 4.4.1 (CBI). However, SoundExchange ignores the provision in each agreement which states "[t]o the extent not inconsistent with the Rates and Terms herein, all applicable regulations, including 37 CFR Parts 370 and 380, shall apply to activities subject to these Rates and Terms." *See* McCrady WDT, Ex. 101–DP at section 6.1 (NAB), Ex. 102–DP at section 5.1 (Commercial Webcasters) and Ex. 103–DP at section 6.1 (CBI). Current § 380.4(f)(3) requires a handwritten signature; such requirement is not inconsistent with the agreements' general requirement to simply submit statements of account. Our interpretation is confirmed by the fact that the NAB-SoundExchange and SoundExchange-CBI WSA agreements submitted to the Judges for adoption here each retained the requirement for a handwritten signature. *See Proposed rule,* 75 FR 16380 (§ 380.13(f)(3)), 16385 (§ 380.23(f)(4)) (April 1, 2010). Since we are adopting those provisions as proposed on April 1, 2010, to accept SoundExchange's proposal here would create an inconsistency in terms that does not exist currently.

d. Identification of Licensees and Late Fee for Reports of Use

SoundExchange requests that the Judges harmonize identification of licensees among the notice of intent to use the sections 112 and 114 licenses, the statements of account and the reports of use, and to impose a late fee for reports of use. These two requests differ from the rest of their requests in that these are notice and recordkeeping terms.[38][39] *See* Kessler Corrected WDT at

---
[38] SoundExchange requested these same, or similar, changes in a rulemaking concluded last year where we imposed census reporting for all services except those broadcasters paying no more than the minimum fee. See Comments of SoundExchange, Docket No. RM 2008–7, at 20–23 (January 29, 2009). Such requests were outside the scope of that rulemaking, which was to improve the reporting regulations in light of technological developments since promulgation of the interim regulation, and were deferred for consideration in a future rulemaking. *See Notice and Recordkeeping for Use of Sound Recordings Under Statutory License (Final rule),* 74 FR 52418, 52422–23 (October 13, 2009).

20–23, 27–28. This is not the first time we have been asked to adopt terms regarding notice and recordkeeping in this context. *Webcaster II,* 72 FR 24109 (May 1, 2007); *SDARS,* 73 FR 4101 (January 28, 2008). While the Copyright Act grants us the authority to adopt such terms here (said terms would supersede those set forth in 37 CFR Part 370), such authority is discretionary. 17 U.S.C. 803(c)(3). To date, we have declined to exercise this discretion. *Webcaster II,* 72 FR at 24109–10 (May 1, 2007); *SDARS,* 73 FR at 4101 (January 28, 2008).

Our prior refusals stemmed from our findings that the issues presented, such as census reporting, were more appropriately addressed in the context of a rulemaking proceeding and that "no persuasive testimony compelling an adjustment of the current recordkeeping regulations" was presented in either instance. *SDARS,* 73 FR 4101 (January 28, 2008), *citing Webcaster II,* 72 FR 24110 (May 1, 2007). In light of the record before us, we decline to adopt SoundExchange's proposals regarding the harmonization of licensee identification and the imposition of a late fee for reports of use because the evidence does not compel us to amend the current recordkeeping regulations here; rather, these issues are more appropriately addressed in a future rulemaking proceeding, for the reasons discussed below.

i. Identification of Licensees

SoundExchange asserts that harmonization of the identification of licensees can be accomplished by (1) requiring licensees to identify themselves on their statements of account and reports of use "in exactly the same way [they are] identified on the corresponding notice of use * * * and that they cover the same scope of activity (e.g., the same channels or stations)," SX PFF at ¶ 568, Kessler Corrected WDT at 28; (2) making the regulations clear that the "Licensee" is "the *entity* identified on the notice of use, statement of account, and report of use and that each Licensee must submit its own notice of use, statement of account, and report of use," *id.* (emphasis in original); and (3) requiring licensees to use an account number issued by SoundExchange. *Id.* at ¶ 571. In support of these requests, Ms. Kessler testified that these proposals would allow SoundExchange to more quickly and efficiently match the requisite

---
[39] Ms. Kessler acknowledges, at least with respect to the late fees for reports of use, that such proposals could be implemented in either the notice and recordkeeping regulations or in the license terms. Kessler Corrected WDT at 28.

notice of use, statement of account and report of use to the correct licensee. Kessler Corrected WDT at 29; 4/20/10 Tr. at 461:2–8 (Kessler). She also claims that such requirements would impose "little or no evident cost" to licensees, and licensees' accounting and reporting efforts would be simplified by use of an account number. Kessler Corrected WDT at 29. SoundExchange also points out that these proposals are included in the NAB–SoundExchange and SoundExchange-CBI agreements.[40] SX PFF at ¶ 569.

While Live365 does not dispute SoundExchange's proposed findings of fact on this issue, it did not stipulate to the language provided by SoundExchange.

These claims are not sufficiently supported in the record. For instance, there is nothing in the record that supports Ms. Kessler's assertion regarding the potential costs, or lack thereof, to licensees in complying with such a requirement. Without input from licensees regarding such information, we are reluctant to adopt such a proposal. Similarly, there is insufficient evidence to support mandating the use of an account number. None of the WSA agreements in evidence contain such a provision. McCrady WDT, Exs. 101–DP (NAB), 102–DP (Commercial Webcasters) and 103–DP (CBI). All that exists is Ms. Kessler's assertion that use of an account number may simplify a licensee's accounting and reporting. Kessler Corrected WDT at 29. Moreover, while the SoundExchange-CBI agreement as adopted herein requires that statements of account list the licensee's name as it appears on the notice of use, *see* § 380.23(f)(1), it does not impose that requirement with regard to reports of use. *Compare* McCrady Ex. 103–DP, section 5.2.2 *with* § 380.23(g). Thus, even if we adopted SoundExchange's proposal, there would still be an inconsistency within the webcasting regulations. We are, therefore, not persuaded that such a proposal should be adopted here; rather, this issue is more appropriately addressed in a future rulemaking proceeding.

ii. Late Fee for Reports of Use

SoundExchange seeks the imposition of the same late fee of 1.5% for reports of use as currently exists for late payments and statements of account. *See* 37 CFR 380.4(c). In support of its request, SoundExchange proffered the testimony of Ms. Kessler. She testified that currently there is widespread

noncompliance with reporting requirements, either failure to file a report of use at all or provision of late and/or "grossly inadequate" reports. Kessler Corrected WDT at 28. Given that a report of use is "a critical element in the fair and efficient distribution of the royalties," 4/20/10 Tr. at 458:21–22 (Kessler), such noncompliance significantly hampers SoundExchange's ability to timely distribute the royalties. Kessler Corrected WDT at 28. Ms. Kessler further noted "that late fees in other areas does [sic] help with our compliance situation." 4/20/10 Tr. at 458:19–20 (Kessler). SoundExchange also points to the inclusion of a late fee for untimely reports of use in the NAB–SoundExchange and SoundExchange-CBI WSA agreements as further support for its request. SX PFF at ¶ 564.

Live365 questions SoundExchange's characterization of a payment as being useless without a report of use given that both the NAB–SoundExchange and CBI–SoundExchange agreements contain reporting waivers. Live365 RCL at ¶ 20.

We are not persuaded by the record before us that there is a need to adopt a late fee for reports of use in this context. The record evidence does not show that a willing buyer and a willing seller would agree to a late fee with respect to reporting, as none of the interactive agreements in evidence contain such a term. Live365 Exs. 17, 18; McCrady WDT, Exs.104–DR and 106–DR. Although the NAB–SoundExchange and SoundExchange-CBI WSA agreements do contain the late fee, they were negotiated under the shadow of a regulatory proceeding, and we note that this late fee was not included in the Commercial Webcasters WSA agreement negotiated by SoundExchange.

*D. Contested Terms for Noncommercial Webcasters*

IBS has proposed two terms. The first is an exemption from the recordkeeping reporting requirements for the small and very small noncommercial webcaster subcategories it proposed in its rate request. As discussed, *supra*, the Judges declined to recognize the proffered subcategories, thus making IBS' request for recordkeeping reporting exemptions moot. The second term proposed by IBS is an express authorization that SoundExchange "may elect to accept collective payments on behalf of small and very small noncommercial webcasters." IBS PFF at ¶ 26. This request is also moot.[41]

## V. Determination and Order

Having fully considered the record, the Copyright Royalty Judges make the above Findings of Fact based on the record. Relying on these Findings of Fact, the Copyright Royalty Judges unanimously adopt this Final Determination of Rates and Terms for the statutory licenses for the digital audio transmission of sound recordings, pursuant to 17 U.S.C. 114, and for the making of ephemeral phonorecords, pursuant to 17 U.S.C. 112(e), for the license period 2011–2015.

*So ordered.*

Dated: January 5, 2011.

**James Scott Sledge,**
*Chief U.S. Copyright Royalty Judge.*

**William J. Roberts, Jr.,**
*U.S. Copyright Royalty Judge.*

**Stanley C. Wisniewski,**
*U.S. Copyright Royalty Judge.*

List of Subjects in 37 CFR Part 380

Copyright, Sound recordings.

**Final Regulations**

For the reasons set forth in the preamble, the Copyright Royalty Judges revise part 380 of title 37 of the Code of Federal Regulations to read as follows:

**PART 380—RATES AND TERMS FOR CERTAIN ELIGIBLE NONSUBSCRIPTION TRANSMISSIONS, NEW SUBSCRIPTION SERVICES AND THE MAKING OF EPHEMERAL REPRODUCTIONS**

**Subpart A—Commercial Webcasters and Noncommercial Webcasters**

Sec.
380.1   General.
380.2   Definitions.
380.3   Royalty fees for the public performance of sound recordings and for ephemeral recordings.
380.4   Terms for making payment of royalty fees and statements of account.
380.5   Confidential Information.
380.6   Verification of royalty payments.
380.7   Verification of royalty distributions.
380.8   Unclaimed funds.

**Subpart B—Broadcasters**

380.10   General.
380.11   Definitions.
380.12   Royalty fees for the public performance of sound recordings and for ephemeral recordings.
380.13   Terms for making payment of royalty fees and statements of account.
380.14   Confidential Information.
380.15   Verification of royalty payments.
380.16   Verification of royalty distributions.
380.17   Unclaimed funds.

---

[40] We note that neither agreement mandates the use of an account number.

[41] Even if the request were not moot, it seems unnecessary. SoundExchange is authorized, by virtue of its recognition as the collective under the sections 112 and 114 licenses, to accept payments on behalf of copyright owners, from one or more users of the licenses.

## Subpart C—Noncommercial Educational Webcasters

380.20  General.
380.21  Definitions.
380.22  Royalty fees for the public performance of sound recordings and for ephemeral recordings.
380.23  Terms for making payment of royalty fees and statements of account.
380.24  Confidential Information.
380.25  Verification of royalty payments.
380.26  Verification of royalty distributions.
380.27  Unclaimed funds.

**Authority:** 17 U.S.C. 112(e), 114(f), 804(b)(3).

## Subpart A—Commercial Webcasters and Noncommercial Webcasters

### § 380.1   General.

(a) *Scope.* This subpart establishes rates and terms of royalty payments for the public performance of sound recordings in certain digital transmissions by Licensees as set forth in this subpart in accordance with the provisions of 17 U.S.C. 114, and the making of Ephemeral Recordings by Licensees in accordance with the provisions of 17 U.S.C. 112(e), during the period January 1, 2011, through December 31, 2015.

(b) *Legal compliance.* Licensees relying upon the statutory licenses set forth in 17 U.S.C. 112(e) and 114 shall comply with the requirements of those sections, the rates and terms of this subpart, and any other applicable regulations.

(c) *Relationship to voluntary agreements.* Notwithstanding the royalty rates and terms established in this subpart, the rates and terms of any license agreements entered into by Copyright Owners and Licensees shall apply in lieu of the rates and terms of this subpart to transmission within the scope of such agreements.

### § 380.2   Definitions.

For purposes of this subpart, the following definitions shall apply:

*Aggregate Tuning Hours* (ATH) means the total hours of programming that the Licensee has transmitted during the relevant period to all listeners within the United States from all channels and stations that provide audio programming consisting, in whole or in part, of eligible nonsubscription transmissions or noninteractive digital audio transmissions as part of a new subscription service, less the actual running time of any sound recordings for which the Licensee has obtained direct licenses apart from 17 U.S.C. 114(d)(2) or which do not require a license under United States copyright law. By way of example, if a service transmitted one hour of programming to

10 simultaneous listeners, the service's Aggregate Tuning Hours would equal 10. If 3 minutes of that hour consisted of transmission of a directly licensed recording, the service's Aggregate Tuning Hours would equal 9 hours and 30 minutes. As an additional example, if one listener listened to a service for 10 hours (and none of the recordings transmitted during that time was directly licensed), the service's Aggregate Tuning Hours would equal 10.

*Broadcaster* is a type of Licensee that owns and operates a terrestrial AM or FM radio station that is licensed by the Federal Communications Commission.

*Collective* is the collection and distribution organization that is designated by the Copyright Royalty Judges. For the 2011–2015 license period, the Collective is SoundExchange, Inc.

*Commercial Webcaster* is a Licensee, other than a Noncommercial Webcaster, that makes eligible digital audio transmissions.

*Copyright Owners* are sound recording copyright owners who are entitled to royalty payments made under this subpart pursuant to the statutory licenses under 17 U.S.C. 112(e) and 114.

*Ephemeral Recording* is a phonorecord created for the purpose of facilitating a transmission of a public performance of a sound recording under a statutory license in accordance with 17 U.S.C. 114, and subject to the limitations specified in 17 U.S.C. 112(e).

*Licensee* is a person that has obtained a statutory license under 17 U.S.C. 114, and the implementing regulations, to make eligible nonsubscription transmissions, or noninteractive digital audio transmissions as part of a new subscription service (as defined in 17 U.S.C. 114(j)(8)) other than a Service as defined in § 383.2(h) of this chapter, or that has obtained a statutory license under 17 U.S.C. 112(e), and the implementing regulations, to make Ephemeral Recordings for use in facilitating such transmissions, but that is not—

(1) A Broadcaster as defined in § 380.11; or

(2) A Noncommercial Educational Webcaster as defined in § 380.21.

*Noncommercial Webcaster* is a Licensee that makes eligible digital audio transmissions and

(1) Is exempt from taxation under section 501 of the Internal Revenue Code of 1986 (26 U.S.C. 501),

(2) Has applied in good faith to the Internal Revenue Service for exemption from taxation under section 501 of the Internal Revenue Code and has a

commercially reasonable expectation that such exemption shall be granted, or

(3) Is operated by a State or possession or any governmental entity or subordinate thereof, or by the United States or District of Columbia, for exclusively public purposes.

*Performance* is each instance in which any portion of a sound recording is publicly performed to a listener by means of a digital audio transmission (*e.g.,* the delivery of any portion of a single track from a compact disc to one listener) but excluding the following:

(1) A performance of a sound recording that does not require a license (*e.g.,* a sound recording that is not copyrighted);

(2) A performance of a sound recording for which the service has previously obtained a license from the Copyright Owner of such sound recording; and

(3) An incidental performance that both:

(i) Makes no more than incidental use of sound recordings including, but not limited to, brief musical transitions in and out of commercials or program segments, brief performances during news, talk and sports programming, brief background performances during disk jockey announcements, brief performances during commercials of sixty seconds or less in duration, or brief performances during sporting or other public events and

(ii) Other than ambient music that is background at a public event, does not contain an entire sound recording and does not feature a particular sound recording of more than thirty seconds (as in the case of a sound recording used as a theme song).

*Performers* means the independent administrators identified in 17 U.S.C. 114(g)(2)(B) and (C) and the parties identified in 17 U.S.C. 114(g)(2)(D).

*Qualified Auditor* is a Certified Public Accountant.

*Side Channel* is a channel on the Web site of a Broadcaster which channel transmits eligible transmissions that are not simultaneously transmitted over the air by the Broadcaster.

### § 380.3   Royalty fees for the public performance of sound recordings and for ephemeral recordings.

(a) *Royalty rates.* Royalty rates and fees for eligible digital transmissions of sound recordings made pursuant to 17 U.S.C. 114, and the making of ephemeral recordings pursuant to 17 U.S.C. 112(e) are as follows:

(1) *Commercial Webcasters:* For all digital audio transmissions, including simultaneous digital audio retransmissions of over-the-air AM or

FM radio broadcasts, and related Ephemeral Recordings, a Commercial Webcaster will pay a royalty of: $0.0019 per performance for 2011; $0.0021 per performance for 2012; $0.0021 per performance for 2013; $0.0023 per performance for 2014; and $0.0023 per performance for 2015.

(2) *Noncommercial Webcasters:* (i) For all digital audio transmissions totaling not more than 159,140 Aggregate Tuning Hours (ATH) in a month, including simultaneous digital audio retransmissions of over-the-air AM or FM radio broadcasts, and related Ephemeral Recordings, a Noncommercial Webcaster will pay an annual per channel or per station performance royalty of $500 in 2011, 2012, 2013, 2014, and 2015.

(ii) For all digital audio transmissions totaling in excess of 159,140 Aggregate Tuning Hours (ATH) in a month, including simultaneous digital audio retransmissions of over-the-air AM or FM radio broadcasts, and related Ephemeral Recordings, a Noncommercial Webcaster will pay a royalty of: $0.0019 per performance for 2011; $0.0021 per performance for 2012; $0.0021 per performance for 2013; $0.0023 per performance for 2014; and $0.0023 per performance for 2015.

(b) *Minimum fee*—(1) *Commercial Webcasters.* Each Commercial Webcaster will pay an annual, nonrefundable minimum fee of $500 for each calendar year or part of a calendar year of the period 2011–2015 during which it is a Licensee pursuant to 17 U.S.C. 112(e) or 114. This annual minimum fee is payable for each individual channel and each individual station maintained by Commercial Webcasters, and is also payable for each individual Side Channel maintained by Broadcasters who are Commercial Webcasters, provided that a Commercial Webcaster shall not be required to pay more than $50,000 per calendar year in minimum fees in the aggregate (for 100 or more channels or stations). For each such Commercial Webcaster, the annual minimum fee described in this paragraph (b)(1) shall constitute the minimum fees due under both 17 U.S.C. 112(e)(4) and 114(f)(2)(B). Upon payment of the minimum fee, the Commercial Webcaster will receive a credit in the amount of the minimum fee against any additional royalty fees payable in the same calendar year.

(2) *Noncommercial Webcasters.* Each Noncommercial Webcaster will pay an annual, nonrefundable minimum fee of $500 for each calendar year or part of a calendar year of the period 2011–2015 during which it is a Licensee pursuant to 17 U.S.C. 112(e) or 114. This annual minimum fee is payable for each individual channel and each individual station maintained by Noncommercial Webcasters, and is also payable for each individual Side Channel maintained by Broadcasters who are Noncommercial Webcasters. For each such Noncommercial Webcaster, the annual minimum fee described in this paragraph (b)(2) shall constitute the minimum fees due under both 17 U.S.C. 112(e)(4) and 114(f)(2)(B). Upon payment of the minimum fee, the Noncommercial Webcaster will receive a credit in the amount of the minimum fee against any additional royalty fees payable in the same calendar year.

(c) *Ephemeral recordings.* The royalty payable under 17 U.S.C. 112(e) for the making of all Ephemeral Recordings used by the Licensee solely to facilitate transmissions for which it pays royalties shall be included within, and constitute 5% of, the total royalties payable under 17 U.S.C. 112(e) and 114.

### § 380.4 Terms for making payment of royalty fees and statements of account.

(a) *Payment to the Collective.* A Licensee shall make the royalty payments due under § 380.3 to the Collective.

(b) *Designation of the Collective.* (1) Until such time as a new designation is made, SoundExchange, Inc., is designated as the Collective to receive statements of account and royalty payments from Licensees due under § 380.3 and to distribute such royalty payments to each Copyright Owner and Performer, or their designated agents, entitled to receive royalties under 17 U.S.C. 112(e) or 114(g).

(2) If SoundExchange, Inc. should dissolve or cease to be governed by a board consisting of equal numbers of representatives of Copyright Owners and Performers, then it shall be replaced by a successor Collective upon the fulfillment of the requirements set forth in paragraph (b)(2)(i) of this section.

(i) By a majority vote of the nine Copyright Owner representatives and the nine Performer representatives on the SoundExchange board as of the last day preceding the condition precedent in this paragraph (b)(2), such representatives shall file a petition with the Copyright Royalty Judges designating a successor to collect and distribute royalty payments to Copyright Owners and Performers entitled to receive royalties under 17 U.S.C. 112(e) or 114(g) that have themselves authorized the Collective.

(ii) The Copyright Royalty Judges shall publish in the **Federal Register** within 30 days of receipt of a petition filed under paragraph (b)(2)(i) of this section an order designating the Collective named in such petition.

(c) *Monthly payments.* A Licensee shall make any payments due under § 380.3 on a monthly basis on or before the 45th day after the end of each month for that month. All monthly payments shall be rounded to the nearest cent.

(d) *Minimum payments.* A Licensee shall make any minimum payment due under § 380.3(b) by January 31 of the applicable calendar year, except that payment for a Licensee that has not previously made eligible nonsubscription transmissions, noninteractive digital audio transmissions as part of a new subscription service or Ephemeral Recordings pursuant to the licenses in 17 U.S.C. 114 and/or 17 U.S.C. 112(e) shall be due by the 45th day after the end of the month in which the Licensee commences to do so.

(e) *Late payments and statements of account.* A Licensee shall pay a late fee of 1.5% per month, or the highest lawful rate, whichever is lower, for any payment and/or statement of account received by the Collective after the due date. Late fees shall accrue from the due date until payment and the related statement of account are received by the Collective.

(f) *Statements of account.* Any payment due under § 380.3 shall be accompanied by a corresponding statement of account. A statement of account shall contain the following information:

(1) Such information as is necessary to calculate the accompanying royalty payment;

(2) The name, address, business title, telephone number, facsimile number (if any), electronic mail address and other contact information of the person to be contacted for information or questions concerning the content of the statement of account;

(3) The handwritten signature of:

(i) The owner of the Licensee or a duly authorized agent of the owner, if the Licensee is not a partnership or corporation;

(ii) A partner or delegee, if the Licensee is a partnership; or

(iii) An officer of the corporation, if the Licensee is a corporation.

(4) The printed or typewritten name of the person signing the statement of account;

(5) The date of signature;

(6) If the Licensee is a partnership or corporation, the title or official position held in the partnership or corporation by the person signing the statement of account;

(7) A certification of the capacity of the person signing; and

(8) A statement to the following effect:

I, the undersigned owner or agent of the Licensee, or officer or partner, have examined this statement of account and hereby state that it is true, accurate, and complete to my knowledge after reasonable due diligence.

(g) *Distribution of royalties.* (1) The Collective shall promptly distribute royalties received from Licensees to Copyright Owners and Performers, or their designated agents, that are entitled to such royalties. The Collective shall only be responsible for making distributions to those Copyright Owners, Performers, or their designated agents who provide the Collective with such information as is necessary to identify the correct recipient. The Collective shall distribute royalties on a basis that values all performances by a Licensee equally based upon the information provided under the reports of use requirements for Licensees contained in § 370.4 of this chapter.

(2) If the Collective is unable to locate a Copyright Owner or Performer entitled to a distribution of royalties under paragraph (g)(1) of the section within 3 years from the date of payment by a Licensee, such royalties shall be handled in accordance with § 380.8.

(h) *Retention of records.* Books and records of a Licensee and of the Collective relating to payments of and distributions of royalties shall be kept for a period of not less than the prior 3 calendar years.

### § 380.5   Confidential Information.

(a) *Definition.* For purposes of this subpart, "Confidential Information" shall include the statements of account and any information contained therein, including the amount of royalty payments, and any information pertaining to the statements of account reasonably designated as confidential by the Licensee submitting the statement.

(b) *Exclusion.* Confidential Information shall not include documents or information that at the time of delivery to the Collective are public knowledge. The party claiming the benefit of this provision shall have the burden of proving that the disclosed information was public knowledge.

(c) *Use of Confidential Information.* In no event shall the Collective use any Confidential Information for any purpose other than royalty collection and distribution and activities related directly thereto.

(d) *Disclosure of Confidential Information.* Access to Confidential Information shall be limited to:

(1) Those employees, agents, attorneys, consultants and independent contractors of the Collective, subject to an appropriate confidentiality agreement, who are engaged in the collection and distribution of royalty payments hereunder and activities related thereto, for the purpose of performing such duties during the ordinary course of their work and who require access to the Confidential Information;

(2) An independent and Qualified Auditor, subject to an appropriate confidentiality agreement, who is authorized to act on behalf of the Collective with respect to verification of a Licensee's statement of account pursuant to § 380.6 or on behalf of a Copyright Owner or Performer with respect to the verification of royalty distributions pursuant to § 380.7;

(3) Copyright Owners and Performers, including their designated agents, whose works have been used under the statutory licenses set forth in 17 U.S.C. 112(e) and 114 by the Licensee whose Confidential Information is being supplied, subject to an appropriate confidentiality agreement, and including those employees, agents, attorneys, consultants and independent contractors of such Copyright Owners and Performers and their designated agents, subject to an appropriate confidentiality agreement, for the purpose of performing their duties during the ordinary course of their work and who require access to the Confidential Information; and

(4) In connection with future proceedings under 17 U.S.C. 112(e) and 114 before the Copyright Royalty Judges, and under an appropriate protective order, attorneys, consultants and other authorized agents of the parties to the proceedings or the courts.

(e) *Safeguarding of Confidential Information.* The Collective and any person identified in paragraph (d) of this section shall implement procedures to safeguard against unauthorized access to or dissemination of any Confidential Information using a reasonable standard of care, but no less than the same degree of security used to protect Confidential Information or similarly sensitive information belonging to the Collective or person.

### § 380.6   Verification of royalty payments.

(a) *General.* This section prescribes procedures by which the Collective may verify the royalty payments made by a Licensee.

(b) *Frequency of verification.* The Collective may conduct a single audit of a Licensee, upon reasonable notice and during reasonable business hours, during any given calendar year, for any or all of the prior 3 calendar years, but

no calendar year shall be subject to audit more than once.

(c) *Notice of intent to audit.* The Collective must file with the Copyright Royalty Judges a notice of intent to audit a particular Licensee, which shall, within 30 days of the filing of the notice, publish in the **Federal Register** a notice announcing such filing. The notification of intent to audit shall be served at the same time on the Licensee to be audited. Any such audit shall be conducted by an independent and Qualified Auditor identified in the notice, and shall be binding on all parties.

(d) *Acquisition and retention of report.* The Licensee shall use commercially reasonable efforts to obtain or to provide access to any relevant books and records maintained by third parties for the purpose of the audit. The Collective shall retain the report of the verification for a period of not less than 3 years.

(e) *Acceptable verification procedure.* An audit, including underlying paperwork, which was performed in the ordinary course of business according to generally accepted auditing standards by an independent and Qualified Auditor, shall serve as an acceptable verification procedure for all parties with respect to the information that is within the scope of the audit.

(f) *Consultation.* Before rendering a written report to the Collective, except where the auditor has a reasonable basis to suspect fraud and disclosure would, in the reasonable opinion of the auditor, prejudice the investigation of such suspected fraud, the auditor shall review the tentative written findings of the audit with the appropriate agent or employee of the Licensee being audited in order to remedy any factual errors and clarify any issues relating to the audit; Provided that an appropriate agent or employee of the Licensee reasonably cooperates with the auditor to remedy promptly any factual errors or clarify any issues raised by the audit.

(g) *Costs of the verification procedure.* The Collective shall pay the cost of the verification procedure, unless it is finally determined that there was an underpayment of 10% or more, in which case the Licensee shall, in addition to paying the amount of any underpayment, bear the reasonable costs of the verification procedure.

### § 380.7   Verification of royalty distributions.

(a) *General.* This section prescribes procedures by which any Copyright Owner or Performer may verify the royalty distributions made by the Collective; provided, however, that

nothing contained in this section shall apply to situations where a Copyright Owner or Performer and the Collective have agreed as to proper verification methods.

(b) *Frequency of verification.* A Copyright Owner or Performer may conduct a single audit of the Collective upon reasonable notice and during reasonable business hours, during any given calendar year, for any or all of the prior 3 calendar years, but no calendar year shall be subject to audit more than once.

(c) *Notice of intent to audit.* A Copyright Owner or Performer must file with the Copyright Royalty Judges a notice of intent to audit the Collective, which shall, within 30 days of the filing of the notice, publish in the **Federal Register** a notice announcing such filing. The notification of intent to audit shall be served at the same time on the Collective. Any audit shall be conducted by an independent and Qualified Auditor identified in the notice, and shall be binding on all Copyright Owners and Performers.

(d) *Acquisition and retention of report.* The Collective shall use commercially reasonable efforts to obtain or to provide access to any relevant books and records maintained by third parties for the purpose of the audit. The Copyright Owner or Performer requesting the verification procedure shall retain the report of the verification for a period of not less than 3 years.

(e) *Acceptable verification procedure.* An audit, including underlying paperwork, which was performed in the ordinary course of business according to generally accepted auditing standards by an independent and Qualified Auditor, shall serve as an acceptable verification procedure for all parties with respect to the information that is within the scope of the audit.

(f) *Consultation.* Before rendering a written report to a Copyright Owner or Performer, except where the auditor has a reasonable basis to suspect fraud and disclosure would, in the reasonable opinion of the auditor, prejudice the investigation of such suspected fraud, the auditor shall review the tentative written findings of the audit with the appropriate agent or employee of the Collective in order to remedy any factual errors and clarify any issues relating to the audit; Provided that the appropriate agent or employee of the Collective reasonably cooperates with the auditor to remedy promptly any factual errors or clarify any issues raised by the audit.

(g) *Costs of the verification procedure.* The Copyright Owner or Performer requesting the verification procedure shall pay the cost of the procedure, unless it is finally determined that there was an underpayment of 10% or more, in which case the Collective shall, in addition to paying the amount of any underpayment, bear the reasonable costs of the verification procedure.

### § 380.8 Unclaimed funds.

If the Collective is unable to identify or locate a Copyright Owner or Performer who is entitled to receive a royalty distribution under this subpart, the Collective shall retain the required payment in a segregated trust account for a period of 3 years from the date of distribution. No claim to such distribution shall be valid after the expiration of the 3-year period. After expiration of this period, the Collective may apply the unclaimed funds to offset any costs deductible under 17 U.S.C. 114(g)(3). The foregoing shall apply notwithstanding the common law or statutes of any State.

## Subpart B—Broadcasters

### § 380.10 General.

(a) *Scope.* This subpart establishes rates and terms of royalty payments for the public performance of sound recordings in certain digital transmissions made by Broadcasters as set forth herein in accordance with the provisions of 17 U.S.C. 114, and the making of Ephemeral Recordings by Broadcasters as set forth herein in accordance with the provisions of 17 U.S.C. 112(e), during the period January 1, 2011, through December 31, 2015.

(b) *Legal compliance.* Broadcasters relying upon the statutory licenses set forth in 17 U.S.C. 112(e) and 114 shall comply with the requirements of those sections, the rates and terms of this subpart, and any other applicable regulations not inconsistent with the rates and terms set forth herein.

(c) *Relationship to voluntary agreements.* Notwithstanding the royalty rates and terms established in this subpart, the rates and terms of any license agreements entered into by Copyright Owners and digital audio services shall apply in lieu of the rates and terms of this subpart to transmission within the scope of such agreements.

### § 380.11 Definitions.

For purposes of this subpart, the following definitions shall apply:

*Aggregate Tuning Hours* means the total hours of programming that the Broadcaster has transmitted during the relevant period to all listeners within the United States from any channels and stations that provide audio programming consisting, in whole or in part, of Eligible Transmissions.

*Broadcaster* means an entity that:

(1) Has a substantial business owning and operating one or more terrestrial AM or FM radio stations that are licensed as such by the Federal Communications Commission;

(2) Has obtained a compulsory license under 17 U.S.C. 112(e) and 114 and the implementing regulations therefor to make Eligible Transmissions and related ephemeral recordings;

(3) Complies with all applicable provisions of Sections 112(e) and 114 and applicable regulations; and

(4) Is not a noncommercial webcaster as defined in 17 U.S.C. 114(f)(5)(E)(i).

*Broadcaster Webcasts* mean eligible nonsubscription transmissions made by a Broadcaster over the Internet that are not Broadcast Retransmissions.

*Broadcast Retransmissions* mean eligible nonsubscription transmissions made by a Broadcaster over the Internet that are retransmissions of terrestrial over-the-air broadcast programming transmitted by the Broadcaster through its AM or FM radio station, including ones with substitute advertisements or other programming occasionally substituted for programming for which requisite licenses or clearances to transmit over the Internet have not been obtained. For the avoidance of doubt, a Broadcast Retransmission does not include programming that does not require a license under United States copyright law or that is transmitted on an Internet-only side channel.

*Collective* is the collection and distribution organization that is designated by the Copyright Royalty Judges. For the 2011–2015 license period, the Collective is SoundExchange, Inc.

*Copyright Owners* are sound recording copyright owners who are entitled to royalty payments made under this subpart pursuant to the statutory licenses under 17 U.S.C. 112(e) and 114(f).

*Eligible Transmission* shall mean either a Broadcaster Webcast or a Broadcast Retransmission.

*Ephemeral Recording* is a phonorecord created for the purpose of facilitating an Eligible Transmission of a public performance of a sound recording under a statutory license in accordance with 17 U.S.C. 114(f), and subject to the limitations specified in 17 U.S.C. 112(e).

*Performance* is each instance in which any portion of a sound recording is publicly performed to a listener by means of a digital audio transmission (*e.g.,* the delivery of any portion of a

single track from a compact disc to one listener) but excluding the following:

(1) A performance of a sound recording that does not require a license (*e.g.,* a sound recording that is not copyrighted);

(2) A performance of a sound recording for which the Broadcaster has previously obtained a license from the Copyright Owner of such sound recording; and

(3) An incidental performance that both:

(i) Makes no more than incidental use of sound recordings including, but not limited to, brief musical transitions in and out of commercials or program segments, brief performances during news, talk and sports programming, brief background performances during disk jockey announcements, brief performances during commercials of sixty seconds or less in duration, or brief performances during sporting or other public events and

(ii) Other than ambient music that is background at a public event, does not contain an entire sound recording and does not feature a particular sound recording of more than thirty seconds (as in the case of a sound recording used as a theme song).

*Performers* means the independent administrators identified in 17 U.S.C. 114(g)(2)(B) and (C) and the parties identified in 17 U.S.C. 114(g)(2)(D).

*Qualified Auditor* is a Certified Public Accountant.

*Small Broadcaster* is a Broadcaster that, for any of its channels and stations (determined as provided in § 380.12(c)) over which it transmits Broadcast Retransmissions, and for all of its channels and stations over which it transmits Broadcaster Webcasts in the aggregate, in any calendar year in which it is to be considered a Small Broadcaster, meets the following additional eligibility criteria:

(1) During the prior year it made Eligible Transmissions totaling less than 27,777 Aggregate Tuning Hours; and

(2) During the applicable year it reasonably expects to make Eligible Transmissions totaling less than 27,777 Aggregate Tuning Hours; provided that, one time during the period 2011–2015, a Broadcaster that qualified as a Small Broadcaster under the foregoing definition as of January 31 of one year, elected Small Broadcaster status for that year, and unexpectedly made Eligible Transmissions on one or more channels or stations in excess of 27,777 aggregate tuning hours during that year, may choose to be treated as a Small Broadcaster during the following year notwithstanding paragraph (1) of the definition of "Small Broadcaster" if it

implements measures reasonably calculated to ensure that it will not make Eligible Transmissions exceeding 27,777 aggregate tuning hours during that following year. As to channels or stations over which a Broadcaster transmits Broadcast Retransmissions, the Broadcaster may elect Small Broadcaster status only with respect to any of its channels or stations that meet all of the foregoing criteria.

**§ 380.12   Royalty fees for the public performance of sound recordings and for ephemeral transmissions.**

(a) *Royalty rates.* Royalties for Eligible Transmissions made pursuant to 17 U.S.C. 114, and the making of related ephemeral recordings pursuant to 17 U.S.C. 112(e), shall, except as provided in § 380.13(g)(3), be payable on a per-performance basis, as follows:

(1) 2011: $0.0017;
(2) 2012: $0.0020;
(3) 2013: $0.0022;
(4) 2014: $0.0023;
(5) 2015: $0.0025.

(b) *Ephemeral royalty.* The royalty payable under 17 U.S.C. 112(e) for any reproduction of a phonorecord made by a Broadcaster during this license period and used solely by the Broadcaster to facilitate transmissions for which it pays royalties as and when provided in this section is deemed to be included within such royalty payments and to equal the percentage of such royalty payments determined by the Copyright Royalty Judges for other webcasting as set forth in § 380.3.

(c) *Minimum fee.* Each Broadcaster will pay an annual, nonrefundable minimum fee of $500 for each of its individual channels, including each of its individual side channels, and each of its individual stations, through which (in each case) it makes Eligible Transmissions, for each calendar year or part of a calendar year during 2011–2015 during which the Broadcaster is a licensee pursuant to licenses under 17 U.S.C. 112(e) and 114, provided that a Broadcaster shall not be required to pay more than $50,000 in minimum fees in the aggregate (for 100 or more channels or stations). For the purpose of this subpart, each individual stream (*e.g.,* HD radio side channels, different stations owned by a single licensee) will be treated separately and be subject to a separate minimum, except that identical streams for simulcast stations will be treated as a single stream if the streams are available at a single Uniform Resource Locator (URL) and performances from all such stations are aggregated for purposes of determining the number of payable performances hereunder. Upon payment of the

minimum fee, the Broadcaster will receive a credit in the amount of the minimum fee against any additional royalties payable for the same calendar year for the same channel or station. In addition, an electing Small Broadcaster also shall pay a $100 annual fee (the "Proxy Fee") to the Collective for the reporting waiver discussed in § 380.13(g)(2).

**§ 380.13   Terms for making payment of royalty fees and statements of account.**

(a) *Payment to the Collective.* A Broadcaster shall make the royalty payments due under § 380.12 to the Collective.

(b) *Designation of the Collective.* (1) Until such time as a new designation is made, SoundExchange, Inc., is designated as the Collective to receive statements of account and royalty payments from Broadcasters due under § 380.12 and to distribute such royalty payments to each Copyright Owner and Performer, or their designated agents, entitled to receive royalties under 17 U.S.C. 112(e) and 114(g).

(2) If SoundExchange, Inc. should dissolve or cease to be governed by a board consisting of equal numbers of representatives of Copyright Owners and Performers, then it shall be replaced by a successor Collective upon the fulfillment of the requirements set forth in paragraph (b)(2)(i) of this section.

(i) By a majority vote of the nine Copyright Owner representatives and the nine Performer representatives on the SoundExchange board as of the last day preceding the condition precedent in this paragraph (b)(2), such representatives shall file a petition with the Copyright Royalty Board designating a successor to collect and distribute royalty payments to Copyright Owners and Performers entitled to receive royalties under 17 U.S.C. 112(e) or 114(g) that have themselves authorized such Collective.

(ii) The Copyright Royalty Judges shall publish in the **Federal Register** within 30 days of receipt of a petition filed under paragraph (b)(2)(i) of this section an order designating the Collective named in such petition.

(c) *Monthly payments and reporting.* Broadcasters must make monthly payments where required by § 380.12, and provide statements of account and reports of use, for each month on the 45th day following the month in which the Eligible Transmissions subject to the payments, statements of account, and reports of use were made. All monthly payments shall be rounded to the nearest cent.

(d) *Minimum payments.* A Broadcaster shall make any minimum

payment due under § 380.12(b) by January 31 of the applicable calendar year, except that payment by a Broadcaster that was not making Eligible Transmissions or Ephemeral Recordings pursuant to the licenses in 17 U.S.C. 114 and/or 17 U.S.C. 112(e) as of said date but begins doing so thereafter shall be due by the 45th day after the end of the month in which the Broadcaster commences to do so.

(e) *Late fees.* A Broadcaster shall pay a late fee for each instance in which any payment, any statement of account or any report of use is not received by the Collective in compliance with applicable regulations by the due date. The amount of the late fee shall be 1.5% of a late payment, or 1.5% of the payment associated with a late statement of account or report of use, per month, or the highest lawful rate, whichever is lower. The late fee shall accrue from the due date of the payment, statement of account or report of use until a fully compliant payment, statement of account or report of use is received by the Collective, provided that, in the case of a timely provided but noncompliant statement of account or report of use, the Collective has notified the Broadcaster within 90 days regarding any noncompliance that is reasonably evident to the Collective.

(f) *Statements of account.* Any payment due under § 380.12 shall be accompanied by a corresponding statement of account. A statement of account shall contain the following information:

(1) Such information as is necessary to calculate the accompanying royalty payment;

(2) The name, address, business title, telephone number, facsimile number (if any), electronic mail address (if any) and other contact information of the person to be contacted for information or questions concerning the content of the statement of account;

(3) The handwritten signature of:

(i) The owner of the Broadcaster or a duly authorized agent of the owner, if the Broadcaster is not a partnership or corporation;

(ii) A partner or delegee, if the Broadcaster is a partnership; or

(iii) An officer of the corporation, if the Broadcaster is a corporation.

(4) The printed or typewritten name of the person signing the statement of account;

(5) The date of signature;

(6) If the Broadcaster is a partnership or corporation, the title or official position held in the partnership or corporation by the person signing the statement of account;

(7) A certification of the capacity of the person signing; and

(8) A statement to the following effect:

I, the undersigned owner or agent of the Broadcaster, or officer or partner, have examined this statement of account and hereby state that it is true, accurate, and complete to my knowledge after reasonable due diligence.

(g) *Reporting by Broadcasters in General.* (1) Broadcasters other than electing Small Broadcasters covered by paragraph (g)(2) of this section shall submit reports of use on a per-performance basis in compliance with the regulations set forth in part 370 of this chapter, except that the following provisions shall apply notwithstanding the provisions of such part 370 of this chapter from time to time in effect:

(i) Broadcasters may pay for, and report usage in, a percentage of their programming hours on an Aggregate Tuning Hour basis as provided in paragraph (g)(3) of this section.

(ii) Broadcasters shall submit reports of use to the Collective on a monthly basis.

(iii) As provided in paragraph (d) of this section, Broadcasters shall submit reports of use by no later than the 45th day following the last day of the month to which they pertain.

(iv) Except as provided in paragraph (g)(3) of this section, Broadcasters shall submit reports of use to the Collective on a census reporting basis (*i.e.,* reports of use shall include every sound recording performed in the relevant month and the number of performances thereof).

(v) Broadcasters shall either submit a separate report of use for each of their stations, or a collective report of use covering all of their stations but identifying usage on a station-by-station basis;

(vi) Broadcasters shall transmit each report of use in a file the name of which includes:

(A) The name of the Broadcaster, exactly as it appears on its notice of use, and

(B) If the report covers a single station only, the call letters of the station.

(vii) Broadcasters shall submit reports of use with headers, as presently described in § 370.4(e)(7) of this chapter.

(viii) Broadcasters shall submit a separate statement of account corresponding to each of their reports of use, transmitted in a file the name of which includes:

(A) The name of the Broadcaster, exactly as it appears on its notice of use, and

(B) If the statement covers a single station only, the call letters of the station.

(2) On a transitional basis for a limited time in light of the unique business and operational circumstances currently existing with respect to Small Broadcasters and with the expectation that Small Broadcasters will be required, effective January 1, 2016, to report their actual usage in compliance with then-applicable regulations. Small Broadcasters that have made an election pursuant to paragraph (h) of this section for the relevant year shall not be required to provide reports of their use of sound recordings for Eligible Transmissions and related Ephemeral Recordings. The immediately preceding sentence applies even if the Small Broadcaster actually makes Eligible Transmissions for the year exceeding 27,777 Aggregate Tuning Hours, so long as it qualified as a Small Broadcaster at the time of its election for that year. In addition to minimum royalties hereunder, electing Small Broadcasters will pay to the Collective a $100 Proxy Fee to defray costs associated with this reporting waiver, including development of proxy usage data.

(3) Broadcasters generally reporting pursuant to paragraph (g)(1) of this section may pay for, and report usage in, a percentage of their programming hours on an Aggregate Tuning Hours basis, if

(i) Census reporting is not reasonably practical for the programming during those hours, and

(ii) If the total number of hours on a single report of use, provided pursuant to paragraph (g)(1) of this section, for which this type of reporting is used is below the maximum percentage set forth below for the relevant year:

(A) 2011: 16%;
(B) 2012: 14%;
(C) 2013: 12%;
(D) 2014: 10%;
(E) 2015: 8%.

(iii) To the extent that a Broadcaster chooses to report and pay for usage on an Aggregate Tuning Hours basis pursuant to this paragraph (g)(3), the Broadcaster shall

(A) Report and pay based on the assumption that the number of sound recordings performed during the relevant programming hours is 12 per hour;

(B) Pay royalties (or recoup minimum fees) at the per-performance rates provided in § 380.12 on the basis of paragraph (g)(3)(iii)(A) of this section;

(C) Include Aggregate Tuning Hours in reports of use; and

(D) Include in reports of use complete playlist information for usage reported on the basis of Aggregate Tuning Hours.

(h) *Election of Small Broadcaster Status.* To be eligible for the reporting waiver for Small Broadcasters with respect to any particular channel in a given year, a Broadcaster must satisfy the definition set forth in § 380.11 and must submit to the Collective a completed and signed election form (available on the SoundExchange Web site at *http://www.soundexchange.com*) by no later than January 31 of the applicable year. Even if a Broadcaster has once elected to be treated as a Small Broadcaster, it must make a separate, timely election in each subsequent year in which it wishes to be treated as a Small Broadcaster.

(i) *Distribution of royalties.* (1) The Collective shall promptly distribute royalties received from Broadcasters to Copyright Owners and Performers, or their designated agents, that are entitled to such royalties. The Collective shall only be responsible for making distributions to those Copyright Owners, Performers, or their designated agents who provide the Collective with such information as is necessary to identify and pay the correct recipient. The Collective shall distribute royalties on a basis that values all performances by a Broadcaster equally based upon information provided under the report of use requirements for Broadcasters contained in § 370.4 of this chapter and this subpart, except that in the case of electing Small Broadcasters, the Collective shall distribute royalties based on proxy usage data in accordance with a methodology adopted by the Collective's Board of Directors.

(2) If the Collective is unable to locate a Copyright Owner or Performer entitled to a distribution of royalties under paragraph (g)(1) of this section within 3 years from the date of payment by a Broadcaster, such distribution may be first applied to the costs directly attributable to the administration of that distribution. The foregoing shall apply notwithstanding the common law or statutes of any State.

(j) *Retention of records.* Books and records of a Broadcaster and of the Collective relating to payments of and distributions of royalties shall be kept for a period of not less than the prior 3 calendar years.

### § 380.14   Confidential Information.

(a) *Definition.* For purposes of this subpart, "Confidential Information" shall include the statements of account and any information contained therein, including the amount of royalty payments, and any information pertaining to the statements of account reasonably designated as confidential by the Broadcaster submitting the statement.

(b) *Exclusion.* Confidential Information shall not include documents or information that at the time of delivery to the Collective are public knowledge. The party claiming the benefit of this provision shall have the burden of proving that the disclosed information was public knowledge.

(c) *Use of Confidential Information.* In no event shall the Collective use any Confidential Information for any purpose other than royalty collection and distribution and activities related directly thereto.

(d) *Disclosure of Confidential Information.* Access to Confidential Information shall be limited to:

(1) Those employees, agents, attorneys, consultants and independent contractors of the Collective, subject to an appropriate confidentiality agreement, who are engaged in the collection and distribution of royalty payments hereunder and activities related thereto, for the purpose of performing such duties during the ordinary course of their work and who require access to the Confidential Information;

(2) An independent and Qualified Auditor, subject to an appropriate confidentiality agreement, who is authorized to act on behalf of the Collective with respect to verification of a Broadcaster's statement of account pursuant to § 380.15 or on behalf of a Copyright Owner or Performer with respect to the verification of royalty distributions pursuant to § 380.16;

(3) Copyright Owners and Performers, including their designated agents, whose works have been used under the statutory licenses set forth in 17 U.S.C. 112(e) and 114(f) by the Broadcaster whose Confidential Information is being supplied, subject to an appropriate confidentiality agreement, and including those employees, agents, attorneys, consultants and independent contractors of such Copyright Owners and Performers and their designated agents, subject to an appropriate confidentiality agreement, for the purpose of performing their duties during the ordinary course of their work and who require access to the Confidential Information; and

(4) In connection with future proceedings under 17 U.S.C. 112(e) and 114(f) before the Copyright Royalty Judges, and under an appropriate protective order, attorneys, consultants and other authorized agents of the parties to the proceedings or the courts.

(e) *Safeguarding of Confidential Information.* The Collective and any person identified in paragraph (d) of this section shall implement procedures to safeguard against unauthorized access to or dissemination of any Confidential Information using a reasonable standard of care, but not less than the same degree of security used to protect Confidential Information or similarly sensitive information belonging to the Collective or person.

### § 380.15   Verification of royalty payments.

(a) *General.* This section prescribes procedures by which the Collective may verify the royalty payments made by a Broadcaster.

(b) *Frequency of verification.* The Collective may conduct a single audit of a Broadcaster, upon reasonable notice and during reasonable business hours, during any given calendar year, for any or all of the prior 3 calendar years, but no calendar year shall be subject to audit more than once.

(c) *Notice of intent to audit.* The Collective must file with the Copyright Royalty Board a notice of intent to audit a particular Broadcaster, which shall, within 30 days of the filing of the notice, publish in the **Federal Register** a notice announcing such filing. The notification of intent to audit shall be served at the same time on the Broadcaster to be audited. Any such audit shall be conducted by an independent and Qualified Auditor identified in the notice, and shall be binding on all parties.

(d) *Acquisition and retention of report.* The Broadcaster shall use commercially reasonable efforts to obtain or to provide access to any relevant books and records maintained by third parties for the purpose of the audit. The Collective shall retain the report of the verification for a period of not less than 3 years.

(e) *Acceptable verification procedure.* An audit, including underlying paperwork, which was performed in the ordinary course of business according to generally accepted auditing standards by an independent and Qualified Auditor, shall serve as an acceptable verification procedure for all parties with respect to the information that is within the scope of the audit.

(f) *Consultation.* Before rendering a written report to the Collective, except where the auditor has a reasonable basis to suspect fraud and disclosure would, in the reasonable opinion of the auditor, prejudice the investigation of such suspected fraud, the auditor shall review the tentative written findings of the audit with the appropriate agent or employee of the Broadcaster being audited in order to remedy any factual errors and clarify any issues relating to the audit; Provided that an appropriate

agent or employee of the Broadcaster reasonably cooperates with the auditor to remedy promptly any factual error or clarify any issues raised by the audit.

(g) *Costs of the verification procedure.* The Collective shall pay the cost of the verification procedure, unless it is finally determined that there was an underpayment of 10% or more, in which case the Broadcaster shall, in addition to paying the amount of any underpayment, bear the reasonable costs of the verification procedure.

### § 380.16    Verification of royalty distributions.

(a) *General.* This section prescribes procedures by which any Copyright Owner or Performer may verify the royalty distributions made by the Collective; Provided, however, that nothing contained in this section shall apply to situations where a Copyright Owner or Performer and the Collective have agreed as to proper verification methods.

(b) *Frequency of verification.* A Copyright Owner or Performer may conduct a single audit of the Collective upon reasonable notice and during reasonable business hours, during any given calendar year, for any or all of the prior 3 calendar years, but no calendar year shall be subject to audit more than once.

(c) *Notice of intent to audit.* A Copyright Owner or Performer must file with the Copyright Royalty Board a notice of intent to audit the Collective, which shall, within 30 days of the filing of the notice, publish in the **Federal Register** a notice announcing such filing. The notification of intent to audit shall be served at the same time on the Collective. Any audit shall be conducted by an independent and Qualified Auditor identified in the notice, and shall be binding on all Copyright Owners and Performers.

(d) *Acquisition and retention of report.* The Collective shall use commercially reasonable efforts to obtain or to provide access to any relevant books and records maintained by third parties for the purpose of the audit. The Copyright Owner or Performer requesting the verification procedure shall retain the report of the verification for a period of not less than 3 years.

(e) *Acceptable verification procedure.* An audit, including underlying paperwork, which was performed in the ordinary course of business according to generally accepted auditing standards by an independent and Qualified Auditor, shall serve as an acceptable verification procedure for all parties

with respect to the information that is within the scope of the audit.

(f) *Consultation.* Before rendering a written report to a Copyright Owner or Performer, except where the auditor has a reasonable basis to suspect fraud and disclosure would, in the reasonable opinion of the auditor, prejudice the investigation of such suspected fraud, the auditor shall review the tentative written findings of the audit with the appropriate agent or employee of the Collective in order to remedy any factual errors and clarify any issues relating to the audit; Provided that the appropriate agent or employee of the Collective reasonably cooperates with the auditor to remedy promptly any factual errors or clarify any issues raised by the audit.

(g) *Costs of the verification procedure.* The Copyright Owner or Performer requesting the verification procedure shall pay the cost of the procedure, unless it is finally determined that there was an underpayment of 10% or more, in which case the Collective shall, in addition to paying the amount of any underpayment, bear the reasonable costs of the verification procedure.

### § 380.17    Unclaimed funds.

If the Collective is unable to identify or locate a Copyright Owner or Performer who is entitled to receive a royalty distribution under this subpart, the Collective shall retain the required payment in a segregated trust account for a period of 3 years from the date of distribution. No claim to such distribution shall be valid after the expiration of the 3-year period. After expiration of this period, the Collective may apply the unclaimed funds to offset any costs deductible under 17 U.S.C. 114(g)(3). The foregoing shall apply notwithstanding the common law or statutes of any State.

## Subpart C—Noncommercial Educational Webcasters

### § 380.20    General.

(a) *Scope.* This subpart establishes rates and terms, including requirements for royalty payments, recordkeeping and reports of use, for the public performance of sound recordings in certain digital transmissions made by Noncommercial Educational Webcasters as set forth herein in accordance with the provisions of 17 U.S.C. 114, and the making of Ephemeral Recordings by Noncommercial Educational Webcasters as set forth herein in accordance with the provisions of 17 U.S.C. 112(e), during the period January 1, 2011, through December 31, 2015.

(b) *Legal compliance.* Noncommercial Educational Webcasters relying upon the statutory licenses set forth in 17 U.S.C. 112(e) and 114 shall comply with the requirements of those sections, the rates and terms of this subpart, and any other applicable regulations not inconsistent with the rates and terms set forth herein.

(c) *Relationship to voluntary agreements.* Notwithstanding the royalty rates and terms established in this subpart, the rates and terms of any license agreements entered into by Copyright Owners and digital audio services shall apply in lieu of the rates and terms of this subpart to transmissions within the scope of such agreements.

### § 380.21    Definitions.

For purposes of this subpart, the following definitions shall apply:

*ATH or Aggregate Tuning Hours* means the total hours of programming that a Noncommercial Educational Webcaster has transmitted during the relevant period to all listeners within the United States over all channels and stations that provide audio programming consisting, in whole or in part, of Eligible Transmissions, including from any archived programs, less the actual running time of any sound recordings for which the Noncommercial Educational Webcaster has obtained direct licenses apart from 17 U.S.C. 114(d)(2) or which do not require a license under United States copyright law. By way of example, if a Noncommercial Educational Webcaster transmitted one hour of programming to 10 simultaneous listeners, the Noncommercial Educational Webcaster's Aggregate Tuning Hours would equal 10. If three minutes of that hour consisted of transmission of a directly licensed recording, the Noncommercial Educational Webcaster's Aggregate Tuning Hours would equal 9 hours and 30 minutes. As an additional example, if one listener listened to a Noncommercial Educational Webcaster for 10 hours (and none of the recordings transmitted during that time was directly licensed), the Noncommercial Educational Webcaster's Aggregate Tuning Hours would equal 10.

*Collective* is the collection and distribution organization that is designated by the Copyright Royalty Judges. For the 2011–2015 license period, the Collective is SoundExchange, Inc.

*Copyright Owners* are sound recording copyright owners who are entitled to royalty payments made under this subpart pursuant to the

statutory licenses under 17 U.S.C. 112(e) and 114(f).

*Eligible Transmission* means an eligible nonsubscription transmission made by a Noncommercial Educational Webcaster over the Internet.

*Ephemeral Recording* is a phonorecord created for the purpose of facilitating an Eligible Transmission of a public performance of a sound recording under a statutory license in accordance with 17 U.S.C. 114(f), and subject to the limitations specified in 17 U.S.C. 112(e).

*Noncommercial Educational Webcaster* means Noncommercial Webcaster (as defined in 17 U.S.C. 114(f)(5)(E)(i)) that

(1) Has obtained a compulsory license under 17 U.S.C. 112(e) and 114 and the implementing regulations therefor to make Eligible Transmissions and related ephemeral recordings;

(2) Complies with all applicable provisions of Sections 112(e) and 114 and applicable regulations;

(3) Is directly operated by, or is affiliated with and officially sanctioned by, and the digital audio transmission operations of which are staffed substantially by students enrolled at, a domestically accredited primary or secondary school, college, university or other post-secondary degree-granting educational institution; and

(4) Is not a "public broadcasting entity" (as defined in 17 U.S.C. 118(g)) qualified to receive funding from the Corporation for Public Broadcasting pursuant to the criteria set forth in 47 U.S.C. 396.

*Performance* is each instance in which any portion of a sound recording is publicly performed to a listener by means of a digital audio transmission (*e.g.,* the delivery of any portion of a single track from a compact disc to one listener) but excluding the following:

(1) A performance of a sound recording that does not require a license (*e.g.,* a sound recording that is not copyrighted);

(2) A performance of a sound recording for which the Noncommercial Educational Webcaster has previously obtained a license from the Copyright Owner of such sound recording; and

(3) An incidental performance that both:

(i) Makes no more than incidental use of sound recordings, including, but not limited to, brief musical transitions in and out of commercials or program segments, brief performances during news, talk and sports programming, brief background performances during disk jockey announcements, brief performances during commercials of sixty seconds or less in duration, or

brief performances during sporting or other public events; and

(ii) Other than ambient music that is background at a public event, does not contain an entire sound recording and does not feature a particular sound recording of more than thirty seconds (as in the case of a sound recording used as a theme song).

*Performers* means the independent administrators identified in 17 U.S.C. 114(g)(2)(B) and (C) and the parties identified in 17 U.S.C. 114(g)(2)(D).

*Qualified Auditor* is a Certified Public Accountant.

**§ 380.22  Royalty fees for the public performance of sound recordings and for ephemeral recordings.**

(a) *Minimum fee.* Each Noncommercial Educational Webcaster shall pay an annual, nonrefundable minimum fee of $500 (the "Minimum Fee") for each of its individual channels, including each of its individual side channels, and each of its individual stations, through which (in each case) it makes Eligible Transmissions, for each calendar year it makes Eligible Transmissions subject to this subpart. For clarity, each individual stream (*e.g.,* HD radio side channels, different stations owned by a single licensee) will be treated separately and be subject to a separate minimum. In addition, a Noncommercial Educational Webcaster electing the reporting waiver described in § 380.23(g)(1), shall pay a $100 annual fee (the "Proxy Fee") to the Collective.

(b) *Additional usage fees.* If, in any month, a Noncommercial Educational Webcaster makes total transmissions in excess of 159,140 Aggregate Tuning Hours on any individual channel or station, the Noncommercial Educational Webcaster shall pay additional usage fees ("Usage Fees") for the Eligible Transmissions it makes on that channel or station after exceeding 159,140 total ATH at the following per-performance rates:

(1) 2011: $0.0017;
(2) 2012: $0.0020;
(3) 2013: $0.0022;
(4) 2014: $0.0023;
(5) 2015: $0.0025.
(6) For a Noncommercial Educational Webcaster unable to calculate actual total performances and not required to report ATH or actual total performances under § 380.23(g)(3), the Noncommercial Educational Webcaster may pay its Usage Fees on an ATH basis, provided that the Noncommercial Educational Webcaster shall pay its Usage Fees at the per-performance rates provided in paragraphs (b)(1) through (5) of this section based on the

assumption that the number of sound recordings performed is 12 per hour. The Collective may distribute royalties paid on the basis of ATH hereunder in accordance with its generally applicable methodology for distributing royalties paid on such basis. In addition, and for the avoidance of doubt, a Noncommercial Educational Webcaster offering more than one channel or station shall pay Usage Fees on a per-channel or -station basis.

(c) *Ephemeral royalty.* The royalty payable under 17 U.S.C. 112(e) for any ephemeral reproductions made by a Noncommercial Educational Webcaster and covered by this subpart is deemed to be included within the royalty payments set forth in paragraphs (a) and (b)(1) through (5) of this section and to equal the percentage of such royalty payments determined by the Copyright Royalty Judges for other webcasting in § 380.3.

**§ 380.23  Terms for making payment of royalty fees and statements of account.**

(a) *Payment to the Collective.* A Noncommercial Educational Webcaster shall make the royalty payments due under § 380.22 to the Collective.

(b) *Designation of the Collective.* (1) Until such time as a new designation is made, SoundExchange, Inc., is designated as the Collective to receive statements of account and royalty payments from Noncommercial Educational Webcasters due under § 380.22 and to distribute such royalty payments to each Copyright Owner and Performer, or their designated agents, entitled to receive royalties under 17 U.S.C. 112(e) or 114(g).

(2) If SoundExchange, Inc., should dissolve or cease to be governed by a board consisting of equal numbers of representatives of Copyright Owners and Performers, then it shall be replaced by a successor Collective upon the fulfillment of the requirements set forth in paragraph (b)(2)(i) of this section.

(i) By a majority vote of the nine Copyright Owner representatives and the nine Performer representatives on the SoundExchange board as of the last day preceding the condition precedent in this paragraph (b)(2), such representatives shall file a petition with the Copyright Royalty Board designating a successor to collect and distribute royalty payments to Copyright Owners and Performers entitled to receive royalties under 17 U.S.C. 112(e) or 114(g) that have themselves authorized such Collective.

(ii) The Copyright Royalty Judges shall publish in the **Federal Register** within 30 days of receipt of a petition filed under paragraph (b)(2)(i) of this

**13056**    **Federal Register** / Vol. 76, No. 46 / Wednesday, March 9, 2011 / Rules and Regulations

section an order designating the Collective named in such petition.

(c) *Minimum fee.* Noncommercial Educational Webcasters shall submit the Minimum Fee, and Proxy Fee if applicable, accompanied by a statement of account, by January 31st of each calendar year, except that payment of the Minimum Fee, and Proxy Fee if applicable, by a Noncommercial Educational Webcaster that was not making Eligible Transmissions or Ephemeral Recordings pursuant to the licenses in 17 U.S.C. 114 and/or 17 U.S.C. 112(e) as of said date but begins doing so thereafter shall be due by the 45th day after the end of the month in which the Noncommercial Educational Webcaster commences doing so. Payments of minimum fees must be accompanied by a certification, signed by an officer or another duly authorized faculty member or administrator of the institution with which the Noncommercial Educational Webcaster is affiliated, on a form provided by the Collective, that the Noncommercial Educational Webcaster.

(1) Qualifies as a Noncommercial Educational Webcaster for the relevant year; and

(2) Did not exceed 159,140 total ATH in any month of the prior year for which the Noncommercial Educational Webcaster did not submit a statement of account and pay any required Usage Fees. At the same time the Noncommercial Educational Webcaster must identify all its stations making Eligible Transmissions and identify which of the reporting options set forth in paragraph (g) of this section it elects for the relevant year (provided that it must be eligible for the option it elects).

(d) *Usage fees.* In addition to its obligations pursuant to paragraph (c) of this section, a Noncommercial Educational Webcaster must make monthly payments of Usage Fees where required by § 380.22(b), and provide statements of account to accompany these payments, for each month on the 45th day following the month in which the Eligible Transmissions subject to the Usage Fees and statements of account were made. All monthly payments shall be rounded to the nearest cent.

(e) *Late fees.* A Noncommercial Educational Webcaster shall pay a late fee for each instance in which any payment, any statement of account or any report of use is not received by the Collective in compliance with the applicable regulations by the due date. The amount of the late fee shall be 1.5% of the late payment, or 1.5% of the payment associated with a late statement of account or report of use, per month, compounded monthly for

the balance due, or the highest lawful rate, whichever is lower. The late fee shall accrue from the due date of the payment, statement of account or report of use until a fully compliant payment, statement of account or report of use (as applicable) is received by the Collective, provided that, in the case of a timely provided but noncompliant statement of account or report of use, the Collective has notified the Noncommercial Educational Webcaster within 90 days regarding any noncompliance that is reasonably evident to the Collective.

(f) *Statements of account.* Any payment due under § 380.22 shall be accompanied by a corresponding statement of account. A statement of account shall contain the following information:

(1) The name of the Noncommercial Educational Webcaster, exactly as it appears on the notice of use, and if the statement of account covers a single station only, the call letters or name of the station;

(2) Such information as is necessary to calculate the accompanying royalty payment as prescribed in this subpart;

(3) The name, address, business title, telephone number, facsimile number (if any), electronic mail address (if any) and other contact information of the person to be contacted for information or questions concerning the content of the statement of account;

(4) The handwritten signature of an officer or another duly authorized faculty member or administrator of the applicable educational institution;

(5) The printed or typewritten name of the person signing the statement of account;

(6) The date of signature;

(7) The title or official position held by the person signing the statement of account;

(8) A certification of the capacity of the person signing; and

(9) A statement to the following effect:

I, the undersigned officer or other duly authorized faculty member or administrator of the applicable educational institution, have examined this statement of account and hereby state that it is true, accurate, and complete to my knowledge after reasonable due diligence.

(g) *Reporting by Noncommercial Educational Webcasters in general*—
(1) *Reporting waiver.* In light of the unique business and operational circumstances currently existing with respect to Noncommercial Educational Webcasters, and for the purposes of this subpart only, a Noncommercial Educational Webcaster that did not exceed 55,000 total ATH for any individual channel or station for more than one calendar month in the

immediately preceding calendar year and that does not expect to exceed 55,000 total ATH for any individual channel or station for any calendar month during the applicable calendar year may elect to pay to the Collective a nonrefundable, annual Proxy Fee of $100 in lieu of providing reports of use for the calendar year pursuant to the regulations at § 370.4 of this chapter. In addition, a Noncommercial Educational Webcaster that unexpectedly exceeded 55,000 total ATH on one or more channels or stations for more than one month during the immediately preceding calendar year may elect to pay the Proxy Fee and receive the reporting waiver described in this paragraph (g)(1) during a calendar year, if it implements measures reasonably calculated to ensure that it will not make Eligible Transmissions exceeding 55,000 total ATH during any month of that calendar year. The Proxy Fee is intended to defray the Collective's costs associated with this reporting waiver, including development of proxy usage data. The Proxy Fee shall be paid by the date specified in paragraph (c) of this section for paying the Minimum Fee for the applicable calendar year and shall be accompanied by a certification on a form provided by the Collective, signed by an officer or another duly authorized faculty member or administrator of the applicable educational institution, stating that the Noncommercial Educational Webcaster is eligible for the Proxy Fee option because of its past and expected future usage and, if applicable, has implemented measures to ensure that it will not make excess Eligible Transmissions in the future.

(2) *Sample-basis reports.* A Noncommercial Educational Webcaster that did not exceed 159,140 total ATH for any individual channel or station for more than one calendar month in the immediately preceding calendar year and that does not expect to exceed 159,140 total ATH for any individual channel or station for any calendar month during the applicable calendar year may elect to provide reports of use on a sample basis (two weeks per calendar quarter) in accordance with the regulations at § 370.4 of this chapter, except that, notwithstanding § 370.4(d)(2)(vi), such an electing Noncommercial Educational Webcaster shall not be required to include ATH or actual total performances and may in lieu thereof provide channel or station name and play frequency. Notwithstanding the foregoing, a Noncommercial Educational Webcaster that is able to report ATH or actual total performances is encouraged to do so.

These reports of use shall be submitted to the Collective no later than January 31st of the year immediately following the year to which they pertain.

(3) *Census-basis reports.* If any of the following three conditions is satisfied, a Noncommercial Educational Webcaster must report pursuant to this paragraph (g)(3):

(i) The Noncommercial Educational Webcaster exceeded 159,140 total ATH for any individual channel or station for more than one calendar month in the immediately preceding calendar year;

(ii) The Noncommercial Educational Webcaster expects to exceed 159,140 total ATH for any individual channel or station for any calendar month in the applicable calendar year; or

(iii) The Noncommercial Educational Webcaster otherwise does not elect to be subject to paragraphs (g)(1) or (2) of this section. A Noncommercial Educational Webcaster required to report pursuant to this paragraph (g)(3) shall provide reports of use to the Collective quarterly on a census reporting basis (*i.e.,* reports of use shall include every sound recording performed in the relevant quarter), containing information otherwise complying with applicable regulations (but no less information than required by § 370.4 of this chapter), except that, notwithstanding § 370.4(d)(2)(vi), such a Noncommercial Educational Webcaster shall not be required to include ATH or actual total performances, and may in lieu thereof provide channel or station name and play frequency, during the first calendar year it reports in accordance with this paragraph (g)(3). For the avoidance of doubt, after a Noncommercial Educational Webcaster has been required to report in accordance with this paragraph (g)(3) for a full calendar year, it must thereafter include ATH or actual total performances in its reports of use. All reports of use under this paragraph (g)(3) shall be submitted to the Collective no later than the 45th day after the end of each calendar quarter.

(h) *Distribution of royalties.* (1) The Collective shall promptly distribute royalties received from Noncommercial Educational Webcasters to Copyright Owners and Performers, or their designated agents, that are entitled to such royalties. The Collective shall only be responsible for making distributions to those Copyright Owners, Performers, or their designated agents who provide the Collective with such information as is necessary to identify and pay the correct recipient. The Collective shall distribute royalties on a basis that values all performances by a Noncommercial Educational Webcaster equally based upon the information

provided under the report of use requirements for Noncommercial Educational Webcasters contained in § 370.4 of this chapter and this subpart, except that in the case of Noncommercial Educational Webcasters that elect to pay a Proxy Fee in lieu of providing reports of use pursuant to paragraph (g)(1) of this section, the Collective shall distribute the aggregate royalties paid by electing Noncommercial Educational Webcasters based on proxy usage data in accordance with a methodology adopted by the Collective's Board of Directors.

(2) If the Collective is unable to locate a Copyright Owner or Performer entitled to a distribution of royalties under paragraph (h)(1) of this section within 3 years from the date of payment by a Noncommercial Educational Webcaster, such distribution may first be applied to the costs directly attributable to the administration of that distribution. The foregoing shall apply notwithstanding the common law or statutes of any State.

(i) *Server logs.* Noncommercial Educational Webcasters shall retain for a period of no less than three full calendar years server logs sufficient to substantiate all information relevant to eligibility, rate calculation and reporting under this subpart. To the extent that a third-party Web hosting or service provider maintains equipment or software for a Noncommercial Educational Webcaster and/or such third party creates, maintains, or can reasonably create such server logs, the Noncommercial Educational Webcaster shall direct that such server logs be created and maintained by said third party for a period of no less than three full calendar years and/or that such server logs be provided to, and maintained by, the Noncommercial Educational Webcaster.

## § 380.24 Confidential Information.

(a) *Definition.* For purposes of this subpart, "Confidential Information" shall include the statements of account and any information contained therein, including the amount of Usage Fees paid, and any information pertaining to the statements of account reasonably designated as confidential by the Noncommercial Educational Webcaster submitting the statement.

(b) *Exclusion.* Confidential Information shall not include documents or information that at the time of delivery to the Collective are public knowledge. The party claiming the benefit of this provision shall have the burden of proving that the disclosed information was public knowledge.

(c) *Use of Confidential Information.* In no event shall the Collective use any

Confidential Information for any purpose other than royalty collection and distribution and activities related directly thereto.

(d) *Disclosure of Confidential Information.* Access to Confidential Information shall be limited to:

(1) Those employees, agents, attorneys, consultants and independent contractors of the Collective, subject to an appropriate confidentiality agreement, who are engaged in the collection and distribution of royalty payments hereunder and activities related thereto, for the purpose of performing such duties during the ordinary course of their work and who require access to Confidential Information;

(2) An independent Qualified Auditor, subject to an appropriate confidentiality agreement, who is authorized to act on behalf of the Collective with respect to verification of a Noncommercial Educational Webcaster's statement of account pursuant to § 380.25 or on behalf of a Copyright Owner or Performer with respect to the verification of royalty distributions pursuant to § 380.26;

(3) Copyright Owners and Performers, including their designated agents, whose works have been used under the statutory licenses set forth in 17 U.S.C. 112(e) and 114(f) by the Noncommercial Educational Webcaster whose Confidential Information is being supplied, subject to an appropriate confidentiality agreement, and including those employees, agents, attorneys, consultants and independent contractors of such Copyright Owners and Performers and their designated agents, subject to an appropriate confidentiality agreement, for the purpose of performing their duties during the ordinary course of their work and who require access to the Confidential Information; and

(4) In connection with future proceedings under 17 U.S.C. 112(e) and 114(f) before the Copyright Royalty Judges, and under an appropriate protective order, attorneys, consultants and other authorized agents of the parties to the proceedings or the courts.

(e) *Safeguarding of Confidential Information.* The Collective and any person identified in paragraph (d) of this section shall implement procedures to safeguard against unauthorized access to or dissemination of any Confidential Information using a reasonable standard of care, but no less than the same degree of security used to protect Confidential Information or similarly sensitive information belonging to the Collective or person.

**§ 380.25  Verification of royalty payments.**

(a) *General.* This section prescribes procedures by which the Collective may verify the royalty payments made by a Noncommercial Educational Webcaster.

(b) *Frequency of verification.* The Collective may conduct a single audit of a Noncommercial Educational Webcaster, upon reasonable notice and during reasonable business hours, during any given calendar year, for any or all of the prior 3 calendar years, but no calendar year shall be subject to audit more than once.

(c) *Notice of intent to audit.* The Collective must file with the Copyright Royalty Board a notice of intent to audit a particular Noncommercial Educational Webcaster, which shall, within 30 days of the filing of the notice, publish in the **Federal Register** a notice announcing such filing. The notification of intent to audit shall be served at the same time on the Noncommercial Educational Webcaster to be audited. Any such audit shall be conducted by an independent Qualified Auditor identified in the notice and shall be binding on all parties.

(d) *Acquisition and retention of report.* The Noncommercial Educational Webcaster shall use commercially reasonable efforts to obtain or to provide access to any relevant books and records maintained by third parties for the purpose of the audit. The Collective shall retain the report of the verification for a period of not less than 3 years.

(e) *Acceptable verification procedure.* An audit, including underlying paperwork, which was performed in the ordinary course of business according to generally accepted auditing standards by an independent Qualified Auditor, shall serve as an acceptable verification procedure for all parties with respect to the information that is within the scope of the audit.

(f) *Consultation.* Before rendering a written report to the Collective, except where the auditor has a reasonable basis to suspect fraud and disclosure would, in the reasonable opinion of the auditor, prejudice the investigation of such suspected fraud, the auditor shall review the tentative written findings of the audit with the appropriate agent or employee of the Noncommercial Educational Webcaster being audited in order to remedy any factual errors and clarify any issues relating to the audit; Provided that an appropriate agent or employee of the Noncommercial

Educational Webcaster reasonably cooperates with the auditor to remedy promptly any factual errors or clarify any issues raised by the audit.

(g) *Costs of the verification procedure.* The Collective shall pay the cost of the verification procedure, unless it is finally determined that there was an underpayment of 10% or more, in which case the Noncommercial Educational Webcaster shall, in addition to paying the amount of any underpayment, bear the reasonable costs of the verification procedure.

**§ 380.26  Verification of royalty distributions.**

(a) *General.* This section prescribes procedures by which any Copyright Owner or Performer may verify the royalty distributions made by the Collective; Provided, however, that nothing contained in this section shall apply to situations where a Copyright Owner or Performer and the Collective have agreed as to proper verification methods.

(b) *Frequency of verification.* A Copyright Owner or Performer may conduct a single audit of the Collective upon reasonable notice and during reasonable business hours, during any given calendar year, for any or all of the prior 3 calendar years, but no calendar year shall be subject to audit more than once.

(c) *Notice of intent to audit.* A Copyright Owner or Performer must file with the Copyright Royalty Board a notice of intent to audit the Collective, which shall, within 30 days of the filing of the notice, publish in the **Federal Register** a notice announcing such filing. The notification of intent to audit shall be served at the same time on the Collective. Any audit shall be conducted by an independent Qualified Auditor identified in the notice, and shall be binding on all Copyright Owners and Performers.

(d) *Acquisition and retention of report.* The Collective shall use commercially reasonable efforts to obtain or to provide access to any relevant books and records maintained by third parties for the purpose of the audit. The Copyright Owner or Performer requesting the verification procedure shall retain the report of the verification for a period of not less than 3 years.

(e) *Acceptable verification procedure.* An audit, including underlying

paperwork, which was performed in the ordinary course of business according to generally accepted auditing standards by an independent Qualified Auditor, shall serve as an acceptable verification procedure for all parties with respect to the information that is within the scope of the audit.

(f) *Consultation.* Before rendering a written report to a Copyright Owner or Performer, except where the auditor has a reasonable basis to suspect fraud and disclosure would, in the reasonable opinion of the auditor, prejudice the investigation of such suspected fraud, the auditor shall review the tentative written findings of the audit with the appropriate agent or employee of the Collective in order to remedy any factual errors and clarify any issues relating to the audit; Provided that the appropriate agent or employee of the Collective reasonably cooperates with the auditor to remedy promptly any factual errors or clarify any issues raised by the audit.

(g) *Costs of the verification procedure.* The Copyright Owner or Performer requesting the verification procedure shall pay the cost of the procedure, unless it is finally determined that there was an underpayment of 10% or more, in which case the Collective shall, in addition to paying the amount of any underpayment, bear the reasonable costs of the verification procedure.

**§ 380.27  Unclaimed funds.**

If the Collective is unable to identify or locate a Copyright Owner or Performer who is entitled to receive a royalty distribution under this subpart, the Collective shall retain the required payment in a segregated trust account for a period of 3 years from the date of distribution. No claim to such distribution shall be valid after the expiration of the 3-year period. After expiration of this period, the Collective may apply the unclaimed funds to offset any costs deductible under 17 U.S.C. 114(g)(3). The foregoing shall apply notwithstanding the common law or statutes of any State.

Dated: January 5, 2011.

James Scott Sledge,
*Chief U.S. Copyright Royalty Judge.*

Approved by:

James H. Billington,
Librarian of Congress.

[FR Doc. 2011–4995 Filed 3–8–11; 8:45 am]

**BILLING CODE 1410–72–P**

**Before the**
**UNITED STATES COPYRIGHT ROYALTY JUDGES**
**Washington, D.C.**

| | |
|---|---|
| In the Matter of: | Docket No. 2009-1 |
| Digital Performance Right in Sound Recordings and Ephemeral Recordings | CRB Webcasting III |

## SOUNDEXCHANGE'S MOTION CONCERNING THE CONDUCT OF PROCEEDINGS ON REMAND

### INTRODUCTION

On January 5, 2011, the Judges of the Copyright Royalty Board issued a Final Determination of Rates and Terms in the Webcasting III Proceeding ("Final Determination"). *See In the Matter of Digital Performance Right in Sound Records and Ephemeral Recordings*, Docket No. 2009-1 CRB (Jan. 5, 2011). In *Intercollegiate Broadcasting System, Inc. v. Copyright Royalty Board*, 684 F.3d 1332 (D.C. Cir. 2012) ("*IBS*"), the D.C. Circuit vacated the Final Determination and remanded to the Judges. Pursuant to 37 C.F.R. § 351.15, SoundExchange hereby submits its "written proposal[] for the conduct and schedule of the resolution of the remand."

SoundExchange respectfully requests that the Judges reinstate the Final Determination in its entirety without undertaking further proceedings. As explained below, reinstatement of the Judges' final decision is appropriate given that the record in this case is complete, and that nothing in the D.C. Circuit's decision called into question, let alone reversed, any substantive aspect of the decision. Moreover, reinstatement is solidly grounded in precedent. Numerous cases in analogous circumstances recognize that once an Appointments Clause violation is remedied, a judicial body may reinstate its prior determination without reopening the record. *See, e.g., Free Enterprise Fund v. Public Co. Accounting Oversight Bd.*, 130 S. Ct. 3138 (2010);

1

*Buckley v. Valeo*, 424 U.S. 1 (1976); *FEC v. Legi-Tech, Inc.*, 75 F.3d 704 (D.C. Cir. 1996);

*Doolin Sec. Sav. Bank, F.S.B. v. Office of Thrift Supervision*, 139 F.3d 203 (D.C. Cir. 1998);

*NLRB v. St. George Warehouse, Inc.*, 645 F.3d 666, 671 (3d Cir. 2011); *NLRB v. Northeastern*

*Land Services, Ltd.*, 645 F.3d 475 (1st Cir. 2011); *NLRB v. Whitesell Corp.*, 638 F.3d 883 (8th

Cir. 2011); *NLRB v. Domsey Trading Corp.*, 636 F.3d 33 (2d Cir. 2011).

## DISCUSSION

**I.     Reinstatement Of The Final Determination Would Be An Appropriate Exercise Of The Judges' Discretion**

The Judges should reinstate the Final Determination.  The record in this proceeding is complete, including the submission of direct and rebuttal cases, all discovery, oral hearings, closing arguments, and proposed findings and conclusions.  Conducting new hearings would be a waste of the Judges' time and the parties' attorney's fees, and would serve no useful purpose. Nor is there any basis for the Judges to depart from the conclusions they reached in the Final Determination in light of the D.C. Circuit's decision, which found no flaw in the substance of the Final Determination.

Under the Board's regulations, the Judges have broad discretion to decide "the conduct and schedule of the resolution of the remand." 37 C.F.R. § 351.15.  Indeed, when the Judges enacted 37 C.F.R. § 351.15, they explained that "[t]he interim rule is purposely flexible to permit the Judges, and the parties, to address the particulars of each remand before the Judges in an effort to promote administrative efficiency and reduce costs." 74 Fed. Reg. 38532-01 (Aug. 4, 2009).   Thus, the Board's regulations impose no requirement that the Board conduct new hearings following a D.C. Circuit remand.  Rather, on remand from the D.C. Circuit, the Judges should analyze "the particulars of each remand" to determine the specific error identified by the

2

D.C. Circuit, and should tailor its proceedings on remand to correct that specific error in an efficient manner.

Applying that standard, the appropriate course of action is to reinstate the Judges' prior decision. The D.C. Circuit vacated the Judges' decision solely on the ground that the Judges were "principal" officers, meaning that they had to be appointed by the President and confirmed by the Senate. *IBS*, 684 F.3d at 1340. The D.C. Circuit remedied that narrow constitutional violation by "invalidating and severing the restrictions on the Librarian [of Congress]'s ability to remove the CRJs." *Id.* Thus, the D.C. Circuit concluded that the Judges who adjudicated the ratemaking proceeding, and enacted the Final Determination of Rates and Terms, were perfectly entitled to be Judges. The sole defect in the prior regime is that the Librarian had insufficient power to remove the Judges; prior to the D.C. Circuit's decision, the Librarian only had the power to remove the Judges "for violation of the standards of conduct adopted under subsection (h), misconduct, neglect of duty, or any disqualifying physical or mental disability," 17 U.S.C. § 802(i), whereas after the D.C. Circuit's decision, the Librarian now has the unrestricted power to remove the Judges.

Critically, that was the *sole* reason for the D.C. Circuit's remand. The D.C. Circuit never gave any suggestion that the Judges' decision might have been incorrect on its merits. *See IBS*, 684 F.3d at 1342. Indeed, IBS barely even attempted to argue that the Judges committed substantive error; IBS' entire merits argument in the D.C. Circuit consisted of a single conclusory paragraph with no citations to the record. *See* Brief of Appellant in *Intercollegiate Broadcasting Systems, Inc. v. Copyright Royalty Bd.*, No. 11-1083 (filed Sept. 6, 2011), pp. 17-18. Nor did the D.C. Circuit give any suggestion that the Judges' proceedings suffered from any kind of procedural defect; the D.C. Circuit never suggested, for instance, that the Judges

3

excluded evidence that should have been included. And finally, the D.C. Circuit gave no suggestion that new hearings would be necessary. To the contrary, it emphasized that it was attempting to "cure the constitutional defect with *as little disruption as possible*." *Id.* at 1336-37 (emphasis added).

Under the circumstances, the appropriate course is to reinstate the Final Determination. The D.C. Circuit remanded because at the time of the Final Determination, the Librarian was not permitted to remove the Judges at will. Reinstating the prior determination at a time that the Librarian *can* remove the Judges would cure the constitutional defect in its entirety, and would be the most efficient and least expensive way to cure that defect.

Moreover, reinstating the prior determination without conducting new hearings would result in no prejudice to IBS. The Judges conducted a lengthy series of hearings that resulted in a massive record, and there is no realistic possibility that the terms on which the Judges previously could have been removed had any effect on the contents of that record. Nor is there any serious argument that IBS has some kind of procedural entitlement to a new hearing; IBS has received more than sufficient process here. The Copyright Act authorizes the Judges to impose rates without conducting any live hearing whatsoever. *See* 17 U.S.C. § 803(b)(5) (permitting the CRB to make determinations on "a paper record . . . under such . . . circumstances as the Copyright Royalty Judges consider appropriate"). It follows *a fortiori* that IBS, which received a full hearing and barely challenges any aspect of that hearing, is not entitled to a re-do. Indeed, conducting new hearings, when the reason for the D.C. Circuit's remand was completely unrelated to the substance of those hearings, is precisely the sort of needless remedy that 37 C.F.R. § 351.15 was designed to prevent.

4

JA176

Of course, SoundExchange recognizes that IBS previously raised a substantive objection to the Final Determination in the D.C. Circuit. But if the Judges reinstate their Final Determination, IBS will still have an opportunity to litigate that issue by filing a new petition for review in the D.C. Circuit. Unless and until the D.C. Circuit identifies such an error, however, no further proceedings or revisions to the Final Determination are necessary.[1]

## II.    Precedent Supports Reinstatement of the Final Determination

Reinstatement of the Final Determination would be solidly grounded in prior agency practice and judicial precedent. Under analogous circumstances, agencies have consistently ratified their prior decisions, and courts have consistently concluded that such ratification was valid, including in many situations where the properly constituted panel contained different members than the panel that rendered the original determination.

For instance, in *FEC v. NRA Political Victory Fund*, 6 F.3d 821 (D.C. Cir. 1993), the D.C. Circuit concluded that the presence of two congressional officers as FEC members was unconstitutional. After the court's opinion issued, the FEC —now, with a different membership – ratified its prior conclusion that a database service, Legi-Tech, had violated federal election law; the D.C. Circuit held that such ratification was permissible. *FEC v. Legi-Tech, Inc.*, 75 F.3d 704 (D.C. Cir. 1996). Relying on *Buckley v. Valeo*, 424 U.S. 1 (1976), the court rejected "Legi–

---

[1] As noted in the Final Determination, SoundExchange entered into separate settlements with the National Association of Broadcasters ("NAB"), and with College Broadcasters, Inc. ("CBI"), and the terms of those settlements became binding rates pursuant to 17 U.S.C. § 801(b)(7)(A). Final Determination, at 6, 53-56. IBS did not object to the adoption of those settlements in the D.C. Circuit, and the adoption of those settlements was therefore not disturbed by the D.C. Circuit's decision. Moreover, even if the D.C. Circuit's decision did technically vacate the rates resulting from those settlements, the CRB would be legally required to reinstate the settlements. After these settlements were published in the Federal Register, no proper objections were submitted. Final Determination, at 6 ("[N]o comments or objections were submitted" to NAB settlement); *id.* at 55 (no "proper objection raised" to CBI settlement). Accordingly, the rates and terms in these settlements must be reinstated.

5

Tech's contention that the FEC's reconstitution and ratification is not an effective remedy," concluding it must "take the FEC's post-reconstitution ratification of its prior decisions at face value and treat it as an adequate remedy for the *NRA* constitutional violation." *Id.* at 708-09. The court accepted this ratification even though the FEC deliberated on the matter for only three days, *id.* at 706, whereas ordinarily the FEC "must engage in a lengthy, elaborate series of administrative steps involving investigation and deliberation before it votes to bring an enforcement action in court." *Doolin Sec. Sav. Bank, F.S.B. v. Office of Thrift Supervision*, 139 F.3d 203, 213 (D.C. Cir. 1998) (describing *FEC v. Legi-Tech*). *See also Doolin*, 139 F.3d at 213-14 (holding that cease-and-desist order issued by Office of Thrift Supervision director – who, petitioner argued, had been appointed illegally – had permissibly been ratified by subsequent, different director).

More recently, in *New Process Steel, L.P. v. NLRB*, 130 S. Ct. 2635 (2010), the Supreme Court addressed a challenge to the NLRB's authority to issue orders after its membership had fallen from five to two. The Court concluded that the two-member NLRB was not permitted to issue orders because it lacked a quorum. *Id.* at 2644-45. After the Court rendered its decision, the President appointed new members to the NLRB. The NLRB – with a new Member participating, who was not on the Board at the time of the Board's initial decision – promptly reinstated its prior opinion in *New Process Steel*. 355 NLRB No. 108 (Aug. 23, 2010). It followed the same procedure in numerous other cases that had been vacated due to the absence of a quorum – that is, reinstating prior decisions, even though the new NLRB panel included one or more members that was not previously on the NLRB – and no court has ever suggested that this procedure was improper. *See, e.g.*, *NLRB v. St. George Warehouse, Inc.*, 645 F.3d 666, 671 (3d Cir. 2011); *NLRB v. Northeastern Land Services, Ltd.*, 645 F.3d 475, 477-78 (1st Cir. 2011);

6

JA178

*NLRB v. Whitesell Corp.*, 638 F.3d 883, 888 (8th Cir. 2011); *NLRB v. Domsey Trading Corp.*, 636 F.3d 33, 34 n.1 (2d Cir. 2011).

Also instructive is the Supreme Court's recent decision in *Free Enterprise Fund v. Public Co. Accounting Oversight Bd.*, 130 S. Ct. 3138 (2010); indeed, the D.C. Circuit expressly modeled its remedy on the remedy in *Free Enterprise Fund. See IBS*, 684 F.3d at 1334. In *Free Enterprise Fund*, the plaintiff challenged the constitutionality of the Public Company Accounting Oversight Board, which had broad authority to, *inter alia*, enact and enforce its own rules. 130 S. Ct. at 3147-48. The Supreme Court held that the Board members' tenure protections violated separation-of-powers principles, and remedied that violation by holding that "the unconstitutional tenure provisions are severable from the remainder of the statute," *id.* at 3161 – closely similar to the D.C. Circuit's remedy here. Significantly, the Court rejected the plaintiffs' request for broad injunctive relief. *Id.* at 3164. Rather, the Court held that the plaintiffs were "entitled to declaratory relief sufficient to ensure that the reporting requirements and auditing standards to which they are subject *will be enforced only by a constitutional agency accountable to the Executive*." *Id.* at 3164 (emphasis added). Thus, the Court made no suggestion that the rules that the PCAOB had previously enacted were suddenly *ultra vires*; to the contrary, the Court explicitly stated that the plaintiffs "are subject" to those rules. *Id.* Nor did the Court suggest that any formal reinstatement of those rules were necessary. The Court merely held that *enforcement* of those pre-existing rules by a properly-constituted PCAOB was sufficient to remedy the constitutional violation. It follows *a fortiori* in this case that reinstatement of the Final Determination would be sufficient to remedy the constitutional violation as well.

This unbroken line of cases is dispositive here. When courts have found defects in an agency's membership, agencies have consistently corrected those errors and reinstated their prior

7

determinations.   Courts have consistently held that this procedure is permissible.   Given the completeness of the record, the lack of any substantive flaw identified by the D.C. Circuit, and the D.C. Circuit's express intent to "cure the constitutional defect with as little disruption as possible," this Court should follow the precedent set forth in the above cases and reinstate the Final Determination in its entirety.

Respectfully submitted,

By _____

C. Colin Rushing (DC Bar 470621)       David A. Handzo (DC Bar 384023)
General Counsel                        Michael B. DeSanctis (DC Bar 460961)
SoundExchange, Inc.                    Jared O. Freedman (DC Bar 469679)
733 10th Street NW, 10th Floor         David Z. Moskowitz (DC Bar 994469)
Washington, DC 20001                   JENNER & BLOCK LLP
(v) 202-640-5858                       1099 New York Ave., N.W., Suite 900
(f) 202-640-5883                       Washington, D.C. 20001
crushing@soundexchange.com             (v) 202-639-6000
                                       (f) 202-639-6066
*Of Counsel*                           dhandzo@jenner.com
                                       mdesanctis@jenner.com
                                       jfreedman@jenner.com
                                       dmoskowitz@jenner.com

                                       *Counsel for SoundExchange, Inc.*

October 22, 2012

8

## CERTIFICATE OF SERVICE

I, Jeffrey K. Phillips, do hereby certify that copies of the foregoing **SOUNDEXCHANGE'S MOTION CONCERNING THE CONDUCT OF PROCEEDINGS ON REMAND** were sent via electronic mail on this 22nd day of October, 2012 to the following:

William Malone
James Hobson
Matthew K. Schettenhelm
MILLER & VAN EATON, PLLC
1155 Connecticut Avenue, NW, Suite 1000
Washington, DC 20036-4306
wmalone@millervaneaton.com
mschettenhelm@millervaneaton.com

*Counsel for Intercollegiate Broadcasting System, Inc.*

Angus M. MacDonald
Ara Hovanesian
Abraham Yacobian
HOVANESIAN & HOVANESIAN
301 E. Colorado Blvd., Ste. 514
Pasadena, CA 91101-1919
Fax: 626/795-8900
angusm@hovlaw.com
arah@hovlaw.com
abrahamy@hovlaw.com

*Counsel for LIVE365, Inc*

David D. Oxenford
Adam S. Caldwell
Ronald G. London
DAVIS WRIGHT TREMAINE, LLP
1919 Pennsylvania Ave., NW, Suite 200
Washington, D.C. 20006
Fax: 202/793-4499
davidoxenford@dwt.com
adamcaldwell@dwt.com
ronaldlondon@dwt.com

*Counsel for LIVE365, Inc.*

William B. Colitre
ROYALTY LOGIC, LLC
21122 Erwin Street
Woodland Hills, CA 91367
Bcolitre@RoyaltyLogic.com
Fax: 818/558-3484

Mitchell L. Stoltz
CONSTANTINE CANNON LLP
1301 K St. NW, Ste. 1050 East
Washington, D.C. 20005
Fax: 202/204-3501
mstoltz@constantinecannon.com

*Counsel for College Broadcasters, Inc.*

Catherine R. Gellis, Esq.
P.O. Box 2477
Sausalito, CA 94966
cbi@cathygellis.com

*Counsel for College Broadcasters, Inc.*

Page 1 of 2

Suzannne Head
Associate General Counsel, Legal and
Regulatory Affairs
NATIONAL ASSOCIATION OF
BROADCASTERS
1771 N Strett NW
Washington, DC 20036
SHead@nab.org

Jeffrey Phillips

Before the
**COPYRIGHT ROYALTY BOARD**
**LIBRARY OF CONGRESS**
Washington, DC

|  |  |  |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Digital Performance in Sound Recordings | ) | Docket No. 2009–1 CRB |
| and Ephemeral Recordings | ) | Webcasting III (on remand) |
| | ) | |

**COLLEGE BROADCASTERS, INC.'S**
**RESPONSE TO JULY 26, 2013 ORDER FOR FURTHER BRIEFING**

College Broadcasters, Inc. ("CBI") respectfully submits this response to the July

26, 2013 order ("Order"), of the Copyright Royalty Judges ("Judges"), which "invite[d]

substantive briefing on the legal issues relating to the resolution of the remand" from the

D.C. Circuit's decision in *Intercollegiate Broadcasting Systems, Inc. v. Copyright*

*Royalty Board*, 684 F.3d 1332 (D.C. Cir. 2012).

In the Order, the Judges noted that both CBI and SoundExchange had submitted

timely proposals pursuant to the requirements of 37 C.F.R. 351.15, which were styled as

"Motions to Govern Remand Proceedings." The Judges further observed in the Order

that "[n]o other party has made a substantive response." Therefore, in response to the

Order, CBI respectfully incorporates by reference the arguments it presented previously

in its October 22, 2012 proposal to govern remand proceedings (its "Proposal") and

requests that the Judges summarily reaffirm, without undertaking further proceedings, its

previous adoption of the settlement jointly submitted by CBI and SoundExchange as the

statutory rates and terms for Non-commercial Educational Webcasters as required by 17

U.S.C. 801(b)(7)(a) for the reasons set forth in that Proposal.[1]  A copy of the Proposal is attached hereto as Exhibit A.

In the Order, the Judges also requested that the parties propose "procedural steps and timing for the resolution of the remand."  The Judges recognized in their Order that the requirements of 37 C.F.R. 351.15 have already been satisfied by CBI and SoundExchange.[2]  CBI and SoundExchange's filings do not conflict, and no other party submitted a timely filing.  While neither CBI nor SoundExchange proposed a specific schedule for the resolution of the remand, both proposed that such a schedule was unnecessary, and CBI maintains that position.  As it did in its first Proposal, CBI respectfully calls for the Judges to re-affirm their prior decision with respect to the CBI-SoundExchange settlement.  It would be a waste of the Judges' resources and the resources of the parties to develop a full proposal concerning the conduct and schedule to resolve the remand when it appears that the only parties to timely file proposals are not in conflict.  In the alternative, CBI proposes the Judges schedule October 1, 2013 as the deadline for briefs and October 15, 2013 for any reply briefs.  This schedule allows ample time for the parties to address the only remaining question:  why the Judges should not immediately act upon the proposals they have already received and summarily re-affirm adoption of the settlement.

---

[1] As also noted in its Proposal, CBI does not concede that the Settlement's adoption is subject to the remand proceeding ordered by the Court of Appeal. *See Intercollegiate Broadcasting System, Inc. v. Copyright Royalty Board*, 684 F.3d 1332, 1342 (D.C. Cir. 2012).  However, because the Order suggests the Judges do consider it subject to the remand, CBI hereby reiterates the arguments put forth in its earlier Proposal.

[2] Order at 2 ("SoundExchange submitted its proposal in the form of a motion to re-issue the determination, and provided legal briefing relating to the issues. . . . The Judges are prepared to proceed pursuant to this section of the regulations and, therefore, invite substantive briefing on the legal issues relating to the resolution of the remand, including those issues raised and briefed by SoundExchange.")

Dated: August 26, 2013

Respectfully submitted,

David D. Golden
(D.C. Bar #985047)
CONSTANTINE CANNON LLP
1301 K Street N.W., Suite 1050 East
Washington, D.C. 20005
Tel: (202) 204-3500
Fax: (202) 204-3501
dgolden@constantinecannon.com

Catherine R. Gellis
(CA Bar # 251927)
P.O. Box 2477
Sausalito, CA 94966
Phone: 202-642-2849
cbi@cathygellis.com

## DECLARATION OF SERVICE

I, David D. Golden, hereby declare:

I am over eighteen years of age and not a party to the within cause. My business address is Constantine Cannon LLP, 1301 K St. N.W., Suite 1050 East, Washington, DC 20005. On August 26, 2012, I caused a copy of COLLEGE BROADCASTERS, INC.'S RESPONSE TO JULY 26, 2013 ORDER FOR FURTHER BRIEFING to be served by electronic mail, on each of the following parties:

William Malone
LAW OFFICE OF WILLIAM R. MALONE
9117 Vendome Drive
Bethesda, MD 20817
(301) 365-1175
malone@ieee.org
*Counsel for Intercollegiate Broadcasting System*

Mark D. Davis
Christopher J. Wright
WILTSHIRE & GRANNIS LLP
1200 Eighteenth Street, NW, Suite 1200
Washington, DC 20036
(202) 730-1336 (direct)
(202) 730-1301 (fax)
mdavis@wiltshiregrannis.com
cwright@wiltshiregrannis.com
*Counsel for Intercollegiate Broadcasting System*

Angus M. MacDonald
Ara Hovanesian
Abraham Yacobian
HOVANESIAN & HOVANESIAN
301 E. Colorado Blvd., Ste. 514
Pasadena, CA 91101-1919
Fax: 626/795-8900
angusm@hovlaw.com
arah@hovlaw.com
abrahamy@hovlaw.com
*Counsel for LIVE365, Inc.*

David A. Handzo
Michael B. DeSanctis
Jared O. Freedman
David Z. Moskowitz
Matthew S. Hellman
JENNER & BLOCK LLP
1099 New York Ave., N.W., Suite 900
Washington, D.C. 20001
(v) 202-639-6000
(f) 202-639-6066
dhandzo@jenner.com
mdesanctis@jenner.com
jfreedman@jenner.com
dmoskowitz@jenner.com
mhellman@jenner.com
*Counsel for SoundExchange, Inc.*

David D. Oxenford
Adam S. Caldwell
Ronald G. London
Davis Wright Tremaine, LLP
1919 Pennsylvania Ave., NW, Suite 200
Washington, D.C. 20006
Fax: 202/793-4499
davidoxenford@dwt.com
adamcaldwell@dwt.com
ronaldlondon@dwt.com
*Counsel for LIVE365, Inc.*

USCA Case #14-1068     Document #1523372     Filed: 11/19/2014     Page 191 of 299

I declare under penalty of perjury that the foregoing is true and correct. Executed

on August 26, 2013 at Washington, District of Columbia.

David D. Golden

# Exhibit A

Filed: 11/19/2014    Document #1523372    USCA Case #14-1068

Before the
**COPYRIGHT ROYALTY BOARD**
**LIBRARY OF CONGRESS**
Washington, DC



RECEIVED
Public Information Office

OCT 22 2012

COPYRIGHT OFFICE

In the Matter of                          )
                                          )
Digital Performance in Sound Recordings   )     Docket No. 2009–1 CRB
and Ephemeral Recordings                  )     Webcasting III (on remand)
                                          )
                                          )

### College Broadcasters, Inc.'s
### Motion to Govern Remand Proceedings

As a participant in the underlying proceeding Docket No. 2009–1 CRB Webcasting III ("Web III"), College Broadcasters, Inc. ("CBI") hereby files this motion to govern remand proceedings pursuant to 37 C.F.R § 351.15 in light of the Court of Appeal's Order of Remand ("Remand Order"). *Intercollegiate Broadcasting System, Inc. v. Copyright Royalty Board*, 684 F.3d 1332, 1342 (D.C. Cir. 2012).

During the underlying proceeding CBI jointly moved with SoundExchange for the Copyright Royalty Board ("CRB") to adopt its settlement ("Settlement"), pursuant to 17 U.S.C. § 801(b)(7)(a), as the statutory rates and terms for Non-commercial Educational Webcasters ("NEWs") as defined by the Settlement. After fully developing the record the CRB adopted the Settlement as required by the statute.[1] Nothing in the D.C. Circuit's decision called into question or otherwise reversed the CRB's adoption of it nor raised any basis for the CRB to revisit it.

CBI does not concede that the Settlement's adoption is subject to the Remand Order in any way.[2]   However, in the interest of imparting clarity to the parties and

---

[1] 17 U.S.C. § 801(b)(7)(a) requires the CRB to adopt a settlement as the statutory rates and terms when, as in this case, there is no objection to it. *See* 76 Fed. Reg. 13026, 13039-40 (Mar. 9, 2011).
[2] The Remand Order does not directly speak to the issue of the Settlement adoption at all, except in mischaracterizing it as having been submitted as simply market rate guidance (and not as the non-

255256 1

ratepayers who rely on these statutory rates and terms, CBI moves the CRB to quickly reaffirm its earlier uncontested adoption of the Settlement at the outset of the Web III remand proceedings to avoid all doubt as to the enforceability of the rates and terms contained within it.

Dated: October 22, 2012

Respectfully submitted,

David D. Golden
(D.C. Bar #985047)
CONSTANTINE CANNON LLP
1301 K Street N.W., Suite 1050 East
Washington, D.C. 20005
Tel: (202) 204-3500
Fax: (202) 204-3501
dgolden@constantinecannon.com

Catherine R. Gellis
(CA Bar # 251927)
P.O. Box 2477
Sausalito, CA 94966
Phone: 202-642-2849
cbi@cathygellis.com

---

discretionary adoption by the CRB as required by 17 U.S.C. § 801(b)(7)(a) it was). *Intercollegiate Broadcasting System, Inc. v. Copyright Royalty Board*, 684 F.3d at 1335. Its adoption was also not an issue on appeal. *See* Opening Brief for Appellant IBS, No. 11-1083, Dkt No. 1327924 at 17-18 (Sept. 6, 2011) (objecting to the CRB not having considered alternate rates for small stations). In its brief, Intercollegiate Broadcasting System, Inc. ("IBS") indicated it wanted different rates for "small educational webcasters." However, during the Web III proceeding, IBS actually advocated for different rates for "small and very small non-commercial webcasters" and not the NEWs addressed by the terms of the Settlement. 76 Fed. Reg. at 13040. Either way, the terms contained within the Settlement addressing NEWs are not subject to reconsideration on the remand.

255256 1

USCA Case #14-1068    Document #1523372    Filed: 11/19/2014    Page 195 of 299

## DECLARATION OF SERVICE

I, David D. Golden, hereby declare:

I am over eighteen years of age and not a party to the within cause. My business address is Constantine Cannon LLP, 1301 K St. N.W., Washington, DC 20005. On October 22, 2012, I caused a copy of College Broadcasters, Inc.'s Motion to Govern Remand Proceedings to be served by electronic mail, which was followed by a hard copy by first-class mail, on each of the following parties:

William Malone
LAW OFFICE OF WILLIAM R.
MALONE
9117 Vendome Drive
Bethesda, MD 20817
(301) 365-1175
malone@ieee.org
*Counsel for Intercollegiate Broadcasting System*

David A. Handzo
Michael B. DeSanctis
Jared O. Freedman
David Z. Moskowitz
JENNER & BLOCK LLP
1099 New York Ave., N.W., Suite 900
Washington, D.C. 20001
(v) 202-639-6000
(f) 202-639-6066
dhandzo@jenner.com
mdesanctis@jenner.com
jfreedman@jenner.com
dmoskowitz@jenner.com
*Counsel for SoundExchange, Inc.*

I declare under penalty of perjury that the foregoing is true and correct. Executed on October 22, 2012 at Washington, District of Columbia.

David D. Golden

255256 1

Before the
**COPYRIGHT ROYALTY BOARD
LIBRARY OF CONGRESS**
Washington, D.C. 20540



R E C E I V E D
Public Information Office

OCT 2 2 2012

COPYRIGHT OFFICE

In the Matter of                                    )
                                                    )
                                                    )     2009-1 CRB Webcasting III
Digital Performance in Sound                        )     (On Remand)
Recordings and Ephemeral Recordings                 )
                                                    )
                                                    )

## NOTICE OF APPEARANCE AND 37 C.F.R. § 350.2 SUBMISSION
## OF COLLEGIATE BROADCASTERS, INC.

Pursuant to 37 C.R.R. § 350.2, Collegiate Broadcasters, Inc. ("CBI") hereby states that

David D. Golden will represent CBI in this proceeding along with Catherine R. Gellis. Mr.

Golden represents that he is an active member in good standing of the bars of the District of

Columbia and Maryland.

Dated: October 22, 2012                         Respectfully submitted,

                                                David D. Golden
                                                (D.C. Bar #985047)
                                                CONSTANTINE CANNON LLP
                                                1301 K Street N.W., Suite 1050 East
                                                Washington, D.C. 20005
                                                Tel: (202) 204-3500
                                                Fax: (202) 204-3501
                                                dgolden@constantinecannon.com

                                                Catherine R. Gellis
                                                (CA Bar # 251927)
                                                P.O. Box 2477
                                                Sausalito, CA 94966
                                                Phone: 202-642-2849
                                                cbi@cathygellis.com

255249 1

## DECLARATION OF SERVICE

I, David D. Golden, hereby declare:

I am over eighteen years of age and not a party to the within cause. My business address

is Constantine Cannon LLP, 1301 K St. N.W., Washington, DC 20005. On October 22, 2012, I

caused a copy of the Notice of Appearance and 37 C.F.R. § 350.2 Submission of Collegiate

Broadcasters Inc. to be served by electronic mail, which was followed by a hard copy by first-

class mail, on each of the following parties:

William Malone
LAW OFFICE OF WILLIAM R. MALONE
9117 Vendome Drive
Bethesda, MD 20817
(301) 365-1175
malone@ieee.org
*Counsel for Intercollegiate Broadcasting
System*

David A. Handzo
Michael B. DeSanctis
Jared O. Freedman
David Z. Moskowitz
JENNER & BLOCK LLP
1099 New York Ave., N.W., Suite 900
Washington, D.C. 20001
(v) 202-639-6000
(f) 202-639-6066
dhandzo@jenner.com
mdesanctis@jenner.com
jfreedman@jenner.com
dmoskowitz@jenner.com
*Counsel for SoundExchange, Inc.*

I declare under penalty of perjury that the foregoing is true and correct. Executed on

October 22, 2012 at Washington, District of Columbia.

David D. Golden

255249 1

JA193

**Before the**
**UNITED STATES COPYRIGHT ROYALTY JUDGES**
**Washington, D.C.**

| | |
|---|---|
| In the Matter of:<br><br>Digital Performance Right in Sound<br>Recordings and Ephemeral Recordings | Docket No. 2009-1 CRB<br>(Webcasting III) |

### IBS'S PROPOSAL FOR THE CONDUCT OF REMAND
### AND SUPPORTING MEMORANDUM OF LAW

The Board has ordered the parties to submit "1) a proposal for the resolution of the remand, including procedural steps and timing and 2) a legal memorandum in support of their respective proposals." Order For Further Briefing (Jul. 26, 2013). Intercollegiate Broadcasting System, Inc., ("IBS") respectfully submits that the Board should hold this proceeding in abeyance until the D.C. Circuit remands the appeal from Webcasting II. Following the remand of Webcasting II, Docket No. 2005-1 CRB DTRA, the Board should consolidate Webcasting II and Webcasting III, as they will raise identical issues—specifically, the propriety of the $500 minimum fee and the proxy fee that must be paid in lieu of submitting usage reports. After consolidating the two cases, the Board should:

- Allow interested parties to submit additional written direct statements;

- Allow interested parties to conduct additional discovery;

- Conduct further hearings and rebuttal proceedings; and

- Allow the parties to submit proposed findings of fact and conclusions of law at the close of the further hearings.

## ARGUMENT

The D.C. Circuit vacated the Board's prior determination because it found that the Copyright Royalty Judges who issued that determination had been appointed in violation of the Appointments Clause of the Constitution, and it remanded the case to the Board for new proceedings that were not tainted by the previous constitutional violation. *See Intercollegiate Broadcasting System, Inc., v. Copyright Royalty Bd.*, 684 F.3d 1332, 1342 (D.C. Cir. 2012). On remand, SoundExchange has asked the Board merely to rubberstamp its prior decision. *See* SoundExchange's Motion Concerning the Conduct of Proceedings on Remand (Oct. 22, 2012) ("SoundEx Mot. re Remand"). But while doing so might save time in the short run, it will not cure the constitutional violation and would only ensure that this case is remanded to the Board yet another time. As explained below, the way to cure the constitutional violation is for a properly appointed panel to rehear the evidence afresh and render an independent decision untainted by the prior Board's decision. Anything short of that would perpetuate the prejudice to IBS that the D.C. Circuit has ordered the Board to correct.

## I.   ON REMAND, THE BOARD MUST CONSIDER THE MINIMUM-FEE ISSUE AFRESH—NOT MERELY RUBBERSTAMP ITS PRIOR RULING.

### A.   It Will Not Cure the Constitutional Defect for a New Panel to Blindly Readopt the Findings of the Prior Panel.

Although the D.C. Circuit did not explicitly articulate the purpose of the remand, that purpose should be obvious: to cure the constitutional defect in the prior proceedings. The Court determined that the prior panel had been appointed through a process that was inconsistent with the Constitution, and those defects are presumed to have affected the Board's decisions. *Cf. Federal Election Commission v. NRA Political Victory Fund*, 6 F.3d 821, 825 (D.C. Cir. 1993) (noting that factors like "whether the Commission is independent of the President because he cannot remove the commissioners . . . have some impact (even though the extent of which may

2

be impossible to measure) on how the [Federal Election] Commission decides matters before it."). The only cure for such a problem is for a properly appointed panel to reexamine the issues afresh.

The only way for the Board to reach a truly independent decision is to hold new hearings on the issues that are still in dispute—namely the $500 minimum fee and the $100 proxy fee. The prior panel heard days of live testimony and had the opportunity to evaluate the demeanor of the witnesses and to ask questions of its own. Proceeding solely on a written record would deprive the Board of these opportunities and it would inevitably lead the Board to give undue deference to the decisions of the prior panel, which had the benefit of questioning and evaluating witnesses firsthand. Moreover, because the prior Board elected to exclude relevant evidence, the contents of the record are not complete. In short, merely evaluating the current record will not allow the Board to make a sufficiently independent decision.

**B.    The D.C. Circuit Plainly Intended for the Board to Proceed Afresh—Not Merely to Rubberstamp Its Prior Ruling as Suggested by SoundExchange.**

SoundExchange asks the Board merely to "reinstate the Final Determination" under the theory that "[c]onducting new hearings would be a waste of the Judges' time and the parties' attorney's fees, and would serve no useful purpose." SoundEx Mot. re Remand at 2. Plainly, however, that was not the view of the D.C. Circuit. The D.C. Circuit has repeatedly made clear that it does not remand cases when the outcome of a new administrative proceeding is preordained. *See, e.g.*, *A.L. Pharma, Inc. v. Shalala*, 62 F.3d 1484, 1489 (D.C. Cir. 1995) (finding that the "proposed remedy of vacatur and remand would be inappropriate" when "it is clear that were we to vacate the FDA's approval of the application and remand, . . . the FDA would approve the application"). If the D.C. Circuit had agreed that new hearings would be a waste of time, it would not have remanded the case for further proceedings. The Court further

3

demonstrated that it did not expect the Board merely to rubberstamp its prior rulings because the Court refused to consider IBS's specific challenges to the $500 minimum fee itself. The Court apparently thought it likely that the newly constituted Board would reach a different decision and therefore concluded that it made no sense to review the prior Board's decision. *Cf. United States v. Coumaris*, 399 F.3d 343, 351 (D.C. Cir. 2005) ("Because the district court might impose a different sentence on remand, and because the parties might choose not to appeal that sentence, consideration of objections to the court's original guidelines calculations would be premature at best and unnecessary at worst.").

## C.    The Precedents Cited by SoundExchange Illustrate Why Adopting the Prior Panel's Decision Would Be Inappropriate.

SoundExchange apparently concedes that the Board *may* conduct further hearings on remand but cites a number of cases purportedly showing that the Board does not *have* to do so. SoundEx Mot. re Remand at 5-8. These cases are either irrelevant or actually suggest the opposite: that it would be inappropriate to blindly readopt the prior panel's ruling. SoundExchange's primary authority is a pair of D.C. Circuit cases from the 1990s—*NRA PoliticalVictory Fund*, 6 F.3d 821 and *Federal Election Commission v. Legi-Tech, Inc.*, 75 F.3d 704 (D.C. Cir. 1996). But neither case supports SoundExchange's conclusion. In *NRA PoliticalVictory Fund*, the Federal Election Commission ("FEC") brought a civil enforcement action against the NRA for alleged violations of the campaign-finance laws, and the district court issued a judgment in favor of the FEC. *NRA PoliticalVictory Fund*, 6 F.3d at 823-24. The D.C. Circuit reversed, finding that structure of the Federal Election Commission violated the Constitution because of the presence of the two Congressionally appointed members. *Id.* at 824. The case says absolutely nothing about whether an agency may rubberstamp its prior decision on remand.

4

Nor does the *Legi-Tech* decision help SoundExchange's case. In *Legi-Tech*, the FEC initiated an enforcement action against Legi-Tech, also for violations of the campaign-finance laws. *FEC v. Legi-Tech, Inc.*, 75 F.3d at 706. While the case was still in the district court, the D.C. Circuit decided *NRA Political Victory Fund*, so Legi-Tech asked the district court to dismiss the case against it on the same grounds. *Id.* In the meantime, however, the FEC voted to exclude the two Congressionally appointed members and then—after three days of deliberation—voted that there was probable cause to continue the *Legi-Tech* prosecution. *Id.* Although the district court dismissed the case, the D.C. Circuit ultimately reversed, holding that the newly reconstituted FEC had properly ratified the decision to bring the lawsuit. *Id.* at 708-09.

Importantly, however, the D.C. Circuit's decision in *Legi-Tech* suggests that the Board cannot merely rubberstamp its prior decision here. First, while the Court considered the possibility that "the FEC must repeat the entire administrative process and, only thereafter, may it bring suit," *Id.* at 708, it decided that such a requirement would be inappropriate because "it is virtually inconceivable that [the FEC's] decisions would differ in any way the second time from that which occurred the first time." *Id.* The court relied on the premise that "remand to the agency is an unnecessary formality where the outcome is clear" and determined that no remand was necessary largely because "there had been no significant change in the membership of the Commission when the district court dismissed the suit, and surely the Commissioners would have every incentive to show that they had not been 'influenced' by the unconstitutional presence of the *ex officio* members." *Id.* at 709.

Here, just the opposite is true. Unlike in *Legi-Tech*, the current Board is comprised of entirely *different* judges, who did *not* hear the live testimony on which the first Board based its

5

decision. There is therefore no reason to believe that further proceedings are an unnecessary formality. In fact, the D.C. Circuit has implicitly found that there *is* a significant chance that the Board's decision will differ: if the court had thought otherwise, it would not have remanded the case, and it would have considered whether the Board's first decision was "arbitrary and capricious." It declined to do so because of the significant possibility that the Board would change its decision on remand.

Moreover, because no judge on the current panel heard *any* of the many days of testimony or argument, it is hard to imagine how the panel could evaluate the prior Board's determinations—including credibility determinations and discretionary evidentiary rulings—based solely on a written record. In doing so, the Board would inevitably give undue deference to the prior Board. And of course, simply deferring to the decision of the prior Board would not cure the constitutional defect that the D.C. Circuit ordered the Board to cure.

The only other cases cited by SoundExchange similarly fail to support its argument. SoundExchange first relies on a series of National Labor Relations Board ("NLRB") cases, but those cases have little to do with the issue in this case. *See NLRB v. St. George Warehouse, Inc.*, 645 F.3d 666, 671 (3d Cir. 2011); *NLRB v. Northeastern Land Services, Ltd.*, 645 F.3d 475, 477-78 (1st Cir. 2011); *NLRB v. Whitesell Corp.*, 638 F.3d 883, 888 (8th Cir. 2011); *NLRB v. Domsey Trading Corp.*, 636 F.3d 33, 34 n.1 (2d Cir. 2011). In each of SoundExchange's NLRB cases, an Administrative Law Judge ("ALJ") first conducted hearings and issued a ruling, and the record was then appealed to a two-member panel the National Labor Relations Board, which affirmed or overruled the ALJ's decision.[1] The Supreme Court ultimately held that a two-member NLRB

---

[1]    *See St. George Warehouse, Inc.*, 645 F.3d at 668 (noting that ALJ issued an order, which the Board affirmed); *Northeastern Land Services, Ltd.*, 645 F.3d at 477 (noting that Board had "affirmed the ALJ's 'rulings, findings, and conclusions'"); *Whitesell Corp.*, 638 F.3d at 887

6

panel did not constitute a quorum, and the Board therefore was obligated to convene panels with a minimum of 3 members to reconsider the cases. After carefully re-reviewing the decisions, the three-member panels largely reached the same conclusion as the prior panels. On judicial review, the courts of appeals did not suggest that this re-review procedure was problematic.

From this fact, SoundExchange concludes that the Board in this case may blindly rubberstamp its prior decision. But these cases suggest nothing of the sort. First, nothing in any of the NLRB cases suggests that the panel merely rubberstamped its prior rulings. Rather, the panels appear to have considered each case afresh, as IBS asks the Board to do here. SoundExchange apparently thinks it significant that the NLRB did not hold additional evidentiary hearings. But that should not be surprising because, unlike in this case, the NLRB was acting as an appellate panel reviewing the record of hearings that had already been held by an Administrative Law Judge. Thus, the NLRB was able to fully readjudicate the appeals without holding a new *evidentiary* hearing. Here, by contrast, the Board is acting as a factfinder in the first instance and should not merely be reviewing the record created by the prior panel. Indeed, if the Board chooses not to hold further hearings, the danger is that it will act more like an appellate panel (giving deferring to the factual findings of the prior panel) than a factfinder hearing the case afresh. This it cannot do.

SoundExchange's only other case is the Supreme Court's decision in *Free Enterprise Fund*, but once again, that case does not remotely suggest that it is appropriate for the Board to rubberstamp its prior decision on remand. *See Free Enterprise Fund v. Public Co. Accounting*

---

("After an administrative law judge ("ALJ") determined that the company had committed several violations of the NLRA, Whitesell appealed these findings to the NLRB."); *Domsey Trading Corp.*, 636 F.3d at 36 ("After fifty-three days of hearings . . ., the ALJ reaffirmed his ruling . . . . The Company filed its objections to the Supplemental Decision with the Board on December 15, 1999.").

7

*Oversight Bd.*, 130 S. Ct. 3138 (2010). In *Free Enterprise Fund*, the Supreme Court *rejected* the petitioner's Appointments Clause argument, although it ultimately struck down parts of the statute creating the Public Company Accounting Oversight Board ("PCAOB") because certain of those provisions violated the separation of powers. According to SoundExchange, *Free Enterprise Fund* is important because the court did not strike down the rules previously adopted by the PCAOB as *ultra vires*. SoundEx Mot. re Remand at 7. SoundExchange seems to suggest, therefore, that the Copyright Royalty Board's prior decision *in this case* is valid and that the current Board can simply rubberstamp it.

There is no merit to this argument. To begin, the Supreme Court appears to have understood that the petitioner in that case did not object to the specific rules that had been previously adopted by the Commission. As the Court put it, "petitioners object to the Board's existence, not to any of its auditing standards." *Free Enterprise Fund,* 130 S. Ct. at 3150. The Supreme Court did not address the continuing validity of the Board's rules because it did not have to. In any event, the petitioners in *Free Enterprise Fund* had sued purely for declaratory and injunctive relief—unlike in this case, where IBS objected to a specific past order issued by the Board. This difference turns out to be dispositive. As the D.C. Circuit has explained, the Supreme Court has sometimes allowed past actions of an unlawfully constituted body to stand when a plaintiff challenging that body seeks "declaratory and injunctive remedies" that "could have purely prospective impact." *NRA Political Victory Fund*, 6 F.3d at 828. Of course, what IBS sought in the D.C. Circuit was not purely prospective relief, so there was no justification to let the Board's Order in this case. More importantly, the D.C. Circuit did not do so. It vacated the Board's prior decision, and SoundExchange cannot circumvent that vacatur by asking the Board to rubberstamp its prior decision.

8

## II.  IF THE BOARD ELECTS NOT TO HOLD FURTHER HEARINGS, IT SHOULD AT LEAST ALLOW FURTHER BRIEFING.

If the Board decides not to hold further hearings as IBS has advocated, IBS respectfully requests an opportunity to brief why the Board should not adopt the $500 minimum fee and the $100 fee to forego census reporting for small and very small webcasters.  If the Board adopts those fees for small and very small webcasters, these issues will inevitably be the focus of another appeal, and IBS respectfully suggests that additional briefing specifically addressing those issues would help the Board make a decision.

### CONCLUSION

For these reasons, the Board should stay this proceeding until the remand of Webcasting II and then rehear the case as further described above.

Respectfully submitted,

August 26, 2013

Christopher J. Wright (D.C. Bar No. 367384)
Mark D. Davis (D.C. Bar No. 987597)
Walter E. Anderson (D.C. Bar No. 975456)

WILTSHIRE & GRANNIS LLP
1200 18th St., NW
Suite 1200
Washington, DC 20036
(202) 730-1300
cwright@wiltshiregrannis.com

*Of Counsel:*    William Malone
9117 Vendome Drive
West Bethesda, MD 20817
(301) 365-1175

*Counsel for Intercollegiate Broadcasting System*

9

## CERTIFICATE OF SERVICE

I hereby certify that on August 26, 2013, copies of the foregoing were sent via electronic mail, with a copy by First Class Mail, to the following:

Ara Hovanesian
Abraham Yacobian
Angus MacDonald
HOVANESIAN & HOVANESIAN
301 E. Colorado Blvd. Suite 514
Pasadena, CA 91101
hovanesian@earthlink.com
P) 626-795-0247
F) 626-795-8900

*Counsel to LIVE365*

David D. Oxford
Adam S. Caldwell
Ronald G. London
DAVIS WRIGHT & TREMAINE LLP
1919 Pennsylvania Avenue, N.W., Suite 200
Washington, D.C. 20006
davidoxenford@dwt.com
adamcaldwell@dwt.com
ronaldlondon@dwt.com
P) 202-973-4256
F) 202-973-4499

*Counsel to LIVE365*

William B. Colitre
ROYALTY LOGIC, LLC
21122 Erwin Street
Woodland Hills, CA 91367
Bcolitre@RoyaltyLogic.com
P) 818-955-8900
F) 818-558-3484

Michael Huppe
Sound Exchange, Inc.
1121 14th Street, NW, Suite 700
Washington, DC 20005
mhuppe@SOUNDEXCHANGE.COM
P) 202-640-5858
F) 202-640-5883

*Counsel to SoundExchange*

David A. Handzo
Michael DeSanctis
Jared Freddman
Steven Englund
JENNER & BLOCK LLP
733 10th Street, N.W., 10th Floor
Washington, DC 20001
dhandzo@jenner.com
mdesanctis@jenner.com
jfreedman@jenner.com
senglund@jenner.com
P) 202-639-6000
F) 202-639-6066

*Counsel to SoundExchange*

Catherine Gellis
CONSTANTINE/CANNON LLP
P.O. Box 2477
Sausalito, CA 94966
cbi@cathygellis.com
P) 202-642-2849

*Counsel for College Broadcasters, Inc.*

Kenneth L. Steinthal
WEIL GOTSHAL & MANGES, LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065
Kenneth.steinthal@weil.com
P) 650-802-3100
F) 650-802-3100

*Counsel for Yahoo!, Inc.*


Brandon Casci
LOUDCITY LLC
197 Highland Avenue #1
Sommerville, MA 02143
brandon@loudcity.net
brandon.casci@gmail.com

Wendy Halley
2700 Pennsylvania Avenue
Santa Monica, CA 90404
whalley@yahoo-inc.com
P)310-526-3411
F) 310-526-4400

*Counsel for Yahoo!, Inc.*


Suzanne Head
Associate General Counsel
National Association of Broadcasters
1771 N Street, NW
Washington, DC 20036
shead@nab.org
P) 202-429-5430

**Before the**
**UNITED STATES COPYRIGHT ROYALTY JUDGES**
**Washington, D.C.**

| | |
|---|---|
| In the Matter of:<br><br>Digital Performance Right in Sound Recordings and Ephemeral Recordings | Docket No. 2009-1<br>CRB Webcasting III |

## <u>SOUNDEXCHANGE'S RESPONSE TO JULY 26, 2013</u>
## <u>ORDER FOR FURTHER BRIEFING</u>

SoundExchange respectfully submits this response to the July 26, 2013 order ("Order"), of the Copyright Royalty Judges, which "invite[d] substantive briefing on the legal issues relating to the resolution of the remand" from the D.C. Circuit's decision in *Intercollegiate Broadcasting Systems, Inc. v. Copyright Royalty Board*, 684 F.3d 1332 (D.C. Cir. 2012).

In the Order, the Judges observed that "SoundExchange [has already] provided legal briefing relating to the issues" in SoundExchange's Motion Concerning the Proceedings On Remand of October 22, 2012 ("SoundExchange Motion"). The Judges further observed in the Order that "[n]o other party has made a substantive response." Therefore, in response to the Order, SoundExchange respectfully incorporates by reference the arguments it presented previously in the SoundExchange Motion, and adheres to its position that the Judges reinstate their determination in its entirety without undertaking further proceedings, for the reasons stated in the SoundExchange Motion. A copy of the SoundExchange Motion is attached.

In the Order, the Judges also requested that the parties provide "a proposal" on "timing." As SoundExchange previously stated, this Judges should resolve this case by ratifying their prior determination. Given the protracted nature of this litigation (including the delay during the pendency of the petition for certiorari), and the importance to the marketplace in resolving the

issues it presents, SoundExchange respectfully respects that the Judges enter a ruling expeditiously.

Respectfully submitted,

By

C. Colin Rushing (DC Bar 470621)
General Counsel
SoundExchange, Inc.
733 10th Street NW, 10th Floor
Washington, DC 20001
(v) 202-640-5858
(f) 202-640-5883
crushing@soundexchange.com

*Of Counsel*

David A. Handzo (DC Bar 384023)
Michael B. DeSanctis (DC Bar 460961)
Jared O. Freedman (DC Bar 469679)
Matthew S. Hellman (DC Bar 484132)
JENNER & BLOCK LLP
1099 New York Ave., N.W., Suite 900
Washington, D.C. 20001
(v) 202-639-6000
(f) 202-639-6066
dhandzo@jenner.com
mdesanctis@jenner.com
jfreedman@jenner.com
mhellman@jenner.com

*Counsel for SoundExchange, Inc.*

August 26, 2013

Before the
**UNITED STATES COPYRIGHT ROYALTY JUDGES**
Washington, D.C.

| | |
|---|---|
| In the Matter of:<br><br>Digital Performance Right in Sound<br>Recordings and Ephemeral Recordings | Docket No. 2009-1<br>CRB Webcasting III |

## SOUNDEXCHANGE'S MOTION CONCERNING THE CONDUCT OF PROCEEDINGS ON REMAND

### INTRODUCTION

On January 5, 2011, the Judges of the Copyright Royalty Board issued a Final Determination of Rates and Terms in the Webcasting III Proceeding ("Final Determination"). *See In the Matter of Digital Performance Right in Sound Records and Ephemeral Recordings*, Docket No. 2009-1 CRB (Jan. 5, 2011). In *Intercollegiate Broadcasting System, Inc. v. Copyright Royalty Board*, 684 F.3d 1332 (D.C. Cir. 2012) ("*IBS*"), the D.C. Circuit vacated the Final Determination and remanded to the Judges. Pursuant to 37 C.F.R. § 351.15, SoundExchange hereby submits its "written proposal[] for the conduct and schedule of the resolution of the remand."

SoundExchange respectfully requests that the Judges reinstate the Final Determination in its entirety without undertaking further proceedings. As explained below, reinstatement of the Judges' final decision is appropriate given that the record in this case is complete, and that nothing in the D.C. Circuit's decision called into question, let alone reversed, any substantive aspect of the decision. Moreover, reinstatement is solidly grounded in precedent. Numerous cases in analogous circumstances recognize that once an Appointments Clause violation is remedied, a judicial body may reinstate its prior determination without reopening the record. *See, e.g., Free Enterprise Fund v. Public Co. Accounting Oversight Bd.*, 130 S. Ct. 3138 (2010);

1

JA207

*Buckley v. Valeo*, 424 U.S. 1 (1976); *FEC v. Legi-Tech, Inc.*, 75 F.3d 704 (D.C. Cir. 1996);

*Doolin Sec. Sav. Bank, F.S.B. v. Office of Thrift Supervision*, 139 F.3d 203 (D.C. Cir. 1998);

*NLRB v. St. George Warehouse, Inc.*, 645 F.3d 666, 671 (3d Cir. 2011); *NLRB v. Northeastern*

*Land Services, Ltd.*, 645 F.3d 475 (1st Cir. 2011); *NLRB v. Whitesell Corp.*, 638 F.3d 883 (8th

Cir. 2011); *NLRB v. Domsey Trading Corp.*, 636 F.3d 33 (2d Cir. 2011).

## DISCUSSION

### I.    Reinstatement Of The Final Determination Would Be An Appropriate Exercise Of The Judges' Discretion

The Judges should reinstate the Final Determination. The record in this proceeding is complete, including the submission of direct and rebuttal cases, all discovery, oral hearings, closing arguments, and proposed findings and conclusions. Conducting new hearings would be a waste of the Judges' time and the parties' attorney's fees, and would serve no useful purpose. Nor is there any basis for the Judges to depart from the conclusions they reached in the Final Determination in light of the D.C. Circuit's decision, which found no flaw in the substance of the Final Determination.

Under the Board's regulations, the Judges have broad discretion to decide "the conduct and schedule of the resolution of the remand." 37 C.F.R. § 351.15. Indeed, when the Judges enacted 37 C.F.R. § 351.15, they explained that "[t]he interim rule is purposely flexible to permit the Judges, and the parties, to address the particulars of each remand before the Judges in an effort to promote administrative efficiency and reduce costs." 74 Fed. Reg. 38532-01 (Aug. 4, 2009). Thus, the Board's regulations impose no requirement that the Board conduct new hearings following a D.C. Circuit remand. Rather, on remand from the D.C. Circuit, the Judges should analyze "the particulars of each remand" to determine the specific error identified by the

2

D.C. Circuit, and should tailor its proceedings on remand to correct that specific error in an efficient manner.

Applying that standard, the appropriate course of action is to reinstate the Judges' prior decision. The D.C. Circuit vacated the Judges' decision solely on the ground that the Judges were "principal" officers, meaning that they had to be appointed by the President and confirmed by the Senate. *IBS*, 684 F.3d at 1340. The D.C. Circuit remedied that narrow constitutional violation by "invalidating and severing the restrictions on the Librarian [of Congress]'s ability to remove the CRJs." *Id.* Thus, the D.C. Circuit concluded that the Judges who adjudicated the ratemaking proceeding, and enacted the Final Determination of Rates and Terms, were perfectly entitled to be Judges. The sole defect in the prior regime is that the Librarian had insufficient power to remove the Judges; prior to the D.C. Circuit's decision, the Librarian only had the power to remove the Judges "for violation of the standards of conduct adopted under subsection (h), misconduct, neglect of duty, or any disqualifying physical or mental disability," 17 U.S.C. § 802(i), whereas after the D.C. Circuit's decision, the Librarian now has the unrestricted power to remove the Judges.

Critically, that was the *sole* reason for the D.C. Circuit's remand. The D.C. Circuit never gave any suggestion that the Judges' decision might have been incorrect on its merits. *See IBS*, 684 F.3d at 1342. Indeed, IBS barely even attempted to argue that the Judges committed substantive error; IBS' entire merits argument in the D.C. Circuit consisted of a single conclusory paragraph with no citations to the record. *See* Brief of Appellant in *Intercollegiate Broadcasting Systems, Inc. v. Copyright Royalty Bd.*, No. 11-1083 (filed Sept. 6, 2011), pp. 17-18. Nor did the D.C. Circuit give any suggestion that the Judges' proceedings suffered from any kind of procedural defect; the D.C. Circuit never suggested, for instance, that the Judges

3

JA209

excluded evidence that should have been included. And finally, the D.C. Circuit gave no suggestion that new hearings would be necessary. To the contrary, it emphasized that it was attempting to "cure the constitutional defect with *as little disruption as possible.*" *Id.* at 1336-37 (emphasis added).

Under the circumstances, the appropriate course is to reinstate the Final Determination. The D.C. Circuit remanded because at the time of the Final Determination, the Librarian was not permitted to remove the Judges at will. Reinstating the prior determination at a time that the Librarian *can* remove the Judges would cure the constitutional defect in its entirety, and would be the most efficient and least expensive way to cure that defect.

Moreover, reinstating the prior determination without conducting new hearings would result in no prejudice to IBS. The Judges conducted a lengthy series of hearings that resulted in a massive record, and there is no realistic possibility that the terms on which the Judges previously could have been removed had any effect on the contents of that record. Nor is there any serious argument that IBS has some kind of procedural entitlement to a new hearing; IBS has received more than sufficient process here. The Copyright Act authorizes the Judges to impose rates without conducting any live hearing whatsoever. *See* 17 U.S.C. § 803(b)(5) (permitting the CRB to make determinations on "a paper record . . . under such . . . circumstances as the Copyright Royalty Judges consider appropriate"). It follows *a fortiori* that IBS, which received a full hearing and barely challenges any aspect of that hearing, is not entitled to a re-do. Indeed, conducting new hearings, when the reason for the D.C. Circuit's remand was completely unrelated to the substance of those hearings, is precisely the sort of needless remedy that 37 C.F.R. § 351.15 was designed to prevent.

4

JA210

Of course, SoundExchange recognizes that IBS previously raised a substantive objection to the Final Determination in the D.C. Circuit. But if the Judges reinstate their Final Determination, IBS will still have an opportunity to litigate that issue by filing a new petition for review in the D.C. Circuit. Unless and until the D.C. Circuit identifies such an error, however, no further proceedings or revisions to the Final Determination are necessary.[1]

## II.    Precedent Supports Reinstatement of the Final Determination

Reinstatement of the Final Determination would be solidly grounded in prior agency practice and judicial precedent. Under analogous circumstances, agencies have consistently ratified their prior decisions, and courts have consistently concluded that such ratification was valid, including in many situations where the properly constituted panel contained different members than the panel that rendered the original determination.

For instance, in *FEC v. NRA Political Victory Fund*, 6 F.3d 821 (D.C. Cir. 1993), the D.C. Circuit concluded that the presence of two congressional officers as FEC members was unconstitutional. After the court's opinion issued, the FEC —now, with a different membership – ratified its prior conclusion that a database service, Legi-Tech, had violated federal election law; the D.C. Circuit held that such ratification was permissible. *FEC v. Legi-Tech, Inc.*, 75 F.3d 704 (D.C. Cir. 1996). Relying on *Buckley v. Valeo*, 424 U.S. 1 (1976), the court rejected "Legi–

---

[1] As noted in the Final Determination, SoundExchange entered into separate settlements with the National Association of Broadcasters ("NAB"), and with College Broadcasters, Inc. ("CBI"), and the terms of those settlements became binding rates pursuant to 17 U.S.C. § 801(b)(7)(A). Final Determination, at 6, 53-56. IBS did not object to the adoption of those settlements in the D.C. Circuit, and the adoption of those settlements was therefore not disturbed by the D.C. Circuit's decision. Moreover, even if the D.C. Circuit's decision did technically vacate the rates resulting from those settlements, the CRB would be legally required to reinstate the settlements. After these settlements were published in the Federal Register, no proper objections were submitted. Final Determination, at 6 ("[N]o comments or objections were submitted" to NAB settlement); *id.* at 55 (no "proper objection raised" to CBI settlement). Accordingly, the rates and terms in these settlements must be reinstated.

5

Tech's contention that the FEC's reconstitution and ratification is not an effective remedy," concluding it must "take the FEC's post-reconstitution ratification of its prior decisions at face value and treat it as an adequate remedy for the *NRA* constitutional violation." *Id.* at 708-09. The court accepted this ratification even though the FEC deliberated on the matter for only three days, *id.* at 706, whereas ordinarily the FEC "must engage in a lengthy, elaborate series of administrative steps involving investigation and deliberation before it votes to bring an enforcement action in court." *Doolin Sec. Sav. Bank, F.S.B. v. Office of Thrift Supervision*, 139 F.3d 203, 213 (D.C. Cir. 1998) (describing *FEC v. Legi-Tech*). *See also Doolin*, 139 F.3d at 213-14 (holding that cease-and-desist order issued by Office of Thrift Supervision director – who, petitioner argued, had been appointed illegally – had permissibly been ratified by subsequent, different director).

More recently, in *New Process Steel, L.P. v. NLRB*, 130 S. Ct. 2635 (2010), the Supreme Court addressed a challenge to the NLRB's authority to issue orders after its membership had fallen from five to two. The Court concluded that the two-member NLRB was not permitted to issue orders because it lacked a quorum. *Id.* at 2644-45. After the Court rendered its decision, the President appointed new members to the NLRB. The NLRB – with a new Member participating, who was not on the Board at the time of the Board's initial decision – promptly reinstated its prior opinion in *New Process Steel*. 355 NLRB No. 108 (Aug. 23, 2010). It followed the same procedure in numerous other cases that had been vacated due to the absence of a quorum – that is, reinstating prior decisions, even though the new NLRB panel included one or more members that was not previously on the NLRB – and no court has ever suggested that this procedure was improper. *See, e.g., NLRB v. St. George Warehouse, Inc.*, 645 F.3d 666, 671 (3d Cir. 2011); *NLRB v. Northeastern Land Services, Ltd.*, 645 F.3d 475, 477-78 (1st Cir. 2011);

6

*NLRB v. Whitesell Corp.*, 638 F.3d 883, 888 (8th Cir. 2011); *NLRB v. Domsey Trading Corp.*, 636 F.3d 33, 34 n.1 (2d Cir. 2011).

Also instructive is the Supreme Court's recent decision in *Free Enterprise Fund v. Public Co. Accounting Oversight Bd.*, 130 S. Ct. 3138 (2010); indeed, the D.C. Circuit expressly modeled its remedy on the remedy in *Free Enterprise Fund. See IBS*, 684 F.3d at 1334. In *Free Enterprise Fund*, the plaintiff challenged the constitutionality of the Public Company Accounting Oversight Board, which had broad authority to, *inter alia*, enact and enforce its own rules. 130 S. Ct. at 3147-48. The Supreme Court held that the Board members' tenure protections violated separation-of-powers principles, and remedied that violation by holding that "the unconstitutional tenure provisions are severable from the remainder of the statute," *id.* at 3161 – closely similar to the D.C. Circuit's remedy here. Significantly, the Court rejected the plaintiffs' request for broad injunctive relief. *Id.* at 3164. Rather, the Court held that the plaintiffs were "entitled to declaratory relief sufficient to ensure that the reporting requirements and auditing standards to which they are subject *will be enforced only by a constitutional agency accountable to the Executive.*" *Id.* at 3164 (emphasis added). Thus, the Court made no suggestion that the rules that the PCAOB had previously enacted were suddenly *ultra vires*; to the contrary, the Court explicitly stated that the plaintiffs "are subject" to those rules. *Id.* Nor did the Court suggest that any formal reinstatement of those rules were necessary. The Court merely held that *enforcement* of those pre-existing rules by a properly-constituted PCAOB was sufficient to remedy the constitutional violation. It follows *a fortiori* in this case that reinstatement of the Final Determination would be sufficient to remedy the constitutional violation as well.

This unbroken line of cases is dispositive here. When courts have found defects in an agency's membership, agencies have consistently corrected those errors and reinstated their prior

7

JA213

determinations. Courts have consistently held that this procedure is permissible. Given the completeness of the record, the lack of any substantive flaw identified by the D.C. Circuit, and the D.C. Circuit's express intent to "cure the constitutional defect with as little disruption as possible," this Court should follow the precedent set forth in the above cases and reinstate the Final Determination in its entirety.

Respectfully submitted,

By _David A. Handzo_ /DZM/

C. Colin Rushing (DC Bar 470621)          David A. Handzo (DC Bar 384023)
General Counsel                           Michael B. DeSanctis (DC Bar 460961)
SoundExchange, Inc.                       Jared O. Freedman (DC Bar 469679)
733 10th Street NW, 10th Floor            David Z. Moskowitz (DC Bar 994469)
Washington, DC 20001                      JENNER & BLOCK LLP
(v) 202-640-5858                          1099 New York Ave., N.W., Suite 900
(f) 202-640-5883                          Washington, D.C. 20001
crushing@soundexchange.com                (v) 202-639-6000
                                          (f) 202-639-6066
*Of Counsel*                              dhandzo@jenner.com
                                          mdesanctis@jenner.com
                                          jfreedman@jenner.com
                                          dmoskowitz@jenner.com

                                          *Counsel for SoundExchange, Inc.*

October 22, 2012

8

## CERTIFICATE OF SERVICE

I, Jeffrey K. Phillips, do hereby certify that copies of the foregoing
**SOUNDEXCHANGE'S MOTION CONCERNING THE CONDUCT OF
PROCEEDINGS ON REMAND** were sent via electronic mail on this 22nd day of
October, 2012 to the following:

William Malone
James Hobson
Matthew K. Schettenhelm
MILLER & VAN EATON, PLLC
1155 Connecticut Avenue, NW, Suite 1000
Washington, DC 20036-4306
wmalone@millervaneaton.com
mschettenhelm@millervaneaton.com

*Counsel for Intercollegiate Broadcasting
System, Inc.*

Angus M. MacDonald
Ara Hovanesian
Abraham Yacobian
HOVANESIAN & HOVANESIAN
301 E. Colorado Blvd., Ste. 514
Pasadena, CA 91101-1919
Fax: 626/795-8900
angusm@hovlaw.com
arah@hovlaw.com
abrahamy@hovlaw.com

*Counsel for LIVE365, Inc*

David D. Oxenford
Adam S. Caldwell
Ronald G. London
DAVIS WRIGHT TREMAINE, LLP
1919 Pennsylvania Ave., NW, Suite 200
Washington, D.C. 20006
Fax: 202/793-4499
davidoxenford@dwt.com
adamcaldwell@dwt.com
ronaldlondon@dwt.com

*Counsel for LIVE365, Inc.*

William B. Colitre
ROYALTY LOGIC, LLC
21122 Erwin Street
Woodland Hills, CA 91367
Bcolitre@RoyaltyLogic.com
Fax: 818/558-3484

Mitchell L. Stoltz
CONSTANTINE CANNON LLP
1301 K St. NW, Ste. 1050 East
Washington, D.C. 20005
Fax: 202/204-3501
mstoltz@constantinecannon.com

*Counsel for College Broadcasters, Inc.*

Catherine R. Gellis, Esq.
P.O. Box 2477
Sausalito, CA 94966
cbi@cathygellis.com

*Counsel for College Broadcasters, Inc.*

Page 1 of 2

Suzannne Head
Associate General Counsel, Legal and
Regulatory Affairs
NATIONAL ASSOCIATION OF
BROADCASTERS
1771 N Strett NW
Washington, DC 20036
SHead@nab.org

Jeffrey Phillips

## CERTIFICATE OF SERVICE

I, Albert Peterson, do hereby certify that copies of the foregoing **SoundExchange's Response to July 26, 2013 Order for Further Briefing** were sent via electronic mail on the 26th day of August, 2013, to the following:

| | |
|---|---|
| Christopher J. Wright<br>Mark D. Davis<br>WILTSHIRE & GRANNIS LLP<br>1200 18th Street, NW, 12th Floor<br>Washington, D.C. 20036<br>Fax: 202/730-1301<br>cwright@wiltshiregrannis.com<br>mdavid@wiltshiregrannis.com<br><br>*Counsel for Intercollegiate Broadcasting System, Inc.* | William Malone<br>9117 Vendome Drive<br>West Bethesda, MD 20817<br>Malone@alum.mit.edu<br><br>*Counsel for Intercollegiate Broadcasting System, Inc.* |
| Adam S. Caldwell<br>Ronald G. London<br>DAVIS WRIGHT TREMAINE, LLP<br>1919 Pennsylvania Ave., NW, Suite 200<br>Washington, D.C. 20006<br>Fax: 202/793-4499<br>adamcaldwell@dwt.com<br>ronaldlondon@dwt.com<br><br>*Counsel for LIVE365, Inc.* | William B. Colitre<br>ROYALTY LOGIC, LLC<br>21122 Erwin Street<br>Woodland Hills, CA 91367<br>Bcolitre@RoyaltyLogic.com<br>Fax: 818/558-3484 |
| Suzanne Head<br>Associate General Counsel, Legal and Regulatory Affairs<br>NATIONAL ASSOCIATION OF BROADCASTERS<br>1771 N Street NW<br>Washington DC 20036<br>SHead@nab.org | David D. Golden<br>CONSTANTINE CANNON LLP<br>1301 K St. NW, Ste. 1050 East<br>Washington, D.C. 20005<br>Fax: 202/204-3501<br>dgolden@constantinecannon.com<br><br>*Counsel for College Broadcasters, Inc.* |
| Catherine R. Gellis, Esq.<br>P.O. Box 2477<br>Sausalito, CA 94966<br>cbi@cathygellis.com<br><br>*Counsel for College Broadcasters, Inc.* | |

Albert Peterson

## UNITED STATES COPYRIGHT ROYALTY JUDGES
### The Library of Congress

*In re*

Digital Performance Right in Sound
Recordings and Ephemeral Recordings

Docket No. 2009-1 CRB
(Webcasting III)

## NOTICE OF INTENTION TO CONDUCT
## PAPER PROCEEDING ON REMAND
## AND
## SOLICITATION OF COMMENTS FROM THE PARTIES

**Background**

On July 6, 2012, the United States Court of Appeals for the District of

Columbia Circuit (D.C. Circuit) ruled on the appeal of the captioned matter filed by

Intercollegiate Broadcasting System, Inc. (IBS), determining that the portion of the

Copyright Act dealing with appointment of Copyright Royalty Judges (Judges)

violated the Appointments Clause, U.S. Const., art. II, § 2, cl. 2. *Intercollegiate*

*Broad. Sys. v. Copyright Royalty Bd.*, 684 F.3d 1332 (D.C. Cir. 2012). The D.C.

Circuit dictated a statutory remedy, *id.* at 1340-41, and the Librarian of Congress

reappointed the Judges under the statute as modified by the court. The D.C. Circuit

did not rule on the merits of the issues raised by IBS on appeal, but remanded the

Judges' final determination, *Digital Performance Right in Sound Recordings and*

*Ephemeral Recordings, Final rule and order*, Docket No. 2009-1 CRB Webcasting

III, 76 FR 13026 (Mar. 9, 2011) (Final Determination), for further action by the re-appointed Judges. *Intercollegiate Broad. Sys.*, 684 F.3d at 1342.

IBS filed a petition seeking a writ of *certiorari* in the United States Supreme Court, which the Supreme Court denied. *Intercollegiate Broad. Sys. v. Copyright Royalty Bd.*, 133 S. Ct. 2735 (2013).

In accordance with 37 C.F.R. § 351.15, on July 26, 2013, the Copyright Royalty Judges (Judges) issued an Order for Further Briefing directing the parties to submit proposals and substantive briefing on the legal issues relating to the resolution of the remand.[1] IBS and SoundExchange filed their respective proposals for conduct of the remand and supporting legal memoranda on August 26, 2013. On September 3, 2013, SoundExchange and College Broadcasters, Inc. (CBI) filed responses to the IBS proposal, and IBS filed a response to CBI's October 22, 2012, filing.

**Proposals of the Parties**

SoundExchange's initial proposal was for the Judges to reinstate the Judges' Final Determination in the captioned matter expeditiously and without further proceedings. *SoundExchange's Response to July 26, 2013 Order for Further Briefing*, Docket No. 2009-1 CRB Webcasting III, at 2 (Aug. 26, 2013); *SoundExchange's Motion Concerning the Conduct of Proceedings on Remand*, Docket No. 2009-1 CRB Webcasting III, at 5 (Oct. 22, 2012) (SoundExchange Proposal).

---

[1] In accordance with 37 C.F.R. § 351.15, on October 22, 2012, before the petition for *certiorari*, SoundExchange provided the Judges with a motion concerning the conduct and schedule of the resolution of the remand. IBS opposed the motion. CBI requested that the Judges reaffirm adoption of the settlement CBI reached with SoundExchange, which settlement was incorporated into the Judges' Final Determination now remanded to the Judges. Apart from SoundExchange, before the petition for *certiorari*, no party submitted a proposal for proceedings under 37 C.F.R. § 351.15.

In its response to the IBS proposal, SoundExchange modified (or perhaps clarified) its proposal. Rather than seeking what would amount to summary ratification of the Final Determination, SoundExchange proposed that the Judges "decide the remaining Webcasting issues on the substantial existing record, and . . . reaffirm their prior determination." *SoundExchange's Response to IBS' Proposal for the Conduct of Remand*, Docket No. 2009-1 CRB Webcasting III, at 2 (Sept. 3, 2013). In effect, SoundExchange now proposes that the Judges conduct a paper proceeding, confined to the existing record, and reissue the Final Determination on that basis.

IBS, by contrast, proposes that the Judges allow parties to submit additional written direct statements, conduct additional discovery, hold further hearings and rebuttal proceedings, and allow the parties to submit proposed findings of fact and conclusions of law at the close of the hearings.[2] *IBS's Proposal for the Conduct of Remand and Supporting Memorandum of Law*, Docket No. 2009-1 CRB Webcasting III, at 1 (Aug. 26, 2013) (IBS Proposal). In essence, IBS proposes (at least with regard to the matters it sought to have reversed on appeal) that the Judges conduct an entirely new proceeding on remand.

CBI, both in its October 22, 2012, submission and in its September 3, 2013, response to the IBS proposal, proposed that the Judges summarily readopt the settlement that it reached with SoundExchange. *College Broadcasters, Inc.'s Motion*

---

[2] In addition, IBS proposes that the Judges hold this proceeding in abeyance until the D.C. Circuit remands the appeal in *Webcasting II*, so that the Judges may conduct a consolidated proceeding on the remands of *Webcasting II* and *Webcasting III*. The Judges will not delay this proceeding (which concerns rates and terms for a period that is more than half over) any longer in order to consolidate it with the proceeding in Webcasting II (which concerns rates and terms for a period that expired nearly three years ago). The Judges will consider the question of consolidation if and when the D.C. Circuit remands the *Webcasting II* Determination.

*to Govern Remand Proceedings*, Docket No. 2009-1 CRB Webcasting III, at 2 (Oct. 22, 2012); *College Broadcasters, Inc.'s Reply to Intercollegiate Broadcasting and SoundExchange's Responses to July 26, 2013 Order*, Docket No. 2009-1 CRB Webcasting III, at 2 (Sept. 3, 2013). In the latter filing, CBI expressly requests that the Judges bifurcate the proceedings on remand by readopting the CBI-SoundExchange settlement first, and addressing the matters raised by IBS thereafter. *Id.*

**Discussion**

As a threshold matter the Judges must determine the scope of the matters that are before them in this remand proceeding. The only portion of the Final Determination that IBS challenged on appeal was the minimum fee for small and very small non-commercial webcasters.[3] However, in its decision the Court of Appeals stated that "we vacate and remand *the determination*," not merely those portions challenged by IBS. *Intercollegiate Broad. Sys.,* 684 F.3d at 1342 (emphasis added). The Judges conclude, therefore, that the entire Final Determination in the captioned matter has been vacated by the D.C. Circuit and is before the Judges on remand.

While the D.C. Circuit vacated and remanded the entire Final Determination, it did not address any of IBS's arguments on the merits. There is nothing in the D.C. Circuit's opinion that intimates that any of the Judges' legal or factual determinations were in error or that the Final Determination suffered from any procedural defect (notwithstanding IBS's suggestions to the contrary, *see, e.g., IBS Proposal*, at 4

---

[3] On remand IBS has also objected (apparently for the first time) to the $100 "proxy fee" for those small and very small non-commercial webcasters that choose not to conduct census reporting – *i.e.*, reporting of every performance of sound recordings covered by the section 112 and 114 statutory licenses during the relevant reporting period. *IBS Proposal*, at 3 (Aug. 26, 2013).

("[t]he Court apparently thought it likely that the newly constituted Board would reach a different decision").  That leaves open the possibility that the Judges could, after an appropriate process, issue a new final determination that substantively makes the same findings and reaches the same conclusions, in whole or in part, as the prior Final Determination..  *See, e.g.*, *FEC v. Legi-Tech, Inc.*, 75 F.3d 704 (D.C. Cir. 1996) (upholding commission decision to ratify an earlier decision that had been rendered when the commission's composition was unconstitutional).  The Judges are also free to reach completely different conclusions in their new final determination, again after an appropriate process.

The D.C. Circuit's opinion provides no guidance as to what constitutes an appropriate process under the circumstances.  The Judges' rules merely require the parties to file written proposals for the conduct and schedule of the resolution of the remand.  37 C.F.R. § 351.15.

Unsurprisingly, the parties' positions differ sharply on what process should be conducted in the instant circumstances.  SoundExchange argues that precedents from the D.C. Circuit and other Courts of Appeals demonstrate that the required process is minimal.  *See, e.g.*, *Free Enterprise Fund v. Public Co. Accounting Oversight Bd.*, 130 S. Ct. 3138 (2010); *Doolin Sec. Sav. Bank, F.S.B. v. Office of Thrift Supervision*, 139 F.3d 203, 213-14 (D.C. Cir. 1998); *FEC v. Legi-Tech, Inc.*, 75 F.3d 704 (D.C. Cir. 1996).  IBS distinguishes those cases, and argues that nothing short of new hearings would suffice for the Judges to reach a decision that is sufficiently independent from that reached by the Judges before the D.C. Circuit cured the

Appointments Clause violation. CBI argues that the Judges have no discretion to reject their settlement, and should readopt it summarily.

The cases cited by SoundExchange support neither a conclusion that the Judges may merely "rubber stamp" the Final Determination, nor (as IBS argues) a conclusion that a complete "do over" of the entire original process is required. *Free Enterprise Fund* did not involve actions taken to ratify a decision by an entity that had been found to be unconstitutional, and is therefore not on point. In the decisions under review in the NLRB cases cited by SoundExchange,[4] the NLRB acted as an appellate body, reviewing decisions by Administrative Law Judges. Those decisions are distinguishable from the instant proceeding in which the Judges conducted evidentiary hearings and acted as finders of fact.

By contrast, *Legi-Tech* and *Doolin* are both on point as they involve ratification by an entity or individual of an earlier action taken by an entity or individual whose authority was later determined to be deficient. In each case the later action was taken after substantive review of the record. In neither case did the process consist of going back to the beginning and repeating all of the administrative or adjudicatory steps that had been taken in the first instance. See *Legi-Tech*, 75 F.3d at 708-09; *Doolin*, 139 F.3d at 213-14 & n.11.

---

[4] *NLRB v. St. George Warehouse, Inc.*, 645 F.3d 666 (3d Cir. 2011); *NLRB v. Northeastern Land Services, Ltd.*, 645 F.3d 475 (1st Cir. 2011); *NLRB v. Whitesell Corp.*, 638 F.3d 883 (8th Cir. 2011); *NLRB v. Domsey Trading Corp.*, 636 F.3d 33 (2d. Cir. 2011). Each of these cases arose out of the Supreme Court's decision in *New Process Steel, L.P. v. NLRB*, 130 S. Ct. 2635 (2010), which upheld a challenge to the NLRB's authority to issue orders with only two members. The cases cited above each upheld later decisions by the NLRB (now comprised of an adequate number of members) to reinstate decisions rendered when it had only two members. The decisions are silent as to the procedures adopted by the NLRB to review their earlier decisions before reinstating them.

In light of the applicable precedent, and considering that none of the current Judges was involved in issuing the Final Determination, the Judges conclude that IBS is entitled to an independent review of the written record in this proceeding by a constitutionally-appointed panel of Judges. Since the D.C. Circuit remanded the entire Final Determination, this review shall extend to the entire record.

The Judges are not persuaded, however, by IBS's arguments that new evidentiary hearings are necessary. As the D.C. Circuit decisions in *Legi-Tech* and *Doolin* demonstrate, a complete repetition of the adjudicatory process is not required to remedy the constitutional violation that resulted in a remand of the instant proceeding. IBS argues that the Judges who rendered the original Determination excluded relevant evidence and had an opportunity to observe and evaluate the demeanor of the witnesses. IBS fails, however, to point to any instance of an exclusion of relevant evidence that affected the outcome of the proceeding, or to any portion of the Final Determination that turned on witness credibility. Moreover, the IBS contention that hearings are required is inconsistent with the Copyright Act and the Judge's rules, both of which specifically permit the Judges to conduct proceedings on the papers alone, without any evidentiary hearing. 17 U.S.C. § 803(b)(5); 37 C.F.R. § 351.3(c). There is no basis to conclude that remand proceedings are excluded from these provisions.

The Judges conclude that no party has provided any specific reason why it is necessary to reopen the record and take further evidence. Each party has had ample opportunity to present its case. It appears to the Judges that it would be neither fair,

nor efficient, nor economical to proceed as proposed by IBS with additional submissions, discovery, and evidentiary hearings.

Accordingly, in light of the vacatur of the entire decision in Web III by the D.C. Circuit, it is the intention of the Judges to confine their review to the voluminous existing record in Web III that was created by all of the parties, including IBS, with regard to all issues.

With regard to adoption of settlement agreements in Webcasting III, the Judges propose to reconsider one and re-adopt the other. CBI has pointed out correctly that under 17 U.S.C. § 801(b)(7)(A) the Judges are directed to adopt such a settlement if no participant objects to it. They argue, therefore, that the Judges should readopt the CBI-SoundExchange settlement summarily because the Judges' original adoption of the settlement was not discretionary. However, IBS did, in fact, object to the settlement. *Final Determination*, 76 FR at 13039. As part of the Final Determination, the Judges concluded that the objection was not proper and adopted the settlement. *Id.* The Judges will consider IBS' objection as part of their review of the overall record.

By contrast, the Judges received no objection to the other settlement agreement that they adopted in the Final Determination – that between SoundExchange and NAB – and are persuaded that no purpose would be served by subjecting the SoundExchange-NAB settlement to further review. The Judges will readopt the SoundExchange-NAB agreement as part of the determination on remand.

## Conclusion and Order

There is no reason in the present record to preclude the Judges from conducting only a paper proceeding, consisting of a review of the existing record in this proceeding, and then issuing a determination at the conclusion of that review. There is also no reason in the present record to allow further discovery or evidentiary hearings. However, to the extent that any party disagrees, that party should identify in its comments to this notice *specific* examples where it believes the outcome of the original proceeding turned on elements, such as witness demeanor, that are not readily determined from a review of the written record.

In accordance with 17 U.S.C. § 803(b)(5)[5], the Judges hereby solicit comments from all parties on the Judges' notice of intention to conduct paper proceedings. Any party that wishes to file such comments is ordered to do so by 5:00 pm on September 27, 2013. Except for such comments, no further submissions will be accepted unless, after consideration of the comments, the Judges issue a subsequent Order allowing further submissions.

Suzanne M. Barnett
Chief Copyright Royalty Judge

DATED: September 17, 2013

---

[5] Section 803(b)(5)(A) requires paper proceedings in cases in which there is no genuine issue of material fact. Section 803(b)(5)(B) permits paper proceedings in circumstances the Judges consider appropriate.

USCA Case #14-1068    Document #1523372    Filed: 11/19/2014    Page 230 of 299

**Before the**
**UNITED STATES COPYRIGHT ROYALTY JUDGES**
**Washington, D.C.**

In the Matter of:

Digital Performance Right in Sound
Recordings and Ephemeral Recordings

Docket No. 2009-1 CRB
(Webcasting III)

### IBS'S COMMENTS REGARDING JUDGES' NOTICE OF INTENTION
### TO CONDUCT PAPER HEARINGS

In its September 17, 2013 Order, the Board gave notice that on remand it will conduct

"only a paper proceeding, consisting of a review of the existing record in this proceeding, and

then issuing a determination at the conclusion of that review." Order at 9. For the reasons stated

previously,[1] IBS continues to object to the Board's proposal merely to *review* the record created

by the prior Board, rather than conduct additional proceedings. As IBS has explained, if the

Board chooses to review a paper record of the live testimony that was presented to the prior

Board, it will essentially put itself in the position of an appellate tribunal, reviewing the prior

Board's findings for clear error, rather than reaching its own independent conclusions. The

Board will also abdicate its duty to hear evidence that the prior Board may have improperly

excluded. Such a procedure will not cure the constitutional violation identified by the D.C.

Circuit.

The Board justifies its decision to review the prior proceedings by a statutory provision

authorizing it "to determine issues on the basis of the filing of the written direct statement by the

participant, the response by any opposing participant, and one additional response by each such

---

[1]    *See* IBS's Proposal for the Conduct of Remand and Supporting Memorandum of Law (filed
Aug. 26, 2013); IBS's Response to CBI's Proposal for the Conduct of Remand (filed Sep. 3,
2013).

1

participant." 17 U.S.C § 803(b)(5). But this provision nowhere authorizes the Board to make determinations based upon transcripts of live testimony presented to a *different* panel. On the contrary, Congress required that the "Copyright Royalty Judges shall preside over hearings in proceedings under this chapter en banc." 17 U.S.C. § 803(a)(2). This provision is inconsistent with the Board's proposal to make a determination based upon hearings at which someone other than the ultimate decision makers presided.

The Board asks the parties to identify "*specific* examples where it believes the outcome of the original proceeding turned on elements, such as witness demeanor, that are not readily determined from a review of the written record." Order at 9. IBS respectfully submits that the prior panel's factual findings were *all* unavoidably influenced by its assessment of witness credibility, and as participants in multiple live hearings, the judges inevitably based these credibility determinations upon their assessments of witness's demeanor. The Board asks for specific examples, but of course, it is impossible to get into the heads of the prior judges to determine the subtle ways in which witness credibility consciously or unconsciously influenced their thinking.

In any event, the Board did not attempt to hide the fact that its determination was influenced by credibility determinations. For example, it rejected IBS's objection to the minimum fee proposed by SoundExchange and CBI because it found that "IBS has not presented any *credible* testimony that the agreement is unreasonable."[2] Similarly, the Board excluded the rebuttal testimony of IBS's Chief Operating Officer Fritz Kass because, based upon his demeanor at the hearing, it determined that he "did not appear to know what was in his testimony." 76 Fed. Reg. at 13,041.

---

[2]    76 Fed. Reg. 13,026-01 at 13,039 (emphasis added).

2

These credibility assessments unavoidably tainted the Board's assessments about Mr. Kass's testimony as a whole and seemingly led the Board to disregard Mr. Kass's testimony on a variety of points—both large and small. For example, Mr. Kass testified that there are approximately 1,500 student-staffed webcasting operations affiliated with academic institutions and that "IBS is the largest organization representing such stations" with a membership of "over 1,000 such stations."[3] Yet the Board chose to completely disregard Mr. Kass's testimony, finding that IBS had "never provided any evidence to demonstrate this is true" and claiming that "IBS has never revealed to the Judges how many members it has, let alone their identities."[4]

More broadly, however, the Board's entire decision to apply the same $500 minimum fee to *all* webcasters amounted to a determination about the credibility of Mr. Kass's testimony in comparison to that of SoundExchange's Chief Operating Officer, Barrie Kessler. Mr. Kass made clear that a $500 minimum fee would not prevail in the market because it was beyond the financial means of numerous "small" and "very small" broadcasters.[5] Yet the Board chose to reject this testimony as insufficiently detailed in favor of the even less detailed testimony of Ms. Kessler,[6] who testified that SoundExchange would not negotiate a fee below $500 because its costs of administering a license averaged $825—even though Ms. Kessler conceded that the costs of administering some licenses were below that number and presented no evidence of SoundExchange's actual costs for administering the license of a very small noncommercial webcaster.[7]

---

[3]    Testimony of Frederick J. Kass (IBS Ex. 4) at ¶ 6.

[4]    76 Fed. Reg. at 13,039 n.18.

[5]    *See, e.g.*, Testimony of Frederick J. Kass (IBS Ex. 4) at ¶ 9 (noting that some stations have budgets as small as $250); 76 Fed. Reg. at 13,040 (quoting Mr. Kass).

[6]    76 Fed. Reg. at 13,040.

[7]    *See* Hearing Tr. Volume III at 525 (Apr. 21, 2010).

3

If, despite IBS's objections, the Board decides to hold paper hearings, IBS respectfully requests the opportunity to supplement the written record. And regardless of whether the Board allows the parties to supplement the written record, IBS respectfully requests that the Board allow the parties to submit legal briefs to guide the Board in its review of the record. If the Board simply reviews the prior briefing in this case without the benefit of additional submissions from the parties, it will necessarily waste time on questions that may no longer be at issue, and it may miss issues that will be raised on appeal.

Respectfully submitted,

September 27, 2013

Christopher J. Wright (D.C. Bar No. 367384)
Mark D. Davis (D.C. Bar No. 987597)
Jared P. Marx (D.C. Bar No. 1008934)

WILTSHIRE & GRANNIS LLP
1200 18th St., NW
Suite 1200
Washington, DC 20036
(202) 730-1300
cwright@wiltshiregrannis.com

*Of Counsel:*    William Malone
9117 Vendome Drive
West Bethesda, MD 20817
(301) 365-1175

*Counsel for Intercollegiate Broadcasting System*

4

## CERTIFICATE OF SERVICE

I hereby certify that on September 27, 2013, copies of the foregoing were sent via electronic mail, with a copy by First Class Mail, to the following:

Ara Hovanesian
Abraham Yacobian
Angus MacDonald
HOVANESIAN & HOVANESIAN
301 E. Colorado Blvd. Suite 514
Pasadena, CA 91101
hovanesian@earthlink.com
P) 626-795-0247
F) 626-795-8900

*Counsel to LIVE365*

David D. Oxford
Adam S. Caldwell
Ronald G. London
DAVIS WRIGHT & TREMAINE LLP
1919 Pennsylvania Avenue, N.W., Suite 200
Washington, D.C. 20006
davidoxenford@dwt.com
adamcaldwell@dwt.com
ronaldlondon@dwt.com
P) 202-973-4256
F) 202-973-4499

*Counsel to LIVE365*

William B. Colitre
ROYALTY LOGIC, LLC
21122 Erwin Street
Woodland Hills, CA 91367
Bcolitre@RoyaltyLogic.com
P) 818-955-8900
F) 818-558-3484

Michael Huppe
Sound Exchange, Inc.
1121 14th Street, NW, Suite 700
Washington, DC 20005
mhuppe@SOUNDEXCHANGE.COM
P) 202-640-5858
F) 202-640-5883

*Counsel to SoundExchange*

David A. Handzo
Michael DeSanctis
Jared Freddman
Steven Englund
JENNER & BLOCK LLP
733 10th Street, N.W., 10th Floor
Washington, DC 20001
dhandzo@jenner.com
mdesanctis@jenner.com
jfreedman@jenner.com
senglund@jenner.com
P) 202-639-6000
F) 202-639-6066

*Counsel to SoundExchange*

Catherine Gellis
CONSTANTINE/CANNON LLP
P.O. Box 2477
Sausalito, CA 94966
cbi@cathygellis.com
P) 202-642-2849

*Counsel for College Broadcasters, Inc.*

Kenneth L. Steinthal
WEIL GOTSHAL & MANGES, LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065
Kenneth.steinthal@weil.com
P) 650-802-3100
F) 650-802-3100

*Counsel for Yahoo!, Inc.*

Brandon Casci
LOUDCITY LLC
197 Highland Avenue #1
Sommerville, MA 02143
brandon@loudcity.net
brandon.casci@gmail.com

Wendy Halley
2700 Pennsylvania Avenue
Santa Monica, CA 90404
whalley@yahoo-inc.com
P)310-526-3411
F) 310-526-4400

*Counsel for Yahoo!, Inc.*

Suzanne Head
Associate General Counsel
National Association of Broadcasters
1771 N Street, NW
Washington, DC 20036
shead@nab.org
P) 202-429-5430

Jared P. Marx

# UNITED STATES COPYRIGHT ROYALTY JUDGES
## The Library of Congress

| | |
|---|---|
| *In re* | |
| Digital Performance Right in Sound Recordings and Ephemeral Recordings | Docket No. 2009-1 CRB (Webcasting III) |

## ORDER FOLLOWING NOTICE OF INTENTION TO CONDUCT PAPER PROCEEDING ON REMAND

On September 17, 2013, the Copyright Royalty Judges (Judges) gave notice of their intention to proceed on remand with paper proceedings. That notice afforded all parties to the captioned proceeding an opportunity to comment on the Judges' intention.

The Judges received comments from SoundExchange, Intercollegiate Broadcasting System, Inc. (IBS), and College Broadcasters, Inc. (CBI). In their comments, each party repeated its respective position regarding the remand procedure.

The Copyright Act and the Judges' procedural regulations permit the Judges to conduct proceedings on the papers alone, without any evidentiary hearing. 17 U.S.C. § 803(b)(5); 37 C.F.R. § 351.3(c). In accordance with that authority, therefore, the Judges shall proceed with their consideration *de novo* on the existing record. The Judges will accept no further submissions.

_____
Suzanne M. Barnett
Chief Copyright Royalty Judge

DATED: October 22, 2013

**UNITED STATES COPYRIGHT ROYALTY JUDGES**
**The Library of Congress**

| | |
|---|---|
| *In re* | |
| **Digital Performance Right in Sound Recordings and Ephemeral Recordings** | **Docket No. 2009-1 CRB (Webcasting III)** |

**ORDER DENYING MOTION FOR REHEARING**

On July 10, 2013, the Copyright Royalty Judges (Judges) issued a Determination after Remand of Rates and Terms for Royalty Years 2011-2015 in this matter (Initial Determination). Pursuant to 17 U.S.C. § 803(c)(2) and 37 C.F.R. Part 353, Intercollegiate Broadcasting System (IBS) filed a motion requesting rehearing (Motion). The Judges now deny that Motion.

The standard for consideration of motions for rehearing is set forth in 17 U.S.C. §803(c)(2)(A), which states that the Judges "may, *in exceptional cases,* upon a motion of a participant in a proceeding ... order a rehearing after the determination in the proceeding is issued ... on such matters as the Copyright Royalty Judges determine to be appropriate." *Id.* (emphasis added). In such "exceptional cases," the movant is required to show that an aspect of the determination may be erroneous. 37 C.F.R. § 353.1. In order to demonstrate that an aspect of the determination may be erroneous, the movant must show that the challenged aspect of the determination is "without evidentiary support in the record or contrary to legal requirements." 37 C.F.R. § 353.2.

Accordingly, rehearing motions should be granted only when (*1*) there has been an intervening change in controlling law; (*2*) new evidence (*i.e.*, evidence that was not available to the moving party while the record was open) is available; or (*3*) there is a need to correct a clear error or prevent manifest injustice. *Order Denying Motions for Rehearing*, Docket No. 2011-1 CRB PSS/Satellite II (January 30, 2013). IBS's Motion does not allege any intervening change in the law or new evidence, so it must necessarily rest on the third criterion.

In applying these standards previously, the Judges have found that rehearing motions "must be subject to a strict standard in order to dissuade repetitive arguments on issues that have already been fully considered ... by the Board." *Order Denying Motion for Rehearing*, Docket No. 2006-1 CRB DSTRA, at 1 (January 8, 2008) (quoting *Order Denying SoundExchange's Motion to Reconsider the Board's Order Requiring, in Part, the Production of Certain Income Tax Returns,* Docket No. 2005-1 CRB DTRA (May 3, 2006)); *Order Denying Motions for Rehearing*, Docket No. 2011-1 CRB PSS/Satellite II (January 30, 2013). This "strict standard" is

ORDER DENYING IBS MOTION FOR REHEARING - 1

consonant with the Judges' statutory obligation to limit rehearings to "exceptional cases." *Cf.*
*Regency Communications Inc. v. Cleartel Communications, Inc.*, 212 F. Supp.2d 1, 3 (D.D.C.
2002).

IBS asserts that a rehearing is warranted because the Judges:

1. Improperly delegated their authority to hold hearings;
2. Failed to establish minimum fees that appropriately distinguish among types of
   webcasters, as required by statute; and
3. Failed to cure the Appointments Clause violation identified by the DC Circuit in
   *Intercollegiate Broadcasting Sys., Inc. v. Copyright Royalty Board,* 684 F.3d 1332, 1342
   (D.C. Cir. 2012), *cert. denied,* 133 S. Ct. 2735 (2013).

Motion at 1. The Judges consider each of the asserted errors as follows.

**Improper Delegation**

IBS contends that, by confining its deliberations to the record developed in evidentiary
hearings presided over by an earlier panel of Judges, the current panel of Judges improperly
delegated responsibility for holding hearings. This conclusion rests on three assertions that the
Judges will address in turn.

1. The Judges' decision to reach its determination based on the record that the parties
   developed in hearings presided over by an earlier panel of Judges constitutes a delegation
   of authority to that earlier panel. Motion at 2-3.

This assertion confuses "delegation" with "succession." This is not a case where the
Judges delegated the job of holding hearings "to a subordinate administrative law judge." *Id.* at
2. The current Judges succeeded to the positions of the earlier Judges and picked up the process
where those earlier Judges left off.

The following hypothetical illustrates the weakness of IBS's assertion. Suppose the
Initial Determination had been rendered, not by the current panel of Judges, but by the original
panel after the Librarian of Congress reappointed the Judges as at-will employees. By IBS's
reasoning, that panel's decision to render a determination based on the existing record would
have constituted a delegation of authority—to themselves.

The Judges reject IBS's forced analogy. The Judges did not delegate anything to anyone.

2. The purported delegation was improper because the earlier panel of Judges was "not
   validly appointed at the time" it held hearings and issued the original Determination.
   Motion at 2 (quoting Initial Determination at 6).

Notwithstanding the judicial finding that the appointment of the prior panel had violated
the Appointments Clause, the *parties* to that hearing created the record. The parties had every
opportunity to present evidence and argue the applicable law. The prior Judges' weighing of the

ORDER DENYING IBS MOTION FOR REHEARING - 2

evidence and analysis of the law resulted in the original Determination that IBS challenged successfully. The current panel weighed and analyzed the record *de novo*.

IBS's second assertion appears to be substantively identical to its third argument—that the Judges failed to remedy the Appointments Clause violation by declining to hold new hearings. The Judges address this argument below.

3. The purported delegation was improper because "Congress made clear that it intended for the same people who would be making the rate determinations to preside over the hearings at which any evidence would be heard." Motion at 1.

This assertion proceeds from an incorrect reading of the Copyright Act (Act). Section 803(a)(2) of the Act states "The Copyright Royalty Judges shall preside over hearings in proceedings under this chapter en banc." From this statement IBS derives the conclusion that "Congress made clear that it intended for the same people who would be making the rate determinations to preside over the hearings at which any evidence would be heard." Motion at 1.

Section 803(a)(2) requires all three Judges to preside at hearings, and permits individual Judges to preside over other specified actions as the Chief Judge deems appropriate. The provision is concerned with the *number* of Judges required to carry out specific activities, not the *identity* of the individual Judges.[1] The Act contemplates the possibility of turnover among the individuals who serve as Copyright Royalty Judges every two years, *see* 17 U.S.C. § 802(c) (Judges appointed for staggered six-year terms, ensuring potential vacancies every two years), or less, *see* 17 U.S.C. § 802(d)(1) (Librarian authorized and directed to fill vacant judgeships expeditiously for remainder of unexpired term), even though rate and distribution proceedings have a timeline that often exceeds two years. Under IBS's theory, the Judges would have to abandon proceedings that are ready, or nearly ready, for a determination and hold new hearings whenever a new Judge is appointed to fill a vacancy. This would have a disastrous impact on the ability of the Judges to carry out the duties assigned to them by Congress within the timeframe that Congress established. In the absence of any specific Congressional directive that the individuals who render a determination must be the same individuals who presided over the hearings, the Judges will not read such an intent into the more general statutory language concerning the number of Judges who must preside at hearings.

**Failure to Distinguish among Types of Webcasters**

IBS contends that the Judges erred by failing to recognize and establish different minimum fees for the categories of webcasters that they proposed. IBS argues that the Act requires the Judges to distinguish among different types of webcasters, and that the record supports the distinctions they propose. While IBS's reading of the statute is sound, its reading of

---

[1] It is axiomatic that when the Judges carry out their responsibilities under the Act, they act in their institutional capacity and not their individual capacity. A decision of the Judges is a decision of the institution, not the individuals who happen to occupy the position at the time. In this way the Copyright Royalty Board is no different from any other agency of government.

ORDER DENYING IBS MOTION FOR REHEARING - 3

the record is not. IBS did not introduce sufficient evidence to establish that the categories it proposed should be recognized by the Judges. IBS's Motion does not allege that any new evidence has come to light that would warrant reconsideration of the Judges' determination.

As the proponent for differential treatment for certain categories of webcasters, IBS bore the burden of proving that those categories "constitute a distinct segment of the noninteractive webcasting market that in a willing buyer/willing seller hypothetical marketplace would produce different, lower rates than" those adopted for other categories. *Digital Performance Right in Sound Recordings and Ephemeral Recordings, Final rule and order*, 72 FR 24084, 24097 (May 1, 2007), *aff'd in relevant part sub nom. Intercollegiate Broad. Sys. v. Copyright Royalty Bd.*, 574 F.3d 748 (D.C. Cir. 2009) (*Web II*).

In its Motion, IBS first seeks to demonstrate that statements in the record concerning the educational nature of its members' activities and lack of any commercial motivation support adoption of its proposed categories of webcasters. These statements demonstrate the distinction between educational and non-educational webcasters as well as the distinction between commercial and noncommercial webcasters. Both distinctions are unnecessary since the Judges have recognized noncommercial webcasters and noncommercial educational webcasters as distinct categories in this proceeding. In addition, IBS's stress on the educational nature of its members' activities is irrelevant, since an educational nature is not a distinguishing characteristic of IBS's proposed categories. IBS's proposed categories are for "small" and "very small" noncommercial webcasters. *See* Initial Determination at 72-74 (describing IBS proposal). These categories would include noncommercial webcasters with no educational purpose or nature.

IBS then takes issue with the Judges' findings concerning affordability of the $500 minimum fee. IBS cites to one piece of record evidence—a statement by Captain Kass that "some IBS members have 'annual operating budgets of only $250.00 or less,'" Motion at 4 (footnote omitted)—as support for its contention that the $500 fee is beyond the reach of the webcasters in IBS's proposed categories. IBS then seeks to show that the evidence that the Judges cited in the Initial Determination was either refuted by this evidence, or irrelevant.

The cited testimony does little to assist IBS, even if the Judges accept such an imprecise statement as evidence. Critically, Captain Kass did not testify that any of those IBS members would fall into either of IBS's proposed categories of "small" and "very small" noncommercial webcasters (which are defined based on their ATH usage, not on the size of their operating budgets). Nor did IBS present any evidence as to how many IBS members had similarly small operating budgets. Nor did IBS disclose the basis for this statement. A single anecdotal reference to "some" webcasters with miniscule operating budgets is insufficient to demonstrate the existence of a "distinct segment of the noninteractive webcasting market . . . ." *Web II*, at 24097.

IBS's efforts to refute the evidence on affordability that the Judges cited are unavailing. Even if the Judges were to agree with IBS's arguments they would not be able to accept IBS's proposed categories. IBS has still failed to meet its burden of demonstrating that a $500 minimum fee is unaffordable to webcasters that fall within its proposed definitions for "small" and "very small" noncommercial webcasters.

ORDER DENYING IBS MOTION FOR REHEARING - 4

IBS makes an additional argument in this context that appears to be misplaced. IBS argues that the Judges relied improperly on the agreement between College Broadcasters Inc. (CBI) and SoundExchange (CBI/SoundExchange Agreement) and the testimony of Barrie Kessler as support for the $500 minimum fee. This evidence does not relate to the Judge's rejection of IBS's proposed categories of webcasters. As discussed above at length in the Initial Determination, the Judges rejected IBS's proposal because of the paucity of supporting evidence in IBS's case. The Judges cited the CBI/SoundExchange Agreement and the testimony of Barrie Kessler as evidence that supports *SoundExchange's* proposed rate structure for noncommercial webcasters.

## Failure to Cure Appointments Clause Violation

IBS contends that "[t]he only cure for" the Appointments Clause Violation identified by the D.C. Circuit "is for a properly appointed panel to reexamine the issues afresh." Motion at 6. That is precisely what has happened. The current panel of Judges, each of whom was appointed in accordance with the D.C. Circuit's decision, conducted a thorough review of the entire record in this proceeding, including all of the parties' written and oral testimony. The Judges then rendered the Initial Determination based on that fresh review of the evidence.

Nevertheless, IBS states that the Judges' review of the record was "not an adequate substitute for attending hearings, hearing live testimony, and making truly independent evidentiary decisions." *Id.* at 7. In essence, IBS's position is that the only way to cure the Appointments Clause violation would have been for the Judges to hold entirely new hearings.

The Judges addressed this contention in their September 17, 2013 Notice of Intention to Conduct Paper Proceeding on Remand (Notice). The Judges concluded that new hearings are unnecessary under applicable D.C. Circuit precedent: "As the D.C. Circuit decisions in *Legi-Tech*[2] and *Doolin*[3] demonstrate, a complete repetition of the adjudicatory process is not required to remedy the constitutional violation that resulted in a remand of the instant proceeding."

In addition, the Judges point out (as they did in the Notice) that the Act and the Judges' rules grant the Judges discretion to conduct proceedings on the papers alone, without holding evidentiary hearings at all. 17 U.S.C. § 803(b)(5); 37 C.F.R. § 351.3(c). There is no basis to conclude that the Judges lack this same discretion in a remand proceeding.[4]

At bottom, IBS's Motion rehashes arguments that IBS advanced prior to the Initial Determination, and that the Judges considered and rejected in the Notice. The Judges reject IBS's arguments again for the reasons set forth in the Notice.

---

[2] *FEC v. Legi-Tech, Inc.,* 75 F.3d 704 (D.C. Cir. 1996).

[3] *Doolin Sec. Sav. Bank, F.S.B. v. Office of Thrift Supervision,* 139 F.3d 203 (D.C. Cir. 1998).

[4] Apart from 37 C.F.R. § 351.15, the Act and the Judges' rules are silent as to the conduct of remand proceedings. The Judges, therefore, apply the statutory provisions and rules governing proceedings in general to the extent that they are applicable in the circumstances of a particular remand proceeding, taking into consideration the proposals submitted by the parties under section 351.15 of the rules.

ORDER DENYING IBS MOTION FOR REHEARING - 5

The Judges understand that, given the paucity of evidence in the existing record for IBS's rate proposal, IBS would prefer a new hearing. As we stated in the Notice, however, doing so "would be neither fair, nor efficient, nor economical . . . ." Notice, at 7-8. The Judges were not required by the Act, the Judges' rules or D.C. Circuit precedent to hold new hearings. To the contrary, when, as in this case, the Judges find no need for evidentiary hearings, the Act directs that paper proceedings "shall" be utilized. 17 U.S.C. § 803(b)(5)(A). The Judges' decision to render a determination without holding new hearings, therefore, is not a basis for granting a rehearing.

**Conclusion**

For the foregoing reasons, the Judges conclude that none of IBS's arguments demonstrate that the Initial Determination was erroneous and that the instant proceeding presents any exceptional circumstances which would justify a rehearing. Accordingly, IBS's Motion is **DENIED**.

**SO ORDERED.**

Suzanne M. Barnett
**Chief Copyright Judge**

David R. Strickler
**Copyright Royalty Judge**

Jesse M. Feder
**Copyright Royalty Judge**

**Dated:  February 4, 2014**

ORDER DENYING IBS MOTION FOR REHEARING - 6

## UNITED STATES COPYRIGHT ROYALTY JUDGES
### The Library of Congress

*In re*

Digital Performance Right in Sound
Recordings and Ephemeral Recordings

Docket No. 2005-1 CRB DTRA
(Webcasting II)

### INITIAL DETERMINATION AFTER SECOND REMAND

#### I. Background

The captioned matter began with a notice in the *Federal Register* in February 2005. In

that notice, the Copyright Royalty Judges (Judges) commenced a rate-setting proceeding and

solicited Petitions to Participate. *See* 70 FR 7970 (February 16, 2005). The aim of the

proceeding was to establish royalty rates and terms, including the establishment of minimum

fees, applicable to entities making ephemeral recordings of copyrighted sound recordings and

digitally performing those recordings[1]. The Judges set rates and terms for use of the rights

during the period 2006 through 2010, publishing their Final Determination on May 1, 2007. 72

FR 24084 (May 1, 2007) (*Web II*).

Intercollegiate Broadcasting System, Inc. (IBS) appealed the Judges' determination to the

U.S. Court of Appeals for the D.C. Circuit. The D.C. Circuit remanded the Judges'

determination of the minimum fee established for noncommercial webcasters, *viz.* $500 per year

per station or channel. Citing insufficient evidence in the record to substantiate the $500

minimum fee, the D.C. Circuit remanded that issue to the Judges for further proceedings. On

---

[1] Owners of rights in sound recordings are subject to compulsory licenses under the Copyright Act. *See, e.g.,* 17
USC § 112(e) (ephemeral recordings), § 114 (d)(2), (3) (transmission). The Judges are tasked to adjudicate, *inter
alia,* disputes relating to licensing fees. *See, e.g.,* 17 USC § 112(e)(3), (4), § 114(f), §§ 801, 803, 804.

May 18, 2010, after granting the parties leave to engage in additional briefing and discovery, the Judges held a further hearing on remand. Following the remand hearing, the Judges issued their remand order on September 17, 2010. 75 FR 56873 (Sept. 17, 2010).

IBS again appealed the Judges' determination. During the pendency of the *Web II* appeal, the Judges issued a final determination regarding rates and terms for the same licenses for the period 2011 through 2015.[2] (*Web III*). IBS appealed the Judges' *Web III* determination challenging again the $500 minimum fee and asserting that appointment of the Judges violated the Appointments Clause of the U.S. Constitution. Given the overlap of issues and the introduction of a constitutional challenge, the D.C. Circuit stayed further proceedings on appeal in *Web II*.

The D.C. Circuit decided *Web III* and concluded that the Judges' appointments were unconstitutional. The D.C. Circuit struck portions of the Copyright Act that it determined to be unconstitutional and the Librarian of Congress appointed a panel of Judges consistent with the altered statute. The D.C. Circuit remanded *Web III* for further proceedings[3] by a constitutionally valid panel of Judges. After the *Web III* remand, on motion of the *Web II* parties, the D.C. Circuit vacated and remanded the *Web II* matter.[4]

The issue before the Judges is determination of the validity and application of the $500 minimum fee for noncommercial webcasters for the period 2006 through 2010. The Judges, after notice to the parties, concluded that they should reach this determination, to the extent a new determination is required, under section 803(b)(5) (paper proceedings) after a *de novo* review of the record.

---

[2] *See* 76 FR 13026 (Mar. 9, 2011) (*Web III*).

[3] *Intercollegiate Broadcasting Sys., Inc. v. Copyright Royalty Board,* 684 F.3d 1332, 1342 (D.C. Cir. 2012), *cert. denied,* 133 S. Ct. 2735 (2013).

[4] *Intercollegiate Broadcasting Sys., Inc. v. Copyright Royalty Board*, No. 10-1314 (D.C. Cir. Sept. 30, 2013) (order granting joint motion for vacatur and remand).

For all of the reasons discussed herein, the Judges determine that the minimum fee for noncommercial webcasters for the license term 2006 through 2010 shall be and remain $500 per station or channel, applicable to the annual flat fee royalties payable for usage of sound recordings for up to 159,140 Aggregate Tuning Hours (ATH) per month. The Judges assert that the question on remand is moot. Nonetheless, the Judges detail in this determination reasons sufficient to uphold their decision on the merits, to the extent required.

## II. The Judges Conclude that the Issue on Remand is Subsumed by the Affirmance of the Flat Royalty Rate of $500.

IBS argues in this remand proceeding that the Judges should eliminate, or significantly reduce, the $500 minimum fee for noncommercial webcasters that the Judges adopted and the D.C. Circuit remanded in the *Web II* Determination. That minimum fee was in effect for the period 2006 through 2010, and thus *expired more than three years ago*. Any change to the minimum fee at issue in this remand proceeding would have no prospective effect whatever on the rates that noncommercial webcasters pay. If a decision by the Judges in IBS's favor at this stage were to have any effect at all, it would be by requiring a retrospective adjustment of noncommercial webcasters' payment obligations (*e.g.*, a refund of minimum fees already paid). Such a remedy would be warranted only if a reduction in the minimum fee would also result in a reduction of a noncommercial webcaster's total payment obligation.

The minimum fee that a webcaster pays is only one component of the webcasters' total payment obligation under the section 114 and section 112(e) statutory licenses. The Final Determination established a rate structure for noncommercial webcasters that consisted of a flat annual fee of $500 for the first 159,140 ATH of usage per month, 37 C.F.R. § 380.3(a)(2)(i) (2008), plus a per-performance rate equal to the commercial rate for usage in excess of 159,140 ATH per month. 37 C.F.R. § 380.3(a)(2)(ii) (2008). In addition, noncommercial webcasters

were subject to the contested $500 annual minimum fee. The minimum fee was non-refundable, but recoupable against the $500 flat royalty fee. 37 C.F.R. § 380.3(b) (2008); *see also Final Determination*, 72 FR at 24100.[5]

Because the $500 minimum fee was recoupable, a noncommercial webcaster's single payment of $500 satisfied both the *minimum fee* and the $500 *flat rate* for the first 159,140 ATH of monthly usage. Nonetheless, the flat rate and the minimum fee are separate and distinct components of the rate structure, codified in separate sections of the Code of Federal Regulations.

In its decision of the appeal of the Final Determination, the D.C. Circuit "vacate[d] the $500 minimum fee" for both commercial[6] and noncommercial webcasters and "remand[ed] that portion of the determination to the Copyright Royalty Judges for further proceedings not inconsistent with this opinion." 574 F.3d at 772. "All other portions of the determination [were] affirmed." *Id.*; *accord id.* at 753.

The plain language of the D.C. Circuit's remand order demonstrates that the court affirmed the flat rate component of the rate structure for noncommercial webcasters. Even if the Judges were to reduce the minimum fee retroactively, noncommercial webcasters' obligation to pay a flat royalty rate of $500 annually would be unaffected. Consequently, a decision in IBS's favor on the minimum fee issue would have no effect on noncommercial webcasters' total payment obligations. That is, given that the $500 payment satisfied both the *minimum fee* and the $500 *flat rate* for the first 159,140 ATH of usage, IBS and its constituents would realize no benefit, even if the Judges were to reduce the minimum fee, thereby eliminating any actual issue

---

[5] This minimum fee, codified in 37 CFR § 380.3(b) (2008), applies to both commercial and noncommercial webcasters.

[6] The commercial webcasters and SoundExchange reached a settlement after the Final Determination was remanded, which the Judges adopted, leaving only the minimum fee for noncommercial webcasters for the Judges to determine in this remand proceeding. *See* 75 FR 6097 (Feb. 8, 2010).

for adjudication. The Judges conclude, therefore, that the instant matter has been rendered moot and that IBS lacks a "significant interest in the proceedings" as required by section 803(b)(2)(C) of the Act.

## III. Assuming the Issue on Remand States an Issue for Adjudication, the Judges' Determination on Remand is Narrowed by the Directive from the D.C. Circuit

### A. The First Remand

In vacating and remanding the Judges' original *Web II* Determination with regard to the "Minimum Annual Fee"[7] for noncommercial webcasters subject to the statutory license, the D.C. Circuit held:

> Because there is *no record evidence* that $500 represented SoundExchange's administrative cost per channel or station, the Judges' determination in this regard cannot be sustained.

*Intercollegiate Broadcast System, Inc. v. Copyright Royalty Board*, 574 F.3d 748, 767 (D.C. Cir. 2009) (emphasis added). The basis for the Court's holding was that, in the absence of sufficient evidence, "the $500 minimum fee was *arbitrary, capricious and not supported by record* evidence ...." *Id.* at 772 (emphasis added).

Accordingly, the D.C. Circuit "remand[ed] the issue of the appropriate minimum fee for noncommercials." *Id.* at 767. To allow for a cure of this defect on remand, the D.C. Circuit instructed the Judges to undertake "further proceedings not inconsistent with this opinion," *id.*, which required the Judges to receive and consider *new* "record evidence" of "SoundExchange's administrative cost per channel or station." *Id.* at 767 (emphasis added).

For the first remand, the Judges permitted the Participants to submit additional papers and to engage in supplemental discovery. Thereafter, on May 18, 2010, the Judges conducted the remand hearing required by the D.C. Circuit. To the extent this second remand presents an issue

---

[7] The rates and terms established by the Judges "shall include a minimum fee ...." 17 U.S.C. § 114(f)(2)(B).

for adjudication, the current, reconstituted panel of Judges has conducted a *de novo* review of the evidence and transcripts of the first remand and analyzed the propriety of the annual $500 minimum fee per station or channel.

## B. The Participants' Witnesses and Relevant Evidence

In the first remand proceeding, SoundExchange, as the collective representing the licensors, presented the written and oral testimony of W. Tucker McCrady, a member of its Licensing Committee, which, is directly responsible for negotiating and approving any settlements related to statutory licenses on behalf of SoundExchange. McCrady WDT at 1. Mr. McCrady is also associate counsel, digital legal affairs, for Warner Music Group (WMG). *Id.* SoundExchange also presented the written and oral testimony of Barrie Kessler, its chief operating officer. SoundExchange also introduced into evidence agreements it reached pursuant to the Webcaster Settlement Acts of 2008 and 2009, with *(i)* College Broadcasters, Inc. (CBI) for noncommercial educational webcasters; *(ii)* National Association of Broadcasters (NAB) for broadcasters who also webcast performances of sound recordings; *(iii)* Sirius XM Radio, Inc. (Sirius XM) for webcasts of signals provided by satellite services; and *(iv)* DiMA for commercial webcasters. 5/18/10 Tr. at 13 (McCrady).

IBS represents a membership of more than 1,000 student-staffed stations and webcasting operations affiliated with domestic academic institutions, and purports to be the largest such organization in the United States. Frederick J. Kass, Jr. (Pre-Remand) WDT at ¶ 6. IBS presented its case principally through the written and oral testimony of Captain Kass, treasurer, director of operations (chief operating officer), and a director of IBS.[8] In addition, IBS presented the written testimony of John E. Murphy, general manager of WHUS, a university radio station

---

[8] Frederick Kass is also retired from the United States Navy, having achieved the rank of Captain. Kass (Pre-remand) WDT ¶ 1. Accordingly, the Judges refer to him in this Determination as Captain Kass.

at the University of Connecticut, and Benjamin Shaiken, at the time a student at the University of

Connecticut and operations manager of WHUS.

## C. The Minimum Fee Proposals of the Participants

### 1. The SoundExchange Proposal

SoundExchange proposed the same dollar level for a minimum fee for noncommercial

webcasters, $500, as it had proposed prior to the first remand.  Specifically, SoundExchange

proposed:

> Each Noncommercial Webcaster will pay an annual, nonrefundable minimum fee
> of $500 for each calendar year or part of a calendar year of the license period
> during which they are [*sic*] Licensees pursuant to licenses under 17 U.S.C. 114.
> This annual minimum fee is payable for each individual channel and each
> individual station maintained by Noncommercial Webcasters and is also payable
> for each individual Side Channel maintained by Broadcasters who are Licensees.
> The minimum fee payable under 17 U.S.C. 112 is deemed to be included within
> the minimum fee payable under 17 U.S.C. 114.  Upon payment of the minimum
> fee, the Licensee will receive a credit in the amount of the minimum fee against
> any additional royalty fees payable in the same calendar year.

*Proposed Rates and Terms of SoundExchange, Inc. for the Remand Proceeding*

*Concerning the Minimum Fee Payable by Noncommercial Webcasters* (Jan. 11, 2010).

Consistent with the Judges' prior ruling in *Web II*, SoundExchange's proposed minimum

fee would be "fully recoupable" against royalty fees owed by noncommercial webcasters subject

to the statutory license.  5/18/10 Tr. at 14 (McCrady).

### 2. The IBS Proposal

IBS proposed that certain smaller noncommercial webcasters be exempt from paying any

minimum fee.  5/18/10 Tr. at 76, 83–85 (Kass); Kass (Supplemental) WDT at 2 (For certain

smaller noncommercial webcasters, "[t]he imposition of a minimum fee should be rejected by

the Judges.")[9]  More particularly, IBS proposed that an exemption from the minimum fee be

provided to webcasters that met IBS's proposed (and unprecedented) classification as either

"Small Noncommercial Webcasters," defined by IBS as those whose total performances of

digitally recorded music is less than 15,914 ATH per month, or "Very Small Noncommercial

Webcasters," defined by IBS as those whose total performances of digitally recorded music is

less than 6,365 ATH per month. *IBS's Restated Rate Proposal* (June 1, 2010).  IBS did not

propose a separate minimum fee for noncommercial webcasters who performed more than

15,914 ATH per month, nor did IBS object to SoundExchange's proposed minimum fee for

noncommercial webcasters who webcast more than 15,914 ATH per month.

      In addition, IBS raised issues that went beyond the scope of the remand instructions of

the D.C. Circuit.[10]

## D. The Participants' Testimony and Evidence

### 1. SoundExchange's Testimony and Evidence

      SoundExchange – through Ms. Kessler's testimony – provided precisely the type of

evidence required by the D.C. Circuit in its remand instructions.  That is, Ms. Kessler testified

regarding the costs incurred by SoundExchange to administer the royalty payment and

distribution process under the statutory license.  As Ms. Kessler testified, broadly speaking,

"there is not necessarily much difference between a noncommercial service and a commercial

---

[9] Because the D.C. Circuit remanded for a determination of "the issue of the appropriate minimum fee for noncommercials," the Judges construe the IBS proposal as a request for a minimum of fee of zero.  The Judges do not reach the question whether a minimum fee of $0 could ever satisfy the statutory mandate to "include a minimum fee for each . . . type of service . . . ."  17 U.S.C. § 114(f)(2)(B).

[10] Specifically – and separate and apart from the minimum fee issue – IBS also requested for these proposed new classes of noncommercial webcasters:  *(1)* a new flat royalty *rate* of $50 per annum for the noncommercial webcasters IBS classified as "Small"; *(2)* a new flat royalty *rate* of $20 per annum for the noncommercial webcasters IBS classified as "Very Small"; and *(3)* new *terms* that would exempt both such proposed classes from recordkeeping and reporting requirements.  *By seeking different royalty rates and terms, IBS has raised issues that go beyond the scope of the remand instructions.*  Indeed, as the D.C. Circuit made clear, except for the minimum fee issue, *"[a]ll other portions of the determination are affirmed."*  574 F.3d at 772 (emphasis added).

service in terms of the effort required for [SoundExchange] to administer ... use of sound recordings." Kessler Corrected WDT at 3.

Ms. Kessler testified that 305 noncommercial webcasters paid the minimum fee of $500 in 2009. Kessler Corrected WDT at 3; 5/18/10 Tr. at 34 (Kessler).[11]  According to Ms. Kessler, by making these payments, the noncommercial webcasters demonstrated that they were able and willing to pay the minimum fee.  5/18/10 Tr. at 33 (Kessler).

According to Ms. Kessler, SoundExchange does not track the administrative costs on a licensee, station, or channel basis in the ordinary course of business.  5/18/10 Tr. at 37 (Kessler). However, for this remand proceeding, SoundExchange estimated its administrative costs and found that the average per channel or station cost for webcasters for 2008 was $803.  5/18/10 Tr. at 36 (Kessler); Kessler Corrected WDT at 9-10.  Further, Ms. Kessler testified that this average cost exceeded the average revenue derived by SoundExchange from noncommercial webcasters. 5/18/10 Tr. at 34 (Kessler).

Ms. Kessler testified that, for all licensees, regardless of size or classification, SoundExchange must perform certain basic processes to administer the collection and distribution of royalty fees related to use of sound recordings.  She also testified that that there was no positive correlation between the volume of sound recordings performed by a station or channel and the administrative work required of SoundExchange, nor, as noted *supra*, was there a greater amount of time and effort expended to administer the licensing process for commercial webcasters compared to noncommercial webcasters.[12]  In fact, as Ms. Kessler testified,

---

[11] The remaining 58 noncommercial webcasters also were charged the $500 minimum fee, but they recouped that minimum fee either because they exceeded the ATH threshold cap or because they streamed multiple channels or stations.

[12] According to Ms. Kessler, although the particular per channel or station costs deviate from the average (by definition, the value of each item within a heterogeneous set will deviate from the set's average value), those deviations are not a function of the classification of the service as commercial or noncommercial. Rather, those

SoundExchange "at times has to devote more time to working with a noncommercial service than it would a commercial service, because of the small and often inexperienced staff and relative lack of automation in the operations of many noncommercial webcasters." Kessler Corrected WDT at 4.

Moreover, SoundExchange's additional documentary evidence regarding the minimum fee contained in other agreements was consistent with the use of the $500 minimum fee in this proceeding. All of the agreements filed pursuant to the Webcaster Settlement Acts of 2008 and 2009 and introduced into evidence by SoundExchange contained minimum fees similar to the $500 per station or channel proposed by SoundExchange. Of particular importance, one of those agreements was the agreement between SoundExchange and noncommercial educational webcasters (the CBI Agreement) for the same type of services as would be covered under the IBS proposal. More specifically, the CBI Agreement contains *the identical minimum fee of $500 per year per station or channel.* 5/18/10 Tr. at 14 (McCrady).

Mr. McCrady testified that this proposed $500 minimum fee represented a substantial discount for noncommercial webcasters. Specifically, Mr. McCrady testified that – with regard to *Commercial* Webcasters – WMG required that its negotiated voluntary licenses for its full catalogue must generate payments anticipated to be at least $25,000. 5/18/10 Tr. at 25 (McCrady), and the lowest commercial minimum fee is 20% of revenue. 5/18/10 Tr. at 20 (McCrady). On percentage terms, therefore, the $500 minimum fee would represent a substantial discount because – accepting *arguendo* IBS's assertion that the average annual operating budget of its member stations is $9,000, *see* 5/18/10 Tr. at 20 (McCrady) and 5/18/10 Tr. at 71 (Kass) – that proposed $500 minimum fee would be less than 6% of that amount.

---

deviations are a function of the amount of "time and attention" required of SoundExchange to administer the license, which itself is a function of the quality of the data provided by the service operating the channel or station. 5/18/10 Tr. at 37-38 (Kessler).

## 2.    IBS's Testimony and Evidence

IBS's primary contention to support a zero minimum fee for "Small"" and "Very Small" noncommercial webcasters is essentially that those entities are unable to afford the $500 minimum fee proposed by SoundExchange.  5/18/10 Tr. at 103 (Kass).  More specifically, Capt. Kass testified that, according to a prior survey by IBS of its member stations – a survey undertaken "back aways" and not proffered by IBS – the average annual operating budget for those campus stations was approximately $9,000 per year.  5/18/10 Tr. at 71 (Kass); Kass (Pre-Remand) WDT at 9.

Messrs. Kass, Murphy, and Shaiken all testified about certain distinctions between college (and, to a lesser extent, high school) radio stations and commercial radio stations.  Kass (Pre-Remand) WDT at ¶¶ 7-8; 10-13; 4/22/10 Tr. at 761, 765(Kass); Murphy WDT at ¶¶ 4-10; Shaiken WDT  ¶¶ 5-9.[13]  The gravamen of these asserted distinctions was that smaller webcasters affiliated with educational institutions have an instructional need for sound recordings that, according to IBS, must be distinguished from the demand of other webcasters, in a manner that would preclude any minimum fee.

However, the evidence and testimony introduced by IBS did not address the issue of whether SoundExchange incurred administrative costs in connection with licensing of sound recordings performed by academic institutions, or the dollar value of such administrative costs.

### E. Analysis and Determination

The Judges concluded in the first remand that SoundExchange's $500 minimum fee proposal is clearly appropriate and eminently reasonable.  The Judges in this remand reach the same conclusion and find several bases in the record for this conclusion.

---

[13] The written testimony of Messrs. Murphy and Shaiken were introduced previously in *Web III* on April 22, 2010, and were subsequently designated as evidence by IBS and admitted in the first *Web II* remand proceeding.  5/18/10 Tr. at 66-67.

First, *IBS did not proffer any evidence to contradict Ms. Kessler's testimony.*
Accordingly, the Judges find as a fact that the cost to administer the statutory license, including
for the noncommercial webcasters represented by IBS, is $803 per year on average. It is
reasonable and appropriate for the minimum fee at least to cover SoundExchange's
administrative cost. Moreover, as noted at the outset of this Determination, the D.C. Circuit
expressly remanded the prior Determination with a directive that the Judges develop just such a
record regarding SoundExchange's administrative costs, in order to ground a decision as to the
minimum fee on evidentiary bases.[14]

Second, the CBI Agreement admitted into evidence is persuasive corroborating evidence.
The CBI Agreement confirms that SoundExchange's proposal represents a minimum fee that has
actually been *negotiated in the marketplace* between a willing buyer and a willing seller. The
Judges further note that the negotiated CBI Agreement employs the same minimum fee per
station or channel, up to the 159,140 ATH threshold, without the smaller sub-classifications
proposed by IBS.

Third, the undisputed fact that 305 noncommercial webcasters paid the $500 minimum
fee in 2009 is persuasive evidence that this minimum fee has not only been included in an
agreement, but has *actually been paid in the marketplace*. Just as webcasting rates (beyond a
minimum fee) must represent marketplace rates, so too should a statutory minimum fee bear a
relationship to the minimum fees that actually are paid for similar services.

In stark contrast, the testimony and evidence proffered by IBS do not present any
countervailing considerations.

---

[14] The Judges note that, as Mr. McCrady testified, generally, minimum fees "are intended not only to cover our costs
of negotiating and administering the license, but to assure that we will receive a substantial guaranteed stream of
revenue for making available our large repertoire of sound recordings." McCrady WDT at 5. Although in the
present proceeding the minimum fee has been based on the administrative costs incurred by SoundExchange,
nothing set forth herein should be construed as precluding a minimum fee from also serving to guarantee a stream of
revenue for licensees as appropriate in the particular proceeding.

First, IBS proffered no record evidence to support the contention that the "Small" or "Very Small" noncommercial webcasters as defined by IBS would be unable to pay a $500 minimum fee. Indeed, IBS did not offer testimony from any entity that demonstrably qualified as a "Small" or "Very Small" noncommercial webcaster. Mere conclusory statements that a $500 minimum payment would be unaffordable for smaller noncommercial webcasters do not serve as probative evidence.

Second, the only testimony that mentions any specifics about the finances of smaller webcasters is the reference by Capt. Kass to the survey performed "back aways" that supposedly showed that IBS members had an average annual operating budget of $9,000. Kass (Pre-Remand) WDT at ¶ 9. IBS did not offer that purported survey into evidence. Without documentary evidence that would allow the Judges to assess the validity of the survey, the Judges cannot accept Capt. Kass's reference to that survey as evidence. *See* 37 C.F.R. 351.l0(e). Moreover, assuming *arguendo* the Judges could accept such a casual reference as probative, the assertion would not advance IBS's case. On its face, an assertion that the average operating budget for IBS members is $9,000 does not establish that its members lack the capacity to make a minimum payment of $500.

Third, the evidence strongly suggests that the ATH cutoffs that IBS proposed for "Small" and "Very Small" noncommercial webcasters are arbitrary. It appears that, for these proposed smaller categories, IBS chose ATH levels that represent 10% and 4%, respectively, of the ATH cutoff (159,400 ATH) for all noncommercial webcasters contained in SoundExchange's rate proposal. *IBS's Restated Rate Proposal* (June 1, 2010). Nothing in the record substantiates these ATH levels as probative of the ability, *vel non,* of a noncommercial webcaster to pay a $500 minimum fee.

Fourth, even if there were a sufficient basis in the record to conclude that "Small" and/or "Very Small" noncommercial webcasters were unable to pay a $500 minimum fee, that alone would not demonstrate that a willing seller in a hypothetical marketplace would be prepared to offer a lower minimum fee. That proposition is particularly dubious in this proceeding given the evidence in the record (discussed *supra*) that SoundExchange's average annual administrative cost exceeds $500 per station or channel.

Fifth, the particular economic circumstances of the academic webcasters represented by IBS are germane *only* to the determination of the statutory royalty rate that they are required to pay – a royalty determination previously rendered by the Judges and affirmed by the D.C. Circuit. Indeed, the prior Determination by the Judges, affirmed by the D.C. Circuit, acknowledged the appropriateness of lower *rates* for noncommercial webcasters compared to the rates set for commercial webcasters. The issue at hand on this remand is different – whether there should be a distinction regarding the *minimum fee* – not the royalty rate – among different groups *within* the category of noncommercial webcasters.[15]

Finally, the testimony of the IBS witnesses regarding the nature of the use of sound recordings[16] by academic institutions is not pertinent to the setting of the minimum fee based on SoundExchange's administrative costs. That is, payment of a minimum fee of zero, and indeed any minimum fee significantly below SoundExchange's actual administrative costs, would

---

[15] The contrast between the *economic* value of a sound recording and the *economic* value of administrative services is instructive in this regard. Administrative services, like any private services or goods, are priced in a market at a level that permits the seller to recover at least its average variable cost of providing those services. By contrast, the marginal cost of producing an additional copy of a sound recording is essentially zero, so the determination of the price for the sound recording, on the supply side, is influenced by that economic fact (and by the recurring sinking of long-term costs to create the recording and the need to provide an incentive for the creation of future sound recordings). Noncommercial webcasters might have been able to argue for *a different or lower royalty rate* based on this economic argument, but the Judges cannot apply this principle to the valuation of a service, such as the provision of administrative functions that, like all private goods or services, are provided at a positive marginal cost.

[16] Pursuant to 17 U.S.C. § 114(f)(2)(B), the Judges can identify and then account for those differences in the "nature of the use of sound recordings" that would support a different rate or term.

provide a webcaster with an unjustified free ride[17] in terms of the cost of administering the license, because SoundExchange incurs that cost *regardless of the nature of the use of the sound recording.*[18]

## IV. Conclusion

For the foregoing reasons, developed from a *de novo* review of the record, the Judges conclude that the $500 minimum fee proposed by SoundExchange for all noncommercial webcasters for the license term 2006 through 2010 is appropriate and consistent with the relevant willing buyer/willing seller statutory standard. The Judges hereby expressly adopt the same minimum fee as set forth in the Final Determination published on May 1, 2007, and the Order on Remand. See 37 C.F.R. § 380.3(b)(2). The Judges also conclude that IBS failed to establish that the zero minimum fee IBS proposed for sub-categories of noncommercial webcasters, either with relevant evidence or economic analysis consistent with the applicable statutory standard..

Suzanne M .Barnett
Chief Copyright Royalty Judge

---

[17] "Small" and "Very Small" noncommercial webcasters would obtain a free ride under the IBS proposal because they receive benefits from SoundExchange's administrative services. As explained by Mr. McCrady, rather than having to negotiate licenses with individual copyright owners in a market without a statutory license, noncommercial webcasters enjoy "one-stop shopping" for rights to all recordings at a pre-established price. McCrady WDT at 11.

[18] The Judges do not rely upon Mr. McCrady's testimony regarding the nature of the use of the sound recordings by academic institutions. He testified that the $500 minimum fee is appropriate because it provides an important educational message for students regarding the value of recorded music and the need to pay for it. 5/18/10 Tr. at 23 (McCrady). Mr. McCrady did not purport to be an educator, he did not claim any direct knowledge of the scope or content of the educational work undertaken by academic institutions that authorize their students to play sound recordings, and SoundExchange did not proffer evidence to indicate that Mr. McCrady possessed the competency to testify as to any relationship between the educational mission of these institutions and the establishment of a minimum fee. Although such a "message" might well be appropriate as part of an economics or business school class or internship, that message might not be part of the curriculum in a music or communications class or internship. Further, a student's understanding of the economic issues regarding the pricing of sound recordings cannot be imparted in such an *ad hoc* manner.

David M. Strickler
Copyright Royalty Judge


Jesse M. Feder
Copyright Royalty Judge

DATED:  March 11, 2014



# FEDERAL REGISTER

**Vol. 79**     **Friday,**

**No. 80**     **April 25, 2014**

---

## Part III

## Library of Congress

Copyright Royalty Board

**37 CFR Part 380**
Determination of Royalty Rates for Digital Performance Right in Sound Recordings and Ephemeral Recordings; Final Rule

## LIBRARY OF CONGRESS

## Copyright Royalty Board

### 37 CFR Part 380

**[Docket No. 2009–1 CRB Webcasting III]**

**Determination of Royalty Rates for Digital Performance Right in Sound Recordings and Ephemeral Recordings**

**AGENCY:** Copyright Royalty Board, Library of Congress.

**ACTION:** Final rule and order.

**SUMMARY:** The Copyright Royalty Judges announce their final determination of the rates and terms for two statutory licenses, permitting certain digital performances of sound recordings and the making of ephemeral recordings, for the period beginning on January 1, 2011, and ending on December 31, 2015.

**DATES:** *Effective Date:* April 25, 2014.

*Applicability Dates:* These rates and terms are applicable to the period January 1, 2011, through December 31, 2015.

**FOR FURTHER INFORMATION CONTACT:** Richard Strasser, Senior Attorney, or Gina Giuffreda, Attorney Advisor. Telephone: (202) 707–7658. Email: *crb@ loc.gov.*

**SUPPLEMENTARY INFORMATION:** On July 6, 2012, the United States Court of Appeals for the District of Columbia Circuit (DC Circuit) remanded this matter for determination. The Copyright Royalty Judges (Judges) determine that the royalty rates payable under 17 U.S.C. 114(f) for the public performance by webcasters of digital sound recordings for the period 2011 through 2015 shall be as follows. For commercial webcasters subject to the agreement between the National Association of Broadcasters and SoundExchange, as stipulated in the agreement. For all other commercial webcasters:

| Year | Rate per- performance [1] |
|---|---|
| 2011 ...................................... | $0.0019 |
| 2012 ...................................... | 0.0021 |
| 2013 ...................................... | 0.0021 |
| 2014 ...................................... | 0.0023 |
| 2015 ...................................... | 0.0023 |

The Judges determine that section 114 public performance rates for noncommercial webcasters shall be as follows. For noncommercial educational

[1] This rate is applicable from first performance, but subject to recoupment credit for the agreed minimum fee of $500 per year for each station or channel.

webcasters, as agreed by and between College Broadcasters, Inc. and SoundExchange in the agreement approved by the Judges in this proceeding. For other noncommercial webcasters, the rate shall be $500 per station or channel, including side channels, up to a maximum usage of 159,140 Aggregate Tuning Hours [2] (ATH) per month. Commercial usage rates apply to usage in excess of 159,140 hours per month.

All parties in interest in this proceeding agreed that royalties payable for the license granted under 17 U.S.C. 112(e) should be bundled with the section 114 royalties and deemed to be 5% of the bundled remittances. The Judges adopt this agreement for the period 2011 through 2015.

Following are the bases of the Judges' determination.

I. Introduction
  A. Subject of the Proceeding
  B. Procedural Posture
  C. Statutory Background
  D. The Record
II. Rates Under the Section 112 Ephemeral License
III. Rate Structure Under the Section 114 Performance License
IV. Rates for Commercial Webcasters
  A. The National Association of Broadcasters/SoundExchange Agreement
  B. All Other Commercial Webcasters
  1. The Live365 Rate Proposal
  2. The SoundExchange Rate Proposal
  3. The "Affordability" of the Proposed Interactive Benchmark Rates
  4. Judges' Conclusions Regarding the Commercial Webcasters Rates
V. Rates for Noncommercial Webcasters
  A. Noncommercial Educational Webcasters
  B. Other Noncommercial Webcasters
  1. Rate Proposals of the Participants
  2. Evaluation of the Rate Proposals and Determination of Rates
VI. Terms
  A. Uncontested Terms
  1. Collective
  2. Stipulated Terms and Technical and Conforming Changes
  3. Electronic Signature on Statement of Account
  B. Contested Terms for Commercial Webcasters
  1. Terms Proposed by Live365
  2. Terms Proposed by SoundExchange
  C. Contested Terms for Noncommercial Webcasters
VII. Determination and Order

[2] "Aggregate Tuning Hours" is defined in SoundExchange's rate proposal as using the same definition employed during the 2006–2010 rate period and codified at 37 CFR 380.2 (2010). It is a measure of the duration of all programming transmitted by licensee, less the actual running time of any sound recordings that are licensed directly or which do not require a license under the Act.

## I. Introduction

### A. Subject of the Proceeding

This Determination results from a rate proceeding convened under section 803(b) of the Copyright Act (Act), 17 U.S.C. 803(b). On January 5, 2009, the Copyright Royalty Judges (Judges) announced commencement of the captioned proceeding. *See,* 74 FR 318 (Jan. 5, 2009). The purpose of the proceeding was to determine royalty rates and terms for the public performance of digital sound recordings by eligible nonsubscription transmission services or new subscription services, as defined in section 114 of the Act.[3] This proceeding includes determination of rates and terms relating to the making of ephemeral copies under section 112 of the Act in furtherance of the digital public performances. The rates and terms the Judges determine in this proceeding apply to the period of January 1, 2011, through December 31, 2015. *See* 17 U.S.C. 804(b)(3)(A).

### B. Procedural Posture

In response to the Judges' published notice of commencement, forty entities filed Petitions to Participate. The participants followed the statutory procedures for rates and terms determinations, which include a voluntary negotiation period. In addition, Congress provided expanded opportunities for settlement by passing the Webcaster Settlement Acts of 2008 and 2009 (WSA).[4] Most participants negotiated agreements relating to rates and terms prior to the hearing.[5]

When the Judges convened the hearing to determine rates and terms applicable to the non-settling participants, the parties remaining were: SoundExchange, Inc. (SoundExchange),

[3] Including as amended by the Digital Millennium Copyright Act (DMCA), Public Law 105–304, 112 Stat. 2860, 2887 (Oct. 27, 1998).

[4] Public Law 110–435, 122 Stat. 4974 (Oct. 16, 2008); Public Law 111–36, 123 Stat. 1926 (June 30, 2009). The Webcaster Settlement Acts of 2008 and 2009 authorized webcasters to negotiate rates and terms for the section 112 and 114 licenses to be effective during the then current rate term *in lieu* of the adjudicated rates for that term, and to extend through the rate term at issue in this proceeding. The WSAs also gave parties the option to exclude those negotiated terms from evidence in a proceeding before the Judges notwithstanding the provisions of sections 112(e)(4) and 114(f)(2)(B), which permit the Judges to consider evidence of voluntarily negotiated licenses in determining statutory rates and terms.

[5] The participants reached eight settlements in all, accounting for approximately 95% of the royalties paid to SoundExchange in 2008 and 2009. The Copyright Office published notices of settlements as follows: 74 FR 9293 (Mar. 3, 2009) (three agreements); 74 FR 34796 (July 17, 2009) (one agreement); and 74 FR 40614 (Aug. 12, 2009) (four agreements).

College Broadcasters, Inc. (CBI),[6] the Intercollegiate Broadcasting System, Inc. (IBS), Live365, Inc. (Live365), RealNetworks, Inc., and Royalty Logic, LLC. The Judges heard evidence for seven days in April 2010 in the direct case and three days in July 2010 in the rebuttal case. On May 5, 2010, the Judges heard oral argument relating to the settlement and resulting regulatory language proposed jointly by SoundExchange and CBI. The Judges heard closing arguments of counsel on July 30, 2010.

Following presentation of written and testimonial evidence, legal briefing, and argument of counsel, the Judges published their Final Determination in this matter on March 9, 2011. *See* 76 FR 13026 (Mar. 9, 2011). IBS filed a timely appeal to the United States Court of Appeals for the DC Circuit. IBS asserted on appeal that the $500 minimum fee and the attendant recordkeeping and reporting requirements established for noncommercial webcasters is excessive and burdensome for small college broadcasters. IBS further challenged the Constitutionality of the statutory construct granting the DC Circuit the power not just to affirm, reverse, or remand appeals from the CRB, but also to remediate CRB determinations—an ability IBS challenged as a non-judicial function and unconstitutional under Article III of the Constitution. IBS likewise challenged the constitutionality of the Judges under the Appointments Clause of the United States Constitution. U.S. Const., art. II, sec. 2, cl.2.[7]

SoundExchange and CBI intervened in the appeal. Both intervenors filed

briefs in support of the Judges' determination. SoundExchange controverted the constitutional challenges asserted by IBS. CBI sought to assure the validity of its agreement with SoundExchange regardless of the resolution of the constitutional issues.

On July 6, 2012, the DC Circuit ruled that the Judges were acting as principal officers of the United States government in violation of the Appointments Clause of the Constitution. *Intercollegiate Broadcasting Sys., Inc.* v. *Copyright Royalty Board*, 684 F.3d 1332, 1342 (D.C. Cir. 2012), *cert. denied*, 133 S. Ct. 2735 (2013).[8] To cure the violation of the Appointments Clause, the DC Circuit excised that portion of the Act that limited the Librarian's ability to remove Judges. Having determined that the Judges were not validly appointed at the time they issued the challenged determination, the DC Circuit "vacate[d] and remand[ed] the determination," without addressing any substantive issue on appeal, so that a constitutionally appointed panel of Judges could render a new determination. *Id.* at 1334, 1342.

Following the Supreme Court's denial of IBS's petition for a writ of *certiorari*, the Judges requested proposals from the participants on the conduct of proceedings on remand. *Order for Further Briefing* (July 26, 2013). SoundExchange essentially argued for a summary reissuance of the Judges' original determination and CBI argued for summary adoption of its settlement with SoundExchange. IBS urged the Judges to reopen the proceeding to allow additional written and oral testimony and new briefing. IBS argued in the alternative that the Judges permit each participant to submit new briefs.

The substantive issues on appeal were (i) the $500 minimum fee for noncommercial educational webcasters and (ii) terms proposed by IBS relating to "small" and "very small" noncommercial webcasters. The language of the DC Circuit's remand, however, was not limited to any specific portion of the determination. Rather, the DC Circuit "vacate[d] and remand[ed] *the determination.*" *Id.* at 1342 (emphasis added). The Judges interpret the Court's remand order as directing the Judges to review the entire record and to issue a new determination on all issues included therein, not just the

$500 minimum fee that was the subject of the appeal.

The Judges have considered both the language of the remand order and proposals from the participants regarding remand procedure. While the DC Circuit's remand instructions compel the Judges to consider anew all issues in the original determination, the Judges decline to reopen the proceeding and accept additional evidence or argument. Each party had ample opportunity to present its case.[9] The Judges have concluded that this matter shall be determined based upon a *de novo* review of the substantial record that the parties developed during the proceeding leading to the first determination.

Upon completion of their *de novo* review of the existing record, the Judges issued their initial *Determination After Remand for Royalty Rates and Terms for 2011–2015*, Docket No. 2009–1 CRB Webcasting III (Jan. 9, 2014) (*Initial Determination*). Pursuant to 17 U.S.C. 803(c)(2) and 37 CFR Part 353, IBS filed a motion for rehearing. After reviewing the motion, the Judges denied the motion for rehearing. *Order Denying Motion for Rehearing*, Docket No. 2009–1 CRB Webcasting III (Feb. 4, 2014). As explained in the February 4, 2014 Order, the Judges determined that IBS had failed to show that any part of the *Initial Determination* was erroneous, *i.e.*, IBS's arguments did not satisfy the "exceptional case" standard necessary to warrant a rehearing. More particularly, the motion failed to establish: (1) An intervening change in controlling law, (2) the availability of new evidence, or (3) a need to correct a clear error or prevent manifest injustice. *Id.*

*C. Statutory Background*

Transmission of a sound recording constitutes a public performance of that work. Owners of copyright in sound recordings are not accorded an exclusive, general public performance right with regard to those recordings. *See* 17 U.S.C. 106(4). Owners of copyright in "musical works,"[10] have an exclusive right of public performance of those works; owners of copyright in "sound recordings"[11] do not. As a

---

[6] In August 2009, under the auspices of the WSA of 2009, CBI and SoundExchange reached a settlement between them (CBI/SoundExchange Agreement) covering rates and terms for certain college broadcasters and noncommercial educational webcasters. The Copyright Office published notice of this settlement on August 12, 2009. *See* 74 FR 40616 (Aug. 12, 2009). CBI and SoundExchange then filed a joint motion for approval of their settlement and adoption of its terms as the applicable regulations for all noncommercial educational webcasters. The Judges published proposed regulations based upon the CBI/SoundExchange agreed rates and terms. *See* 75 FR 16377 (Apr. 1, 2010). The Judges received multiple comments in favor of the proposed regulations and an objection from IBS. The Judges, therefore, heard oral argument of counsel in May 2010, and published the Final Rule relating to the CBI/SoundExchange Agreement and the NAB/SoundExchange Agreement. *See* 76 FR 13026 (Mar. 9, 2011).

[7] IBS argued that the Judges were principal officers of the United States government and, as such, must be appointed by the President with the advice and consent of the United States Senate. IBS also opined that the Librarian is not an agency head authorized to appoint inferior officers of the government, notwithstanding that the Librarian is appointed by the President and confirmed by the Senate.

[8] To remedy the violation of the Appointments Clause, the Librarian appointed the incumbent panel as at-will employees. The Librarian appointed the current panel of Judges while the IBS appeal was pending; consequently, the panel of Judges making the determination on remand is not the same as the panel that made the first determination.

[9] The Judges' consideration of this issue is discussed in detail in *Notice of Intention to Conduct Paper Proceeding on Remand and Solicitation of Comments from the Parties* (Sept. 17, 2013).

[10] A "musical work" is a musical composition, together with any accompanying words, that has been fixed in any tangible medium of expression. *See* 17 U.S.C. 102(a)(2).

[11] "Sound recordings' are works that result from the fixation of a series of musical, spoken, or other
Continued

JA258

consequence, U.S. copyright law permits many public performances of sound recordings—including radio broadcasts—to take place without the authorization of, or compensation to, sound recording copyright owners (*e.g.*, performers and record labels).

In 1995, Congress enacted the Digital Performance Right in Sound Recordings Act (DPRA),[12] which created and granted to sound recording copyright owners a new exclusive right to perform a sound recording publicly by means of a digital audio transmission. 17 U.S.C. 106(6). The new right was, however, subject to a number of important limitations, including the grant to subscription digital audio transmission services (including satellite digital audio radio services) of a statutory license that permitted them to use sound recordings without the agreement of the copyright owner. 17 U.S.C. 114(d)(2), (f) (1997) (amended 1998).

Technology proceeded apace and, within a few short years, digital transmissions of sound recordings over the Internet were prevalent and available from both subscription and nonsubscription services. Congress did not specifically contemplate these "webcaster" services when it drafted the DPRA. Consequently, Congress expanded the statutory license in section 114 to cover "eligible nonsubscription transmissions," *i.e.*, webcasting, when it enacted the Digital Millennium Copyright Act of 1998, Public. Law 105–304, 112 Stat. 2860 (Oct. 28, 1998),

> To ensure that recording artists and record companies will be protected as new technologies affect the ways in which their creative works are used; and . . . to create fair and efficient licensing mechanisms that address the complex issues facing copyright owners and copyright users as a result of the rapid growth of digital audio services. . . .

H.R. Rep. No. 105–796, at 79–80 (1998). In addition, in recognition of the fact that webcasters must make temporary copies of sound recordings in order to facilitate the transmission process, Congress created a compulsory licensing scheme for so-called "ephemeral" recordings. *See id.* at 89–90. Licensees are limited to no more than one ephemeral recording (unless the terms of the license permit more) for use in the broadcasting or transmission of the copied work. 17 U.S.C. 112(e). The

ephemeral recording must be transitory in nature, unless the licensee retains it solely for archival purposes. *See* 17 U.S.C. 112(a).

In the Copyright Royalty and Distribution Reform Act of 2004,[13] Congress created the role of Copyright Royalty Judge and authorized the Judges, *inter alia*, to determine and set rates and terms for the licensing and use of copyrighted works in several contexts, *e.g.*, cable television transmission, satellite radio broadcast, and, the medium relevant to this proceeding, webcasting. Congress retained the prior statutory standards and made them applicable to the Judges for determining rates and terms for both the ephemeral and the public performance licenses. For webcasting rates under either license, the "Judges shall establish rates and terms that most clearly represent the rates and terms that would have been negotiated in the marketplace between a willing buyer and a willing seller." 17 U.S.C. 114(f)(2)(B). The quoted language is substantially identical to the statutory language regarding ephemeral recordings. *See* 17 U.S.C. 112(e)(4).

To ascertain rates that represent this hypothetical market under both statutory sections, the Judges shall consider "economic, competitive, and programming information presented by the parties. . . ." *Id.* The Judges are not limited with regard to the evidence they may consider (other than the limitations in the WSAs on the use of agreements reached under those statutes). The Judges' determination relating to both licenses should also account for whether the use at issue might substitute for, promote, or otherwise affect the copyright owners' stream of revenues. The Judges must also consider, again for both licenses, the relative contributions of the owners and licensees in making the licensed work available to the public. *Id.* Except as directed by the WSAs, the Judges may consider rates and terms negotiated in voluntary licensing agreements for comparable transmission services. *Id.*

### D. The Record

SoundExchange, Live365, IBS, and CBI presented evidence in this proceeding.[14] CBI only presented evidence to support adoption of its settlement with SoundExchange for noncommercial educational webcasting. SoundExchange and Live365 presented evidence relating to commercial

webcasters. SoundExchange presented evidence relating to noncommercial webcasting; IBS presented evidence for small noncommercial webcasters. The Judges received written and live testimony from 15 witnesses[15] and admitted 60 documentary exhibits into evidence.

The record on which the Judges base this determination after remand is the existing record, including written and oral legal argument of counsel, and transcripts of the entire determination proceeding.[16]

## II. Rates Under the Section 112 Ephemeral License

Between the direct and rebuttal phases of this proceeding, SoundExchange and Live365 presented settlements of (i) the minimum fee and royalty rates for the section 112 license and (ii) the minimum fee for the section 114 license applicable to the commercial webcasters not encompassed by the NAB/ SoundExchange Agreement. These two settlements were included in one stipulation. The terms of the settlement are the same as the agreement reached and included as a final rule following the prior webcasting rate determination, following remand. *See Digital Performance Right in Sound Recordings and Ephemeral Recordings (Final rule)*, 75 FR 6097 (Feb. 8, 2010).

The minimum fee for commercial webcasters is an annual, nonrefundable fee of $500 for each individual channel and each individual station (including any side channel), subject to an annual cap of $50,000. The royalty rate for the section 112 license is bundled with the fee for the section 114 license. There is one additional term in the stipulation that was not included in the prior determination. The royalty rate for the section 112 license is deemed to be 5% of the bundled royalties. No party objected to the stipulation. SoundExchange presented unopposed evidence to support the minimum fee for commercial webcasters and the bundled royalty rates. *See* SoundExchange Proposed Findings of Fact (SX PFF) at ¶¶ 459–468, 472. These agreed provisions are supported by the parties and the evidence.

There is no disagreement between SoundExchange and IBS as to the rates for the section 112 license for noncommercial webcasters. As it did for commercial webcasters, SoundExchange

sounds, but not including the sounds accompanying a motion picture or other audiovisual work, regardless of the nature of the material objects, such as disks, tapes, or other phonorecords, in which they are embodied." 17 U.S.C. 101.

[12] Public Law 104–39, 109 Stat. 336 (Nov. 1, 1995).

[13] Public Law 108–419, 118 Stat. 2341 (Nov. 30, 2004).

[14] After filing Written Direct Statements, RealNetworks, Inc. withdrew from the proceedings, and Royalty Logic, LLC, did not participate further.

[15] The Judges also considered designated written testimony.

[16] The original panel of judges heard approximately ten days of testimony and legal argument in aggregate, resulting in approximately 2,600 pages of transcripts.

USCA Case #14-1068     Document #1523372     Filed: 11/19/2014     Page 264 of 299

proposed a bundled rate approach for both the section 112 and section 114 rights, allocating 5% of the entire bundled royalty as the section 112 royalty. SX PFF at ¶ 671. IBS endorsed the proposal. *Amplification of IBS' Restated Rate Proposal*, at 2. The testimony offered by SoundExchange supported this proposal and the Judges adopt it. *See, e.g.,* Ford WDT at 9–12, 14–15; 4/20/10 Tr. at 434 (Ford); 4/22/10 Tr. at 729–31 (McCrady); *Post-Hearing Responses to Judges' Questions by Michael D. Pelcovits*, at 5 (May 21, 2010).

The issues remaining for the Judges' determination are (i) rates and terms for commercial webcasters' section 114 licenses and (ii) the rates and terms—specifically, the minimum fee—for noncommercial webcasters' section 114 licenses.

### III. Rate Structure Under the Section 114 Performance License

The Copyright Act clearly establishes the willing buyer/willing seller standard for the royalty rates at issue in this proceeding. *See* 17 U.S.C. 114(f)(2)(B). To establish the *level* of such rates, the Judges must first determine the *structure* of those rates, *i.e.,* the metric or metrics that willing buyers and sellers likely would have negotiated in the marketplace.

SoundExchange and Live365 proposed that royalties for the section 114 license be computed pursuant to a per-performance usage structure. SoundExchange acknowledged, however, that "[t]he metrics by which most services pay" are the "percentage-of-revenue" metric or the "per-subscriber" metric—both of which are not fixed rates," but rather are rates that increase the monetary payment "as subscribers and revenue increase." SX Reply PFF ¶ 74. However, neither SoundExchange nor Live365 proposed an alternative to the per-performance rate structure.

SoundExchange's industry witness noted the ubiquity of rate structures based on revenues or subscribership. More particularly, W. Tucker McCrady, Associate Counsel, Digital Legal Affairs at Warner Music Group acknowledged that "[i]n the U.S., WMG does not have a single agreement with an audio streaming service where the payment amount is based solely on a per-play rate, as is the case with the statutory license." *See* McCrady WDT at 10. As Mr. McCrady further explained, the per-play royalty fee is typically combined with a percentage-of-revenue royalty fee, so that a per-play floor is seen as sort of a minimum protection for the value of the music," whereas, beyond

that minimum, "a *revenue share . . .* allows us to share in the upside *. . .*." 4/22/10 Tr. at 658 (McCrady) (emphasis added).

Live365 introduced as an exhibit in this proceeding the prior written direct testimony of Dr. Pelcovits in the previous webcasting proceeding, *Digital Performance Right in Sound Recordings and Ephemeral Recordings, Final rule and order,* 72 FR 24084, 24090 (May 1, 2007), *aff'd in relevant part sub nom. Intercollegiate Broad. Sys.* v. *Copyright Royalty Bd.,* 574 F.3d 748 (D.C. Cir. 2009)(*Web II*), in which he testified:

- Through the percentage-of-revenue, the record companies ensure that they will receive a share of royalties in the benchmark interactive market that *properly compensates* them for their valuable copyrighted material,
- The business justification for the percentage-of-revenue structure is so compelling *it should be adopted as the rate structure for the statutory license,*
- Removing the percentage-of-revenue element would unravel the complex set of factors that affected the negotiations, and undoubtedly would change the underlying rates, and
- There is a good argument that the percentage-of-revenue rate applied in the interactive market should simply be adopted for the noninteractive market. Live365 Tr. Ex. 5, at 28–30.

The parties to the instant proceeding declined to propose rates based explicitly on the revenues of webcasters, apparently because they had concluded that the Judges would reject revenue-based rates.[17] The parties thus submitted no evidence as to any alternative rate structure premised explicitly on the percentage-of-revenue realized by webcasters.

Given the limitations of the record developed by the parties, the Judges defer to the parties' decision to eschew advocacy for such percentage-of-

revenue based fees in this proceeding. 17 U.S.C. 114(f)(2)(B) ("In determining . . . rates and terms the Copyright Royalty Judges shall base their decision on . . . information presented by the parties . . . ."). Accordingly, the Judges consider the relative merits of the competing per-performance rates proposed by the two contending parties.

The Judges recognize, however, that as a practical and strategic matter, participants in these proceedings carefully consider prior rate proceedings as roadmaps to ascertain the structure of the rates they propose. Mindful of that fact, the Judges wish to emphasize that by deferring to the present parties' decision to propose only a per-performance rate structure, the Judges do not *per se* reject future consideration of rate structures predicated upon other measurements, such as a percentage of revenue realized by webcasters.[18]

### IV. Rates for Commercial Webcasters

#### A. The National Association of Broadcasters/SoundExchange Agreement

Section 801(b)(7)(A) of the Act allows for the adoption of rates and terms negotiated by "some or all of the participants in a proceeding at any time during the proceeding," provided they are submitted to the Copyright Royalty Judges for approval. The Judges must adopt the settlement after affording all interested parties an opportunity to comment, unless a participant in the proceeding objects to it and the Judges determine that the settlement does not provide a reasonable basis for setting rates and terms.

On June 1, 2009, the National Association of Broadcasters (NAB) and SoundExchange filed a settlement of all issues between them in this proceeding, including proposed rates and terms (NAB/SoundExchange Agreement). Their settlement was one of several WSA agreements that the Copyright

---

[17] For example, SoundExchange expressly noted that in *Web II* both the webcasters and SoundExchange "proposed rate structures that included revenue-based elements and usage-based elements [but the] Judges . . . concluded that a per-performance usage fee structure was more appropriate for commercial webcasters, and rejected revenue-based proposals." SX PFF ¶ 36 (*quoting Web II*, 72 FR at 24089). Likewise, Dr. Pelcovits indicated that his choice of a rate structure was constrained by the fact that the Judges in *Web II* had "rejected alternatives such as fees calculated as a percentage of the buyer's revenue. . . ." Pelcovits WDT at 6. The Judges note, however, that the rejection of percentage-of-revenue rate structures in *Web II* was based on the evidentiary record in that proceeding and that *Web II* explicitly did not establish a *per se* rejection of such rate structures. *Web II,* 72 FR at 24090 ("[The] evidence in the record weighs in favor of a per-performance usage fee structure. . . .This does not mean that some revenue-based metric could not be successfully developed. . . .").

[18] Of course, the Judges' adoption of any rate structure in a future proceeding would depend upon the evidence and arguments the participants present, including arguments addressing concerns raised by the Judges in earlier proceedings. *See, e.g., Web II,* 72 FR at 24089–90. The Judges' possible future consideration of a percentage-of-revenue rate structure in a section 114(f)(2)(B) proceeding for noninteractive webcasting does not suggest that such a structure or the resulting rates should necessarily be related in any manner to the structure or level of rates set [pursuant to section 801(b)(1) for preexisting services identified in section 114(f)(2)(B)]. *Determination of Reasonable Rates and Terms for the Digital Performance of Sound Recordings and Ephemeral Recordings, Final rule and order,* 67 FR 45240, 45244 (July 8, 2002)(*Web I*). Additionally, although rates might be set pursuant to the same structure under both statutory provisions, there is no reason why the level of rates would necessarily be the same.

Office published in the **Federal Register**. NAB and SoundExchange filed their WSA agreement in the instant proceeding and requested that the Judges adopt the agreed rates and terms for some services of commercial broadcasters for the period 2011 through 2015. The settlement applies to statutory webcasting activities of commercial terrestrial broadcasters, including digital simulcasts of analog broadcasts and separate digital programming. The settlement includes per-performance royalty rates, a minimum fee, and reporting requirements.

The Judges published the settlement (with minor modifications [19]) as proposed regulations in the **Federal Register** on April 1, 2010, and provided interested parties an opportunity to comment and object by April 22, 2010. 75 FR 16377 (Apr. 1, 2010) (publishing NAB/SoundExchange and CBI/ SoundExchange Agreements). The Judges received no comments or objections; therefore, the provisions of section 801(b)(7)(A)(ii) (permitting the Judges to decline to adopt the settlement as a basis for statutory rates and terms) are inapplicable. In the absence of an objection from a party that would be bound by the proposed rates and terms, the Judges adopt the rates and terms in the settlement for certain digital transmissions of commercial broadcasters for the period of 2011–2015. 17 U.S.C. 801(b)(7)(A).

*B. All Other Commercial Webcasters*

Only two participants— SoundExchange and Live365— presented evidence relating to public performance royalty rates for commercial webcasters.

SoundExchange proposed that the section 114 royalty rates for noninteractive webcasting be established by applying two categories of benchmarks:

• Agreements between SoundExchange and: (a) The NAB; and (b) Sirius XM Satellite Radio (Sirius XM), both of which established per-

performance royalty rates for the same noninteractive webcaster rights that at issue in this proceeding; and

• Rates established in a different but purportedly analogous market—the market for *interactive* webcasting of digital sound recordings—adjusted to render them probative of the rates for noninteractive webcasting.

Relying on these proposed benchmarks, SoundExchange proposed the following royalty rate schedule:

| Year | Rate per-performance |
|------|---------------------|
| 2011 | $0.0021 |
| 2012 | 0.0023 |
| 2013 | 0.0025 |
| 2014 | 0.0027 |
| 2015 | 0.0029 |

SX PFF ¶ 11.

Live365 proposed that commercial webcasters pay $0.0009 per performance throughout the entire period 2011–2015. Live365 PFF ¶ 170. In addition, Live365 sought a 20% discount on its proposed per-performance rate for "Internet radio aggregators," such as itself, to account for the alleged value to copyright owners of their provision of certain specified "aggregation services." Live365 PFF ¶ 193.

Live365's proposed rate is not premised upon any benchmarks. Its economic expert, Dr. Mark Fratrik, stated that he was "not aware of comparable, voluntary license agreements that would serve as an appropriate benchmark for an industry-wide rate." Fratrik Corrected and Amended WDT at 7 [hereinafter, Fratrik WDT].[20]

Rather, Live365 proposed a unique model by which:

• Revenues are estimated for a supposedly "representative" webcaster;

• All costs—except for the royalty fees to be determined—are estimated for a "representative" webcaster; and

• Royalty fees are established, on a per-performance basis, at a level which assures the "representative" webcaster a 20% operating margin, *i.e.*, a 20% profit.

*1. The Live365 Rate Proposal*

As discussed above, Live365 proposed a single constant rate of $0.0009 for each year of the 2011–2015 rate period. This proposed rate was

supported by Dr. Fratrik's written and oral testimony.

With regard to the fundamentals of the hypothetical market, Dr. Fratrik first assumed, correctly, that the "underlying product" consisted of "blanket licenses for each record company which allows use of that record company's complete repertoire of sound recordings." Fratrik WDT at 8. Next, he properly assumed that the rates must be those that would be negotiated between a willing buyer and a willing seller. Fratrik WDT at 4.

With regard to the market participants, Dr. Fratrik properly identified the hypothetical "willing buyers" to be the webcasting services that operated under the statutory license." *Id.* at 8. He also properly identified the "hypothetical willing sellers" as the several record companies. *Id.*

To determine the statutory rate, Dr. Fratrik attempted to determine the appropriate license rate based upon an examination of the revenue and cost structure of a mature webcaster—in this case, Live365." *Id.* at 4.

For assumed revenues, Dr. Fratrik utilized in his model "publicly available industry data on webcasting revenues." *Id.* These revenue figures were not historical data, but rather "estimates of revenues recognizing the changing marketplace." *Id.* at 10. More particularly, Dr. Fratrik relied upon "[p]ublicly available industry reports from Accustream and ZenithOptimedia [to] serve as lower and upper bounds, respectively, on advertising revenue measurements for the past period." *Id.* at 16. Although webcaster revenue came from two sources, subscriptions and advertising, the only data available to Dr. Fratrik, and the only data he used, were advertising revenues. *Id.* at 16–17.

For assumed costs, Dr. Fratrik utilized the "operating costs" from Live365. *Id.* at 5. Given the mechanics of his model, the costs he included were "all of the operating costs *except* for the royalty rates to be paid to the copyright owners." *Id.* (emphasis added). The royalty cost is omitted because it is the "unknown" that Dr. Fratrik's analysis is designed to determine. Dr. Fratrik chose to utilize the costs incurred by Live365 because, in his opinion, "Live365 is a representative webcaster with respect to its operating costs . . . and will serve as a good conservative proxy for the industry as it is a mature operator." *Id.* at 16.

With regard to the difference between revenues and costs, *i.e.*, profits, Dr. Fratrik assumed that "a Commercial webcaster is *entitled* to a reasonable profit margin." *Id.* at 17 (emphasis added). Accordingly, Dr. Fratrik

---

[19] Exercising the right granted in the WSAs, SoundExchange and NAB provided in their agreement that, unlike the rates and terms they set for the section 114 licenses, the rates and terms they set for the ephemeral recording license could not be used as evidence and would not serve as precedent in any contested rate determination. The Judges, deeming such language inappropriate to the purposes of the regulations, declined to include it in the published regulations. For the same reason, the Judges declined to accept language in the agreement regarding SoundExchange's acceptance of a broadcaster's election to be a "Small Broadcaster" or the broadcaster's reservation of rights. The Judges also declined on the same basis to include some of the language of the CBI agreement.

[20] Throughout this determination, the Judges will employ abbreviations that they have used in past determinations, *e.g.*, "WDT" for the last version of the witness's Written Direct Testimony; "WRT" for Written Rebuttal Testimony; "Tr." for hearing transcripts; "PFF" for Proposed Findings of Fact, *etc.*

attempted to identify a "fair operating margin (measured as a percentage of revenues)" for a hypothetical webcaster. *Id.* at 5. Dr. Fratrik's proposal fails to create a royalty rate framework that can satisfy the statutory criteria *viz.*, rates that would have been negotiated in the marketplace between a willing buyer and a willing seller; the Judges cannot adopt it.

### a. Dr. Fratrik's Misapplication of a Public Utility-Style Rate-Setting Process in the Present "Willing Buyer/Willing Seller" Statutory Context

Dr. Fratrik's methodology mimics the methodology by which government agencies or commissions set rates for public utilities or other regulated natural monopolies. There is no basis in the Act or in economic theory to support the use of this paradigm to establish royalty rates for the licensing of sound recordings by noninteractive webcasters.

A fundamental defect in this reasoning is Dr. Fratrik's requirement that the statutory royalty rate must provide for a fixed "profit margin" for webcasters. See 4/27/10 Tr. at 1138 (Fratrik) ("I believe the 20 percent rate is what they would strive to get *and have to get*.") (emphasis added). Dr. Fratrik does not provide any evidentiary support for the assumption that the record companies, *i.e.*, the willing sellers in the hypothetical marketplace, would accept (or be compelled to accept) a royalty rate simply because it allowed buyers to realize a predetermined level of revenue as profits. Further, Dr. Fratrik does not provide any evidentiary support for his assumption that the buyers, *i.e.*, the webcasters, would require a royalty rate low enough to maintain a predetermined 20% profit margin or otherwise be driven out of the marketplace. *See* 4/27/10 Tr. at 1166–67 (Fratrik) (Dr. Fratrik unaware of any webcasters earning 20% operating margin).

Not only does Dr. Fratrik's methodology lack evidentiary support, it has embedded within it a perverse incentive structure. Dr. Fratrik's methodology would cause the royalty rates to be a function not only of the revenues of the webcasters, but also a function of: (i) The other (non-royalty) operating costs incurred by the webcasters; and (ii) the guaranteed profit (20% according to Dr. Fratrik) after inclusion of the (to be determined) royalty costs. This fundamental flaw in Dr. Fratrik's methodology can be demonstrated algebraically as follows:

Dr. Fratrik's requirement of a 20% operating profit for webcasters can be expressed as:

TOTAL PROFIT = TOTAL REVENUE (TR) − TOTAL COST (TC) = 0.2(TR)

Dr. Fratrik dichotomizes costs into royalty costs (*i.e.*, the unknown to be determined) and all other operating costs, which can be expressed as:

TC = Royalty Costs (rc) + All Other Operating Costs (oc)

So,

TR − rc − c = 0.2(TR)

Subtracting 0.2(TR) from both sides of the equation results in the following:

0.8(TR) − rc−oc = 0

Adding rc to both sides of the equation results in the following:

0.8(TR) − oc = rc

For presentation purposes, the above equation can be set forth in reverse as:

rc = 0.8(TR) − oc

This presentation makes plain that in Dr. Fratrik's model the royalty rate would be a function of: (i) The revenues of the webcaster (TR); and (ii) all other webcaster costs (oc). Egregiously, the relationship between the royalty rate and all other costs incurred by the webcaster (oc) would be inverse, *i.e.*, as all other costs (oc) increased, the section 114 royalty rate would decrease.

Thus, a webcaster would have no incentive to minimize or otherwise reduce all other operating costs, because higher operating costs would result in a lower royalty paid to owners/compulsory licensors of sound recordings. Such a result would be perverse: The royalty revenue realized by the owners/licensors would be subject to the cost-minimization successes or failures of the webcasters under a formula by which the latter had no incentive to minimize costs.[21]

As previously noted, Dr. Fratrik's methodology mimics the setting of public utility rates for natural monopolies. In that setting, the "unknown" variable is the rate to be charged to the end-user, which, when multiplied by the number of units of the service sold, establishes the revenue received by the seller. What can be "known" (*i.e.*, determined via such public utility-style hearings) are: (i) The reasonable costs incurred by the utility; and (ii) the fair rate of return to which the utility is deemed entitled by

consideration of appropriate marketplace returns on capital. *See generally* Charles F. Phillips, Jr., *The Regulation of Public Utilities: Theory and Practice* 169 (2d ed. 1988).

In the present proceeding, the "unknown" is different, but the proposed methodology is similar. What is "unknown" is one element of total costs, *i.e.*, the royalty fee. The revenues received by the sale to the end-users (*i.e.*, the provision of the listening experience to consumers) is known (or estimated), whether as a function of advertising revenues, subscriptions, or both. Here, as in classic rate regulation, the percentage to be realized as a rate of return (profit) likewise is known or discovered (as Dr. Fratrik purported to have "discovered" the 20% return by his examination of the assertedly analogous terrestrial radio marketplace).

The foregoing analysis crystalizes a fundamental problem in Dr. Fratrik's analysis: Rate-setting proceedings under section 114 of the Act are not the same as public utility rate proceedings. The Act instructs the Judges to use the willing buyer/willing seller construct, assuming no statutory license. The Judges are not to identify the buyers' reasonable other (non-royalty) costs and decide upon a level of return (normal profit) sufficient to attract capital to the buyers.

Moreover, Dr. Fratrik's methodology attempts to graft a public utility style rate—designed to regulate a natural monopoly—onto a rate-setting scheme in which he properly acknowledges the existence of a multitude of buyers, whose costs are critical to his analysis. Public utility-style rate-setting procedures are designed to consider the costs and potential returns to a monopoly seller, not the costs or potential returns of numerous buyers.

Not only does Dr. Fratrik's methodology improperly apply the public utility style rate-setting process, it ignores and thus exacerbates a particularly thorny issue in such rate regulation. Regulators of natural monopolies such as public utilities must ascertain the actual operating costs of the monopolist, and disallow inappropriate costs from entering the "rate base." This undertaking is very difficult. *See generally* Richard Posner, *Economic Analysis of Law* 367 (6th ed. 2003) ("The regulatory agency's success in monitoring the regulated firm's costs will inevitably be uneven."); Paul Krugman & Robin Wells, *Microeconomics* 374 (2d ed. 2009) ("[R]egulated monopolies . . . tend to exaggerate costs to regulators . . . .").

Here, Dr. Fratrik relies upon only Live365's particular cost data, rather

---

[21] If webcasters operating under Dr. Fratrik's methodology did minimize or otherwise reduce all other operating costs, then, in order to prevent an increase in their above pre-established profit margin, the royalty rate would need to increase. However, given that the Act requires these rates to be fixed for five years, the webcaster could reduce or minimize all other operating costs and simply pocket the profit, increasing their profit percentage above the level set by the Judges.

than any industry-wide cost data, without providing any evidence that Live365's cost structure is representative of the industry. SX PFF ¶¶ 312–322. Further, there is no breakdown for Dr. Fratrik of those other operating costs incurred by Live365 that would ensure that his *de facto* rate base includes only appropriate categories of costs incurred at minimally efficient levels.

To the extent Live365 is not sufficiently representative of all webcasters (or representative at all of other webcasters), Dr. Fratrik's methodology would yield an inaccurate royalty rate. On a more general level, to the extent the cost structure of any given webcaster is not representative of the industry writ large, Dr. Fratrik's methodology is hopelessly impractical. To utilize rate-of-return style regulation in a competitive industry such as webcasting would require information regarding the cost structures of thousands of buyers of sound recordings.

This defect in Dr. Fratrik's methodology was made plain during his cross-examination. For example, Dr. Fratrik admitted that if other royalties (such as for musical works paid by Live365 to Performing Rights Organizations) were to increase, then, *ceteris paribus,* under his methodology the royalties paid to SoundExchange for sound recordings would decrease. 4/27/10 Tr. at 1127 (Fratrik). This relationship, as Dr. Fratrik also admitted, existed with regard to all costs (other than sound recording performance royalties) incurred by a webcaster. Pursuant to his methodology, for example, a webcaster's staff wages, payments to advertising agencies, and payment to bandwidth suppliers could all depress the sound recording royalty. *Id.* at 1125 (Fratrik). Thus, Dr. Fratrik was compelled during cross-examination to conclude:

Q: Okay. So basically the way you modeled this out, if anybody else who supplies an input to Live [365] raises their price, the result is going to be your suggested royalty rate goes down, right?

A: Assuming all the other factors remain constant.

*Id.* at 1127–28.

The Judges conclude that two glaring and fatal defects in Dr. Fratrik's methodology are: (i) Its ill-conceived attempt to utilize the public utility style ratemaking construct in this "willing buyer/willing seller" context; and (ii) its reliance upon an inverse relationship between the sound recording royalty rate and all other operating costs

incurred by webcasters.[22] Thus, while (in the interest of completeness) the following section discusses details of the methodology proposed by Dr. Fratrik, the Judges' rejection of his overall rate structure alone constitutes a sufficient basis to reject Live365's proposed rate.

### b. The Specific Elements of Dr. Fratrik's Model and His Proposed Rates

As summarized below, even assuming, *arguendo,* that the Live365 model had been acceptable in theory to the Judges, the inputs in that model—costs, revenues and profit margin—failed to establish a credible "marketplace" rate under the "willing buyer/willing seller" standard.

### (1) Costs

Dr. Fratrik assumed that Live365's cost structure would serve as a good conservative proxy for the industry as it is a mature operator. Fratrik WDT at 16. This assumption is unsupported by the evidence, which revealed an array of existing webcasting services and business models. SX PFF at ¶ 323.

Moreover, it would be unreasonable for the Judges to conclude, as Live365 urged, that these many disparate business models might be experiencing essentially the same unit costs. Indeed, Dr. Fratrik conceded that even Live365 has two separate business lines, "broadcasting" services[23] and webcasting and, further, that Live365 also acts as an aggregator with respect to webcasting. Dr. Fratrik offered no example of a comparable participant in the industry that is structured in this manner. Further, Dr. Fratrik failed in his attempt to adjust Live365's costs to isolate only webcasting operations, because he failed to address the *synergistic* nature of Live365's various

lines of business. SX PFF at ¶¶ 355, 357, 358.

### (2) Revenues

The revenue side of Dr. Fratrik's analysis suffers from infirmities as well. Most importantly, Dr. Fratrik admitted that the advertising revenue estimates (from ZenithOptimedia and Accustream) upon which he relied were "challenging" because many webcasters do not report their revenues publicly. 4/27/10 Tr. at 1220 (Fratrik). The limitations of these databases diminished the credibility of the analyses that depended upon them.

That analysis is apparently based only on Dr. Fratrik's analysis of revenues using the data Dr. Fratrik found to constitute his "upper bound," derived from ZenithOptimedia data. In an attempt to avoid the acknowledged problems with these data, Dr. Fratrik attempted to mix and match his several revenue data sources. To further muddy the statistical waters and compromise his analysis, Dr. Fratrik added to the "upper bound" and "lower bound" of his combined data sets a third separate source—Live365's own subscription revenue data. This further admixture only underscores the lack of rigor and persuasiveness in the Live365 analysis.[24]

### (3) Profit Margin

Dr. Fratrik has not provided adequate support for the assumption of a 20% operating margin for webcasters in his analysis. That operating profit margin was not put forward as either a historical profit margin (or a forecasted profit margin) for webcasters. Indeed, Dr. Fratrik conceded that he had no "evidence that actual webcasters" would require a 20% operating margin, and that he was not aware of any

---

[22] The Judges distinguish Dr. Fratrik's methodology from a structure that would be based upon the percentage of -revenue realized by a webcaster, *without regard to the webcaster's other costs.* If Dr. Fratrik's methodology had simply made the royalty rate a function of webcaster revenue, the methodology would have relied upon a positive (*i.e.,* direct) relationship—as revenues received by webcasters increased, royalty rates would also increase. Such a methodology would constitute a percentage-of-revenue royalty rate, which (as noted *supra*) was rejected on evidentiary bases in *Determination of Reasonable Rates and Terms for the Digital Performance of Sound Recordings and Ephemeral Recordings, Final rule and order,* 67 FR 45240 (July 8, 2002)(*Web I*) and *Web II,* yet (as also noted *supra*) was not foreclosed by either of those decisions as a potential *future* basis for determining rates in a section 114 proceeding.

[23] Live365 refers to the services it provides to *webcasters* as "broadcasting" services, in an Orwellian (and unsuccessful) attempt to distinguish its principal webcasting business from its ancillary webcasting support services.

[24] Dr. Fratrik's analysis also makes certain assertions regarding future growth—or lack of future growth—in the webcasting industry. The Judges note that predictions by witnesses as to future industry growth are highly speculative—economists are not oracles and ergodicity should not be assumed—past growth (or decline) is not necessarily indicative of future trends. *See generally* John Maynard Keynes, *The General Theory of Employment, Interest and Money* 97 (1936) ("Our knowledge of the factors which will govern the yield of an investment some years hence is usually very slight and often negligible. . . . If we speak frankly, we have to admit that our basis of knowledge for estimating . . . amounts to little and sometimes to nothing . . . *even five years hence.*) (emphasis added). The instant dispute makes the point well because the economy was in recession in all of 2008 and economic activity overall remained depressed throughout 2009, causing a reduction in the revenues received by many businesses throughout the United States and the world. That decline does not necessarily foretell a trend in a particular industry, including the markets for interactive and noninteractive sound recording licenses.

**Federal Register** / Vol. 79, No. 80 / Friday, April 25, 2014 / Rules and Regulations    **23109**

webcaster currently earning a 20% margin. 4/27/10 Tr. at 1166–67 (Fratrik).

Rather, Dr. Fratrik's 20% figure was derived from the profit margins reported by the over-the-air (a/k/a terrestrial) radio broadcasting industry. SX PFF at ¶¶ 328, 330. However, the record of evidence in this proceeding does not support the notion that profit margins for webcasters are likely to be similar to the more capital intensive terrestrial radio industry. SX PFF at ¶¶ 332–335. In fact, Dr. Fratrik admitted that the terrestrial radio industry requires much higher capital costs than webcasting, and that the barriers to entry are higher for terrestrial radio than for webcasting. 4/27/10 Tr. at 1168–72 (Fratrik); *see also* SoundExchange rebuttal testimony of Dr. Janusz Ordover, WRT at 3 ("Dr. Fratrik's selection of a minimum expected margin of 20% is based on margins earned by terrestrial radio broadcasters, who operate in a market with higher fixed capital and other costs and therefore do not provide a useful benchmark from which to determine a reasonable operating margin.").

In fact, when choosing the 20% figure, Dr. Fratrik did not even look at the returns earned by any other digital business, which are lower than 5%. 4/27/10 Tr. at 1173–74 (Fratrik). Likewise, if Dr. Fratrik had considered the operating margins of record companies, he would have had to reconcile the fact that they too had operating margins of approximately 5% or less. 4/27/10 Tr. at 1175–76 (Fratrik).

### c. Live365's Proposed Aggregator Discount

Live365 seeks a further 20% discount applicable to the commercial webcasting per-performance rate for certain "qualified webcast aggregation services" that operate a network of at least 100 independently operated "aggregated webcasters" that individually "stream less than 100,000 ATH per month of royalty-bearing performances." Rate Proposal For Live365, Inc., Appendix A, Proposed Regulations at § 380.2 and § 380.3(a)(2). This "discount" proposal may be more properly understood as a proposed term rather than an additional rate proposal. It is conditional; that is, it is applicable only to the extent that certain defined conditions are met (*e.g.*, minimum number of 100 aggregated webcasters and each individual aggregated webcaster streaming less than 100,000 ATH per month). It proposes to establish a mechanism whereby a group of commercial webcasters under certain qualifying conditions may utilize a "webcast aggregation service" to aggregate their monitoring and reporting

functions. Rate Proposal for Live365, Inc., Appendix A, Proposed Regulations at § 380.2(m). Monitoring and reporting are compliance-related functions that are currently required of all individual webcaster licensees.

The Judges discern no theory and no evidence that would support an adoption of the so-called "aggregator discount" as a separate rate or as a separate term. Live365 submitted the testimony of Mr. Floater in support of the "aggregator discount." He testified that the asserted benefits of an aggregation service flow to the individual webcasters who contract to use that service. As Mr. Floater asserted, the aggregator offers "a streaming architecture that can aggregate tens of thousands of individual webcasters" and provides individual webcasters with "broadcast tools and services [that] contain costs. . . ." Floater Corrected WDT at 11–14. Dr. Fratrik provided further testimony regarding these aggregation services, noting that they consisted of collecting and compiling "all of the necessary documentation of the copyrighted works that are streamed and the number of total listening levels for each of these copyrighted works." Fratrik WDT at 38.

The Judges construe these "aggregator services" as benefits that individual webcasters receive pursuant to their contracts with an aggregator—such as Live365. Apparently, through certain economies of scale or otherwise, Live365 can provide these services at a lower cost per webcaster than the cost each webcaster would incur if it assumed the duties individually. That is a real economic benefit to the individual webcasters. In turn, Live365 can realize a profit from the fees it charges webcasters for these aggregation services, after Live365 incurs the costs of providing the aggregation services. Thus, the webcasters are enriched by the difference between the higher cost of providing these services individually and the contract rate they pay to Live365, and Live365 is enriched by the difference between the fee it charges the individual webcasters and the cost of providing the aggregation services.

Thus, the economic benefits of these aggregation transactions have already been accounted for in the private market through these contracts. Accordingly, the benefits and burdens of the services have already been addressed privately, and it would constitute a double-counting if the Judges were to reduce the rate paid by aggregators and received by the copyright owners.

Live365 contended that the discount is appropriate because copyright owners receive a benefit from the aggregation of

these services. However, the copyright owners are not parties to the aggregation contracts between Live365 (or any aggregator) and the webcasters. To the extent there are external benefits arising from those agreements that inure to copyright owners, they are no different than any form of benefits that inure to third parties from the contractual arrangements of other parties. The Judges cannot compel such third parties to incur a cost in exchange for such unsolicited benefits.

This point relates to yet another basis to deny to Live365 a reduced royalty rate in exchange for its provision of aggregation services. Under the Act, royalty payments unambiguously are to be established and paid for "public performances of sound recordings. . . ." 17 U.S.C. 114(f)(2)(A). The aggregation services provided by Live365 are not themselves "public performances of sound recordings," but rather are services that are complementary to the provision of "public performances of sound recordings." Live365 is improperly attempting to characterize a distinct complementary service as an essential element of utility bundled into the "public performance of sound recordings." The complementary—as opposed to bundled—nature of the service is underscored by the separate fee received by Live365 from the webcasters who voluntarily choose to utilize that service.

Further, since these aggregation services are not themselves "public performances of sound recordings," the rationale for the statutory license is not triggered. The rationale for the statutory license is to cure the perceived market failure that may arise if multiple webcasters were required to negotiate for individual licenses for a multitude of recordings from the various copyright owners. That rationale does not present itself with respect to the aggregation services—and certainly, Live365 has not presented any evidence to that effect. Alternately stated, if an aggregator desired to internalize the benefit its services provided to the record companies, the aggregator could attempt to enter into voluntary contracts with the record companies. There is no market failure or other issue that would preclude or impede such negotiations and contracts. Of course, since Live365 indicated that copyright owners already receive these benefits as a concomitant to the services provided to the webcasters, there is no incentive for a copyright owner to pay for those benefits. (That is the economic nature of a positive externality.)

In sum, Live365 has asked the Judges to provide aggregators with

remuneration from the copyright owners that is both unavailable under the statute and that Live365 was unable to procure in the private marketplace. The Judges decline to do so.

**d. Conclusions Regarding the Live365 Proposal Based on Dr. Fratrik's Model**

For the foregoing reasons, the Judges decline to utilize Live365's proposed rate structure or rates to set the rates for the 2011–2015 rate period or establish a zone of reasonableness within which to set the rates.

Live365 contends that the rates for the 2011–2015 term should be set at a level below the 2010 rates to reflect certain factors identified in section 114(f)(2)(B)(i) and (ii) of the Act.[25] However, as a general principle, espoused in both *Web II* and *Web I*, and absent evidence to the contrary, these statutory considerations are deemed to have been addressed implicitly within the participant's proposed rate structure. *See Web II*, 72 FR at 24095; *Web I*, 67 FR at 45244. Live365 proffered no evidence to support another conclusion.

In the present case, given the Judges' rejection of the Live365 rate structure and proposed rates, they have no basis to depart from this general principle. Moreover, Live365 provides only a qualitative argument for its proposed downward adjustments, rather than a quantitative basis for a reduction below the 2010 rates. Further, even if qualitative arguments were sufficient in this regard, Live365 has not established such a basis for a decrease in webcaster royalty rates.

**2. The SoundExchange Rate Proposal**

**a. Zone of Reasonableness**

SoundExchange sought to demonstrate that its proposed rates were within a zone of reasonableness delineated by its economic expert witness, Dr. Michael Pelcovits. He constructed his zone of reasonableness based upon the following assumptions:

• The rates are intended to be those that would have been negotiated in the marketplace between a willing buyer and a willing seller;

• The rates are intended to replicate those that would have been negotiated in a hypothetical marketplace;

• The hypothetical marketplace is one in which no statutory license exists;

• The buyers in this hypothetical marketplace are the statutory webcasting services;

• The sellers in this hypothetical marketplace are record companies;

• The products sold consist of a blanket license for each record company's complete repertoire of sound recordings;

• A per-performance usage fee structure was adopted, rather than a fee structure based upon a percentage of the buyer's revenue, a per-subscriber fee or a flat fee.[26]

The Judges conclude that these general assumptions by Dr. Pelcovits are appropriate when determining the zone of reasonableness within which the statutory rates may be set.

**b. Benchmark Analysis**

Dr. Pelcovits utilized a "benchmark" approach, *i.e.*, an attempt to establish rates by comparing, and as appropriate adjusting, rates set forth in other agreements that he concluded were sufficiently comparable. Dr. Pelcovits's overall benchmark approach to establishing a rate structure is consistent with both *Web I* and *Web II*. Further, the Act itself authorizes the Judges to utilize a benchmark analysis: "In establishing such rates and terms, the Copyright Royalty Judges may consider the rates and terms for comparable types of digital audio transmission services and comparable circumstances under voluntary license agreements described in subparagraph (A)." 17 U.S.C. 114(f)(2)(B).

The Judges, therefore, agree that it is appropriate to rely on benchmarks to establish rates in this section 114 proceeding.[27]

Dr. Pelcovits identified the following two categories of benchmarks:

• The then-contemporaneous license fees for statutory webcasting services that had been negotiated in two separate agreements under the WSA between SoundExchange and two groups of broadcasters: terrestrial (over-the-air) broadcasters represented by the NAB and Sirius XM;

• The then-contemporaneous license fees that had been negotiated between buyers and sellers in the market for interactive, on-demand digital audio transmissions.

Pelcovits WDT at 2.

The WSA Agreements relied upon by Dr. Pelcovits are such voluntary agreements. Thus, the Judges may rely upon those agreements as benchmarks, assuming the Judges find them to be sufficiently comparable, perhaps after any appropriate adjustments.

The agreements between buyers and sellers in the interactive market are not expressly identified under the Act as agreements upon which the Judges may rely as benchmarks in a proceeding under section 114. However, nothing in the Act suggests that it would be improper for the Judges to consider those agreements as potential evidentiary benchmarks, or as some other form of probative evidence. In this regard, the Act clearly does not constrain the Judges from considering any economic evidence (apart from non-precedential WSA agreements) that they conclude would be probative of the rate that would be established between willing buyers and willing sellers in the hypothetical marketplace—regardless of whether that evidence relates to a market other than the market for licenses of sound recordings by webcasters.[28]

Thus, the Judges conclude that it was proper for Dr. Pelcovits to use benchmark analyses in attempting to establish the zone of reasonableness for rates in this proceeding.[29]

---

[25] These factors are: (i) The promotional or substitution effects of the use of webcasting services by the public on the sales of phonorecords or other effects of the use of webcasting that may interfere with or enhance the sound recording copyright owner's other streams of revenue from its sound recordings; and (ii) the relative contributions made by the copyright owner and the webcasting service with respect to creativity, technology, capital investment, cost, and risk in bringing the copyrighted work and the service to the public.

[26] Dr. Pelcovits did not opine that a percentage-of-revenue-based fee or any other type of fee structure was economically improper. Rather, he indicated that he believed the "per-performance approach" constituted "precedent" established in *Web II*, and therefore he did "not attempt to independently examine the merits of different rate structures." Pelcovits WDT at 6. As noted *supra*, however, *Web II* did *not* create such a precedent, but rather noted that the parties' failure of proofs regarding a proposed percentage-of-revenue fee structure "does not mean that some revenue-based metric could not be successfully developed" for use in a future proceeding under section 114. *Web II*, 72 FR at 24090. Nonetheless, even though he was mistaken in that regard, Dr. Pelcovits relied on that belief as to precedent by declining to consider a percent-of-revenue rate structure, or any other rate structure. Thus, the Judges can consider only his per-performance rate structure, and contrast it with Dr. Fratrik's methodology.

[27] The appropriateness of the benchmark method of analysis was called into question by Live365 through the rebuttal expert economic testimony of Dr. Michael Salinger, who described the benchmark approach as a "shortcut," used "because it is convenient, not because it is correct." Salinger WRT at 12–13.

[28] A wide array of potentially comparable markets can and should be considered by the Judges, including those with comparable economic characteristics. For example, a market in which copies of goods can be reproduced at zero marginal cost may provide relevant economic evidence (even if it is not a market for sound recordings), whereas, for example, a market for ancillary reporting services that benefits buyers and sellers of sound recording licenses (such as Live365's aggregator services discussed *infra*) may be economically quite distinct even though it relates to the same parties and licenses.

[29] Dr. Pelcovits's use of benchmarks in principle, discussed in this section, is a separate issue from the issues of whether the particular benchmarks he applied were appropriate, whether his adjustments to those benchmarks were correct or whether other adjustments may be required.

**(1) SoundExchange's First Proposed Benchmark: The WSA Agreements**

The first benchmark category relied upon by Dr. Pelcovits is comprised of two multi-year agreements that had recently been entered into between SoundExchange and two entities: (i) The NAB, covering webcasting by over-the-air (terrestrial) radio stations; and (ii) Sirius XM, covering webcasting of the music channels broadcast on satellite radio. Each of these agreements was entered into in 2009 pursuant to the WSA and each established royalty rates for the period 2011 through 2015. Together, these two agreements cover webcasters that paid more than 50% of the webcasting royalties received by SoundExchange in 2008. Pelcovits WDT at 14.

Both the NAB and Sirius XM agreements set royalty rates on a per-performance basis. The rates established by those agreements for the license term under consideration by the Judges are set forth below.

| Year | NAB Agreement | Sirius XM Agreement |
|------|---------------|---------------------|
| 2011 ...................... | $0.0017 | $0.0018 |
| 2012 ...................... | $0.0020 | $0.0020 |
| 2013 ...................... | $0.0022 | $0.0021 |
| 2014 ...................... | $0.0023 | $0.0022 |
| 2015 ...................... | $0.0025 | $0.0024 |

*Id.* Dr. Pelcovits found these agreements to be "useful to understand the bargaining range over which buyers and sellers would negotiate in the hypothetical market for statutory webcasting." *Id.* at 15.

The Judges agree for the following reasons:

• The rights being sold were precisely the rights at issue in this proceeding;
• The buyers (with the broadcasters represented as a group by the NAB) share characteristics with the buyers in the hypothetical market at issue in this case, but are not identical in all respects;
• The sellers are the same copyright owners whose copyrights are at issue in this case, albeit represented by SoundExchange;
• The copyrights will be used for statutory webcasting services; and
• The agreements were contemporaneous with the time at which the hearing in this proceeding was conducted.

The Judges find that additional reasons support the use of the WSA Agreements as benchmarks in this proceeding.

First, no later than September 2009, "404 entities had opted into the NAB Agreement on behalf of several thousand individual stations." Kessler WDT at 21. Of those broadcasters, approximately 100 were start-ups, reporting their first instance of

webcasting after the execution of the NAB Agreement. Ordover WRT at 18. Thus, the rates contained in the NAB Agreement clearly were acceptable to a large number of webcasters.

Second, in similar fashion, as of September 2009, several commercial webcasters opted into the Sirius XM Agreement. *See* Live365 Trial Ex. 25 at 18. The fact that these webcasters, who did not participate in the negotiations, nonetheless adopted the terms of the agreement is evidence that the negotiated rates and terms were reasonable and acceptable to the webcasters.

Third, it is noteworthy that the webcasters who have entered into the NAB Agreement are almost entirely dependent on advertising rather than subscription revenue. 4/20/10 Tr. at 283 (Pelcovits). This fact tends to address the concern raised by Dr. Michael Salinger, the economic expert testifying on rebuttal for Live365, that Dr. Pelcovits's interactive services benchmark analysis had failed to consider webcasters that were dependent primarily on advertising revenue.

Live365 raised a number of criticisms that it argued diminished the value of these WSA Agreements as benchmarks. The Judges address here each of Live365's questions.

**(a) Were the rates in the WSA agreements increased in exchange for the revised lower rates for 2009 and 2010 that were agreed to by the parties to the WSA agreements?**

Live365 alleged that the 2011–2015 rates in the WSA agreements are higher than they otherwise would be because SoundExchange acquiesced to a lowering of the already existing 2009 and 2010 statutory rates for the NAB and Sirius XM. Dr. Salinger surmised that SoundExchange must have bargained for some form of *quid pro quo* in the 2011–2015 rate structure in exchange for a reduction in the rates already established for 2009 and 2010. Salinger WRT at ¶¶ 55–56. Live365 presented no evidence of such a bargain, however.

On the other hand, Dr. Pelcovits opined that SoundExchange's reduction of the 2009 and 2010 rates, as permitted under the WSAs, was analogous to a "signing bonus"—offered to induce the NAB and Sirius XM to settle early. That assertion, too, raised a factual question rather than an issue that required expert economic testimony. SoundExchange likewise did not proffer testimony or any other evidence to identify the benefit that SoundExchange received by

reducing the statutory 2009 and 2010 webcasting rates.

Neither Dr. Salinger nor Dr. Pelcovits proffered any empirical evidence to support their respective hypotheses as to the relationship, *vel non*, between the reduction in the 2009–2010 rates and the rates for 2011–2015 in the WSA agreements. Neither did the respective parties proffer testimony from their other witnesses that would shed light upon the negotiating strategies of the parties as they related to this issue.

In the absence of such factual or economic evidence, the Judges cannot reach any conclusion regarding the relationship between the reduction of the 2009 and 2010 webcasting rates and establishment of the voluntary rates for 2011–2015 in the WSA agreements. Accordingly, the reduction in the 2009 and 2010 rates charged by SoundExchange to the NAB and Sirius XM cannot serve to diminish the value of the rates in the WSA Agreements as benchmarks in this proceeding.

**(b) Does the grant by the four major record companies to the NAB of a waiver of the "Sound Recording Performance Complement" rules diminish the probative value of the NAB agreement as a benchmark?**

Live365 asserts that the waiver by the four major record companies[30] of the "sound recording performance complement" for the benefit of the NAB in its WSA Agreement undermines the value of those rates as benchmarks. It is correct that, contemporaneous with entering into its WSA Agreement with SoundExchange, the NAB negotiated "performance complement waivers" with each of the major record companies. Pelcovits WDT at 20 n.21. These waivers allowed the NAB broadcasters to simulcast their broadcasts on the Internet even though the number of plays by an artist or from an album might exceed the allowable levels under section 114(j)(13) of the Act.[31] Live365, through its economic expert, Dr. Fratrik, opined that the waiver of the "performance complement" provided additional value to the NAB broadcasters, a value that must be bundled implicitly into the purported benchmark per-performance rates contained in the NAB/SoundExchange Agreement. Dr. Fratrik opined that if the terrestrial broadcasters

[30] As of the date of this Determination on remand, there are three major record labels, following the merger of EMI and Sony.

[31] In their role as terrestrial broadcasters, the NAB broadcasters were not bound by the "performance complement," but in their role as webcasters they would have been subject to the restriction without the waiver.

covered by the NAB/SoundExchange Agreement had been bound by the "performance complement," they would have been required to modify their webcasts, as opposed to simply simulcasting their terrestrial broadcasts. Fratrik WDT at 43–44.

However, neither Dr. Fratrik nor any other witness provided any empirical evidence to indicate the extent, if any, of any additional value realized by the NAB broadcasters in exchange for the waiver of the performance complement rules. Thus, the Judges are asked, in effect, to unbundle the per-performance rates in the NAB/SoundExchange Agreement, without any evidence as to the value of this "stick" within that bundle, *i.e.,* the waiver of the performance complement rules.

SoundExchange disputed the assertion that the waiver of the performance complement rules should reduce the efficacy of the NAB agreement as a benchmark. Even so, Dr. Pelcovits does admit the existence of *some* value in the waiver of the performance complement rules:

The performance complement waivers are *uniquely valuable to broadcasters,* whose over-the-air programming is not subject to a sound recording copyright and therefore not subject to the performance complement. The waiver allows these broadcasters to re-transmit their terrestrial signal without having to alter the programming that they created primarily for a use not subject to the performance complement.

Pelcovits WDT at 20 n.21 (emphasis added).

Dr. Pelcovits notes though that "[t]he market value of the waiver appears to be very small, since Sirius XM, with no such waiver, agreed to rates that are virtually identical over the life of the contract." *Id.* Dr. Pelcovits is correct. The differences between the per-performance rates in the NAB/SoundExchange Agreement and the Sirius XM/SoundExchange Agreement for the 2011–2015 rate period are illustrated on the following table.

| Year | NAB Rate | Sirius XM rate | Difference |
|------|----------|----------------|------------|
| 2011 .... | $0.0017 | $0.0018 | − $0.0001 |
| 2012 .... | 0.0020 | 0.0020 | 0.0000 |
| 2013 .... | 0.0022 | 0.0021 | +0.0001 |
| 2014 .... | 0.0023 | 0.0022 | +0.0001 |
| 2015 .... | 0.0025 | 0.0024 | +0.0001 |

Thus, the average annual difference in the per-performance rates between the two agreements is $0.00004. Accordingly, the Judges conclude that the waiver of the performance complement rule has no discernible impact on the value of the WSA Agreements as benchmarks.

(c) Does it matter if the terrestrial broadcasters covered by the NAB/SoundExchange Agreement were able to pay a higher rate because their webcasting costs are lower than the costs of pure webcasters?

Dr. Fratrik opined that the terrestrial commercial radio broadcasters have a vastly different cost structure than pure play webcasters, which allows them to pay higher royalty rates for sound recordings. Specifically, Dr. Fratrik noted:

• Terrestrial radio broadcasters who simulcast on the web their over-the-air transmissions have already incurred the necessary programming costs.[32]
• Terrestrial commercial radio stations can promote their Web site on their own broadcast stations, reducing their advertising costs.[33]
• Terrestrial radio broadcasters can use the sunk cost of a pre-existing sales force to sell online advertising.
• Terrestrial radio broadcasters have audiences more concentrated in the same geographic area than pure webcasters, thus allowing the former to realize more revenue selling advertising to local advertisers.

Fratrik WDT at 41–42. Consequently, Dr. Fratrik concluded "terrestrial broadcasters are more willing to pay higher royalty fees for webcasting as they are able to generate greater profits from that industry." *Id.* at 42.

Live365 has not quantified or otherwise estimated the monetary value of these differences. Thus, even if this argument had substantive merit, the Judges could not make any specific adjustment of the rates in the NAB/SoundExchange Agreement to reflect these theoretical cost advantages.

More importantly, however, the recitation of these advantages inuring to the benefit of the NAB simulcasters is simply another way of stating that their business models afford them the *synergy* to expand horizontally across the landscape of differentiated sound recording sub-markets by paying a higher per-performance fee than webcasters with a more costly and less synergistic business model.[34] As noted

in *Web I,* the Act does not provide for a consideration of "the financial health of any particular service" when establishing rates. 67 FR at 45254.

(d) Did the WSA agreements have the design, intent, and effect of raising the input costs of smaller webcasters?

Live365, through Dr. Salinger, opined that the parties to the WSA agreements set rates above market levels for 2011–2015 because they had strategically intended to use those rates as benchmarks, and thereby raise the costs of their rivals, *i.e.,* all other webcasters. Salinger WRT at 23. As Dr. Salinger notes, those parties had the power to influence the impact of those contractual rates, because they could elect—as they ultimately did—to permit these agreements and rates to be made available as potential precedents. *Id.* at 24.

This argument is theoretically plausible, as noted in the articles cited by Dr. Salinger. *Id.* at 24 (*citing* Steven Salop and David Scheffman, *Raising Rivals' Costs,* 73 Am. Econ. Rev. 267–71 (1983); Thomas Krattenmaker and Steven Salop, *Anticompetitive Exclusion: Raising Rivals' Costs to Achieve Power over Price,* 96 Yale L.J. 209 (1986)). However, Live365 has not provided any empirical or other evidence that would tend to prove the existence of such strategic coordination or conduct in this proceeding.

In the absence of any such evidence, the Judges cannot simply assume a multi-party conspiracy among SoundExchange, the NAB, and Sirius XM to increase the rates charged to the NAB and Sirius XM, in the hope that the Judges would utilize those WSA rates to establish the statutory rates. Although the Judges acknowledge that, generally, explicit or tacit collusion may exist among participants in concentrated industries, that general proposition cannot serve as the basis for an ultimate finding of specific tri-partite collusion, absent an adequate factual record.

---

[32] The webcasters on whose behalf NAB negotiated a deal with SoundExchange are predominantly simulcasters, *i.e.,* entities that offer terrestrial broadcasts of their programming and simultaneously transmit that same programming on the internet. Ordover WRT ¶ 51.

[33] This point seems to confuse economic cost with out-of-pocket cost. If a broadcaster foregoes paid advertising from a third party in order to air an advertisement for its own webcasts, that broadcaster has incurred an opportunity cost equal to the advertising revenue that the third party would have paid.

[34] SoundExchange's rebuttal economic witness, Dr. Janusz Ordover, makes an important point in his critique of Dr. Fratrik's cost differential argument—one that relates to the rate structure analysis

undertaken earlier in this Determination. Specifically, Dr. Ordover opines that SoundExchange would not offer pure webcasters a lower rate in light of their higher cost structures unless SoundExchange could "price discriminate at the level of license." Ordover WRT at 15. In this context, Dr. Ordover then identifies the pros and cons of marginal cost pricing, as well as the impact of such price discrimination upon the subscription rates of the ultimate consumers, the returns to licensors, and the shifting of revenues between and among different webcasters. *Id.* at 14–16. These are the types of issues that would need to be addressed and supported by empirical analyses in a proceeding in which a party had proposed a rate premised on a form of price discrimination, such as a percentage-of-revenue based fee.

(e) Were the rates in the WSA agreements inflated to reflect litigation cost savings by the NAB and Sirius XM?

Live365 asserted that the rates in the WSA Agreements are higher than market rates because they reflect the litigation cost saved by the NAB and Sirius XM of foregoing a rate proceeding and its attendant expenses. Live365 PFF ¶¶ 322–326. Further, Live365 asserted that this litigation cost/opportunity cost saving only affected the settling webcasters, not SoundExchange, because the latter would be incurring litigation costs regardless, since other webcasters (such as Live365) remained as contesting parties at the time of settlement. Live365 PFF ¶ 283.

SoundExchange disputed these assertions on several grounds.

First, SoundExchange asserted that the principal reason for the WSA Agreements was that the parties had "a high degree of confidence that the Judges would establish rates consistent with the willing buyer/willing seller construct . . . ." SX PFF ¶ 282. Dr. Ordover explained that, consequently "neither party likely would be willing to incur litigation costs in the event of a disagreement . . . ." Ordover WRT at 16. This is certainly one explanation to counter Live365's assumption that the NAB and Sirius XM paid a rate premium to avoid litigation costs. The Judges recognize that rational parties will attempt to predict the determination of any tribunal, and that they will tend to settle if their respective predictions are sufficiently proximate.[35]

Second, SoundExchange asserted that it too had an incentive to avoid litigation costs, and that such an incentive offset the potential impact of any similar incentive on the settling webcasters with regard to the rates contained in the WSA Agreements. Ordover WRT at 5, 16–17; 8/2/10 Tr. at 351 (Ordover) (threat of litigation "works on both sides"). However,

Live365 is correct in its claim that SoundExchange still would have been required to participate in a rate proceeding against other contesting webcasters. Nonetheless, SoundExchange did avoid the potential impact of arguments that would have been made by the NAB and Sirius XM that might have resulted in lower rates. Instead, SoundExchange was required ultimately to contest the claims of only one webcaster, Live365.

In any event, neither party presented evidence to the Judges regarding how to quantify the relative opportunity costs saved by SoundExchange and/or the settling webcasters. For all these reasons, the Judges cannot adjust the marketplace rates to reflect any such impact arising out of the litigation costs allegedly avoided by the WSA Agreements.[36]

(f) Are the rates in the WSA agreements reflective of SoundExchange's monopoly power?

Live365 asserted that the rates in the WSA Agreements reflect the monopoly power of the single seller in those two contracts, *i.e.,* SoundExchange. Live365 PFF ¶ 286. As Live365 correctly notes, in the "hypothetical market" that the Judges are statutorily required to consider, the hypothetical sellers are the several record companies rather than a single monopolist. *Web II*, 72 FR at 24087, *Web I*, 67 FR at 45244.

Dr. Salinger, Live365's economic rebuttal witness, testified that it is "a very general principle of economics" that the presence of a monopolist "poses a risk of increased prices." Salinger WRT at 26. SoundExchange's rebuttal economic witness, Dr. Ordover, concurred, acknowledging that SoundExchange "may [have] additional bargaining power" because of its status as the single seller. Ordover WRT at 22.

The power that these two economists acknowledged was the well-understood market power of a (single price) monopolist to set a price at a level higher than would be set in a perfectly competitive market, while also restricting the quantity sold to the level at which marginal revenue equals

marginal cost. *See, e.g.,* Krugman & Wells, *supra,* at 367; Edwin Mansfield & Gary Yohoe, *Microeconomics* 364–65 (11th ed. 2004).

It is not at all apparent, however, that the market power of SoundExchange to command a high rate would be appreciably greater (if at all) than the power of the major record companies, who owned approximately 85% of supply (the sound recordings) and therefore comprise an oligopoly. 4/20/10 Tr. at 299 (Pelcovits). As stated by Dr. Pelcovits:

[N]egotiation of the WSA Agreements by SoundExchange *does not significantly alter the market power equation.* Each record company has a unique catalog of sound recordings that are highly valued (or even necessary inputs) to any webcasting service. The individual record companies, as a consequence, have a degree of market power.

Pelcovits WDT at 17 (emphasis added). Dr. Pelcovits's testimony is consonant with contemporary economic understanding that oligopoly pricing behavior can mimic monopoly pricing decisions.

Economists once believed that oligopoly pricing may have been essentially indeterminate. More modern game theory analyses recognize, however, the strong potential for tacit collusion among long-standing oligopolists (such as the major record companies), after repeated "tit for tat" pricing maneuvers, that will cause oligopolistic pricing to approach monopoly pricing:

[W]hen oligopolists expect to compete with each other over an extended period of time, each individual firm will often conclude that it is in its own best interest to be helpful to the other firms in the industry. So it will restrict its output in a way that raises the profits of the other firms, expecting them to return the favor. . . . [T]hey manage to act as if they had . . . an agreement. When this happens, we say that firms engage in tacit collusion.

Krugman & Wells, *supra,* at 401; *see* Hal Varian, *Intermediate Economics: A Modern Approach* 531 (8th ed. 2010) ("The threat implicit in tit for tat may allow the firms to maintain high prices."). Such tacit collusion can lead to pricing by oligopolists at the monopoly level. *See, e.g.,* L. Kaplow, *On the Meaning of Horizontal Agreements in Competition Law,* 99 Cal. L. Rev. 683, 811 (2011) ("oligopoly pricing is akin to monopoly pricing.").

Thus, consistent with Dr. Pelcovits's testimony, *theoretically* there *could* be no important difference between the bargaining power of the four major record companies and SoundExchange. However, as discussed *infra,* the evidence in this proceeding does not

---

[35] However, SoundExchange overstates the logic of this point. The mere fact that two adversarial parties reach a settlement premised upon their mutual prediction of the Judges' future determination does not mean that they have correctly predicted (with "a high degree of confidence" no less) that the rate the parties settled upon would be the same as the rates the Judges ultimately would have established. It is a sufficient inducement for the parties to settle if they agree on their prediction, not that their prediction be correct. It would be hopelessly circular if the Judges were to put their imprimatur on rates negotiated in a settlement merely on the assumption that the parties were able to predict how the Judges would apply the statutory standards. Such an argument would essentially require the Judges to abdicate their responsibilities and defer to the settling parties, whose self-declared rational expectations as to the Judges' future determination would be deemed both prescient and dispositive.

[36] Two ancillary points were made by the respective parties with regard to the alleged impact of litigation costs: Live365 asserted that the settling webcasters did not have the same capacity to absorb litigation costs as SoundExchange, but there was no evidence that indicated such a disparity existed or, even if it did, how it affected the rates upon which the parties settled. Fratrik WDT at 43; Ordover WRT at 17. SoundExchange argued that the settling parties had additional options beyond settle or litigate—they could either elect not to participate in the rate proceeding or decide not to webcast. SX PFF ¶ 284. Both of those supposed "options" seem extreme.

indicate that the rates in the WSA Agreements were so high as to enable SoundExchange to extract monopoly rents from webcasters.[37]

(i) The NAB's Countervailing Market Power

As Dr. Ordover noted, the NAB, which negotiated on behalf of a group of broadcasters, enjoyed a degree of bargaining power on the buyers' side during its negotiations with SoundExchange. Ordover WRT at 23; see also 7/28/10 Tr. at 129–30 (Salinger) (acknowledging balance of power in this context). This power arose from the fact that, at the time of the WSA Agreement negotiations, the NAB broadcasters had accounted for over 50% of the royalty payments to SoundExchange in the immediately preceding calendar year. Ordover WRT at 23; Live365 Trial Ex. 25. As Dr. Ordover testified, "[s]uch added market power on the buyer side tends to mitigate, if not fully offset, additional leverage that SoundExchange might bring to the negotiations." Ordover WRT at 23; Web II, 72 FR at 24091 ("[T]he question of competition is not confined to an examination of the seller's side of the market alone. Rather, it is concerned with whether market prices can be unduly influenced by sellers' power or buyers' power in the market.")

(ii) The Availability of a Rate Setting Proceeding

The monopoly power of SoundExchange was compromised by the fact that the NAB or any webcasters negotiating with SoundExchange could

have chosen instead to be subject to the rates to be set by the Judges. Ordover WRT at 23. Dr. Ordover explained that "[a]t some point, buyers such as the NAB members would simply elect to seek rates established by the Judges— which would be free of any potential cartel effects—rather than voluntarily agree to pay above-market rates." Ordover WRT at 23; see Salinger WRT at 27 (buyers can resort to the court if the collective seeks to charge more than each individual member could charge).

(iii) The Evidence Did Not Demonstrate That the Individual Record Companies Necessarily Would Have Negotiated a Lower Rate Than SoundExchange

As Dr. Ordover explained, the nature of the market indicated that SoundExchange might have been in a position to negotiate rates that were actually lower than the rates the record companies would have negotiated individually. More particularly, the existence, vel non, of SoundExchange's power to set higher prices "depends partially on the assumption one makes about whether a webcaster requires access to the repertoire of all four major record companies in order to operate an economically viable business, or only to a subset." Ordover WRT at 23–24.

As Dr. Ordover further explained, if the repertoires of all four major record companies were each required by webcasters (i.e., if the repertoires were necessary complements) and webcasters were required to negotiate with each record company individually, then each record company would have an incentive to charge a monopoly price to maximize its profits without concern for the impact on the market writ large. That is, while these higher prices would constitute profits for the record company receiving them, they would constitute higher monopoly costs (incurred four times—paid by webcasters to each of the four record companies). The webcasters would pass on the higher costs to listeners, thus reducing the quantity of sound recordings made available to end users. Ordover WRT at 25–26.

By contrast, SoundExchange, as a collective, would internalize the impact of the complementary nature of the repertoires on industry revenue and thus seek to maximize that overall revenue. This would result in lower overall rates compared to the situation in which the individual record companies negotiated separately. Ordover WRT at 27.

Of course, this argument would be valid only if the repertoires of the several record companies indeed were complements rather than substitutes. If

it was sufficient for webcasters to obtain only the licenses for one (or less than all four) of the major record companies, then separate negotiations with individual record companies (absent collusion, tacit or otherwise) could lead to competitively lower royalty rates.

The parties presented no evidence from which the Judges could conclude that the repertoires of the respective record companies were complements or substitutes, or, perhaps, complementary to some degree and substitutional to some degree.[38] Thus, the Judges cannot conclude that SoundExchange necessarily wielded a level of pricing power sufficient to affect the use of the WSA Agreements as benchmarks.[39]

(g) Conclusion Regarding the WSA Agreements

On balance, the Judges conclude that the arguments made by Live365 as to why the WSA Agreements cannot serve as benchmarks are not persuasive. Therefore, the Judges conclude that the evidence permits these two agreements to serve as benchmarks in this proceeding.

(2) SoundExchange's Second Proposed Benchmark: The Adjusted Interactive Subscription Service Rate

In addition to its WSA Agreements benchmark, SoundExchange relied on Dr. Pelcovits's analysis of another purported benchmark—the market for interactive webcasting of digital

---

[37] An oligopolistic marketplace rate that did approximate the monopoly rate could be inconsistent with the rate standard set forth in 17 U.S.C. 114(f)(2)(B), as that standard has been construed by the D.C. Circuit and the Librarian of Congress. The D.C. Circuit has held that this statutory section does not oblige the Judges to set rates by assuming a market that achieves "metaphysical perfection and competitiveness." Intercollegiate Broadcast System, Inc. v. Copyright Royalty Board, 574 F.3d 748, 757 (D.C. Cir. 2009). Rather, as the Librarian of Congress held in Web I, the "willing seller/willing buyer" standard calls for rates that would have been set in a "competitive marketplace." 67 FR at 45244–45 (emphasis added). See also Web II, 67 FR at 24091–93 (explaining that Web I required an "effectively competitive market" rather than a "perfectly competitive market." (emphasis added)). Between the extremes of a market with "metaphysically perfect competition" and a monopoly (or collusive oligopoly) market devoid of competition there exists "[in] the real world . . . a mind-boggling array of different markets," Krugman & Wells, supra, at 356, all of which possess varying characteristics of a "competitive marketplace." As explained in the text, infra, in this proceeding the evidence demonstrates that sufficient competitive factors existed to permit the WSA Agreements to serve as useful benchmarks, and does not demonstrate that the rates in the WSA Agreements approximated monopoly rates.

[38] In Web II, the Judges found that there was testimony sufficient to indicate that the several repertoires were substitutes rather than complements. 72 FR at 24093. The contesting parties in this proceeding did not provide the Judges with evidence sufficient to make a factual finding as to this issue.

[39] The Judges reject an additional argument made by SoundExchange that the WSA Agreements could be construed as competitive by comparing the prices negotiated by the major record companies in their agreements with "custom radio services" to the lower prices in the WSA Agreements. Pelcovits WDT at 19. The Judges agree with Dr. Salinger's critique that a comparison of rates for "custom radio services" and noninteractive webcasters is not an "apples-to-apples" comparison, because "custom radio" adds additional value in terms of substitutability for the purchase of music and adds a level of control for the listener. Salinger WRT at 26. Further, even Dr. Pelcovits acknowledges that custom radio service involves a "degree of interactivity . . . and therefore is not necessarily comparable to noninteractive webcasting." Pelcovits WDT at 32. Thus, this issue posits at least two potential explanatory variables that could explain why the record companies negotiated higher rates for custom radio than SoundExchange negotiated for noninteractive services in the WSA Agreements: (i) The monopoly or oligopoly character of the seller(s); and (ii) the differentiated nature of the two services. Absent any empirical or other evidence that indicates how each of these explanatory variables relates to the pricing differential, SoundExchange's attempt to rely on the pricing differential as probative of a more competitive rate must fail.

performances of sound recordings. According to Dr. Pelcovits, that interactive market is comparable to the noninteractive market at issue in this proceeding for the following reasons:

• Both markets have similar buyers;
• Both markets have similar sellers;
• Both markets utilize a blanket license in sound recordings;
• Both markets are input markets;
• Both markets have a demand schedule for these inputs that is derived from the demand of ultimate consumers; and
• Both markets deliver the sound recordings via the Internet.

Pelcovits WDT at 3; 4/19/10 Tr. at 126 (Pelcovits).

In the interactive market, the rates for sound recordings are not subject to the statutory license. Rather, in the interactive market, the rates for sound recordings are set through marketplace negotiations between the owners of the sound recordings, as sellers/licensors, and the individual interactive webcasters, as buyers/licensees.

The major difference between the two markets is the role of the ultimate consumer in selecting the sound recordings for listening. In the interactive market (as the adjective connotes), the ultimate consumer essentially decides which sound recordings he or she will receive.[40] By contrast, in the noninteractive market (as the adjective again connotes), the consumer plays a more passive role, and the webcaster offers the consumer music that the webcaster anticipates the listener might enjoy (much like radio). *Compare* 17 U.S.C. 114(j)(6) with 17 U.S.C. 114(j)(7).

Thus, it is necessary to isolate the value of such consumer choice, *i.e.,* the utility of interactivity, and subtract that value from any estimate of the value of sound recordings in the interactive market, in order to make that value more comparable to the value in the noninteractive market.

Dr. Pelcovits attempted to make such an adjustment in his analysis (as well as other adjustments discussed *infra*),

which resulted in his proposed per-performance rate of $0.0036 per play for a statutory noninteractive webcaster.

The Judges conclude, as the Judges concluded in *Web II,* that such an adjusted benchmark constitutes the type of benchmark that the Act permits (but does not require) the Judges to consider. However, the fact that this is an appropriate type of benchmark to be considered does not necessarily mean that any particular application of the benchmark will be of assistance in a given proceeding. Rather, the Judges must consider the application of such a benchmark, and decide whether to adopt or reject it *in toto* or whether it is necessary to adjust the proposed benchmark.

As explained *infra,* the Judges have concluded that the interactive benchmark proposed by Dr. Pelcovits on behalf of SoundExchange is of assistance in establishing a zone of reasonableness in this proceeding, but only after making certain significant adjustments to that proposed benchmark.

(a) The Methodology Utilized by Dr. Pelcovits in His Interactive Benchmark Analysis

Dr. Pelcovits opined that "the interactive, on-demand music services [are] the best benchmark to use for the purpose of setting rates for statutory webcasting services in this proceeding." Pelcovits WDT at 23. Dr. Pelcovits testified, "it is reasonable to predict that the ratio of per-subscriber royalty fees to consumer subscription prices will be essentially the same in both the benchmark and target markets." Pelcovits WDT at 23; *see* 4/20/10 Tr. at 277–78 (Pelcovits). The theory upon which Dr. Pelcovits relied to make this prediction was premised on the economic concept of "derived demand." As Dr. Pelcovits testified, "webcasters demand or have a need for the music performance because that's what their customers demand." 4/19/10 Tr. at 132 (Pelcovits); Pelcovits WDT at 23 ("I believe it is reasonable to predict that the ratio of per-subscriber royalty fees to consumer subscription prices will be essentially the same in both the benchmark and target markets.").

However, in order to use the rates in this interactive benchmark market to develop rates in the target market, Dr. Pelcovits also concluded that he was required to make adjustments "to account for the differences between the benchmark and target markets." Pelcovits WDT at 22; 4/29/10 Tr. at 127 (Pelcovits). Specifically, Dr. Pelcovits adjusted (i) the interactive benchmark rates to take into account the fact that

there are more plays per subscriber in the noninteractive market; and (ii) the subscription prices in the interactive market to remove the value of interactivity. Pelcovits WDT at 23.

(i) The Marketplace Agreements Considered by Dr. Pelcovits

Dr. Pelcovits obtained 214 agreements between certain interactive webcasters and the four major record companies, *viz.,* Universal Music Group, Sony Music Entertainment, Warner Music Group, and EMI, that spanned the period from approximately 2004 through 2009, with an emphasis on contracts that were created in the most recent three years. Pelcovits WDT, App IV. Under the terms of these agreements, Dr. Pelcovits found that the interactive webcasters generally "pay royalties on the basis of the greatest of three measures: A per-play rate; a percentage of gross revenue rate; and a per-subscriber fee." Pelcovits WDT at 29; 4/29/10 Tr. at 129–30 (Pelcovits).

Dr. Pelcovits had available for consideration, *inter alia,* two types of interactive webcasting models: (i) Subscription on-demand interactive streaming services and (ii) advertising-supported (nonsubscription) on-demand streaming services.[41] SoundExchange explained the difference between these models in the following manner, through the testimony of its industry witness:

• Subscription on-demand interactive streaming.

This type of webcasting allows a paying subscriber to request the exact song he or she wishes to hear. McCrady WDT at 12. In addition, most of these services allow their subscribers to conditionally download requested songs to their personal computer and sometimes to a portable storage device, such as an iPod. *Id.* These downloads remain available for listening at any time by a subscriber, provided that the subscription remains active. *Id.*

• Advertising-supported (nonsubscription) on-demand interactive streaming.

This type of webcasting is the same as subscription on-demand interactive

---

[40] The ability of the ultimate consumer to choose to listen to specific sound recordings renders that decision analogous to the decision to purchase music digitally or otherwise. Thus, as noted in the legislative history of the Digital Performance Right in Sound Recordings Act, that statute permits the owners of sound recordings to bargain directly with each interactive webcaster over the price of each transmission, in the same manner as if the parties were negotiating the price of a digital download for outright purchase. *See* H.R. Rep. No. 104–274 at 14 (1995) ("Of all the new forms of digital transmission services, interactive services are most likely to have a significant impact on traditional record sales, and therefore pose the greatest threat to the livelihoods of those whose income depends upon revenues derived from traditional record sales.").

[41] Dr. Pelcovits also reviewed agreements between "custom radio" services and the four major record companies, agreements that, according to SoundExchange's witnesses, occupy a functional gray area between interactive and noninteractive services. *See* McCrady WDT at 16. Dr. Pelcovits made note of such agreements in his testimony, including a particular reference to the agreement between WMG and one such custom radio service, Slacker Premium. As discussed *infra,* Dr. Pelcovits needed data regarding the number of plays by Slacker Premium to serve as a proxy for the number of plays by noninteractive webcasters, because such data was not available for clearly noninteractive services. Pelcovits WDT at 32.

streaming except the listener does not subscribe and receives *gratis* the songs he or she wishes to hear. The webcaster sells advertising on the site and the listener hears the advertising as well as the specific songs requested. Mr. McCrady described these interactive webcasting services that derive their revenue from advertising alone and not from subscriptions to be "experimental" and not yet "mature." 4/22/10 Tr. at 663 (McCrady); McCrady WDT at 15.

Dr. Pelcovits ultimately elected to ignore the advertising-supported (nonsubscription) on-demand interactive streaming in his analysis because, in his opinion, "it is more straightforward to infer differences in consumer willingness-to-pay (and by extension how much the webcaster would be willing to pay for the license) from observed prices for subscription services." Pelcovits WDT at 24.

(ii) Dr. Pelcovits's Calculation of the Per-Play Rate in the Benchmark Interactive Subscription Market

Dr. Pelcovits proceeded to calculate the "effective per play rate" paid under the contracts between the benchmark interactive services and the four major record companies. To do so, he obtained data from the major record companies that revealed:

- The revenue reported by the interactive subscription services to the major record companies; and
- The number of unique plays those services reported to the major record companies.

Pelcovits WDT at 30; 4/29/10 Tr. at 128 (Pelcovits). The revenue data that Dr. Pelcovits analyzed represented not merely revenue paid under the per-performance rate structure in the interactive contracts, but rather all revenue, regardless of whether that revenue had been paid pursuant to one of the other structures contained in those contracts. Pelcovits WDT at 30.

As noted at the outset of this determination, given Dr. Pelcovits's assumption that only a per-performance (*i.e.,* per play) royalty rate structure would pass muster with the Judges, he only proposed a per-play royalty rate. Accordingly, Dr. Pelcovits determined an "effective" per-play royalty rate by combining the revenue reported and paid pursuant to the percentage-of-revenue structure and the per-play structure for the purposes of his analysis. Pelcovits WDT at 30.

The data reviewed by Dr. Pelcovits also showed that the percentage of plays on the interactive services attributable to the four major record companies was approximately 85%. 4/20/10 Tr. at 299 (Pelcovits). Thus, by considering only

the data from the four major record companies, Dr. Pelcovits did not consider 15% of the sellers in his benchmark market.

With regard to the number of plays per subscriber for his benchmark market, Dr. Pelcovits counted "the total number of unique plays of recorded music owned (or distributed) by the four major record companies reported by the interactive webcasting service(s)." Pelcovits WDT at 30; 4/19/10 Tr. at 130–31 (Pelcovits). Dr. Pelcovits calculated the average number of monthly plays by these interactive subscription services to be 287.37 per subscriber. Pelcovits WDT at 31. To derive the effective per-play rate in the interactive market, Dr. Pelcovits then divided the total revenue collected by the record companies by 287.37, *i.e.,* the total number of unique plays. This division resulted in an effective per-play rate for the benchmark interactive subscription service market of \$0.02194 per play. *Id.*

(iii) Dr. Pelcovits's Adjustments to the \$0.02194 Per-Play Rate in the Benchmark Interactive Subscription Market

Dr. Pelcovits believed that it was necessary to make certain adjustments to the interactive benchmark streaming per-play rate before it could be applied to the noninteractive streaming market. In particular, Dr. Pelcovits adjusted for:

- The higher usage intensity (number of plays per month) by subscribers of noninteractive services compared to subscribers of interactive services; and
- The value that consumers place on the greater interactivity offered by the on-demand services compared to statutory services that do not offer that function.

Pelcovits WDT at 3, 31.[42]

(a) The Adjustment for Usage Intensity/ Number of Monthly Plays

Dr. Pelcovits's first adjustment sought to account for the fact that there were a greater number of plays by subscribers of noninteractive services than by subscribers on interactive statutory services. Pelcovits WDT at 31; *see* 4/19/10 Tr. at 139–41 (Pelcovits).

While, as noted *supra,* Dr. Pelcovits was able to obtain data regarding the number of interactive plays, he admitted to difficulty in calculating the number of noninteractive plays. As Dr. Pelcovits candidly acknowledged, the noninteractive services "do not report

the number of subscribers in public documents or in data provided to the record companies or SoundExchange." Pelcovits WDT at 31.

In light of these difficulties, Dr. Pelcovits turned to data provided to the record companies for the subscription custom radio service Slacker Premium. Pelcovits WDT at 32. Although Slacker Premium is not a noninteractive service, because it allows for a degree of user customization, Dr. Pelcovits claimed that most of the music transmitted through the service is "pushed to the consumer," rather than being truly on-demand. Pelcovits WDT at 32. Therefore, he concluded that the data on plays-per-subscriber for this one service would serve as a good proxy for plays-per-subscriber for statutory subscription services.[43] Pelcovits WDT at 32; 4/19/10 Tr. at 141–42 (Pelcovits). Although the unavailability of data for the number of plays of unambiguously noninteractive services reduces the usefulness of Dr. Pelcovits's proposed benchmark, it does not invalidate his methodology and results.[44]

Using the Slacker Premium data, Dr. Pelcovits determined that the average monthly plays per subscriber for a purely noninteractive service was 563.36. Pelcovits WDT at 32. Dividing the plays per subscriber for interactive services (287.37) by the plays per subscriber for statutory services (563.36) resulted in a per-play adjustment of 0.5101. Pelcovits WDT at 33.

(b) The Interactivity Adjustment

Dr. Pelcovits also made an adjustment to account for the difference in the relative value of a service that is interactive to one that is not. Dr. Pelcovits began his calculation of the interactivity adjustment by comparing the subscription rates for selected benchmark interactive services with the subscription rates for certain audio streaming services that he identified as "arguably" noninteractive services. Pelcovits WDT at 24; Live365 Trial Ex. 5 at 31–32.

Inasmuch as that "value added" feature (by definition) is not available for the noninteractive Dr.

---

[42] Dr. Pelcovits made a third adjustment in an attempt to account for the substitutional effect of the two types of services on CD and permanent download sales. Pelcovits WDT at 35–36. As explained *infra,* the Judges find that this adjustment is subsumed within his willing seller/willing buyer analysis.

[43] Dr. Pelcovits established his own definition of "statutory services" as "services that offer no interactivity or limited interactivity," but he cautioned that he was not making a "legal judgment" as to whether his self-defined "statutory services" would qualify legally as noninteractive statutory services. Pelcovits WDT at 24–25 and n.22.

[44] Based on other data produced by Live365 during discovery, Dr. Pelcovits testified that he was able to confirm that the number of plays per subscriber that he calculated for Slacker Premium represented a reasonable estimate of the plays per subscriber for the statutory webcasting market. Pelcovits WDT at 32 n.27.

Pelcovits calculated the value of the interactivity feature in order to subtract it from his proposed benchmark service. Dr. Pelcovits calculated the purported value added by interactivity in two ways. 4/19/10 Tr. at 133–34 (Pelcovits); Live365 Trial Ex. 5 at 37–40.

First, Dr. Pelcovits compared the retail subscription prices for the interactive and noninteractive streaming services that he analyzed. Pelcovits WDT at 24; Live365 Trial Ex. 5 at 39–40. More particularly, he supervised the collection of information regarding 41 audio streaming services out of the agreements that SoundExchange had provided to him. Pelcovits WDT at 24; 4/19/10 Tr. at 134–35 (Pelcovits). However, Dr. Pelcovits excluded from his analysis 23 of those 41 services (56% of the total) because they were not subscription services. The remaining 18 services that he included in his analysis were paid subscription services. Pelcovits WDT at 24. Of these 18 subscription services, 11 were in the benchmark interactive market, and 7, according to Dr. Pelcovits, "arguably qualify as statutory services." Pelcovits WDT at 24–25. Dr. Pelcovits found that the average monthly subscription price for the 7 noninteractive services that he defined as "statutory" was $4.13. Pelcovits WDT at 25.

With regard to the 11 interactive subscription services, Dr. Pelcovits calculated the average subscription price in two different ways. Pelcovits WDT at 25.

• First, Dr. Pelcovits calculated the average monthly subscription prices for the 11 interactive services—an average of $13.70.
• Second, Dr. Pelcovits re-calculated the average monthly subscription prices of 2 of these 11 interactive services to adjust them downward to reflect additional value these 2 services provided in the form of a fixed monthly number of permanent downloads at no additional cost to the subscriber.[45] This calculation resulted in a lower average monthly subscription price of $13.30.

Pelcovits WDT at 25; 4/19/10 Tr. at 135–36 (Pelcovits).

To make his interactivity adjustment, Dr. Pelcovits then subtracted the average (mean) subscription price of his 7 statutory noninteractive services ($4.13) from the average (mean) subscription

price of his 11 benchmark interactive services. Because he calculated two different averages for the 11 benchmark interactive services (one ignoring the bundled free downloads and the other adjusting for the bundled free downloads, as noted *supra*), Dr. Pelcovits performed two different subtractions ($13.70 − $4.13; and $13.30 − $4.13). These calculations resulted in interactivity adjustment factors of:

0.301 (using the unadjusted subscription prices for the interactive services); and

0.311 (using the subscription prices for the interactive services adjusted for the bundled downloads offered by two of the benchmark interactive services).

Pelcovits WDT at 26; 4/19/10 Tr. at 136–37 (Pelcovits).[46]

As an alternative measure of the value of interactivity (to be subtracted from the benchmark value), Dr. Pelcovits performed a hedonic regression. Pelcovits WDT at 26; Live365 Trial Ex. 5 at 38–39. As Dr. Pelcovits accurately summarized, a hedonic regression is a statistical technique that can be applied "to measure the value of different characteristics of a heterogeneous product." Pelcovits WDT at 26. *See also* Salinger WRT at 18 ("Hedonic regression is a statistical analysis of prices that seeks to explain prices as a function of product features.").

This hedonic regression was used "to isolate the value of interactivity to consumers of on-line music services" by measuring "the value of interactivity from the different characteristics of a heterogeneous product," which in this case is subscription audio streaming services. Pelcovits WDT at 26; 4/19/10 Tr. at 137 (Pelcovits). In his hedonic regression, Dr. Pelcovits analyzed a number of variables across the same 18 subscription-streaming services he had considered in his "mean comparison" interactivity adjustment, and applied those variables to the subscription price. Pelcovits WDT at 26–27. Among the variables that Dr. Pelcovits included in his hedonic regression were: (i) The presence of interactivity; (ii) the availability of a mobile application for the service; and, (iii) and the ability to conditionally download tracks to a portable device (expressed as "Tethered

Downloads" in the regression table). Pelcovits WDT at 27; *see also* Live365 Trial Ex. 5 at 39.

Dr. Pelcovits's hedonic regression analysis resulted in an interactivity coefficient indicating that "interactivity is worth $8.52 per month to the typical subscriber." Pelcovits WDT at 28; 4/19/10 Tr. at 137–39 (Pelcovits). Dr. Pelcovits then applied this $8.52 value for interactivity to the $13.30 mean value for the 11 interactive on-demand services he had analyzed (*see supra*). By this comparison, the interactivity feature comprised 64.1% of the entire value of the price paid by consumers for subscriptions to interactive webcasting subscriptions ($8.52/$13.30 = 64.1%). *Id.* Alternatively stated, the value of a noninteractive subscription would create an alternative interactivity adjustment factor of 35.9% (*i.e.*, 100% − 64.1%).

Based on the above techniques, Dr. Pelcovits derived three potential interactivity adjustment factors. Pelcovits WDT at 28. That range is shown in the following table.

| Source | Interactivity adjustment |
|---|---|
| Comparison of Mean Subscription Rates—Unadjusted Subscription Prices .................. | 0.301 |
| Comparison of Mean Subscription Rates—Adjusted Subscription Prices ........... | 0.311 |
| Regression of Subscription Prices ......... | 0.359 |

Pelcovits WDT at 29.

(iv) Dr. Pelcovits's Derivation of Recommended Rates Based on the Foregoing Adjusted Benchmark Analysis

Dr. Pelcovits then multiplied the unadjusted per-play rate he had calculated in the benchmark market by the two adjustment factors. That is, he multiplied the unadjusted per-play rate by: (i) The per-play adjustment (that had accounted for the greater number of plays in the statutory noninteractive market) and (ii) the interactivity adjustment rate (calculated three different ways—two "mean" comparisons and one hedonic regression). Through this multiplication, Dr. Pelcovits derived the following range of recommended statutory per-play license fees:

---

[45] These "permanent" downloads are distinguished from the "conditional" downloads referred to by Mr. McCrady and discussed *supra*, because the listener cannot retain the "conditional" downloads after his or her subscription has expired. McCrady WDT at 12.

[46] "Interactivity adjustment factor" is simply the ratio of the mean noninteractive subscription price ($4.13) to the mean interactive subscription price, as calculated in two different ways ($13.70 or $13.30). Thus, the math is as follows: $4.13/$13.70 = 0.301 and $4.13/$13.30 = 0.311.

| Recommended source of interactivity adjustment | Proposed statutory per-play rate (rounded) |
|---|---|
| Comparison of Mean Subscription Rates—Unadjusted Subscription Prices ($0.02194 × 0.51 × 0.301) (benchmark per play rate) × (# of plays adj.) × (interactivity adj.) ............................................. | $0.0034 |
| Comparison of Mean Subscription Rates—Adjusted Subscription Prices ($0.02194 × 0.51 × 0.311) (benchmark per play rate) × (# of plays adj.) × (interactivity adj.) ............................................. | 0.0035 |
| Regression of Subscription Prices ($0.02194 × 0.51 × 0.359) (benchmark per play rate) × (# of plays adj.) × (interactivity adj.) ....... | 0.0040 |

Pelcovits WDT at 33; *see* 4/19/10 Tr. at 142–45 (Pelcovits) (explaining step-by-step calculations to derive recommended statutory per-play royalty fee).

Dr. Pelcovits then calculated the simple average of the above three recommended rates—$0.0036 per play (rounded). Pelcovits WDT at 33; 4/19/10 Tr. at 145 (Pelcovits).

(b) Review of Dr. Pelcovits's Interactive Benchmark Analysis

(i) The Overemphasis on Subscription Revenues and the Failure To Account for Advertising Revenues

Dr. Pelcovits's interactive benchmark analysis is of some, albeit limited, assistance in determining the royalty rate in the noninteractive market. His analysis was based upon the subscription revenues of noninteractive webcasters, without accounting for their advertising revenues. In fact, "the reality of a lot of the services is that they have a mix of subscribers and non-subscribers." 7/28/10 Tr. at 55 (Salinger); *see also* 4/20/10 Tr. at 312–13 (Pelcovits) (acknowledging that most listening to noninteractive webcasting is by non-subscribers).

Moreover, as noted *supra*, Dr. Pelcovits possessed data regarding advertising revenue for both the benchmark market and the statutory market, yet he chose not to focus on such data, asserting that it failed to reflect the willingness of consumers to pay for the services.[47] Pelcovits WDT at 24.

The Judges conclude that the interactive benchmark model as developed by Dr. Pelcovits is compromised, and its usefulness reduced, by its failure to take into account the advertising revenue received in both the interactive benchmark market and the statutory noninteractive market.

(ii) SoundExchange's Failure To Incorporate Independent Label Contract Rates in its Benchmark Analysis

Dr. Pelcovits relied upon the contracts between the major record companies and 18 webcasters in performing his interactive benchmark comparison. However, he completely excluded from his rate analysis the rates charged by the independent record companies in his benchmark interactive market and in the noninteractive market that is the subject of this proceeding. This is an important omission, because, as noted by Live365's rebuttal economic witness, Dr. Michael Salinger, approximately 40% of the music streamed on noninteractive webcasts is owned and licensed by independent labels. Salinger WRT at 15. On the other hand, Dr. Salinger did not provide any empirical support for the conclusion that inclusion of the rates charged by independent labels would have resulted in different rates. SX RFF at ¶¶ 101–103.

Thus, the issue becomes one of allocation of the burden of going forward with evidence on this point. The Judges conclude that since SoundExchange had collected information on 214 agreements between webcasters and record companies, including independents, it was in the best position to go forward with evidence indicating the impact, *vel non*, of the rates charged by the independent labels. By failing to do so, SoundExchange compromised the probative value of its benchmark analysis. Accordingly, the Judges conclude that the absence of any evidence as to the impact of the rates charged by the independent labels, either within the model itself or as an adjustment, diminishes the value of that interactive benchmark analysis.

(iii) SoundExchange's Failure To Adjust for the Downward Trend in Rates in the Interactive Benchmark Market

The effective play rate in the interactive benchmark market calculated by Dr. Pelcovits covered an 18-month period from 2007 through 2009. 4/20/10 Tr. at 309–10 (Pelcovits). Dr. Pelcovits relied upon the average

rate in that 18-month period. However, he did not account for the fact that the rate had been declining during this period, from $0.02610 in 2007 down to $0.01917 in 2009. By relying upon the average during the period, $0.02194, and not weighting more heavily in that average the more recent periods, Dr. Pelcovits's model failed to account for the temporal decline of rates during his period of analysis. Salinger WRT at 16–17; Live365 Reb. Ex. 1; 7/28/10 Tr. at 127–28 (Salinger).[48] Thus the Judges conclude that the interactive benchmark rate analysis is compromised by the failure to adequately weight this downward trend in rates.

However, as Dr. Salinger acknowledged, this concern could have been addressed by multiplying Dr. Pelcovits's recommended $0.0036 rate by the ratio of the low 2009 rate to the average rate over the 18-month period, *i.e.*, by multiplying that rate by .01917/.02194 (or .8737). 7/28/10 Tr. at 128–29 (Salinger). SoundExchange performed this calculation and noted that the rate established by its interactive benchmark analysis decreased to $0.0031, still above its proposed rates for the term of the license. SX PFF ¶ 210.

(iv) The Limited Data Regarding Noninteractive Plays

Dr. Pelcovits candidly admitted that he was unable to obtain data regarding the number of monthly noninteractive plays, because such data was not available. Pelcovits WDT at 31–32. Although he attempted to use a different source as a proxy for such data—the monthly plays by the Slacker Premium service that allegedly had some noninteractive features—the probative value of his analysis was diminished by this lack of sufficient data.

---

[47] Dr. Pelcovits's decision to ignore advertising revenues in his analysis implicitly constituted an *a priori* rejection of the noninteractive webcaster business model that seeks revenue primarily through advertising rather than from subscriptions.

[48] *See* note 24 *supra*, regarding the more serious problem with attempts to predict future industry trends.

**(c) Problems With Dr. Pelcovits's Hedonic Regression Used as an Alternative To Measure the Value of Interactivity To Be Subtracted From Interactive Benchmark Value**

Dr. Salinger set forth the same valid overarching criticism of Dr. Pelcovits's hedonic regression adjustment as he had asserted with regard to Dr. Pelcovits's adjustment based on the ratios of royalties to mean subscription rates in the two markets. That is, Dr. Salinger opined "*any* estimate of a reasonable royalty rate . . . suffers from the fundamental flaw that noninteractive Internet radio is primarily an advertising-supported business, not a subscription business." Salinger WRT at 18 (emphasis added).

On a more granular level, Dr. Salinger further questioned the results of Dr. Pelcovits's hedonic regression. First, Dr. Salinger disagreed with Dr. Pelcovits's use of "dummy variables" (*i.e.*, "fixed effects variables") in the hedonic regression. Second, Dr. Salinger questioned the significance of the results given what Dr. Salinger testified was the relatively broad confidence interval bracketing the estimated interactivity coefficient in the hedonic regression. Salinger WRT at 20, 21 n.31 and Exhibit 6; 7/28/10 Tr. at 66–69 (Salinger).

With regard to the first issue, Dr. Salinger noted, and Dr. Pelcovits did not disagree, that dummy variables "are indicator variables that capture unobserved characteristics whose value does not change over time." Salinger WRT at 21; *see also* Pelcovits WDT at 28.

In the present case, Dr. Pelcovits included fixed effects/dummy variables for six separate interactive services— one each offered by Classical Archives, Digitally Imported, Pasito Tunes, and Altnet (formerly Kazaa), respectively, and two offered by iMesh.com. In his Written Direct Testimony, Dr. Pelcovits did not comment upon the impact of these fixed effects/dummy variables. However, he also ran his regression *without* these fixed effects/dummy variables. This alternative regression increased the value of interactivity from $8.52 to $10.55 per subscriber per month. Salinger WRT at 20.

This higher value for the interactivity feature, when *subtracted* from the overall value of an interactive service as computed by Dr. Pelcovits, "caus[ed] the estimated royalty rate to decline . . . from $0.0036 to $0.0023." Salinger WRT at 20 (emphasis added). SoundExchange did not contest the probative value of this criticism, but rather acknowledged: "Dr. Pelcovits also

ran regressions without the fixed effects variables, and those results were produced to Live365." SX PFF ¶ 215. The Judges are mindful that this essentially undisputed revised value— $0.0023—is highly proximate to the rates established in the WSA Agreements.[49]

Dr. Salinger's second specific criticism of Dr. Pelcovits's hedonic regression, identified above, concerns the breadth of the confidence interval within which lies Dr. Pelcovits's estimated interactivity coefficient. Specifically, Dr. Pelcovits did not provide any "confidence interval" around his result. Salinger WRT at 21– 22 and n.31. Dr. Salinger calculated that, at a 95% confidence interval, Dr. Pelcovits's regression results would have a range that would be far less (on the low end of the range) than the rate that Live365 proposed and far higher (on the high end of the range) than the rates that SoundExchange proposed. *Id.*

**3. The "Affordability" of the Proposed Interactive Benchmark Rates**

Live365 asserted that SoundExchange's interactive benchmark rate was too high. Specifically, Live365 asserted that this interactive benchmark rate could not be utilized because numerous webcasters would be unable to afford the $0.0036 rate derived from that analysis. Live365 PFF ¶¶ 216–222. Although Live365 characterizes this alleged unaffordability as a "reality check," it is no such thing. A single price established in any market by its very nature inevitably will restrict some purchasers who are unable or unwilling to pay the market price. (In common parlance, they may be said to have been "priced out of the market.") The rate of $0.0036 may be too high for other reasons (and indeed it is), but the fact that any particular number of webcasters might not profit under that rate, or that others would either shut down or never enter the market, is not evidence that the rate deviates from the market rate. The essence of a single market price is that it rations goods and services; by definition, a non-discriminatory price system therefore excludes buyers who cannot or will not pay the market price (and excludes sellers who cannot or will not accept the market price).

**4. Judges' Conclusions Regarding the Commercial Webcasters Rates**

To summarize the Judges' conclusions as discussed above:[50]

• The Judges will set a per-performance rate, in light of the fact that neither of the contesting parties proposed a percentage-of-revenue based rate or any other rate structure.

• The Judges shall not utilize the Live365 Model to establish either the rate for commercial webcasters or the zone of reasonableness within which an appropriate rate would lie.

• The Judges shall utilize the rates set forth in the WSA Agreements between SoundExchange and the NAB and Sirius XM, respectively, to establish an approximate zone of reasonableness for the statutory rates to be determined in this proceeding.

• The Judges shall utilize the SoundExchange interactive benchmark analysis, adjusted to reflect the undisputed impact of the fixed effects/dummy variables, to establish an approximate zone of reasonableness for the statutory rates to be determined in this proceeding.

The Judges are also mindful of the procedural context of this determination, as summarized at the outset of this decision, *supra*. Rates were set for noninteractive commercial webcasting almost three years ago, on March 9, 2011, for the 2011–2015 rate period. No participant sought a rehearing or appealed those rates to the D.C. Circuit.

Further, after the D.C. Circuit vacated the March 9, 2011, determination and the case was remanded to the Judges, neither Live365 nor SoundExchange requested any new proceeding in connection with any aspect of the prior determination. Indeed, Live365 did not respond to the Judges' request for

---

[49] Dr. Pelcovits also acknowledged that his hedonic regression did not necessarily isolate product characteristics (such as interactivity in the present proceeding) from supply and demand effects on prices (subscription rates in the present proceeding). 4/20/10 Tr. at 373–76.

[50] In considering the Live365 proposal, the willing buyer/willing seller standard in the Act encompasses consideration of economic, competitive, and programming information presented by the parties, including (i) the promotional or substitution effects of the use of webcasting services by the public on the sales of phonorecords or other effects of the use of webcasting that may interfere with or enhance the sound recording copyright owner's other streams of revenue from its sound recordings; and (ii) the relative contributions made by the copyright owner and the webcasting service with respect to creativity, technology, capital investment, cost and risk in bringing the copyrighted work and the service to the public. *See* 17 U.S.C. 114(f)(2)(B)(i) and (ii). The adoption of an adjusted benchmark approach to determine the rates leads this panel to agree with *Web II* and *Web I* that such statutory considerations implicitly have been factored into the negotiated prices utilized in the benchmark agreements. *Web II*, 72 FR at 24095; *Web I*, 67 FR at 45244. Therefore, the Judges have implicitly incorporated such considerations in the evaluation of the benchmark proposals submitted by SoundExchange. Accordingly, the Judges conclude that SoundExchange's separate analyses discussing these statutory factors, *see* SoundExchange PFF, Point IX, are subsumed in its willing buyer/willing seller analyses.

suggestions as to how to proceed with the remand, and SoundExchange responded only with regard to the minimum fee issue that had been challenged on appeal by IBS, stating that the prior determination in that regard should be reaffirmed.

Thus, it is clear that the contesting parties had accepted the rates as established in the March 9, 2011, determination. The Judges are reluctant to upset settled expectations by retroactively altering rates that have been established for several years, and that licensees have already paid in some years, provided that those rates fall within the zone of reasonableness that the Judges determine in this proceeding.

The present *de novo* determination is substantively distinct in a number of respects from the prior determination, but the analysis leads to an approximate "zone of reasonableness" within which an appropriate rate for commercial webcasters can be established that includes the rates established in the March 9, 2011 determination.

Specifically, the Judges find that the approximate zone of reasonableness for the rates for commercial webcasters for the 2011–2015 rate period is as follows:

| Year | Lower bound | Upper bound |
|---|---|---|
| 2011 ..................................... | $0.0017 (NAB/SX rate) ................................... | $0.0023 (lowest adjusted interactive rate). |
| 2012 ..................................... | $0.0020 (NAB/SX; Sirius XM/SX rate) ........................ | $0.0023 (lowest adjusted interactive rate). |
| 2013 ..................................... | $0.0021 (Sirius XM/SX rate) ............................... | $0.0023 (lowest adjusted interactive rate). |
| 2014 ..................................... | $0.0022 (Sirius SM/SX rate) ............................... | $0.0023 (lowest adjusted interactive; NAB/SX rate). |
| 2015 ..................................... | $0.0023 (lowest adjusted interactive rate) .................. | $0.0025 (NAB/SX rate). |

The Judges recognize that the rates set previously for the 2011–2015 term fall within this zone of reasonableness,[51] and hereby adopt them.

Accordingly, with regard to the license for commercial webcasters, the Judges set the following per-play rates for the five-year period that began in 2011:

| Year | Rate |
|---|---|
| 2011 ......................................... | $0.0019 |
| 2012 ......................................... | $0.0021 |
| 2013 ......................................... | $0.0021 |
| 2014 ......................................... | $0.0023 |
| 2015 ......................................... | $0.0023 |

## V. Rates For Noncommercial Webcasters

### A. Noncommercial Educational Webcasters

On August 13, 2009, SoundExchange and CBI submitted a joint motion under 17 U.S.C. 801(b)(7)(A) regarding a partial settlement "for certain internet transmissions by college radio stations and other noncommercial educational webcasters" (CBI/SoundExchange Agreement). The parties sought to make the agreed rates and terms applicable to noncommercial educational webcasters for the period 2011 through 2015.[52] *Joint Motion to Adopt Partial*

*Settlement,* at 1 (Aug. 13, 2009). CBI and SoundExchange reached the CBI/SoundExchange Agreement under authorization granted by the 2009 WSA. The Copyright Office published the terms of the settlement in the **Federal Register**. *See* 74 FR 40616 (Aug. 12, 2009). By virtue of that publication, the CBI/SoundExchange Agreement is "available, as an option, to any . . . noncommercial webcaster meeting the eligibility conditions of such agreement." 17 U.S.C. 114(f)(5)(B).

On April 1, 2010, the Judges published the CBI/SoundExchange Agreement, with minor changes,[53] under the authority of section 801(b)(7)(A) of the Act. *See* 75 FR 16377 (Apr. 1, 2010) (including CBI/SoundExchange Agreement and NAB/SoundExchange Agreement). With respect to rates, the Agreement imposes an annual, nonrefundable minimum fee of $500 for each station or individual

channel, including each of its individual side channels. *Id.* at 16384. Under the Agreement, those noncommercial educational webcasters whose monthly ATH exceed 159,140, pay additional fees on a per-performance basis. The CBI/SoundExchange Agreement also provides for an optional $100 proxy fee that noncommercial educational webcasters may pay in lieu of submitting reports of use of sound recordings. The agreement also contains a number of payment terms.

Section 801(b)(7)(A) of the Act provides that, after providing notice and opportunity for affected parties to comment, the Judges shall adopt a settlement agreement among some or all of the participants in a proceeding as a basis for statutory rates and terms, unless a participant in the proceeding objects and the Judges find that the agreement does not provide a reasonable basis for setting rates and terms. The Judges received 24 comments from terrestrial radio stations favoring adoption of the CBI/SoundExchange Agreement.[54] IBS opposed adoption of the CBI/SoundExchange Agreement. The Judges held a hearing on those objections on May 5, 2010.[55]

---

[51] However, the zone of reasonableness in this determination is significantly tighter than the zone established in the vacated determination. Specifically, the zone in the vacated determination was bracketed by a low per-play rate of $0.0019 and a high rate of $0.0036. 76 FR at 13036.

[52] The proposed regulatory language in the CBI/SoundExchange agreement originally included the following sentences in 37 CFR 380.20(b) that created confusion as to whether SoundExchange and CBI were asking the Judges to adopt the agreement as an option for noncommercial educational webcasters or whether the agreement would be binding on all noncommercial educational webcasters:

However, if a Noncommercial Educational Webcaster is also eligible for any other rates and terms for its Eligible Transmissions during the period January 1, 2011, through December 31, 2015, it may by written notice to the Collective in a form to be provided by the Collective, elect to be subject to such other rates and terms rather than the rates and terms specified in this subpart. If a single educational institution has more than one station making Eligible Transmissions, each such station may determine individually whether it elects to be subject to this subpart.

*Digital Performance Right in Sound Recordings and Ephemeral Recordings, Proposed rule,* 75 FR 16377, 16383 (Apr. 1, 2010); *see* 5/5/10 Tr. at 5–51 (Hearing on Joint Motion to Adopt Partial Settlement).

With the concurrence of SoundExchange's counsel, *see* 5/5/10 Tr. at 46–47, 50–51 (Hearing on Joint Motion to Adopt Partial Settlement), the Judges find the language confusing and unnecessary and decline to adopt it.

[53] The Judges modified a reference to earlier regulations to bring it up to date. Deeming it inappropriate to the purpose of CRB regulations, the Judges declined to adopt language regarding compliance or noncompliance with the Agreement and reservation of rights. *See* note 52 *supra,* and accompanying text.

[54] Many of these comments asserted that the rate structure was compatible with their stations' respective budget constraints, *see, e.g., Comment of Bill Keith for WSDP Radio, Plymouth-Canton Community Schools* (Apr. 20, 2010) ("The monetary amount was reasonable and most college or high school stations can live with the amounts charged for webcasting"), and several expressed satisfaction with the $100 proxy fee in lieu of reports of use. *See, e.g., Comments of Christopher Thuringer for WRFL, University of Kentucky* (Apr. 20, 2010); *Comments of David Black, General Manager, WSUM–FM* (Apr. 19, 2010).

[55] The Judges deferred a decision whether to adopt the settlement until IBS had an opportunity to present its witness testimony as part of its direct and rebuttal cases.

The rationale for the IBS objection to adoption of the settlement described in the CBI/SoundExchange Agreement has remained elusive throughout the proceeding. In its initial comments, IBS expressed its concern that adoption of the agreement would create an "impression" that the Judges had "prejudged the outcome of the adjudicatory hearing," notwithstanding IBS's acknowledgement that "the proposed rates and terms . . . are non-exclusive, i.e., [the Agreement] provides for other parties' agreeing with SX to different rates and terms." *Comments of IBS* (Apr. 22, 2010).

During the May 5, 2010, hearing, IBS argued that by moving for adoption of their settlement agreement, CBI and SoundExchange were "attempt[ing] to freeze IBS out of statutory rights to a decision from the Board on the record." 5/5/10 Tr. at 52 (Hearing on Joint Motion to Adopt Partial Settlement). IBS also raised for the first time specific exceptions to the $500 minimum fee and $100 proxy fee that are part of the CBI/SoundExchange Agreement. *Id.* at 62–64.

In closing argument, IBS reiterated its objection to adoption of the CBI/SoundExchange Agreement. When pressed by the Judges to articulate specific objections, IBS counsel stated that IBS objected to the agreement to the extent it applied to IBS's smaller members.[56] By this, the Judges understand counsel to be expressing concern that adoption of the agreement would prevent IBS from pursuing its

rate proposal (for "small" and "very small" noncommercial webcasters) in the proceeding.

The Judges find that IBS did not interpose a proper objection under section 801(b)(7)(A)(ii) of the Act that would require the Judges to weigh the reasonableness of the CBI/SoundExchange Agreement. IBS's objection is premised on the erroneous assumption that adoption of the agreement would prevent IBS from pursuing its rate proposal. IBS's proposal relates to different categories of webcasters from those covered by the CBI/SoundExchange Agreement. While the latter covers noncommercial educational webcasters, the IBS proposal covers noncommercial webcasters (whether or not they qualify as "educational") that fall within its definitions of "small" and "very small." Adoption of the one does not preclude (and has not precluded) consideration of the other.

In addition, even if the Judges were to consider IBS's objection to be proper, IBS failed to present any evidence to support a conclusion that the CBI/SoundExchange Agreement does not form a reasonable basis for setting rates and terms for noncommercial educational webcasters. IBS's counsel made dire predictions that the rate structure adopted in the agreement would prevent many IBS members from performing webcasting services. *See, e.g.,* 5/5/10 Tr. at 62–64 (Hearing on Joint Motion to Adopt Partial Settlement). IBS did not offer testimony from any adversely affected member, however, in spite of the Judges' invitation to do so. *Id.* at 81–82. By contrast, 24 noncommercial webcasters filed comments with the Judges stating that they support the rates and terms of the CBI/SoundExchange Agreement, which they found reasonable and affordable. The Judges find those comments to be both credible and persuasive.

Finding neither a proper nor a credible objection to the CBI/SoundExchange Agreement, nor other grounds requiring rejection, the Judges adopt the agreement (with the modification described *supra* at note 52) as the basis for rates and terms for noncommercial educational webcasters for the period 2011–2015.

*B. Other Noncommercial Webcasters*

1. Rate Proposals of the Participants

For noncommercial webcasters, SoundExchange proposes a royalty of $500 per station or channel (including any side channel maintained by a broadcaster that is a licensee, if not

covered by SoundExchange's proposed settlement with CBI) for each calendar year or part of a calendar year during which the webcaster is a licensee under sections 114 and 112 of the Act. The licensee would pay the royalty in the form of a $500 per station or channel annual minimum fee, with no cap. The $500 fee would constitute the minimum fee under both 17 U.S.C. 112(e)(4) and 114(f)(2)(B), and would permit the noncommercial webcaster to perform sound recordings up to a limit of 159,140 ATH per month. If a station or channel were to exceed the ATH limit in any month, then the noncommercial webcaster would pay at the commercial usage rates for any overage. *Second Revised Proposed Rates and Terms of SoundExchange,* at 3–4 (July 23, 2010). SoundExchange's proposal would cover all noncommercial webcasters that are not covered by the CBI/SoundExchange Agreement (*i.e.,* noncommercial educational webcasters).

The IBS rate proposal is more difficult to discern. *See, e.g.,* 4/22/10 Tr. at 774–93 (Kass). [57] IBS proposes to create two new categories of noncommercial webcasters: Small noncommercial webcasters (defined as noncommercial webcasters with usage up to 15,914 ATH per month) and very small noncommercial webcasters (defined as noncommercial webcasters with usage up to 6,365 ATH per month). *Amplification of IBS's Restated Rate Proposal,* at 1 (July 28, 2010). Under the IBS proposal, small noncommercial webcasters would pay a flat annual fee of $50, which would also constitute the minimum fee. Very small noncommercial webcasters would pay a flat annual fee of $20, which would constitute the minimum fee. *Id.* at 2. Noncommercial webcasters that exceed

---

[56] [THE JUDGES]: You're not proposing a rate for noncommercial educational webcasters. Only CBI and SoundExchange are.

MR. MALONE: Right.

[THE JUDGES]: So why are you objecting to the adoption of that if you have a—two separate categories that you want adopted?

MR. MALONE: Well, the judges can certainly say that—I mean, there's nothing incompatible with them. The—

[THE JUDGES]: But I'm asking you why are you still objecting to the adoption of a $500 minimum fee for noncommercial educational webcasters when you have proposed new fees for two new types of services and have not proposed a fee for something called a noncommercial educational webcaster?

MR. MALONE: Well, our—

[THE JUDGES]: Where is your dog in that fight? I don't see it.

MR. MALONE: All right. The dog in that fight is—and, again, excluding indirect effects that I understand to be the context of your question. We have no objection to the terms that are there as long as they don't apply to our small stations.

[THE JUDGES]: So you're just objecting to it on the theory that you just hope that what's ever in there doesn't somehow get applied to your case, even though you're asking for two completely different services?

MR. MALONE: That's essentially correct, Your Honor.

9/30/10 Tr. at 660–61 (IBS Closing Argument).

[57] IBS did not file a formal rate proposal with the Judges prior to the evidentiary hearing. Instead, IBS included a vague request in the written direct testimony of one of its three witnesses, Frederick J. Kass, Jr., IBS's chief operating officer. Kass WDT at 1, 9 ("IBS Members should only pay for their direct use of the statutory license by the IBS Member. There should be no minimum fee greater than that which would reasonably approximate the annual direct use of the statutory license, not to exceed $25.00 annually."). Capt. Kass's written testimony also included as an exhibit a joint petition to adopt an agreement negotiated between the RIAA, IBS, and the Harvard Radio Broadcasting, Co. that was submitted to the Copyright Office on August 26, 2004. That agreement contained rates that diverged from those Capt. Kass proposed in his testimony. This discrepancy led to a convoluted discussion during Capt. Kass's live testimony as the Judges strived to determine precisely what rate structure IBS was seeking. 4/22/10 Tr. at 774–93 (Kass). After the hearing, IBS submitted a "Restatement of IBS's Rate Proposal" on May 21, 2010, and an "Amplification of IBS's Restated Rate Proposal" on July 28, 2010. The proposal summarized in text is from IBS's July 28, 2010, submission.

15,914 ATH would be subject to the noncommercial webcasting rates proposed by SoundExchange, including SoundExchange's proposed per performance rates for transmissions in excess of 159,140 ATH per month. *Id.* IBS also expressly adopted SoundExchange's proposal with regard to ephemeral recordings under section 112. *Id.*

IBS also proposed that noncommercial webcasters transmitting more than 15,914 ATH but no more than 55,000 ATH per month, be permitted to pay a $100 annual proxy fee in lieu of submitting reports of use. *Id.* at 3. IBS proposed that noncommercial webcasters transmitting fewer than 15,914 ATH per month be exempted from making reports of use. *Id.* While couched as part of IBS's rate proposal, this is a proposed term that the Judges will consider in the discussion of terms, *infra,* part VI.

As an alternative to the foregoing proposal, IBS stated that it was "prepared to offer to SoundExchange" an annual $10,000 payment to cover IBS members that are small noncommercial webcasters. *Id.* The $10,000 payment was apparently an estimate based on IBS's proposed rates for "small" and "very small" noncommercial webcasters; to the extent that participation by IBS members were to exceed $10,000, "there would be a true up within 15 days of the end of the year." *Id.*[58]

## 2. Evaluation of the Rate Proposals and Determination of Rates

Section 114(f)(2)(B) of the Act directs the Judges to "distinguish among the different types of . . . services then in operation" in applying the willing buyer/willing seller standard to determine rates and terms. *Id.* The recognition of different services is to be "based on criteria including, but not limited to, the quantity and nature of the use of sound recordings and the degree to which use of the service may substitute for or may promote the purchase of phonorecords by consumers." *Id.*

In *Web II,* the Judges found that noncommercial webcasters constituted a different type of service that should be subject to a different rate from commercial webcasters.

Based on the available evidence, we find that, up to a point, certain "noncommercial" webcasters may constitute a distinct segment

of the noninteractive webcasting market that in a willing buyer/willing seller hypothetical marketplace would produce different, lower rates than . . . for Commercial Webcasters. A segmented marketplace may have multiple equilibrium prices because it has multiple demand curves for the same commodity relative to a single supply curve . . . . The multiple demand curves represent distinct classes of buyers and each demand curve exhibits a different price elasticity of demand. By definition, if the commodity in question derives its demand from its ultimate use, then the marketplace can remain segmented only if buyers are unable to transfer the commodity easily among ultimate uses. Put another way, each type of ultimate use must be different.

*Web II,* 72 FR at 24097. As a safeguard to ensure that the distinct segment of the market occupied by noncommercial webcasters did not encroach on the segment occupied by commercial webcasters, the Judges capped eligibility for the noncommercial rate at 159,140 ATH per month. *Id.* at 24097, 24099–100.

In this proceeding both SoundExchange and IBS have proposed rates for noncommercial webcasters that differ from the rates for commercial webcasters, implicitly endorsing the commercial/noncommercial distinction adopted by the Judges in *Web II.* For noncommercial webcasters that do not exceed the 159,140 ATH monthly thresholds, these participants have proposed the continuation of what is economically a zero rate for the sound recordings (together with a $500 minimum fee).

The Judges conclude that it is appropriate to continue this commercial/noncommercial distinction because there is a good economic foundation for maintaining this dichotomy. More specifically, a "noncommercial" webcaster by definition is not participating fully in the private market. Although the costs associated with the production and delivery of a sound recording remain the same regardless of whether it is played by a commercial or noncommercial webcaster, apparently the noncommercial webcaster receives little or no customer or advertiser revenue. (Revenue must be received from some source though, in order to pay the minimum fee.)

The zero per-performance fee has an economic basis because it reflects: (i) The paucity of revenue earned by a noncommercial webcaster; and (ii) the essentially zero marginal cost to the licensors of supplying an additional copy of a sound recording. The $500 annual minimum fee per channel or station defrays a portion of the

transaction costs incurred in administering the license.[59]

Where SoundExchange and IBS part company is with IBS's proposal to make further distinctions among noncommercial webcasters based on the quantity of sound recordings they transmit under the statutory license (as measured by ATH).

Section 114(f)(2)(B) expressly mentions the quantity of use of sound recordings as an element that may be considered in recognizing different types of services. If a participant in a rate proceeding were to present evidence that, in a hypothetical marketplace, a willing buyer and a willing seller would negotiate a different rate for noncommercial webcasters at a given ATH level than they would for all other noncommercial webcasters, that would argue in favor of recognizing noncommercial webcasters at that ATH level as a distinct type of service. IBS, however, did not present any such evidence.

IBS presented testimony from three witnesses as part of its direct case.[60] Mr. John Murphy, general manager of WHUS at the University of Connecticut, Mr. Benjamin Shaiken, a student at the University of Connecticut and operations manager of WHUS, and Captain Kass, each testified about the distinctions between college (and, to a lesser extent, high school) radio stations and commercial radio stations. 4/21/10 Tr. at 570–73 (Murphy); Murphy WDT ¶ 4; 4/21/10 Tr. at 615 (Shaiken); Shaiken WDT ¶ 6; 4/22/10 Tr. at 761, 765 (Kass); Kass WDT ¶ 6. This is beside the point. There is no dispute between SoundExchange and IBS as to whether there should be different rates for commercial and noncommercial webcasters. Both participants accept the commercial/noncommercial distinction that was part of the Judges' determination in *Web II,* and the Judges adopt it in this proceeding. The issue at hand is whether there should be a

---

[58] It is unclear whether IBS intended this proposed payment as part of the rates proposed to the Judges for adoption, or as an offer to SoundExchange. Given the Judges' rejection of IBS's proposed rate structure, it is not necessary to resolve this ambiguity.

[59] Of course, this rate structure does not permit the licensors to recoup from the noncommercial webcasters any portion of the long-term (non-marginal) costs incurred in the creation and production of sound recordings.

[60] The Judges declined to admit the testimony of IBS's sole rebuttal witness, Frederick Kass, after it became apparent that his Written Rebuttal Testimony was not submitted in accordance with the Judges' rules (it was not verified in accordance with 37 CFR 350.4(d)) and Capt. Kass was unfamiliar with its contents. 7/29/10 Tr. at 292–96 (Kass). IBS sought reconsideration of the decision, which the Judges denied. *Order Denying IBS's Motion for Reconsideration of the Rulings Excluding Its Rebuttal Case* (Aug. 18, 2010). Even if Capt. Kass's testimony had been admitted, it could not have made up for the deficiencies of IBS's direct case, as such testimony would have been outside the scope of rebuttal testimony.

distinction among different groups within the category of noncommercial webcasters.

IBS's primary contention to support a different rate for "small" and "very small" noncommercial webcasters was that entities falling into those categories are unable to pay the $500 minimum fee proposed by SoundExchange. This argument fails for several reasons.

First and foremost, there is no record evidence to support the contention that noncommercial webcasters who transmit less than 15,914 ATH per month are unable to pay a $500 minimum royalty. IBS did not offer testimony from any entity that demonstrably qualified as a "small" or "very small" noncommercial webcaster.[61] Conclusory statements by counsel that a $500 minimum royalty is unaffordable for smaller noncommercial webcasters are not evidence. *See, e.g.,* 5/5/10 Tr. at 62–64 (Hearing on Joint Motion to Adopt Partial Settlement); IBS PFF at ¶¶ 9–10; IBS PCL at ¶ 4. Further, these assertions are undercut by testimony that some of these same entities pay IBS close to $500 annually for membership dues and fees for attending conferences. *See* 4/22/10 Tr. at 803–05 (Kass). The only testimony that mentions any specifics about the finances of smaller webcasters is a reference by Captain Kass to a survey that showed that IBS members had an average annual operating budget of $9,000. Kass WDT at ¶ 9. The survey, which was conducted more than ten years ago, 4/22/10 Tr. at 835 (Kass), was not offered into evidence. Without documentary evidence that would allow the Judges to assess the validity of the survey, Capt. Kass's reference to it cannot be accepted as evidence. *See* 37 CFR 351.10(e). Even if the Judges could accept such a reference as evidence, it would not advance IBS's case. On its face, an assertion that the average operating budget for IBS members is $9,000 does not establish that its members lack the wherewithal to pay a $500 minimum royalty.

There also is no evidence in the record to establish any correlation between the quantity of sound recordings being transmitted by a

noncommercial webcaster and the size of that webcaster's operating budget (and, thus, its ability to pay a $500 annual minimum fee).

In addition, the evidence strongly suggests that the ATH cutoffs that IBS proposed for "small" and "very small" noncommercial webcasters are arbitrary. It appears that IBS chose ATH levels that represent 10% and 4%, respectively, of the ATH cutoff for noncommercial webcasters employed in *Web II* and SoundExchange's rate proposal. *Id.* at 787, 791; IBS PFF at ¶ 10; IBS PCL at ¶ 1. Nothing in the record substantiates these ATH levels as definitive or conclusive of a webcaster's ability to pay a $500 minimum royalty.

Finally, even if there were a sufficient basis in the record to conclude that "small" and "very small" noncommercial webcasters are unable to pay a $500 minimum fee, that, in itself, does not demonstrate that a willing seller in a hypothetical marketplace would be prepared to negotiate a different, lower rate with them. That proposition is particularly dubious in this proceeding given the evidence in the record (discussed *infra*) that SoundExchange's average annual administrative cost exceeds $500 per station or side channel. The record does not support a conclusion that, in a hypothetical marketplace, a willing seller would agree to a price that is substantially below its administrative costs.

As to the statutory criterion of the "nature of the use of sound recordings" for distinguishing between types of services, there is no evidence in the record establishing that the use of sound recordings by "small" and "very small" noncommercial webcasters differs qualitatively from that of other noncommercial webcasters. 9/30/10 Tr. at 647–51 (IBS Closing Argument) (conceding the point).

For the foregoing reasons, the Judges find that IBS has failed to establish a basis for its proposal to recognize "small" and "very small" noncommercial webcasters as types of services that are distinct from noncommercial webcasters generally. The remainder of the rate proposal (for noncommercial webcasters that exceed 15,914 ATH per month) is identical to the SoundExchange rate proposal. As noted *supra,* IBS proposed an additional term for a subset of noncommercial webcasters. This is discussed *infra,* part VI. The Judges, therefore, reject the IBS proposal for "small" and "very small" noncommercial webcasters and proceed to evaluate the SoundExchange rate proposal for noncommercial webcasters.

SoundExchange contends that its rate proposal (i) most closely approximates the rate that a willing buyer and willing seller would negotiate in a hypothetical market, (ii) is demonstrably affordable to a broad range of noncommercial webcasters, and (iii) is objectively reasonable given the average administrative cost per service or channel. The Judges agree.

The CBI/SoundExchange Agreement (*see* III.B.2.A, *supra*) is persuasive evidence that SoundExchange's proposal satisfies the willing buyer/willing seller standard. That negotiated agreement employs the same minimum per-channel fee without a cap, as well as the 159,140 ATH limitation. The fact that 24 noncommercial webcasters filed comments supporting the agreement corroborates that conclusion.

SoundExchange points out that it was established in *Web II* that 363 noncommercial webcasters paid royalties in 2009 similar to SoundExchange's current rate proposal, with 305 of those webcasters paying only the $500 minimum fee. *Web II (Determination on Remand),* 75 FR at 56874. Taken together with IBS's failure to present even a morsel of contrary evidence, the Judges find this fact to be strong evidence that noncommercial webcasters are able and willing to pay the proposed fees.[62]

---

[61] The two IBS witnesses who were actually engaged in webcasting were both affiliated with WHUS at the University of Connecticut, Storrs. There is no record evidence regarding the quantity of sound recordings transmitted by WHUS. Two facts in the record—WHUS's 2009 annual revenues of more than $500,000, and their annual profits of more than $87,000, 4/21/10 Tr. at 583–86 (Murphy)—suggest that WHUS is not a "small" or "very small" webcaster as those terms are conventionally understood. *See also id.* at 590 ("WHUS is probably one of the most financially well-off stations in the entire IBS system").

[62] In its proposed findings, IBS introduced two new related arguments: (i) "Congress in Section 114(f)(2) intended that the minimum rate be tailored to the type of service in accord with the general public policy favoring small businesses," and (ii) the Judges are required under the Regulatory Flexibility Act (RFA), 5 U.S.C. 601(8), to determine whether the $500 fee unnecessarily burdens IBS's members. IBS PFF (Reformatted) at ¶¶ 10–13. Both contentions are without merit.

The Judges find no support in the text or legislative history of the Act for the proposition that rates adopted under section 114(f)(2) must be tailored to benefit small businesses. The statute is quite clear that the Judges' task is to determine rates that "most clearly represent the rates and terms that would have been negotiated in the marketplace between a willing buyer and a willing seller." 17 U.S.C. 114(f)(2)(B).

IBS has also failed to establish that the RFA applies to this proceeding. The RFA defines a "rule" (that triggers review under the Act) as "any rule for which the agency publishes a general notice of proposed rulemaking pursuant to" the APA. 5 U.S.C. 601(2). Determinations of the Judges in rate proceedings are not subject to the notice and comment rulemaking process under the APA. Moreover, the RFA's definition of "rule" specifically excludes "a rule of particular applicability relating to rates." *Id.*

Nor has IBS established that any of its members (or any entities falling within its proposed definitions of "small" and "very small" noncommercial webcasters) are "small entities" as defined in 5 U.S.C. 601(6). IBS did not introduce any evidence concerning any webcaster other than WHUS, and never even identified its own members in this proceeding.

In any event, the Judges did consider the circumstances of noncommercial webcasters in

Continued

Finally, the testimony of Ms. Barrie Kessler, SoundExchange's Chief Operating Officer, demonstrates that the $500 annual minimum fee is reasonable. Ms. Kessler estimated SoundExchange's annual administrative cost per station or channel to be approximately $825 on average. Kessler WDT at 25. IBS offered no persuasive evidence to dispute this estimate. As the Judges have noted in previous proceedings, it is reasonable and appropriate for the minimum fee to at least cover SoundExchange's administrative cost. *See, e.g., Web II (Determination on Remand),* 75 FR at 56873–74. With the average administrative cost exceeding $800, the Judges find a $500 minimum fee to be eminently reasonable and appropriate.

In conclusion, the Judges find that the evidence in this proceeding strongly supports SoundExchange's rate proposal for noncommercial webcasters. The Judges adopt that proposal for the 2011–2015 rate period.

## VI. Terms

As part of every rate determination, the Judges adjust the regulatory language that effects the rate changes. These implementing terms are published in title 37 of the Code of Federal Regulations. The Judges are obliged to adopt agreed terms if, after published notice, no party prospectively bound by the terms objects. *See* 17 U.S.C. 801(b)(7)(A). For the Judges to adopt a contested proposed term, the proponent must show support for its adoption by reference to the record of the proceeding.

In this proceeding, both SoundExchange and Live365 proposed changes to the existing regulatory language. Some of the terms proposed by SoundExchange are contained in the NAB/SoundExchange and CBI/SoundExchange agreements adopted in this proceeding. The Judges will adopt any contested proposed terms only if the proponent meets its evidentiary burden.

### A. Uncontested Terms

#### 1. Collective

The Judges have concluded previously that designation of a single Collective is economically and administratively efficient. No party to this proceeding requested a different or additional Collective. SoundExchange seeks to continue as the sole Collective for royalties paid by commercial and noncommercial webcasters under the licenses at issue in this proceeding for the period 2011–2015.

SoundExchange is a section 501(c)(6) nonprofit organization governed by a Board of Directors comprised of an equal number of artist representatives and copyright owners. *See* Kessler WDT at 2. Over the years of its service as the Collective, SoundExchange has gained knowledge and experience and has developed efficient systems for achieving the goals of the Collective at a reasonable cost to those entitled to the royalties. *See id.* at 4. In the absence of any request or suggestion to the contrary, the Judges designate SoundExchange as the Collective for the 2011–2015 license period.

#### 2. Stipulated Terms and Technical and Conforming Changes

SoundExchange and Live365 stipulated to certain terms in the Proposed Regulations appearing as an attachment to the Second Revised Proposed Rates and Terms of SoundExchange, Inc., filed July 23, 2010. They stipulated that some of the current provisions of the webcasting terms remain unchanged, that some provisions be removed or changed because the terms were applicable only to the 2006–2010 license period, and that some provisions be changed to reflect the terms of the NAB/SoundExchange and CBI/SoundExchange agreements.

The Judges find that the stipulated terms constitute for the most part technical and non-controversial changes that will add to the clarity of the applicable regulations. The Judges, therefore, adopt the terms proposed jointly by SoundExchange and Live365. In addition, the Judges adopt what they deem to be technical and conforming changes to the regulations proposed by SoundExchange, and not opposed by any party, in Section IV of their Second Revised Rates and Terms, filed July 23, 2010.

#### 3. Electronic Signature on Statement of Account

SoundExchange proposed eliminating the requirement of a handwritten signature on the statement of account found in section 380.4(f)(3). SX PFF at ¶ 576. According to SoundExchange, allowing electronic signatures would make it easier for licensees to submit their statements of account. *Id., citing* Funn WRT at 3 n.1. Live365's proposed regulations would also eliminate the requirement for a handwritten signature on the statement of account. *See* Attachment to PFF, Proposed Regulations, § 380.4(f)(3).

The Judges find that this uncontested term would improve the ease and efficiency with which statements of account may be processed electronically. In addition, they find the change to be consonant with the public policy preference expressed by Congress in adopting the E–SIGN Act, Public Law 106–229, 114 Stat. 464 (June 30, 2000), which established a general rule upholding the validity of electronic signatures in interstate and foreign commerce.

The Judges note that the terms they adopted with regard to other categories of licensees did not eliminate the extant requirement for a handwritten signature on statements of account. *See, e.g.,* 37 CFR 380.13(f)(3) (for Broadcasters); 380.23(f)(4) (for Noncommercial Educational Webcasters). The signatories to the Agreements incorporating the handwritten signature requirement did not participate in the hearing, however, and did not request a change in the signature requirement in this proceeding. Given the advance of technology, the Judges anticipate such requests in the forthcoming rulemaking proceeding. *See* note 66, *infra.*

The adopted terms are included in the appended regulatory language.

### B. Contested Terms for Commercial Webcasters

#### 1. Terms Proposed by Live365

Live365 proposed changes to the definitions of two terms in section 380.2: "performance" and "aggregate tuning hours." [63] Live365 PFF at ¶ 387 and PCL at ¶ 79. Specifically, Live365 proposed to modify the definition of "performance" to "exclude[ ] any performances of sound recording that are not more than thirty (30) consecutive seconds." Live365 PFF at ¶ 387. Live365 suggested this modification would conform the definition of "performance" in section 380.2 to that of a "performance" or "play" defined in the four interactive service agreements reviewed by Dr. Pelcovits. *Id.* Live365 also contended that precedent has excluded partial performances from "royalty-bearing" performances, citing *Digital Performance Right in Sound Recordings and Ephemeral Recordings, Docket Nos.*

---

[63] In the proposed regulations attached to its proposed findings of fact, Live365 included an additional term: A proposed deadline for the completion and issuance of a report regarding an audit to verify royalty payments. *See* Attachment to Live365's Proposed Findings of Fact and Conclusions of Law, § 380.6(g). Live365 did not discuss this proposal in its proposed findings and conclusions, and Live365 presented no evidence to support the need for such a term. The Judges consider the proposal withdrawn.

---

*2002–1 CARP DTRA3 & 2001–2 CARP DTNSRA,* 68 FR 27506, 09 (May 20, 2003).

Live365's proposal regarding the definition of "aggregate tuning hours" sought to exclude programming that does not contain recorded music, *e.g.*, talk, sports, and advertising not containing music. Live365 PCL at ¶ 79. Live365 asserted "programming without sound recordings should not be subject to consideration in regulations dealing with a royalty to be paid for the use of sound recordings." *Id.*

SoundExchange opposed both of the Live365 proposed modifications. SoundExchange contended that these proposed modifications would constitute new terms, not revisions to a rate proposal, which SoundExchange asserted may be revised, under section 351.4(b)(3), at any time up to and including submission of proposed findings of fact.[64] SX Reply Findings of Fact at ¶ 223 (hereinafter, RFF).

SoundExchange asserted that Live365's citation to interactive service agreements without more did not provide sufficient analysis and was insufficient to show the need for or benefit of the requested redefinition of "performance." *Id.* at ¶¶ 226–228. SoundExchange pointed to Live365's failure to consider the potential effect of its definition of "performance" on the per-performance rate presented by Drs. Pelcovits and Fratrik. *Id.* at ¶ 230. SoundExchange contended that if the Live365 performance exclusion proposal were adopted, SoundExchange would require an upward adjustment to the per-performance rate.[65] *Id.*

With regard to the request to redefine "aggregate tuning hours," SoundExchange argued that Live365 failed to point to anything in the record explaining, much less supporting, the need for the proposed change. *Id.* at ¶¶ 231–232. Live365 offered no evidence or analysis regarding the development of a performance rate based on the current definition of "aggregate tuning hours." The parties developed their evidence regarding the proposed performance royalty rates using the existing definition.

Live365 has not met its burden regarding adoption of these terms. The Judges, therefore, decline to adopt either of Live365's proposed definitions.

---

[64] The Judges need not address this argument as they decline to adopt the proposal on other grounds.

[65] According to SoundExchange, the upward adjustment would result from a reduction in the number of plays in the calculation of a per-performance rate. SX RFF at ¶ 230.

## 2. Terms Proposed by SoundExchange

SoundExchange proposed several terms relating to the Webcasters' royalties at issue in this proceeding.[66] The terms proposed by SoundExchange follow.

### a. Server Log Retention

SoundExchange urged the Judges expressly to include server logs as records to be retained pursuant to section 380.4(h). *See Second Revised Rates and Terms of SoundExchange, Inc., Section III.A., Proposed Regulations,* § 380.4(h) (July 23, 2010); Kessler Corrected WDT at 27. SoundExchange asserted that retention of these records is required under the current regulations, but requested this amendment because not all licensees retain server logs. SX PFF at ¶¶ 556–57; Kessler Corrected WDT at 27. SoundExchange asserted that "[t]he evidence indicates marketplace acceptance of such a term," citing to the CBI/SoundExchange Agreement which contains an equivalent term. SX PFF at ¶ 555.

In its opposition to this term, Live365 noted that neither the NAB/SoundExchange Agreement nor the Commercial Webcasters Agreement contained this term nor do any of the interactive service agreements submitted in this proceeding. Live365 RFF at ¶ 555. Live365 further argued that SoundExchange failed to establish that the benefits to SoundExchange of this term outweigh the burden on licensees to comply. *Id.* at ¶ 557.

The Judges find that SoundExchange has failed to meet its evidentiary burden. None of the interactive agreements in evidence is as specific as the regulation SoundExchange proposes. Live365 Exs. 17 and 18; McCrady WDT, Exs. 104–DR & 106–DR. Rather, the agreements require licensees only to retain records relating to their

---

[66] On October 21, 2013, during the pendency of this remand proceeding, SoundExchange filed a petition for rulemaking seeking changes to the CRB Notice and Recordkeeping regulations. In the petition, SoundExchange proposes changes to: (i) Standardize, consolidate, identify, and match reports to facilitate distribution of royalties; (ii) conform report formatting of electronic reports, including adoption of electronic signatures; (iii) require use of the International Standard Recording Code or another unambiguous identifier of tracks actually transmitted; (iv) require reports to include all performances transmitted by a licensee, even though some may not be subject to the statutory license; (v) address late or missing Reports of Use by shortening the reporting period, imposing late fees, and allowing proxy distributions; (vi) set time limits for submission of corrected or amended Reports of Use; (vii) require licensees to retain source documents for the data reported on the Reports of Use; and (viii) implement several regulatory changes denominated by SoundExchange as "housekeeping."

obligations under the agreement and in terms no more specific than the current regulation. *See, e.g.,* Live365 Exs. 17 at ¶ 7(h) and Ex. 18 at ¶ 7(h); McCrady WDT, Exs. 104–DR at ¶ 6(j) and 106–DR at ¶ 4(h). Since these agreements were negotiated in a setting free from the constraints of the regulatory scheme, they provide the best evidence of the agreement of a willing buyer and a willing seller in this respect.

SoundExchange's assertion that inclusion of this term in the CBI/SoundExchange Agreement constitutes "marketplace acceptance" is overbroad. As SoundExchange acknowledged, the parties reached agreement under atypical marketplace conditions, overshadowed by the possibility of a regulatory proceeding. *See* 9/30/10 Tr. at 547–48 (SoundExchange Closing Argument). Furthermore, while the CBI/SoundExchange Agreement contains the term, the NAB/SoundExchange and Sirius XM Agreements do not, thus undercutting the thrust of the SoundExchange argument.

SoundExchange failed to note, let alone balance, the burden on licensees against the likely benefits from the proposed change. The Judges are loathe to adopt a term without such evidence. The Judges decline to amend § 380.4(h) to specify server logs.

### b. Standardized Forms for Statements of Account

SoundExchange proposed to require licensees to submit statements of account on a standardized form prescribed by SoundExchange. SoundExchange asserted that a standard form would simplify licensees' calculations of the royalties owed and facilitate SoundExchange's efficient collection of information from licensees. SX PFF at ¶¶ 572, 575. At the time of hearing in this proceeding, SoundExchange provided a template statement of account on its Web site. *Id.* at ¶ 574. SoundExchange noted that noncommercial educational webcasters are required pursuant to their WSA agreement to use a form supplied by SoundExchange. McCrady WDT, Ex. 103–DP at section 4.4.1.

Live365 opposed adoption of this term because it would have general application, thus affecting parties that did not participate in this proceeding. Live365 asserted that a change with such an impact is addressed more appropriately in a rulemaking proceeding. Live365 RFF at ¶ 574.

The Judges do not find support in the record for adoption of a mandatory standardized statement of account. As Mr. Funn testified, the majority of

webcasters currently use the template form made available on SoundExchange's Web site. Funn WRT at 2; 8/2/10 Tr. at 492 (Funn) ("much more than half" of webcasters currently use template). Mr. Funn provided no information quantifying the additional work for SoundExchange to process a nonconforming statement of account from the webcasters that choose not to use the template. Further, neither the NAB/SoundExchange Agreement nor the Sirius XM/SoundExchange Agreement contains this term. McCrady WDT, Exs. 101–DP and 102–DP.

Given the already widespread use of SoundExchange's template form, the lack of quantification in the record of the time savings to SoundExchange by having a standardized form, and SoundExchange's failure to include this term in the NAB/SoundExchange and Sirius XM/SoundExchange Agreements, the Judges find that the record does not support the adoption of this term.

### c. Identification of Licensees and Late Fee for Reports of Use

SoundExchange requested that the Judges harmonize identification of licensees among the (i) notice of intent to use licenses under sections 112 and 114, (ii) statements of account, and (iii) reports of use, and to impose a late fee for reports of use. These two requests differ from the rest of the SoundExchange requests in that these are notice and recordkeeping terms.[67] Ms. Kessler acknowledges, at least with respect to the late fees for reports of use, that they could be implemented either in the notice and recordkeeping regulations or in the license terms. *See* Kessler WDT at 20–23, 27–28. The Judges decline to adopt SoundExchange's proposals regarding the harmonization of licensee identification and the imposition of a late fee for reports of use. The evidence does not compel amendment of the current recordkeeping regulations; rather, these issues are more appropriately addressed in a future rulemaking proceeding.

[67] *See* n.66, *supra.* SoundExchange requested these same, or similar, changes in an earlier rulemaking, in which the Judges imposed census reporting for all services except those broadcasters paying no more than the minimum fee. *See* Comments of SoundExchange, Docket No. RM 2008–7, at 20–23 (Jan. 29, 2009). The requests were outside the scope of that rulemaking, which was to improve the reporting regulations in light of technological developments since promulgation of the interim regulation. The Judges deferred SoundExchange's requests for consideration in a future rulemaking. *See Notice and Recordkeeping for Use of Sound Recordings Under Statutory License (Final rule),* 74 FR 52418, 52422–23 (Oct. 13, 2009).

### (1) Identification of Licensees

SoundExchange asserted that harmonization of the identification of licensees can be accomplished by (i) requiring licensees to identify themselves on their statements of account and reports of use "in exactly the same way [they are] identified on the corresponding notice of use . . . and that they cover the same channels or stations)," SX PFF at ¶ 568, Kessler WDT at 28; (ii) making the Judges clear that the "Licensee" is "the *entity* identified on the notice of use, statement of account, and report of use and that each Licensee must submit its own notice of use, statement of account, and report of use," *id.* (emphasis in original); and (iii) requiring licensees to use an account number issued by SoundExchange. *Id.* at ¶ 571. Ms. Kessler testified that these proposals would allow SoundExchange to match to the requisite notice of use, statement of account, and report of use to the correct licensee more quickly and efficiently. Kessler WDT at 29; 4/20/10 Tr. at 461 (Kessler). She also claimed that, for "little or no evident cost" to licensees, their accounting and reporting efforts would be simplified by use of an account number. Kessler WDT at 29. SoundExchange also asserted that these proposals are included in the NAB/SoundExchange and CBI/SoundExchange Agreements. SX PFF at ¶ 569. In fact, neither Agreement requires use of an account number.

Live365 did not controvert SoundExchange's proposed findings of fact relating to the identification issue, nor did it stipulate to the proposed term. As the term is not agreed, the Judges treat it as a litigated term. SoundExchange's witness asserted, without evidence, that the cost to licensees of conforming their reports and using an assigned account number would be minimal. Kessler WDT at 29.

Conformity of reporting and use of an account number system, however, is not a feature of the WSA Agreements in evidence. McCrady WDT, Exs. 101–DP (NAB), 102–DP (Commercial Webcasters) and 103–DP (CBI). The CBI/SoundExchange Agreement requires that statements of account list the licensee's name as it appears on the notice of use, *see* § 380.23(f)(1), but it does not impose that requirement on reports of use. *Compare* McCrady Ex. 103–DP, section 5.2.2 *with* § 380.23(g).

If adopted in this proceeding, therefore, SoundExchange's proposal would create an inconsistency within the webcasting regulations. The Judges decline to adopt this proposal, but find

that the issue would be more appropriately addressed in a future rulemaking proceeding.

### (2) Late Fee for Reports of Use

SoundExchange sought imposition of a late fee of 1.5% for reports of use. The regulations currently require a late fee for untimely payments and statements of account. *See* 37 CFR 380.4(c). In support of this request, Ms. Kessler testified that there was widespread noncompliance with reporting requirements. She cited failure to file reports of use as well as late or "grossly inadequate" reports. Kessler WDT at 28. Ms. Kessler testified that noncompliance with the report of use and payment requirements significantly hamper SoundExchange's ability to make timely royalty distributions. Kessler WDT at 28; 4/20/10 Tr. at 458 (Kessler). SoundExchange also points to the inclusion of a late fee for untimely reports of use in the NAB/SoundExchange and CBI/SoundExchange Agreements as further support for its request. SX PFF at ¶ 564.

Live365 questioned SoundExchange's characterization of a payment as being useless without a report of use given that both the NAB/SoundExchange and CBI/SoundExchange Agreements contain reporting waivers. Live365 RCL at ¶ 20.

The Judges are not persuaded that a late fee for reports of use is necessary. None of the interactive agreements in evidence contains such a term. Live365 Exs. 17, 18; McCrady WDT, Exs.104–DR and 106–DR. Only the NAB/SoundExchange and CBI/SoundExchange Agreements contain the late fee; the parties did not include a late fee in the Sirius XM/SoundExchange Agreement.

SoundExchange failed to meet its burden with regard to this proposal; the Judges decline to adopt the proposed late fee terms.

### C. Contested Terms for Noncommercial Webcasters

IBS proposed two new terms. The first is an exemption from the recordkeeping reporting requirements, or a permissive proxy fee *in lieu* of reporting, for noncommercial webcasters whose usage exceeds 15,914 ATH per month, but is less than 55,000 ATH per month. The second term proposed by IBS is an express authorization that SoundExchange "may elect to accept collective payments on behalf of small and very small noncommercial webcasters." IBS PFF at ¶ 26.

The Judges decline to adopt IBS's proposed subcategories of noncommercial webcasters, rendering

moot their proposed exception from reporting for small and very small noncommercial webcasters. Their proposal to create an *ad hoc* subcategory of noncommercial webcasters whose usage falls between 15,914 and 55,000 ATH suffers from the same defects as their proposal to create formal categories for small and very small noncommercial webcasters. IBS presented no evidence to support differential treatment for webcasters falling in this *ad hoc* subcategory. While there was evidence regarding the appropriateness and desirability of a proxy fee for *educational* noncommercial webcasters, there was no evidence presented by any party that the same is true for noncommercial webcasters other than educational webcasters (who may already take advantage of the CBI/SoundExchange Agreement).

The Judges decline to adopt IBS's second proposal. As the Judges do not recognize IBS's proposed subcategories, the second proposal is rendered moot.

## VII. Determination and Order

Having fully considered the record, the Copyright Royalty Judges make the above Findings of Fact and Determination based on the record. The Judges issue the foregoing as a Final Determination. The Register of Copyrights may review the Judges' Final Determination for legal error in resolving a material issue of substantive copyright law. The Librarian shall cause the Judges' Final Determination, and any correction thereto by the Register, to be published in the **Federal Register** no later than the conclusion of the 60-day review period.

*So ordered.*

Dated: February 12, 2014.

**Suzanne M. Barnett,**
*Chief Copyright Royalty Judge.*

**David R. Strickler,**
*Copyright Royalty Judge.*

**Jesse M. Feder,**
*Copyright Royalty Judge.*

## List of Subjects in 37 CFR Part 380

Copyright, Sound recordings.

## Final Regulations

■ In consideration of the foregoing, the Copyright Royalty Judges revise part 380 of title 37 of the Code of Federal Regulations to read as follows:

## PART 380—RATES AND TERMS FOR CERTAIN ELIGIBLE NONSUBSCRIPTION TRANSMISSIONS, NEW SUBSCRIPTION SERVICES AND THE MAKING OF EPHEMERAL REPRODUCTIONS

### Subpart A—Commercial Webcasters and Noncommercial Webcasters

Sec.
380.1  General.
380.2  Definitions.
380.3  Royalty fees for the public performance of sound recordings and for ephemeral recordings.
380.4  Terms for making payment of royalty fees and statements of account.
380.5  Confidential Information.
380.6  Verification of royalty payments.
380.7  Verification of royalty distributions.
380.8  Unclaimed funds.

### Subpart B—Broadcasters

Sec.
380.10  General.
380.11  Definitions.
380.12  Royalty fees for the public performance of sound recordings and for ephemeral recordings.
380.13  Terms for making payment of royalty fees and statements of account.
380.14  Confidential Information.
380.15  Verification of royalty payments.
380.16  Verification of royalty distributions.
380.17  Unclaimed funds.

### Subpart C—Noncommercial Educational Webcasters

Sec.
380.20  General.
380.21  Definitions.
380.22  Royalty fees for the public performance of sound recordings and for ephemeral recordings
380.23  Terms for making payment of royalty fees and statements of account.
380.24  Confidential Information.
380.25  Verification of royalty payments.
380.26  Verification of royalty distributions.
380.27  Unclaimed funds.

**Authority:** 17 U.S.C. 112(e), 114(f), 804(b)(3).

## Subpart A—Commercial Webcasters and Noncommercial Webcasters

### § 380.1  General.

(a) *Scope.* This subpart establishes rates and terms of royalty payments for the public performance of sound recordings in certain digital transmissions by Licensees as set forth in this subpart in accordance with the provisions of 17 U.S.C. 114, and the making of Ephemeral Recordings by Licensees in accordance with the provisions of 17 U.S.C. 112(e), during the period January 1, 2011, through December 31, 2015.

(b) *Legal compliance.* Licensees relying upon the statutory licenses set forth in 17 U.S.C. 112(e) and 114 shall comply with the requirements of those sections, the rates and terms of this subpart, and any other applicable regulations.

(c) *Relationship to voluntary agreements.* Notwithstanding the royalty rates and terms established in this subpart, the rates and terms of any license agreements entered into by Copyright Owners and Licensees shall apply in lieu of the rates and terms of this subpart to transmission within the scope of such agreements.

### § 380.2  Definitions.

For purposes of this subpart, the following definitions shall apply:

*Aggregate Tuning Hours* (ATH) means the total hours of programming that the Licensee has transmitted during the relevant period to all listeners within the United States from all channels and stations that provide audio programming consisting, in whole or in part, of eligible nonsubscription transmissions or noninteractive digital audio transmissions as part of a new subscription service, less the actual running time of any sound recordings for which the Licensee has obtained direct licenses apart from 17 U.S.C. 114(d)(2) or which do not require a license under United States copyright law. By way of example, if a service transmitted one hour of programming to 10 simultaneous listeners, the service's Aggregate Tuning Hours would equal 10. If 3 minutes of that hour consisted of transmission of a directly licensed recording, the service's Aggregate Tuning Hours would equal 9 hours and 30 minutes. As an additional example, if one listener listened to a service for 10 hours (and none of the recordings transmitted during that time was directly licensed), the service's Aggregate Tuning Hours would equal 10.

*Broadcaster* is a type of Licensee that owns and operates a terrestrial AM or FM radio station that is licensed by the Federal Communications Commission.

*Collective* is the collection and distribution organization that is designated by the Copyright Royalty Judges. For the 2011–2015 license period, the Collective is SoundExchange, Inc.

*Commercial Webcaster* is a Licensee, other than a Noncommercial Webcaster, that makes eligible digital audio transmissions.

*Copyright Owners* are sound recording copyright owners who are entitled to royalty payments made under this subpart pursuant to the statutory licenses under 17 U.S.C. 112(e) and 114.

*Ephemeral Recording* is a phonorecord created for the purpose of

facilitating a transmission of a public performance of a sound recording under a statutory license in accordance with 17 U.S.C. 114, and subject to the limitations specified in 17 U.S.C. 112(e).

*Licensee* is a person that has obtained a statutory license under 17 U.S.C. 114, and the implementing regulations, to make eligible nonsubscription transmissions, or noninteractive digital audio transmissions as part of a new subscription service (as defined in 17 U.S.C. 114(j)(8)) other than a Service as defined in § 383.2(h) of this chapter, or that has obtained a statutory license under 17 U.S.C. 112(e), and the implementing regulations, to make Ephemeral Recordings for use in facilitating such transmissions, but that is not—

(1) A Broadcaster as defined in § 380.11; or

(2) A Noncommercial Educational Webcaster as defined in § 380.21.

*Noncommercial Webcaster* is a Licensee that makes eligible digital audio transmissions and:

(1) Is exempt from taxation under section 501 of the Internal Revenue Code of 1986 (26 U.S.C. 501),

(2) Has applied in good faith to the Internal Revenue Service for exemption from taxation under section 501 of the Internal Revenue Code and has a commercially reasonable expectation that such exemption shall be granted, or

(3) Is operated by a State or possession or any governmental entity or subordinate thereof, or by the United States or District of Columbia, for exclusively public purposes.

*Performance* is each instance in which any portion of a sound recording is publicly performed to a listener by means of a digital audio transmission (*e.g.*, the delivery of any portion of a single track from a compact disc to one listener) but excluding the following:

(1) A performance of a sound recording that does not require a license (*e.g.*, a sound recording that is not copyrighted);

(2) A performance of a sound recording for which the service has previously obtained a license from the Copyright Owner of such sound recording; and

(3) An incidental performance that both:

(i) Makes no more than incidental use of sound recordings including, but not limited to, brief musical transitions in and out of commercials or program segments, brief performances during news, talk and sports programming, brief background performances during disk jockey announcements, brief performances during commercials of sixty seconds or less in duration, or brief performances during sporting or other public events, and

(ii) Other than ambient music that is background at a public event, does not contain an entire sound recording and does not feature a particular sound recording of more than thirty seconds (as in the case of a sound recording used as a theme song).

*Performers* means the independent administrators identified in 17 U.S.C. 114(g)(2)(B) and (C) and the parties identified in 17 U.S.C. 114(g)(2)(D).

*Qualified Auditor* is a Certified Public Accountant.

*Side Channel* is a channel on the Web site of a Broadcaster which channel transmits eligible transmissions that are not simultaneously transmitted over the air by the Broadcaster.

### § 380.3  Royalty fees for the public performance of sound recordings and for ephemeral recordings.

(a) *Royalty rates.* Royalty rates and fees for eligible digital transmissions of sound recordings made pursuant to 17 U.S.C. 114, and the making of ephemeral recordings pursuant to 17 U.S.C. 112(e) are as follows:

(1) *Commercial Webcasters.* For all digital audio transmissions, including simultaneous digital audio retransmissions of over-the-air AM or FM radio broadcasts, and related Ephemeral Recordings, a Commercial Webcaster will pay a royalty of: $0.0019 per performance for 2011; $0.0021 per performance for 2012; $0.0021 per performance for 2013; $0.0023 per performance for 2014; and $0.0023 per performance for 2015.

(2) *Noncommercial Webcasters.* (i) For all digital audio transmissions totaling not more than 159,140 Aggregate Tuning Hours (ATH) in a month, including simultaneous digital audio retransmissions of over-the-air AM or FM radio broadcasts, and related Ephemeral Recordings, a Noncommercial Webcaster will pay an annual per channel or per station performance royalty of $500 in 2011, 2012, 2013, 2014, and 2015.

(ii) For all digital audio transmissions totaling in excess of 159,140 Aggregate Tuning Hours (ATH) in a month, including simultaneous digital audio retransmissions of over-the-air AM or FM radio broadcasts, and related Ephemeral Recordings, a Noncommercial Webcaster will pay a royalty of: $0.0019 per performance for 2011; $0.0021 per performance for 2012; $0.0021 per performance for 2013; $0.0023 per performance for 2014; and $0.0023 per performance for 2015.

(b) *Minimum fee*—(1) *Commercial Webcasters.* Each Commercial

Webcaster will pay an annual, nonrefundable minimum fee of $500 for each calendar year or part of a calendar year of the period 2011–2015 during which it is a Licensee pursuant to 17 U.S.C. 112(e) or 114. This annual minimum fee is payable for each individual channel and each individual station maintained by Commercial Webcasters, and is also payable for each individual Side Channel maintained by Broadcasters who are Commercial Webcasters, provided that a Commercial Webcaster shall not be required to pay more than $50,000 per calendar year in minimum fees in the aggregate (for 100 or more channels or stations). For each such Commercial Webcaster, the annual minimum fee described in this paragraph (b)(1) shall constitute the minimum fees due under both 17 U.S.C. 112(e)(4) and 114(f)(2)(B). Upon payment of the minimum fee, the Commercial Webcaster will receive a credit in the amount of the minimum fee against any additional royalty fees payable in the same calendar year.

(2) *Noncommercial Webcasters.* Each Noncommercial Webcaster will pay an annual, nonrefundable minimum fee of $500 for each calendar year or part of a calendar year of the period 2011–2015 during which it is a Licensee pursuant to 17 U.S.C. 112(e) or 114. This annual minimum fee is payable for each individual channel and each individual station maintained by Noncommercial Webcasters, and is also payable for each individual Side Channel maintained by Broadcasters who are Noncommercial Webcasters. For each such Noncommercial Webcaster, the annual minimum fee described in this paragraph (b)(2) shall constitute the minimum fees due under both 17 U.S.C. 112(e)(4) and 114(f)(2)(B). Upon payment of the minimum fee, the Noncommercial Webcaster will receive a credit in the amount of the minimum fee against any additional royalty fees payable in the same calendar year.

(c) *Ephemeral recordings.* The royalty payable under 17 U.S.C. 112(e) for the making of all Ephemeral Recordings used by the Licensee solely to facilitate transmissions for which it pays royalties shall be included within, and constitute 5% of, the total royalties payable under 17 U.S.C. 112(e) and 114.

### § 380.4  Terms for making payment of royalty fees and statements of account.

(a) *Payment to the Collective.* A Licensee shall make the royalty payments due under § 380.3 to the Collective.

(b) *Designation of the Collective.* (1) Until such time as a new designation is made, SoundExchange, Inc., is

designated as the Collective to receive statements of account and royalty payments from Licensees due under § 380.3 and to distribute such royalty payments to each Copyright Owner and Performer, as their designated agents, entitled to receive royalties under 17 U.S.C. 112(e) or 114(g).

(2) If SoundExchange, Inc. should dissolve or cease to be governed by a board consisting of equal numbers of representatives of Copyright Owners and Performers, then it shall be replaced by a successor Collective upon the fulfillment of the requirements set forth in paragraph (b)(2)(i) of this section.

(i) By a majority vote of the nine Copyright Owner representatives and the nine Performer representatives on the SoundExchange board as of the last day preceding the condition precedent in paragraph (b)(2) of this section, such representatives shall file a petition with the Copyright Royalty Judges designating a successor to collect and distribute royalty payments to Copyright Owners and Performers entitled to receive royalties under 17 U.S.C. 112(e) or 114(g) that have themselves authorized the Collective.

(ii) The Copyright Royalty Judges shall publish in the **Federal Register** within 30 days of receipt of a petition filed under paragraph (b)(2)(i) of this section an order designating the Collective named in such petition.

(c) *Monthly payments.* A Licensee shall make any payments due under § 380.3 on a monthly basis on or before the 45th day after the end of each month for that month. All monthly payments shall be rounded to the nearest cent.

(d) *Minimum payments.* A Licensee shall make any minimum payment due under § 380.3(b) by January 31 of the applicable calendar year, except that payment for a Licensee that has not previously made eligible nonsubscription transmissions, noninteractive digital audio transmissions as part of a new subscription service or Ephemeral Recordings pursuant to the licenses in 17 U.S.C. 114 and/or 17 U.S.C. 112(e) shall be due by the 45th day after the end of the month in which the Licensee commences to do so.

(e) *Late payments and statements of account.* A Licensee shall pay a late fee of 1.5% per month, or the highest lawful rate, whichever is lower, for any payment and/or statement of account received by the Collective after the due date. Late fees shall accrue from the due date until payment and the related statement of account are received by the Collective.

(f) *Statements of account.* Any payment due under § 380.3 shall be

accompanied by a corresponding statement of account. A statement of account shall contain the following information:

(1) Such information as is necessary to calculate the accompanying royalty payment;

(2) The name, address, business title, telephone number, facsimile number (if any), electronic mail address and other contact information of the person to be contacted for information or questions concerning the content of the statement of account;

(3) The signature of:

(i) The owner of the Licensee or a duly authorized agent of the owner, if the Licensee is not a partnership or corporation;

(ii) A partner or delegee, if the Licensee is a partnership; or

(iii) An officer of the corporation, if the Licensee is a corporation.

(4) The printed or typewritten name of the person signing the statement of account;

(5) The date of signature;

(6) If the Licensee is a partnership or corporation, the title or official position held in the partnership or corporation by the person signing the statement of account;

(7) A certification of the capacity of the person signing; and

(8) A statement to the following effect:

I, the undersigned owner or agent of the Licensee, or officer or partner, have examined this statement of account and hereby state that it is true, accurate, and complete to my knowledge after reasonable due diligence.

(g) *Distribution of royalties.* (1) The Collective shall promptly distribute royalties received from Licensees to Copyright Owners and Performers, or their designated agents, that are entitled to such royalties. The Collective shall only be responsible for making distributions to those Copyright Owners, Performers, or their designated agents who provide the Collective with such information as is necessary to identify the correct recipient. The Collective shall distribute royalties on a basis that values all performances by a Licensee equally based upon the information provided under the reports of use requirements for Licensees contained in § 370.4 of this chapter.

(2) If the Collective is unable to locate a Copyright Owner or Performer entitled to a distribution of royalties under paragraph (g)(1) of this section within 3 years from the date of payment by a Licensee, such royalties shall be handled in accordance with § 380.8.

(h) *Retention of records.* Books and records of a Licensee and of the

Collective relating to payments of and distributions of royalties shall be kept for a period of not less than the prior 3 calendar years.

### § 380.5  Confidential Information.

(a) *Definition.* For purposes of this subpart, ''Confidential Information'' shall include the statements of account and any information contained therein, including the amount of royalty payments, and any information pertaining to the statements of account reasonably designated as confidential by the Licensee submitting the statement.

(b) *Exclusion.* Confidential Information shall not include documents or information that at the time of delivery to the Collective are public knowledge. The party claiming the benefit of this provision shall have the burden of proving that the disclosed information was public knowledge.

(c) *Use of Confidential Information.* In no event shall the Collective use any Confidential Information for any purpose other than royalty collection and distribution and activities related directly thereto.

(d) *Disclosure of Confidential Information.* Access to Confidential Information shall be limited to:

(1) Those employees, agents, attorneys, consultants and independent contractors of the Collective, subject to an appropriate confidentiality agreement, who are engaged in the collection and distribution of royalty payments hereunder and activities related thereto, for the purpose of performing such duties during the ordinary course of their work and who require access to the Confidential Information;

(2) An independent and Qualified Auditor, subject to an appropriate confidentiality agreement, who is authorized to act on behalf of the Collective with respect to verification of a Licensee's statement of account pursuant to § 380.6 or on behalf of a Copyright Owner or Performer with respect to the verification of royalty distributions pursuant to § 380.7;

(3) Copyright Owners and Performers, including their designated agents, whose works have been used under the statutory licenses set forth in 17 U.S.C. 112(e) and 114 by the Licensee whose Confidential Information is being supplied, subject to an appropriate confidentiality agreement, and including those employees, agents, attorneys, consultants and independent contractors of such Copyright Owners and Performers and their designated agents, subject to an appropriate confidentiality agreement, for the purpose of performing their duties

during the ordinary course of their work and who require access to the Confidential Information; and

(4) In connection with future proceedings under 17 U.S.C. 112(e) and 114 before the Copyright Royalty Judges, and under an appropriate protective order, attorneys, consultants and other authorized agents of the parties to the proceedings or the courts.

(e) *Safeguarding of Confidential Information.* The Collective and any person identified in paragraph (d) of this section shall implement procedures to safeguard against unauthorized access to or dissemination of any Confidential Information using a reasonable standard of care, but no less than the same degree of security used to protect Confidential Information or similarly sensitive information belonging to the Collective or person.

### §380.6 Verification of royalty payments.

(a) *General.* This section prescribes procedures by which the Collective may verify the royalty payments made by a Licensee.

(b) *Frequency of verification.* The Collective may conduct a single audit of a Licensee, upon reasonable notice and during reasonable business hours, during any given calendar year, for any or all of the prior 3 calendar years, but no calendar year shall be subject to audit more than once.

(c) *Notice of intent to audit.* The Collective must file with the Copyright Royalty Judges a notice of intent to audit a particular Licensee, which shall, within 30 days of the filing of the notice, publish in the **Federal Register** a notice announcing such filing. The notification of intent to audit shall be served at the same time on the Licensee to be audited. Any such audit shall be conducted by an independent and Qualified Auditor identified in the notice, and shall be binding on all parties.

(d) *Acquisition and retention of report.* The Licensee shall use commercially reasonable efforts to obtain or to provide access to any relevant books and records maintained by third parties for the purpose of the audit. The Collective shall retain the report of the verification for a period of not less than 3 years.

(e) *Acceptable verification procedure.* An audit, including underlying paperwork, which was performed in the ordinary course of business according to generally accepted auditing standards by an independent and Qualified Auditor, shall serve as an acceptable verification procedure for all parties with respect to the information that is within the scope of the audit.

(f) *Consultation.* Before rendering a written report to the Collective, except where the auditor has a reasonable basis to suspect fraud and disclosure would, in the reasonable opinion of the auditor, prejudice the investigation of such suspected fraud, the auditor shall review the tentative written findings of the audit with the appropriate agent or employee of the Licensee being audited in order to remedy any factual errors and clarify any issues relating to the audit; Provided that an appropriate agent or employee of the Licensee reasonably cooperates with the auditor to remedy promptly any factual errors or clarify any issues raised by the audit.

(g) *Costs of the verification procedure.* The Collective shall pay the cost of the verification procedure, unless it is finally determined that there was an underpayment of 10% or more, in which case the Licensee shall, in addition to paying the amount of any underpayment, bear the reasonable costs of the verification procedure.

### §380.7 Verification of royalty distributions.

(a) *General.* This section prescribes procedures by which any Copyright Owner or Performer may verify the royalty distributions made by the Collective; provided, however, that nothing contained in this section shall apply to situations where a Copyright Owner or Performer and the Collective have agreed as to proper verification methods.

(b) *Frequency of verification.* A Copyright Owner or Performer may conduct a single audit of the Collective upon reasonable notice and during reasonable business hours, during any given calendar year, for any or all of the prior 3 calendar years, but no calendar year shall be subject to audit more than once.

(c) *Notice of intent to audit.* A Copyright Owner or Performer must file with the Copyright Royalty Judges a notice of intent to audit the Collective, which shall, within 30 days of the filing of the notice, publish in the **Federal Register** a notice announcing such filing. The notification of intent to audit shall be served at the same time on the Collective. Any audit shall be conducted by an independent and Qualified Auditor identified in the notice, and shall be binding on all Copyright Owners and Performers.

(d) *Acquisition and retention of report.* The Collective shall use commercially reasonable efforts to obtain or to provide access to any relevant books and records maintained by third parties for the purpose of the audit. The Copyright Owner or Performer requesting the verification procedure shall retain the report of the verification for a period of not less than 3 years.

(e) *Acceptable verification procedure.* An audit, including underlying paperwork, which was performed in the ordinary course of business according to generally accepted auditing standards by an independent and Qualified Auditor, shall serve as an acceptable verification procedure for all parties with respect to the information that is within the scope of the audit.

(f) *Consultation.* Before rendering a written report to a Copyright Owner or Performer, except where the auditor has a reasonable basis to suspect fraud and disclosure would, in the reasonable opinion of the auditor, prejudice the investigation of such suspected fraud, the auditor shall review the tentative written findings of the audit with the appropriate agent or employee of the Collective in order to remedy any factual errors and clarify any issues relating to the audit; Provided that the appropriate agent or employee of the Collective reasonably cooperates with the auditor to remedy promptly any factual errors or clarify any issues raised by the audit.

(g) *Costs of the verification procedure.* The Copyright Owner or Performer requesting the verification procedure shall pay the cost of the procedure, unless it is finally determined that there was an underpayment of 10% or more, in which case the Collective shall, in addition to paying the amount of any underpayment, bear the reasonable costs of the verification procedure.

### §380.8 Unclaimed funds.

If the Collective is unable to identify or locate a Copyright Owner or Performer who is entitled to receive a royalty distribution under this subpart, the Collective shall retain the required payment in a segregated trust account for a period of 3 years from the date of distribution. No claim to such distribution shall be valid after the expiration of the 3-year period. After expiration of this period, the Collective may apply the unclaimed funds to offset any costs deductible under 17 U.S.C. 114(g)(3). The foregoing shall apply notwithstanding the common law or statutes of any State.

### Subpart B—Broadcasters

### §380.10 General.

(a) *Scope.* This subpart establishes rates and terms of royalty payments for the public performance of sound recordings in certain digital transmissions made by Broadcasters as

set forth herein in accordance with the provisions of 17 U.S.C. 114, and the making of Ephemeral Recordings by Broadcasters as set forth herein in accordance with the provisions of 17 U.S.C. 112(e), during the period January 1, 2011, through December 31, 2015.

(b) *Legal compliance.* Broadcasters relying upon the statutory licenses set forth in 17 U.S.C. 112(e) and 114 shall comply with the requirements of those sections, the rates and terms of this subpart, and any other applicable regulations not inconsistent with the rates and terms set forth herein.

(c) *Relationship to voluntary agreements.* Notwithstanding the royalty rates and terms established in this subpart, the rates and terms of any license agreements entered into by Copyright Owners and digital audio services shall apply in lieu of the rates and terms of this subpart to transmission within the scope of such agreements.

## § 380.11  Definitions.

For purposes of this subpart, the following definitions shall apply:

*Aggregate Tuning Hours* means the total hours of programming that the Broadcaster has transmitted during the relevant period to all listeners within the United States from any channels and stations that provide audio programming consisting, in whole or in part, of Eligible Transmissions.

*Broadcaster* means an entity that:

(1) Has a substantial business owning and operating one or more terrestrial AM or FM radio stations that are licensed as such by the Federal Communications Commission;

(2) Has obtained a compulsory license under 17 U.S.C. 112(e) and 114 and the implementing regulations therefor to make Eligible Transmissions and related ephemeral recordings;

(3) Complies with all applicable provisions of Sections 112(e) and 114 and applicable regulations; and

(4) Is not a noncommercial webcaster as defined in 17 U.S.C. 114(f)(5)(E)(i).

*Broadcaster Webcasts* mean eligible nonsubscription transmissions made by a Broadcaster over the Internet that are not Broadcast Retransmissions.

*Broadcast Retransmissions* mean eligible nonsubscription transmissions made by a Broadcaster over the Internet that are retransmissions of terrestrial over-the-air broadcast programming transmitted by the Broadcaster through its AM or FM radio station, including ones with substitute advertisements or other programming occasionally substituted for programming for which requisite licenses or clearances to transmit over the Internet have not been

obtained. For the avoidance of doubt, a Broadcast Retransmission does not include programming that does not require a license under United States copyright law or that is transmitted on an Internet-only side channel.

*Collective* is the collection and distribution organization that is designated by the Copyright Royalty Judges. For the 2011–2015 license period, the Collective is SoundExchange, Inc.

*Copyright Owners* are sound recording copyright owners who are entitled to royalty payments made under this subpart pursuant to the statutory licenses under 17 U.S.C. 112(e) and 114(f).

*Eligible Transmission* shall mean either a Broadcaster Webcast or a Broadcast Retransmission.

*Ephemeral Recording* is a phonorecord created for the purpose of facilitating an Eligible Transmission of a public performance of a sound recording under a statutory license in accordance with 17 U.S.C. 114(f), and subject to the limitations specified in 17 U.S.C. 112(e).

*Performance* is each instance in which any portion of a sound recording is publicly performed to a listener by means of a digital audio transmission (*e.g.,* the delivery of any portion of a single track from a compact disc to one listener) but excluding the following:

(1) A performance of a sound recording that does not require a license (*e.g.,* a sound recording that is not copyrighted);

(2) A performance of a sound recording for which the Broadcaster has previously obtained a license from the Copyright Owner of such sound recording; and

(3) An incidental performance that both:

(i) Makes no more than incidental use of sound recordings including, but not limited to, brief musical transitions in and out of commercials or program segments, brief performances during news, talk and sports programming, brief background performances during disk jockey announcements, brief performances during commercials of sixty seconds or less in duration, or brief performances during sporting or other public events, and

(ii) Other than ambient music that is background at a public event, does not contain an entire sound recording and does not feature a particular sound recording of more than thirty seconds (as in the case of a sound recording used as a theme song).

*Performers* means the independent administrators identified in 17 U.S.C.

114(g)(2)(B) and (C) and the parties identified in 17 U.S.C. 114(g)(2)(D).

*Qualified Auditor* is a Certified Public Accountant.

*Small Broadcaster* is a Broadcaster that, for any of its channels and stations (determined as provided in § 380.12(c)) over which it transmits Broadcast Retransmissions, and for all of its channels and stations over which it transmits Broadcaster Webcasts in the aggregate, in any calendar year in which it is to be considered a Small Broadcaster, meets the following additional eligibility criteria:

(1) During the prior year it made Eligible Transmissions totaling less than 27,777 Aggregate Tuning Hours; and

(2) During the applicable year it reasonably expects to make Eligible Transmissions totaling less than 27,777 Aggregate Tuning Hours; provided that, one time during the period 2011–2015, a Broadcaster that qualified as a Small Broadcaster under the foregoing definition as of January 31 of one year, elected Small Broadcaster status for that year, and unexpectedly made Eligible Transmissions on one or more channels or stations in excess of 27,777 aggregate tuning hours during that year, may choose to be treated as a Small Broadcaster during the following year notwithstanding paragraph (1) of the definition of "Small Broadcaster" if it implements measures reasonably calculated to ensure that it will not make Eligible Transmissions exceeding 27,777 aggregate tuning hours during that following year. As to channels or stations over which a Broadcaster transmits Broadcast Retransmissions, the Broadcaster may elect Small Broadcaster status only with respect to any of its channels or stations that meet all of the foregoing criteria.

## § 380.12  Royalty fees for the public performance of sound recordings and for ephemeral recordings.

(a) *Royalty rates.* Royalties for Eligible Transmissions made pursuant to 17 U.S.C. 114, and the making of related ephemeral recordings pursuant to 17 U.S.C. 112(e), shall, except as provided in § 380.13(g)(3), be payable on a per-performance basis, as follows:

(1) 2011: $0.0017;

(2) 2012: $0.0020;

(3) 2013: $0.0022;

(4) 2014: $0.0023;

(5) 2015: $0.0025.

(b) *Ephemeral royalty.* The royalty payable under 17 U.S.C. 112(e) for any reproduction of a phonorecord made by a Broadcaster during this license period and used solely by the Broadcaster to facilitate transmissions for which it pays royalties as and when provided in this

section is deemed to be included within such royalty payments and to equal the percentage of such royalty payments determined by the Copyright Royalty Judges for other webcasting as set forth in § 380.3.

(c) *Minimum fee.* Each Broadcaster will pay an annual, nonrefundable minimum fee of $500 for each of its individual channels, including each of its individual side channels, and each of its individual stations, through which (in each case) it makes Eligible Transmissions, for each calendar year or part of a calendar year during 2011–2015 during which the Broadcaster is a licensee pursuant to licenses under 17 U.S.C. 112(e) and 114, provided that a Broadcaster shall not be required to pay more than $50,000 in minimum fees in the aggregate (for 100 or more channels or stations). For the purpose of this subpart, each individual stream (*e.g.,* HD radio side channels, different stations owned by a single licensee) will be treated separately and be subject to a separate minimum, except that identical streams for simulcast stations will be treated as a single stream if the streams are available at a single Uniform Resource Locator (URL) and performances from all such stations are aggregated for purposes of determining the number of payable performances hereunder. Upon payment of the minimum fee, the Broadcaster will receive a credit in the amount of the minimum fee against any additional royalties payable for the same calendar year for the same channel or station. In addition, an electing Small Broadcaster also shall pay a $100 annual fee (the "Proxy Fee") to the Collective for the reporting waiver discussed in § 380.13(g)(2).

**§ 380.13   Terms for making payment of royalty fees and statements of account.**

(a) *Payment to the Collective.* A Broadcaster shall make the royalty payments due under § 380.12 to the Collective.

(b) *Designation of the Collective.* (1) Until such time as a new designation is made, SoundExchange, Inc., is designated as the Collective to receive statements of account and royalty payments from Broadcasters due under § 380.12 and to distribute such royalty payments to each Copyright Owner and Performer, or their designated agents, entitled to receive royalties under 17 U.S.C. 112(e) and 114(g).

(2) If SoundExchange, Inc. should dissolve or cease to be governed by a board consisting of equal numbers of representatives of Copyright Owners and Performers, then it shall be replaced by a successor Collective upon the

fulfillment of the requirements set forth in paragraph (b)(2)(i) of this section.

(i) By a majority vote of the nine Copyright Owner representatives and the nine Performer representatives on the SoundExchange board as of the last day preceding the condition precedent in paragraph (b)(2) of this section, such representatives shall file a petition with the Copyright Royalty Board designating a successor to collect and distribute royalty payments to Copyright Owners and Performers entitled to receive royalties under 17 U.S.C. 112(e) or 114(g) that have themselves authorized such Collective.

(ii) The Copyright Royalty Judges shall publish in the **Federal Register** within 30 days of receipt of a petition filed under paragraph (b)(2)(i) of this section an order designating the Collective named in such petition.

(c) *Monthly payments and reporting.* Broadcasters must make monthly payments where required by § 380.12, and provide statements of account and reports of use, for each month on the 45th day following the month in which the Eligible Transmissions subject to the payments, statements of account, and reports of use were made. All monthly payments shall be rounded to the nearest cent.

(d) *Minimum payments.* A Broadcaster shall make any minimum payment due under § 380.12(b) by January 31 of the applicable calendar year, except that payment by a Broadcaster that was not making Eligible Transmissions or Ephemeral Recordings pursuant to the licenses in 17 U.S.C. 114 and/or 17 U.S.C. 112(e) as of said date but begins doing so thereafter shall be due by the 45th day after the end of the month in which the Broadcaster commences to do so.

(e) *Late fees.* A Broadcaster shall pay a late fee for each instance in which any payment, any statement of account or any report of use is not received by the Collective in compliance with applicable regulations by the due date. The amount of the late fee shall be 1.5% of a late payment, or 1.5% of the payment associated with a late statement of account or report of use, per month, or the highest lawful rate, whichever is lower. The late fee shall accrue from the due date of the payment, statement of account or report of use until a fully compliant payment, statement of account or report of use is received by the Collective, provided that, in the case of a timely provided but noncompliant statement of account or report of use, the Collective has notified the Broadcaster within 90 days regarding any noncompliance that is reasonably evident to the Collective.

(f) *Statements of account.* Any payment due under § 380.12 shall be accompanied by a corresponding statement of account. A statement of account shall contain the following information:

(1) Such information as is necessary to calculate the accompanying royalty payment;

(2) The name, address, business title, telephone number, facsimile number (if any), electronic mail address (if any) and other contact information of the person to be contacted for information or questions concerning the content of the statement of account;

(3) The handwritten signature of:

(i) The owner of the Broadcaster or a duly authorized agent of the owner, if the Broadcaster is not a partnership or corporation;

(ii) A partner or delegee, if the Broadcaster is a partnership; or

(iii) An officer of the corporation, if the Broadcaster is a corporation.

(4) The printed or typewritten name of the person signing the statement of account;

(5) The date of signature;

(6) If the Broadcaster is a partnership or corporation, the title or official position held in the partnership or corporation by the person signing the statement of account;

(7) A certification of the capacity of the person signing; and

(8) A statement to the following effect:

I, the undersigned owner or agent of the Broadcaster, or officer or partner, have examined this statement of account and hereby state that it is true, accurate, and complete to my knowledge after reasonable due diligence.

(g) *Reporting by Broadcasters in General.* (1) Broadcasters other than electing Small Broadcasters covered by paragraph (g)(2) of this section shall submit reports of use on a per-performance basis in compliance with the regulations set forth in part 370 of this chapter, except that the following provisions shall apply notwithstanding the provisions of such part 370 of this chapter from time to time in effect:

(i) Broadcasters may pay for, and report usage in, a percentage of their programming hours on an Aggregate Tuning Hour basis as provided in paragraph (g)(3) of this section.

(ii) Broadcasters shall submit reports of use to the Collective on a monthly basis.

(iii) As provided in paragraph (d) of this section, Broadcasters shall submit reports of use by no later than the 45th day following the last day of the month to which they pertain.

(iv) Except as provided in paragraph (g)(3) of this section, Broadcasters shall submit reports of use to the Collective on a census reporting basis (*i.e.*, reports of use shall include every sound recording performed in the relevant month and the number of performances thereof).

(v) Broadcasters shall either submit a separate report of use for each of their stations, or a collective report of use covering all of their stations but identifying usage on a station-by-station basis;

(vi) Broadcasters shall transmit each report of use in a file the name of which includes:

(A) The name of the Broadcaster, exactly as it appears on its notice of use, and

(B) If the report covers a single station only, the call letters of the station.

(vii) Broadcasters shall submit reports of use with headers, as presently described in § 370.4(e)(7) of this chapter.

(viii) Broadcasters shall submit a separate statement of account corresponding to each of their reports of use, transmitted in a file the name of which includes:

(A) The name of the Broadcaster, exactly as it appears on its notice of use, and

(B) If the statement covers a single station only, the call letters of the station.

(2) On a transitional basis for a limited time in light of the unique business and operational circumstances currently existing with respect to Small Broadcasters and with the expectation that Small Broadcasters will be required, effective January 1, 2016, to report their actual usage in compliance with then-applicable regulations. Small Broadcasters that have made an election pursuant to paragraph (h) of this section for the relevant year shall not be required to provide reports of use of sound recordings for Eligible Transmissions and related Ephemeral Recordings. The immediately preceding sentence applies even if the Small Broadcaster actually makes Eligible Transmissions for the year exceeding 27,777 Aggregate Tuning Hours, so long as it qualified as a Small Broadcaster at the time of its election for that year. In addition to minimum royalties hereunder, electing Small Broadcasters will pay to the Collective a $100 Proxy Fee to defray costs associated with this reporting waiver, including development of proxy usage data.

(3) Broadcasters generally reporting pursuant to paragraph (g)(1) of this section may pay for, and report usage in,

a percentage of their programming hours on an Aggregate Tuning Hours basis, if:

(i) Census reporting is not reasonably practical for the programming during those hours, and

(ii) If the total number of hours on a single report of use, provided pursuant to paragraph (g)(1) of this section, for which this type of reporting is used is below the maximum percentage set forth below for the relevant year:

(A) 2011: 16%;

(B) 2012: 14%;

(C) 2013: 12%;

(D) 2014: 10%;

(E) 2015: 8%.

(iii) To the extent that a Broadcaster chooses to report and pay for usage on an Aggregate Tuning Hours basis pursuant to paragraph (g)(3) of this section, the Broadcaster shall

(A) Report and pay based on the assumption that the number of sound recordings performed during the relevant programming hours is 12 per hour;

(B) Pay royalties (or recoup minimum fees) at the per-performance rates provided in § 380.12 on the basis of paragraph (g)(3)(iii)(A) of this section;

(C) Include Aggregate Tuning Hours in reports of use; and

(D) Include in reports of use complete playlist information for usage reported on the basis of Aggregate Tuning Hours.

(h) *Election of Small Broadcaster Status.* To be eligible for the reporting waiver for Small Broadcasters with respect to any particular channel in a given year, a Broadcaster must satisfy the definition set forth in § 380.11 and must submit to the Collective a completed and signed election form (available on the SoundExchange Web site at *http://www.soundexchange.com*) by no later than January 31 of the applicable year. Even if a Broadcaster has once elected to be treated as a Small Broadcaster, it must make a separate, timely election in each subsequent year in which it wishes to be treated as a Small Broadcaster.

(i) *Distribution of royalties.* (1) The Collective shall promptly distribute royalties received from Broadcasters to Copyright Owners and Performers, or their designated agents, that are entitled to such royalties. The Collective shall only be responsible for making distributions to those Copyright Owners, Performers, or their designated agents who provide the Collective with such information as is necessary to identify and pay the correct recipient. The Collective shall distribute royalties on a basis that values all performances by a Broadcaster equally based upon information provided under the report of use requirements for Broadcasters

contained in § 370.4 of this chapter and this subpart, except that in the case of electing Small Broadcasters, the Collective shall distribute royalties based on proxy usage data in accordance with a methodology adopted by the Collective's Board of Directors.

(2) If the Collective is unable to locate a Copyright Owner or Performer entitled to a distribution of royalties under paragraph (g)(1) of this section within 3 years from the date of payment by a Broadcaster, such distribution may be first applied to the costs directly attributable to the administration of that distribution. The foregoing shall apply notwithstanding the common law or statutes of any State.

(j) *Retention of records.* Books and records of a Broadcaster and of the Collective relating to payments of and distributions of royalties shall be kept for a period of not less than the prior 3 calendar years.

### § 380.14   Confidential Information.

(a) *Definition.* For purposes of this subpart, "Confidential Information" shall include the statements of account and any information contained therein, including the amount of royalty payments, and any information pertaining to the statements of account reasonably designated as confidential by the Broadcaster submitting the statement.

(b) *Exclusion.* Confidential Information shall not include documents or information that at the time of delivery to the Collective are public knowledge. The party claiming the benefit of this provision shall have the burden of proving that the disclosed information was public knowledge.

(c) *Use of Confidential Information.* In no event shall the Collective use any Confidential Information for any purpose other than royalty collection and distribution and activities related directly thereto.

(d) *Disclosure of Confidential Information.* Access to Confidential Information shall be limited to:

(1) Those employees, agents, attorneys, consultants and independent contractors of the Collective, subject to an appropriate confidentiality agreement, who are engaged in the collection and distribution of royalty payments hereunder and activities related thereto, for the purpose of performing such duties during the ordinary course of their work and who require access to the Confidential Information;

(2) An independent and Qualified Auditor, subject to an appropriate confidentiality agreement, who is authorized to act on behalf of the

JA288

Collective with respect to verification of a Broadcaster's statement of account pursuant to § 380.15 or on behalf of a Copyright Owner or Performer with respect to the verification of royalty distributions pursuant to § 380.16;

(3) Copyright Owners and Performers, including their designated agents, whose works have been used under the statutory licenses set forth in 17 U.S.C. 112(e) and 114(f) by the Broadcaster whose Confidential Information is being supplied, subject to an appropriate confidentiality agreement, and including those employees, agents, attorneys, consultants and independent contractors of such Copyright Owners and Performers and their designated agents, subject to an appropriate confidentiality agreement, for the purpose of performing their duties during the ordinary course of their work and who require access to the Confidential Information; and

(4) In connection with future proceedings under 17 U.S.C. 112(e) and 114(f) before the Copyright Royalty Judges, and under an appropriate protective order, attorneys, consultants and other authorized agents of the parties to the proceedings or the courts.

(e) *Safeguarding of Confidential Information.* The Collective and any person identified in paragraph (d) of this section shall implement procedures to safeguard against unauthorized access to or dissemination of any Confidential Information using a reasonable standard of care, but not less than the same degree of security used to protect Confidential Information or similarly sensitive information belonging to the Collective or person.

### § 380.15 Verification of royalty payments.

(a) *General.* This section prescribes procedures by which the Collective may verify the royalty payments made by a Broadcaster.

(b) *Frequency of verification.* The Collective may conduct a single audit of a Broadcaster, upon reasonable notice and during reasonable business years, during any given calendar year, for any or all of the prior 3 calendar years, but no calendar year shall be subject to audit more than once.

(c) *Notice of intent to audit.* The Collective must file with the Copyright Royalty Board a notice of intent to audit a particular Broadcaster, which shall, within 30 days of the filing of the notice, publish in the **Federal Register** a notice announcing such filing. The notification of intent to audit shall be served at the same time on the Broadcaster to be audited. Any such audit shall be conducted by an independent and Qualified Auditor

identified in the notice, and shall be binding on all parties.

(d) *Acquisition and retention of report.* The Broadcaster shall use commercially reasonable efforts to obtain or to provide access to any relevant books and records maintained by third parties for the purpose of the audit. The Collective shall retain the report of the verification for a period of not less than 3 years.

(e) *Acceptable verification procedure.* An audit, including underlying paperwork, which was performed in the ordinary course of business according to generally accepted auditing standards by an independent and Qualified Auditor, shall serve as an acceptable verification procedure for all parties with respect to the information that is within the scope of the audit.

(f) *Consultation.* Before rendering a written report to the Collective, except where the auditor has a reasonable basis to suspect fraud and disclosure would, in the reasonable opinion of the auditor, prejudice the investigation of such suspected fraud, the auditor shall review the tentative written findings of the audit with the appropriate agent or employee of the Broadcaster being audited in order to remedy any factual errors and clarify any issues relating to the audit; Provided that an appropriate agent or employee of the Broadcaster reasonably cooperates with the auditor to remedy promptly any factual error or clarify any issues raised by the audit.

(g) *Costs of the verification procedure.* The Collective shall pay the cost of the verification procedure, unless it is finally determined that there was an underpayment of 10% or more, in which case the Broadcaster shall, in addition to paying the amount of any underpayment, bear the reasonable costs of the verification procedure.

### § 380.16 Verification of royalty distributions.

(a) *General.* This section prescribes procedures by which any Copyright Owner or Performer may verify the royalty distributions made by the Collective; provided, however, that nothing contained in this section shall apply to situations where a Copyright Owner or Performer and the Collective have agreed as to proper verification methods.

(b) *Frequency of verification.* A Copyright Owner or Performer may conduct a single audit of the Collective upon reasonable notice and during reasonable business hours, during any given calendar year, for any or all of the prior 3 calendar years, but no calendar year shall be subject to audit more than once.

(c) *Notice of intent to audit.* A Copyright Owner or Performer must file with the Copyright Royalty Board a notice of intent to audit the Collective, which shall, within 30 days of the filing of the notice, publish in the **Federal Register** a notice announcing such filing. The notification of intent to audit shall be served at the same time on the Collective. Any audit shall be conducted by an independent and Qualified Auditor identified in the notice, and shall be binding on all Copyright Owners and Performers.

(d) *Acquisition and retention of report.* The Collective shall use commercially reasonable efforts to obtain or to provide access to any relevant books and records maintained by third parties for the purpose of the audit. The Copyright Owner or Performer requesting the verification procedure shall retain the report of the verification for a period of not less than 3 years.

(e) *Acceptable verification procedure.* An audit, including underlying paperwork, which was performed in the ordinary course of business according to generally accepted auditing standards by an independent and Qualified Auditor, shall serve as an acceptable verification procedure for all parties with respect to the information that is within the scope of the audit.

(f) *Consultation.* Before rendering a written report to a Copyright Owner or Performer, except where the auditor has a reasonable basis to suspect fraud and disclosure would, in the reasonable opinion of the auditor, prejudice the investigation of such suspected fraud, the auditor shall review the tentative written findings of the audit with the appropriate agent or employee of the Collective in order to remedy any factual errors and clarify any issues relating to the audit; Provided that the appropriate agent or employee of the Collective reasonably cooperates with the auditor to remedy promptly any factual errors or clarify any issues raised by the audit.

(g) *Costs of the verification procedure.* The Copyright Owner or Performer requesting the verification procedure shall pay the cost of the procedure, unless it is finally determined that there was an underpayment of 10% or more, in which case the Collective shall, in addition to paying the amount of any underpayment, bear the reasonable costs of the verification procedure.

### § 380.17 Unclaimed funds.

If the Collective is unable to identify or locate a Copyright Owner or Performer who is entitled to receive a royalty distribution under this subpart,

the Collective shall retain the required payment in a segregated trust account for a period of 3 years from the date of distribution. No claim to such distribution shall be valid after the expiration of the 3-year period. After expiration of this period, the Collective may apply the unclaimed funds to offset any costs deductible under 17 U.S.C. 114(g)(3). The foregoing shall apply notwithstanding the common law or statutes of any State.

## Subpart C—Noncommercial Educational Webcasters

### §380.20  General.

(a) *Scope.* This subpart establishes rates and terms, including requirements for royalty payments, recordkeeping and reports of use, for the public performance of sound recordings in certain digital transmissions made by Noncommercial Educational Webcasters as set forth herein in accordance with the provisions of 17 U.S.C. 114, and the making of Ephemeral Recordings by Noncommercial Educational Webcasters as set forth herein in accordance with the provisions of 17 U.S.C. 112(e), during the period January 1, 2011, through December 31, 2015.

(b) *Legal compliance.* Noncommercial Educational Webcasters relying upon the statutory licenses set forth in 17 U.S.C. 112(e) and 114 shall comply with the requirements of those sections, the rates and terms of this subpart, and any other applicable regulations not inconsistent with the rates and terms set forth herein.

(c) *Relationship to voluntary agreements.* Notwithstanding the royalty rates and terms established in this subpart, the rates and terms of any license agreements entered into by Copyright Owners and digital audio services shall apply in lieu of the rates and terms of this subpart to transmissions within the scope of such agreements.

### §380.21  Definitions.

For purposes of this subpart, the following definitions shall apply:

*ATH or Aggregate Tuning Hours* means the total hours of programming that a Noncommercial Educational Webcaster has transmitted during the relevant period to all listeners within the United States over all channels and stations that provide audio programming consisting, in whole or in part, of Eligible Transmissions, including from any archived programs, less the actual running time of any sound recordings for which the Noncommercial Educational Webcaster has obtained direct licenses apart from

17 U.S.C. 114(d)(2) or which do not require a license under United States copyright law. By way of example, if a Noncommercial Educational Webcaster transmitted one hour of programming to 10 simultaneous listeners, the Noncommercial Educational Webcaster's Aggregate Tuning Hours would equal 10. If three minutes of that hour consisted of transmission of a directly licensed recording, the Noncommercial Educational Webcaster's Aggregate Tuning Hours would equal 9 hours and 30 minutes. As an additional example, if one listener listened to a Noncommercial Educational Webcaster for 10 hours (and none of the recordings transmitted during that time was directly licensed), the Noncommercial Educational Webcaster's Aggregate Tuning Hours would equal 10.

*Collective* is the collection and distribution organization that is designated by the Copyright Royalty Judges. For the 2011–2015 license period, the Collective is SoundExchange, Inc.

*Copyright Owners* are sound recording copyright owners who are entitled to royalty payments made under this subpart pursuant to the statutory licenses under 17 U.S.C. 112(e) and 114(f).

*Eligible Transmission* means an eligible nonsubscription transmission made by a Noncommercial Educational Webcaster over the Internet.

*Ephemeral Recording* is a phonorecord created for the purpose of facilitating an Eligible Transmission of a public performance of a sound recording under a statutory license in accordance with 17 U.S.C. 114(f), and subject to the limitations specified in 17 U.S.C. 112(e).

*Noncommercial Educational Webcaster* means Noncommercial Webcaster (as defined in 17 U.S.C. 114(f)(5)(E)(i)) that:

(1) Has obtained a compulsory license under 17 U.S.C. 112(e) and 114 and the implementing regulations therefor to make Eligible Transmissions and related ephemeral recordings;

(2) Complies with all applicable provisions of Sections 112(e) and 114 and applicable regulations;

(3) Is directly operated by, or is affiliated with and officially sanctioned by, and the digital audio transmission operations of which are staffed substantially by students enrolled at, a domestically accredited primary or secondary school, college, university or other post-secondary degree-granting educational institution; and

(4) Is not a "public broadcasting entity" (as defined in 17 U.S.C. 118(g))

qualified to receive funding from the Corporation for Public Broadcasting pursuant to the criteria set forth in 47 U.S.C. 396.

*Performance* is each instance in which any portion of a sound recording is publicly performed to a listener by means of a digital audio transmission (*e.g.,* the delivery of any portion of a single track from a compact disc to one listener) but excluding the following:

(1) A performance of a sound recording that does not require a license (*e.g.,* a sound recording that is not copyrighted);

(2) A performance of a sound recording for which the Noncommercial Educational Webcaster has previously obtained a license from the Copyright Owner of such sound recording; and

(3) An incidental performance that both:

(i) Makes no more than incidental use of sound recordings, including, but not limited to, brief musical transitions in and out of commercials or program segments, brief performances during news, talk and sports programming, brief background performances during disk jockey announcements, brief performances during commercials of sixty seconds or less in duration, or brief performances during sporting or other public events; and

(ii) Other than ambient music that is background at a public event, does not contain an entire sound recording and does not feature a particular sound recording of more than thirty seconds (as in the case of a sound recording used as a theme song).

*Performers* means the independent administrators identified in 17 U.S.C. 114(g)(2)(B) and (C) and the parties identified in 17 U.S.C. 114(g)(2)(D).

*Qualified Auditor* is a Certified Public Accountant.

### §380.22  Royalty fees for the public performance of sound recordings and for ephemeral recordings.

(a) *Minimum fee.* Each Noncommercial Educational Webcaster shall pay an annual, nonrefundable minimum fee of $500 (the "Minimum Fee") for each of its individual channels, including each of its individual side channels, and each of its individual stations, through which (in each case) it makes Eligible Transmissions, for each calendar year it makes Eligible Transmissions subject to this subpart. For clarity, each individual stream (*e.g.,* HD radio side channels, different stations owned by a single licensee) will be treated separately and be subject to a separate minimum. In addition, a Noncommercial Educational Webcaster electing the reporting waiver

described in § 380.23(g)(1), shall pay a $100 annual fee (the "Proxy Fee") to the Collective.

(b) *Additional usage fees.* If, in any month, a Noncommercial Educational Webcaster makes total transmissions in excess of 159,140 Aggregate Tuning Hours on any individual channel or station, the Noncommercial Educational Webcaster shall pay additional usage fees ("Usage Fees") for the Eligible Transmissions it makes on that channel or station after exceeding 159,140 total ATH at the following per-performance rates:

(1) 2011: $0.0017;
(2) 2012: $0.0020;
(3) 2013: $0.0022;
(4) 2014: $0.0023;
(5) 2015: $0.0025.

(6) For a Noncommercial Educational Webcaster unable to calculate actual total performances and not required to report ATH or actual total performances under § 380.23(g)(3), the Noncommercial Educational Webcaster may pay its Usage Fees on an ATH basis, provided that the Noncommercial Educational Webcaster shall pay its Usage Fees at the per-performance rates provided in paragraphs (b)(1) through (5) of this section based on the assumption that the number of sound recordings performed is 12 per hour. The Collective may distribute royalties paid on the basis of ATH hereunder in accordance with its generally applicable methodology for distributing royalties paid on such basis. In addition, and for the avoidance of doubt, a Noncommercial Educational Webcaster offering more than one channel or station shall pay Usage Fees on a per-channel or -station basis.

(c) *Ephemeral royalty.* The royalty payable under 17 U.S.C. 112(e) for any ephemeral reproductions made by a Noncommercial Educational Webcaster and covered by this subpart is deemed to be included within the royalty payments set forth in paragraphs (a) and (b)(1) through (5) of this section and to equal the percentage of such royalty payments determined by the Copyright Royalty Judges for other webcasting in § 380.3.

**§ 380.23    Terms for making payment of royalty fees and statements of account.**

(a) *Payment to the Collective.* A Noncommercial Educational Webcaster shall make the royalty payments due under § 380.22 to the Collective.

(b) *Designation of the Collective.* (1) Until such time as a new designation is made, SoundExchange, Inc., is designated as the Collective to receive statements of account and royalty payments from Noncommercial

Educational Webcasters due under § 380.22 and to distribute such royalty payments to each Copyright Owner and Performer, or their designated agents, entitled to receive royalties under 17 U.S.C. 112(e) or 114(g).

(2) If SoundExchange, Inc., should dissolve or cease to be governed by a board consisting of equal numbers of representatives of Copyright Owners and Performers, then it shall be replaced by a successor Collective upon the fulfillment of the requirements set forth in paragraph (b)(2)(i) of this section.

(i) By a majority vote of the nine Copyright Owner representatives and the nine Performer representatives on the SoundExchange board as of the last day preceding the condition precedent in this paragraph (b)(2), such representatives shall file a petition with the Copyright Royalty Board designating a successor to collect and distribute royalty payments to Copyright Owners and Performers entitled to receive royalties under 17 U.S.C. 112(e) or 114(g) that have themselves authorized such Collective.

(ii) The Copyright Royalty Judges shall publish in the **Federal Register** within 30 days of receipt of a petition filed under paragraph (b)(2)(i) of this section an order designating the Collective named in such petition.

(c) *Minimum fee.* Noncommercial Educational Webcasters shall submit the Minimum Fee, and Proxy Fee if applicable, accompanied by a statement of account, by January 31st of each calendar year, except that payment of the Minimum Fee, and Proxy Fee if applicable, by a Noncommercial Educational Webcaster that was not making Eligible Transmissions or Ephemeral Recordings pursuant to the licenses in 17 U.S.C. 114 and/or 17 U.S.C. 112(e) as of said date but begins doing so thereafter shall be due by the 45th day after the end of the month in which the Noncommercial Educational Webcaster commences doing so. Payments of minimum fees must be accompanied by a certification, signed by an officer or another duly authorized faculty member or administrator of the institution with which the Noncommercial Educational Webcaster is affiliated, on a form provided by the Collective, that the Noncommercial Educational Webcaster:

(1) Qualifies as a Noncommercial Educational Webcaster for the relevant year; and

(2) Did not exceed 159,140 total ATH in any month of the prior year for which the Noncommercial Educational Webcaster did not submit a statement of account and pay any required Usage Fees. At the same time the

Noncommercial Educational Webcaster must identify all its stations making Eligible Transmissions and identify which of the reporting options set forth in paragraph (g) of this section it elects for the relevant year (provided that it must be eligible for the option it elects).

(d) *Usage fees.* In addition to its obligations pursuant to paragraph (c) of this section, a Noncommercial Educational Webcaster must make monthly payments of Usage Fees where required by § 380.22(b), and provide statements of account to accompany these payments, for each month on the 45th day following the month in which the Eligible Transmissions subject to the Usage Fees and statements of account were made. All monthly payments shall be rounded to the nearest cent.

(e) *Late fees.* A Noncommercial Educational Webcaster shall pay a late fee for each instance in which any payment, any statement of account or any report of use is not received by the Collective in compliance with the applicable regulations by the due date. The amount of the late fee shall be 1.5% of the late payment, or 1.5% of the payment associated with a late statement of account or report of use, per month, compounded monthly for the balance due, or the highest lawful rate, whichever is lower. The late fee shall accrue from the due date of the payment, statement of account or report of use until a fully compliant payment, statement of account or report of use (as applicable) is received by the Collective, provided that, in the case of a timely provided but noncompliant statement of account or report of use, the Collective has notified the Noncommercial Educational Webcaster within 90 days regarding any noncompliance that is reasonably evident to the Collective.

(f) *Statements of account.* Any payment due under § 380.22 shall be accompanied by a corresponding statement of account. A statement of account shall contain the following information:

(1) The name of the Noncommercial Educational Webcaster, exactly as it appears on the notice of use, and if the statement of account covers a single station only, the call letters or name of the station;

(2) Such information as is necessary to calculate the accompanying royalty payment as prescribed in this subpart;

(3) The name, address, business title, telephone number, facsimile number (if any), electronic mail address (if any) and other contact information of the person to be contacted for information or questions concerning the content of the statement of account;

(4) The handwritten signature of an officer or another duly authorized faculty member or administrator of the applicable educational institution;

(5) The printed or typewritten name of the person signing the statement of account;

(6) The date of signature;

(7) The title or official position held by the person signing the statement of account;

(8) A certification of the capacity of the person signing; and

(9) A statement to the following effect:

I, the undersigned officer or other duly authorized faculty member or administrator of the applicable educational institution, have examined this statement of account and hereby state that it is true, accurate, and complete to my knowledge after reasonable due diligence.

(g) *Reporting by Noncommercial Educational Webcasters in general*—(1) *Reporting waiver.* In light of the unique business and operational circumstances currently existing with respect to Noncommercial Educational Webcasters, and for the purposes of this subpart only, a Noncommercial Educational Webcaster that did not exceed 55,000 total ATH for any individual channel or station for more than one calendar month in the immediately preceding calendar year and that does not expect to exceed 55,000 total ATH for any individual channel or station for any calendar month during the applicable calendar year may elect to pay to the Collective a nonrefundable, annual Proxy Fee of $100 in lieu of providing reports of use for the calendar year pursuant to the regulations at § 370.4 of this chapter. In addition, a Noncommercial Educational Webcaster that unexpectedly exceeded 55,000 total ATH on one or more channels or stations for more than one month during the immediately preceding calendar year may elect to pay the Proxy Fee and receive the reporting waiver described in this paragraph (g)(1) during a calendar year, if it implements measures reasonably calculated to ensure that it will not make Eligible Transmissions exceeding 55,000 total ATH during any month of that calendar year. The Proxy Fee is intended to defray the Collective's costs associated with this reporting waiver, including development of proxy usage data. The Proxy Fee shall be paid by the date specified in paragraph (c) of this section for paying the Minimum Fee for the applicable calendar year and shall be accompanied by a certification on a form provided by the Collective, signed by an officer or another duly authorized

faculty member or administrator of the applicable educational institution, stating that the Noncommercial Educational Webcaster is eligible for the Proxy Fee option because of its past and expected future usage and, if applicable, has implemented measures to ensure that it will not make excess Eligible Transmissions in the future.

(2) *Sample-basis reports.* A Noncommercial Educational Webcaster that did not exceed 159,140 total ATH for any individual channel or station for more than one calendar month in the immediately preceding calendar year and that does not expect to exceed 159,140 total ATH for any individual channel or station for any calendar month during the applicable calendar year may elect to provide reports of use on a sample basis (two weeks per calendar quarter) in accordance with the regulations at § 370.4 of this chapter, except that, notwithstanding § 370.4(d)(2)(vi), such an electing Noncommercial Educational Webcaster shall not be required to include ATH or actual total performances and may in lieu thereof provide channel or station name and play frequency. Notwithstanding the foregoing, a Noncommercial Educational Webcaster that is able to report ATH or actual total performances is encouraged to do so. These reports of use shall be submitted to the Collective no later than January 31st of the year immediately following the year to which they pertain.

(3) *Census-basis reports.* If any of the following three conditions is satisfied, a Noncommercial Educational Webcaster must report pursuant to this paragraph (g)(3):

(i) The Noncommercial Educational Webcaster exceeded 159,140 total ATH for any individual channel or station for more than one calendar month in the immediately preceding calendar year;

(ii) The Noncommercial Educational Webcaster expects to exceed 159,140 total ATH for any individual channel or station for any calendar month in the applicable calendar year; or

(iii) The Noncommercial Educational Webcaster otherwise does not elect to be subject to paragraphs (g)(1) or (2) of this section. A Noncommercial Educational Webcaster required to report pursuant to paragraph (g)(3) of this section shall provide reports of use to the Collective quarterly on a census reporting basis (*i.e.*, reports of use shall include every sound recording performed in the relevant quarter), containing information otherwise complying with applicable regulations (but no less information than required by § 370.4 of this chapter), except that, notwithstanding § 370.4(d)(2)(vi), such a

Noncommercial Educational Webcaster shall not be required to include ATH or actual total performances, and may in lieu thereof provide channel or station name and play frequency, during the first calendar year it reports in accordance with paragraph (g)(3) of this section. For the avoidance of doubt, after a Noncommercial Educational Webcaster has been required to report in accordance with paragraph (g)(3) of this section for a full calendar year, it must thereafter include ATH or actual total performances in its reports of use. All reports of use under paragraph (g)(3) of this section shall be submitted to the Collective no later than the 45th day after the end of each calendar quarter.

(h) *Distribution of royalties.* (1) The Collective shall promptly distribute royalties received from Noncommercial Educational Webcasters to Copyright Owners and Performers, or their designated agents, that are entitled to such royalties. The Collective shall only be responsible for making distributions to those Copyright Owners, Performers, or their designated agents who provide the Collective with such information as is necessary to identify and pay the correct recipient. The Collective shall distribute royalties on a basis that values all performances by a Noncommercial Educational Webcaster equally based upon the information provided under the report of use requirements for Noncommercial Educational Webcasters contained in § 370.4 of this chapter and this subpart, except that in the case of Noncommercial Educational Webcasters that elect to pay a Proxy Fee in lieu of providing reports of use pursuant to paragraph (g)(1) of this section, the Collective shall distribute the aggregate royalties paid by electing Noncommercial Educational Webcasters based on proxy usage data in accordance with a methodology adopted by the Collective's Board of Directors.

(2) If the Collective is unable to locate a Copyright Owner or Performer entitled to a distribution of royalties under paragraph (h)(1) of this section within 3 years from the date of payment by a Noncommercial Educational Webcaster, such distribution may first be applied to the costs directly attributable to the administration of that distribution. The foregoing shall apply notwithstanding the common law or statutes of any State.

(i) *Server logs.* Noncommercial Educational Webcasters shall retain for a period of no less than three full calendar years server logs sufficient to substantiate all information relevant to eligibility, rate calculation and reporting under this subpart. To the extent that a third-party Web hosting or service

provider maintains equipment or software for a Noncommercial Educational Webcaster and/or such third party creates, maintains, or can reasonably create such server logs, the Noncommercial Educational Webcaster shall direct that such server logs be created and maintained by said third party for a period of no less than three full calendar years and/or that such server logs be provided to, and maintained by, the Noncommercial Educational Webcaster.

(ii) [Reserved]

§ 380.24   **Confidential Information.**

(a) *Definition.* For purposes of this subpart, "Confidential Information" shall include the statements of account and any information contained therein, including the amount of Usage Fees paid, and any information pertaining to the statements of account reasonably designated as confidential by the Noncommercial Educational Webcaster submitting the statement.

(b) *Exclusion.* Confidential Information shall not include documents or information that at the time of delivery to the Collective are public knowledge. The party claiming the benefit of this provision shall have the burden of proving that the disclosed information was public knowledge.

(c) *Use of Confidential Information.* In no event shall the Collective use any Confidential Information for any purpose other than royalty collection and distribution and activities related directly thereto.

(d) *Disclosure of Confidential Information.* Access to Confidential Information shall be limited to:

(1) Those employees, agents, attorneys, consultants and independent contractors of the Collective, subject to an appropriate confidentiality agreement, who are engaged in the collection and distribution of royalty payments hereunder and activities related thereto, for the purpose of performing such duties during the ordinary course of their work and who require access to Confidential Information;

(2) An independent Qualified Auditor, subject to an appropriate confidentiality agreement, who is authorized to act on behalf of the Collective with respect to verification of a Noncommercial Educational Webcaster's statement of account pursuant to § 380.25 or on behalf of a Copyright Owner or Performer with respect to the verification of royalty distributions pursuant to § 380.26;

(3) Copyright Owners and Performers, including their designated agents, whose works have been used under the statutory licenses set forth in 17 U.S.C. 112(e) and 114(f) by the Noncommercial Educational Webcaster whose Confidential Information is being supplied, subject to an appropriate confidentiality agreement, and including those employees, agents, attorneys, consultants and independent contractors of such Copyright Owners and Performers and their designated agents, subject to an appropriate confidentiality agreement, for the purpose of performing their duties during the ordinary course of their work and who require access to the Confidential Information; and

(4) In connection with future proceedings under 17 U.S.C. 112(e) and 114(f) before the Copyright Royalty Judges, and under an appropriate protective order, attorneys, consultants and other authorized agents of the parties to the proceedings or the courts.

(e) *Safeguarding of Confidential Information.* The Collective and any person identified in paragraph (d) of this section shall implement procedures to safeguard against unauthorized access to or dissemination of any Confidential Information using a reasonable standard of care, but no less than the same degree of security used to protect Confidential Information or similarly sensitive information belonging to the Collective or person.

§ 380.25   **Verification of royalty payments.**

(a) *General.* This section prescribes procedures by which the Collective may verify the royalty payments made by a Noncommercial Educational Webcaster.

(b) *Frequency of verification.* The Collective may conduct a single audit of a Noncommercial Educational Webcaster, upon reasonable notice and during reasonable business hours, during any given calendar year, for any or all of the prior 3 calendar years, but no calendar year shall be subject to audit more than once.

(c) *Notice of intent to audit.* The Collective must file with the Copyright Royalty Board a notice of intent to audit a particular Noncommercial Educational Webcaster, which shall, within 30 days of the filing of the notice, publish in the **Federal Register** a notice announcing such filing. The notification of intent to audit shall be served at the same time on the Noncommercial Educational Webcaster to be audited. Any such audit shall be conducted by an independent Qualified Auditor identified in the notice and shall be binding on all parties.

(d) *Acquisition and retention of report.* The Noncommercial Educational Webcaster shall use commercially reasonable efforts to obtain or to provide access to any relevant books and records maintained by third parties for the purpose of the audit. The Collective shall retain the report of the verification for a period of not less than 3 years.

(e) *Acceptable verification procedure.* An audit, including underlying paperwork, which was performed in the ordinary course of business according to generally accepted auditing standards by an independent Qualified Auditor, shall serve as an acceptable verification procedure for all parties with respect to the information that is within the scope of the audit.

(f) *Consultation.* Before rendering a written report to the Collective, except where the auditor has a reasonable basis to suspect fraud and disclosure would, in the reasonable opinion of the auditor, prejudice the investigation of such suspected fraud, the auditor shall review the tentative written findings of the audit with the appropriate agent or employee of the Noncommercial Educational Webcaster being audited in order to remedy any factual errors and clarify any issues relating to the audit; Provided that an appropriate agent or employee of the Noncommercial Educational Webcaster reasonably cooperates with the auditor to remedy promptly any factual errors or clarify any issues raised by the audit.

(g) *Costs of the verification procedure.* The Collective shall pay the cost of the verification procedure, unless it is finally determined that there was an underpayment of 10% or more, in which case the Noncommercial Educational Webcaster shall, in addition to paying the amount of any underpayment, bear the reasonable costs of the verification procedure.

§ 380.26   **Verification of royalty distributions.**

(a) *General.* This section prescribes procedures by which any Copyright Owner or Performer may verify the royalty distributions made by the Collective; provided, however, that nothing contained in this section shall apply to situations where a Copyright Owner or Performer and the Collective have agreed as to proper verification methods.

(b) *Frequency of verification.* A Copyright Owner or Performer may conduct a single audit of the Collective upon reasonable notice and during reasonable business hours, during any given calendar year, for any or all of the prior 3 calendar years, but no calendar year shall be subject to audit more than once.

(c) *Notice of intent to audit.* A Copyright Owner or Performer must file with the Copyright Royalty Board a

notice of intent to audit the Collective, which shall, within 30 days of the filing of the notice, publish in the **Federal Register** a notice announcing such filing. The notification of intent to audit shall be served at the same time on the Collective. Any audit shall be conducted by an independent Qualified Auditor identified in the notice, and shall be binding on all Copyright Owners and Performers.

(d) *Acquisition and retention of report.* The Collective shall use commercially reasonable efforts to obtain or to provide access to any relevant books and records maintained by third parties for the purpose of the audit. The Copyright Owner or Performer requesting the verification procedure shall retain the report of the verification for a period of not less than 3 years.

(e) *Acceptable verification procedure.* An audit, including underlying paperwork, which was performed in the ordinary course of business according to generally accepted auditing standards by an independent Qualified Auditor, shall serve as an acceptable verification

procedure for all parties with respect to the information that is within the scope of the audit.

(f) *Consultation.* Before rendering a written report to a Copyright Owner or Performer, except where the auditor has a reasonable basis to suspect fraud and disclosure would, in the reasonable opinion of the auditor, prejudice the investigation of such suspected fraud, the auditor shall review the tentative written findings of the audit with the appropriate agent or employee of the Collective in order to remedy any factual errors and clarify any issues relating to the audit; Provided that the appropriate agent or employee of the Collective reasonably cooperates with the auditor to remedy promptly any factual errors or clarify any issues raised by the audit.

(g) *Costs of the verification procedure.* The Copyright Owner or Performer requesting the verification procedure shall pay the cost of the procedure, unless it is finally determined that there was an underpayment of 10% or more, in which case the Collective shall, in addition to paying the amount of any

underpayment, bear the reasonable costs of the verification procedure.

**§ 380.27  Unclaimed funds.**

If the Collective is unable to identify or locate a Copyright Owner or Performer who is entitled to receive a royalty distribution under this subpart, the Collective shall retain the required payment in a segregated trust account for a period of 3 years from the date of distribution. No claim to such distribution shall be valid after the expiration of the 3-year period. After expiration of this period, the Collective may apply the unclaimed funds to offset any costs deductible under 17 U.S.C. 114(g)(3). The foregoing shall apply notwithstanding the common law or statutes of any State.

Dated: February 12, 2014.

**Suzanne M. Barnett,**
*Chief Copyright Royalty Judge.*

Approved By:

**James H. Billington,**
*Librarian of Congress.*

[FR Doc. 2014–08664 Filed 4–24–14; 8:45 am]

**BILLING CODE P**

### Certificate of Service

I hereby certify that on the 19th day of November, 2014, the foregoing document was filed and thus served by email through the Court's Electronic Filing System.  Two copies will be delivered to the Clerk of the court by November 21st.

November 19, 2014                                   /s/ John R. Grimm

                                                            John R. Grimm