**[ORAL ARGUMENT SCHEDULED FOR JANUARY 12, 2015]**

No. 14-1068

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

————————————

INTERCOLLEGIATE BROADCASTING SYSTEM, INC.,

Appellant,

v.

COPYRIGHT ROYALTY BOARD and LIBRARIAN OF CONGRESS,

Appellees,

COLLEGE BROADCASTERS, INC. and
SOUNDEXCHANGE, INC.,

Intervenors.

————————————

ON APPEAL FROM THE COPYRIGHT ROYALTY JUDGES

————————————

**FINAL BRIEF FOR APPELLEES**

————————————

JOYCE R. BRANDA
 *Acting Assistant Attorney General*

MARK R. FREEMAN
SONIA K. McNEIL
 *(202) 616-8209*
 *Attorneys, Appellate Staff*
 *Civil Division, Room 7234*
 *U.S. Department of Justice*
 *950 Pennsylvania Ave., N.W.*
 *Washington, D.C.  20530*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel certifies:

### A.    Parties and Amici

The appellant is Intercollegiate Broadcasting System, Inc. (IBS).  The appellees are the Copyright Royalty Board and the Librarian of Congress.

With the permission of this Court, College Broadcasters, Inc. and SoundExchange, Inc., intervened in support of the appellees.  *See* No. 14-1068, docket entry #14 (June 24, 2014) (granting motions to intervene).

There are no amici.

### B.    Rulings Under Review

This case is a direct appeal from a determination of the Copyright Royalty Judges.  Appellant IBS seeks review of a decision establishing royalty rates and terms for the transmission of sound recordings by webcasting services between January 1, 2011, and December 31, 2015.  *See Determination of Royalty Rates for Digital Performance Right in Sound Recordings and Ephemeral Recordings*, 79 Fed. Reg. 23,102 (Apr. 25, 2014) (JA257-94).

### C.    Related Cases

The Copyright Royalty Judges entered the determination appealed here following a decision by this Court vacating and remanding a prior determination regarding rates and terms for the same license period, on the basis that the structure of the administrative body at the time of the prior determination violated the

Appointments Clause. *See Intercollegiate Broadcasting System, Inc.* v. *Copyright Royalty Board*, 684 F.3d 1332 (D.C. Cir. 2012), *cert. denied*, 133 S. Ct. 2735 (2013).

We are not aware of any other related cases within the meaning of D.C. Circuit Rule 28(a)(1)(C).

Respectfully submitted,

/s/ Sonia K. McNeil
Sonia K. McNeil

# TABLE OF CONTENTS

**Page**

GLOSSARY

INTRODUCTION ..................................................................................................1

STATEMENT OF JURISDICTION ......................................................................3

STATEMENT OF THE ISSUES............................................................................3

PERTINENT STATUTES AND REGULATIONS ...............................................3

STATEMENT OF THE CASE ...............................................................................4

I.      STATUTORY AND REGULATORY BACKGROUND ..................................4

      A.      The Copyright Royalty Judges ..............................................................4

      B.      The Webcasting Statutory License ........................................................4

      C.      The Ratemaking Decision Process........................................................5

II.     FACTUAL AND PROCEDURAL BACKGROUND.......................................7

      A.      Prior Proceedings...................................................................................7

      B.      This Court's Constitutional Ruling .......................................................8

      C.      The Determination of the New Copyright Royalty Judges.....................9

SUMMARY OF ARGUMENT..............................................................................12

STANDARD OF REVIEW ...................................................................................13

ARGUMENT .........................................................................................................14

I.      THE NEW COPYRIGHT ROYALTY JUDGES REASONABLY
      BASED THEIR DETERMINATION ON A DE NOVO REVIEW
      OF THE EXISTING ADMINISTRATIVE RECORD ...................................14

A.    The New Panel Issued a New Determination Based on an Independent Review of the Record Evidence ......................................14

B.    The Judges Were Not Required To Conduct a New Evidentiary Hearing on Remand ..................................................................19

II.    THE MINIMUM ANNUAL FEE ESTABLISHED BY THE COPYRIGHT ROYALTY JUDGES IS REASONABLE, CONSISTENT WITH THE COPYRIGHT ACT, AND SUPPORTED BY SUBSTANTIAL EVIDENCE..............................................25

A.    The Copyright Royalty Judges Rationally Set a Minimum Annual Fee for Noncommercial Webcasting Services of $500 Per Station or Channel ........................................................26

B.    IBS Fails to Demonstrate Any Error in the Copyright Royalty Judges' Determination....................................................29

CONCLUSION .......................................................................32

CERTIFICATE OF COMPLIANCE WITH
FEDERAL RULE OF APPELLATE PROCEDURE 32(A)

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                                                                    **Page**

*Doolin Sec. Sav. Bank, FSB* v. *Office of Thrift Supervision*,
  139 F.3d 203 (D.C. Cir. 1998) ............................................................... 22, 23

*FEC* v. *Legi-Tech, Inc.*,
  75 F.3d 704 (D.C. Cir. 1996) ...................................................................22

*In re Permian Basin Area Rate Cases*,
  390 U.S. 747 (1968) ...............................................................................14

*Independent Producers Group* v. *Library of Congress*,
  759 F.3d 100 (D.C. Cir. 2014) ............................................................ 3, 10

*Intercollegiate Broadcast System, Inc.* v. *Copyright Royalty Bd.*,
  571 F.3d 69 (D.C. Cir. 2009) .........................................................4, 14, 30

*Intercollegiate Broadcasting System, Inc.* v. *Copyright Royalty Board*,
  684 F.3d 1332 (D.C. Cir. 2012), *cert. denied*, 133 S. Ct. 2735 (2013) ....... 1, 9, 15, 20, 21

*J.J. Cassone Bakery, Inc.* v. *NLRB*,
  554 F.3d 1041 (D.C. Cir. 2009) .......................................................... 13, 23

*Recording Indus. Ass'n of Am.* v. *Copyright Royalty Tribunal*,
  662 F.2d 1 (D.C. Cir. 1981).............................................................. 4, 14

*Ryder* v. *United States*,
  515 U.S. 177 (1995) ...............................................................................20

*SoundExchange, Inc.* v. *Librarian of Congress*,
  571 F.3d 1220 (D.C. Cir. 2009) .................................................................8

*Time Warner Entm't Co.* v. *FCC*,
  56 F.3d 151 (D.C. Cir. 1995) ...................................................................13

* Authorities upon which we chiefly rely are marked with asterisks.

*Wingo* v. *Wedding,*
    418 U.S. 461 (1974) ................................................................ 20, 21

**Constitution:**

U.S. CONST. art. II, § 2, cl. 2 ........................................................8

**Statutes:**

17 U.S.C. § 106 ....................................................................................4

17 U.S.C. § 114 ....................................................................................3

17 U.S.C. § 114(f)(2) ..........................................................................5

*17 U.S.C. § 114(f)(2)(A) ........................................................5, 7, 26

*17 U.S.C. § 114(f)(2)(B) .............................5, 12, 14, 26, 27, 28, 30

*17 U.S.C. § 114(f)(3) ......................................................................29

17 U.S.C. § 114(f)(5)(E)(i) ................................................................8

17 U.S.C. § 114(f)(5)(E)(iii) ..............................................................8

17 U.S.C. § 801 ....................................................................................3

17 U.S.C. § 801 *et seq.* ..................................................................3, 4

17 U.S.C. § 802(c) ............................................................................21

17 U.S.C. § 802(f)(1)(D) ....................................................................6

17 U.S.C. § 803 ...............................................................................3, 5

17 U.S.C. § 803(a)(1) ......................................................................19

17 U.S.C. § 803(b) ..............................................................................6

17 U.S.C. § 803(b)(1)(A)-(B) ............................................................5

*17 U.S.C. § 803(b)(5)................................................................6, 17, 19, 21

*17 U.S.C. § 803(b)(5)(B) ...........................................................1, 2, 6, 10, 17

17 U.S.C. § 803(b)(6)(C) ....................................................................................6

17 U.S.C. § 803(b)(6)(C)(i) ................................................................................6

17 U.S.C. § 803(b)(6)(C)(ii)(II) .........................................................................5

17 U.S.C. § 803(c) ..............................................................................................6

17 U.S.C. § 803(c)(1) ..........................................................................................6

17 U.S.C. § 803(c)(6) ..........................................................................................7

17 U.S.C. § 803(d) ..............................................................................................3

17 U.S.C. § 803(d)(1) ......................................................................................3, 7

17 U.S.C. § 803(d)(3) ........................................................................................13

Copyright Royalty and Distribution Reform Act of 2004,
   Pub. L. No. 108-419, 118 Stat. 2341................................................................4

**Regulations:**

37 C.F.R. § 301.1 ................................................................................................3

37 C.F.R. § 351.11 ..............................................................................................6

37 C.F.R. § 351.15 ............................................................................................10

37 C.F.R. § 351.3(c) ..........................................................................................10

37 C.F.R. § 351.4(b) ............................................................................................5

37 C.F.R. § 380.2 ..............................................................................................27

37 C.F.R. § 380.3(a)(2)(i) ...................................................................26

37 C.F.R. § 380.3(b)(2) .....................................................................25

70 Fed. Reg. 30,901 (May 31, 2005) ...................................................4

74 Fed. Reg. 318 (Jan. 5, 2009).........................................................7

*Determination of Royalty Rates for Digital Performance Right in Sound Recordings and Ephemeral Recordings*, 79 Fed. Reg. 23,102 (Apr. 25, 2014)..................................2, 3, 7, 10, 11, 12, 15-19, 25-31

*Digital Performance Right in Sound Recordings and Ephemeral Recordings*, 76 Fed. Reg. 13,026 (Mar. 9, 2011) ...................................................8, 18, 19

## GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| IBS | Intercollegiate Broadcasting System, Inc. (appellant) |
| FD | *Determination of Royalty Rates for Digital Performance Right in Sound Recordings and Ephemeral Recordings*, 79 Fed. Reg. 23,102 (Apr. 25, 2014) ("Final Determination") (JA257-94) |
| JA | Joint Appendix |
| Paper Proceeding Notice | *Notice of Intention to Conduct Paper Proceeding on Remand and Solicitation of Comments from the Parties*, Docket No. 2009-1 CRB (Webcasting III) (Sept. 17, 2013) (JA218-26) |
| Paper Proceeding Order | *Order Following Notice of Intention to Conduct Paper Proceeding on Remand*, Docket No. 2009-1 CRB (Webcasting III) (Oct. 22, 2013) (JA233) |
| Rehearing Order | *Order Denying Motion for Rehearing*, Docket No. 2009-1 CRB (Webcasting III) (Feb. 4, 2014) (JA234-39) |

**INTRODUCTION**

In 2012, this Court held that the Copyright Royalty Judges in office at that time had been invalidly appointed under the Appointments Clause. *See Intercollegiate Broadcasting System, Inc.* v. *Copyright Royalty Board*, 684 F.3d 1332, 1336-42 (D.C. Cir. 2012) (hereinafter *IBS I*), *cert. denied*, 133 S. Ct. 2735 (2013). To cure the constitutional violation and "minimize[] any collateral damage," the Court declared invalid and severed the provision of the Copyright Act specifying that the Librarian of Congress could remove the Judges only for cause. *Id.* at 1340. The Court then vacated the underlying royalty ratemaking determination at issue in that case and remanded for proceedings before a properly appointed panel.

This appeal concerns the ratemaking proceedings on remand. Following this Court's constitutional ruling, the Librarian of Congress appointed three new Copyright Royalty Judges as inferior officers removable at will. After seeking proposals from the parties regarding how best to proceed, the new Judges declined to reopen the record or to repeat the ten-day administrative trial conducted by the prior panel. Instead, the new Judges explained that they would conduct a *de novo* "[p]aper proceeding[]" on the existing administrative record. *See* 17 U.S.C. § 803(b)(5)(B) (authorizing such a proceeding when the Judges deem it "appropriate"). The Judges accordingly reviewed *de novo* the entire record of the proceeding before the prior panel, including the parties' rate proposals and written submissions, as well as thousands of pages of transcripts and exhibits from an administrative trial that

featured testimony from fifteen witnesses. After that painstaking review, the Judges issued a new determination setting rates and terms for digital performances of sound recordings ("webcasting") in the 2011 through 2015 license period. *See Determination of Royalty Rates for Digital Performance Right in Sound Recordings and Ephemeral Recordings*, 79 Fed. Reg. 23,102 (Apr. 25, 2014) (FD) (JA257-94).

In this appeal, Intercollegiate Broadcasting System, Inc. (IBS), argues that the new determination remains irreparably tainted by the constitutional defect in the prior scheme—notwithstanding the new Judges' proper appointment and their *de novo* review of the record—because the new Judges did not personally supervise the administrative trial. On the merits, IBS asserts that the new Judges established an unreasonable minimum annual royalty fee for the webcasting statutory license.

These assertions should be rejected. A panel of three new Copyright Royalty Judges, appointed in the manner required by this Court's constitutional ruling, established the rates and terms for the webcasting license in a *de novo* paper proceeding—a procedure that Congress expressly authorized the Judges to employ. 17 U.S.C. § 803(b)(5)(B). Nothing in the Constitution or the Copyright Act required the new Judges to do more. Moreover, the new Judges did not simply ratify the prior panel's analysis on *de novo* review (although they could have done so), but weighed the evidence differently from their predecessors in various respects. Based on that careful review, the Judges selected a reasonable minimum annual fee that is supported by substantial evidence in the record. The determination should be affirmed.

## STATEMENT OF JURISDICTION

The final determination of the Copyright Royalty Judges was published in the Federal Register on April 25, 2014.[1]  *See* 79 Fed. Reg. 23,102.  Appellant IBS filed its notice of appeal in this Court within the time provided by 17 U.S.C. § 803(d)(1).  This Court has jurisdiction under 17 U.S.C. § 803(d).

## STATEMENT OF THE ISSUES

1.      Whether, on remand from this Court's constitutional ruling, the new Copyright Royalty Judges issued their ratemaking determination in a manner consistent with the Constitution and the Copyright Act.

2.      Whether the $500 minimum annual fee for noncommercial webcasters established by the Copyright Royalty Judges is reasonable, consistent with the Copyright Act, and supported by the record.

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes and regulations, including relevant portions of 17 U.S.C. §§ 114, 801, and 803, are reproduced in the addendum to this brief.

---

[1] Appellants refer to the agency as the "Copyright Royalty Board," a term drawn from the regulations.  *See* 37 C.F.R. § 301.1.  This brief uses the statutory term "Copyright Royalty Judges," *see* 17 U.S.C. § 801 *et seq.*, following the Judges' own practice.  *See also Independent Producers Group* v. *Library of Congress*, 759 F.3d 100, 102 (D.C. Cir. 2014) (adopting the shorthand "Royalty Judges").

## STATEMENT OF THE CASE

I.  STATUTORY AND REGULATORY BACKGROUND

### A.    The Copyright Royalty Judges

The Copyright Act grants owners of a copyright a set of exclusive rights in the copyrighted work.  *See generally* 17 U.S.C. § 106.  In some circumstances, however, the Act limits the exclusivity of these rights by granting use of the copyrighted work to any person who satisfies conditions set by law, including payment of a royalty.  *See id.* §§ 107-22.  Congress enacted the first such statutory license in 1909.  *See Recording Indus. Ass'n of Am.* v. *Copyright Royalty Tribunal*, 662 F.2d 1, 3 (D.C. Cir. 1981).

Since the Copyright Act of 1976, Congress has entrusted responsibility for setting and adjusting statutory royalty rates and distributing royalty funds collected under statutory licenses to a series of administrative bodies.  *See generally Intercollegiate Broadcast System, Inc.* v. *Copyright Royalty Bd.*, 571 F.3d 69, 73 (D.C. Cir. 2009); 70 Fed. Reg. 30,901, 30,901 (May 31, 2005) (describing the history of royalty ratemaking under the Copyright Act).  In 2004, Congress transferred these functions to a new panel of three Copyright Royalty Judges located within the Library of Congress.  *See* Copyright Royalty and Distribution Reform Act of 2004, Pub. L. No. 108-419, 118 Stat. 2341 (codified at 17 U.S.C. § 801 *et seq.*).

### B.    The Webcasting Statutory License

Congress assigned to the Copyright Royalty Judges the duty to set rates and terms for the statutory license for "webcasting"—the performance of copyrighted

4

sound recordings over the internet, such as by "internet radio" music services. *See* 17 U.S.C. § 114(f)(2). If webcasting services and copyright owners do not agree on rates and terms, the Judges conduct a contested proceeding to determine "reasonable" royalty rates and terms for the license period in question. *Id.* § 114(f)(2)(A) (instructing the Copyright Royalty Judges to hold such a proceeding every five years, if necessary).

The Copyright Act directs that the sound recording royalty rates set by the Judges "shall include a minimum fee for each [] type of [webcasting] service." *Ibid.* The Copyright Royalty Judges must select rates "that most clearly represent" what "would have been negotiated in the marketplace between a willing buyer and a willing seller." *Id.* § 114(f)(2)(B). Congress instructed the Judges to decide what royalty best approximates a market rate based on "economic, competitive and programming information presented by the parties." *Ibid.*

## C.    The Ratemaking Decision Process

The Copyright Act sets out the Judges' ratemaking process in meticulous detail. *See generally* 17 U.S.C. § 803 ("Proceedings of Copyright Royalty Judges"). Any party with an interest in the proceeding may participate. *See id.* § 803(b)(1)(A)-(B). Parties must present royalty rate proposals and other information to the Judges in the form of written direct statements that include "witness statements, testimony, and exhibits." *See id.* § 803(b)(6)(C)(ii)(II) (defining "written direct statement"); 37 C.F.R. § 351.4(b) (listing required contents). Parties are also permitted to submit written rebuttal

statements addressing others' filings. *See* 17 U.S.C. § 803(b)(6)(C)(i) (contemplating rebuttal statements); 37 C.F.R. § 351.11 (regulating written rebuttals). All parties must file any direct or rebuttal statements by specifically enumerated deadlines. *See* 17 U.S.C. § 803(b)(6)(C).

The Copyright Act gives the Judges two ways to evaluate the parties' evidence and establish appropriate rates and terms. The Judges may conduct a live, trial-like adversarial hearing, thereby permitting the cross-examination of witnesses and the introduction of trial exhibits. *See id.* § 803(b) (describing such hearings). Alternatively, the Act authorizes the Judges to "decide, *sua sponte* or upon motion of a participant, to determine issues on the basis of" the parties' submissions through "[p]aper proceedings." *Id.* § 803(b)(5). Congress instructed that the Judges should employ paper proceedings when the material facts are undisputed and all parties consent, but further provided that the Judges "may" conduct a paper proceeding "under such other circumstances as the Copyright Royalty Judges consider appropriate." *Id.* § 803(b)(5)(B).

At the conclusion of either kind of proceeding, absent a settlement, the Judges issue a final "determination" setting rates and terms for the relevant license period. *See generally id.* § 803(c) ("Determination of Copyright Royalty Judges"). The Judges must reach a decision and issue their determination "in no event later than 15 days before the expiration of the then current statutory rates and terms." *Id.* § 803(c)(1). Following a review for legal error by the Register of Copyrights, *id.* § 802(f)(1)(D), the

Librarian of Congress then publishes the determination in the Federal Register and makes the determination and the administrative record available to the public. *Id.* § 803(c)(6).

An aggrieved party may seek direct review in this Court of a final determination of the Copyright Royalty Judges by filing a notice of appeal within 30 days of the publication of the determination in the Federal Register. 17 U.S.C. § 803(d)(1) (providing for appeal of "[a]ny determination of the Copyright Royalty Judges under [§ 803(c)]").

## II.    FACTUAL AND PROCEDURAL BACKGROUND

In the proceeding below, the Copyright Royalty Judges determined the rates and terms for the webcasting statutory license for the years 2011 through 2015. *See Determination of Royalty Rates for Digital Performance Right in Sound Recordings and Ephemeral Recordings*, 79 Fed. Reg. 23,102 (Apr. 25, 2014) (JA257-94). The Judges' determination established rates and terms for all eligible webcasting services. *See generally ibid.* IBS challenges only the portion of the determination setting the minimum annual fee for noncommercial webcasting services. FD 23,120-24 (JA275-79).

### A.    Prior Proceedings

As Congress directed, the Copyright Royalty Judges began the process of establishing webcasting royalty rates and terms for year 2011 through 2015 in January 2009. 74 Fed. Reg. 318 (Jan. 5, 2009) (announcing proceedings and soliciting responses from interested parties); 17 U.S.C. § 114(f)(2)(A). Forty entities filed

petitions to participate.  The parties who were unable to reach a settlement included the parties now before this Court:  SoundExchange, Inc., represents owners of copyrighted sound recordings, while IBS and College Broadcasters, Inc. represent noncommercial webcasting services such as college internet radio stations.[2]

The Copyright Royalty Judges commenced an adversarial ratemaking proceeding and opted to conduct a live administrative hearing, at which the parties presented testimony from fifteen witnesses.  The Judges issued their final determination in March 2011.  *See Digital Performance Right in Sound Recordings and Ephemeral Recordings*, 76 Fed. Reg. 13,026 (Mar. 9, 2011) (JA140-72).

### B.     This Court's Constitutional Ruling

IBS appealed the determination.  Drawing on the concurring opinion  in *SoundExchange, Inc.* v. *Librarian of Congress*, 571 F.3d 1220, 1226-1227 (D.C. Cir. 2009) (Kavanaugh, J., concurring), IBS contended, *inter alia*, that the Copyright Royalty Judges had been invalidly appointed under the Appointments Clause, U.S. Const. art. II, § 2, cl. 2, because they were not appointed by the President with the advice and consent of the Senate.

This Court concluded that Congress had vested the Judges with sufficient authority and independence that they qualified as "principal" officers of the United States, and consequently that the power to appoint the Judges could not properly be

---

[2] *See* 17 U.S.C. § 114(f)(5)(E)(i), (iii) (defining "noncommercial webcaster" and "webcaster").

vested in the Librarian of Congress. *See generally Intercollegiate Broadcasting System, Inc.* v. *Copyright Royalty Board*, 684 F.3d 1332 (D.C. Cir. 2012) (hereinafter *IBS I*), *cert. denied*, 133 S. Ct. 2735 (2013). Therefore, to "cure[] the constitutional defect with as little disruption as possible," the Court declared invalid and severed the provision of the Copyright Act specifying that the Librarian of Congress could remove the Judges only for cause. *Id.* at 1336-37, 1340. "Once the limitations on the Librarian's removal authority are nullified," the Court explained, the Judges "become validly appointed inferior officers." *Id.* at 1341.

Because the agency's structure had been unconstitutional at the time the Copyright Royalty Judges entered their determination, the Court vacated the determination and remanded the matter to the Judges. *Id.* at 1342. IBS filed a petition for a writ of certiorari, urging that this Court had erred in failing to impose a more sweeping remedy for the Appointments Clause violation. Brief for Petitioner at 29-34, *Intercollegiate Broadcasting System, Inc.* v. *Copyright Royalty Board*, 133 S. Ct. 2735 (2013) (No. 12-928). The Supreme Court denied review. 133 S. Ct. 2735 (2013).

### C.    The Determination of the New Copyright Royalty Judges

Following this Court's ruling, the Librarian of Congress formally appointed three Copyright Royalty Judges as inferior officers removable at will. The new Judges then solicited proposals from the parties concerning how best to conduct the

proceedings on remand.[3]    FD 23,103 (JA258); *see* 37 C.F.R. § 351.15.    After considering the parties' submissions, the Judges declined either to "summarily reaffirm" the prior panel's decision, as College Broadcasters urged (JA183), or to conduct an entirely new evidentiary proceeding on some or all issues, as IBS insisted was required (JA194-204).

Instead, the new Judges explained that they would conduct a *de novo* review of the existing administrative record and would "issue a new determination on all issues included therein."  FD 23,103 (JA258).  The Judges further notified the parties that they intended to fulfill this responsibility by conducting a new "paper proceeding" under the Copyright Act, and invited the parties to identify any reason why the Judges could not proceed in this manner.  *See Notice of Intention to Conduct Paper Proceeding on Remand and Solicitation of Comments from the Parties*, Docket No. 2009-1 CRB (Webcasting III) (Sept. 17, 2013) (Paper Proceeding Notice) (JA218-26); *see* 17 U.S.C. § 803(b)(5)(B); 37 C.F.R. § 351.3(c).  After considering the parties' submissions, the new Judges concluded that "[e]ach party has had ample opportunity to present its case."  Paper Proceeding Notice at 7 (JA224).  The Judges thus decided that a paper proceeding would be "fair," "efficient," and "economical."  Paper Proceeding Notice at 7-8 (JA224-25).

---

[3] None of these Judges participated in the first determination.  *See* FD 23,103 n.8 (JA258).

The new Judges reviewed *de novo* the entire record of the prior proceeding, including the approximately 2,600-page transcript of the hearing conducted by the former panel, and issued a new determination on every aspect of the webcasting statutory license for the 2011 to 2015 license period. *See generally Determination of Royalty Rates for Digital Performance Right in Sound Recordings and Ephemeral Recordings*, 79 Fed. Reg. 23,102 (Apr. 25, 2014) (FD) (JA257-94).   The determination explicitly recites that it reflects the new Judges' *de novo* appraisal of the record and all of the evidence submitted by the parties.  FD 23,103 (JA258) ("The Judges have concluded that this matter shall be determined based upon a *de novo* review of the substantial record that the parties developed during the proceeding leading to the first determination."); FD 23,120 (JA275) (observing that "[t]he present *de novo* determination is substantively distinct in a number of respects from the prior determination").

On the merits, as relevant here, the new Judges found "strong evidence that noncommercial webcasters are able and willing" to pay a minimum annual fee of $500 per station or channel, observing that some noncommercial webcasters had agreed to such a fee, FD 23,123 (JA278), and that the fee fell far below SoundExchange's per station or channel administrative cost.  FD 23,124 (JA279).  The Judges also noted IBS had not offered testimony from any member that would be "adversely affected" by this fee, despite the prior panel's invitation to do so.  *See* FD 23,121 (JA274). Accordingly, in light of the entire record, the new Judges concluded that a minimum

annual fee of $500 per station or channel reasonably approximated a market-based rate for noncommercial webcasting services.  FD 23,121-23 (JA274-78); 17 U.S.C. § 114(f)(2)(B) (directing the Judges to set a minimum fee that reflects what "would have been negotiated . . . between a willing buyer and a willing seller").

IBS sought rehearing, which the Judges denied in a written order. *Order Denying Motion for Rehearing*, Docket No. 2009-1 CRB (Webcasting III) (Feb. 4, 2014) (Rehearing Order) (JA234-39).  This appeal followed.

## SUMMARY OF ARGUMENT

On remand from this Court's constitutional ruling, a properly appointed panel of three new Copyright Royalty Judges issued a new determination of the rates and terms for the webcasting statutory license based on their *de novo* review of the existing administrative record.  The Copyright Act permitted the Judges to proceed in that manner, and the Constitution required nothing more.

IBS does not dispute that the Judges have the authority to conduct ratemaking proceedings on the written record, and it was entirely appropriate for the new Judges to exercise that authority on remand from this Court.  Contrary to IBS's contention, the new Judges did not "ratif[y] . . . the old Judges' decision" (Br. 32), but issued a new determination following a new proceeding under Section 803(b) of the Copyright Act.  And in any event, this Court's precedents foreclose IBS's argument that the new Judges could not permissibly base their determination on a *de novo* evaluation of the record gathered by the prior panel.

12

On the merits, the new Judges established a minimum fee for noncommercial webcasting services that is reasonable, consistent with the Copyright Act, and supported by substantial evidence in the record. As the Judges explained, a $500 minimum fee per station or channel is consistent with the minimum fees contained in voluntary license agreements between copyright owners and noncommercial webcasters, and it is substantially less than SoundExchange's actual average per-channel administrative expenses in managing the statutory license. The Judges reasonably rejected IBS's arguments in support of a far lower minimum fee. The determination of the Copyright Royalty Judges should be affirmed.

## STANDARD OF REVIEW

This Court reviews *de novo* constitutional challenges to agency action. *J.J. Cassone Bakery, Inc.* v. *NLRB*, 554 F.3d 1041, 1044 (D.C. Cir. 2009). The Court reviews final determinations of the Copyright Royalty Judges under the familiar standards of the Administrative Procedure Act (APA). *See* 17 U.S.C. § 803(d)(3) (specifying that "Section 706 of title 5 shall apply with respect to review by the court of appeals under this subsection").

"Because agency ratemaking is far from an exact science and involves policy determinations in which the agency is acknowledged to have expertise," *Time Warner Entm't Co.* v. *FCC*, 56 F.3d 151, 163 (D.C. Cir. 1995) (internal quotations omitted), this Court's review of the Judges' ratemaking determinations under the APA is "highly deferential." *Intercollegiate Broadcast System, Inc.*, 571 F.3d at 79; *see In re Permian Basin*

13

*Area Rate Cases*, 390 U.S. 747, 790 (1968). That principle applies with special force here.

As this Court has emphasized, the Copyright Royalty Judges' task "is not a routine exercise in historical cost of service ratemaking." *Recording Indus. Ass'n of Am.* v. *Copyright Royalty Tribunal*, 662 F.2d 1, 8 (D.C. Cir. 1981). Instead, the Copyright Act directs the Judges to "establish rates and terms that most clearly represent the rates and terms that would have been negotiated in the marketplace between a willing buyer and a willing seller" if the webcasting statutory license—which by design precludes a free marketplace—did not exist. 17 U.S.C. § 114(f)(2)(B). This Court's task is "only [to] assess the reasonableness of the Judges' interpretation of the inherent ambiguity" in Congress's directive. *Intercollegiate Broadcast System, Inc.*, 571 F.3d at 77.

## ARGUMENT

## I.    THE NEW COPYRIGHT ROYALTY JUDGES REASONABLY BASED THEIR DETERMINATION ON A *DE NOVO* REVIEW OF THE EXISTING ADMINISTRATIVE RECORD

### A.    The New Panel Issued a New Determination Based on an Independent Review of the Record Evidence

1.    It is undisputed that the determination below was issued by a properly appointed panel of Copyright Royalty Judges. This Court indicated that, when it declared invalid the limitations on the Librarian of Congress's removal power, the Judges "bec[a]me validly appointed inferior officers." *Intercollegiate Broadcasting System, Inc.* v. *Copyright Royalty Board*, 684 F.3d 1332, 1341 (D.C. Cir. 2012), *cert. denied*, 133 S.

Ct. 2735 (2013).   Following this Court's ruling, the Librarian appointed three Copyright Royalty Judges removable at will.  *See* FD 23,103 n.8 (JA258); *cf.* IBS Br. 26 (acknowledging that "the Board's membership changed completely following remand").

The new panel's ratemaking determination, in turn, makes clear on its face that it reflects an exercise of the new Judges' independent judgment and discretion.  *See* FD 23,103 (JA258) ("The Judges have concluded that this matter shall be determined based upon a *de novo* review of the substantial record that the parties developed during the proceeding leading to the first determination."); FD 23,120 (JA275) (observing that "[t]he present *de novo* determination is substantively distinct in a number of respects from the prior determination"); FD 23,103 (JA258) (explaining that the new Judges issued their determination "[u]pon completion of their *de novo* review of the existing record").  Nothing in the Copyright Act or this Court's constitutional ruling required the Judges to do more.

The Judges acted well within their discretion in declining to reopen the record and conduct a new evidentiary proceeding on remand.  As the Judges observed, this Court's remand order did not direct the agency to employ any particular procedure. *See ibid.*  The Judges therefore sought proposals from the parties to determine how best to proceed.  SoundExchange pressed the new Judges to "resolve this case by ratifying" the prior determination.   JA205 (SoundExchange proposal).   College Broadcasters likewise urged the new Judges to "summarily reaffirm" the prior

15

determination "without undertaking further proceedings." JA183 (College Broadcasters proposal). IBS, in contrast, contended that the Judges were required to allow the parties to file new briefs and submit additional oral and written testimony on the issue of the minimum annual fee for noncommercial webcasters—in effect, to start over from scratch, at least with respect to the issues that IBS sought to contest. JA194-204, 227-32 (IBS proposal).

The new Judges declined to endorse either of these approaches. On the one hand, the Judges decided against summarily ratifying the prior determination. This Court had vacated and remanded "*the determination*," the Judges observed, which they understood as a direction "to issue a new determination on all issues included therein." FD 23,103 (JA258) (emphasis in original). The Judges therefore concluded that their task was "to review the entire record and to issue a new determination on all issues included therein, not just the $500 minimum fee that was the subject of the [prior] appeal." *Ibid.*

On the other hand, the new Judges saw little purpose in conducting an entirely new evidentiary hearing. The Judges explained that "[e]ach party has had ample opportunity to present its case" and emphasized that "no party has provided any specific reason why it is necessary to reopen the record and take further evidence." Paper Proceeding Notice at 7 (JA224). In particular, the Judges rejected IBS's suggestion that a new hearing was necessary because the prior panel had observed and evaluated the demeanor of witnesses: "IBS fails . . . to point to any instance of an

16

exclusion of relevant evidence that affected the outcome of the proceeding, or to any portion of the Final Determination that turned on witness credibility." *Ibid.*

The Judges therefore sensibly elected to conduct a paper proceeding on the existing record. The Copyright Act authorizes the Judges to dispense with a live evidentiary hearing and issue a determination on the basis of the paper record in such "circumstances as the Copyright Royalty Judges consider appropriate," 17 U.S.C. § 803(b)(5)(B), provided that they first afford the parties "the opportunity to comment" on their decision to do so, *id.* § 803(b)(5). The Judges accordingly issued a notice announcing their decision to conduct the remand by paper proceeding and soliciting comments from the parties. *See* Paper Proceeding Notice at 9 (JA226). The notice explained that "it is the intention of the Judges to confine their review to the voluminous existing record . . . that was created by all of the parties, including IBS, with regard to all issues." Paper Proceeding Notice at 8 (JA225). The Judges stressed they would be "free to reach completely different conclusions in their new final determination." Paper Proceeding Notice at 5 (JA222).

In response, each party submitted comments "repeat[ing] its respective position regarding the remand procedure." Paper Proceeding Order at 1 (JA233). Finding no reason to conduct a new evidentiary hearing, therefore, the Judges ordered that the matter would be submitted on the papers: "[T]he Judges shall proceed with their consideration *de novo* on the existing record. The Judges will accept no further submissions." *Ibid.*

17

2.    The new Judges accordingly reviewed *de novo* the entire record of the proceeding before the prior panel, including thousands of pages of transcripts from the ten-day evidentiary hearing, and issued a new determination of rates and terms for the webcasting statutory license for the 2011 to 2015 period.  *See* FD 23,102-03 (JA257-58) (describing the scope of the evidence the Judges considered).

The determination leaves no doubt that the new Judges exercised independent judgment.  Although the new Judges ultimately came to rest on the same per-performance royalty rates (which are not challenged in this appeal), they analyzed the relevant market evidence differently in several respects.[4]  And it is the new panel's reasoning, not the prior panel's, that will have precedential weight in future webcasting ratemaking proceedings.  *See* 17 U.S.C. § 803(a)(1) (specifying that the Judges shall generally "act in accordance with . . . prior determinations").

Even on the question of the noncommercial webcasting minimum fee—the particular issue on which IBS contends the panel erred (Br. 33-39)—the new Judges' reasoning diverged from their predecessors'.  In particular, the new Judges identified

---

[4] For example, the new Judges reached different conclusions about the reasonable range of commercial webcasting royalty rates the record evidence could support.  The former panel found, based on the parties' proposed benchmarks, that appropriate webcasting royalty rates lay between $0.0019 and $0.0036 "per play," meaning for each performance by a webcasting service of a copyrighted sound recording.  76 Fed. Reg. at 13,035 (JA149).  After conducting their own analysis of the record evidence, the new Judges decided that the parties' evidence supported webcasting royalty rates between $0.0017 and $0.0025 per play, a substantially different range.  FD 23,120 (JA275).

additional concerns with IBS's evidence not mentioned by the prior panel. *Compare*

FD 23,123 & n.61 (JA278) (new determination) (discussing, *e.g.*, the staleness of IBS's

evidence even at the time of the evidentiary hearing), *with* 76 Fed. Reg. at 13,040-42

(JA154-56) (prior determination).

### B.    The Judges Were Not Required To Conduct a New Evidentiary Hearing on Remand

IBS contends (Br. 20-32) that the remand procedure was insufficient to cure

the constitutional error and that the new Judges were required personally to conduct a

new evidentiary hearing.  Yet IBS fails to explain why it was entitled to more than

what it received:  a *de novo* determination of the rates and terms of the webcasting

statutory license by a panel of Copyright Royalty Judges properly appointed under the

Constitution.

1.   IBS does not dispute that the Copyright Act authorizes the Judges to

conduct paper proceedings—that is, to issue ratemaking determinations without any

evidentiary hearing at all.  *See* 17 U.S.C. § 803(b)(5).  Indeed, IBS appears to recognize

(*see* Br. 31) that the Judges could have conducted a paper proceeding to establish the

rates and terms for the webcasting statutory license in the first instance.   IBS

nevertheless insists (Br. 20-32) that, because the prior panel conducted a live

evidentiary hearing, the new Judges could not purge the constitutional error without

conducting their own hearing as well.

That contention highlights the basic error in IBS's argument: the new Judges did not "ratif[y] . . . the old Judges' decision" (Br. 32), but issued a new determination following a new proceeding under Section 803(b) of the Copyright Act. The statute permits the Judges to conduct such a proceeding on the written record, without conducting an evidentiary hearing, and it was entirely appropriate for the Judges to exercise that authority in these circumstances.

IBS contends that "controlling precedent" required the Judges to conduct a new hearing, citing *Ryder* v. *United States*, 515 U.S. 177 (1995), and *Wingo* v. *Wedding*, 418 U.S. 461 (1974). But IBS misunderstands both decisions. The Supreme Court established in *Ryder* that "one who makes a timely challenge to the constitutional validity of the appointment of an officer who adjudicates his case is entitled to a decision on the merits of the question and whatever relief may be appropriate if a violation indeed occurred." 515 U.S. at 182-83. Thus, when IBS timely challenged the validity of the prior Judges' appointment, this Court adjudicated that challenge and granted the appropriate relief: vacatur of the prior determination. *See IBS I*, 684 F.3d at 1342. Nothing in *Ryder* addresses the procedures that the properly appointed Judges were required to employ on remand.

*Wingo* is similarly inapt. The Supreme Court in that case invalidated a local rule purporting to authorize magistrate judges to conduct evidentiary hearings in federal habeas corpus cases. Because the governing statute required the district court judge to "personally hold evidentiary hearings," *Wingo*, 418 U.S. at 472, the Court concluded

it was not sufficient for the district court instead to review *de novo* the results of a hearing actually held before a magistrate judge.  *See id.* at 472-74.  Here, as already discussed, Congress authorized the Judges to issue determinations without conducting any evidentiary hearing at all.  *See* 17 U.S.C. § 803(b)(5).  IBS thus received all the process to which it was entitled under the governing statute.

Moreover, as the Judges explained in their order denying rehearing, the provisions of the Copyright Act establishing the Copyright Royalty Judges foreclose IBS's contention that the Judges cannot issue a determination without having personally participated in the relevant evidentiary hearing.  Rehearing Order at 3 (JA236).  The Judges serve staggered six-year terms.  *See* 17 U.S.C. § 802(c).  But if IBS were correct that the Judges who issue a determination must be the same Judges who conducted the underlying evidentiary hearing, "the Judges would have to abandon proceedings that are ready, or nearly ready, for a determination and hold new hearings whenever a new Judge is appointed to fill a vacancy."  Rehearing Order at 3 (JA236).  Congress could not have intended that result, which "would have a disastrous impact on the ability of the Judges to carry out the duties assigned to them by Congress within the timeframe that Congress established."  *Ibid.*  The structure of the Copyright Act thus presumes that duly appointed Copyright Royalty Judges may issue determinations based on their own review of the record, even if they did not personally preside over an evidentiary hearing.

21

2.  IBS nevertheless argues that, absent a new evidentiary hearing, the new Judges' determination was "incurably tainted" (Br. 24) by the prior panel's participation in the evidentiary proceeding, notwithstanding the new Judges' *de novo* review of the record.  But this Court's decisions do not support IBS's theory of administrative original sin.

In *FEC* v. *Legi-Tech, Inc.*, 75 F.3d 704 (D.C. Cir. 1996), for example, the Court declined to compel a properly constituted FEC to commence a new enforcement proceeding, notwithstanding that a constitutional defect existed at the time of the original inquiry.  *Id.* at 707.  The Court was "willing to assume" that "some effects" of the earlier constitutional error would linger "no matter what course was followed," but nonetheless concluded that the properly reconstituted agency could ratify its prior actions.  *Id.* at 708-09.  The Court reached that conclusion, moreover, "despite misgivings about whether the new FEC had engaged in a 'real fresh deliberation,'" *Doolin Sec. Sav. Bank, FSB* v. *Office of Thrift Supervision*, 139 F.3d 203, 213 (D.C. Cir. 1998).  Here, by contrast, the three new Judges reviewed the entire record afresh.[5]

---

[5] Recognizing that *Legi-Tech* fatally undermines its theory of incurable taint, IBS seeks to distinguish the decision on various grounds.  Br. 25-28.  None is persuasive. It is true that *Legi-Tech* involved an administrative enforcement action rather than ratemaking, Br. 25-26, but it is difficult to imagine why that distinction would matter if IBS were correct that a validly appointed body may never act on the basis of a factual record assembled by an invalidly appointed one.  Likewise, IBS is correct that the voting membership of the FEC had not changed in *Legi-Tech*, *see* Br. 26, but that distinction only reinforces the weakness of IBS's taint argument here because the

*Continued on next page.*

Similarly, in *Doolin*, this Court upheld a determination of the properly appointed Director of the Office of Thrift Supervision, notwithstanding that the underlying agency proceeding had been commenced by an invalidly appointed official. 139 F.3d at 213-14.  The Court emphasized that the new Director had "made a detached and considered judgment" after acting "in the normal course of agency adjudication."  *Id.* at 213.  And in *J.J. Cassone Bakery, Inc.* v. *NLRB*, 554 F.3d 1041 (D.C. Cir. 2009), this Court upheld an order of the National Labor Relations Board based on evidence collected during a hearing conducted by an administrative law judge who was ostensibly biased in favor of the government.  *Id.* at 1045-46.  The Court observed that the Board "took pains" to "closely scrutinize[]" the entire record and concluded that "the agency's careful reassessment of the record" cured any asserted violation of the litigant's rights.  *Id.* at 1045.

As the new Judges explained, these precedents demonstrate that an agency need not "go[] back to the beginning" and reprise "all of the administrative or adjudicatory steps" to cure an earlier constitutional error.  *See* Paper Proceeding Notice at 6 (JA223).  Indeed, to our knowledge, this Court has never suggested that the Constitution requires more than an independent review of the relevant facts by a properly appointed official.

---

Librarian's appointments following this Court's decision resulted in a new determination by a new panel exercising independent judgment.

3.    IBS offers no reason to doubt that the new Judges exercised their independent judgment in reviewing the administrative record.  As already discussed, the Judges repeatedly indicated that they would review *de novo* the record "that was created by all of the parties, including IBS," and that they regarded themselves as "free to reach completely different conclusions in their new final determination." Paper Proceeding Notice at 5, 8 (JA222, 225).  In urging the contrary, IBS highlights the Judges' remark in their rehearing order that the new panel "picked up the process where th[e] earlier Judges left off."  Br. 30 (quoting Rehearing Order at 2 (JA235)). But as the context makes clear, the Judges made that remark in responding to IBS's contention that the new panel had improperly "delegated" its authority to hold evidentiary hearings to the prior panel:  as the Judges explained, that argument "confuses 'delegation' with 'succession.'"  Rehearing Order at 2 (JA235).  The Judges went on to emphasize that "[t]he current panel weighed and analyzed the record *de novo*." Rehearing Order at 3 (JA236).

In any event, even now, IBS has not identified any respect in which it was prejudiced by the Judges' decision to conduct the remand on the paper record.  The Judges explained in their Paper Proceeding Notice that IBS had failed "to point to any instance of an exclusion of relevant evidence that affected the outcome of the proceeding, or to any portion of the Final Determination that turned on witness credibility."  Paper Proceeding Notice at 7 (JA224).  In its appellate brief, IBS asserts that the Judges were "too quick to assume that IBS was not prejudiced" (Br. 29), but

24

again fails to identify any specific respect in which they were harmed by the Judges' *de novo* review of the written record and transcripts. IBS observes, for example, that the new Judges could not consider evidence that the prior panel excluded (Br. 32 & n.66), but it does not point to any *actual* proffered evidence that IBS believes the new Judges should have considered.[6] For this reason as well, IBS's challenge to the remand procedures must be rejected.

## II. THE MINIMUM ANNUAL FEE ESTABLISHED BY THE COPYRIGHT ROYALTY JUDGES IS REASONABLE, CONSISTENT WITH THE COPYRIGHT ACT, AND SUPPORTED BY SUBSTANTIAL EVIDENCE

The only aspect of the determination that IBS challenges on the merits is the Judges' conclusion that all noncommercial webcasting services should pay a minimum annual fee of $500 per station or channel. FD 23,120-24 (JA275-79). The Copyright Act requires the Judges to establish a minimum annual fee for the webcasting statutory license. *See* 17 U.S.C. § 114(f)(2)(A). IBS contends that, in setting that minimum fee, the Judges failed to draw appropriate distinctions among webcasters of different types and failed to set a minimum fee that perfectly tracks a free market. As we explain below, on any view of the record, the minimum annual fee adopted by the new Judges is reasonable and supported by substantial evidence.

---

[6] In any event, the new Judges did consider evidence excluded by the prior panel—"the testimony of IBS's sole rebuttal witness"—and concluded that even if the witness's testimony had been admitted, "it could not have made up for the deficiencies of IBS's direct case." FD 23,122 n.60 (JA277).

### A.  The Copyright Royalty Judges Rationally Set a Minimum Annual Fee for Noncommercial Webcasting Services of $500 Per Station or Channel

In establishing the rates and terms for the webcasting license, including the applicable minimum fee, the Judges distinguished between commercial webcasting services and noncommercial services.  As the Judges observed, the agency had concluded in past licensing periods that "up to a point, certain 'noncommercial' webcasters may constitute a distinct segment of the noninteractive webcasting market."  FD 23,122 (JA277) (internal quotations omitted); *see* 17 U.S.C. § 114(f)(2)(B) (directing the Judges to "distinguish among the different types" of webcasters).  Both SoundExchange and IBS encouraged the new Judges to maintain this distinction in the proceeding below.  *See* FD 23,122 (JA277).  The parties also agreed that noncommercial webcasting services that do not exceed a certain threshold number of performances, measured by the number of hours of sound recordings subject to the statutory license that are performed by the webcasting service ("aggregate tuning hours"), should pay *only* the minimum annual fee, with no additional royalty obligation.  *See ibid.*; 37 C.F.R. § 380.2 (defining "Aggregate Tuning Hours").[7]

---

[7] The minimum annual fee per channel or station is credited against a noncommercial webcaster's royalty obligation.  37 C.F.R. § 380.3(b)(2).  In a portion of the determination that IBS does not contest, the new Judges established a $500 annual per channel or station performance royalty rate for certain noncommercial webcasters.  *See id.* § 380.3(a)(2)(i); FD 23,122 (JA277) (explaining that this structure imposes "what is economically a zero rate for the sound recordings" performed by such services).  Thus, even if the new Judges had adopted IBS's proposed "small" and

*Continued on next page.*

The parties disputed, however, the appropriate amount of the minimum fee for webcasters below that threshold. IBS proposed that the Judges further distinguish among noncommercial webcasters by dividing them into three subgroups according to size. IBS contended that "small" or "very small" webcasters should pay minimum annual fees respectively of only $50 and $20 per station or channel, arguing that no higher fee would be affordable. *See* FD 23,121-23 (JA276-78). SoundExchange, in contrast, proposed a flat minimum fee of $500 per station or channel. SoundExchange based that figure on an agreement it had struck with College Broadcasters, an organization that likewise represents noncommercial webcasters, in which College Broadcasters agreed to a $500 minimum annual fee for college radio stations and certain other noncommercial webcasting services. *See* FD 23,120 (JA275); 17 U.S.C. § 114(f)(2)(B) (authorizing the Judges to consider voluntary license agreements in setting webcasting rates and terms).

The Judges rejected IBS's proposal and credited SoundExchange's. As the Judges explained, the Copyright Act directs them to set rates that approximate what "would have been negotiated in the marketplace between a willing buyer and a willing seller." 17 U.S.C. § 114(f)(2)(B) (instructing the Judges to choose the fee "that most clearly" satisfies this standard); FD 23,122 (JA277). The Judges pointed out that the record included written comments from 24 noncommercial webcasters in support of a

"very small" noncommercial webcasting subcategories and minimum fees, these webcasters would still be required annually to pay $500 per station or channel.

$500 minimum fee, plus written direct testimony showing that, on average, SoundExchange annually incurred about $825 per channel or station in administrative costs connected to the statutory license. FD 23,123-24 (JA278-79). The Judges found these facts "persuasive evidence that SoundExchange's proposal satisfies the willing buyer/willing seller standard." FD 23,123 (JA278).

The Judges considered and rejected IBS's contention that a $500 minimum fee was unreasonably high for smaller noncommercial webcasters. The Judges noted that no webcaster in IBS's proposed categories had actually asserted that a $500 minimum fee would be prohibitively high. *See* FD 23,121 (JA276) (noting that "IBS did not offer testimony from *any* adversely affected member" despite the prior panel's invitation to do so) (emphasis added). And in any event, the Judges explained, "even if there were a sufficient basis in the record to conclude that 'small' and 'very small' noncommercial webcasters are unable to pay a $500 minimum fee," that would not by itself provide a basis for doubting the reasonableness of the $500 fee unless "a willing seller in a hypothetical marketplace would be prepared to negotiate a different, lower rate." FD 23,123 (JA278). The Judges observed that such a proposition "is particularly dubious in this proceeding" because a willing seller would not likely "agree to a price that is substantially below its administrative costs." *Ibid.*

Based on all these considerations, the new Judges concluded that substantial evidence supported setting the minimum annual fee at $500 per station or channel for all noncommercial webcasters. *See* FD 23,120-24 (JA275-79).

28

**B.    IBS Fails to Demonstrate Any Error in the Copyright Royalty Judges' Determination**

IBS's principal contention is that the Judges failed adequately to distinguish among types of webcasters. The company asserts (Br. 33-35, 39) that the new Judges ignored "a clear statutory requirement" because they "set the same minimum annual fee for *all* commercial and noncommercial webcasters," "completely failing to distinguish among them." As the determination makes clear on its face, that contention is without merit. The Judges distinguished among and separately addressed the rates and terms appropriate for different types of webcasters in the marketplace, including commercial and noncommercial services. *See generally* FD 23,105-27 (JA260-82). Although they also set the minimum fee for commercial services at $500, they did so *because that was the minimum fee upon which commercial broadcasters agreed* in a voluntary settlement agreement. FD 23,102 & n.1 (JA257). Section 114 of the Copyright Act requires the Judges to give effect to such voluntary agreements "in lieu of" any determination. *See* 17 U.S.C. § 114(f)(3). IBS cannot suppose that this constitutes error.

In any event, the Judges' statutory responsibility to distinguish among different types of webcasting services in establishing the royalty rates and terms for the Section 114 statutory license and to set a minimum fee for each type of service, *see id.* § 114(f)(2)(B), does not mean that the minimum fees must themselves be different. As IBS does not dispute, the Judges set per-performance royalty rates and payment

terms for commercial webcasting services that are different from those for noncommercial services.  In particular, only noncommercial webcasters that do not exceed a certain threshold number of performances may pay the minimum fee without any additional per-performance royalty obligation.  *See* FD 23,121-23 (JA276-78).  The Judges thus distinguished among different types of webcasting services in their determination.

IBS next essays that the $500 fee does not "*most clearly* reflect" what copyright owners and noncommercial webcasters "would negotiate in the marketplace."  Br. 35 (emphasis in original) (citing 17 U.S.C. § 114(f)(2)(B)).  But as this Court has observed, "[t]he statute does not require that the market assumed by the Judges achieve metaphysical perfection."  *Intercollegiate Broadcast System, Inc.*, 571 F.3d at 77.  The Judges reasonably concluded that the statutory standard was satisfied by evidence that copyright owners and certain noncommercial webcasters voluntarily agreed to a $500 minimum annual fee per station or channel; that SoundExchange's associated administrative costs exceed this fee; and that noncommercial webcasters were willing and able to pay it.  *See* FD 23,120-24 (JA275-79); *see also* 17 U.S.C. § 114(f)(2)(B) (providing that the Judges "may consider . . . voluntary license agreements" when establishing royalty rates and terms under the statutory license).

Finally, IBS asserts (Br. 36-39) that the Judges engaged in "backward reasoning" and "ignored" the company's evidence in service of setting a minimum annual fee without basis in the record.  This contention cannot be squared with any

30

fair reading of the determination.  IBS itself appears to recognize (*see* Br. 37, 39 n.70) that the company's best evidence in support of its proposal was testimony about a decade-old survey that was absent from the record and, as the Judges explained, unhelpful in any event.  *See* FD 23,123 (JA278) (discussing the survey).  It was hardly capricious for the Judges to give other evidence more weight.

## CONCLUSION

For the foregoing reasons, the determination of the Copyright Royalty Judges should be affirmed.

Respectfully submitted,

JOYCE R. BRANDA
  *Acting Assistant Attorney General*

MARK R. FREEMAN
SONIA K. MCNEIL

 /s/ Sonia K. McNeil
SONIA K. MCNEIL
  *(202) 616-8209*
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7234*
  *U.S. Department of Justice*
  *950 Pennsylvania Ave., N.W.*
  *Washington, D.C.  20530*

NOVEMBER 2014

32

## CERTIFICATE OF COMPLIANCE WITH
## FEDERAL RULE OF APPELLATE PROCEDURE 32(A)

I hereby certify that this brief complies with the type-volume limitation set forth in Fed. R. App. Pro. 32(a)(7)(B) because it contains 7,925 words, excluding the parts of the brief exempted under Rule 32(a)(7)(B)(iii) and D.C. Circuit Rule 32(a)(1), according to the count of Microsoft Word.

I further certify that this brief complies with the requirements of Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in 14-point Garamond, a proportionally spaced font.

/s/ Sonia K. McNeil
SONIA K. McNEIL

## CERTIFICATE OF SERVICE

I hereby certify that on November 25, 2014, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system. I further certify that I will cause eight paper copies of this brief to be filed with the Court within three business days.

The participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

/s/ Sonia K. McNeil
SONIA K. McNEIL

# ADDENDUM

## ADDENDUM CONTENTS

**Page**

17 U.S.C. § 114..................................................................................A1

17 U.S.C. § 801..................................................................................A3

17 U.S.C. § 803..................................................................................A5

37 C.F.R. § 351.3..............................................................................A17

37 C.F.R. § 351.4..............................................................................A17

37 C.F.R. § 351.10............................................................................A18

**17 U.S.C. § 114.  Scope of exclusive rights in sound recordings**

. . .

**(f) Licenses for certain nonexempt transmissions.—**

. . .

    **(2)(A)** Proceedings under chapter 8 shall determine reasonable rates and terms of royalty payments for public performances of sound recordings by means of eligible nonsubscription transmission services and new subscription services specified by subsection (d)(2) during the 5-year period beginning on January 1 of the second year following the year in which the proceedings are to be commenced, except in the case of a different transitional period provided under section 6(b)(3) of the Copyright Royalty and Distribution Reform Act of 2004, or such other period as the parties may agree. Such rates and terms shall distinguish among the different types of eligible nonsubscription transmission services and new subscription services then in operation and shall include a minimum fee for each such type of service. Any copyright owners of sound recordings or any entities performing sound recordings affected by this paragraph may submit to the Copyright Royalty Judges licenses covering such eligible nonsubscription transmissions and new subscription services with respect to such sound recordings. The parties to each proceeding shall bear their own costs.

    **(B)** The schedule of reasonable rates and terms determined by the Copyright Royalty Judges shall, subject to paragraph (3), be binding on all copyright owners of sound recordings and entities performing sound recordings affected by this paragraph during the 5-year period specified in subparagraph (A), a transitional period provided under section 6(b)(3) of the Copyright and Distribution Act of 2004, or such other period as the parties may agree. Such rates and terms shall distinguish among the different types of eligible nonsubscription transmission services then in operation and shall include a minimum fee for each such type of service, such differences to be based on criteria including, but not limited to, the quantity and nature of the use of sound recordings and the degree to which use of the service may substitute for or may promote the purchase of phonorecords by consumers. In establishing rates and terms for transmissions by eligible nonsubscription services and new subscription services, the Copyright Royalty Judges shall establish rates and terms that most clearly represent the rates and terms that would have been negotiated in the marketplace between a willing buyer and a willing seller. In determining such rates and terms, the Copyright Royalty

Judges shall base their decision on economic, competitive and programming information presented by the parties, including--

>    **(i)** whether use of the service may substitute for or may promote the sales of phonorecords or otherwise may interfere with or may enhance the sound recording copyright owner's other streams of revenue from its sound recordings; and

>    **(ii)** the relative roles of the copyright owner and the transmitting entity in the copyrighted work and the service made available to the public with respect to relative creative contribution, technological contribution, capital investment, cost, and risk.

In establishing such rates and terms, the Copyright Royalty Judges may consider the rates and terms for comparable types of digital audio transmission services and comparable circumstances under voluntary license agreements described in subparagraph (A).

>    **(C)** The procedures under subparagraphs (A) and (B) shall also be initiated pursuant to a petition filed by any copyright owners of sound recordings or any eligible nonsubscription service or new subscription service indicating that a new type of eligible nonsubscription service or new subscription service on which sound recordings are performed is or is about to become operational, for the purpose of determining reasonable terms and rates of royalty payments with respect to such new type of service for the period beginning with the inception of such new type of service and ending on the date on which the royalty rates and terms for eligible nonsubscription services and new subscription services, as the case may be, most recently determined under subparagraph (A) or (B) and chapter 8 expire, or such other period as the parties may agree.

**(3)** License agreements voluntarily negotiated at any time between 1 or more copyright owners of sound recordings and 1 or more entities performing sound recordings shall be given effect in lieu of any decision by the Librarian of Congress or determination by the Copyright Royalty Judges.

. . . .

**17 U.S.C. § 801.  Copyright Royalty Judges; appointment and functions**

. . .

**(b) Functions.**--Subject to the provisions of this chapter, the functions of the Copyright Royalty Judges shall be as follows:

. . .

**(3)(A)** To authorize the distribution, under sections 111, 119, and 1007, of those royalty fees collected under sections 111, 119, and 1005, as the case may be, to the extent that the Copyright Royalty Judges have found that the distribution of such fees is not subject to controversy.

**(B)** In cases where the Copyright Royalty Judges determine that controversy exists, the Copyright Royalty Judges shall determine the distribution of such fees, including partial distributions, in accordance with section 111, 119, or 1007, as the case may be.

**(C)** Notwithstanding section 804(b)(8), the copyright royalty judges, at any time after the filing of claims under section 111, 119, or 1007, may, upon motion of one or more of the claimants and after publication in the Federal Register of a request for responses to the motion from interested claimants, make a partial distribution of such fees, if, based upon all responses received during the 30-day period beginning on the date of such publication, the copyright royalty judges conclude that no claimant entitled to receive such fees has stated a reasonable objection to the partial distribution, and all such claimants--

**(i)** agree to the partial distribution;

**(ii)** sign an agreement obligating them to return any excess amounts to the extent necessary to comply with the final determination on the distribution of the fees made under subparagraph (B);

**(iii)** file the agreement with the Copyright Royalty Judges; and

**(iv)** agree that such funds are available for distribution.

**(D)** The Copyright Royalty Judges and any other officer or employee acting in good faith in distributing funds under subparagraph (C) shall not be

held liable for the payment of any excess fees under subparagraph (C). The Copyright Royalty Judges shall, at the time the final determination is made, calculate any such excess amounts.

**(4)** To accept or reject royalty claims filed under sections 111, 119, and 1007, on the basis of timeliness or the failure to establish the basis for a claim.

**(5)** To accept or reject rate adjustment petitions as provided in section 804 and petitions to participate as provided in section 803(b)(1) and (2).

**(6)** To determine the status of a digital audio recording device or a digital audio interface device under sections 1002 and 1003, as provided in section 1010.

**(7)(A)** To adopt as a basis for statutory terms and rates or as a basis for the distribution of statutory royalty payments, an agreement concerning such matters reached among some or all of the participants in a proceeding at any time during the proceeding, except that--

> **(i)** the Copyright Royalty Judges shall provide to those that would be bound by the terms, rates, or other determination set by any agreement in a proceeding to determine royalty rates an opportunity to comment on the agreement and shall provide to participants in the proceeding under section 803(b)(2) that would be bound by the terms, rates, or other determination set by the agreement an opportunity to comment on the agreement and object to its adoption as a basis for statutory terms and rates; and

> **(ii)** the Copyright Royalty Judges may decline to adopt the agreement as a basis for statutory terms and rates for participants that are not parties to the agreement, if any participant described in clause (i) objects to the agreement and the Copyright Royalty Judges conclude, based on the record before them if one exists, that the agreement does not provide a reasonable basis for setting statutory terms or rates.

**(B)** License agreements voluntarily negotiated pursuant to section 112(e)(5), 114(f)(3), 115(c)(3)(E)(i), 116(c), or 118(b)(2) that do not result in statutory terms and rates shall not be subject to clauses (i) and (ii) of subparagraph (A).

**(C)** Interested parties may negotiate and agree to, and the Copyright Royalty Judges may adopt, an agreement that specifies as terms notice and

recordkeeping requirements that apply in lieu of those that would otherwise apply under regulations.

**(8)** To perform other duties, as assigned by the Register of Copyrights within the Library of Congress, except as provided in section 802(g), at times when Copyright Royalty Judges are not engaged in performing the other duties set forth in this section.

**(c) Rulings.**--The Copyright Royalty Judges may make any necessary procedural or evidentiary rulings in any proceeding under this chapter and may, before commencing a proceeding under this chapter, make any such rulings that would apply to the proceedings conducted by the Copyright Royalty Judges.

. . . .

## 17 U.S.C. § 803.  Proceedings of Copyright Royalty Judges

**(a) Proceedings.--**

**(1) In general.**--The Copyright Royalty Judges shall act in accordance with this title, and to the extent not inconsistent with this title, in accordance with subchapter II of chapter 5 of title 5, in carrying out the purposes set forth in section 801.The Copyright Royalty Judges shall act in accordance with regulations issued by the Copyright Royalty Judges and the Librarian of Congress, and on the basis of a written record, prior determinations and interpretations of the Copyright Royalty Tribunal, Librarian of Congress, the Register of Copyrights, copyright arbitration royalty panels (to the extent those determinations are not inconsistent with a decision of the Librarian of Congress or the Register of Copyrights), and the Copyright Royalty Judges (to the extent those determinations are not inconsistent with a decision of the Register of Copyrights that was timely delivered to the Copyright Royalty Judges pursuant to section 802(f)(1)(A) or (B), or with a decision of the Register of Copyrights pursuant to section 802(f)(1)(D)), under this chapter, and decisions of the court of appeals under this chapter before, on, or after the effective date of the Copyright Royalty and Distribution Reform Act of 2004.

**(2) Judges acting as panel and individually.**--The Copyright Royalty Judges shall preside over hearings in proceedings under this chapter en banc. The Chief Copyright Royalty Judge may designate a Copyright Royalty Judge to preside individually over such collateral and administrative proceedings, and over such

proceedings under paragraphs (1) through (5) of subsection (b), as the Chief Judge considers appropriate.

**(3) Determinations.**--Final determinations of the Copyright Royalty Judges in proceedings under this chapter shall be made by majority vote. A Copyright Royalty Judge dissenting from the majority on any determination under this chapter may issue his or her dissenting opinion, which shall be included with the determination.

**(b) Procedures.**--

**(1) Initiation.**--

**(A) Call for petitions to participate.--(i)** The Copyright Royalty Judges shall cause to be published in the Federal Register notice of commencement of proceedings under this chapter, calling for the filing of petitions to participate in a proceeding under this chapter for the purpose of making the relevant determination under section 111, 112, 114, 115, 116, 118, 119, 1004, or 1007, as the case may be--

**(I)** promptly upon a determination made under section 804(a);

**(II)** by no later than January 5 of a year specified in paragraph (2) of section 804(b) for the commencement of proceedings;

**(III)** by no later than January 5 of a year specified in subparagraph (A) or (B) of paragraph (3) of section 804(b) for the commencement of proceedings, or as otherwise provided in subparagraph (A) or (C) of such paragraph for the commencement of proceedings;

**(IV)** as provided under section 804(b)(8); or

**(V)** by no later than January 5 of a year specified in any other provision of section 804(b) for the filing of petitions for the commencement of proceedings, if a petition has not been filed by that date, except that the publication of notice requirement shall not apply in the case of proceedings under section 111 that are scheduled to commence in 2005.

**(ii)** Petitions to participate shall be filed by no later than 30 days after publication of notice of commencement of a proceeding under clause (i),

except that the Copyright Royalty Judges may, for substantial good cause shown and if there is no prejudice to the participants that have already filed petitions, accept late petitions to participate at any time up to the date that is 90 days before the date on which participants in the proceeding are to file their written direct statements. Notwithstanding the preceding sentence, petitioners whose petitions are filed more than 30 days after publication of notice of commencement of a proceeding are not eligible to object to a settlement reached during the voluntary negotiation period under paragraph (3), and any objection filed by such a petitioner shall not be taken into account by the Copyright Royalty Judges.

**(B) Petitions to participate.**--Each petition to participate in a proceeding shall describe the petitioner's interest in the subject matter of the proceeding. Parties with similar interests may file a single petition to participate.

**(2) Participation in general.**--Subject to paragraph (4), a person may participate in a proceeding under this chapter, including through the submission of briefs or other information, only if--

**(A)** that person has filed a petition to participate in accordance with paragraph (1) (either individually or as a group under paragraph (1)(B));

**(B)** the Copyright Royalty Judges have not determined that the petition to participate is facially invalid;

**(C)** the Copyright Royalty Judges have not determined, sua sponte or on the motion of another participant in the proceeding, that the person lacks a significant interest in the proceeding; and

**(D)** the petition to participate is accompanied by either--

**(i)** in a proceeding to determine royalty rates, a filing fee of $150; or

**(ii)** in a proceeding to determine distribution of royalty fees--

**(I)** a filing fee of $150; or

**(II)** a statement that the petitioner (individually or as a group) will not seek a distribution of more than $1000, in which

-A7-

case the amount distributed to the petitioner shall not exceed $1000.

**(3) Voluntary negotiation period.**--

 **(A) Commencement of proceedings.**--

  **(i) Rate adjustment proceeding.**--Promptly after the date for filing of petitions to participate in a proceeding, the Copyright Royalty Judges shall make available to all participants in the proceeding a list of such participants and shall initiate a voluntary negotiation period among the participants.

  **(ii) Distribution proceeding.**--Promptly after the date for filing of petitions to participate in a proceeding to determine the distribution of royalties, the Copyright Royalty Judges shall make available to all participants in the proceeding a list of such participants. The initiation of a voluntary negotiation period among the participants shall be set at a time determined by the Copyright Royalty Judges.

 **(B) Length of proceedings.**--The voluntary negotiation period initiated under subparagraph (A) shall be 3 months.

 **(C) Determination of subsequent proceedings.**--At the close of the voluntary negotiation proceedings, the Copyright Royalty Judges shall, if further proceedings under this chapter are necessary, determine whether and to what extent paragraphs (4) and (5) will apply to the parties.

. . .

**(5) Paper proceedings.**--The Copyright Royalty Judges in proceedings under this chapter may decide, sua sponte or upon motion of a participant, to determine issues on the basis of the filing of the written direct statement by the participant, the response by any opposing participant, and one additional response by each such participant. Prior to making such decision to proceed on such a paper record only, the Copyright Royalty Judges shall offer to all parties to the proceeding the opportunity to comment on the decision. The procedure under this paragraph--

 **(A)** shall be applied in cases in which there is no genuine issue of material fact, there is no need for evidentiary hearings, and all participants in the proceeding agree in writing to the procedure; and

**(B)** may be applied under such other circumstances as the Copyright Royalty Judges consider appropriate.

**(6) Regulations.**--

**(A) In general.**--The Copyright Royalty Judges may issue regulations to carry out their functions under this title. All regulations issued by the Copyright Royalty Judges are subject to the approval of the Librarian of Congress and are subject to judicial review pursuant to chapter 7 of title 5, except as set forth in subsection (d). Not later than 120 days after Copyright Royalty Judges or interim Copyright Royalty Judges, as the case may be, are first appointed after the enactment of the Copyright Royalty and Distribution Reform Act of 2004, such judges shall issue regulations to govern proceedings under this chapter.

**(B) Interim regulations.**--Until regulations are adopted under subparagraph (A), the Copyright Royalty Judges shall apply the regulations in effect under this chapter on the day before the effective date of the Copyright Royalty and Distribution Reform Act of 2004, to the extent such regulations are not inconsistent with this chapter, except that functions carried out under such regulations by the Librarian of Congress, the Register of Copyrights, or copyright arbitration royalty panels that, as of such date of enactment, are to be carried out by the Copyright Royalty Judges under this chapter, shall be carried out by the Copyright Royalty Judges under such regulations.

**(C) Requirements.**--Regulations issued under subparagraph (A) shall include the following:

**(i)** The written direct statements and written rebuttal statements of all participants in a proceeding under paragraph (2) shall be filed by a date specified by the Copyright Royalty Judges, which, in the case of written direct statements, may be not earlier than 4 months, and not later than 5 months, after the end of the voluntary negotiation period under paragraph (3). Notwithstanding the preceding sentence, the Copyright Royalty Judges may allow a participant in a proceeding to file an amended written direct statement based on new information received during the discovery process, within 15 days after the end of the discovery period specified in clause (iv).

**(ii)(I)** Following the submission to the Copyright Royalty Judges of written direct statements and written rebuttal statements by the participants in a proceeding under paragraph (2), the Copyright Royalty

Judges, after taking into consideration the views of the participants in the proceeding, shall determine a schedule for conducting and completing discovery.

>**(II)** In this chapter, the term "written direct statements" means witness statements, testimony, and exhibits to be presented in the proceedings, and such other information that is necessary to establish terms and rates, or the distribution of royalty payments, as the case may be, as set forth in regulations issued by the Copyright Royalty Judges.

**(iii)** Hearsay may be admitted in proceedings under this chapter to the extent deemed appropriate by the Copyright Royalty Judges.

**(iv)** Discovery in connection with written direct statements shall be permitted for a period of 60 days, except for discovery ordered by the Copyright Royalty Judges in connection with the resolution of motions, orders, and disputes pending at the end of such period. The Copyright Royalty Judges may order a discovery schedule in connection with written rebuttal statements.

**(v)** Any participant under paragraph (2) in a proceeding under this chapter to determine royalty rates may request of an opposing participant nonprivileged documents directly related to the written direct statement or written rebuttal statement of that participant. Any objection to such a request shall be resolved by a motion or request to compel production made to the Copyright Royalty Judges in accordance with regulations adopted by the Copyright Royalty Judges. Each motion or request to compel discovery shall be determined by the Copyright Royalty Judges, or by a Copyright Royalty Judge when permitted under subsection (a)(2). Upon such motion, the Copyright Royalty Judges may order discovery pursuant to regulations established under this paragraph.

**(vi)(I)** Any participant under paragraph (2) in a proceeding under this chapter to determine royalty rates may, by means of written motion or on the record, request of an opposing participant or witness other relevant information and materials if, absent the discovery sought, the Copyright Royalty Judges' resolution of the proceeding would be substantially impaired. In determining whether discovery will be granted under this clause, the Copyright Royalty Judges may consider--

**(aa)** whether the burden or expense of producing the requested information or materials outweighs the likely benefit, taking into account the needs and resources of the participants, the importance of the issues at stake, and the probative value of the requested information or materials in resolving such issues;

**(bb)** whether the requested information or materials would be unreasonably cumulative or duplicative, or are obtainable from another source that is more convenient, less burdensome, or less expensive; and

**(cc)** whether the participant seeking discovery has had ample opportunity by discovery in the proceeding or by other means to obtain the information sought.

**(II)** This clause shall not apply to any proceeding scheduled to commence after December 31, 2010.

**(vii)** In a proceeding under this chapter to determine royalty rates, the participants entitled to receive royalties shall collectively be permitted to take no more than 10 depositions and secure responses to no more than 25 interrogatories, and the participants obligated to pay royalties shall collectively be permitted to take no more than 10 depositions and secure responses to no more than 25 interrogatories. The Copyright Royalty Judges shall resolve any disputes among similarly aligned participants to allocate the number of depositions or interrogatories permitted under this clause.

**(viii)** The rules and practices in effect on the day before the effective date of the Copyright Royalty and Distribution Reform Act of 2004, relating to discovery in proceedings under this chapter to determine the distribution of royalty fees, shall continue to apply to such proceedings on and after such effective date.

**(ix)** In proceedings to determine royalty rates, the Copyright Royalty Judges may issue a subpoena commanding a participant or witness to appear and give testimony, or to produce and permit inspection of documents or tangible things, if the Copyright Royalty Judges' resolution of the proceeding would be substantially impaired by the absence of such testimony or production of documents or tangible things. Such subpoena shall specify with reasonable particularity the

materials to be produced or the scope and nature of the required testimony. Nothing in this clause shall preclude the Copyright Royalty Judges from requesting the production by a nonparticipant of information or materials relevant to the resolution by the Copyright Royalty Judges of a material issue of fact.

(x) The Copyright Royalty Judges shall order a settlement conference among the participants in the proceeding to facilitate the presentation of offers of settlement among the participants. The settlement conference shall be held during a 21-day period following the 60-day discovery period specified in clause (iv) and shall take place outside the presence of the Copyright Royalty Judges.

(xi) No evidence, including exhibits, may be submitted in the written direct statement or written rebuttal statement of a participant without a sponsoring witness, except where the Copyright Royalty Judges have taken official notice, or in the case of incorporation by reference of past records, or for good cause shown.

**(c) Determination of Copyright Royalty Judges.**--

**(1) Timing.**--The Copyright Royalty Judges shall issue their determination in a proceeding not later than 11 months after the conclusion of the 21-day settlement conference period under subsection (b)(6)(C)(x), but, in the case of a proceeding to determine successors to rates or terms that expire on a specified date, in no event later than 15 days before the expiration of the then current statutory rates and terms.

**(2) Rehearings.**--

**(A) In general.**--The Copyright Royalty Judges may, in exceptional cases, upon motion of a participant in a proceeding under subsection (b)(2), order a rehearing, after the determination in the proceeding is issued under paragraph (1), on such matters as the Copyright Royalty Judges determine to be appropriate.

**(B) Timing for filing motion.**--Any motion for a rehearing under subparagraph (A) may only be filed within 15 days after the date on which the Copyright Royalty Judges deliver to the participants in the proceeding their initial determination.

**(C) Participation by opposing party not required.**--In any case in which a rehearing is ordered, any opposing party shall not be required to participate in the rehearing, except that nonparticipation may give rise to the limitations with respect to judicial review provided for in subsection (d)(1).

**(D) No negative inference.**--No negative inference shall be drawn from lack of participation in a rehearing.

**(E) Continuity of rates and terms.--(i)** If the decision of the Copyright Royalty Judges on any motion for a rehearing is not rendered before the expiration of the statutory rates and terms that were previously in effect, in the case of a proceeding to determine successors to rates and terms that expire on a specified date, then--

    **(I)** the initial determination of the Copyright Royalty Judges that is the subject of the rehearing motion shall be effective as of the day following the date on which the rates and terms that were previously in effect expire; and

    **(II)** in the case of a proceeding under section 114(f)(1)(C) or 114(f)(2)(C), royalty rates and terms shall, for purposes of section 114(f)(4)(B), be deemed to have been set at those rates and terms contained in the initial determination of the Copyright Royalty Judges that is the subject of the rehearing motion, as of the date of that determination.

**(ii)** The pendency of a motion for a rehearing under this paragraph shall not relieve persons obligated to make royalty payments who would be affected by the determination on that motion from providing the statements of account and any reports of use, to the extent required, and paying the royalties required under the relevant determination or regulations.

**(iii)** Notwithstanding clause (ii), whenever royalties described in clause (ii) are paid to a person other than the Copyright Office, the entity designated by the Copyright Royalty Judges to which such royalties are paid by the copyright user (and any successor thereto) shall, within 60 days after the motion for rehearing is resolved or, if the motion is granted, within 60 days after the rehearing is concluded, return any excess amounts previously paid to the extent necessary to comply with the final determination of royalty rates by the Copyright Royalty Judges. Any underpayment of royalties resulting from a rehearing shall be paid within the same period.

**(3) Contents of determination.**--A determination of the Copyright Royalty Judges shall be supported by the written record and shall set forth the findings of fact relied on by the Copyright Royalty Judges. Among other terms adopted in a determination, the Copyright Royalty Judges may specify notice and recordkeeping requirements of users of the copyrights at issue that apply in lieu of those that would otherwise apply under regulations.

**(4) Continuing jurisdiction.**--The Copyright Royalty Judges may issue an amendment to a written determination to correct any technical or clerical errors in the determination or to modify the terms, but not the rates, of royalty payments in response to unforeseen circumstances that would frustrate the proper implementation of such determination. Such amendment shall be set forth in a written addendum to the determination that shall be distributed to the participants of the proceeding and shall be published in the Federal Register.

**(5) Protective order.**--The Copyright Royalty Judges may issue such orders as may be appropriate to protect confidential information, including orders excluding confidential information from the record of the determination that is published or made available to the public, except that any terms or rates of royalty payments or distributions may not be excluded.

**(6) Publication of determination.**--By no later than the end of the 60-day period provided in section 802(f)(1)(D), the Librarian of Congress shall cause the determination, and any corrections thereto, to be published in the Federal Register. The Librarian of Congress shall also publicize the determination and corrections in such other manner as the Librarian considers appropriate, including, but not limited to, publication on the Internet. The Librarian of Congress shall also make the determination, corrections, and the accompanying record available for public inspection and copying.

**(7) Late payment.**--A determination of the Copyright Royalty Judges may include terms with respect to late payment, but in no way shall such terms prevent the copyright holder from asserting other rights or remedies provided under this title.

**(d) Judicial review.**--

**(1) Appeal.**--Any determination of the Copyright Royalty Judges under subsection (c) may, within 30 days after the publication of the determination in the Federal Register, be appealed, to the United States Court of Appeals for the District of Columbia Circuit, by any aggrieved participant in the proceeding under subsection

(b)(2) who fully participated in the proceeding and who would be bound by the determination. Any participant that did not participate in a rehearing may not raise any issue that was the subject of that rehearing at any stage of judicial review of the hearing determination. If no appeal is brought within that 30-day period, the determination of the Copyright Royalty Judges shall be final, and the royalty fee or determination with respect to the distribution of fees, as the case may be, shall take effect as set forth in paragraph (2).

**(2) Effect of rates.**--

    **(A) Expiration on specified date.**--When this title provides that the royalty rates and terms that were previously in effect are to expire on a specified date, any adjustment or determination by the Copyright Royalty Judges of successor rates and terms for an ensuing statutory license period shall be effective as of the day following the date of expiration of the rates and terms that were previously in effect, even if the determination of the Copyright Royalty Judges is rendered on a later date. A licensee shall be obligated to continue making payments under the rates and terms previously in effect until such time as rates and terms for the successor period are established. Whenever royalties pursuant to this section are paid to a person other than the Copyright Office, the entity designated by the Copyright Royalty Judges to which such royalties are paid by the copyright user (and any successor thereto) shall, within 60 days after the final determination of the Copyright Royalty Judges establishing rates and terms for a successor period or the exhaustion of all rehearings or appeals of such determination, if any, return any excess amounts previously paid to the extent necessary to comply with the final determination of royalty rates. Any underpayment of royalties by a copyright user shall be paid to the entity designated by the Copyright Royalty Judges within the same period.

    **(B) Other cases.**--In cases where rates and terms have not, prior to the inception of an activity, been established for that particular activity under the relevant license, such rates and terms shall be retroactive to the inception of activity under the relevant license covered by such rates and terms. In other cases where rates and terms do not expire on a specified date, successor rates and terms shall take effect on the first day of the second month that begins after the publication of the determination of the Copyright Royalty Judges in the Federal Register, except as otherwise provided in this title, or by the Copyright Royalty Judges, or as agreed by the participants in a proceeding that would be bound by the rates and terms. Except as otherwise provided in this

title, the rates and terms, to the extent applicable, shall remain in effect until such successor rates and terms become effective.

**(C) Obligation to make payments.**--

**(i)** The pendency of an appeal under this subsection shall not relieve persons obligated to make royalty payments under section 111, 112, 114, 115, 116, 118, 119, or 1003, who would be affected by the determination on appeal, from--

**(I)** providing the applicable statements of account and reports of use; and

**(II)** paying the royalties required under the relevant determination or regulations.

**(ii)** Notwithstanding clause (i), whenever royalties described in clause (i) are paid to a person other than the Copyright Office, the entity designated by the Copyright Royalty Judges to which such royalties are paid by the copyright user (and any successor thereto) shall, within 60 days after the final resolution of the appeal, return any excess amounts previously paid (and interest thereon, if ordered pursuant to paragraph (3)) to the extent necessary to comply with the final determination of royalty rates on appeal. Any underpayment of royalties resulting from an appeal (and interest thereon, if ordered pursuant to paragraph (3)) shall be paid within the same period.

**(3) Jurisdiction of court.**--Section 706 of title 5 shall apply with respect to review by the court of appeals under this subsection. If the court modifies or vacates a determination of the Copyright Royalty Judges, the court may enter its own determination with respect to the amount or distribution of royalty fees and costs, and order the repayment of any excess fees, the payment of any underpaid fees, and the payment of interest pertaining respectively thereto, in accordance with its final judgment. The court may also vacate the determination of the Copyright Royalty Judges and remand the case to the Copyright Royalty Judges for further proceedings in accordance with subsection (a).

. . . .

**37 C.F.R. § 351.3 Controversy and further proceedings.**

**(a) Declaration of controversy.**  If a settlement has not been reached within the voluntary negotiation period, the Copyright Royalty Judges will issue an order declaring that further proceedings are necessary. The procedures set forth at §§ 351.5, et seq., for formal hearings will apply, unless the abbreviated procedures set forth in paragraphs (b) and (c) of this section are invoked by the Copyright Royalty Judges.

. . .

**(c) Paper proceedings--**

    **(1) Standard.**  The procedure under this paragraph (c) will be applied in cases in which there is no genuine issue of material fact, there is no need for evidentiary hearings, and all participants in the proceeding agree in writing to the procedure. In the absence of an agreement in writing among all participants, this procedure may be applied by the Copyright Royalty Judges either on the motion of a party or by the Copyright Royalty Judges sua sponte.

    **(2) Procedure.**  Paper proceedings will be decided on the basis of the filing of the written direct statement by the participant (or participant group filing a joint petition), the response by any opposing participant, and one optional reply by a participant who has filed a written direct statement.

**37 C.F.R. § 351.4 Written direct statements.**

**(a) Required filing; deadline.**  All parties who have filed a petition to participate in the hearing must file a written direct statement. The deadline for the filing of the written direct statement will be specified by the Copyright Royalty Judges, not earlier than 4 months, nor later than 5 months, after the end of the voluntary negotiation period set forth in § 351.2.

**(b) Required content.**

    **(1) Testimony.**  The written direct statement shall include all testimony, including each witness's background and qualifications, along with all the exhibits.

    **(2) Designated past records and testimony.**  Each participating party may designate a portion of past records, including records of the Copyright

Royalty Tribunal or Copyright Arbitration Royalty Panels, that it wants included in its direct statement. If a party intends to rely on any part of the testimony of a witness in a prior proceeding, the complete testimony of that witness (i.e., direct, cross and redirect examination) must be designated. The party submitting such past records and/or testimony shall include a copy with the written direct statement.

   **(3) Claim.**  In the case of a royalty distribution proceeding, each party must state in the written direct statement its percentage or dollar claim to the fund. In the case of a rate (or rates) proceeding, each party must state its requested rate. No party will be precluded from revising its claim or its requested rate at any time during the proceeding up to, and including, the filing of the proposed findings of fact and conclusions of law.

**(c) Amended written direct statements.**  A participant in a proceeding may amend a written direct statement based on new information received during the discovery process, within 15 days after the end of the discovery period. An amended written direct statement must explain how it differs from the written direct statement it will amend and must demonstrate that the amendment is based on new information received during the discovery process. The participant amending its written direct statement may file either the amended portions of the written direct statement or submit complete new copies at its option.


**37 C.F.R. § 351.10 Evidence.**

**(a) Admissibility.**  All evidence that is relevant and not unduly repetitious or privileged, shall be admissible. Hearsay may be admitted to the extent deemed appropriate by the Copyright Royalty Judges. Written testimony and exhibits must be authenticated or identified in order to be admissible as evidence. The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims. Extrinsic evidence of authenticity as a condition precedent to admissibility is not required with respect to materials that can be self-authenticated under Rule 902 of the Federal Rules of Evidence such as certain public records. No evidence, including exhibits, may be submitted without a sponsoring witness, except for good cause shown.

**(b) Examination of witnesses.**  All witnesses shall be required to take an oath or affirmation before testifying. Parties are entitled to conduct direct examination (consisting of the testimony of the witness in the written statements and an oral

summary of that testimony); cross-examination (limited to matters raised on direct examination); and redirect examination (limited to matters raised on cross-examination). The Copyright Royalty Judges may limit the number of witnesses or limit questioning to avoid cumulative testimony.

**(c) Exhibits--**

    **(1) Submission.** Writings, recordings and photographs shall be presented as exhibits and marked by the presenting party. "Writings" and "recordings" consist of letters, words, or numbers, or their equivalent, set down by handwriting, typewriting, printing, photostating, photographing, magnetic impulse, mechanical or electronic recording, or other form of data compilation. "Photographs" include still photographs, video tapes, and motion pictures.

    **(2) Separation of irrelevant portions.** Relevant and material matter embraced in an exhibit containing other matter not material or relevant or not intended as evidence must be plainly designated as the matter offered in evidence, and the immaterial or irrelevant parts shall be marked clearly so as to show they are not intended as evidence.

    **(3) Summary exhibits.** The contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in the hearing may be presented in the form of a chart, summary, or calculation. The originals, or duplicates, shall be made available for examination or copying, or both, by other parties at a reasonable time and place. The Copyright Royalty Judges may order that they be produced in the hearing.

**(d) Copies.** Anyone presenting exhibits as evidence must present copies to all other participants in the proceedings, or their attorneys, and afford them an opportunity to examine the exhibits in their entirety and offer into evidence any other portion that may be considered material and relevant.

**(e) Introduction of studies and analyses.** If studies or analyses are offered in evidence, they shall state clearly the study plan, the principles and methods underlying the study, all relevant assumptions, all variables considered in the analysis, the techniques of data collection, the techniques of estimation and testing, and the results of the study's actual estimates and tests presented in a format commonly accepted within the relevant field of expertise implicated by the study. The facts and judgments upon which conclusions are based shall be stated clearly, together with any alternative

courses of action considered. Summarized descriptions of input data, tabulations of input data and the input data themselves shall be retained.

**(f) Objections.**  Parties are entitled to raise objections to evidence on any proper ground during the course of the hearing and to raise an objection that an opposing party has not furnished unprivileged underlying documents.

**(g) New exhibits for use in cross-examination.**  Exhibits that have not been identified and exchanged in advance may be shown to a witness on cross-examination. However, copies of such exhibits must be distributed to the Copyright Royalty Judges and to the other participants before being shown to the witness at the time of cross-examination, unless the Copyright Royalty Judges direct otherwise. Such exhibits can be used solely to impeach the witness's direct testimony.