ORAL ARGUMENT SCHEDULED FOR JANUARY 12, 2015

NO. 14-1068

**IN THE
UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**
_____

INTERCOLLEGIATE BROADCASTING SYSTEM, INC.,

*Petitioner*,

v.

COPYRIGHT ROYALTY BOARD and
LIBRARY OF CONGRESS,

*Respondents*.
_____

On Petition for Review of a Determination of the
Copyright Royalty Board

**FINAL BRIEF OF PETITIONER
INTERCOLLEGIATE BROADCASTING SYSTEM, INC.**

Christopher J. Wright
Timothy J. Simeone
John R. Grimm
HARRIS, WILTSHIRE & GRANNIS, LLP
1919 M Street, N.W., Eighth Floor
Washington, D.C. 20036
Telephone:  (202) 730-1300
cwright@hwglaw.com

November 25, 2013                *Counsel for Petitioner*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), Petitioner Intercollegiate Broadcasting System, Inc. hereby submits the following statement of the parties, rulings under review, and related cases.

## A.    PARTIES

The parties to the Copyright Royalty Board proceeding for which review is sought were:

- LIVE365, Inc.
- SoundExchange, Inc.
- College Broadcasters, Inc.
- Yahoo!, Inc.
- Intercollegiate Broadcasting System, Inc.

The Parties to this Review are Petitioner Intercollegiate Broadcasting System, Inc., and Respondents Copyright Royalty Board and Library of Congress. SoundExchange, Inc., and College Broadcasters, Inc. are intervenors in this Court. Petitioner is not aware of any amici in this Court.

## B.    RULINGS UNDER REVIEW

Petitioner seeks review of the Copyright Royalty Board's April 25, 2014 Determination of Royalty Rates for Digital Performance Right in Sound Recordings and Ephemeral Recordings, Docket No. 2009-1 CRB Webcasting III, 79 Fed. Reg. 23,102.

i

## C.     RELATED CASES

Petitioner has previously sought review in this Court of Respondent's Determination of Royalty Rates for Digital Performance Right in Sound Recordings and Ephemeral Recordings: (1) *Intercollegiate Broadcasting System, Inc. v. Copyright Royalty Board*, 684 F.3d 1332 (D.C. Cir. 2012), *cert. denied* 133 S. Ct. 2735; (2) *Intercollegiate Broadcasting System, Inc. v. Copyright Royalty Board*, 574 F.3d 748 (D.C. Cir. 2009).

Petitioner is not aware of any other related cases pending in this Court or any other court.

ii

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1, Petitioner Intercollegiate Broadcasting System, Inc. ("IBS") hereby states that it is a not-for-profit, non-stock, Rhode Island corporation. IBS is an association of webcasters at colleges, universities, academies, and high schools, many of which must make royalty payments for their transmission of music. IBS has no parent corporation, and no publicly held corporation owns ten percent or more of any stock in IBS.

iii

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............. i

CORPORATE DISCLOSURE STATEMENT ....................................................... iii

TABLE OF CONTENTS.................................................................................. iv

GLOSSARY.................................................................................................. vi

TABLE OF AUTHORITIES ............................................................................ vii

JURISDICTION.............................................................................................1

STATUTES AND REGULATIONS ....................................................................1

STATEMENT OF ISSUES ...............................................................................1

STATEMENT OF THE CASE............................................................................2

SUMMARY OF THE ARGUMENT ..................................................................15

STANDING ...............................................................................................18

STANDARD OF REVIEW ............................................................................19

ARGUMENT ..............................................................................................19

I.    THE JUDGES' DETERMINATION IS UNCONSTITUTIONAL
      BECAUSE THE JUDGES HAVE NOT CURED THE
      APPOINTMENTS CLAUSE VIOLATION THAT INVALIDATED
      THEIR ORIGINAL ORDER ..................................................................20

      A. Controlling Precedent Requires a New Hearing..................................20

      B. The Reasons Advanced by the Judges to Justify Denying a
         New Hearing were Inadequate..........................................................24

II.   THE CRB IGNORED CONGRESS'S MANDATE AND IBS'S
      EVIDENCE WHEN IT IMPOSED THE SAME $500
      MINIMUM FEE ON ALL WEBCASTERS .............................................33

      A. The Judges Failed Adequately to Distinguish Among Different
         Types of Webcasters as Mandated by Congress. ................................33

B. The Judges Ignored IBS's Evidence That Failing to Distinguish Among Different Types of Webcasters Would Harm Small Webcasters. ................................................................................36

III.  A REMAND IN THIS CASE WOULD BE AN APPROPRIATE USE OF CRB RESOURCES ...............................................................40

A. A Remand to the CRB Would Be Productive ......................................40

B. A New Proceeding Would Be a Minimal Burden ................................41

CONCLUSION .................................................................................................42

STATUTORY ADDENDUM ..............................................................................A1

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

v

# GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act, 5 U.S.C. § 701 *et seq.* |
| CRB | Copyright Royalty Board. |
| *Determination* | Determination of Royalty Rates for Digital Performance Right in Sound Recordings and Ephemeral Recordings; Final Rule, 79 Fed. Reg. 23,102 (Apr. 25, 2014). |
| Kass Testimony | Transcript of Frederick Kass Testimony, Determination of Royalty Rates for Digital Performance Right in Sound Recordings and Ephemeral Recordings, No. 2009-1 CRB Webcasting III. |
| Kass Rebuttal | Transcript of Frederick Kass Rebuttal Testimony, Determination of Royalty Rates for Digital Performance Right in Sound Recordings and Ephemeral Recordings No. 2009-1 CRB Webcasting III. |
| Notice of Intent | Notice of Intention To Conduct Paper Proceeding on Remand And Solicitation of Comments from the Parties, Determination of Royalty Rates for Digital Performance Right in Sound Recordings and Ephemeral Recordings, No. 2009-1 CRB Webcasting III. |
| Order Denying Motion for Rehearing | Order Denying Motion for Rehearing, Determination of Royalty Rates for Digital Performance Right in Sound Recordings and Ephemeral Recordings, No. 2009-1 CRB Webcasting III. |

# TABLE OF AUTHORITIES

**Cases**

*In re Aiken County*,
725 F.3d 255 (D.C. Cir. 2013) .................................................................34

*Butte County, Cal. v. Hogen*,
613 F.3d 190 (D.C. Cir. 2010) .................................................................36

*Doolin v. Office of Thrift Supervision*,
139 F.3d 203 (D.C. Cir. 1998) ................................................... 16, 24, 28

*Fed. Election Comm'n v. Legi-Tech, Inc.*,
75 F.3d 704 (D.C. Cir. 1996) ......................................... 16, 24, 25, 26, 27

*Freytag v. Comm'r*,
501 U.S. 868 (1991) ................................................................................20

*Gen. Motors Corp. v. Ruckelshaus*,
742 F.2d 1561 (D.C. Cir. 1984) ...............................................................34

*Heckler v. Chaney*,
470 U.S. 821 (1985) .................................................................................34

*Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*,
684 F.3d 1332 (D.C. Cir. 2012) ............................................ 2, 5, 6, 8, 9, 11, 12, 30

*Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*,
574 F.3d 748 (D.C. Cir. 2009) .......................................................... 19, 38

*J.J. Cassone Bakery, Inc. v. NLRB*,
554 F.3d 1041 (D.C. Cir. 2009) ...............................................................19

*Landry v. F.D.I.C.*,
204 F.3d 1125 (D.C. Cir. 2000) ......................... 15, 16, 20, 21, 27, 29, 32

*Morall v. DEA*,
412 F.3d 165 (D.C. Cir. 2005) .................................................................36

*Nat. Resources Defense Council, Inc. v. U.S. EPA*,

vii

822 F.2d 104 (D.C. Cir. 1987) ...................................................................36

*New Life Evangelistic Center, Inc. v. Sebelius*,
672 F.Supp.2d 61 (D.D.C. 2009) ..............................................................36

*New York State Dep't of Law v. FCC*,
984 F.2d 1209 (D.C. Cir. 1993) ................................................................26

*Owner-Operator Indep. Drivers Ass'n, Inc. v. Fed. Motor Carrier Safety Admin.*,
494 F.3d 188 (D.C. Cir. 2007) ..................................................................34

*Plaut v. Spendthrift Farm, Inc.*,
514 U.S. 211 (1995) ...................................................................................29

*Ryder v. United States*,
515 U.S. 177 (1995) ............................................... 16, 21, 22, 23, 27

*United States v. Raddatz*,
447 U.S. 667 (1980) ...................................................................................23

*Wingo v. Wedding*,
418 U.S. 461 (1974) ............................................... 16, 21, 23, 30


## Constitutional Provisions

*U.S. Const. art. II, § 2, cl. 2 .....................................................................11


## Statues and Regulations

5 U.S.C. § 706 ...........................................................................................19

17 U.S.C. § 101 ............................................................................................5

17 U.S.C. § 102 .........................................................................................4, 5

17 U.S.C. § 106 .............................................................................................4

*17 U.S.C. § 112 ...........................................................................................5

*17 U.S.C. § 114 ..................................................... 4, 5, 6, 33, 35

17 U.S.C. § 801 .........................................................................................5, 6

17 U.S.C. § 802 .........................................................................................6, 7

17 U.S.C. § 803 ........................................................................ 8, 18, 26

37 C.F.R. § 380.3 ......................................................................... 34, 37

Copyright Royalty and Distribution Reform Act of 2004, Pub. L. 104-419, 118 Stat. 2341 ........................................................................5

## Administrative Materials

*Determination of Royalty Rates for Digital Performance Right in Sound Recordings and Ephemeral Recordings; Final Rule, 79 Fed. Reg. 23,102 (Apr. 25, 2014).................................... 2, 5, 8, 9, 10, 12, 14, 31, 35, 37, 38, 39, 40

Digital Performance Right in Sound Recordings and Ephemeral Recordings; Final Rule, 76 Fed. Reg. 13,026 (Mar. 9, 2011) ............................................................2

IBS's Comments Regarding Judges' Notice of Intention to Conduct Paper Hearings, Determination of Royalty Rates for Digital Performance Right in Sound Recordings and Ephemeral Recordings, No. 2009-1 CRB Webcasting III ........................................................................13

IBS's Proposal for the Conduct of Remand and Supporting Memorandum of Law, Determination of Royalty Rates for Digital Performance Right in Sound Recordings and Ephemeral Recordings, No. 2009-1 CRB Webcasting III ........12

Initial Determination After Second Remand (Web II), Digital Performance Right in Sound Recording and Ephemeral Recordings, No. 2005-1 CRB DTRA (Webcasting II) ........................................................................14

Memorandum Opinion on Material Questions of Substantive Law, Determination of Royalty Rates for Digital Performance Right in Sound Recordings and Ephemeral Recordings, No. 2009-1 CRB Webcasting III....................................7

*Notice of Intention To Conduct Paper Proceeding on Remand And Solicitation of Comments from the Parties, Determination of Royalty Rates for Digital Performance Right in Sound Recordings and Ephemeral Recordings, No. 2009-1 CRB Webcasting III........................................................ 12, 13, 25, 29

Notice of Participants, Commencement of Voluntary Negotiation Period, and Case Scheduling Order, Ex. A, Determination of Royalty Rates and Terms for New Subscription Services for Digital Performance Right in Sound Recordings and Ephemeral Recordings, No. 14-CRB-0002 ........................................................41

Order Denying Motion for Rehearing, Determination of Royalty Rates for Digital Performance Right in Sound Recordings and Ephemeral Recordings, No. 2009-1 CRB Webcasting III........................................................ 17, 30, 31, 32

(Page 10 of Total)

*Order Following Notice of Intention to Conduct Paper Proceeding on Remand, Determination of Royalty Rates for Digital Performance Right in Sound Recordings and Ephemeral Recordings, No. 2009-1 CRB Webcasting III ........13

Order Granting in Part and Denying in Part IBS's Motion to Compel CBI to Answer Interrogatory and Produce Documents, Determination of Royalty Rates for Digital Performance Right in Sound Recordings and Ephemeral Recordings, No. 2009-1 CRB Webcasting III ..........................................................................7

Transcript of Frederick Kass Rebuttal Testimony, Determination of Royalty Rates for Digital Performance Right in Sound Recordings and Ephemeral Recordings No. 2009-1 CRB Webcasting III ........................................................................10

Transcript of Frederick Kass Testimony, Determination of Royalty Rates for Digital Performance Right in Sound Recordings and Ephemeral Recordings, No. 2009-1 CRB Webcasting III ................................................................. 9, 10, 39

## Other

Black's Law Dictionary (9th ed. 2009) ................................................................30

Order, *College Broadcasters, Inc. v. Copyright Royalty Board*, 684 F.3d 1332 (D.C. Cir. 2012) (Doc. No. 1463371) ................................................................8

*Authorities upon which we chiefly rely are marked with asterisks.

x

## JURISDICTION

This case is before the Court on the Intercollegiate Broadcasting System's ("IBS") challenge to a final determination of the Copyright Royalty Board (the "Board") setting royalty rates for digital performance rights in sound recordings and ephemeral recordings.  The Board had authority to issue this determination under 17 U.S.C. §§ 801, 803, and 804.  The Board's determination was released on April 25, 2014, and IBS timely filed a petition for review on May 2, 2014. Jurisdiction in this Court is proper under 17 U.S.C. § 803(d)(1) which authorizes this Court to hear appeals of ratemaking determinations made by the Copyright Royalty Board acting under 17 U.S.C. § 803(c).

## STATUTES AND REGULATIONS

Pertinent statutes and regulations are reproduced in the Addendum to this brief.

## STATEMENT OF ISSUES

1.      Whether the Copyright Royalty Board's determination of certain statutory royalty rates for noncommercial webcasters—required on remand after this Court held that the prior Board was unconstitutionally appointed—again violated the Appointments Clause because the new Board merely ratified decisions made by its unconstitutionally appointed predecessors instead of building its own record in a new proceeding.

1

2.    Whether the Board acted arbitrarily, capriciously, or contrary to law in setting royalty rates when it ignored the Copyright Act's mandate to distinguish among services and instead applied the same $500 minimum annual fee to *all* webcasters, regardless of their size or ability to pay.

## STATEMENT OF THE CASE

This appeal relates directly to this Court's decision in *Intercollegiate Broadcasting System, Inc. v. Copyright Royalty Board*, 684 F.3d 1332 (D.C. Cir. 2012), which held that the Copyright Royalty Board (the "CRB" or "Board") was unconstitutionally appointed.  Because of that constitutional infirmity, this Court vacated the Board's 2011 determination—in the "Web III proceeding"[1]—of royalty rates for webcasters and remanded for reconsideration by a constitutionally appointed Board.  The Intercollegiate Broadcasting System ("IBS") now challenges the reconstituted Board's Final Determination (the "*Determination*") on remand.[2]  That *Determination* should be set aside because (1) the new Board merely ratified the work of the unconstitutionally appointed judges rather than conducting its own proceeding; and (2) the Board acted arbitrarily, capriciously, or

---

[1]    Digital Performance Right in Sound Recordings and Ephemeral Recordings; Final Rule, 76 Fed. Reg. 13,026 (Mar. 9, 2011) (J.A.140).

[2]    Determination of Royalty Rates for Digital Performance Right in Sound Recordings and Ephemeral Recordings; Final Rule, 79 Fed. Reg. 23,102 (Apr. 25, 2014) [hereinafter *Determination*] (J.A.257).

2

contrary to law by ignoring the Copyright Act's mandate to *distinguish* among services, and instead applying the same $500 minimum annual fee to *all* webcasters without explanation.

### A.    Factual Background

*IBS and Webcasting*:  IBS is a non-profit organization that represents college and high school radio stations, including advocating on their behalf, providing technical guidance, and conducting educational meetings and seminars.  IBS was founded in the 1940s and has over 1,000 member stations.

Although many IBS member stations were originally over-the-air "radio" stations, today many are involved in webcasting—digital transmission of music over the Internet.  Indeed, webcasting is increasingly popular among IBS member stations.  About half of those IBS members who choose to webcast do so exclusively—they do not broadcast over traditional airwaves at all.

Webcasting appeals to IBS members because of its low cost compared to traditional radio broadcasting.  As webcasting becomes more popular, IBS's membership rolls include more and more high school stations and bare-budget college stations that do not have the means to secure FCC FM broadcast licenses or maintain broadcasting facilities.

IBS members vary widely in size.  Some are well-funded, professionally organized radio stations at major universities; some are no more than after-school

clubs playing music over high school PA systems; and many fall somewhere in between.  The members' budgets are equally varied.  While some have yearly operating budgets in the thousands of dollars, some budgets are as low as a few hundred dollars or less.

**B.     Statutory Background**

*The Copyright Act*:  Webcasting a song implicates two distinct copyrights: the rights in the audio recording itself,[3] and separate rights to the underlying musical work.[4]  Ordinarily, under the Copyright Act, whoever owns these rights has the exclusive right, *inter alia*, to copy,[5] perform,[6] and digitally transmit[7] a song.  Congress, however, sometimes grants statutory licenses to third parties, enabling them to use certain works for which they do not possess exclusive rights.

Two such statutory licenses are relevant for webcasters.[8]  The first allows webcasters to digitally transmit audio recordings,[9] and the second, related license

---

[3]   17 U.S.C. § 102(7).

[4]   *Id.* § 102(2).

[5]   *Id.* § 106(1).

[6]   *Id.* § 106(4).

[7]   *Id.* § 106(6).

[8]   The relevant licenses and royalty rates, and this appeal, apply only to nonsubscription transmissions.  *Id.* § 114(d)(2).

[9]   *Id.* § 114(d).

4

allows them to create "ephemeral copies"[10] of those works as necessary to facilitate their webcast.  In exchange for the license to copy and transmit (and make ephemeral copies of) the works of others, webcasters must pay statutory royalties to the owners of the musical works they transmit.[11]  Normally these royalties are paid to rights holders through third-party clearinghouses such as Intervenor SoundExhange, Inc. ("SoundExchange").[12]

*The Copyright Royalty Board*:  In 2004, Congress created the Copyright Royalty Board,[13] an arm of the Library of Congress, to replace the Copyright Arbitration Royalty Panel in setting rates and terms for royalties due under the Copyright Act.[14]  The three Copyright Royalty Judges (the "Judges") who comprise the Board are responsible for setting royalty rates for each type of

---

[10]  *Id.* § 112(e).  The Act does not define "ephemeral copy," and the precise duration of such copies is the subject of confusion.  The Board has described such copies as "transitory," 79 Fed. Reg. at 23,104 (J.A.259), but the Copyright Act applies only to works that are "fixed," and a work that is "transitory" is not fixed.  17 U.S.C. § 102(a) (extending copyright protection to works that are "fixed in any tangible medium of expression"); *id.* § 101 (defining fixed as "a more than transitory duration").  Moreover, the Act allows ephemeral copies to be kept for up to six months—a period that is far less fleeting than the name suggests.  *Id.* § 112(e)(1)(C).

[11]  17 U.S.C. §§ 112(e), 114(d)(2).

[12]  *See IBS v. CRB*, 684 F.3d at 1334-39.

[13]  Copyright Royalty and Distribution Reform Act of 2004, Pub. L. 104-419, 118 Stat. 2341.

[14]  *Id.* § 801(b)(1) (defining functions of Copyright Royalty Judges).

5

webcast service.[15]  In addition to setting usage-based statutory royalty rates, the

Judges also establish the minimum annual rates webcasters must pay.  The Judges'

rates must reflect what willing parties would negotiate on the market.[16]

The Judges are appointed by the Librarian of Congress (the "Librarian"),

without the advice and consent of the Senate,[17] and sit for staggered six-year

terms.[18]  Originally, the Librarian had limited oversight of the Judges; however,

this Court's 2012 decision invalidated the portions of the Copyright Act limiting

the Librarian's authority to remove the Judges.  *IBS v. Copyright Royalty Bd.*, 684

F.3d 1332, 1340-41 (D.C. Cir. 2012).

Although they sit within the Library of Congress, the Judges bear many of

the hallmarks of more familiar non-Article-III judges, including magistrate judges,

bankruptcy judges, and administrative law judges.  Members of the CRB are styled

copyright royalty *judges*, not copyright royalty commissioners, directors,

administrators, or a similar term.  Not only do the Judges have a judicial title, but

---

[15]  *Id.* § 114(f)(2)(B) (requiring Judges to "distinguish among the different types of eligible nonsubscription transmission services then in operation and . . . include a minimum fee for *each type of service*") (emphasis added).

[16]  *Id.* (requiring Judges to set rates that "*most clearly* represent the rates and terms that would have been negotiated in the marketplace between a willing buyer and a willing seller") (emphasis added).

[17]  17 U.S.C. § 801(a).

[18]  17 U.S.C. § 802(c).

6

they have judicial qualifications: while one of the Judges must be an expert in copyright law[19] and one must be an expert in economics,[20] the Chief Copyright Royalty Judge must have "at least 5 years of experience in adjudications, arbitrations, or court trials."[21]

The Judges also exercise authority similar to that of other courts. The Board has conducted its ratemaking proceedings as adversarial trials, with the Judges taking live testimony, ruling on evidentiary objections, and hearing argument from counsel. The Judges rule on pre-trial discovery disputes,[22] and they are also authorized to refer legal questions to the Register of Copyrights (the "Register"), who issues advisory opinions.[23] In one such opinion, the Register concluded that the Judges have the authority to subpoena non-party witnesses when doing so is necessary to enable the Judges to execute their responsibilities.[24] Some of the

---

[19]  *Id.* § 802(a)(1).

[20]  *Id.*

[21]  *Id.*

[22]  *See, e.g.*, Order Granting in Part and Denying in Part IBS's Motion to Compel CBI to Answer Interrogatory and Produce Documents, Determination of Royalty Rates for Digital Performance Right in Sound Recordings and Ephemeral Recordings, No. 2009-1 CRB Webcasting III  (J.A.110).

[23]  17 U.S.C. § 802(f)(1)(A), (B).

[24]  Memorandum Opinion on Material Questions of Substantive Law at 8, Determination of Royalty Rates for Digital Performance Right in Sound Recordings and Ephemeral Recordings, No. 2009-1 CRB Webcasting III ("[T]he CRJs do have the authority to subpoena a witness to appear and give testimony or to produce and permit inspection of documents or tangible things

7

Judges' rulemakings are reviewed by the district court,[25] but Congress has made the Board's royalty ratemaking appealable directly to this Court.[26]

## C.  Procedural Background

*The Original Proceeding*:  As noted above, this case has previously been before this Court in *Intercollegiate Broadcasting System v. Copyright Royalty Board*, 684 F.3d 1332 (D.C. Cir. 2012).  The previous—unconstitutionally appointed—CRB panel commenced the ratemaking proceedings underlying that case on January 5, 2009.  *Determination*, 79 Fed. Reg. at 23,102 (J.A.257).  The purpose of that proceeding was to set royalty rates and terms for the statutory licenses under Sections 112 and 114 of the Copyright Act.  *Id.*

Forty entities filed petitions to participate in the proceeding.  *Determination*, 79 Fed. Reg. at 23,102 (J.A.257).  Most reached voluntary settlements, *id.*, and in April and July, 2010, the Judges conducted hearings to determine the rates and terms that would apply to the non-settling parties.  *Id.* at 23,103.  Among the non-settling parties (and therefore parties to the Board's hearings) were IBS, and

---

even when that witness is not a participant in the proceedings . . . .  This authority is restricted to instances where the resolution of the proceeding would be substantially impaired by the absence of such testimony or production . . . .") (J.A.109).

[25]  *See, e.g.*, Order, *College Broadcasters, Inc. v. Copyright Royalty Board*, 684 F.3d 1332 (D.C. Cir. 2012) (Doc. No. 1463371) (ordering transfer of CRB rulemaking appeal to United States District Court for the District of Columbia).

[26]  17 U.S.C. § 803(d)(1).

8

intervenors SoundExchange and College Broadcasters, Inc. ("CBI").[27]  The Judges

heard testimony from witnesses and argument from counsel for those parties.

*IBS's Evidence*:  In the proceeding, SoundExchange proposed that the

Judges set a $500 minimum annual fee for all noncommercial webcasters, in

satisfaction of both the Section 112 and Section 114 licenses.  *Determination*, 79

Fed. Reg. at 23,121 (J.A.276).  IBS, however, proposed two further categories of

noncommercial webcasters, small and very small,[28] each subject to separate, lower

annual fees.  *Id.*

IBS supported its proposal with evidence regarding the variable size and

financial means of its member stations.  It submitted written testimony from its

COO and director Frederick J. Kass, Jr., that "the average annual operating budget

for campus stations [is] about nine thousand dollars per year, but some hav[e]

annual operating budgets of only $250.00 or less."[29]  Kass further testified that

---

[27]  CBI is an association of educational webcasters.  *IBS v. CRB*, 684 F.3d at 1335.

[28]  Which category a station fit into would be determined by its aggregate tuning hours ("ATH")—a measure of a webcaster's monthly listenership.  Under IBS's proposal, small webcasters would have no more than 15,914 ATH per month, and very small webcasters would no more than 6,365 ATH per month.  79 Fed. Reg. at 23,121 (J.A.276).

[29]  Transcript of Frederick Kass Testimony at 6, Determination of Royalty Rates for Digital Performance Right in Sound Recordings and Ephemeral Recordings, No. 2009-1 CRB Webcasting III [hereinafter Kass Testimony] (J.A.38).

9

IBS's members' "[f]unding sources vary from academic budgets to student activity funds to advertising to dues paid by staff members."[30]

IBS also submitted specific testimony—which the judges did not admit[31]—as to why the proposed $500 annual fee was improper for smaller stations. Specifically, Kass testified that "[f]ive hundred dollars is at such a high level that it (i) is disproportionate to [smaller stations'] use of digitally recorded music and (ii) is for many smaller webcasters or would-be webcasters a barrier-to-entry."[32] Therefore, "[t]he [$500 fee] agreement between SoundEx[change] and CBI is not an appropriate benchmark to use in setting a minimum fee for the overwhelming majority of the small and very small educational webcasters."[33]  IBS did not oppose applying the $500 fee to noncommercial webcasters generally, but proposed instead a $50 annual fee for those designated "small," and a $20 annual fee for "very small" ones.  *Determination*, 79 Fed. Reg. 23,121 (J.A.276).

Based on the record they compiled, including their impressions and determinations from the oral testimony, the Judges published their final

---

[30]  *Id.* ¶ 7.

[31]  *Determination*, 79 Fed. Reg. at 23,122 n.60.

[32]  Transcript of Frederick Kass Rebuttal Testimony at 3, Determination of Royalty Rates for Digital Performance Right in Sound Recordings and Ephemeral Recordings No. 2009-1 CRB Webcasting III [hereinafter Kass Rebuttal] (J.A.114).

[33]  *Id.* ¶ 8.

10

determination on March 9, 2011.  *Id.*  Among other provisions, the final

determination included a $500 minimum annual fee for all noncommercial

webcasters, including small and very small ones, though the Judges did not adopt

the small and very small categories.

*IBS's First Appeal*:  IBS appealed the Board's final determination, alleging

two errors: first, it challenged the merits of the Board's rate determinations, on the

ground that the blanket $500 rate for *all* services ignored Congress's mandate to

differentiate among different services, and did not reflect rates that would be

negotiated on the open market by small and very small noncommercial webcasters.

Second, it argued that the Judges' appointment by the Librarian violated the

Appointments Clause,[34] and therefore invalidated the Board's determination.

In 2012, this Court issued its opinion in *Intercollegiate Broadcasting

System, Inc. v. Copyright Royalty Board*.  It agreed with IBS that the Judges were

appointed in violation of the Appointments Clause.  684 F.3d at 1340.  The Court

invalidated and severed the portion of the Copyright Act that limited the

Librarian's ability to remove the Judges, thereby curing the Appointments Clause

---

[34] U.S. Const. art. II, § 2, cl. 2 ("[The President] shall nominate, and by and with the Advice and Consent of the Senate, shall appoint . . . Officers of the United States, . . . but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.").

11

defect going forward. *Id.* at 1342. The Court then vacated and remanded the Board's determination "[b]ecause the Board's structure was unconstitutional at the time it issued its determination . . . ." *Id.* The Court did not reach IBS's objection to the merits of the Board's determination, or how the Board should proceed on remand. *See id.*

*The Proceedings on Remand*: Following this Court's remand, the Librarian appointed three new copyright royalty judges to replace the earlier Board. The new Judges solicited comments on how they should proceed. *Determination*, 79 Fed. Reg. at 23,103 (J.A.258). IBS argued that the only way to remedy the constitutional defect in the earlier Board's determination was for the new Board to reopen proceedings and allow further written and oral testimony and briefing.[35]

The Judges disagreed and issued a "Notice of Intention to Conduct Paper Proceeding on Remand and Solicitation of Comments From The Parties."[36] They acknowledged IBS's argument that new proceedings were constitutionally required, but noted their intent instead to "conduct[] only a paper proceeding,

---

[35]  *Determination*, 79 Fed. Reg. at 23,103 (J.A.258); IBS's Proposal for the Conduct of Remand and Supporting Memorandum of Law, Determination of Royalty Rates for Digital Performance Right in Sound Recordings and Ephemeral Recordings, No. 2009-1 CRB Webcasting III.

[36]  Notice of Intention To Conduct Paper Proceeding on Remand And Solicitation of Comments from the Parties, Determination of Royalty Rates for Digital Performance Right in Sound Recordings and Ephemeral Recordings, No. 2009-1 CRB Webcasting III [hereinafter Notice of Intent] (J.A.218).

consisting of a review of the existing record in this proceeding, and then issuing a determination at the conclusion of that review."  Notice of Intent at 9 (J.A.226). The Board solicited further comment on this determination.

In response, IBS again filed comments arguing that the Board's proposed course on remand would not cure the Appointments Clause violation.[37] Specifically, IBS pointed out that the Judges would be basing their determination on testimony taken by the original Board.[38]  That testimony necessarily embodied the earlier Judges' credibility determinations and evidentiary rulings.  IBS pointed out that new Judges would obviously be unable to make their own assessment of witness demeanor if they only reviewed the record.  IBS again requested that the Judges reopen the proceeding for new hearings to permit such firsthand assessments, or, at the least, allow the parties to submit supplemental briefing. Despite these arguments by IBS, on October 22, 2013, the Board indicated that it would "proceed with [the Judges'] consideration *de novo* on the existing record."[39]

---

[37]  IBS's Comments Regarding Judges' Notice of Intention to Conduct Paper Hearings, Determination of Royalty Rates for Digital Performance Right in Sound Recordings and Ephemeral Recordings, No. 2009-1 CRB Webcasting III.

[38]  *Id.* at 1-3.

[39]  Order Following Notice of Intention to Conduct Paper Proceeding on Remand, Determination of Royalty Rates for Digital Performance Right in Sound Recordings and Ephemeral Recordings, No. 2009-1 CRB Webcasting III (J.A.233).

13

*The Final Determination*:  On April 25, 2014, the Judges issued the final "Determination of Royalty Rates for Digital Performance Right in Sound Recordings and Ephemeral Recordings" challenged here.  *Determination*, 79 Fed. Reg. 23,102 (J.A.257).  The *Determination* set statutory royalty rates for the period from January 1, 2011 through December 31, 2015.[40]  *Id.* at 23,102.

That final *Determination* is substantially identical to the earlier Board's order that this Court invalidated.  Although the Judges addressed at length their decision not to reopen the proceedings, they did not identify a single decision of the earlier Board with which they disagreed.  In particular, as relevant here, the Judges—like their predecessors—set a blanket $500 minimum annual fee[41] for all

---

[40] Although much of this period has already passed, this Court's review is still important.  As the Board recognized in the proceedings to set the 2006-2010 rates, even a rate change at the very end of the applicable period could apply retroactively if it reduces a webcaster's overall payment obligation.  *See* Initial Determination After Second Remand (Web II) at 3, Digital Performance Right in Sound Recording and Ephemeral Recordings, No. 2005-1 CRB DTRA (Webcasting II). ("If a decision by the Judges in IBS's favor at this stage were to have any effect at all, it would be by requiring a retrospective adjustment of noncommercial webcasters' payment obligations (*e.g.*, a refund of minimum fees already paid).  Such a remedy would be warranted only if a reduction in the minimum fee would also result in a reduction of a noncommercial webcaster's total payment obligation.") (J.A.242).

[41] The *Determination* also sets rates for ephemeral copies under 17 U.S.C. § 112. Rather than set a separate rate for these copies, the Judges determined that 5% of the annual fee would be considered the ephemeral copy royalty.  IBS does not object to this portion of the Judges' *Determination*.  79 Fed. Reg. at 23,121.

14

webcasters, and explicitly rejected IBS's request that they set separate rates for small and very small noncommercial webcasters.

## SUMMARY OF ARGUMENT

IBS's member stations are subject to royalty rates under the *Determination* that were not based on record evidence or statutory criteria, without ever having had the opportunity to present their case to a constitutionally appointed panel of copyright royalty judges. The *Determination*'s imposition of the $500 minimum annual fee challenged here should therefore be set aside.

I.     The Judges' *Determination* is still tainted by the Appointments Clause violation that originally led this Court to remand the Web III rates. By merely reviewing *de novo* their predecessors' proceedings instead of conducting their own proceeding permitting firsthand credibility determinations and evidentiary rulings, the Judges did nothing more than enshrine the constitutional violations that this Court sought to cure.

The Constitution and controlling case law require more. This Court has noted that Appointments Clause violations are structural constitutional errors,[42] and the Supreme Court has repeatedly held that merely reviewing proceedings conducted by an invalidly appointed judge, or by a judge otherwise acting outside

---

[42]  *Landry v. F.D.I.C.*, 204 F.3d 1125, 1130 (D.C. Cir. 2000).

of his legal authority, is an insufficient remedy.[43]  IBS is entitled to a proceeding

before a lawfully constituted panel—but the Judges still have not given it one.

The cases on which the *Determination* relies do not support the decision not

to conduct a new proceeding on remand.  In particular, *Federal Election*

*Commission v. Legi-Tech, Inc.*,[44] and *Doolin Security Savings Bank v. Office of*

*Thrift Supervision*[45] do not give the Judges the authority they claim.  *Legi-Tech*

applied to a unilateral FEC enforcement action, not an adversarial judicial

proceeding, and this Court's decision was motivated by practical realties that are

absent here, and case law that does not apply to Appointments Clause violations.

In *Doolin*, this Court found that an agency order issued by an invalidly appointed

director was nevertheless valid, 139 F.3d at 211-12—unlike in this case, where this

Court held the determination by unconstitutionally appointed judges to be *invalid*.

The Judges also applied a harmless-error standard of review in rejecting

IBS's arguments that they should conduct a new proceeding, but this Court has

specifically held such an analysis inappropriate for Appointments Clause

violations.[46]  Such an approach also ignores the Supreme Court's teaching that

---

[43]  *See Ryder v. United States*, 515 U.S. 177 (1995); *Wingo v. Wedding*, 418 U.S. 461 (1974).

[44]  75 F.3d 704 (D.C. Cir. 1996).

[45]  139 F.3d 203 (D.C. Cir. 1998).

[46]  *Landry*, 204 F.3d at 1131.

16

assessing witness credibility and demeanor—which a review of the record does not allow—is essential to a proper determination of parties' rights.

Finally, the Judges' *Determination* was not truly independent of the earlier Board's influence.  The Judges overtly relied on the earlier Board's witness examinations, and characterized their role in the process as merely "pick[ing] up the process where th[e] earlier Judges left off."[47]  They even admitted that they found the earlier record difficult to discern, yet they refused to conduct their own independent hearing.  Such conduct defeats the purpose of a vacatur, and IBS is entitled to a new proceeding before the new constitutionally appointed Judges.

II.    By applying the same uniform $500 annual rate to every webcaster regardless of size or financial means, the Judges ignored Congress's clear directive that they distinguish among types of webcasters and set rates that most clearly reflect what webcasters would freely negotiate on the market.  The Judges also ignored IBS's record evidence that the $500 fee was inappropriate for many IBS member stations.

The Judges improperly placed the burden on IBS to show that its members could not support the $500 annual fee.  And although IBS did put forward such

---

[47]  Order Denying Motion for Rehearing at 2, Determination of Royalty Rates for Digital Performance Right in Sound Recordings and Ephemeral Recordings, No. 2009-1 CRB Webcasting III [hereinafter as Order Denying Motion for Rehearing] (J.A.235).

17

evidence—which the Judges ignored—this reasoning ignores this Court's lesson from the Judges' Web II proceeding that their decision must be grounded in *substantial evidence*, not a mere absence of contrary evidence. Indeed, the Judges' logic in setting the blanket $500 Web III rate is no different from the unreasoned decision making that led this court to vacate the virtually identical $500 blanket rate in the Web II proceeding. A disregard of statutory considerations, record evidence, and this Court's prior rulings constitutes quintessential arbitrary and capricious rulemaking.

III.    A new proceeding would be a productive use of CRB resources. Because the Board will already begin conducting Web IV proceedings in 2015, the additional burden of taking limited testimony regarding Web III rates would be minimal. Moreover, the remand proceedings would not be a wasteful exercise, because the Judges have identified specific areas of the record that they found deficient, and a new proceeding would provide IBS a useful opportunity to supplement and clarify the record.

## STANDING

IBS has standing to bring this appeal because it is "an aggrieved participant . . . [which] fully participated in the proceeding and [which] would be bound by the [CRB's] determination." 17 U.S.C. § 803(d)(1).

18

## STANDARD OF REVIEW

Decisions by the Copyright Royalty Board are reviewed under the Administrative Procedure Act. *Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*, 574 F.3d 748, 755 (D.C. Cir. 2009). Under the APA, an agency decision must be set aside if it is arbitrary or capricious, contrary to law, or not supported by substantial evidence. *Id.*; 5 U.S.C. § 706(2)(A). Constitutional challenges to agency actions are reviewed *de novo*. *See, e.g.*, *J.J. Cassone Bakery, Inc. v. NLRB*, 554 F.3d 1041, 1044 (D.C. Cir. 2009).

## ARGUMENT

The across-the-board $500 minimum annual fee challenged here should be set aside because: (I) by relying on the unconstitutional Board's record instead of conducting a new hearing, the Judges preserved the original Board's constitutional infirmity and the new *Determination* is thus unconstitutional; (II) the Judges acted arbitrarily and capriciously when, in contravention of Congress's instructions and IBS's evidence, they failed to distinguish among different kinds of webcasters and to set rates reflecting what they would negotiate on the market; and (III) although the Constitution requires a new hearing on remand in any event, a new proceeding will be a beneficial opportunity and not a waste of resources.

19

## I.   THE JUDGES' DETERMINATION IS UNCONSTITUTIONAL BECAUSE THE JUDGES HAVE NOT CURED THE APPOINTMENTS CLAUSE VIOLATION THAT INVALIDATED THEIR ORIGINAL ORDER.

The Judges failed to cure the Appointments Clause violation that led this Court to remand the Board's original *Determination*.  Although this Court determined that the Board's original members were unconstitutionally appointed, the Judges on remand refused to exercise independent decision-making judgment by conducting a new trial.  Instead, they chose to abdicate their fact-finding role to their predecessors.  But by merely endorsing the record compiled by the original, unconstitutional Board, the Judges preserved the unconstitutionality that this Court had sought to correct.

The Constitution requires more.  As set forth below, the case law is clear that IBS is entitled to a new hearing before validly appointed judges, and the Judges' rationale for failing to assemble a new record is flawed.

### A.   Controlling Precedent Requires a New Hearing.

The case law establishes that the remedy when invalidly appointed judges exercise judicial authority is for new judges to conduct a new *hearing*, not merely a *de novo* review of the record assembled by the constitutionally invalid tribunal. As this Court has held, an Appointments Clause violation is a structural constitutional error.  *Landry v. F.D.I.C.*, 204 F.3d 1125, 1130 (D.C. Cir. 2000) (citing *Freytag v. Comm'r*, 501 U.S. 868, 878-79 (1991)).  For a party to be

20

entitled to remediation of an Appointments Clause violation, "no direct injury is necessary." *Landry*, 204 F.3d at 1130-31; *see also id.* at 1130-32 (finding that errors pertaining to the structure of the Constitution are so fundamental as to deprive one of basic fairness). Accordingly, the Supreme Court has repeatedly held that *de novo* review of the pre-existing record on remand is insufficient to cure errors resulting from judges exceeding their legal authority, whether due to an invalid appointment or other comparable error. *See Ryder v. United States*, 515 U.S. 177 (1995); *Wingo v. Wedding*, 418 U.S. 461 (1974). IBS is thus entitled to a new evidentiary hearing before the Board.

In *Ryder*, a member of the Coast Guard was convicted by court martial of drug offenses. 515 U.S. at 179. Two courts—the Coast Guard Court of Military Review, followed by the United States Court of Military Appeals, *id.* at 179—affirmed his conviction. Ryder argued on his second appeal that the intermediate appellate panel had been improperly appointed, in violation of the Appointments Clause, because two of the three members were civilians appointed by the General Counsel for the Department of Transportation. *Id.* The Court of Military Appeals agreed, *id.*, but affirmed the intermediate court's ruling under the *de facto* officer doctrine, "which confers validity upon acts performed by a person acting under the color of official title even though it is later discovered that the legality of that person's appointment or election to office is deficient." *Id.* at 180.

21

The Supreme Court reversed.  It explained that cases in which it had applied the *de facto* officer doctrine "did not involve basic constitutional protections designed in part for the benefit of litigants."  *Id.* at 182 (internal quotation omitted).  "We think that one who makes a timely challenge to the constitutional validity of the appointment of an officer who adjudicates his case is entitled to a decision on the merits of the question and whatever relief may be appropriate if a violation indeed occurred."  *Id.* at 182-83.  The *Ryder* Court therefore rejected the government's argument that the Court of Military Appeals' finding that "petitioner suffered no adverse consequences from the composition of the court" obviated the need for a new hearing.  *Id.* at 186.  The Coast Guard Court of Military Review "had broader discretion [than the Court of Military Appeals] to review claims of error, revise factual determinations, and revise sentences," so it "cannot be said that review by the properly constituted Court of Military Appeals gave petitioner all the possibility for relief that review by a properly constituted Coast Guard Court of Military Review would have given him."  *Id.* at 187.  Accordingly, petitioner was "entitled to a *hearing before a properly appointed panel* of [the] [C]ourt [of Military Review]."  *Id.* at 188 (emphasis added).

The review conducted by the Judges here is functionally similar to the Court of Military Appeals review in *Ryder* that the Supreme Court found inadequate. The Judges' review of the pre-established record unquestionably did not give IBS

22

"all the possibility for relief" that a new "hearing before a properly appointed panel" of the CRB would have provided.  *Id.* at 187-88.

Indeed, the Supreme Court has expressly found that *de novo* review of an existing record is an inadequate remedy where a validly appointed judge exceeds the scope of his legal authority.  *See Wingo v. Wedding*, 418 U.S. 461 (1974).  In *Wingo*, a state prisoner challenged a district judge's dismissal of his habeas petition on the basis of *de novo* review, as contemplated by local rules.  418 U.S. at 463-66.  The Supreme Court held that the Federal Magistrates Act did not authorize a magistrate judge to conduct an evidentiary habeas hearing, and that the local rules therefore conferred more authority on magistrate judges than the law allowed.[48]  *Id.* at 472.  The *Wingo* Court specifically held that this error was not cured by the district judge's review of the magistrate judge's hearing.  *Id.* at 473-74 ("The invalidity of Local Rule 16 is not cured by its provision that the 'District Judge shall proceed to hear the recording of the . . . evidentiary hearing and give it *de novo* consideration.'").

---

[48]  It is true that Congress abrogated *Wingo* in this one respect, when it amended the Federal Magistrates Act to allow magistrate judges to make evidentiary hearings in habeas cases.  *See United States v. Raddatz*, 447 U.S. 667, 674 (1980) (describing abrogation).  But the Court's reasoning still applies when it is clear that a judge exceeds his legal authority, as the original Copyright Royalty Judges did in this case.

23

Under *Ryder* and *Wingo*, the Judges' conclusion that *de novo* review of the unconstitutionally appointed CRB panel's record remedies the constitutional violation is incorrect. In both of those cases, the Supreme Court concluded that *de novo* review of an invalid decision by validly appointed judges was *not* enough.

**B.    The Reasons Advanced by the Judges to Justify Denying a New Hearing were Inadequate.**

In declining to conduct a new proceeding on remand, the Judges advanced several justifications, including that case law purportedly supports their decision; that IBS did not show how the lack of hearing would prejudice it; and that the Judges were independent of their predecessors. Each of these justifications is unavailing because: (1) case law does not support the Judges' decision; (2) harmless error analysis is improper in Appointments Clause cases; and (3) the *Determination* is not independent of the earlier Board's reasoning, but rather was incurably tainted by it.

**1.    The Cases on Which the Judges Relied do not Support their Conclusion.**

The Judges maintained that Court's decisions in *FEC v. Legi-Tech, Inc.*[49] and *Doolin Sec. Savings Bank v. Office of Thrift Supervision*[50] justified their

---

[49]  75 F.3d 704 (D.C. Cir 1996).

[50]  *Doolin v. Office of Thrift Supervision*, 139 F.3d 203 (D.C. Cir. 1998).

24

decision to merely review their predecessors' work.[51]  Their reliance on those cases is misplaced.

Neither *Legi-Tech* nor *Doolin* allows the Judges to rely on the preexisting record.  *Legi-Tech* involved a challenge to an FEC civil enforcement action against Legi-Tech, a database vendor, for violations of elections law.  75 F.3d at 705-06.  After the FEC filed its enforcement action, this Court decided, in a separate case, that the presence of two congressional officers as non-voting members of the Commission violated the Constitution and, as constituted, it had no authority to bring enforcement actions.  *Id.* at 706.  The FEC reconstituted itself absent the improper members and re-authorized the enforcement action already begun against Legi-Tech.  *Id.*

This Court allowed the FEC to continue the existing enforcement proceedings even though it was commenced by an invalidly constituted panel, and rejected Legi-Tech's argument that that the FEC could not "'rubberstamp'" its earlier decision.  *Id.* at 707-08.  But *Legi-Tech* dealt with an agency's unilateral decision whether to take enforcement action—an area of traditionally broad

---

[51]  Specifically, the *Determination* states:  "As the D.C. Circuit's decisions in *Legi-Tech* and *Doolin* demonstrate, a complete repetition of the adjudicatory process is not required to remedy the constitutional violation that resulted in a remand of the instant proceeding."  *See* Notice of Intent at 7 (J.A.224).

25

discretion[52]—not with judges' exercise of judicial authority in an adversarial

proceeding to determine a party's rights.  *Id.* at 109. More important, *Legi-Tech*

was predicated on factors that are inapposite here.  First, *Legi-Tech* was based in

part on the practical futility of remanding to the FEC for new proceedings because

the Commission's voting membership had not changed.[53]  "[F]orcing the

Commission to start at the beginning of the administrative process, given human

nature, promises no more detached and 'pure' consideration of the merits . . . ."  75

F.3d at 709.  Here, in contrast, the Board's membership changed completely

following remand—so there is no reason to *doubt* that it could reach a "detached

and 'pure' consideration of the merits."  The fact that the *Legi-Tech* Court was

compelled to accommodate human nature (under unique circumstances) does not

---

52  *See, e.g.*, *New York State Dep't of Law v. FCC*, 984 F.2d 1209, 1215 (D.C. Cir. 1993) (noting agency enforcement discretion is presumptively unreviewable). Indeed, this Court lacked authority even to review the FEC's enforcement decision in *Legi-Tech*.  75 F.3d at 709 ("We must bear in mind that we have no statutory authority to review the FEC's decision to sue.").  This is in contrast to 17 U.S.C. § 803(d)(1), which specifically grants this Court authority to review the Judges' determinations.  Thus, to the extent that the Court's subject matter jurisdiction played a role in the *Legi-Tech* ruling, that case is completely inapposite.

53  75 F.3d at 709 ("After all, there had been no significant change in the membership of the Commission when the district court dismissed the suit, and surely the Commissioners would have every incentive to show that they had not been 'influenced' by the unconstitutional presence of the *ex officio* members.").

26

mean that its decision must apply even when the exigencies that motivated it are removed.

Second, *Legi-Tech* also relied on the fact that, in *Buckley v. Valeo*, "the Supreme Court accorded *de facto* validity to all FEC proceedings and allowed the FEC to continue functioning . . . despite . . . the presence of unconstitutionally appointed . . . members." 75 F.3d at 708. As discussed above, however, the Supreme Court has *specifically declined* to accord *de facto* validity to judicial decisions violating the Appointments Clause. *See Ryder*, 515 U.S. 177 at 179 ("We hold that the judges' actions were not valid *de facto*."); *id.* at 183 ("Any other rule would create a disincentive to raise Appointments Clause challenges with respect to questionable *judicial* appointments.") (emphasis added). Indeed, the *Ryder* Court specifically rejected the application of *Buckley v. Valeo* to Appointments Clause violations. *Id.* at 180 (noting lower court's reliance on *Buckley v. Valeo*).

Finally, this Court appeared to perform a harmless-error analysis in *Legi-Tech*. It declined to order a new hearing in part because "the relevant issue is the degree of continuing prejudice now, after the FEC's reconstitution and ratification, and whether that degree of prejudice—if it exists—requires dismissal." 75 F.3d at 708. But this Court has already held that such an analysis is inappropriate when the Appointments Clause is violated. *Landry*, 204 F.3d at 1131 ("There is

27

certainly no rule that a party claiming constitutional error in the vesting authority must show a direct causal link between the error and the authority's adverse decision."). *Legi-Tech* depends on an analytical approach that does not apply to this case, and it does not determine the proper course on remand.

*Doolin*, the other case on which the Judges rely, also does not authorize them to merely review their predecessors' work. In fact, *Doolin* had nothing at all to do with the proper procedure following a remand—it involved the question whether an agency order issued by an invalidly appointed director was nevertheless valid. 139 F.3d at 211-12. This Court held that it was,[54] but this is a moot point because this Court has also already held that the Judges' earlier *Determination* was *not* valid and vacated it. But because the Court upheld the order in *Doolin*, there was no vacatur and remand, and *Doolin* is absolutely silent on how the Judges ought to have handled this remand.

## 2.     The Judges Improperly Applied Harmless-Error Analysis.

The Judges also attempted to justify their decision not to hold new hearings on the ground that "IBS fails . . . to point to any instance of an exclusion of relevant evidence that affected the outcome of the proceeding . . . ." (Notice of

---

[54]  139 F.3d at 212. The director was improperly appointed not under the Appointments Clause, but under the Vacancies Act, and the Court upheld the order at issue under the APA's harmless-error rule. *Id.* at 212. But the APA does not govern constitutional questions, and, again, this Court has held that Appointments Clause violations do not receive harmless-error review.

28

intent at 7).[55]  But, as noted *supra* at 27-28, this Court has specifically rejected a harmless-error approach to Appointments Clause violations because, "for Appointments Clause violations, demand for a clear causal link to a party's harm will likely make the Clause no wall[56] at all."  *Landry*, 204 F.3d at 1131.

Moreover, the Judges were too quick to assume that IBS was not prejudiced; they gave short shrift to the argument that their failure to make their own assessments of witness credibility and demeanor is itself a harm to IBS.  But in *Wingo*, the Supreme Court stressed just how important the judge's role of factfinder is.  Indeed, a key reason the district judge's *de novo* review of the magistrate judge's hearing transcript was insufficient was that the district judge could not make the kinds of credibility determinations the CRB Judges found unimportant: "[t]o experienced lawyers it is a commonplace that the outcome of a lawsuit—and hence the vindication of legal rights—depends more often on how

---

[55] *See also* Notice of Intent at 9 ("[T]o the extent that any party disagrees, that party should identify in its comments to this notice *specific* examples where it believes the outcome of the original proceeding turned on elements, such as witness demeanor, that are not readily determined from a review of the written record.") (emphasis in original).

[56] The unusual comparison to a "wall" refers to the idea that separation of powers "is a prophylactic device, establishing high walls and clear distinctions because low walls and vague distinctions will not be judicially defensible in the heat of interbranch conflict."  204 F.2d at 1131 (quoting *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 239 (1995) (internal quotation marks and modifications omitted)).

29

the factfinder appraises the facts than on a disputed construction of a statute or interpretation of a line of precedents." *Wingo*, 418 U.S. at 474.

### 3. The Challenged *Determination* Did not Represent the Judges' Analysis Independent of the Earlier Board.

Although the Judges half-heartedly maintained they were independent from the prior unconstitutional Board, they do not deny that it influenced their work. For example, when they denied IBS's motion for a new hearing, the Judges noted that they "succeeded to the positions of the earlier Judges and *picked up the process where those earlier Judges left off.*"[57] This view of the Judges' role is entirely at odds with the purpose of a vacatur, which is to "nullify or cancel; [to] make void; [or to] invalidate,"[58] because "pick[ing] up" from the earlier Board implicitly validates every decision that led to the point where the "earlier Judges left off."[59] This Court vacated the original Board's *Determination* "[b]ecause the Board's structure was unconstitutional at the time it issued its determination . . ."[60]—not because it wanted the new Judges to finish the work begun by their constitutionally infirm predecessors.

---

[57]  Order Denying Motion for Rehearing at 2 (emphasis added) (J.A.235).

[58]  Black's Law Dictionary (9th ed. 2009).

[59]  Revealingly, the judges did not identify a single decision of the earlier Board regarding noncommercial webcasters which they would change.

[60]  684 F.3d at 1342.

The *Determination* paints a frank picture of how much the Judges were limited by merely reviewing the record. The Judges noted that IBS's rate proposal was "difficult to discern,"[61] and described IBS's evidence as "vague."[62] But if the Judges found IBS's arguments or other aspects of the prior record opaque, they had the ability—indeed, the responsibility—to conduct their own hearings and obtain clarification. Yet rather than independently satisfying themselves that that they understood the evidence, the Judges allowed a "difficult to discern" record gathered by unconstitutionally appointed judges to form the basis of their decision.

The Judges' *Determination* even incorporates a colloquy between the earlier Judges and counsel.[63] The Judges thus overtly relied on their unconstitutionally appointed predecessors to question counsel for them. This can only be considered an abdication of their fact-finding role, and vests far too much power in a board that this Court has already held to be unconstitutional as constituted.

Nor does the fact that the Judges' rules allow them to conduct a papers-only hearing *in the first instance* mean that it is proper for them to consider testimony taken by the earlier Board.[64] Here, they did *not* conduct a review of *just* the

---

[61] 79 Fed. Reg. at 23,121.

[62] *Id.* n.57.

[63] *See* 79 Fed. Reg. at 23,121 n.56.

[64] *See* Order Denying Motion for Rearing at 5 ("In addition, the Judges point out (as they did in the Notice) that the Act and the Judges' rules grant the Judges discretion to conduct proceedings on the papers alone, without holding

31

papers: they "conducted a thorough review of the *entire record* in this proceeding, including all of the parties' written *and oral* testimony."[65]  The oral testimony the Judges reviewed was taken by the original Board, subject to the original Judges' evidentiary rulings, and is therefore tainted by the original Board's constitutional infirmity.[66]  The Judges' consideration of that testimony necessarily injects the unconstitutionally appointed Judges' reasoning into this proceeding and preserves the constitutional defect this Court sought to remedy.

In sum, if the new Judges' ratification of the old Judges' decision were enough to cure the structural constitutional defect, this Court's remand would be meaningless.  This Court recognized as much in *Landry*, when it noted that "[i]f the process of final de novo review could cleanse the [Appointments Clause] violation of its harmful impact, then all such arrangements would escape judicial review . . . ."  204 F.3d at 1132.

---

evidentiary hearings at all . . . . There is no basis to conclude that the Judges lack this same discretion in a remand proceeding.") (citations omitted).

[65]  Order Denying Motion for Rehearing at 5 (emphasis added).

[66]  For instance, if the new Judges disagree with an evidentiary ruling excluding testimony, they have no way of reversing it and hearing the excluded evidence. By reviewing the record only, the new Judges were limited by the old Judges' line of questioning as well.  Thus, while the Judges purported to be reviewing the earlier testimony *de novo*, they implicitly affirmed *every* evidentiary ruling and *every* decision regarding what clarification to seek and what questions to ask made by the earlier Board.  As a result, there can be no doubt that *some* of the earlier Judges' decisions necessarily found their way into the current *Determination*.

32

## II.  THE CRB IGNORED CONGRESS'S MANDATE AND IBS'S EVIDENCE WHEN IT IMPOSED THE SAME $500 MINIMUM FEE ON ALL WEBCASTERS.

The Judges' *Determination* should be set aside because the uniform $500 annual fee fails to distinguish among different types of webcasters, and accordingly does not reflect rates that parties would negotiate on the market.  The determination is arbitrary, capricious, and contrary to law because: (A) the Judges failed to consider congressionally prescribed factors; and (B) the Judges ignored evidence IBS put forward in support of its proposals.

### A.  The Judges Failed Adequately to Distinguish Among Different Types of Webcasters as Mandated by Congress.

The Judges' *Determination* is invalid because the Judges did not abide by Congress's mandate.  The Act requires the Board, in setting royalty rates under § 114, to "distinguish among the different types of eligible nonsubscription transmission services then in operation and . . . include a minimum fee for *each type of service*."  17 U.S.C. § 114(f)(2)(B) (emphasis added).  The Board must consider "the quantity and nature of the use of sound recordings and the degree to which use of the service may substitute for or may promote the purchase of phonorecords by consumers."  *Id.*  The Judges must then choose rates that "*most clearly* represent the rates and terms that would have been negotiated in the marketplace between a willing buyer and a willing seller."  *Id.* (emphasis added).

33

Despite these requirements, the Judges set the same minimum annual fee for *all* commercial and noncommercial webcasters, regardless of their size, listenership, or operating budgets—completely failing to distinguish among them. An agency may not ignore a clear statutory requirement. *See, e.g.*, *Heckler v. Chaney*, 470 U.S. 821, 839 (1985) ("It may be presumed that Congress does not intend administrative agencies, agents of Congress' own creation, to ignore clear. . . statutory or constitutional commands . . . ."); *In re Aiken County*, 725 F.3d 255, 387 (D.C. Cir. 2013) ("[F]ederal agencies may not ignore statutory mandates or prohibitions merely because of policy disagreement with Congress."); *Owner-Operator Indep. Drivers Ass'n, Inc. v. Fed. Motor Carrier Safety Admin.*, 494 F.3d 188, 207 (D.C. Cir. 2007) ("An agency acts arbitrarily if it ignores an issue that Congress directs it to address."); *Gen. Motors Corp. v. Ruckelshaus*, 742 F.2d 1561, 1573 (D.C. Cir. 1984) ("[N]either this court nor the agency is free to ignore the plain meaning of the statute and to substitute its policy judgment for that of Congress.") (internal quotation marks omitted).

The Judges imposed the same $500 minimum annual fee on every webcaster.[67]  It is axiomatic that one does not "distinguish among . . . different

---

[67]  *See* 37 C.F.R. § 380.3(b)(1) ("*Each* Commercial Webcaster will pay an annual nonrefundable minimum fee of $500 . . . ."); *id.* § 380.3(b)(2) ("*Each* Noncommercial Webcaster will pay an annual nonrefundable minimum fee of $500 . . . .") (emphasis added).

34

types" of entities by treating them exactly the same.  By giving the smallest high school radio station operating on a shoestring budget *exactly the same* annual fee as the largest multi-million dollar company like Pandora, the Judges ignored[68] Congress's instructions, and their *Determination* is arbitrary, capricious, and contrary to law.

The Judges also failed to establish rates that *most clearly* reflect what a willing buyer and seller would negotiate in the marketplace.  In determining the rates a willing buyer and seller would negotiate, the Judges must consider "economic, competitive and programming information."  17 U.S.C. § 114(f)(2)(B). Again, however, the Judges applied the same annual $500 fee to all webcasters, without addressing any of the economic, competitive, and programming differences that inevitably exist among dozens of different entities.  Nor did the Judges indicate why a blanket minimum fee reflected what willing buyers and sellers would negotiate in the market.

The universal $500 minimum fee is squarely at odds with Congress's requirement that the Board consider differences among webcasters.  By setting such a universal minimum fee, the Judges ignored Congress's plain requirement and their *Determination* should be set aside.

---

[68]  The Judges did acknowledge the statutory requirement that they distinguish among different types of webcasters.  *See* 79 Fed. Reg. at 23,122.

35

### B.     The Judges Ignored IBS's Evidence That Failing to Distinguish Among Different Types of Webcasters Would Harm Small Webcasters.

Although IBS presented evidence that the $500 minimum fee would harm small and very small webcasters, the Judges simply ignored it.  An agency acts arbitrarily and capriciously when it ignores evidence in the record.  *See, e.g.*, *Butte County, Cal. v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010) ("[A]n agency cannot ignore evidence contradicting its position.")[69]; *Morall v. DEA*, 412 F.3d 165, 178 (D.C. Cir. 2005) (collecting cases for proposition that agencies must consider all evidence); *Nat. Resources Defense Council, Inc. v. U.S. EPA*, 822 F.2d 104, 111 (D.C. Cir. 1987) ("[A]n agency rule is arbitrary and capricious if the agency . . . ignores important arguments or evidence . . . .").  The Judges nonetheless disregarded or ignored the evidence IBS put forward in support of its proposal.

In particular, the Judges simply failed to seriously consider IBS's proposed tiered rate structure for regular, small, and very small noncommercial webcasters. They acknowledged IBS's proposal, yet claimed that IBS "did not present any . . .

---

[69]  *See also Butte County, Cal. v. Hogen*, 609 F. Supp. 2d 20, 30 (D.D.C. 2009) ("[The D.C.] Circuit has held that an agency rule is arbitrary and capricious if the agency relies on improper factors, *ignores important arguments or evidence*, or fails to articulate a reasonable basis for the rule . . . .") (internal quotation marks and modifications omitted) (emphasis in original); *New Life Evangelistic Center, Inc. v. Sebelius*, 672 F. Supp. 2d 61, 74 (D.D.C. 2009) ("An agency errs when it ignores contradictory relevant evidence regarding a critical factor in its decision.").

36

evidence" that "would argue in favor of recognizing" it. *Determination*, 79 Fed. Reg. at 23,122. This is perplexing, since the Judges admit that IBS *did* put forward evidence in support of its proposals, including testimony regarding "a survey that showed that IBS members had an average annual operating budget of $9,000." *Id.* at 21,123.

The Judges improperly chose not to credit this testimony—not because it was not probative or persuasive, but because they considered it inadmissible. *Id.* ("[The] reference to [the survey] cannot be accepted as evidence. *See* 37 CFR [§] 351.10(e)."). But this misconstrues the Board's own rules of evidence: 37 C.F.R. § 351.10(e) provides criteria for studies and analyses that are introduced into evidence, but it does not provide that oral evidence of such studies is inadmissible. Moreover, the Board's rules provide that "*all evidence* that is relevant and not unduly repetitious or privileged, shall be admissible," and even that "[h]earsay may be admitted to the extent deemed appropriate by the . . . Judges." 37 C.F.R. § 351.10(a) (emphasis added). The CRB's rules thus did not exclude testimony regarding IBS members' operating budgets from evidence, and the Judges improperly failed to consider IBS's evidence.

This is not the first time the Judges have set a $500 minimum annual fee without evidentiary support, and when they did so in their Web II proceeding, this Court set it aside as arbitrary and capricious. *IBS v. CRB*, 574 F.3d 748 (D.C. Cir.

37

2009).  In that proceeding, the Judges applied the same $500 minimum fee to noncommercial webcasters as commercial webcasters on the theory that the minimum annual fee covered the costs of administering the statutory license, and noncommercial webcasters should at least have to pay the cost of administering their licenses.  *Id.* at 767.

This Court set the $500 fee aside as arbitrary and capricious because it was not based on substantial evidence.  *Id.*  In particular, the Judges based the fee on the presumed cost of administering a license, even though they noted that there was little evidence in the record of what it actually cost to administer a license.  *Id.* Rejecting such logic, this Court pointed out that rational decision making "requires more than an absence of contrary evidence; it requires substantial evidence to support a decision."  *Id.*

The Judges seem not to have taken the Web II remand to heart.  They justified their $500 minimum fee on the ground that "an assertion that the average operating budget for IBS members is $9,000 does not establish that its members lack the wherewithal to pay a $500 minimum royalty."  *Determination*, 79 Fed. Reg. at 21,123.  But this is *precisely* the type of backward reasoning—citing a mere absence of contrary evidence—that led this Court to remand the Web II rate, and it misses the mark; Congress did not require that the Judges set a rate that is merely within webcasters' *ability* to pay.  Congress required the CRB to set a rate

38

that webcasters would *willingly agree to* in the marketplace, and there is no substantial evidence that any webcaster, regardless of its financial means, would agree to a $500 annual fee. Moreover, the Judges allow noncommercial educational webcasters to opt out of the requirement to report their use of sound recordings. *Determination*, 79 Fed. Reg. at 23,120. But if this is the case, the Judges have not shown how the cost of administering their license could possibly remain $500 a year.

While $500 may not be ruinous to some webcasters, it would be to others[70]—and it is implausible that *every type* of webcaster, however big or small, would *willingly agree* in the marketplace to the same $500 annual fee. The Judge did not cite *substantial* evidence that noncommercial webcasters would voluntarily agree to such a rate, whereas the very fact that IBS objected to the universal $500 fee is evidence that some webcasters would not.

In short, the Judges' decision to disregard both Congress's requirements and IBS's evidence and to set the same annual fee for all webcasters was arbitrary and capricious and contrary to the law.

---

[70] IBS put on testimony that some stations have operating budgets as low as $250 a year or less. Kass Testimony at 7.

39

## III.   A REMAND IN THIS CASE WOULD BE AN APPROPRIATE USE OF CRB RESOURCES.

The Constitution requires that the Judges conduct a new evidentiary hearing, but such a hearing need not be a pointless exercise—remanding this case for a new ratemaking will not waste CRB time or resources for two reasons: (A) IBS would be able to raise productive arguments the Judges were unable to consider by merely reviewing the papers; and (B) a new proceeding could be limited to clarifying the record in a few key areas.

### A.   A Remand to the CRB Would Be Productive.

As noted, *supra* at 31, the Judges felt that the record they reviewed lacked clarity. A remand would provide them the opportunity to build the kind of record that could properly support a royalty rate structure. Moreover, there are compelling arguments against the Judges' existing rate structure which are not the subject of this appeal, yet which the Judges would benefit from hearing.

For instance, in addition to the $500 minimum royalty fee, the Judges have also required all noncommercial webcasters to pay at least a $100 yearly fee as part of their royalty reporting requirements. *Determination*, 79 Fed. Reg. at 23,120. To the extent the Judges are required to set *a* minimum yearly royalty rate, the $100 and $500 yearly fees are duplicative. IBS has not challenged the $100 rate in this appeal, but on remand, the Judges might benefit from an elaboration of potential unintended redundancies in their *Determination*.

40

### B.     A New Proceeding Would Be a Minimal Burden.

Though the original Web III ratemaking proceeding was a days-long affair, the proceedings on remand need not impose a substantial burden on the Judges. Much of the parties' work is already done, and any party that did not wish to participate in new proceedings could consent to the Judges considering their evidence from the earlier proceeding.  The Judges' *Determination* identifies discrete areas that lack clarity, and IBS's allegations of error in this appeal are limited to a failure to consider several specific pieces of evidence and criteria. Providing the Judges a proper, complete record, including witness testimony, would be much simpler than conducting the original Web III proceeding, and a remand for a new hearing would therefore be a productive, efficient use of CRB resources.

Moreover, the Judges regularly conduct proceedings, and an upcoming initial hearing to determine Web IV rates (which will apply beginning January, 2016) has already been scheduled for March 23, 2015.[71]  Remand here could be as simple as the Judges considering evidence regarding the $500 minimum Web III fee challenged here during the Web IV proceeding.  If the Judges are persuaded

---

[71]  *See*, Notice of Participants, Commencement of Voluntary Negotiation Period, and Case Scheduling Order, Ex. A, Determination of Royalty Rates and Terms for New Subscription Services for Digital Performance Right in Sound Recordings and Ephemeral Recordings, No. 14-CRB-0002.

41

that the fee should be lowered for small and very small webcasters, they could order a refund or apply an offset to Web IV rates; if they decide the Web III approach was proper, they will have reached their own independent determination without any unconstitutional influence, and IBS will have had its opportunity to have its members' rights determined by a lawfully constituted body.

## CONCLUSION

This Court should remand the *Determination* to the Copyright Royalty Board to conduct a new evidentiary hearing, and should set aside the *Determination* to the extent that it imposes a universal $500 fee on all webcasters.

Dated: November 25, 2014                    Respectfully submitted,

/s/ Christopher J. Wright
Christopher J. Wright
Timothy J. Simeone
John R. Grimm
HARRIS, WILTSHIRE & GRANNIS
1919 M St. NW
The Eighth Floor
Washington, DC 20036
Telephone: 202-730-1300
*Counsel for Petitioner*

42

# STATUTORY ADDENDUM

# STATUTORY ADDENDUM

## Table of Contents

17 U.S.C. § 112 ................................................................................A2

17 U.S.C. § 114 ................................................................................A6

17 U.S.C. § 801 ..............................................................................A18

17 U.S.C. § 803 ..............................................................................A23

A1

## 17 U.S.C. § 112

(a)(1) Notwithstanding the provisions of section 106, and except in the case of a motion picture or other audiovisual work, it is not an infringement of copyright for a transmitting organization entitled to transmit to the public a performance or display of a work, under a license, including a statutory license under section 114(f), or transfer of the copyright or under the limitations on exclusive rights in sound recordings specified by section 114(a), or for a transmitting organization that is a broadcast radio or television station licensed as such by the Federal Communications Commission and that makes a broadcast transmission of a performance of a sound recording in a digital format on a nonsubscription basis, to make no more than one copy or phonorecord of a particular transmission program embodying the performance or display, if—

 (A) the copy or phonorecord is retained and used solely by the transmitting organization that made it, and no further copies or phonorecords are reproduced from it; and

(B) the copy or phonorecord is used solely for the transmitting organization's own transmissions within its local service area, or for purposes of archival preservation or security; and

(C) unless preserved exclusively for archival purposes, the copy or phonorecord is destroyed within six months from the date the transmission program was first transmitted to the public.

* * *

 (e) Statutory license.—(1) A transmitting organization entitled to transmit to the public a performance of a sound recording under the limitation on exclusive rights specified by section 114(d)(1)(C)(iv) or under a statutory license in accordance with section 114(f) is entitled to a statutory license, under the conditions specified by this subsection, to make no more than 1 phonorecord of the sound recording (unless the terms and conditions of the statutory license allow for more), if the following conditions are satisfied:

(A) The phonorecord is retained and used solely by the transmitting organization that made it, and no further phonorecords are reproduced from it.

A2

(B) The phonorecord is used solely for the transmitting organization's own transmissions originating in the United States under a statutory license in accordance with section 114(f) or the limitation on exclusive rights specified by section 114(d)(1)(C)(iv).

(C) Unless preserved exclusively for purposes of archival preservation, the phonorecord is destroyed within 6 months from the date the sound recording was first transmitted to the public using the phonorecord.

(D) Phonorecords of the sound recording have been distributed to the public under the authority of the copyright owner or the copyright owner authorizes the transmitting entity to transmit the sound recording, and the transmitting entity makes the phonorecord under this subsection from a phonorecord lawfully made and acquired under the authority of the copyright owner.

(2) Notwithstanding any provision of the antitrust laws, any copyright owners of sound recordings and any transmitting organizations entitled to a statutory license under this subsection may negotiate and agree upon royalty rates and license terms and conditions for making phonorecords of such sound recordings under this section and the proportionate division of fees paid among copyright owners, and may designate common agents to negotiate, agree to, pay, or receive such royalty payments.

(3) Proceedings under chapter 8 shall determine reasonable rates and terms of royalty payments for the activities specified by paragraph (1) during the 5-year period beginning on January 1 of the second year following the year in which the proceedings are to be commenced, or such other period as the parties may agree. Such rates shall include a minimum fee for each type of service offered by transmitting organizations. Any copyright owners of sound recordings or any transmitting organizations entitled to a statutory license under this subsection may submit to the Copyright Royalty Judges licenses covering such activities with respect to such sound recordings. The parties to each proceeding shall bear their own costs.

(4) The schedule of reasonable rates and terms determined by the Copyright Royalty Judges shall, subject to paragraph (5), be binding on all copyright owners of sound recordings and transmitting organizations entitled to a statutory license under this subsection during the 5-year period specified in paragraph (3), or such other period as the parties may agree. Such rates shall include a minimum fee for each type of service offered by transmitting organizations. The Copyright Royalty

A3

Judges shall establish rates that most clearly represent the fees that would have been negotiated in the marketplace between a willing buyer and a willing seller. In determining such rates and terms, the Copyright Royalty Judges shall base their decision on economic, competitive, and programming information presented by the parties, including—

(A) whether use of the service may substitute for or may promote the sales of phonorecords or otherwise interferes with or enhances the copyright owner's traditional streams of revenue; and

(B) the relative roles of the copyright owner and the transmitting organization in the copyrighted work and the service made available to the public with respect to relative creative contribution, technological contribution, capital investment, cost, and risk.


In establishing such rates and terms, the Copyright Royalty Judges may consider the rates and terms under voluntary license agreements described in paragraphs (2) and (3). The Copyright Royalty Judges shall also establish requirements by which copyright owners may receive reasonable notice of the use of their sound recordings under this section, and under which records of such use shall be kept and made available by transmitting organizations entitled to obtain a statutory license under this subsection.

(5) License agreements voluntarily negotiated at any time between 1 or more copyright owners of sound recordings and 1 or more transmitting organizations entitled to obtain a statutory license under this subsection shall be given effect in lieu of any decision by the Librarian of Congress or determination by the Copyright Royalty Judges.

(6)(A) Any person who wishes to make a phonorecord of a sound recording under a statutory license in accordance with this subsection may do so without infringing the exclusive right of the copyright owner of the sound recording under section 106(1)—

(i) by complying with such notice requirements as the Copyright Royalty Judges shall prescribe by regulation and by paying royalty fees in accordance with this subsection; or

A4

(ii) if such royalty fees have not been set, by agreeing to pay such royalty fees as shall be determined in accordance with this subsection.

(B) Any royalty payments in arrears shall be made on or before the 20th day of the month next succeeding the month in which the royalty fees are set.

\* \* \*

(f)(1) Notwithstanding the provisions of section 106, and without limiting the application of subsection (b), it is not an infringement of copyright for a governmental body or other nonprofit educational institution entitled under section 110(2) to transmit a performance or display to make copies or phonorecords of a work that is in digital form and, solely to the extent permitted in paragraph (2), of a work that is in analog form, embodying the performance or display to be used for making transmissions authorized under section 110(2), if—

(A) such copies or phonorecords are retained and used solely by the body or institution that made them, and no further copies or phonorecords are reproduced from them, except as authorized under section 110(2); and

(B) such copies or phonorecords are used solely for transmissions authorized under section 110(2).

\* \* \*

A5

## 17 U.S.C. § 114

\* \* \*

(d) Limitations on exclusive right.—Notwithstanding the provisions of section 106(6)—

(1) Exempt transmissions and retransmissions.—The performance of a sound recording publicly by means of a digital audio transmission, other than as a part of an interactive service, is not an infringement of section 106(6) if the performance is part of—

(A) a nonsubscription broadcast transmission;

\* \* \*

(2) Statutory licensing of certain transmissions.—The performance of a sound recording publicly by means of a subscription digital audio transmission not exempt under paragraph (1), an eligible nonsubscription transmission, or a transmission not exempt under paragraph (1) that is made by a preexisting satellite digital audio radio service shall be subject to statutory licensing, in accordance with subsection (f) if—

(A)(i) the transmission is not part of an interactive service;

(ii) except in the case of a transmission to a business establishment, the transmitting entity does not automatically and intentionally cause any device receiving the transmission to switch from one program channel to another; and

(iii) except as provided in section 1002(e), the transmission of the sound recording is accompanied, if technically feasible, by the information encoded in that sound recording, if any, by or under the authority of the copyright owner of that sound recording, that identifies the title of the sound recording, the featured recording artist who performs on the sound recording, and related information, including information concerning the underlying musical work and its writer;

\* \* \*

(e) Authority for Negotiations.—

(1) Notwithstanding any provision of the antitrust laws, in negotiating statutory licenses in accordance with subsection (f), any copyright owners of sound recordings and any entities performing sound recordings affected by this section

A6

may negotiate and agree upon the royalty rates and license terms and conditions for the performance of such sound recordings and the proportionate division of fees paid among copyright owners, and may designate common agents on a nonexclusive basis to negotiate, agree to, pay, or receive payments.

(2) For licenses granted under section 106(6), other than statutory licenses, such as for performances by interactive services or performances that exceed the sound recording performance complement—

(A) copyright owners of sound recordings affected by this section may designate common agents to act on their behalf to grant licenses and receive and remit royalty payments: Provided, That each copyright owner shall establish the royalty rates and material license terms and conditions unilaterally, that is, not in agreement, combination, or concert with other copyright owners of sound recordings; and

(B) entities performing sound recordings affected by this section may designate common agents to act on their behalf to obtain licenses and collect and pay royalty fees: Provided, That each entity performing sound recordings shall determine the royalty rates and material license terms and conditions unilaterally, that is, not in agreement, combination, or concert with other entities performing sound recordings.

(f) Licenses for certain nonexempt transmissions.—

(1)(A) Proceedings under chapter 8 shall determine reasonable rates and terms of royalty payments for subscription transmissions by preexisting subscription services and transmissions by preexisting satellite digital audio radio services specified by subsection (d)(2) during the 5-year period beginning on January 1 of the second year following the year in which the proceedings are to be commenced, except in the case of a different transitional period provided under section 6(b)(3) of the Copyright Royalty and Distribution Reform Act of 2004, or such other period as the parties may agree. Such terms and rates shall distinguish among the different types of digital audio transmission services then in operation. Any copyright owners of sound recordings, preexisting subscription services, or preexisting satellite digital audio radio services may submit to the Copyright Royalty Judges licenses covering such subscription transmissions with respect to such sound recordings. The parties to each proceeding shall bear their own costs.

A7

(B) The schedule of reasonable rates and terms determined by the Copyright Royalty Judges shall, subject to paragraph (3), be binding on all copyright owners of sound recordings and entities performing sound recordings affected by this paragraph during the 5-year period specified in subparagraph (A), a transitional period provided under section 6(b)(3) of the Copyright Royalty and Distribution Reform Act of 2004, or such other period as the parties may agree. In establishing rates and terms for preexisting subscription services and preexisting satellite digital audio radio services, in addition to the objectives set forth in section 801(b)(1), the Copyright Royalty Judges may consider the rates and terms for comparable types of subscription digital audio transmission services and comparable circumstances under voluntary license agreements described in subparagraph (A).

(C) The procedures under subparagraphs (A) and (B) also shall be initiated pursuant to a petition filed by any copyright owners of sound recordings, any preexisting subscription services, or any preexisting satellite digital audio radio services indicating that a new type of subscription digital audio transmission service on which sound recordings are performed is or is about to become operational, for the purpose of determining reasonable terms and rates of royalty payments with respect to such new type of transmission service for the period beginning with the inception of such new type of service and ending on the date on which the royalty rates and terms for subscription digital audio transmission services most recently determined under subparagraph (A) or (B) and chapter 8 expire, or such other period as the parties may agree.

(2)(A) Proceedings under chapter 8 shall determine reasonable rates and terms of royalty payments for public performances of sound recordings by means of eligible nonsubscription transmission services and new subscription services specified by subsection (d)(2) during the 5-year period beginning on January 1 of the second year following the year in which the proceedings are to be commenced, except in the case of a different transitional period provided under section 6(b)(3) of the Copyright Royalty and Distribution Reform Act of 2004, or such other period as the parties may agree. Such rates and terms shall distinguish among the different types of eligible nonsubscription transmission services and new subscription services then in operation and shall include a minimum fee for each such type of service. Any copyright owners of sound recordings or any entities performing sound recordings affected by this paragraph may submit to the Copyright Royalty Judges licenses covering such eligible nonsubscription transmissions and new subscription services with respect to such sound recordings. The parties to each proceeding shall bear their own costs.

A8

(B) The schedule of reasonable rates and terms determined by the Copyright Royalty Judges shall, subject to paragraph (3), be binding on all copyright owners of sound recordings and entities performing sound recordings affected by this paragraph during the 5-year period specified in subparagraph (A), a transitional period provided under section 6(b)(3) of the Copyright Royalty and Distribution1 Act of 2004, or such other period as the parties may agree. Such rates and terms shall distinguish among the different types of eligible nonsubscription transmission services then in operation and shall include a minimum fee for each such type of service, such differences to be based on criteria including, but not limited to, the quantity and nature of the use of sound recordings and the degree to which use of the service may substitute for or may promote the purchase of phonorecords by consumers. In establishing rates and terms for transmissions by eligible nonsubscription services and new subscription services, the Copyright Royalty Judges shall establish rates and terms that most clearly represent the rates and terms that would have been negotiated in the marketplace between a willing buyer and a willing seller. In determining such rates and terms, the Copyright Royalty Judges shall base their decision on economic, competitive and programming information presented by the parties, including—

(i) whether use of the service may substitute for or may promote the sales of phonorecords or otherwise may interfere with or may enhance the sound recording copyright owner's other streams of revenue from its sound recordings; and

(ii) the relative roles of the copyright owner and the transmitting entity in the copyrighted work and the service made available to the public with respect to relative creative contribution, technological contribution, capital investment, cost, and risk.

In establishing such rates and terms, the Copyright Royalty Judges may consider the rates and terms for comparable types of digital audio transmission services and comparable circumstances under voluntary license agreements described in subparagraph (A).

(C) The procedures under subparagraphs (A) and (B) shall also be initiated pursuant to a petition filed by any copyright owners of sound recordings or any eligible nonsubscription service or new subscription service indicating that a new type of eligible nonsubscription service or new subscription service on which sound recordings are performed is or is about to become operational, for the purpose of determining reasonable terms and rates of royalty payments with respect to such new type of service for the period beginning with the inception of

A9

such new type of service and ending on the date on which the royalty rates and terms for eligible nonsubscription services and new subscription services, as the case may be, most recently determined under subparagraph (A) or (B) and chapter 8 expire, or such other period as the parties may agree.

(3) License agreements voluntarily negotiated at any time between 1 or more copyright owners of sound recordings and 1 or more entities performing sound recordings shall be given effect in lieu of any decision by the Librarian of Congress or determination by the Copyright Royalty Judges.

(4)(A) The Copyright Royalty Judges shall also establish requirements by which copyright owners may receive reasonable notice of the use of their sound recordings under this section, and under which records of such use shall be kept and made available by entities performing sound recordings. The notice and recordkeeping rules in effect on the day before the effective date of the Copyright Royalty and Distribution Reform Act of 2004 shall remain in effect unless and until new regulations are promulgated by the Copyright Royalty Judges. If new regulations are promulgated under this subparagraph, the Copyright Royalty Judges shall take into account the substance and effect of the rules in effect on the day before the effective date of the Copyright Royalty and Distribution Reform Act of 2004 and shall, to the extent practicable, avoid significant disruption of the functions of any designated agent authorized to collect and distribute royalty fees.

(B) Any person who wishes to perform a sound recording publicly by means of a transmission eligible for statutory licensing under this subsection may do so without infringing the exclusive right of the copyright owner of the sound recording—

(i) by complying with such notice requirements as the Copyright Royalty Judges shall prescribe by regulation and by paying royalty fees in accordance with this subsection; or

(ii) if such royalty fees have not been set, by agreeing to pay such royalty fees as shall be determined in accordance with this subsection.

(C) Any royalty payments in arrears shall be made on or before the twentieth day of the month next succeeding the month in which the royalty fees are set.

(5)(A) Notwithstanding section 112(e) and the other provisions of this subsection, the receiving agent may enter into agreements for the reproduction and

A10

performance of sound recordings under section 112(e) and this section by any 1 or more commercial webcasters or noncommercial webcasters for a period of not more than 11 years beginning on January 1, 2005, that, once published in the Federal Register pursuant to subparagraph (B), shall be binding on all copyright owners of sound recordings and other persons entitled to payment under this section, in lieu of any determination by the Copyright Royalty Judges. Any such agreement for commercial webcasters may include provisions for payment of royalties on the basis of a percentage of revenue or expenses, or both, and include a minimum fee. Any such agreement may include other terms and conditions, including requirements by which copyright owners may receive notice of the use of their sound recordings and under which records of such use shall be kept and made available by commercial webcasters or noncommercial webcasters. The receiving agent shall be under no obligation to negotiate any such agreement. The receiving agent shall have no obligation to any copyright owner of sound recordings or any other person entitled to payment under this section in negotiating any such agreement, and no liability to any copyright owner of sound recordings or any other person entitled to payment under this section for having entered into such agreement.

(B) The Copyright Office shall cause to be published in the Federal Register any agreement entered into pursuant to subparagraph (A). Such publication shall include a statement containing the substance of subparagraph (C). Such agreements shall not be included in the Code of Federal Regulations. Thereafter, the terms of such agreement shall be available, as an option, to any commercial webcaster or noncommercial webcaster meeting the eligibility conditions of such agreement.

(C) Neither subparagraph (A) nor any provisions of any agreement entered into pursuant to subparagraph (A), including any rate structure, fees, terms, conditions, or notice and recordkeeping requirements set forth therein, shall be admissible as evidence or otherwise taken into account in any administrative, judicial, or other government proceeding involving the setting or adjustment of the royalties payable for the public performance or reproduction in ephemeral phonorecords or copies of sound recordings, the determination of terms or conditions related thereto, or the establishment of notice or recordkeeping requirements by the Copyright Royalty Judges under paragraph (4) or section 112(e)(4). It is the intent of Congress that any royalty rates, rate structure, definitions, terms, conditions, or notice and recordkeeping requirements, included in such agreements shall be considered as a compromise motivated by the unique business, economic and political circumstances of webcasters, copyright owners, and performers rather than as matters that would have been negotiated in the marketplace between a willing

A11

buyer and a willing seller, or otherwise meet the objectives set forth in section 801(b). This subparagraph shall not apply to the extent that the receiving agent and a webcaster that is party to an agreement entered into pursuant to subparagraph (A) expressly authorize the submission of the agreement in a proceeding under this subsection.

(D) Nothing in the Webcaster Settlement Act of 2008, the Webcaster Settlement Act of 2009, or any agreement entered into pursuant to subparagraph (A) shall be taken into account by the United States Court of Appeals for the District of Columbia Circuit in its review of the determination by the Copyright Royalty Judges of May 1, 2007, of rates and terms for the digital performance of sound recordings and ephemeral recordings, pursuant to sections 112 and 114.2

(E) As used in this paragraph—

(i) the term "noncommercial webcaster" means a webcaster that—

(I) is exempt from taxation under section 501 of the Internal Revenue Code of 1986 (26 U.S.C. 501);

(II) has applied in good faith to the Internal Revenue Service for exemption from taxation under section 501 of the Internal Revenue Code and has a commercially reasonable expectation that such exemption shall be granted; or

(III) is operated by a State or possession or any governmental entity or subordinate thereof, or by the United States or District of Columbia, for exclusively public purposes;

(ii) the term "receiving agent" shall have the meaning given that term in section 261.2 of title 37, Code of Federal Regulations, as published in the Federal Register on July 8, 2002; and

(iii) the term "webcaster" means a person or entity that has obtained a compulsory license under section 112 or 1143 and the implementing regulations therefor.

(F) The authority to make settlements pursuant to subparagraph (A) shall expire at 11:59 p.m. Eastern time on the 30th day after the date of the enactment of the Webcaster Settlement Act of 2009.

(g) Proceeds from licensing of transmissions.—

A12

(1) Except in the case of a transmission licensed under a statutory license in accordance with subsection (f) of this section—

(A) a featured recording artist who performs on a sound recording that has been licensed for a transmission shall be entitled to receive payments from the copyright owner of the sound recording in accordance with the terms of the artist's contract; and

(B) a nonfeatured recording artist who performs on a sound recording that has been licensed for a transmission shall be entitled to receive payments from the copyright owner of the sound recording in accordance with the terms of the nonfeatured recording artist's applicable contract or other applicable agreement.

(2) An agent designated to distribute receipts from the licensing of transmissions in accordance with subsection (f) shall distribute such receipts as follows:

(A) 50 percent of the receipts shall be paid to the copyright owner of the exclusive right under section 106(6) of this title to publicly perform a sound recording by means of a digital audio transmission.

(B) 2 ½ percent of the receipts shall be deposited in an escrow account managed by an independent administrator jointly appointed by copyright owners of sound recordings and the American Federation of Musicians (or any successor entity) to be distributed to nonfeatured musicians (whether or not members of the American Federation of Musicians) who have performed on sound recordings.

(C) 2 ½ percent of the receipts shall be deposited in an escrow account managed by an independent administrator jointly appointed by copyright owners of sound recordings and the American Federation of Television and Radio Artists (or any successor entity) to be distributed to nonfeatured vocalists (whether or not members of the American Federation of Television and Radio Artists) who have performed on sound recordings.

(D) 45 percent of the receipts shall be paid, on a per sound recording basis, to the recording artist or artists featured on such sound recording (or the persons conveying rights in the artists' performance in the sound recordings).

(3) A nonprofit agent designated to distribute receipts from the licensing of transmissions in accordance with subsection (f) may deduct from any of its

A13

receipts, prior to the distribution of such receipts to any person or entity entitled thereto other than copyright owners and performers who have elected to receive royalties from another designated agent and have notified such nonprofit agent in writing of such election, the reasonable costs of such agent incurred after November 1, 1995, in—

(A) the administration of the collection, distribution, and calculation of the royalties;

(B) the settlement of disputes relating to the collection and calculation of the royalties; and

(C) the licensing and enforcement of rights with respect to the making of ephemeral recordings and performances subject to licensing under section 112 and this section, including those incurred in participating in negotiations or arbitration proceedings under section 112 and this section, except that all costs incurred relating to the section 112 ephemeral recordings right may only be deducted from the royalties received pursuant to section 112.

(4) Notwithstanding paragraph (3), any designated agent designated to distribute receipts from the licensing of transmissions in accordance with subsection (f) may deduct from any of its receipts, prior to the distribution of such receipts, the reasonable costs identified in paragraph (3) of such agent incurred after November 1, 1995, with respect to such copyright owners and performers who have entered with such agent a contractual relationship that specifies that such costs may be deducted from such royalty receipts.

* * *

(j) Definitions.—As used in this section, the following terms have the following meanings:

(1) An "affiliated entity" is an entity engaging in digital audio transmissions covered by section 106(6), other than an interactive service, in which the licensor has any direct or indirect partnership or any ownership interest amounting to 5 percent or more of the outstanding voting or non-voting stock.

(2) An "archived program" is a predetermined program that is available repeatedly on the demand of the transmission recipient and that is performed in the same order from the beginning, except that an archived program shall not include a recorded event or broadcast transmission that makes no more than an incidental

A14

use of sound recordings, as long as such recorded event or broadcast transmission does not contain an entire sound recording or feature a particular sound recording.

(3) A "broadcast" transmission is a transmission made by a terrestrial broadcast station licensed as such by the Federal Communications Commission.

(4) A "continuous program" is a predetermined program that is continuously performed in the same order and that is accessed at a point in the program that is beyond the control of the transmission recipient.

(5) A "digital audio transmission" is a digital transmission as defined in section 101, that embodies the transmission of a sound recording. This term does not include the transmission of any audiovisual work.

(6) An "eligible nonsubscription transmission" is a noninteractive nonsubscription digital audio transmission not exempt under subsection (d)(1) that is made as part of a service that provides audio programming consisting, in whole or in part, of performances of sound recordings, including retransmissions of broadcast transmissions, if the primary purpose of the service is to provide to the public such audio or other entertainment programming, and the primary purpose of the service is not to sell, advertise, or promote particular products or services other than sound recordings, live concerts, or other music-related events.

(7) An "interactive service" is one that enables a member of the public to receive a transmission of a program specially created for the recipient, or on request, a transmission of a particular sound recording, whether or not as part of a program, which is selected by or on behalf of the recipient. The ability of individuals to request that particular sound recordings be performed for reception by the public at large, or in the case of a subscription service, by all subscribers of the service, does not make a service interactive, if the programming on each channel of the service does not substantially consist of sound recordings that are performed within 1 hour of the request or at a time designated by either the transmitting entity or the individual making such request. If an entity offers both interactive and noninteractive services (either concurrently or at different times), the noninteractive component shall not be treated as part of an interactive service.

(8) A "new subscription service" is a service that performs sound recordings by means of noninteractive subscription digital audio transmissions and that is not a preexisting subscription service or a preexisting satellite digital audio radio service.

A15

(9) A "nonsubscription" transmission is any transmission that is not a subscription transmission.

(10) A "preexisting satellite digital audio radio service" is a subscription satellite digital audio radio service provided pursuant to a satellite digital audio radio service license issued by the Federal Communications Commission on or before July 31, 1998, and any renewal of such license to the extent of the scope of the original license, and may include a limited number of sample channels representative of the subscription service that are made available on a nonsubscription basis in order to promote the subscription service.

(11) A "preexisting subscription service" is a service that performs sound recordings by means of noninteractive audio-only subscription digital audio transmissions, which was in existence and was making such transmissions to the public for a fee on or before July 31, 1998, and may include a limited number of sample channels representative of the subscription service that are made available on a nonsubscription basis in order to promote the subscription service.

(12) A "retransmission" is a further transmission of an initial transmission, and includes any further retransmission of the same transmission. Except as provided in this section, a transmission qualifies as a "retransmission" only if it is simultaneous with the initial transmission. Nothing in this definition shall be construed to exempt a transmission that fails to satisfy a separate element required to qualify for an exemption under section 114(d)(1).

(13) The "sound recording performance complement" is the transmission during any 3-hour period, on a particular channel used by a transmitting entity, of no more than—

(A) 3 different selections of sound recordings from any one phonorecord lawfully distributed for public performance or sale in the United States, if no more than 2 such selections are transmitted consecutively; or

(B) 4 different selections of sound recordings—

(i) by the same featured recording artist; or

(ii) from any set or compilation of phonorecords lawfully distributed together as a unit for public performance or sale in the United States,

A16

if no more than three such selections are transmitted consecutively:

Provided, That the transmission of selections in excess of the numerical limits provided for in clauses (A) and (B) from multiple phonorecords shall nonetheless qualify as a sound recording performance complement if the programming of the multiple phonorecords was not willfully intended to avoid the numerical limitations prescribed in such clauses.

(14) A "subscription" transmission is a transmission that is controlled and limited to particular recipients, and for which consideration is required to be paid or otherwise given by or on behalf of the recipient to receive the transmission or a package of transmissions including the transmission.

(15) A "transmission" is either an initial transmission or a retransmission.

A17

## 17 U.S.C. § 801

(a) Appointment.—The Librarian of Congress shall appoint 3 full-time Copyright Royalty Judges, and shall appoint 1 of the 3 as the Chief Copyright Royalty Judge. The Librarian shall make appointments to such positions after consultation with the Register of Copyrights.

(b) Functions.—Subject to the provisions of this chapter, the functions of the Copyright Royalty Judges shall be as follows:

(1) To make determinations and adjustments of reasonable terms and rates of royalty payments as provided in sections 112(e), 114, 115, 116, 118, 119, and 1004. The rates applicable under sections 114(f)(1)(B), 115, and 116 shall be calculated to achieve the following objectives:

(A) To maximize the availability of creative works to the public.

(B) To afford the copyright owner a fair return for his or her creative work and the copyright user a fair income under existing economic conditions.

(C) To reflect the relative roles of the copyright owner and the copyright user in the product made available to the public with respect to relative creative contribution, technological contribution, capital investment, cost, risk, and contribution to the opening of new markets for creative expression and media for their communication.

(D) To minimize any disruptive impact on the structure of the industries involved and on generally prevailing industry practices.

(2) To make determinations concerning the adjustment of the copyright royalty rates under section 111 solely in accordance with the following provisions:

(A) The rates established by section 111(d)(1)(B) may be adjusted to reflect—

(i) national monetary inflation or deflation; or

(ii) changes in the average rates charged cable subscribers for the basic service of providing secondary transmissions to maintain the real constant dollar level of the royalty fee per subscriber which existed as of the date of October 19, 1976,

A18

except that—

(I) if the average rates charged cable system subscribers for the basic service of providing secondary transmissions are changed so that the average rates exceed national monetary inflation, no change in the rates established by section 111(d)(1)(B) shall be permitted; and

(II) no increase in the royalty fee shall be permitted based on any reduction in the average number of distant signal equivalents per subscriber.

The Copyright Royalty Judges may consider all factors relating to the maintenance of such level of payments, including, as an extenuating factor, whether the industry has been restrained by subscriber rate regulating authorities from increasing the rates for the basic service of providing secondary transmissions.

(B) In the event that the rules and regulations of the Federal Communications Commission are amended at any time after April 15, 1976, to permit the carriage by cable systems of additional television broadcast signals beyond the local service area of the primary transmitters of such signals, the royalty rates established by section 111(d)(1)(B) may be adjusted to ensure that the rates for the additional distant signal equivalents resulting from such carriage are reasonable in the light of the changes effected by the amendment to such rules and regulations. In determining the reasonableness of rates proposed following an amendment of Federal Communications Commission rules and regulations, the Copyright Royalty Judges shall consider, among other factors, the economic impact on copyright owners and users; except that no adjustment in royalty rates shall be made under this subparagraph with respect to any distant signal equivalent or fraction thereof represented by—

(i) carriage of any signal permitted under the rules and regulations of the Federal Communications Commission in effect on April 15, 1976, or the carriage of a signal of the same type (that is, independent, network, or noncommercial educational) substituted for such permitted signal; or

(ii) a television broadcast signal first carried after April 15, 1976, pursuant to an individual waiver of the rules and regulations of the Federal Communications Commission, as such rules and regulations were in effect on April 15, 1976.

(C) In the event of any change in the rules and regulations of the Federal Communications Commission with respect to syndicated and sports program

A19

exclusivity after April 15, 1976, the rates established by section 111(d)(1)(B) may be adjusted to assure that such rates are reasonable in light of the changes to such rules and regulations, but any such adjustment shall apply only to the affected television broadcast signals carried on those systems affected by the change.

(D) The gross receipts limitations established by section 111(d)(1) (C) and (D) shall be adjusted to reflect national monetary inflation or deflation or changes in the average rates charged cable system subscribers for the basic service of providing secondary transmissions to maintain the real constant dollar value of the exemption provided by such section, and the royalty rate specified therein shall not be subject to adjustment.

(3)(A) To authorize the distribution, under sections 111, 119, and 1007, of those royalty fees collected under sections 111, 119, and 1005, as the case may be, to the extent that the Copyright Royalty Judges have found that the distribution of such fees is not subject to controversy.

(B) In cases where the Copyright Royalty Judges determine that controversy exists, the Copyright Royalty Judges shall determine the distribution of such fees, including partial distributions, in accordance with section 111, 119, or 1007, as the case may be.

(C) Notwithstanding section 804(b)(8), the copyright royalty judges, at any time after the filing of claims under section 111, 119, or 1007, may, upon motion of one or more of the claimants and after publication in the Federal Register of a request for responses to the motion from interested claimants, make a partial distribution of such fees, if, based upon all responses received during the 30-day period beginning on the date of such publication, the copyright royalty judges conclude that no claimant entitled to receive such fees has stated a reasonable objection to the partial distribution, and all such claimants—

(i) agree to the partial distribution;

(ii) sign an agreement obligating them to return any excess amounts to the extent necessary to comply with the final determination on the distribution of the fees made under subparagraph (B);

(iii) file the agreement with the Copyright Royalty Judges; and

(iv) agree that such funds are available for distribution.

A20

(D) The Copyright Royalty Judges and any other officer or employee acting in good faith in distributing funds under subparagraph (C) shall not be held liable for the payment of any excess fees under subparagraph (C). The Copyright Royalty Judges shall, at the time the final determination is made, calculate any such excess amounts.

(4) To accept or reject royalty claims filed under sections 111, 119, and 1007, on the basis of timeliness or the failure to establish the basis for a claim.

(5) To accept or reject rate adjustment petitions as provided in section 804 and petitions to participate as provided in section 803(b) (1) and (2).

(6) To determine the status of a digital audio recording device or a digital audio interface device under sections 1002 and 1003, as provided in section 1010.

(7)(A) To adopt as a basis for statutory terms and rates or as a basis for the distribution of statutory royalty payments, an agreement concerning such matters reached among some or all of the participants in a proceeding at any time during the proceeding, except that—

(i) the Copyright Royalty Judges shall provide to those that would be bound by the terms, rates, or other determination set by any agreement in a proceeding to determine royalty rates an opportunity to comment on the agreement and shall provide to participants in the proceeding under section 803(b)(2) that would be bound by the terms, rates, or other determination set by the agreement an opportunity to comment on the agreement and object to its adoption as a basis for statutory terms and rates; and

(ii) the Copyright Royalty Judges may decline to adopt the agreement as a basis for statutory terms and rates for participants that are not parties to the agreement, if any participant described in clause (i) objects to the agreement and the Copyright Royalty Judges conclude, based on the record before them if one exists, that the agreement does not provide a reasonable basis for setting statutory terms or rates.

(B) License agreements voluntarily negotiated pursuant to section 112(e)(5), 114(f)(3), 115(c)(3)(E)(i), 116(c), or 118(b)(2) that do not result in statutory terms and rates shall not be subject to clauses (i) and (ii) of subparagraph (A).

A21

(C) Interested parties may negotiate and agree to, and the Copyright Royalty Judges may adopt, an agreement that specifies as terms notice and recordkeeping requirements that apply in lieu of those that would otherwise apply under regulations.

(8) To perform other duties, as assigned by the Register of Copyrights within the Library of Congress, except as provided in section 802(g), at times when Copyright Royalty Judges are not engaged in performing the other duties set forth in this section.

(c) Rulings.—The Copyright Royalty Judges may make any necessary procedural or evidentiary rulings in any proceeding under this chapter and may, before commencing a proceeding under this chapter, make any such rulings that would apply to the proceedings conducted by the Copyright Royalty Judges.

(d) Administrative support.—The Librarian of Congress shall provide the Copyright Royalty Judges with the necessary administrative services related to proceedings under this chapter.

(e) Location in Library of Congress.—The offices of the Copyright Royalty Judges and staff shall be in the Library of Congress.

(f) Effective date of actions.—On and after the date of the enactment of the Copyright Royalty and Distribution Reform Act of 2004, in any case in which time limits are prescribed under this title for performance of an action with or by the Copyright Royalty Judges, and in which the last day of the prescribed period falls on a Saturday, Sunday, holiday, or other nonbusiness day within the District of Columbia or the Federal Government, the action may be taken on the next succeeding business day, and is effective as of the date when the period expired.

A22

## 17 U.S.C. § 803

(a) Proceedings.—

(1) In general.—The Copyright Royalty Judges shall act in accordance with this title, and to the extent not inconsistent with this title, in accordance with subchapter II of chapter 5 of title 5, in carrying out the purposes set forth in section 801.The Copyright Royalty Judges shall act in accordance with regulations issued by the Copyright Royalty Judges and the Librarian of Congress, and on the basis of a written record, prior determinations and interpretations of the Copyright Royalty Tribunal, Librarian of Congress, the Register of Copyrights, copyright arbitration royalty panels (to the extent those determinations are not inconsistent with a decision of the Librarian of Congress or the Register of Copyrights), and the Copyright Royalty Judges (to the extent those determinations are not inconsistent with a decision of the Register of Copyrights that was timely delivered to the Copyright Royalty Judges pursuant to section 802(f)(1) (A) or (B), or with a decision of the Register of Copyrights pursuant to section 802(f)(1)(D)), under this chapter, and decisions of the court of appeals under this chapter before, on, or after the effective date of the Copyright Royalty and Distribution Reform Act of 2004.

(2) Judges acting as panel and individually.—The Copyright Royalty Judges shall preside over hearings in proceedings under this chapter en banc. The Chief Copyright Royalty Judge may designate a Copyright Royalty Judge to preside individually over such collateral and administrative proceedings, and over such proceedings under paragraphs (1) through (5) of subsection (b), as the Chief Judge considers appropriate.

(3) Determinations.—Final determinations of the Copyright Royalty Judges in proceedings under this chapter shall be made by majority vote. A Copyright Royalty Judge dissenting from the majority on any determination under this chapter may issue his or her dissenting opinion, which shall be included with the determination.

(b) Procedures.—

(1) Initiation.—

(A) Call for petitions to participate.—(i) The Copyright Royalty Judges shall cause to be published in the Federal Register notice of commencement of proceedings under this chapter, calling for the filing of petitions to participate in a proceeding

A23

under this chapter for the purpose of making the relevant determination under section 111, 112, 114, 115, 116, 118, 119, 1004, or 1007, as the case may be—

(I) promptly upon a determination made under section 804(a);

(II) by no later than January 5 of a year specified in paragraph (2) of section 804(b) for the commencement of proceedings;

(III) by no later than January 5 of a year specified in subparagraph (A) or (B) of paragraph (3) of section 804(b) for the commencement of proceedings, or as otherwise provided in subparagraph (A) or (C) of such paragraph for the commencement of proceedings;

(IV) as provided under section 804(b)(8); or

(V) by no later than January 5 of a year specified in any other provision of section 804(b) for the filing of petitions for the commencement of proceedings, if a petition has not been filed by that date, except that the publication of notice requirement shall not apply in the case of proceedings under section 111 that are scheduled to commence in 2005.

(ii) Petitions to participate shall be filed by no later than 30 days after publication of notice of commencement of a proceeding under clause (i), except that the Copyright Royalty Judges may, for substantial good cause shown and if there is no prejudice to the participants that have already filed petitions, accept late petitions to participate at any time up to the date that is 90 days before the date on which participants in the proceeding are to file their written direct statements. Notwithstanding the preceding sentence, petitioners whose petitions are filed more than 30 days after publication of notice of commencement of a proceeding are not eligible to object to a settlement reached during the voluntary negotiation period under paragraph (3), and any objection filed by such a petitioner shall not be taken into account by the Copyright Royalty Judges.

(B) Petitions to participate.—Each petition to participate in a proceeding shall describe the petitioner's interest in the subject matter of the proceeding. Parties with similar interests may file a single petition to participate.

(2) Participation in general.—Subject to paragraph (4), a person may participate in a proceeding under this chapter, including through the submission of briefs or other information, only if—

A24

(A) that person has filed a petition to participate in accordance with paragraph (1) (either individually or as a group under paragraph (1)(B));

(B) the Copyright Royalty Judges have not determined that the petition to participate is facially invalid;

(C) the Copyright Royalty Judges have not determined, sua sponte or on the motion of another participant in the proceeding, that the person lacks a significant interest in the proceeding; and

(D) the petition to participate is accompanied by either—

(i) in a proceeding to determine royalty rates, a filing fee of $150; or

(ii) in a proceeding to determine distribution of royalty fees—

(I) a filing fee of $150; or

(II) a statement that the petitioner (individually or as a group) will not seek a distribution of more than $1000, in which case the amount distributed to the petitioner shall not exceed $1000.

(3) Voluntary negotiation period.—

(A) Commencement of proceedings.—

(i) Rate adjustment proceeding.—Promptly after the date for filing of petitions to participate in a proceeding, the Copyright Royalty Judges shall make available to all participants in the proceeding a list of such participants and shall initiate a voluntary negotiation period among the participants.

(ii) Distribution proceeding.—Promptly after the date for filing of petitions to participate in a proceeding to determine the distribution of royalties, the Copyright Royalty Judges shall make available to all participants in the proceeding a list of such participants. The initiation of a voluntary negotiation period among the participants shall be set at a time determined by the Copyright Royalty Judges.

(B) Length of proceedings.—The voluntary negotiation period initiated under subparagraph (A) shall be 3 months.

A25

(C) Determination of subsequent proceedings.—At the close of the voluntary negotiation proceedings, the Copyright Royalty Judges shall, if further proceedings under this chapter are necessary, determine whether and to what extent paragraphs (4) and (5) will apply to the parties.

(4) Small claims procedure in distribution proceedings.

(A) In general.—If, in a proceeding under this chapter to determine the distribution of royalties, the contested amount of a claim is $10,000 or less, the Copyright Royalty Judges shall decide the controversy on the basis of the filing of the written direct statement by the participant, the response by any opposing participant, and 1 additional response by each such party.

(B) Bad faith inflation of claim.—If the Copyright Royalty Judges determine that a participant asserts in bad faith an amount in controversy in excess of $10,000 for the purpose of avoiding a determination under the procedure set forth in subparagraph (A), the Copyright Royalty Judges shall impose a fine on that participant in an amount not to exceed the difference between the actual amount distributed and the amount asserted by the participant.

(5) Paper proceedings.—The Copyright Royalty Judges in proceedings under this chapter may decide, sua sponte or upon motion of a participant, to determine issues on the basis of the filing of the written direct statement by the participant, the response by any opposing participant, and one additional response by each such participant. Prior to making such decision to proceed on such a paper record only, the Copyright Royalty Judges shall offer to all parties to the proceeding the opportunity to comment on the decision. The procedure under this paragraph—

(A) shall be applied in cases in which there is no genuine issue of material fact, there is no need for evidentiary hearings, and all participants in the proceeding agree in writing to the procedure; and

(B) may be applied under such other circumstances as the Copyright Royalty Judges consider appropriate.

(6) Regulations.—

(A) In general.—The Copyright Royalty Judges may issue regulations to carry out their functions under this title. All regulations issued by the Copyright Royalty

A26

Judges are subject to the approval of the Librarian of Congress and are subject to judicial review pursuant to chapter 7 of title 5, except as set forth in subsection (d). Not later than 120 days after Copyright Royalty Judges or interim Copyright Royalty Judges, as the case may be, are first appointed after the enactment of the Copyright Royalty and Distribution Reform Act of 2004, such judges shall issue regulations to govern proceedings under this chapter.

(B) Interim regulations.—Until regulations are adopted under subparagraph (A), the Copyright Royalty Judges shall apply the regulations in effect under this chapter on the day before the effective date of the Copyright Royalty and Distribution Reform Act of 2004, to the extent such regulations are not inconsistent with this chapter, except that functions carried out under such regulations by the Librarian of Congress, the Register of Copyrights, or copyright arbitration royalty panels that, as of such date of enactment, are to be carried out by the Copyright Royalty Judges under this chapter, shall be carried out by the Copyright Royalty Judges under such regulations.

(C) Requirements.—Regulations issued under subparagraph (A) shall include the following:

(i) The written direct statements and written rebuttal statements of all participants in a proceeding under paragraph (2) shall be filed by a date specified by the Copyright Royalty Judges, which, in the case of written direct statements, may be not earlier than 4 months, and not later than 5 months, after the end of the voluntary negotiation period under paragraph (3). Notwithstanding the preceding sentence, the Copyright Royalty Judges may allow a participant in a proceeding to file an amended written direct statement based on new information received during the discovery process, within 15 days after the end of the discovery period specified in clause (iv).

(ii)(I) Following the submission to the Copyright Royalty Judges of written direct statements and written rebuttal statements by the participants in a proceeding under paragraph (2), the Copyright Royalty Judges, after taking into consideration the views of the participants in the proceeding, shall determine a schedule for conducting and completing discovery.

(II) In this chapter, the term "written direct statements" means witness statements, testimony, and exhibits to be presented in the proceedings, and such other information that is necessary to establish terms and rates, or the distribution of

A27

royalty payments, as the case may be, as set forth in regulations issued by the Copyright Royalty Judges.

(iii) Hearsay may be admitted in proceedings under this chapter to the extent deemed appropriate by the Copyright Royalty Judges.

(iv) Discovery in connection with written direct statements shall be permitted for a period of 60 days, except for discovery ordered by the Copyright Royalty Judges in connection with the resolution of motions, orders, and disputes pending at the end of such period. The Copyright Royalty Judges may order a discovery schedule in connection with written rebuttal statements.

(v) Any participant under paragraph (2) in a proceeding under this chapter to determine royalty rates may request of an opposing participant nonprivileged documents directly related to the written direct statement or written rebuttal statement of that participant. Any objection to such a request shall be resolved by a motion or request to compel production made to the Copyright Royalty Judges in accordance with regulations adopted by the Copyright Royalty Judges. Each motion or request to compel discovery shall be determined by the Copyright Royalty Judges, or by a Copyright Royalty Judge when permitted under subsection (a)(2). Upon such motion, the Copyright Royalty Judges may order discovery pursuant to regulations established under this paragraph.

(vi)(I) Any participant under paragraph (2) in a proceeding under this chapter to determine royalty rates may, by means of written motion or on the record, request of an opposing participant or witness other relevant information and materials if, absent the discovery sought, the Copyright Royalty Judges' resolution of the proceeding would be substantially impaired. In determining whether discovery will be granted under this clause, the Copyright Royalty Judges may consider—

(aa) whether the burden or expense of producing the requested information or materials outweighs the likely benefit, taking into account the needs and resources of the participants, the importance of the issues at stake, and the probative value of the requested information or materials in resolving such issues;

(bb) whether the requested information or materials would be unreasonably cumulative or duplicative, or are obtainable from another source that is more convenient, less burdensome, or less expensive; and

A28

(cc) whether the participant seeking discovery has had ample opportunity by discovery in the proceeding or by other means to obtain the information sought.

(II) This clause shall not apply to any proceeding scheduled to commence after December 31, 2010.

(vii) In a proceeding under this chapter to determine royalty rates, the participants entitled to receive royalties shall collectively be permitted to take no more than 10 depositions and secure responses to no more than 25 interrogatories, and the participants obligated to pay royalties shall collectively be permitted to take no more than 10 depositions and secure responses to no more than 25 interrogatories. The Copyright Royalty Judges shall resolve any disputes among similarly aligned participants to allocate the number of depositions or interrogatories permitted under this clause.

(viii) The rules and practices in effect on the day before the effective date of the Copyright Royalty and Distribution Reform Act of 2004, relating to discovery in proceedings under this chapter to determine the distribution of royalty fees, shall continue to apply to such proceedings on and after such effective date.

(ix) In proceedings to determine royalty rates, the Copyright Royalty Judges may issue a subpoena commanding a participant or witness to appear and give testimony, or to produce and permit inspection of documents or tangible things, if the Copyright Royalty Judges' resolution of the proceeding would be substantially impaired by the absence of such testimony or production of documents or tangible things. Such subpoena shall specify with reasonable particularity the materials to be produced or the scope and nature of the required testimony. Nothing in this clause shall preclude the Copyright Royalty Judges from requesting the production by a nonparticipant of information or materials relevant to the resolution by the Copyright Royalty Judges of a material issue of fact.

(x) The Copyright Royalty Judges shall order a settlement conference among the participants in the proceeding to facilitate the presentation of offers of settlement among the participants. The settlement conference shall be held during a 21-day period following the 60-day discovery period specified in clause (iv) and shall take place outside the presence of the Copyright Royalty Judges.

(xi) No evidence, including exhibits, may be submitted in the written direct statement or written rebuttal statement of a participant without a sponsoring

A29

witness, except where the Copyright Royalty Judges have taken official notice, or in the case of incorporation by reference of past records, or for good cause shown.

(c) Determination of Copyright Royalty Judges.—

(1) Timing.—The Copyright Royalty Judges shall issue their determination in a proceeding not later than 11 months after the conclusion of the 21-day settlement conference period under subsection (b)(6)(C)(x), but, in the case of a proceeding to determine successors to rates or terms that expire on a specified date, in no event later than 15 days before the expiration of the then current statutory rates and terms.

(2) Rehearings.—

(A) In general.—The Copyright Royalty Judges may, in exceptional cases, upon motion of a participant in a proceeding under subsection (b)(2), order a rehearing, after the determination in the proceeding is issued under paragraph (1), on such matters as the Copyright Royalty Judges determine to be appropriate.

(B) Timing for filing motion.—Any motion for a rehearing under subparagraph (A) may only be filed within 15 days after the date on which the Copyright Royalty Judges deliver to the participants in the proceeding their initial determination.

(C) Participation by opposing party not required.—In any case in which a rehearing is ordered, any opposing party shall not be required to participate in the rehearing, except that nonparticipation may give rise to the limitations with respect to judicial review provided for in subsection (d)(1).

(D) No negative inference.—No negative inference shall be drawn from lack of participation in a rehearing.

(E) Continuity of rates and terms.—(i) If the decision of the Copyright Royalty Judges on any motion for a rehearing is not rendered before the expiration of the statutory rates and terms that were previously in effect, in the case of a proceeding to determine successors to rates and terms that expire on a specified date, then—

(I) the initial determination of the Copyright Royalty Judges that is the subject of the rehearing motion shall be effective as of the day following the date on which the rates and terms that were previously in effect expire; and

A30

(II) in the case of a proceeding under section 114(f)(1)(C) or 114(f)(2)(C), royalty rates and terms shall, for purposes of section 114(f)(4)(B), be deemed to have been set at those rates and terms contained in the initial determination of the Copyright Royalty Judges that is the subject of the rehearing motion, as of the date of that determination.

(ii) The pendency of a motion for a rehearing under this paragraph shall not relieve persons obligated to make royalty payments who would be affected by the determination on that motion from providing the statements of account and any reports of use, to the extent required, and paying the royalties required under the relevant determination or regulations.

(iii) Notwithstanding clause (ii), whenever royalties described in clause (ii) are paid to a person other than the Copyright Office, the entity designated by the Copyright Royalty Judges to which such royalties are paid by the copyright user (and any successor thereto) shall, within 60 days after the motion for rehearing is resolved or, if the motion is granted, within 60 days after the rehearing is concluded, return any excess amounts previously paid to the extent necessary to comply with the final determination of royalty rates by the Copyright Royalty Judges. Any underpayment of royalties resulting from a rehearing shall be paid within the same period.

(3) Contents of determination.—A determination of the Copyright Royalty Judges shall be supported by the written record and shall set forth the findings of fact relied on by the Copyright Royalty Judges. Among other terms adopted in a determination, the Copyright Royalty Judges may specify notice and recordkeeping requirements of users of the copyrights at issue that apply in lieu of those that would otherwise apply under regulations.

(4) Continuing jurisdiction.—The Copyright Royalty Judges may issue an amendment to a written determination to correct any technical or clerical errors in the determination or to modify the terms, but not the rates, of royalty payments in response to unforeseen circumstances that would frustrate the proper implementation of such determination. Such amendment shall be set forth in a written addendum to the determination that shall be distributed to the participants of the proceeding and shall be published in the Federal Register.

(5) Protective order.—The Copyright Royalty Judges may issue such orders as may be appropriate to protect confidential information, including orders excluding confidential information from the record of the determination that is published or

A31

made available to the public, except that any terms or rates of royalty payments or distributions may not be excluded.

(6) Publication of determination.—By no later than the end of the 60-day period provided in section 802(f)(1)(D), the Librarian of Congress shall cause the determination, and any corrections thereto, to be published in the Federal Register. The Librarian of Congress shall also publicize the determination and corrections in such other manner as the Librarian considers appropriate, including, but not limited to, publication on the Internet. The Librarian of Congress shall also make the determination, corrections, and the accompanying record available for public inspection and copying.

(7) Late payment.—A determination of the Copyright Royalty Judges may include terms with respect to late payment, but in no way shall such terms prevent the copyright holder from asserting other rights or remedies provided under this title.

(d) Judicial review.—

(1) Appeal.—Any determination of the Copyright Royalty Judges under subsection (c) may, within 30 days after the publication of the determination in the Federal Register, be appealed, to the United States Court of Appeals for the District of Columbia Circuit, by any aggrieved participant in the proceeding under subsection (b)(2) who fully participated in the proceeding and who would be bound by the determination. Any participant that did not participate in a rehearing may not raise any issue that was the subject of that rehearing at any stage of judicial review of the hearing determination. If no appeal is brought within that 30-day period, the determination of the Copyright Royalty Judges shall be final, and the royalty fee or determination with respect to the distribution of fees, as the case may be, shall take effect as set forth in paragraph (2).

(2) Effect of rates.—

(A) Expiration on specified date.—When this title provides that the royalty rates and terms that were previously in effect are to expire on a specified date, any adjustment or determination by the Copyright Royalty Judges of successor rates and terms for an ensuing statutory license period shall be effective as of the day following the date of expiration of the rates and terms that were previously in effect, even if the determination of the Copyright Royalty Judges is rendered on a later date. A licensee shall be obligated to continue making payments under the rates and terms previously in effect until such time as rates and terms for the

A32

successor period are established. Whenever royalties pursuant to this section are paid to a person other than the Copyright Office, the entity designated by the Copyright Royalty Judges to which such royalties are paid by the copyright user (and any successor thereto) shall, within 60 days after the final determination of the Copyright Royalty Judges establishing rates and terms for a successor period or the exhaustion of all rehearings or appeals of such determination, if any, return any excess amounts previously paid to the extent necessary to comply with the final determination of royalty rates. Any underpayment of royalties by a copyright user shall be paid to the entity designated by the Copyright Royalty Judges within the same period.

(B) Other cases.—In cases where rates and terms have not, prior to the inception of an activity, been established for that particular activity under the relevant license, such rates and terms shall be retroactive to the inception of activity under the relevant license covered by such rates and terms. In other cases where rates and terms do not expire on a specified date, successor rates and terms shall take effect on the first day of the second month that begins after the publication of the determination of the Copyright Royalty Judges in the Federal Register, except as otherwise provided in this title, or by the Copyright Royalty Judges, or as agreed by the participants in a proceeding that would be bound by the rates and terms. Except as otherwise provided in this title, the rates and terms, to the extent applicable, shall remain in effect until such successor rates and terms become effective.

(C) Obligation to make payments.—

(i) The pendency of an appeal under this subsection shall not relieve persons obligated to make royalty payments under section 111, 112, 114, 115, 116, 118, 119, or 1003, who would be affected by the determination on appeal, from—

(I) providing the applicable statements of account and reports of use; and

(II) paying the royalties required under the relevant determination or regulations.

(ii) Notwithstanding clause (i), whenever royalties described in clause (i) are paid to a person other than the Copyright Office, the entity designated by the Copyright Royalty Judges to which such royalties are paid by the copyright user (and any successor thereto) shall, within 60 days after the final resolution of the appeal, return any excess amounts previously paid (and interest thereon, if ordered pursuant to paragraph (3)) to the extent necessary to comply with the final

A33

determination of royalty rates on appeal. Any underpayment of royalties resulting from an appeal (and interest thereon, if ordered pursuant to paragraph (3)) shall be paid within the same period.

(3) Jurisdiction of court.—Section 706 of title 5 shall apply with respect to review by the court of appeals under this subsection. If the court modifies or vacates a determination of the Copyright Royalty Judges, the court may enter its own determination with respect to the amount or distribution of royalty fees and costs, and order the repayment of any excess fees, the payment of any underpaid fees, and the payment of interest pertaining respectively thereto, in accordance with its final judgment. The court may also vacate the determination of the Copyright Royalty Judges and remand the case to the Copyright Royalty Judges for further proceedings in accordance with subsection (a).

(e) Administrative matters.—

(1) Deduction of costs of Library of Congress and Copyright Office from filing fees.—

(A) Deduction from filing fees.—The Librarian of Congress may, to the extent not otherwise provided under this title, deduct from the filing fees collected under subsection (b) for a particular proceeding under this chapter the reasonable costs incurred by the Librarian of Congress, the Copyright Office, and the Copyright Royalty Judges in conducting that proceeding, other than the salaries of the Copyright Royalty Judges and the 3 staff members appointed under section 802(b).

(B) Authorization of appropriations.—There are authorized to be appropriated such sums as may be necessary to pay the costs incurred under this chapter not covered by the filing fees collected under subsection (b). All funds made available pursuant to this subparagraph shall remain available until expended.

(2) Positions required for administration of compulsory licensing.—Section 307 of the Legislative Branch Appropriations Act, 1994, shall not apply to employee positions in the Library of Congress that are required to be filled in order to carry out section 111, 112, 114, 115, 116, 118, or 119 or chapter 10.

A34

**CERTIFICATE OF COMPLIANCE**

**Type-Volume Limitation:**

     Pursuant to Fed. R. App. P. 32(a)(7)(C), I hereby certify that this brief contains 9,818 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

**Typeface:**

     I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2013 in 14 point, Times New Roman font.

Dated: November 25, 2014             /s/ Christopher J. Wright

## CERTIFICATE OF SERVICE

I certify that on November 25, 2014, the foregoing document was served on all parties or their counsel of record through the CM/ECF system.

/s/ Christopher J. Wright