ORAL ARGUMENT SCHEDULED FOR JANUARY 12, 2015

NO. 14-1068

**IN THE**
**UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**
————————————————————

INTERCOLLEGIATE BROADCASTING SYSTEM, INC.,

*Petitioner*,

v.

COPYRIGHT ROYALTY BOARD and
LIBRARY OF CONGRESS,

*Respondents*.
————————————————————

On Petition for Review of a Determination of the
Copyright Royalty Board

**FINAL REPLY BRIEF OF PETITIONER**
**INTERCOLLEGIATE BROADCASTING SYSTEM, INC.**

Christopher J. Wright
Timothy J. Simeone
John R. Grimm
HARRIS, WILTSHIRE & GRANNIS, LLP
1919 M ST. NW, THE EIGHTH FLOOR
Washington, D.C. 20036
Telephone:  (202) 730-1300
cwright@hwglaw.com

November 25, 2014                          *Counsel for Petitioner*

# TABLE OF CONTENTS

Table of Authorities ................................................................................. iii

Glossary ................................................................................................. v

SUMMARY OF ARGUMENT ............................................................... 1

ARGUMENT .......................................................................................... 4

   I.  The Judges Still Have Not Cured the Constitutional Defect that
      Invalidated the Earlier Determination ........................................... 4

     A. The Judges' Persistent Argument that IBS Must Demonstrate
        Prejudice is Not Supported by the Law .................................... 5

     B. The Judges Have Denied This Court's Vacatur Its Proper Effect. .......... 6

        1. This Court's Vacatur and Remand Required the Judges to
           Compile a New Record ....................................................... 7

        2. The Judges' "Papers-Only" Proceeding on Remand
           Incorporated Oral Testimony from the Previous Proceeding in
           Violation of the Copyright Act and the Appointments Clause ........... 8

        3. The Substantially Identical Determinations Undermine the
           Pretense that the Judges' Decision was Fully Independent. ............... 10

     C. The Judges Fail to Distinguish this Court's Decision in
        *Landry v. FDIC*. ................................................................... 11

     D. The Judges' Reliance on Cases Concerning Discretionary Agency
        Activity is Misplaced ............................................................. 12

  II.  The Judges' Across-the-Board $500 Annual Fee Was Arbitrary and
      Capricious, and Based on Reasoning This Court has Emphatically
      Rejected. ....................................................................................... 15

  III.  A New Proceeding On Remand Would Not Be A Wasteful Exercise ........ 19

i

CONCLUSION ..................................................................................................20

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ii

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page**

*Action on Smoking and Health v. Civ. Aeronautics Bd.*,
   713 F.2d 795 (D.C. Cir. 1983) ................................................................ 6-9,

*Butte Cnty., Cal. v. Hogen*,
   613 F.3d 190 (D.C. Cir. 2010) ..................................................................16

*Doolin Sec. Savings v. Office of Thrift Supervision*,
   139 F.3d 203 (D.C. Cir. 1998) .................................................................13

*Federal Election Comm'n v. Legi-Tech, Inc.*,
   75 F.3d 704 (D.C. Cir. 1996) .............................................................. 13-14

*Heartland Reg'l Med. Ctr. v. Sebelius*,
   566 F.3d 193 (D.C. Cir. 2009) ...................................................................7

*Intercollegiate Broadcasting System, Inc. v. CRB*,
   574 F.3d 748 (D.C. Cir. 2009) ......................................................... 3,17-19

*In re Aiken County*,
   725 F.3d 255 (D.C. Cir. 2013) ..................................................................16

*Landry v. FDIC*,
   204 F.3d 1125 (D.C. Cir. 2000) ...........................................2, 5, 6, 11-12, 14-15

*New Process Steel, L.P. v. NLRB*,
   560 U.S. 674 (2010) ................................................................................13

*New York State Dep't of Law v. FCC*,
   984 F.2d 1209 (D.C. Cir. 1993) ................................................................13

*Ryder v. United States*,
   515 U.S. 177 (1995) ........................................................................ 2, 14-15

*Wingo v. Wedding*,
   418 U.S. 461 (1974) ..........................................................................2, 14

iii

**Statutes**

*17 U.S.C. § 114 ................................................................................16

17 U.S.C. § 803 ..............................................................................9, 14

**Administrative Materials**

Order Denying Motion for Rehearing..................................................8

Written Direct Testimony of Barrie Kessler .......................................18

*Determination of Royalty Rates for Digital Performance Right in Sound
    Recordings and Ephemeral Recordings; Final Rule,
    79 Fed. Reg. 23,102 (Apr. 25, 2014) ...............................3, 6, 8-9, 17-18

Notice of Participants, Commencement of Voluntary Negotiation Period, and Case
    Scheduling Order, Determination of Royalty Rates and Terms for Ephemeral
    Recordings and Digital Performance of Sound Recordings,
    No. 14-CRB-001-WR (2016-2020) ..................................................19

*Authorities upon which we chiefly rely are marked with asterisks.

iv

# GLOSSARY

| **Term** | **Definition** |
| --- | --- |
| APA | Administrative Procedure Act, 5 U.S.C. § 701 *et seq*. |
| ALJ | Administrative Law Judge. |
| CRB | Copyright Royalty Board |
| *Determination* | Determination of Royalty Rates for Digital Performance Right in Sound Recordings and Ephemeral Recordings; Final Rule, 79 Fed. Reg. 23, 102 (Apr. 25, 2014). |
| IBS | Intercollegiate Broadcasting System, Inc. |
| NLRB | National Labor Relations Board. |
| Written Direct Testimony of Barrie Kessler | Written Direct Testimony of Barrie Kessler, Determination of Royalty Rates for Digital Performance Right in Sound Recordings, N. 2009-1 CRB Webcasting III. |

v

## SUMMARY OF ARGUMENT

In its opening Brief, the Intercollegiate Broadcasting System ("IBS") showed that, the Copyright Royalty Judges (the "Judges") erred in failing to conduct a new proceeding following this Court's remand because: (1) an Appointments Clause violation is a structural constitutional error for which no showing of prejudice is required; (2) the original Copyright Royalty Judges' unconstitutional exercise of authority could not be cured by a *de novo* consideration of the record that they lacked constitutional authority to assemble; and (3) the Judges perpetuated the constitutional infirmity of their predecessors' appointments by explicitly relying on their work.

The core facts of this case are undisputed. The previous panel of Copyright Royalty Board ("CRB") judges held their office unconstitutionally. They set a royalty structure that requires all commercial and noncommercial webcasters, including IBS member stations large and small to pay $500 annually—even if that amount exceeds the annual budget of, for example, a small webcaster at an educational institution. After IBS successfully invoked its right to have its members' rate obligations determined by lawfully appointed authorities, the new Judges refused to consider *any* argument or evidence not assembled by their unconstitutionally appointed predecessors, and adopted an identical annual fee. And despite the fact that IBS members have been obliged to pay the $500 fee for

years, IBS has still never had an opportunity to oppose the fee before a panel of judges whose appointment does not offend the Constitution.

In response to this challenge the newly appointed Judges rehash the same arguments they have advanced since this Court's 2012 vacatur and remand. These arguments were wrong when the Judges first relied on them, and they are wrong today.

As a preliminary matter, IBS's entitlement to relief does not depend on its ability to show prejudice, which it *has* done at any rate. Moreover, the Judges' decision to rely on the existing record following remand fundamentally failed to give effect to this Court's vacatur: as this Court's precedent shows, when an agency determination is *vacated* and remanded, the remedy includes compiling a new record.

The Judges attempt to distinguish the cases on which IBS relies on the basis of superficial differences, flatly ignoring the fundamental constitutional principles for which they stand. But Appellees and Intervenors cannot dispute that in *Landry v. FDIC*, 204 F.3d 1125 (D.C. Cir. 2000), this Court refused to allow an agency's *de novo* of an ALJ determination prevent it from hearing a challenge to the ALJ's appointment. Likewise, in both *Ryder v. United States*, 515 U.S. 177 (1995) and *Wingo v. Wedding*, 418 U.S. 461 (1974), the Supreme Court invalidated the decisions of judges acting beyond their legal authority, despite the later *review* of

2

properly authorized judges. These cases leave no room for the Judges to end-run their duty to conduct an independent proceeding—a duty they still have not met.

Moreover, on the merits of their decision, the Judges have failed to justify their arbitrary and capricious $500 blanket annual fee. They do not disagree that they imposed the same $500 fee on all webcasters, despite their admitted statutory obligation to set rates for each type of webcaster reflecting what would be negotiated in the market. Instead, they argue that the fee was supported by the evidence, even though their reasoning was soundly rejected by this Court in an earlier proceeding in 2009. *Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*, 574 F.3d 748 (D.C. Cir. 2009). As in that proceeding, the Judges here set an annual minimum fee intended to cover SoundExchange's cost of administering a webcaster's license *without any evidence in the record* as to what IBS members— which webcast only a tiny fraction of the songs played by a large commercial webcaster like Pandora—cost SoundExchange.

In sum, the Judges' Determination of Royalty Rates for Digital Performance Right in Sound Recordings and Ephemeral Recordings (the "*Determination*") is both unconstitutional and arbitrary and capricious. And since the Judges are already conducting their next webcasting ratemaking proceedings, new proceedings here would not pose an appreciable burden. This Court should set the challenged fee aside, and order the Copyright Royalty Judges to conduct a new

3

evidentiary proceeding to determine its Web III rates.  That is the result that both the Constitution and the Copyright Act require.

**ARGUMENT**

The $500 annual payment mandated by the Judges suffers two fatal flaws: (1) the Judges failed to cure the Appointments Clause defect that invalidated their original determination; and (2) the $500 minimum fee was arbitrary and capricious.[1]  Moreover, SoundExchange is wrong that a new proceeding on remand would impose an unacceptable burden on the Copyright Royalty Board, or the parties.

## I.    THE JUDGES STILL HAVE NOT CURED THE CONSTITUTIONAL DEFECT THAT INVALIDATED THE EARLIER DETERMINATION.

The Judges' $500 annual minimum fee is unconstitutional because it remains tainted by the original Judges' Appointments Clause violation.  The proper cure is for the new Judges to conduct a new proceeding on remand, not to merely review the earlier record *de novo*.

---

[1] The Judges argue that IBS only challenges the $500 annual *minimum fee*, but not the $500 annual *royalty rate*.  (Br. 26 n.7).  But IBS's Statement of Issues Presented clearly referred to the $500 "royalty for statutory licenses under 17 U.S.C. §§ 112 and 114," and its opening brief discusses Section 112 and 114 licenses the minimum fee in conjunction with one another.  (*E.g.*, Br. 9-10).  The *Determination* is arbitrary and capricious insofar as it requires IBS members to pay $500 a year.

4

The Judges have not refuted this simple proposition.  As an initial matter,
(A) IBS's right to a new proceeding does not depend on it showing how it has been
prejudiced by the Judges' conduct.  Moreover, (B) by refusing to conduct a new
proceeding, the Judges ignored the purpose of this Court's vacatur.  Finally, (C) it
is settled law that a mere *de novo* review cannot cure an underlying Appointments
Clause violation.

### A.   The Judges' Persistent Argument that IBS Must Demonstrate Prejudice is Not Supported by the Law.

At the outset, it is necessary to dispel the Judges' incorrect belief that they
may rely on the earlier Board's record and witness examinations unless IBS can
demonstrate specific prejudice from the Appointments Clause violation.  (Br. 24-
26).[2]  That is not the law, and in fact this Court's precedent is directly to the
contrary: "There is certainly no rule that a party claiming constitutional error in the
vesting of authority must show a direct causal link between the error and the
authority's adverse decision."[3]  *Landry v. FDIC*, 204 F.3d 1125, 1131 (D.C. Cir.
2000).

---

[2]   For instance, the Judges claim that "[E]ven now, IBS has not identified any
respect in which it was prejudiced by the Judges' decision to conduct the
remand on the paper record." (Br. 24), and "[IBS] fails to identify any specific
respect in which [it was] harmed by the Judges' *de novo* review of the written
record and transcripts."  (Br. 25).

[3]   Indeed, "[f]or Appointments Clause violations, demand for a clear causal link to
a party's harm will likely make the Clause no wall at all," and "*Freytag* [*v.
Commissioner*] itself indicates that judicial review of an Appointments Clause

5

The Judges have no answer to this. IBS does not need to show how it was prejudiced by the earlier Judges' evidentiary decisions and witness questions, and it would be similarly improper to require IBS to show how it was prejudiced by the current Judges' direct reliance on them.[4] Although IBS *has* described why reliance on the earlier record harmed it, (Br. 28-31), its rights under the constitution do not hinge on whether it can prove how things might have been different if the current Judges had compiled their own record.

### B.     The Judges Have Denied This Court's Vacatur Its Proper Effect.

The Judges' claim that they were justified in conducting *de novo* review—rather than assembling a record of their own—overlooks the effect of this Court's order *vacating* the earlier determination. A vacatur involves more than simply sending an order back to an agency to re-think a decision[5]—its effect is "'to annul;

---

claim will proceed even where any possible injury is radically attenuated." *Landry*, 204 F.3d at 1131.

[4]  For example, the Judges support their *Determination* with references to oral arguments conducted by their predecessors, including direct quotations from the trial transcript. *See* 79 Fed. Reg. 23,102, 23,121 n.56 (Apr. 25, 2014) and accompanying text (J.A.276).

[5]  The Judges argue that IBS "confuses delegation with succession" (Br. 24 (internal quotation marks omitted)). The argument that the unconstitutionally appointed Judges are allowed to hand their work off to their successors (Br. 21) badly misses the mark. IBS does not dispute that *properly appointed* Judges may pass work off to their successors. In this case, however, the current Judges "succeeded" a group of judges who had *no legal authority* at all, and therefore could not be a part of any succession scheme envisioned by Congress.

6

to cancel or rescind; to declare, to render, or to make void; to defeat; to deprive of force; to make of *no authority or validity*; to set aside.'" *Action on Smoking and Health v. Civ. Aeronautics Bd.*, 713 F.2d 795, 797 (D.C. Cir. 1983) (emphasis added).[6] As set forth below, the current Judges were required to pursue proper rulemaking processes—including assembling a record supporting their decision— to arrive at a valid new decision.

### 1.    This Court's Vacatur and Remand Required the Judges to Compile a New Record.

The Judges' task on remand was to engage in a constitutionally valid ratemaking. Under this Court's precedents, that required engaging in the decisionmaking process from the beginning. In *Action on Smoking*, this Court *vacated* an agency decision to rescinding and replacing three rules when the agency failed to provide an adequate basis to justify the new ones. *Id.* On remand, the agency purported to adopt a superseding new rule with the same effect as those vacated, and provided a further explanation of its reasoning. *Id.* at 798.

The Court held that this was not enough: if the new rule was to be more than an improper *post hoc* rationalization for those vacated, the agency was required to

---

[6]    The Court knows how to send a decision back to an agency without nullifying it completely when appropriate. *See, e.g.*, *Heartland Reg'l Med. Ctr. v. Sebelius*, 566 F.3d 193, 199 (D.C. Cir. 2009) (holding that declaring decision "invalid" does not necessarily vacate the decision). This Court's use of the word "vacate" was not an accident, and the Judges must not deprive the Court's decision of its intended effect.

7

follow statutory rulemaking procedures and compile a new record in support of its

new decision: "If . . . [the regulation] is in fact a *new* rule, then it must be

promulgated in accordance with the rulemaking procedures demanded by [the

APA], including its notice and comment requirements." *Id.* at 800 (emphasis in

original). The agency could not simply "pick[] up where [the] earlier Judges left

off." Order Denying Motion for Rehearing at 2 (J.A.235). The Judges in this case

likewise could not skip past the Copyright Act's procedural requirements once this

Court vacated the earlier proceeding.[7]

## 2. The Judges' "Papers-Only" Proceeding on Remand Incorporated Oral Testimony from the Previous Proceeding in Violation of the Copyright Act and the Appointments Clause.

The Judges attempt to excuse their failure to compile a new record by

pointing out that the rules allow them to conduct a papers-only proceeding. (Br.

19). That does not help them here. First, as IBS observed in its opening brief (Br.

31-32), the Judges' "papers-only" proceeding on remand in fact included

transcripts of oral testimony taken by the earlier Judges and thus was not actually

limited to the parties' papers. *See* 79 Fed. Reg. at 23,104 (J.A.259) ("The record

---

[7]   *Action on Smoking* involved a notice-and-comment rulemaking, so the Court required the agency to undertake a new notice-and-comment procedure. 713 F.2d at 800. Of course, the Judges make their ratemaking determinations under procedures set forth in the Copyright Act, not under the APA's notice-and-comment procedures, but this simply means that the Judges must compile a new record under those procedures.

8

on which the Judges base their determination after remand is the existing record, including written and oral legal argument of counsel, and transcripts of the entire determination proceeding."). Without the ability to observe witnesses independently, the Judges were forced to rely on the earlier Judges' credibility determinations, and even based their decision in part on colloquies among the earlier Judges, witnesses, and counsel. *See id.* at 23,121 n.56 (J.A.276). But plainly Congress did not intend the paper proceeding provisions to be a mechanism for preserving constitutional deficiencies in the record.

Second, the Judges' review of the record was not the *kind* of papers-only proceeding authorized by statute. Congress authorized a papers-only proceeding consisting of "written direct statement[s] . . . , the response by any opposing participant, and one additional response by each such participant." 17 U.S.C. § 803(b)(5). That is not what happened here—what happened here is that *unconstitutionally appointed* judges compiled a record *more* extensive than the papers-only proceeding envisioned by Congress, and then *constitutionally appointed* judges relied on that earlier record. As discussed above, however, *Action on Smoking* makes it clear that this Court's 2012 vacatur required the

9

Judges to compile a *new* record.[8]  Thus, the portion of the Copyright Act allowing

for papers-only proceedings simply was not satisfied here.

### 3.    The Substantially Identical Determinations Undermine the Pretense that the Judges' Decision was Fully Independent.

The Judges attempt to minimize the extent of their predecessors' influence

by implausibly arguing that the nearly identical determinations do not indicate

improper reliance on the earlier Board.  The crux of this argument is that, contrary

to IBS's characterization, they did not "ratify" the earlier Judges' decision but

instead reached an independent decision which just happens to be almost

completely identical to the earlier decision that this Court vacated.  (*See* Br. 2

("[T]he new judges did not simply ratify the prior panel's analysis on *de novo*

review (although they could have done so), but weighed the evidence differently

from their predecessors in various respects.")).

To support this argument, the Judges point to a few discrete instances where

the new *Determination* differs from the old,[9] but ignore the fact that the Judges

*exclusively* considered the record their predecessors compiled, refused to accept

new papers, accepted all of their predecessors' witness credibility determinations

---

[8]    Of course, were the Judges to compile a new record, nothing would prevent a party from re-submitting the same papers it submitted in an earlier proceeding.

[9]    For example, in a section of the *Determination* wholly unrelated to this appeal, the Judges set a per-play royalty rate at between $0.0017 and $0.0025 whereas the earlier Judges set the rate at between $0.0019 and $0.0036.  (Br. 18 n.4).

10

and evidentiary rulings, based their *Determination* in part on their predecessors'

questions at trial—even quoting their predecessors verbatim in their

*Determination*—and adopted a rate structure that is overwhelmingly (if not

entirely) identical to the one this court vacated. In short, the Judges have given this

court no reason to believe that the new *Determination* was truly independent.

### C.    The Judges Fail to Distinguish this Court's Decision in *Landry v. FDIC*.

IBS's opening brief relied substantially on *Landry*, for the proposition that

*de novo* review of the record cannot cure an underlying Appointments Clause

defect. The Judges and SoundExchange have no response.

In *Landry*, this Court had to determine whether it could consider the

constitutionality of an ALJ's appointment after the ALJ's decision had been

reviewed *de novo* within the FDIC. The Court explained that "if the process of

final de novo review could cleanse the [Appointments Clause] violation of its

harmful impact, then all such arrangements would escape judicial review," *id.* at

1132, and concluded that it could examine the Appointments Clause challenge

notwithstanding the intervening *de novo* review.

Although the Court did not find an Appointments Clause violation in

*Landry*, the fact that it considered the issue indicates that *de novo* review could not

cure an underlying constitutional defect. If *de novo* review left no injury to

11

redress, the availability of judicial review would be meaningless at best, and unconstitutional at worst.

The only real difference between this case and *Landry* is that here, the *de novo* review came *after* the Court held the earlier Judges' appointments unconstitutional, whereas in *Landry*, the *de novo* review preceded the Court's Appointments Clause analysis. But this accident of chronology cannot alter a fundamental constitutional principle. As a logical matter, *de novo* review does not *more* effectively expunge constitutional error simply because it comes *after* this Court's conclusive determination that constitutional error in fact occurred. The Court should not embrace such a bizarre result.

### D. The Judges' Reliance on Cases Concerning Discretionary Agency Activity is Misplaced.

Although the Judges and SoundExchange ignore *Landry* and dismiss IBS's other cases[10] as "inapt" (Br. 20), it is in fact the precedents on which Appellees rely that are inapplicable here. In particular, they focus on a series of cases in which agencies were allowed to essentially ratify earlier *policy* decisions. But the fundamental difference between cases like *FEC v. Legi-Tech* and *Doolin*—on

---

[10]  In addition to *Landry*, IBS cited *Ryder v. United States*, 515 U.S. 177 (1995) and *Wingo v. Wedding*, 418 U.S. 461 (1974) in support of the proposition that remedying Appointments Clause violations requires more than *de novo* review.

which the Judges rely—and this one is that those cases did not involve ALJs exercising *judicial* authority, like the Judges did here.

SoundExchange claims that a line of cases challenging National Labor Relations Bureau decisions refutes IBS's argument that *Legi-Tech* and *Doolin* are inapposite. (Br. 14). The Supreme Court remanded a decision to the Bureau because it issued the challenged decisions without a quorum. *New Process Steel, L.P. v. NLRB*, 560 U.S. 674 (2010). On remand, the Bureau reinstated the vacated decisions without conducting a new proceeding. (Br. 14). Yet, according to SoundExchange, "[i]n reviewing those reinstated decisions, no court has suggested that the NLRB was somehow prohibited from reinstating those prior decisions unless it had first engaged in an entirely new set of hearings." *Id.* But this is because no one challenged the Bureau's procedure on remand. Maybe no court has suggested the Bureau's procedure was incorrect, but no court has also said that it was proper.

It is odd that the Judges and SoundExchange fail to recognize the significance of the distinction between judicial decisionmaking and discretionary agency action. For one thing, agency decisions such as whether to bring enforcement actions are inherently within the agency's discretion. As this Court indicated in *Legi-Tech*, its ability to review discretionary Executive-Branch activity is limited: "We must bear in mind that we have no statutory authority to

13

review the FEC's decision to sue." *Fed. Election Comm'n v. Legi-Tech, Inc.*, 75

F.3d 704, at 709; *see also New York State Dep't of Law v. FCC*, 984 F.2d 1209,

1215 (D.C. Cir. 1993) (noting that agency enforcement decisions are

presumptively unreviewable).[11]  It is natural that the procedures required on

remand would be less rigorous in situations where the agency is ultimately only

accountable to itself.

More important, judicial activity is fundamentally different from other

administrative activities.  The Judges' task was not simply to determine if it agreed

with a policy decision like in *Legi-Tech*, but to evaluate evidence and conform its

determination to a specific legal standard.  Unlike with an agency policy decision,

there is a greater potential for constitutional defects to linger, and thus a greater

need for independent record making on remand.  Finally, agencies taking

enforcement action are not required to remain impartial the way judges are, so

there is less concern when they simply re-adopt views taken by their predecessors.

Because of these differences, the relevant law here comes from cases

involving *de novo* review of a judge's *ultra vires* actions.  IBS has pointed to

---

[11] In contrast, this Court has explicit statutory authority to review decision of the
Copyright Royalty Judges.  *See* 17 U.S.C. § 803(d)(1).

14

numerous cases where *de novo* review of decisions that exceeded a *judge's*[12] authority, as opposed to an agency's, did not cure the underlying defect.  In each of IBS's cases, a judge or group of judges rendered a decision which in some manner—*including Appointments Clause violations*[13]—exceeded the judge's legal powers.  And in each case, a later judge's review did not cure the error.  There is no reason why these cases should not mandate the same result here, where the underlying principles are the same.

The relevant rule of law here is simple: when a judge acts without legal authority, mere review—*de novo* or not—of the resulting decision is an insufficient remedy, *especially* when the new judges' rule is supported by a record the previous judges compiled.  This principle animates all of the cases IBS relies on in its opening brief, and it required the Judges here to conduct their own proceeding on remand.

## II.   THE JUDGES' ACROSS-THE-BOARD $500 ANNUAL FEE WAS ARBITRARY AND CAPRICIOUS, AND BASED ON REASONING THAT THIS COURT HAS EMPHATICALLY REJECTED.

The Judges' blanket $500 annual royalty and minimum fee, applicable to all webcasters, was arbitrary and capricious because it ignored both the statute and the

---

[12] *Ryder*, *Wingo*, and *Landry* all involved challenges to non-Article-III judges too, so there is no reason why the Copyright Royalty Judges should not fall within the ambit of these cases.

[13] *Landry*, 204 F.3d at 1131; *Ryder*, 515 U.S. at 178.

15

record evidence.  The Judges overlooked the plain and unambiguous statutory

mandate that they set appropriate rates for *each type* of webcasting service, which

they failed to do.  The Judges fail to cite any evidence that a $500 annual fee or

annual royalty rate is appropriate for IBS stations.  What is more, in 2009 this

Court rejected precisely the same reasoning the Judges relied on here.

While they continue to support a blanket $500 rate, the Judges do not really

dispute that subcategories of "small" and "very small" noncommercial webcasters

exist, or that the *Determination* treats them exactly the same as the largest

webcasters.  Nor do they disagree that they are required to "distinguish among the

different types of eligible nonsubscription transmission services . . . in operation

. . . and shall include a minimum fee for each type of service."  17 U.S.C. §

114(f)(2)(B).  Notwithstanding this requirement, however, the Judges imposed the

same $500 annual minimum fee on every webcaster regardless of size.

As IBS pointed out in its opening brief (Br. 34, 36), the Judges may not

simply disregard Congress's requirements or the record evidence.  *See, e.g.*, *In re

Aiken County*, 725 F.3d 255, 259 (D.C. Cir. 2013) (noting that agencies may not

ignore statutory mandates); *Butte County, Cal. v. Hogen*, 613 F.3d 190, 194 (D.C.

Cir. 2010) (noting that agencies may not ignore evidence).  Yet the *Determination*

speaks for itself: all webcasters are treated the same with respect to the $500

annual fee, even though they vary by size, and even though IBS presented evidence

16

challenging the $500 fee (*see* Br. 9-10, 36-37 (detailing IBS's evidence)).  The

Judges set their $500 rate without any evidentiary support for the notion that it was

appropriate for small and very small noncommercial webcasters.

To justify the annual $500 royalty and fee, the Judges argue that the *average*

annual per-station or per-channel cost to SoundExchange is $825, (Br. 28 (citing

79 Fed. Reg. at 23,124)), and that "IBS offered no persuasive evidence to dispute

this estimate."  79 Fed. Reg. at 23,124 (J.A.279).  This is the exact reasoning this

Court rejected in 2009 when the Judges set their Web II rates.

In the 2009 case, as here, the previous Judges imposed a blanket $500

annual fee on all webcasters, commercial or otherwise.  *IBS v. CRB*, 574 F.3d 748,

766 (D.C. Cir. 2009).  They chose $500 on the theory that the annual fee ought to

at least cover the cost of administering the license, and because there was no record

evidence suggesting that noncommercial webcasters would have lower

administrative expenses.  *Id.*  This Court reversed because the Judges' "approach

[was] inconsistent with rational decisionmaking, which requires more than an

absence of contrary evidence; it requires substantial evidence to support a

decision."  *Id.* at 767.

Just as before, the Judges' justification for this $500 annual fee scheme is

that IBS has not shown that it does *not* cost SoundExchange $825 a year—in other

words, the basis for their $500 royalty and minimum fee is an "absence of contrary

17

evidence." *Id.* But there is no substantial evidence to *support* making IBS members pay $500: the Judges cited only an industry-wide *average* administrative cost, but did not offer a single piece of evidence as to the annual administrative cost of small or very small noncommercial webcasters—or even noncommercial webcasters generally.

Indeed, the $500 fee was completely arbitrary with respect to IBS because "[t]he exact cost imposed by any particular licensee varies widely," Written Direct Testimony of Barrie Kessler at 25 (J.A.26), and SoundExchange did not put forward any evidence as to IBS members' particular administrative expenses. Thus, the *Determination* cannot stand for this reason alone; as this Court held in 2009, "[b]ecause there is no record evidence that $500 represented SoundExchange's administrative cost *per channel or station*, the Judges' determination in this regard cannot be sustained." 574 F.3d at 767 (emphasis added).

While the Judges disagree that IBS put forward evidence supporting its opposition to the $500 minimum fee, they fail to advance any evidence that the annual cost to SoundExchange of IBS's members is anywhere near $500. Their across-the-board $500 rate fails to distinguish among different types of webcasters as Congress required; it failed to account for IBS's evidence; and with respect to IBS, the Judges essentially picked $500 out of the air. In doing so, they employed

18

an approach this Court has described "inconsistent with rational decisionmaking[.]" *Id.* The $500 fee is arbitrary and capricious, and it cannot be sustained.

### III. A NEW PROCEEDING ON REMAND WOULD NOT BE A WASTEFUL EXERCISE.

A new proceeding on remand, which the Constitution requires, would not be disruptive or wasteful, despite SoundExchange's dire warnings (Br. 19). First, the argument that it would be costly for SoundExchange to attend a new hearing is disingenuous, since SoundExchange is already an active participant in the Judges' Web IV proceedings to set webcasting rates beginning in 2016.[14] SoundExchange will be undergoing the "cost and expense" of a new ratemaking proceeding regardless of this Court's decision, and the additional burden of asking SoundExchange to address the $500 blanket fee during the Web IV proceeding would be minimal. Likewise, a remand need not require SoundExchange to "unwind[] years of fee collection," (Br. 19), because the Judges could apply a rate change retroactively by offsetting the 2016 rates.

---

[14] *See* Notice of Participants, Commencement of Voluntary Negotiation Period, and Case Scheduling Order, Determination of Royalty Rates and Terms for Ephemeral Recordings and Digital Performance of Sound Recordings, No. 14-CRB-001-WR (2016-2020), *available at* http://www.loc.gov/crb/orders/2014/2-19-14-NOPVNP-Case-Scheduling-order.pdf (last visited November 4, 2014).

19

Moreover, as the Judges and SoundExchange have pointed out, the Judges can conduct a papers-only hearing. IBS has never disputed that they may do so, as long as they do so properly. While the Constitution (and *Action on Smoking*) would require the Judges to compile a new record and accept new papers, a party could certainly submit an earlier pleading (at extremely low cost) if it so chose. There is no reason why enforcing the Constitution's requirements must be a costly disruption for SoundExchange.

## CONCLUSION

This Court should set aside the portions of the Judges' *Determination* requiring IBS members to pay $500 annually, and require the Judges to conduct a new proceeding with a new record.

November 25, 2014                                    Respectfully submitted,

                                                    /s/_____
                                                    Christopher J. Wright
                                                    Timothy J. Simeone
                                                    John R. Grimm
                                                    HARRIS, WILTSHIRE & GRANNIS
                                                    1919 M ST. NW, THE EIGHTH FLOOR
                                                    Washington, DC 20036
                                                    Telephone: 202-730-1300
                                                    *Counsel for Petitioner*

20

# CERTIFICATE OF COMPLIANCE

**Type-Volume Limitation**

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C), I hereby certify that this brief contains 4,623 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

**Typeface**

I further certify that this brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2013 in 14-point, Times New Roman.

Dated: November 25, 2014

/s/ _____

Christopher J. Wright
Timothy J. Simeone
John R. Grimm
HARRIS, WILTSHIRE & GRANNIS
1919 M ST. NW, THE EIGHTH FLOOR
Washington, DC 20036
Telephone: 202-730-1300
*Counsel for Petitioner*

21

## CERTIFICATE OF SERVICE

I certify that on November 25, 2014, the foregoing document was served on all

parties or their counsel of record through the CM/ECF system.

/s/ Christopher J. Wright

22