ORAL ARGUMENT SCHEDULED FOR JANUARY 12, 2015

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

------------------------

### No. 14-1068

------------------------

**INTERCOLLEGIATE BROADCASTING SYSTEM, INC.,**
*Appellant*,

**v.**

**COPYRIGHT ROYALTY BOARD and LIBRARY OF CONGRESS,**

*Appellees,*

**SOUNDEXCHANGE, INC., and**

**COLLEGE BROADCASTERS, INC.,**
*Intervenors.*

------------------------

**On Appeal from the Copyright Royalty Judges**

------------------------

**FINAL BRIEF OF INTERVENOR SOUNDEXCHANGE, INC.**
**IN SUPPORT OF APPELLEES**

------------------------

C. COLIN RUSHING
GENERAL COUNSEL
SOUNDEXCHANGE, INC.
733 10th Street, NW
10th Floor
Washington, DC 20001
(202) 640-5858

*Of Counsel*

MATTHEW S. HELLMAN
MICHAEL B. DESANCTIS
ZOILA E. HINSON
ISHAN K. BHABHA
JENNER & BLOCK LLP
1099 New York Avenue, NW
Suite 900
Washington, DC 20001
(202) 639-6000

December 2, 2014

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), Appellant SoundExchange, Inc. ("SoundExchange") certifies as follows:

**1.** **Parties and Amici.** All parties, intervenors, and amici appearing before the Copyright Royalty Judges and in this Court are listed in Appellant Intercollegiate Broadcasting System, Inc.'s ("IBS") opening brief.

**2.** **Rulings Under Review.** The ruling under review is a ratemaking decision of the Copyright Royalty Judges: *Determination of Royalty Rates for Digital Performance Right in Sound Recordings and Ephemeral Recordings*, 79 Fed. Reg. 23,102 (April 25, 2014) (codified at 37 C.F.R. § 380).

**3.** **Related Cases.** This case has not previously come before this Court or any other court. This Court previously addressed the constitutionality of the appointment of the Copyright Royalty Judges in *Intercollegiate Broadcasting System Inc. v. Copyright Royalty Board*, 684 F.3d 1332 (D.C. Cir. 2012), *cert denied*, 133 S. Ct. 2735 (2013).

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and D.C. Circuit Rule 26.1, SoundExchange respectfully submits this corporate disclosure statement.

SoundExchange is an independent, incorporated, non-profit performance rights organization, representing the owners of sound-recording copyrights and the performers featured in those recordings.  SoundExchange collects royalties paid pursuant to statutory licenses under Sections 112 and 114 of the Copyright Act, 17 U.S.C. §§ 112, 114, which allow the public performance of sound recordings via certain digital audio transmissions.  SoundExchange distributes these royalties to the artists who created the sound recordings and the owners of the sound recordings.  SoundExchange has not issued any shares or debt securities to the public, and SoundExchange has no parent companies.  SoundExchange has no subsidiaries or affiliates that have issued any shares or debt securities to the public. No publicly-held company has a 10% or greater ownership interest in SoundExchange.  Because SoundExchange is a trade association as defined in D.C. Circuit Rule 26.1(b), it is not required to disclose the names of its members.

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ..............i

CORPORATE DISCLOSURE STATEMENT ....................................... ii

TABLE OF AUTHORITIES ...........................................................v

GLOSSARY..........................................................................vii

STATEMENT OF ISSUES ..........................................................1

STATUTES AND REGULATIONS...................................................1

STATEMENT OF THE CASE........................................................1

    A.    The 2011 Webcasting Determination And Appeal .............................2

    B.    The Current Determination .....................................................4

SUMMARY OF ARGUMENT ......................................................7

STANDARD OF REVIEW ..........................................................10

ARGUMENT .......................................................................10

I.    THE CONSTITUTION DOES NOT REQUIRE A NEW LIVE HEARING ON REMAND, AND SUCH A HEARING WOULD BE WASTEFUL AND DISRUPTIVE.................................................10

    A.    Courts Have Long Held That A Validly Constituted Tribunal May Affirm Or Reissue A Decision Issued By A Prior Unconstitutionally Structured Entity.................................11

    B.    IBS's Purported Contrary Authority Is Inapposite. ...........................15

    C.    A Mandatory Live Hearing Would Be Wasteful and Disruptive. ......17

II.    THE CRJs' DETERMINATION OF THE $500 MINIMUM FEE IS REASONABLE.......................................................20

    A.    Substantial Evidence Supports the $500 Minimum Fee. ...................21

    B.    IBS's Arguments Mischaracterize the CRJs' Determination and the Evidence. .....................................................25

CONCLUSION ......................................................................................28

CERTIFICATE OF COUNSEL PURSUANT TO CIRCUIT RULE 28(d) ...........29

CERTIFICATE OF COMPLIANCE......................................................30

CERTIFICATE OF SERVICE ............................................................31

# TABLE OF AUTHORITIES*

## CASES

*Andrade v. Regnery*, 824 F.2d 1253 (D.C. Cir. 1987) ................................................ 12

*Atrium of Princeton, LLC v. NLRB*, 684 F.3d 1310 (D.C. Cir. 2012) .................... 14

*Buckley v. Valeo*, 424 U.S. 1 (1976), *superseded by McConnell v. Federal Election Commission*, 540 U.S. 93 (2003) .......................................................... 13

*\*Doolin Security Savings Bank, F.S.B. v. Office of Thrift Supervision*, 139 F.3d 203 (D.C. Cir. 1998) ............................................................................. 12, 13

*\*Federal Election Commission v. Legi-Tech, Inc.*, 75 F.3d 704 (D.C. Cir. 1996) ................................................................................................. 7, 10, 11, 12

*Intercollegiate Broadcast System, Inc. v. Copyright Royalty Board*, 574 F.3d 748 (D.C. Cir. 2009) ............................................................................................ 10

*Intercollegiate Broadcasting System, Inc. v. Copyright Royalty Board*, 684 F.3d 1332 (D.C. Cir. 2012), *cert. denied*, 133 S. Ct. 2735 (2013) ....... 3, 4, 16, 20

*J.J. Cassone Bakery, Inc. v. NLRB*, 554 F.3d 1041 (D.C. Cir. 2009) ..................... 10

*Laurel Bay Health & Rehabilitation Center v. NLRB*, 666 F.3d 1365 (D.C. Cir. 2012) ............................................................................................................. 14

*New Process Steel, L.P. v. NLRB*, 560 U.S. 674 (2010) ......................................... 14

*NLRB v. Domsey Trading Corp.*, 636 F.3d 33 (2d Cir. 2011) ................................ 14

*NLRB v. Northeastern Land Services, Ltd.*, 645 F.3d 475 (1st Cir. 2011) ............. 14

*NLRB v. St. George Warehouse, Inc.*, 645 F.3d 666 (3d Cir. 2011) ...................... 14

*NLRB v. Whitesell Corp.*, 638 F.3d 883 (8th Cir. 2011) ......................................... 14

*Ryder v. United States*, 515 U.S. 177 (1995) ................................................... 15, 17

*Wingo v. Wedding*, 418 U.S. 461 (1974) ......................................................... 15, 17

---

\* Authorities upon which we chiefly rely are marked with asterisks.

CONSTITUTIONAL PROVISIONS AND STATUTES

U.S. Const., art. II, § 2, cl. 2 ................................................................3

5 U.S.C. § 601(2) .................................................................................25

5 U.S.C. § 706(2) .................................................................................10

17 U.S.C. § 112(e) .................................................................................2

17 U.S.C. § 114 ......................................................................................2

17 U.S.C. § 114(f)(2)(B) .........................................................9, 20, 25, 26

17 U.S.C. § 803(b)(5) ........................................................................5, 10

17 U.S.C. § 803(d)(3) ...........................................................................10

OTHER AUTHORITIES

38 C.F.R. § 351.3(c) ...............................................................................5

37 C.F.R. § 380 ......................................................................................6

37 C.F.R. § 380.2 ...................................................................................1

37 C.F.R. § 380.3(b)(2) ..........................................................................7

37 C.F.R. § 380.22(b) ...........................................................................26

*Digital Performance Right in Sound Recordings and Ephemeral Recordings*,
   76 Fed. Reg. 13,026 (Mar. 9, 2011) ......................................................2

# GLOSSARY

The following abbreviations or terms are used in this brief:

| | |
|---|---|
| 2011 Webcasting III Determination | *Digital Performance Right in Sound Recordings and Ephemeral Recordings*, 76 Fed. Reg. 13,026 (Mar. 9, 2011) (JA 140) |
| CRB | Copyright Royalty Board |
| CRJ(s) | Copyright Royalty Judge(s) |
| Determination | *Determination of Royalty Rates For Digital Performance Rights in Sound Recordings and Ephemeral Recordings*, 79 Fed. Reg. 23,102 (Apr. 25, 2014) (codified at 37 C.F.R. § 380) (JA 256) |
| IBS | Appellant Intercollegiate Broadcasting System, Inc. |
| IBS's Comments | *IBS's Comments Regarding Judges' Notice of Intention To Conduct Paper Hearings*, Docket No. 2009-1 CRB Webcasting III, at 2 (Sept. 27, 2013) |
| Notice of Intent | *Notice of Intention to Conduct Paper Proceeding on Remand and Solicitation of Comments from the Parties*, Docket No. 2009-1, at 4 (Sept. 17, 2013) (JA 227) |

vii

## STATEMENT OF ISSUES

1. Whether, on remand from this Court's Appointments Clause ruling, the Copyright Royalty Judges were obligated to take new evidence rather than enter a new determination upon a *de novo* review of the existing record.

2. Whether the $500 minimum annual fee for noncommercial webcasters established by the Copyright Royalty Judges is unlawful.

## STATUTES AND REGULATIONS

All pertinent statutes and regulations are set forth in the addendum to the brief of Appellees Copyright Royalty Board and Librarian of Congress.

## STATEMENT OF THE CASE

This is an appeal from a final determination of the Copyright Royalty Judges ("CRJs") setting statutory rates and terms that commercial and noncommercial webcasters must pay copyright owners and performers for the performance of copyrighted sound recordings on noninteractive webcasting services. SoundExchange is the nonprofit entity designated by the CRJs to collect statutory royalties from webcasters and to distribute those royalties to copyright owners and performers. *See* 37 C.F.R. § 380.2. The CRJs issued their final determination on January 14, 2014. IBS is appealing the rates and fees set for certain classes of noncommercial webcasters.

### A.    The 2011 Webcasting Determination And Appeal

On March 9, 2011, the CRJs issued their determination in *Digital Performance Right in Sound Recordings and Ephemeral Recordings*, 76 Fed. Reg. 13,026 (Mar. 9, 2011) ("*2011 Webcasting III Determination*") (JA 140).  In that determination, the CRJs set the rates and terms applicable between 2011 and 2015 for the statutory licenses available under the Copyright Act for noninteractive webcasters who perform sound recordings.  *See 2011 Webcasting III Determination*, 76 Fed. Reg. at 13,047-49 (codified at 37 C.F.R. §§ 380.3, 380.4) (JA 161-163); 17 U.S.C. §§ 112(e), 114.  As part of its determination of the rates, and relevant for this appeal, the CRJs determined that each noncommercial webcaster would be required to pay a minimum fee of $500 annually for each calendar year that it was a licensee pursuant to 17 U.S.C. § 112(e) and § 114.  *2011 Webcasting III Determination*, 76 Fed. Reg. at 13,048; *IBS's Comments Regarding Judges' Notice of Intention To Conduct Paper Hearings*, Docket No. 2009-1 CRB Webcasting III, at 2 (Sept. 27, 2013) ("IBS's Comments").  As the CRJs explained, the $500 minimum fee would be credited against any additional royalties the noncommercial webcaster was required to pay during the ensuing calendar year. *Id.*

Appellant IBS appealed the *2011 Webcasting III Determination* to this Court, raising two arguments relevant to this appeal.  *First*, IBS's primary

argument was that the *2011 Webcasting III Determination* was void because the Copyright Royalty Board was acting in violation of the Appointments Clause, U.S. Const., art. II, § 2, cl. 2. *See Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*, 684 F.3d 1332, 1336 (D.C. Cir. 2012) ("*IBS*"), *cert. denied*, 133 S. Ct. 2735 (2013). *Second*, in a single paragraph, IBS asserted that the $500 minimum fee was excessively burdensome for small college broadcasters. *Id.* at 1335. *See* Brief of Appellant IBS, at 17-18, *Intercollegiate Broadcasting Systems, Inc. v. Copyright Royalty Bd.*, 684 F.3d 1332 (D.C. Cir. 2012) (No. 11-1083).

On July 6, 2012, this Court issued its decision, agreeing with IBS that the CRB was structured in violation of the Appointments Clause. Specifically, this Court determined that the CRJs exercised "significant authority" in setting rates that could have billions of dollars in consequences for regulated industries. 684 F.3d at 1137-38. Moreover, the Court found that the CRJs' rate determinations were "not reversible or correctable by any other officer or entity within the executive branch," *id.* at 1340, and that the grounds upon which the Librarian of Congress could remove a CRJ failed to provide sufficient control of the judges' decision, *id.* at 1339-40. As such, this Court found the CRJs were "principal officers – but obviously ones not appointed in the manner constitutionally required for such officers." *Id.* at 1341. To remedy the problem, this Court "invalidat[ed] and sever[ed] the restrictions on the Librarian's ability to remove the CRJs," *id.* at

1340, and vacated and remanded the *2011 Webcasting III Determination*, *id.* at 1342. In light of its decision regarding the Appointments Clause, the Court did not address IBS's challenge to the $500 minimum fee.

### B.    The Current Determination

On remand, the CRJs asked the parties to propose how the remand proceedings should be conducted. SoundExchange argued that the CRJs should conduct a paper proceeding, confined to the substantial record created during the Webcasting III trial. SoundExchange further urged that the CRJs should review the minimum fee issue *de novo* on the paper record, and reinstate the $500 minimum fee. *See SoundExchange's Response to IBS's Proposal for the Conduct of Remand*, Docket No. 2009-1 CRB Webcasting III, at 2 (Sept. 3, 2013). IBS, by contrast, argued for an entirely new trial, allowing the parties to submit additional written direct statements, conduct additional discovery, hold further hearings and rebuttal proceedings, and submit new proposed findings of fact and conclusions of law. *See IBS's Proposal for the Conduct of Remand and Support Memorandum of Law*, Docket No. 2009-1 CRB Webcasting III, at 1 (Aug. 26, 2013).

In a decision issued on September 17, 2013, the CRJs determined that this Court's decision to vacate the entire Webcasting III Determination meant that the CJRs were required to issue a determination on all issues raised in Webcasting III, not merely the $500 minimum fee that was the subject of IBS's D.C. Circuit

appeal. *Notice of Intention to Conduct Paper Proceeding on Remand and Solicitation of Comments from the Parties*, Docket No. 2009-1, at 4 (Sept. 17, 2013) ("Notice of Intent") (JA 221). Agreeing with SoundExchange, the CRJs further decided that they would conduct a paper proceeding and base their final determination on a review of the existing record. *Id*. at 9 (JA 226). In reaching this decision, the CRJs noted that existing D.C. Circuit precedent in analogous situations did not require a "complete repetition of the adjudicatory process . . . to remedy the constitutional violation that resulted in a remand of the [Webcasting III] proceeding." *Id.* at 7 (JA 224).

Moreover, the CRJs rejected IBS's claim that the Judges that had rendered the original Webcasting III Determination had excluded relevant evidence or that their decision had turned on witness credibility. To the contrary, the CRJs found "IBS fail[ed] . . . to point to *any instance* of an exclusion of relevant evidence that affected the outcome of the proceeding, or to *any* portion of the Final Determination that turned on witness credibility." *Id.* (emphasis added) (JA 224). The CJRs also observed that requiring a second evidentiary hearing would be inconsistent with the Copyright Act, which specifically permits the CRJs to conduct paper proceedings when making rate determinations. *Id.* (citing 17 U.S.C. § 803(b)(5); 38 C.F.R. § 351.3(c)) (JA 224).

Nevertheless, the CRJs indicated that to the extent any party disagreed with its determination and believed an evidentiary hearing was required, "that party should identify in its comments . . . *specific* examples where it believes the outcome of the original proceeding turned on elements, such as witness demeanor, that are not readily determined from a review of the written record." *Id.* at 9 (emphasis in original) (JA 226). Unable to provide any specific examples of credibility determinations that were determinative of the minimum fee issue, IBS instead claimed "the prior panel's factual findings were *all* unavoidably influenced by its assessment of witness credibility," and that it was "impossible to get into the heads of the prior judges to determine the subtle ways in which witness credibility consciously or unconsciously influenced their thinking." *See IBS's Comments Regarding Judges' Notice of Intention To Conduct Paper Hearings*, Docket No. 2009-1 CRB Webcasting III, at 2 (Sept. 27, 2013) ("IBS's Comments").

After conducting a "*de novo* review of the substantial record that the parties developed during the proceeding leading to the first [Webcasting III] determination," the CRJs issued a determination once again setting rates and terms applicable between 2011 and 2015 for noninteractive webcasters who perform sound recordings. *See Determination of Royalty Rates For Digital Performance Rights in Sound Recordings and Ephemeral Recordings*, 79 Fed. Reg. 23,102, 23,103, 23,128-129 (Apr. 25, 2014) (codified at 37 C.F.R. § 380)

6

("*Determination*") (JA 283-84).  In addition to setting royalty rates, the CRJs again set a $500 annual minimum fee for noncommercial webcasters.  *Id.* at 23,128 (codified at 37 C.F.R. § 380.3(b)(2)) (JA 283); *id.* at 23,123 (JA 278).

## SUMMARY OF ARGUMENT

The central premise of IBS's appeal is that the CRJs violated the Constitution when they engaged in *de novo* review of the Webcasting III record on remand from this Court.  According to IBS, the CRJs were constitutionally obligated to provide IBS with a new hearing in which IBS could provide new evidence.  That contention defies both law and logic, and the $500 minimum fee determination adopted in the *Determination* should be affirmed.

**I.A.**   This Court has consistently recognized that a new plenary hearing is not required in order to cure a prior Appointments Clause violation.  To the contrary, this Court has held that a properly constituted panel need not "repeat the entire administrative process" so long as it renders an independent judgment.  *Fed. Election Comm'n v. Legi-Tech, Inc.*, 75 F.3d 704, 708 (D.C. Cir. 1996).  Tellingly, the purported contrary authority that IBS invokes is limited to cases in which a party has argued that review by an *appellate* tribunal cured some flaw in the original tribunal's composition.  Here, the *de novo* review was performed by the *original* tribunal itself.  The Constitution requires nothing more.

**I.B.**   This case also illustrates perfectly why a plenary hearing would be wasteful.  The CRJs *expressly asked IBS* to point to new material that would justify a new live hearing, and IBS was unable to do so.   The CRJs found in the *Determination* that the minimal material IBS did invoke was irrelevant.   IBS is also wrong to contend that the CRJs were somehow inescapably dependent upon the credibility determinations of the prior panel.  The CRJs expressly explained that their decision did not rest upon any determination of credibility.  Moreover, it was entirely appropriate for the CRJs to require IBS to present a good reason for holding a new hearing.  The expense of such a hearing – let alone the expense that SoundExchange would incur in unwinding the minimum fee payments collected over the last five years in the event those fees were modified – would be highly substantial.   IBS presented nothing to warrant taking the burdensome step of holding a new live hearing.

**II.A.**  On the merits, the CRJs' decision to reinstate the $500 minimum fee should be affirmed.   The record contains substantial evidence supplied by SoundExchange supporting the reasonableness of a $500 minimum fee.  Among other things, SoundExchange negotiated an agreement with another group of college broadcasters that set the same $500 minimum per channel fee for noncommercial education webcasters.  As the *Determination* recognized, that is clearly "persuasive evidence" that the $500 minimum fee is what a willing buyer

and willing seller would agree to.  Likewise, SoundExchange presented testimony that SoundExchange's annual administrative cost averaged $825 per station, demonstrating that a fee lower than $500 was not a plausible outcome of a willing buyer/willing seller negotiation.  IBS "offered no persuasive evidence" disputing this testimony.  *Determination* at 23,124 (citing Kessler Testimony at 25) (JA 279).

**II.B.**  Finally, IBS's claim that the CRJs applied the incorrect legal standards when evaluating the $500 minimum fee are also without merit.  IBS is simply wrong that Congress requires that the CRJs distinguish among webcasters based on their size and financial means.  To the contrary, in 17 U.S.C. § 114(f)(2)(B), Congress required the CRJs to distinguish among webcasters based on the "quantity and nature of the use of sound recordings," precisely the standard the CRJs noted.  Moreover, the CRJs properly applied this standard, and concluded that while the $500 fee was firmly grounded in the evidence, nothing in the record established that small and very small noncommercial webcasters used sound recordings in a manner that was materially different than other noncommercial webcasters.  IBS's claims as regards the standard of review are likewise contradicted by the record.  Far from conducting harmless error review, the CRJs conducted a *de novo* review of the substantial record and considered the very evidence IBS now claims was excluded.

9

## STANDARD OF REVIEW

This Court reviews *de novo* constitutional challenges to agency action. *J.J. Cassone Bakery, Inc. v. NLRB*, 554 F.3d 1041, 1044 (D.C. Cir. 2009). Determinations of the Copyright Royalty Judges are reviewed under the "familiar standard of the Administrative Procedures Act ('APA')." *Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*, 574 F.3d 748, 755 (D.C. Cir. 2009) (citing 17 U.S.C. § 803(d)(3)). Determinations of the CRJs are therefore upheld "unless they are arbitrary, capricious, contrary to law, or not supported by substantial evidence." *Id.* (citing 5 U.S.C. § 706(2)).

## ARGUMENT

## I.    THE CONSTITUTION DOES NOT REQUIRE A NEW LIVE HEARING ON REMAND, AND SUCH A HEARING WOULD BE WASTEFUL AND DISRUPTIVE.

IBS does not and cannot dispute that the Copyright Act expressly authorizes the CRJs to make their determination on the basis of a paper record without the presentation of live evidence. *See* 17 U.S.C. § 803(b)(5). At bottom then, IBS's argument is that the Constitution nevertheless *requires* a new live plenary hearing rather than *de novo* review on the existing record where the CRJs' original decision has been vacated under the Appointments Clause.

That argument is flatly foreclosed by this Court's precedents recognizing that a properly constituted panel need not "repeat the entire administrative process" so long as it renders an independent judgment. *Legi-Tech, Inc.*, 75 F.3d at 708.

10

Indeed, this Court has affirmed subsequent determinations that were far less searching than the CRJs' determination on remand in this case. Moreover, such a hearing would be wasteful and disruptive, especially given that IBS has literally been unable to point to a single piece of material new evidence that it would present at any such hearing.

### A.     Courts Have Long Held That A Validly Constituted Tribunal May Affirm Or Reissue A Decision Issued By A Prior Unconstitutionally Structured Entity.

This Court has repeatedly held that there is no constitutional entitlement to a complete do-over of the administrative process where the original panel was improperly constituted. Instead, it is enough that a properly constituted panel exercise its independent judgment against an existing record.

For example, in *Federal Election Commission v. Legi-Tech, Inc.*, 75 F.3d 704 (D.C. Cir. 1996), the Commission had voted to begin an enforcement proceeding against Legi-Tech in federal court at a time when two of the Commission's members were improperly seated. After the improper seating came to light, the Commission reconstituted itself without the offending members. The Commission's General Counsel then submitted recommendations on all pending proceedings to the Commission and, after three days of deliberation, the Commission voted to continue the enforcement proceeding. *Id.* at 706. On appeal to this Court, Legi-tech argued that the proceeding was tainted because the

Commission did not "redo the statutorily required procedures in their entirety – *i.e.*, decide whether to initiate an investigation, investigate, decide whether to find probable cause that a violation occurred, attempt conciliation, and institute suit." *Id.* at 707. This Court disagreed. It rejected Legi-Tech's claim that the FEC had merely "rubberstamped" its prior decision and it instead held that "much the better course is to take the FEC's post-reconstitution ratification of its prior decisions at face value and treat it as an adequate remedy for [improper seating]." *Id.* at 709.

Similarly instructive is *Doolin Security Savings Bank, F.S.B. v. Office of Thrift Supervision*, 139 F.3d 203 (D.C. Cir. 1998). In *Doolin*, this Court recognized that a previous director of the OTS was improperly appointed. The Court addressed the petitioner's claim that because the previous director had no authority to issue a "Notice of Charges" against the petitioner, a subsequent cease and desist order issued by the *new* director, after the new director "reviewed the ALJ's proposal and the parties' exceptions, and issued a final written opinion," was invalid. *See id.* at 204, 212-13. This Court rejected the claim: the new director's "reasoned conclusion that the Bank violated the law as the Notice of Charges had alleged was necessarily an affirmation of the validity of the charges, and hence a 'ratification,' even though he did not formally invoke the term." *Id.* at 213 (citing *Andrade v. Regnery*, 824 F.2d 1253, 1257 (D.C. Cir. 1987)) (footnote omitted). "To require another Director sign a new notice containing charges

12

already found to be supported, not merely by probable cause, but by substantial evidence would do nothing but give the Bank the benefit of delay." *Id.* at 214.

IBS's attempts to distinguish both of these cases fail. As regards *Legi-Tech*, IBS claims that because the underlying case concerned "an agency's unilateral decision whether to take enforcement action – an area of traditionally broad discretion," it presents a different issue from CRJs' "exercise of judicial authority in an adversarial proceeding to determine a party's rights." IBS Br. 25-26. But the specific nature of the agency's actions – whether they fall within an area of broad discretion or not – has no logical connection to whether a properly constituted administrative tribunal may reaffirm the actions taken by its predecessor.[1]

IBS's attempt to distinguish *Doolin* is similarly unpersuasive. While IBS is correct that *Doolin* did not deal with proceedings on remand, the precise procedural posture of the case is beside the point. *Doolin* held that *regardless* of whether a notice of charges had been issued by a validly authorized officer, a properly appointed officer *could* ratify the charges and act upon them. That situation is on all fours with the instant case.

---

[1] It is likewise unclear what significance IBS draws from *Legi-Tech's* citation to *Buckley v. Valeo*, 424 U.S. 1 (1976), *superseded by McConnell v. Federal Election Commission*, 540 U.S. 93 (2003). *See* IBS Br. 27. Regardless of whether the Supreme Court has accorded *de facto* validity to the decisions of some unconstitutionally structured entities, here the *Determination* was issued by *validly* appointed judges, and thus the status of predecessor judges is irrelevant.

13

Finally, another line of cases coming out of the National Labor Relations Bureau (NLRB) provides further confirmation that IBS's argument is incorrect. In *New Process Steel, L.P. v. NLRB*, 560 U.S. 674 (2010), the Supreme Court held that the NLRB needed a quorum of at least three members to issue decisions. After the President appointed new members to the NLRB, the NLRB reinstated multiple decisions that had been vacated without undertaking plenary new hearings. In reviewing those reinstated decisions, no court has suggested that the NLRB was somehow prohibited from reinstating those prior decisions unless it had first engaged in an entirely new set of hearings. *See Laurel Bay Health & Rehabilitation Ctr. v. NLRB*, 666 F.3d 1365, 1373 (D.C. Cir. 2012); *see also Atrium of Princeton, LLC v. NLRB*, 684 F.3d 1310, 1314 n.* (D.C. Cir. 2012); *NLRB v. St. George Warehouse, Inc.*, 645 F.3d 666, 671 (3d Cir. 2011); *NLRB v. Ne. Land Servs, Ltd.*, 645 F.3d 475, 477-78 (1st Cir. 2011); *NLRB v. Whitesell Corp.*, 638 F.3d 883, 888 (8th Cir. 2011); *NLRB v. Domsey Trading Corp.*, 636 F.3d 33, 34 n.1 (2d Cir. 2011). Were IBS correct, all of these decisions would have required the NLRB to redo their determinations from outset, and not simply reaffirm them. Instead, all of these decisions sensibly allowed the NLRB to reinstate its prior decisions.

**B.     IBS's Purported Contrary Authority Is Inapposite.**

In the face of this precedent, IBS claims that two Supreme Court cases –
*Ryder v. United States*, 515 U.S. 177 (1995) and *Wingo v. Wedding*, 418 U.S. 461
(1974) – required that the CRJs take new evidence.  *See* IBS Br. 20-24.  Those
cases are irrelevant because they are solely concerned with whether *appellate*
review can ratify a decision by an improperly constituted tribunal.  Those cases say
nothing about the issue presented in his case: namely, the procedures an
administrative tribunal must take *on remand* after vacatur by an appellate court.

In *Ryder*, a member of the Coast Guard was convicted in military court and
appealed to the Coast Guard Court of Military Review, which affirmed his
conviction.  515 U.S. at 179.  That three-judge court included two judges who were
civilians appointed in violation of the Appointments Clause.  *Id.*  The Court of
Military Appeals nonetheless found that the actions of those judges were valid
under the *de facto* officer doctrine.  *Id.* at 180.  The Supreme Court disagreed and
rejected the government's claim that the Court of Military Appeals had "applied
something akin to a harmless-error doctrine in affirming petitioner's conviction . . .
[by] refusing to redress the violation because petitioner suffered no adverse
consequences from the composition of the court."  *Id.* at 186.  Rather, the Court
"[e]xamin[ed] the difference in function and authority between the Coast Guard
Court of Military Review and the Court of Military Appeals," and determined that

15

"the former had broader discretion to review claims of error, revise factual determinations, and revise sentences than did the latter." *Id.* at 187. As such, the Court found "[i]t simply cannot be said . . . that review by the properly constituted Court of Military Appeals gave petitioner all the possibility for relief that review by a properly constituted Coast Guard Court of Military Review would have given him." *Id.* at 187-88.

IBS claims that the review conducted by the CRJs "is functionally similar" to the review conducted by the Court of Military Appeals in *Ryder*, which the Supreme Court found inadequate to cure the Appointments Clause violation. IBS Br. 22. But, the two cases are entirely distinct. In *Ryder* the question was whether an Appointment Clause violation could be rendered harmless when a higher court, with less discretion, reviewed the decision rendered by the unconstitutionally structured tribunal. Here, by contrast, this Court *vacated* the Webcasting III Determination in light of the Appointments Clause violation, *see IBS*, 684 F.3d at 1342, and a new set of CRJs, with *exactly the same* scope of authority as the prior tribunal, reviewed the record *de novo* and issued a new determination. The only thing *Ryder* says about the question the instant case actually presents – namely the procedures that should be followed on remand – is that the petitioner was "entitled to a hearing before a properly appointed panel of [the Coast Guard Court of

16

Military Review].'' 515 U.S. at 188. That is the exact remedy IBS received on remand here.

Similarly inapposite is *Wingo*, where the Supreme Court determined that the Federal Magistrates Act had not changed the requirement in 28 U.S.C. § 2243 that a federal district judge personally conduct habeas corpus evidentiary hearings. 418 U.S. at 469-70. Accordingly, the Court determined that a federal district judge, alone, was required to conduct habeas evidentiary proceedings, and that it was insufficient for a district judge to review a magistrate's determination. *See id.* at 472-73. But this case does not present a "review" of the prior CRJ determination—it resulted in a new, *de novo* interpretation by a properly constituted Copyright Royalty Board. *Wingo* thus provides no support for IBS's claims.

### C.     A Mandatory Live Hearing Would Be Wasteful and Disruptive.

The above authority decides this case: IBS has no constitutional right to a plenary hearing as opposed to *de novo* review on the existing record. This case shows the wisdom of that rule because, contrary to IBS's contentions, any such hearing would be wasteful and disruptive.

*First*, despite having been given every opportunity to do so, IBS has failed to point to any new relevant evidence it would introduce at a live hearing. IBS does contend that it would present evidence that the CRJs excluded as unreliable in the

17

first proceeding: testimony about a survey purporting to show that IBS members had an average annual operating budget of $9,000.  IBS Br. at 37 (quoting *Determination* at 21,123).  However, the CRJs expressly rejected the relevance of that evidence on remand.  The CRJs noted that the evidence had been excluded because the survey itself was not offered into evidence, and the CRJs therefore could not assess its validity.  *Determination* at 23,123 (JA 278).  As the CRJs further explained, however, even if it were admitted, that evidence "would not advance IBS's case" that a $500 minimum fee was not appropriate for all noncommercial stations because, "[o]n its face, an assertion that the average operating budget for IBS members is $9,000 does not establish that its members lack the wherewithal to pay a $500 minimum royalty."  *Id.* (JA 278).

*Second*, and relatedly, IBS is wrong when it contends that the CRJs were incapable of engaging in true *de novo* review on remand, and that they were necessarily reliant on the prior panel's conclusions regarding witness credibility and demeanor.  *E.g.,* IBS Br. at 17 ("The [CRJ]s overtly relied on the earlier Board's witness examinations, and characterized their role in the process as merely 'pick[ing] up the process where th[e] earlier [CRJ]s left off.'")  But in their decision to conduct a paper proceeding on remand, the CRJs concluded that IBS "fail[ed] . . . to point to any instance of an exclusion of relevant evidence that affected the outcome of the proceeding, or to any portion of the Final

18

Determination that turned on witness credibility." Notice of Intent at 7 (JA 224); *see also* IBS Br. at 28. IBS argued below that the original CRJs had excluded testimony about a survey allegedly showing that IBS-member webcasters had average annual budgets of $9,000 because they did not find the witness credible. *See IBS's Comments*, at 2-3. But as just explained, *supra*, on remand the CRJs did consider this evidence – and substantively rejected it. Moreover, it is simply not credible to claim that the CRJs simply rubberstamped the reasoning of the prior decision when they issued a new Determination that was 143 pages long and provided new reasoning in support of the rates and terms. The review here was categorically *de novo*, not deferential.

*Third*, SoundExchange wishes to emphasize the significant disruption that would result if CRJs were required to hold plenary hearings to revisit and revise increasingly historical rates and terms. Evidence from the original in-person hearing established that it already cost SoundExchange on average $825 annually per station or channel to administer a license – significantly more than the current $500 annual minimum fee for noncommercial stations. *Determination* at 23,124 (citing Kessler Testimony at 25) (JA 279). SoundExchange should not be subjected to the cost and expense of a new live hearing, let alone the cost and expense of unwinding years of fee collection, without a compelling reason for doing so. Indeed, when this Court vacated the original Webcasting III

19

determination, it described itself as attempting "cure[] the constitutional defect with as little disruption as possible." *IBS*, 684 F.3d at 1336-37. IBS has shown no basis whatsoever to justify the disruption that a new live hearing would create.

## II.   THE CRJs' DETERMINATION OF THE $500 MINIMUM FEE IS REASONABLE.

IBS's appeal should be denied because the CRJs properly executed their responsibility under the Copyright Act and set a reasonable minimum annual fee. The Copyright Act requires the CRJs to set "reasonable" fees that "most clearly represent the rates and terms that would have been negotiated in the marketplace between a willing buyer and a willing seller." 17 U.S.C. § 114(f)(2)(B). As the Determination makes clear, the $500 minimum fee the CRB set for noncommercial stations is both entirely reasonable and supported by substantial evidence.[2]

---

[2] Although IBS seeks to have the determination set aside as a whole, IBS Br. at 2, its arguments apply only to the portion of the determination addressing "small" and "very small" non-commercial webcasters. Its appeal does not, and should not, affect the portion of the determination addressing the statutory rates and terms for "non-commercial educational webcasters," which the CRJs established as regulations as a result of adopting the settlement between SoundExchange and College Broadcasters, Inc. pursuant to 17 U.S.C. § 801(b)(7)(A). "Adoption of [those rates and terms for that class of non-commercial educational webcaster] does not preclude (and has not precluded) consideration of [alternative rates and terms for these other classes of webcasters]." *Determination* at 23,102, 23,121 (JA 257, 276).

### A.     Substantial Evidence Supports the $500 Minimum Fee.

SoundExchange has presented substantial evidence supporting the reasonableness of a $500 minimum fee. *First*, SoundExchange has presented perhaps the best possible evidence that a willing buyer and a willing seller would agree to the $500 minimum fee: an actual agreement with a willing buyer. As the *Determination* notes, SoundExchange and College Broadcasters, Inc. negotiated an agreement that set the same $500 minimum per channel fee for noncommercial education webcasters. *Determination* at 23,135 (JA 280). That SoundExchange and CBI were, in fact, able to negotiate a $500 minimum fee is "persuasive evidence" that a willing buyer and willing seller would negotiate this price in the open market. *Determination* at 23,123-24 (JA 278-279). Indeed, 24 noncommercial webcasters filed statements supporting the SoundExchange-CBI agreement, further substantiating the CRJs' conclusion. *Id.*

*Second*, IBS has contended that its members would not be willing to pay a $500 minimum fee because they cannot afford to do so. Yet substantial evidence belies this assertion. More than 300 noncommercial webcasters have already paid the $500 minimum fee as a result of the *Webcasting II* proceeding, demonstrating that they are willing and able to do so. *Determination* at 23,123-24 (JA 278-279). The CRJs correctly concluded that this fact was "strong evidence that

21

noncommercial webcasters are able and willing to pay the proposed fee." *Determination* at 25,123 (JA 278).

*Finally*, testimony from SoundExchange's Chief Operating Officer Barrie Kessler demonstrates that SoundExchange would be unlikely to negotiate a minimum fee lower than $500 per station in the open market. Kessler testified that SoundExchange's annual administrative cost averaged $825 per station and IBS "offered no persuasive evidence" disputing this testimony. *Determination* at 23,124 (citing Kessler Testimony at 25) (JA 279). In setting the minimum fee, the CRJs properly reasoned that it was "reasonable and appropriate" for SoundExchange's fee to cover at least its administrative costs. *Determination* at 23,124 (citing *Web II (Determination on Remand)*, 75 Fed. Reg. at 56,873-74) (JA 279). Moreover, SoundExchange's administrative costs support the conclusion that it would not be willing to offer a minimum fee substantially lower than $500 because it would consistently lose money on the exchange.

In contrast to the substantial evidence supporting the reasonableness of the $500 minimum fee, IBS cannot point to any record evidence supporting its proposed distinctions for "small" and "very small" stations. Contrary to IBS's assertions, it presented *no evidence* that the webcasters it has defined as "small" or "very small" could not pay a $500 minimum royalty. *Determination* at 23,123 (JA 278). First, as the CRJs noted, IBS did not offer *any* testimony from any

22

webcasters that it established qualified as "small" or "very small." *Id.* (JA 278).[3]
Moreover, IBS has defined "small" and "very small" webcasters as webcasters
using less than 10% and 4% respectively of the quantity of sound recordings
permitted to noncommercial webcasters under *Web II* and SoundExchange's rate
proposal. *Id.* (citing 4/22/10 Tr. at 787, 791; IBS PFF ¶ 10; IBS PCL ¶ 1) (JA
278).   As the CRJs pointed out, however, these cutoffs appear to be entirely
arbitrary, and IBS has presented no evidence establishing that webcasting these
specific quantities of sound recordings indicates anything at all about a webcaster's
ability to pay the $500 minimum fee. *See Id.* (JA 278).  Indeed, IBS failed to
establish that *any* of its members even fit its proposed definitions of "small" and
"very small" stations.

IBS has pointed to only a single piece of actual evidence that it claims
establishes that the $500 minimum fee is unreasonable: testimony regarding a
survey IBS claims demonstrates that its members have an average operating budget

---

[3] In fact, IBS offered the testimony of only two witnesses engaged in webcasting,
but failed to offer any record evidence establishing the webcaster qualified as
either "small" or "very small." *Determination* at 23,123 (JA 278).  However, as
the CRJs noted, the little evidence in the record regarding the webcaster with
which both witnesses were affiliated suggests that it does not qualify as "small" or
"very small": WHUS's annual revenues totaled more than $500,000 and its annual
profits were more than $87,000. *Id.* at n.61 (JA 278).  In contrast, if WHUS *does*
qualify as a "small" or "very small" station, then its revenues and profits
demonstrate that IBS's argument that "small" and "very small" stations cannot
afford the $500 minimum fee is clearly false.

of $9,000.  The CRJs correctly concluded that this evidence does not establish that "small" or "very small" stations would be unwilling or unable to pay a $500 minimum fee.  As the CRJs concluded, "an assertion that the average operating budget for IBS members is $9,000 does not establish that its members lack the wherewithal to pay a $500 minimum royalty."  *Id.* (JA 278).[4]

Finally, even if IBS had presented record evidence that "small" or "very small" webcasters were not able to pay a $500 minimum that evidence would not establish that a willing seller would be prepared to negotiate a lower rate with those webcasters.  As established, it costs SoundExchange an average of $825 per station to administer a webcasting license.  This evidence suggests that SoundExchange would be unwilling to negotiate the $20 and $50 minimum annual fees for "very small" and "small" webcasters that IBS proposed because it would be losing hundreds of dollars per station on administrative costs alone.  *See Determination* at 23,123 (JA 278).  IBS can point to no evidence to the contrary.[5]

---

[4] Although on remand the CRJs considered the substance of this testimony, they also noted that the evidence had been excluded as inadmissible at the initial hearing:  The relevant "Written Rebuttal Testimony was not submitted in accordance with the [CRJ]s' rules (it was not verified in accordance with 37 CFR 350.4(d)) and Capt. Kass was unfamiliar with its contents. 7/29/10 Tr. at 292- 96 (Kass)."  *Determination* at 23,122 n.60 (JA 277).

[5] The CRJs also took note of, but properly rejected, two additional legal arguments that IBS first made in its proposed findings of fact.  IBS does not appear to reiterate these arguments in its briefing on appeal, but, in any event, these

### B.    IBS's Arguments Mischaracterize the CRJs' Determination and the Evidence.

Unable to point to any record evidence suggesting the $500 minimum fee is unreasonable, IBS asserts that the CRJs misapplied the pertinent legal standards. These arguments, however, mischaracterize both the CRJs' determination and the evidence in the record, and should be rejected.

Throughout its brief, IBS asserts – without basis – that the CRJs ignored Congress's mandate to distinguish among different types of webcasters because it applied the same $500 minimum fee to "to every webcaster regardless of size or financial means." IBS Br. at 17; *see also* IBS Br. at 19, 33-35. These assertions mischaracterize the CRJs' determination. As a preliminary matter, Congress does

---

arguments should clearly be rejected. *First*, IBS asserted that, in § 114(f)(2), Congress intended that the minimum rate be tailored to the type of service in accord with the general public policy favoring small businesses. The CRJs correctly concluded that the statute expressly tasks the CRJs with determining rates that "most clearly represent the rates and terms that would have been negotiated in the marketplace between a willing buyer and a willing seller." 17 U.S.C. § 114(f)(2)(B). In contrast, there was is "no support in the text or legislative history of the Act for the proposition that rates adopted under section 114(f)(2) must be tailored to benefit small businesses." *Determination* at 23,123 n.62 (JA 278). *Second*, IBS asserted that, under the Regulatory Flexibility Act, 5 U.S.C. § 601(6), the CRJs were required to determine whether the $500 fee unnecessarily burdens IBS's members. *Id.* at n.62 (citing IBS PFF (Reformatted ¶¶ 10-13)) (JA 278). Yet, the RFA applies only to "rules," and its definition of "rules" expressly excludes "a rule of particular applicability relating to rates," such as the ratemaking proceeding at issue in this appeal. 5 U.S.C. § 601(2). Further, the RFA applies only to "rules" for which the agency "publishes a general notice of proposed rulemaking pursuant to" the APA. 5 U.S.C. § 601(2). A ratemaking determination is not subject to the notice and comment rulemaking process under the APA.

*not* require that the CJRs distinguish among webcasters based on either size or financial means. Rather the Copyright Act requires that the CRJs distinguish among webcasters based on "the quantity and nature of the use of sound recordings," a standard the CRJs expressly noted. *See Determination* at 23,122 (citing 17 U.S.C. § 114(f)(2)(B)) (JA 277).

Moreover, the CRJs *did* distinguish between commercial webcasters, who must pay a per-performance fee, and noncommercial webcasters who are subject only to a minimum annual fee of $500 when their quantity of sound recording transmissions remains at or below a specified threshold.[6] *Determination* at 23,122-23 (JA 277-78). Further, the CRJs expressly considered whether they should draw further distinctions for "small" and "very small" broadcasters based on their use of sound recordings. *Determination* at 23,123 (JA 278). The CRJs concluded, however, that there was "no evidence in the record establishing that the use of sound recordings by 'small' and 'very small' noncommercial webcasters differs qualitatively from that of other noncommercial broadcasters," – a point IBS ultimately conceded. *Determination* at 23,123 (citing 9/30/10 Tr. at 647-51 (IBS Closing Argument)) (JA 278). And even if Congress had required the CRJs to

---

[6] The minimum fee paid by a noncommercial webcaster covers up to 159,140 "Aggregate Tuning Hours," or total hours of audio programming of "eligible nonsubscription transmission[s] or [noninteractive digital audio transmissions as part of a] new subscription service" per month. *See Determination* at 23,102 & n.2 (JA 257); 37 C.F.R. § 380.22(b).

distinguish among webcasters based on size or financial means, IBS failed to present any evidence linking its definitions of "small" or "very small" webcasters to the webcasters' ability to pay the $500 minimum fee.

IBS's argument regarding the burden of proof similarly mischaracterizes the CRJs' decision. IBS contends that the CRJs failed to ground its decision to set a $500 minimum fee in substantial evidence, and instead cited the "mere absence of contrary evidence" to justify their determination. IBS Br. at 17-18; *see also* IBS Br. at 37-39. But as discussed above the CRJs firmly grounded their decision in the substantial evidence that supported the $500 minimum fee. *See Determination* at 23,123-24 (JA 278-79). Although the CRJs did indeed find that IBS had failed to either establish the reasonableness of its own rate proposal or substantively dispute the reasonableness of the $500 minimum fee, *Determination* at 23,123 (JA 278), they did so in addition to explaining the substantial affirmative evidence supporting their conclusion.

Finally, IBS's argument that the CRJs applied an incorrect standard of review should be rejected in its entirety. IBS contends that the CRJs improperly applied a harmless error analysis because, in their Notice of Intent to Conduct Paper Proceeding on Remand, the CRJs noted that "IBS fails . . . to point to any instance of an exclusion of relevant evidence that affected the outcome of the proceeding." IBS Br. at 28-29 (quoting Notice of Intent at 7). IBS's argument

27

fails as a matter of fact. The CRJs expressly stated that they "concluded that this matter shall be determined based upon a *de novo* review of the substantial record." *Determination* at 23,102 (JA 257). Further, the CRJs *did* consider the only evidence IBS has contended was erroneously excluded: testimony regarding a survey that purports to establish the average operating budget of IBS members is $9,000. The CRJs thus conducted the de novo review of the record to which IBS claims it is entitled.

## CONCLUSION

For the foregoing reasons, SoundExchange respectfully asks that the Copyright Royalty Judge's *Determination* be affirmed.

Respectfully submitted,

/s/  Matthew S. Hellman

C. COLIN RUSHING
GENERAL COUNSEL
SOUNDEXCHANGE, INC.
733 10th Street, NW
10th Floor
Washington, DC 20001
(202) 640-5858

MATTHEW S. HELLMAN
MICHAEL B. DESANCTIS
ZOILA E. HINSON
ISHAN K. BHABHA
JENNER & BLOCK LLP
1099 New York Avenue, NW
Suite 900
Washington, DC 20001
(202) 639-6000

28

# CERTIFICATE OF COUNSEL PURSUANT TO CIRCUIT RULE 28(D)

Pursuant to D.C. Circuit Rule 28(d), the undersigned certifies that counsel for SoundExchange has conferred with counsel for the other intervenor, College Broadcasters, Inc. (CBI), and the parties have determined that submission of a single brief is not practicable in this case.

Although both parties favor affirmance and negotiated a settlement in this case, SoundExchange, as the collective designated as the administrator of statutory licenses and as the representative of the interests of copyright owners and performers, and CBI, as a representative of the interests of webcasters who perform copyrighted sound recordings, represent adverse interest groups and in their briefs have addressed issues particular to their interests. The parties have agreed that separate intervenor briefs are required in this case in light of the different interests represented and arguments presented.

/s/  Matthew S. Hellman

Matthew S. Hellman
*Attorney for Intervenor*
*SoundExchange, Inc.*

## CERTIFICATE OF COMPLIANCE

I, Matthew S. Hellman, in reliance on the word count of the word processing system used to prepare this brief, certify that the foregoing brief complies with the type-volume limitation set forth in this Court's Order of November 12, 2013. The brief contains 6,629 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Local Rule 32(a)(1).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5), and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6). The brief has been prepared in a proportionately spaced typeface using Microsoft Word in Times New Roman 14-point font.

Dated: December 2, 2014                           /s/Matthew S. Hellman

                                                  Matthew S. Hellman
                                                  *Attorney for Intervenor*
                                                  *SoundExchange, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on December 2, 2014, using the Appellate CM/ECF system, I electronically caused to be filed with the Clerk of Court for the U.S. Court of Appeals for the District of Columbia Circuit the foregoing Brief. Participants in the case are registered CM/ECF users and the service will be accomplished by the Appellate CM/ECF system.

/s/ Matthew S. Hellman

Matthew S. Hellman